## IN THE UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF ILLINOIS

**RECEIVED**

OCT 3 0 2007 *aew*
OCT 30 2007
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

United States of America ex rel.                    )

_HENRY KACZMAREK N-95790_                    )
(Full name and prison number)                    )
(Include name under which convicted)                    )
                    )
                    )
PETITIONER                    )

                    )    **07CV6126**
                    )    **JUDGE ANDERSEN**
                    )    **MAG. JUDGE DENLOW**
vs.                    )

_DONALD HULICK, WARDEN_                    )
(Warden, Superintendent, or authorized                    )
person having custody of petitioner)                    )
                    )
                    )
RESPONDENT, and                    )
                    )
                    )
(Fill in the following blank **only** if judgment                    )
attacked imposes a sentence to commence in the                    )
future)                    )
                    )
ATTORNEY GENERAL OF THE STATE OF                    )    Case Number of State Court Conviction:
                    )
_____                    )    _87- C R - 6131_
                    )
(State where judgment entered)                    )

## PETITION FOR WRIT OF HABEAS CORPUS – PERSON IN STATE CUSTODY

1.  Name and location of court where conviction entered: _Circuit Court, Cook County, Ill._
_Criminal Division-2600 S. Calif. Ave. Cook County, Il, 60608_

2.  Date of judgment of conviction: _MAY 07, 1996_

3.  Offense(s) of which petitioner was convicted (list all counts with indictment numbers, if known)

_87-CR-6131 FIRST DEGREE MURDER_

4.  Sentence(s) imposed: _NATURAL LIFE IMPRISONMENT_

5.  What was your plea?  (Check one)         (A) Not guilty       (X)
                                            (B) Guilty           ( )
                                            (C) Nolo contendere  ( )

If you pleaded guilty to one count or indictment and not guilty to another count or indictment, give details:

_N/A_

## PART I – TRIAL AND DIRECT REVIEW

1. Kind of trial: (Check one):   Jury (XX)   Judge only ( )

2. Did you testify at trial?   YES (XX)   NO ( )

3. Did you appeal from the conviction or the sentence imposed? YES (XX)   NO ( )

   (A) If you appealed, give the

   (1) Name of court: Appellate Court of Illinois, First Judicial District

   (2) Result:   Conviction affirmed, Sentence Reversed & Remanded

   (3) Date of ruling: December 27, 2000

   (4) Issues raised: (1) The State Presented The Testimony of Two Former
   Police Officers as Experts in Luminol Testing and Blood Splatter,
   Defendant Sought to Rebut the State's Witnesses with the Testimony
   CONTINUED ON ADDITIONAL PAGES

   (B) If you did not appeal, explain briefly why not:

   N/A

4. Did you appeal, or seek leave to appeal, to the highest state court? YES (XX)   NO ( )

   (A) If yes, give the

   (1) Result: Appellate Court, Sentence Reversed; Trial Court Affm'd

   (2) Date of ruling: October 2, 2003

   (3) Issues raised: The Natural Life Sentence Imposed on Henry Kaczmarek
   for Murder Based on the Murder Being Brutal and Heinous Must be Re-
   duced to the Maximum Term of Forty Years Where the Sentence is Uncon-
   stitutional Pursuant to Apprendi v New Jersey, in Which the U.S.
   Supreme Court Held That Facts That Increase the Prescribed Range of
   Penalties Must Be Charged in the Indictment Submitted to the Jury, and
   (B) If no, why not: Proved Beyond a Reasonable Doubt.

5. Did you petition the United States Supreme Court for a writ of *certiorari*? Yes (XX)   No ( )

   If yes, give (A) date of petition: 11/23/03   (B) date *certiorari* was denied: 2/23/04

Revised: 7/20/05

PART I - TRIAL AND DIRECT REVIEW:

3. (A) (4)   Issues raised:

of Dr. Siegesmund Who Himself Gave Training Seminars to
Police Officers in Blood Splatter and Had Done Luminol
Testing. Where the State's Case Turned on the Location and
Quantity of Blood Found on Defendant's Clothes, the Judge
Erred in Prohibiting Dr. Siegesmund from Testifying for the
Defense.

(2)   The Court Erred in Allowing Mitch Rea to Testify as an
Expert for the State in Luminol Testing Where Rea, Had Never
Taken a College Level Chemistry Course, Did Not Know How to
Perform a Confirmatory Test to Determine Whether the Sub-
stance That Luminesced Was in Fact Blood, and Did Not Make
the Chemical Luminol Mixture Himself but Obtained Pre-Pack-
aged Chemicals from a Private Chemist.

(3)   Where the Crux of Defendant's Case Was That Any "Blood
Splatter" Was a Result of Defendant Having Been in Fist
Fights Rather than by Any Alleged Attack on Decedent, the
Judge Erred in Not Allowing Defendant to Present Evidence
That Defendant's Girlfriend Had Been with Defendant on
Several Occasions Where Defendant had Been Wearing His
Quilted Coat While Fighting and the Other Person Had Bled.

(4)   Defendant's Constitutional Right to a Speedy Trial Was
Denied Where Over Three and One Half Years Elapsed Between
Reversal of Defendant's Murder Conviction and His Second
Trial and Where He Was Not Responsible for a Bulk of the
Delay.

4.  (A)  (3)  Issues raised:

Either The Legislature or the Express Findings of the Trier of
Fact.

(II)

Defendant's Constitutional Right to a Speedy Trial Was Denied
Where Three and One Half Years Elasped Between The Reversal of
Defendant's Murder Conviction and His Second Trial and Where
Defendant Was Not Responsible for a Bulk of the Delay.

## PART II – COLLATERAL PROCEEDINGS

1. With respect to this conviction or sentence, have you filed a post-conviction petition in state court?

   YES (XX)  NO ( )

   With respect to *each* post-conviction petition give the following information (use additional sheets if necessary):

   A. Name of court: Circuit Court, Criminal Division, Cook County, Ill.

   B. Date of filing: March 24, 2004

   C. Issues raised: (A) Defendant Received Ineffective Assistance of Trial Counsel, Ineffective Assistance of Appellate Counsel and His Rights to Rights to Due Process and Equal Protection Were Violated Where:

   D. Did you receive an evidentiary hearing on your petition?      YES ( )  NO (XX)

   E. What was the court's ruling?   Summarily dismissed, no evidentiary hearing

   F. Date of court's ruling:   June 14, 2004

   G. Did you appeal from the ruling on your petition?      YES (XX)  NO ( )

   H. (a)  If yes, (1) what was the result?  Trial Court Dismissal Affirmed

   (2) date of decision:   November 16, 2006; Reh'g Den. 12/6/06

   (b)  If no, explain briefly why not: _____ N/A _____

   I. Did you appeal, or seek leave to appeal this decision to the highest state court?

   YES (XX)  NO ( )

   (a)  If yes, (1) what was the result?  Petition for Leave to Appeal Denied

   (2) date of decision:   May 31, 2007

   (b)  If no, explain briefly why not: _____ N/A _____

Revised: 7/20/05

PART II. COLLATERAL PROCEEDINGS:

1. (C)  Issues raised:

Trial Counsel Failed To Discover and Use a Laboratory/
Forensic Report From the Chicago Police Department Crime
Laboratory Division Signed By Pamela Fish, the "Forensic
Expert," Called By the State To Testify To the Blood Evidence
Found At Both the Scene Of the Crime and the Blood Droplets
On the Defendant's Clothing.

(B)  The Defendant Was Denied His Constitutional Rights To Due
Process, Equal Protection, And a Fundamentally Fair Trial
Where the Prosecutor Knowingly Elicited False And Misleading
Testimony From Their Expert Witness, Pamela Fish.

(C)  Under Article I, Sections 2 and 12 Of the Illinois Constitu-
tion And the Sixth And Fourteenth Amendments To the United
States Constitution This Defendant is Asserting His Claim Of
Actual Innocence.

(D)  Defendant's Rights To Due Process, Equal Protection And a
Fundamentally Fair Trial Were Violated When the Trial Judge Was
Clearly Biased Against the Defendant During His Trial And Appel-
late Counsel Was Ineffective For Failing To Raise This Issue
After Defendant Brought It To Her Attention Where:

(D)(1)  As Is Shown In the Record, the Court Had a Grudge Of
Some Sort Against the Defendant. Defendant Doesn't Know
and Can Only Speculate As To the Judge's Reasons For
the Bias. But It Is Evident Where the Court Declared
All Of the State's Witnesses To Be "Expert" Witnesses
At the State's Request Even Though Their Credentials
Suggested Otherwise, And Refused To Declare the Defend-
ant's Forensic Witness an "Expert" Despite the Fact
That His Credentials Suggested He Was I Fact An Expert.

(E)  The Defendant's Rights Under the Fourteenth Amendment Have
Been Violated In Accord With the Higher Court's Rulings In
People V Swift, 781 N.E.2d 292; Fiore v White, 531 U.S. 225;
and Bunkley v Florida, 123 S.Ct. 2020 Where:

(E)(!)  The Court Lacked Subject Matter Jurisdiction In That It
Didn't Have the Inherent Power Nor Statutory Authority
In Which To Make Or Enter the Particular Judgment,
Order, Or Decree That It Made. In Accord With U.S. v
Cotton, 535 U.S. 625, Subject Matter Jurisdiction Is
Not Subject To Res Judicata Or Waiver.

2. With respect to this conviction or sentence, have you filed a petition in a **state court** using any other form of post-conviction procedure, such as *coram nobis* or habeas corpus?    YES ( )        NO (XX)

    A. If yes, give the following information with respect to each proceeding (use separate sheets if necessary):

        1.    Nature of proceeding               N/A

        2.    Date petition filed                  N/A

        3.    Ruling on the petition             N/A

        4.    Date of ruling                    N/A

        5.    If you appealed, what was
              the ruling on appeal?               N/A

        6.    Date of ruling on appeal          N/A

        7.    If there was a further appeal,
              what was the ruling ?             N/A

        8.    Date of ruling on appeal          N/A

3. With respect to this conviction or sentence, have you filed a previous petition for habeas corpus in **federal court**?    YES ( )    NO (XX)

    A. If yes, give name of court, case title and case number:         N/A

    B. Did the court rule on your petition?  If so, state

        (1) Ruling:         N/A

        (2)    Date:         N/A

4. With respect to this conviction or sentence, are there legal proceedings pending in any court, other than this petition?    YES ( )        NO (XX)

    If yes, explain:         N/A

Revised: 7/20/05

## PART III – PETITIONER'S CLAIMS

1. State briefly every ground on which you claim that you are being held unlawfully. Summarize briefly the facts supporting each ground. You may attach additional pages stating additional grounds and supporting facts. If you fail to set forth all grounds in this petition, you may be barred from presenting additional grounds later.

**BEFORE PROCEEDING IN THE FEDERAL COURT, YOU MUST ORDINARILY FIRST EXHAUST YOUR STATE COURT REMEDIES WITH RESPECT TO EACH GROUND FOR RELIEF ASSERTED.**

(A) Ground one  Defendant's Constitutional Right To a Speedy Trial
Supporting facts (tell your story briefly without citing cases or law):

Was Denied Where Over Three And One Half Years Elapsed Between

Reversal Of Defendant's Murder Conviction And His Second Trial

And Where He Was Not Responsible For a Bulk Of the Delay.

FACTS: The Appellate Court of Illinois, First Judicial District

reversed defendant's murder conviction and remanded the case for

a new trial on March 31, 1993. The State did not bring defendant

to trial until November, 1996, over three and one half years

(B) Ground two  The Natural Life Sentence Imposed On Henry Kaczmarek
Supporting facts:

For Murder Based On the Murder Being Brutal And Heinous Must Be

Reduced To the Maximum Term Of Forty Years Where the Sentence Is

Unconstitutional Pursuant To Apprendi v New Jersey, In  Which the

United States Supreme Court Held That Facts That Increase the

Prescribed Range Of Penalties Must Be Charged In the Indictment,

Submitted To the Jury, And Proved Beyond A Reasonable Doubt.

FACTS: In this case, based upon a belief that the murder was

brutal and heinous, the trial judge imposed a term of natural

life imprisonment. (RN.13) The Question of whether the offense

was "brutal and heinous" was never pled in the indictment, sub-

mitted to the jury and proved beyond a reasonable doubt. Thus,

defendant was denied his right to due process, his right to

5

Revised: 7/20/05

GROUND ONE, continued:

after the reversal of his conviction. Defendant filed a written
motion to dismiss based on a violation of his constitutional
right to a speedy trial which the trial court denied in November
of 1996. (C.203-291)

The delay in retrying defendant is presumptively prejudicial
because more than three and one half years passed between the
reversal of defendant's conviction and his second trial. Both the
Illinois Appellate Court and Illinois Supreme Court found this
factor to be unreasonably long enough so as to trigger considera-
tion of the remaining three factors.

The reason for a bulk of the delay in the case at bar must
be weighed against the State. For two years the State was trying
to get additional evidence for the retrial of defendant. In Nov-
ember of 1993, the State advised the court that it was seeking a
blood splatter expert. (SR.49,54) In February of 1994, the State
informed the court that it was still trying to get an expert for
retrial. (SR.64) In June, 1994, the State requested a continuance
to conduct D.N.A. teting. (C.248) The State told the court that
it would have the results in August or September. (C.250) In
September, October, November, and December of 1994, the State
averred that it was still waiting on the D.N.A. testing. (C.257,
261,277,283) In May of 1995, the State advised the court that the
Chicago Crime Lab was "in the middle" of the D.N.A. testing.
(SR.93) In October of 1995, the State asserted that it still did
not have the D.N.A. results. (C.128) The appellate court and
Illinois Supreme Court attributed the majority of the delay to
defendant. In fact, the appellate court assigned all but 26 days

-5(A)-

of the continuances to defendant. This analysis by the Illinois courts is both incorrect as a matter of pre-existing law and is factually incorrect.

First, as a matter of pre-existing law, defendant cannot be charged with any part of the continuance when the State has an already established continuance. This is true even if at some point during the State's established continuance defendant seeks his own continuance for other reasons. Defendant's actions did not cause nor contribute to the State's continuances. Because it is the State's duty and responsibility to provide discovery and bring defendant to trial defendant cannot be held responsible for the State's dilatory tactics in not providing discovery, for initiating its discovery (D.N.A. analysis), so late, or for obtaining continuances to secure expert witnesses or additional D.N.A. testing.

Second, the Illinois courts attribute many of the continuances to defendant because of the many changes of defense counsel. This factor is attributable to the State, not defendant. Defendant was being represented by the Public Defender's Office. Due to attrition of the P.D.'s staff attorney's (attrition that occurred because the State took so long in obtaining its expert witnesses and D.N.A. analysis), defendant had many attorney's assigned to his case. Contrary to the Illinois courts opinions, this occurrence was a direct result of the State's actions and is therefore attributable to the State.

Third, both Illinois courts stressed that it was in defendant's best interest to wait until the D.N.A. testing results were

posted because the results could potentially exonerate defendant.
This simply was not the case. In 1989, when the blood evidence
was fresh, defendant had an independent laboratory (Cel Mar)
(sic), labs in Chicago perform D.N.A. analysis on blood samples
the State provided to defendant. (See attached Document # 1) In
1989, it was determined that the D.N.A. test results were "incon-
clusive." So there was no way new testing by the State could be
anything other than "inclusive" due to age and possible degreda-
tion. In fact, the State's D.N.A. testing results were "incon-
clusive." Defendant had absolutely no interest whatsoever in
delaying the trial to obtain new D.N.A. test results.

   At defendant's November, 1996, trial, Serologist Pam Fish
testified that the results of her D.N.A. tests on defendant's
jacket wer inconclusive and the sample from defendant's pants was
too small and degraded to test. (RJ.163)

   In November of 1994, defendant filed a pro-se motion to
dismiss charges based upon constitutional and statutory speedy
trial violations. (C.271-276) In his motion for discharge, de-
fendant noted that section 103-5(c) allows the court to grant the
State an additional 120 days or four months to obtain D.N.A.
evidence after a showing of "due diligence." Here, without a
showing of "due diligence," the State asked for, and was granted
more than 16 additional months to obtain D.N.A. testing. Here,
the minimal two-year long delay in the State's effort to procure
more evidence against defendant was not due to defendant; thus,
the lengthy delay must be weighed heavily against the State.

   The assertion of defendant's right to a speedy trial must
also weigh in defendant's favor. The appellate court issued its
opinion on March 6, 1992, and its mandate on July 17, 1992. The

-5(C)-

opinion on March 31, 1993, and its mandate on July 15, 1993. The court appointed the Office of the Public Defender. Defendant demanded a speedy trial on July 21, 1993. (C.229) Defendant advised the court that he would wait and the cause was continued. In October, November, and December of 1994, defendant moved for discharge on the basis of a speedy trial violation. (C.261,277, 283) Defendant told the court that his counsel would not present his motion for discharge and asked for a bar association attorney. The court denied defendant's motion for other counsel. In November of 1996, while represented by private counsel, defense counsel filed a motion to dismiss based upon a violation of defendant's right to a speedy trial. The court denied the motion and subsequently denied defendant's post trial motion which included a speedy trial violation claim. Here, defendant asserted his right to a speedy trial. It is the State's duty to bring defendant to trial. This factor must weigh against the State and in defendant's favor.

Prejudice to the defendant also weighs in his favor. Prejudice, assessed in light of the interests of defendant's that the speedy trial right was designed to protect has been identified as: (1) the right against oppressive pre trial incarceration; (2) to minimize anxiety and concern of the accused; and, (3) to limit the possibility that the defense will be impaired by diminishing memories and loss of exculpatory evidence.

In this case, defendant's anxiety was reflected in the record and noted by the court. In February of 1994, the judge affirmed that defendant was anxious to be tried. (S.R.II.68)

Subsequently, in June and August of 1995, the judge stated that defendant was anxious to get to trial. (S.R.II.113,121) In defendant's motion for discharge, defendant asserted that defendant had "been subjected to unwarranted, lengthy pre-trial detention; dilatory tactics have maximized his anxiety, and his defense has been impaired by the 44 months that have passed since the appellate court's remand." Defendant emphasized in his motion for discharge that the State had once already prepared its case as it had taken the cause to trial on a previous occasion. (C.214)

When these four factors are weighed: (1) length of delay; (2) reasons for the delay; (3) defendant's assertion of his right; and (4) prejudice to the defendant, it becomes apparent that defendant's constitutional right to a speedy trial was denied.

Furthermore, the State concedes that "the record established that D.N.A. testing was the cause for the delay." (St.Br. @ 53) Further, the State acknowledges that defense counsel could not prepare for trial until obtaining the D.N.A. results. (St.Br. @ 50) The State was the party who was continuing the cause, month after month, to have the D.N.A. testing done. As the State concedes, defense counsel could not know what needed to be rebutted or how to prepare its defense until after the State completed its testing. (St.Br. @ 52,53-54) Defendant cannot be charged with any continuances while the State is in its own established continuance and is not ready for trial. Defendant's constitutional speedy trial rights were violated and defendant is entitled to be released from custody and the charges against him dismissed.

CLAIM TWO – continued:

notice, and his right to trial by jury.

In this case, based upon a belief that the murder was brutal and heinous, the trial judge imposed a term of natural life imprisonment. (R.N.13) Similar to the invalidated New Jersey statute discussed in Apprendi, this factor should have been charged in the indictment, submitted to the jury, and proven beyond a reasonable doubt before the sentencing judge could impose a term greater than forty years. In enacting this statute, the legislature impermissibly removed from the jury the assessment of facts that serve to increase the prescribed range of penalties to which a criminal defendant is exposed. As such, the brutal and heinous provisions of the Illinois Criminal Code of Corrections runs afoul of the ocnstitutional mandates prescribed in Apprendi.

Because the facts that served to elevate defendant's sentence were not pled in the indictment, submitted to the jury, or proved beyond a reasonable doubt, defendant was denied his right to notice, due process, and his right to a jury. Based upon these facts the court's holding that the error was harmless is contrary to pre-existing U.S. Supreme Court case law. The U.S. Supreme Court's most recent holdings that the error is harmless flies in the face of pre-existing case law that has not been abrogated.

Furthermore, defendant's sentence is void since the offense was not proven beyond a reasonable doubt to be brutal and heinous.

(C) Ground three  This Court Should Grant Review To Resolve The Con-
    Supporting facts:

flict Between The First District's Decision In This Case, Holding

That Newspaper Articles Are Not Sufficient Support For A Pro Se

Post Conviction Petition To Withstand Summary Dismissal, And The

Fourth District's Decision in People v Ledbetter, Holding That

Newspaper Articles Do Satisfy The Requirements Of Sections 122-2

Of The Post Conviction Hearing Act. This Court Should Also Grant

Review To Clarify The Type Of "Affidavits," Records Or Other

(D) Ground four  Henry Kaczmarek's Pro Se Post Conviction Petition
    Supporting facts:

Presented The Gist Of A Constitutional Claim Of Ineffective As-

sistance Of Trial And Appellate Counsels For Failing To Challenge

The Admissibility Of The State's Expert Witnesses' Testimony

Regarding Luminol Testing And Blood Splatter Evidence Under Frye

v United States. Kaczmarek's Petition Thereby Warrants Further

Proceedings Under The Post Conviction Hearing Act.

FACTS:    In his pro-se post conviction petition, Henry Kaczmarek

2.  Have all grounds raised in this petition been presented to the highest court having jurisdiction?

      YES ( )  NO (XX)

3.  If you answered "NO" to question (2), state briefly what grounds were not so presented and why not:
    Grounds four, five, six, and seven were not presented to the

    highest state court because of State appointed counsel. Petitioner

    will allege cause and prejudice for these issues.

Revised: 7/20/05

CLAIM THREE - Continued:

Evidence" That Are Necessary To Satisfy The Requirements Of
Section 122-2 and Survive Summary Dismissal.

FACTS:    Henry Kaczmarek filed a pro-se post conviction petition
alleging that the State presented the perjured testimony of
criminalist Pamela Fish in order to secure his conviction for
first degree murder. Kaczmarek attached newspaper articles to his
petition reporting that Fish had been transferred to an adminis-
trative job within the Illinois State Police crime lab after her
work had been questioned in several high profile rape cases, and
that several civil suits had been filed against Fish claiming
that Fish misled juries and ignored evidence that could have
exonerated defendants. The articles also cited two reports that
had been filed in federal court in relation to the civil suits.
One of these reports, authored by DNA expert Dr. Edward Blake and
criminalist Alan Keel, concluded that in many of the cases where
Fish testified, she misrepresented the scientific significance of
her findings either directly or by omission, that the nature of
these errors were such that a reasonable investigator, attorney,
or fact finder would be misled, and that she always offered the
opinion most damaging to the defendant. The circuit court sum-
marily dismissed Kaczmarek's pro-se petition and the First Dis-
trict appellate court affirmed. Order at 5. The appellate court
held that Kaczmarek had failed to comply with Section 122-2 of
the Post Conviction Hearing Act by attaching only newspaper
articles to his petition, rather than the actual reports referred
to in the articles. Order at 4. Therefore, according to the

appellate court, Kaczmarek's petition was properly dismissed under the Illinois Supreme Court's decision in People v Collins, 202 Ill.2d 59. Order at 4.

In his pro-se post conviction petition, Henry Kaczmarek alleged that the State presented the perjured testimony of Pamela Fish in order to secure his conviction for first degree murder. (C.78-82) This error is cognizable under the Post Conviction Hearing Act ("Act"), because it amount's to "a substantial denial" of Henry's constitutional rights as required by the Act. In so ruling, the trial court erred, because the petition alleged constitutional errors that were not substantively rebutted by the record.

In his petition, Henry alleged that his right to due process ws violated when the State presented the perjured testimony of criminalist Pam Fish in order to secure his conviction for first degree murder. A conviction obtained by theknowing use of perjured testimony violates due process and must be set aside if there is any reasonable likelihood that the false testimony could have affected the jury's verdict. In this case, defendant had a plaus- ible explanation for the reason that the victim's blood might have been on his pants and jacket. It, in fact, it was the vic- tim's blood, it was a critical element to the State's case. In fact, the State consistently argued the importance of Fish's testimony in both opening statement and closing argument. The State relied heavily on Fish's testimony and expert opinions in its effort to connect Henry to the crime.

In his post conviction petition, Henry claimed that Pam

Fish's testimony was perjured. (C.78-82) In support of his alle-
gation, Henry attached four newspaper articles to his petition.
(C.92-98) The first article reports that Pam Fish had been trans-
ferred to an administrative job within the Illinois State Police
crime lab in research and development where she would review
proposed projects and help write grants. Nicole Ziegler Dizon,
Crime Lab Supervisor Transferred, The State Journal Register,
August 16, 2001. Fish had been the supervisor of the biochemistry
division of the Illinois State Police crime lab which handled DNA
and trace evidence. Id. The article reported that this transfer
came after Fish's work had been questioned in several high pro-
file rape cases, and that several civil suits had been filed
against Fish claiming that Fish misled juries and ignored evidence
that could have exonerated defendants. Id.

The second article describes a report, authored by Edward T.
Blake and Alan Keel, which had been filed in federal court accus-
ing Pam Fish of providing false testimony in nine cases, includ-
ing one involving Billy Wardell and Donald Reynolds, who were
wrongfully convicted of the 1986 rape of two University of Chicago
students. Robert C. Herguth, Report Slams '80's Police Lab,
Chicago Suntimes, January 14, 2001. The two men were later ex-
onerated by DNA. Id. The report was filed as part of a civil
lawsuit being brought by Wardell and Reynolds. Id. The report
also stated that Fish gave contradictory and questionable testi-
mony in the case of the four men convicted of the 1986 rape and
murder of medical student Lori Roscetti on the West Side. Id. The
article pointed out that Fish had first come under scrutiny when

it was revealed that she failed to disclose that John Willis, who was wrongly convicted of rape, had a different blood type from the actual offender. Id.

The third article describes the report authored by Blake and Keel regarding Fish and another report authored by Dr. Howard Harris regarding the Chicago Police Department crime laboratory. Both of these reports were filed in federal court in connection with the civil suit filed by Billy Wardell and Donald Reynolds. Maurice Possley and Steve Mills, Disorganization Typified Crime Lab, Report Says, Chicago Tribune, January 15, 2001. The report pertaining to the Chicago Police Department crime lab concluded that the lab "displayed serious deviations from established crime laboratory standards for care of crime laboratories in 1986." Id. The report pertaining to Fish alleged that she "falsely testified about the results of blood tests performed for the Reynolds and Wardell case, as well as the cases of seven other men." Id.

The final article also discusses the Blake and Keel report. Steve Mills and Maurice Possley, State Crime Lab Fraud Charged, Chicago Tribune, January 14, 2001. The article quotes the report as stating, "' In many of these cases, Ms. Fish misrepresented the scientific significance of her findings either directly or by omission. ... The nature of these errors are such that a reason-able investigator, attorney, or fact finder would be misled. ... And always, she offered the opinion most damaging to the defend-ant.'" Id. According to the article, in the Willis case, Fish testified that her test results wer inconclusive, but her lab notes later showed that the tests excluded Willis as a suspect.

-6(D)-

Id. In the cases of Larry and Calvin Ollins, who were accused of
the rape and murder of Lori Roscetti, Fish's testimony helped to
convict the brothers even though her tests ruled them out as
having any link to the semen found in Roscetti, a fact that Fish
failed to disclose to the jury. Id. In an interview, Blake told
the Chicago Tribune that he was surprised that the disclosures in
past cases had not generated investigation into all of Fish's
cases. Id.

The articles Henry attached to his petition support his
allegation that Pam Fish testified falsely at his trial. These
documents give numerous examples of cases where Fish either
testified falsely or gave misleading testimony, always in support
of the State's case against the defendants. The newspaper articles
detail the many cases in which Fish's testimony aided in the con-
viction of certain defendants who were later exonerated of the
crimes for which they were convicted. The articles also discuss
how Fish was transferred to an administrative position within the
crime lab after theallegations of her misconduct were revealed.

The report from Alan Keel and Edward Blake, as reported in
the articles, concludes that in many of the cases in which Fish's
testimony was critical to the State's case, she misrepresented
the scientific significance of her findings either directly or by
omission to such an extent that a reasonable investigator, at-
torney or fact finder would have been misled concerning the
ability of her work to include or exclude relevant individuals as
potential sources of biological evidence.

Moreover, the facts of Smith and those of Willis as described

in <u>Smith</u>, are strikingly similar to the facts in this case.
First, as in <u>Smith</u> and <u>Willis</u>, part of Fish's test results in
this case were inconclusive. Fish's results from the DNA testing
that she did on Henry's jacket were inconclusive. Thus, like
<u>Smith</u> and <u>Willis</u>, without a hearing (<u>a denial of due process</u>), it
cannot be determined whether Fish's testimony regarding incon-
clusive test results was factually accurate or factually false.

Second, as in <u>Smith</u> and <u>Willis</u>, Fish testified that she got
"no reaction" fort one out of the nine enzymes that she tested
for on Henry's pants and jacket. Fish testified that she was not
able to determine the type of GLO enzyme present in the samples
taken from Henry's pants and jacket. Also, as in <u>Smith</u> and <u>Willis</u>,
Fish testified that of the enzymes she was able to recover, they
were allconsistent with Nielsen's blood. Thus, like <u>Smith</u> and
<u>Willis</u>, without a hearing, it cannot be determined whether Fish's
testimony that she got no reaction was factually accurate or
factually false.

Finally, as in <u>Smith</u> and <u>Willis</u>, Fish testified that she
could not conduct DNA testing on many of the blood samples because
the samples were "degraded." Fish testified that she was not able
to obtain a DNA profile from the blood samples taken from Henry's
pants because the samples were too small or degraded. Thus, like
<u>Smith</u> and <u>Willis</u>, without a hearing, it cannot be determined
whether Fish's inability to conduct DNA testing for the reason
provided at trial was in fact accurate or was factually false.

Furthermore, of far greater importance is the fact that the
newspaper articles conclusively demonstrate Pam Fish testified

falsely in multiple cases on behalf of the State which resulted in the conviction of defendants who were later exonerated by DNA evidence. Thus, Pam Fish has no credibility whatsoever. Her testimony in the instant case in and of itself is so highly prejudicial to Henry Kaczmarck that his conviction on this basis alone should be reversed. Because no pictures were taken of the electrophoresis gels generated by Pam Fish, there is absolutely no way to determine if she falsified her results to obtain Henry's conviction for the State as she did in so many other cases. It is one thing for a State witness to commit perjury at trial, but it jumps to an entirely new and substantially greater level when the same witness over and over again testifies falsely in favor of the State.

By failing to provide Henry Kaczmarek with a second stage proceeding (appoint counsel to amend and supplement post concivtion petition), by stating that the documents attached to his post conviction petition failed to state the "gist" of a constitutional claim, the Illinois court system has denied Henry Kaczmarek due process of law.

The courts analysis of the facts of this case is contrary to facts of previously established U.S. Supreme Court case law. Additionally, the courts analysis is inconsistent with that of previously established precedent of U.S. Supreme Court cases.

GROUND FOUR - Continued:

alleged that he received the ineffective assistance of counsel where his appellate and trial counsel's failed to challenge the

trial court's erroneous acquiescence to the expert testimonies of the State's witnesses Mitch Rea and Rod Englert. (C.84-85) Where both trial and appellate counsel failed to challenge these wit-nesses' testimonies under <u>Frye v United States</u>, Henry stated the gist of a constitutional claim cognizable under the Post Convic-tin Hearing Act. However, the circuit court dismissed Henry's petition as frivolous and patently without merit thereby denying him due process of law. In so ruling, the trial court erred, because the petition alleged constitutional errors that were not substantively rebutted by the record which results in a denial of due process.

In his <u>pro-se</u> post conviction petition, Henry alleged that the trial judge was biased against him as evidenced by the judge allowing the State's expert witnesses to testify as experts despite their credentials suggesting that they were not in fact experts. (C.84) Henry further alleged in his petition that his trial and appellate counsels were ineffective for failing to challenge these experts' testimonies at both the trial and appel-late levels. (C.84)

The two State expert witnesses at issue were Mitch Rea and Rod Englert. Mitch Rea, an Arizona fraud investigator, testified that he was contacted by the Cook County State's Attorney's Office in the Spring of 1994 to perform luminol testing in con-junction with the Nielsen murder. (Second Trial R.K.26) The trial court accepted Rea as an expert in the field of luminol testing. (Second Trial R.K.25-26) Rea testified that luminol testing is a chemical test for the presence of blood. (Second Trial R.K.9) In

the forensic context, Rea testified, luminol testing is primarily used to find blood that you cannot see. (Second Trial R.K.10-11) Rea described that when the test is conducted, the luminol will produce a fleeting luminance or glow where the blood is present. (Second Trial R.K.12) Rea admitted that luminol will react not only with human blood, but animal blood, certain metals, cleansers, common household agents, bleach, and some plant material as well. (Second Trial R.K.17)

Rea conducted luminol testing on Henry's jacket and he testified that he observed a luminance consistent with blood on the right front arm, right panel, left front panel, and left front sleeve of Henry's jacket. (Second Trial R.K.26-27, K.32-37) Rea took photographs of the jacket and pants showing the locations of the glow. (Second Trial R.K.39)

Rod Englert testified on behalf of the State regarding blood splatter evidence. The court ruled that Englert was an expert in the field of crime scene reconstruction and blood splatter. (Second Trial R.K.66) Upon request from the Cook County State's Attorney, Englert reviewed the photographs of the Nielsen crime scene, the statements of witnesses, the luminol testing photographs prepared by Mitch Rea, and the physical evidence recovered in the case. (Second Trial R.K.66-69)

Concerning Ms. Nielsen's apartment, Englert noted that there was blood on the floor of the kitchen leading into Ms. Nielsen's bedroom. (Second Trial R.K.91) Englert also observed that "on the floor are smears of blood, as though a struggle took place, and one of the individuals on the floor was bleeding." (Second Trial

-6(I)-

R.K.91) When asked whether it was unusual not to have any foot-
prints in the blood, Englert stated that it would not be unusual
because blood dries very fast. (Second Trial R.K.86-91)

Englert stated that the left and right knee areas of Henry's
pants contained transfer stains and not splatter. (Second Trial
R.K.94) The transfer does not involve energy but just a transfer
of something that was bloody that touched the pants. (Second
Trial R.K.95) As for the bottom of the pants, Englert opined that
there were numerous specks of blood consistent with medium velo-
city splatter. (Second Trial R.K.96) Englert stated that the
blood on defendant's pants would not be consistent with a person
picking up a bloody bag in a gangway. (Second Trial R.K.100)
Further, Englert opined that the blood on the jeans would not be
consistent with the wearer of the jeans "kneeing" someone in the
nose. (Second Trial R.K.102)

In examining the luminol photographs of Henry's jacket,
Englert stated that the stains on the right and left arms con-
tained splatter. (Second Trial R.K.109) Englert stated that over
the front of the jacket were little specks of projected blood.
(Second Trial R.K.111) On the right pocket was a very light
transfer stain. (Second Trial R.K.111)

Englert asserted that the manner of Nielsen's death was that
she was attacked first in the kitchen where she received many
blows while on the floor, and that she, while still alive, was
taken into the bedroom and thrown on the bed. (Second Trial
R.K.117) Englert acknowledged that there was a great deal of
blood in Ms. Nielsen's bed. (Second Trial R.K.134)

Englert admitted that he was assuming that the blood splatter on Henry's jeans was Nielsen's blood. (Second Trial R.K.123) Englert conceded that no report stated that the splatter on the lower left leg was Nielsen's blood and that if it were someone else's blood he would have to reevaluate his position. (Second Trial R.K.122-123) Englert testified that it was "very, very possible" to get medium velocity splatter from a fight. (Second Trial R.K.125)

While trial and appellate counsels challenged the expertise of Rea and Englert, trial counsel did not request a <u>Frye</u> hearing to determine the admissibility of luminol testing and blood splatter evidence, nor did appellate counsel raise this issue on appeal. In Illinois, the exclusive test for the admission of expert testimony is governed by the <u>Frye</u> standard. The <u>Frye</u> test is to be applied when the scientific principle, technique or test offered by the expert to support his or her conclusion is new or novel. In Illinois, no reported cases have addressed the admissibility of luminol testing. Additionally, the admissibility of blood splatter evidence has not been established in Illinois under <u>Frye</u>.

Thus, the admissibility of luminol testing and blood splatter evidence in Illinois has not been established under <u>Frye</u>. As such, defense counsel should have demanded a <u>Frye</u> hearing before Rea and Englert testified at Henry's trial, and appellate counsel should have raised the issue of trial counsel's ineffectiveness for not doing so on appeal. A <u>Frye</u> hearing could have resulted in a finding that one or both of the luminol testing or blood splat-

ter evidence was inadmissible at Henry's trial because such testing had not gained general acceptance in the community. Or, the court may have found the evidence to be admissible but only in a limited capacity that would have been made clear to the jury. Counsel's failure to challenge this evidence under Frye was unreasonable.

Moreover, Henry was prejudiced as a result of his trial and appellate counsel's ineffectiveness. Rea's and Englert's testimonies were extremely damaging to Henry's case. Rea's testimony served as a basis for Englert's testimony. The foundation for Englert's testimony was that the areas on Henry's jacket and pants that glowed were blood, Nielsen's blood. Englert then opined that the "splatter" on the bottom of Henry's pants and the cuffs of his jacket was consistent with medium velocity splatter, and not picking up a bloody bag in a gangway, as Henry contended. Moreover, the State relied heavily on Rea's and Englert's testimonies in its closing arguments. The luminol testing and blood splatter evidence were critical to the State in refuting Henry's claim that he found the bag of Nielsen's things in the gangway and merely carried it to his car. Rea's testimony that the luminol testing showed blood splatters on Henry's pants and jacket was the basis for Englert's testimony that the blood stains found on Henry's jacket and pants could not have come from carrying a bloody bag, but rather were consistent with Henry's being Nielsen's killer.

Henry's pro-se post conviction petition, alleging that his trial and appellate counsels were ineffective for failing to

challenge the trial court's acquiescence to the testimonies of
Rea and Englert, stated the gist of a meritorious constitutional
claim of ineffective assistance of counsel. Because luminol
testing and blood splatter analysis have not achieved general
acceptance in Illinois, trial counsel should have demanded a <u>Frye</u>
hearing before this evidence was admitted at Henry's trial, and
having failed to do so, appellate counsel should have raised the
issue of trial counsel's ineffectiveness on appeal. Rea's and
Englert's testimonies regarding the luminol testing and blood
splatter analysis were critical to the State's case against
Henry, and Henry was thereby severely prejudiced by his counsels'
ineffectiveness.

The instant issue was not raised to the highest court in the
State. Petitioner asserts that failure to be the result of the
State appointed Public Defender's failure to raise the issue
while representing petitioner. This constitutes cause.

Petitioner further asserts, as the foregoing argument estab-
lishes this issue would have reversed his case had this issue
been raised to the highest State court. Counsel's failure to do
so prejudiced petitioner in that his case would have been reversed
and remanded for a new trial.

The State courts decisions were contrary to, or involved an
unreasonable application of clearly established Federal law, as
determined by the Supreme Court of the United States. The court's
factual findings are unreasonable in the light of clear and con-
vincing evidence in the record. The State courts factual findings
were not only debatable or arguably wrong, but were "clearly wrong."

(E)   <u>GROUND FIVE</u>:   The State Presented The Testimony of Two
Former Police Officers as Experts in Luminol Testing and Blood
Splatter. Defendant Sought to Rebut the State's Witnesses with
the Testimony of Dr. Giegesmund Who Himself Gave Training Seminars
to Police Officers in Blood Splatter and Had Done Luminol Testing.
Where the State's Case Turned on the Location and Quantity of
Blood Found on Defendant's Clothes, the Judge Erred in Prohibiting
Dr. Siegesmund from Testifying for the Defense.

<u>FACTS</u>: In the instant case, the trial judge precluded defendant
from presenting the testimony of Dr. Kenneth Siegesmund to rebut
the State's expert witnesses, Mitch Rea and Rod Englert. As a
result Henry Kaczmarek was denied a fair trial.

In the case at bar, following argument on Dr. Siegesmund's
credentials, the court ruled that he would not recognize Sieges-
mund as an expert in the field of blood splatter. (R.L.40) The
court further fuled that Dr. Siegesmund could testify on the
process of luminol testing but not the interpretation of it.
(R.L.40) The trial judge erred in not permitting defense expert
Kenneth Siegesmund from presenting testimony in order to rebut
the testimony of the State's experts. (R.L.40)

> ### The Trial Judge was Acting Under a Misapprehension of Law
> ### Concerning Experts

The judge's ruling that Dr. Kenneth Siegesmund was not an
expert must be disregarded where the court was acting under a
misapprehension as to what qualified a witness to be an expert.
The judge's statement concerning the standard by which to evaluate
whether a person was qualified to testify as an expert was in

direct contravention of the mandate of the Illinois Supreme Court. (R.L.40) The trial judge stated "The fact that someone has some knowledge that some in the public sector may not have doesn't make somebody an expert." (R.L.40) The judge's standard for admissibility was directly at odds with the standard articulated by the courts. Not only was the judge incorrect concerning the measure by which to evaluate an expert's qualifications to testify, but he was also incorrect in his ultimate ruling that Dr. Siegesmund should not be allowed to testify.

### Dr. Siegesmund Was Qualified to Testify About Luminol Testing And Blood Splatter

Dr. Siegesmund testified that he had a doctorate in biology, having majored in his undergraduate studies in biology and minored in chemistry. (R.L.3) Dr. Siegesmund stated that he had performed luminol testing well over a hundred times and had lectured in forensic science. (R.L.5) Dr. Siegesmund stated that the last time he conducted luminol testing was three weeks before. (R.L.27) Dr. Siegesmund further averred that he had performed dozens of experiments in blood splatter and that he had been qualified to testify as an expert in the area of blood splatter 20 to 30 times. (R.L.28,L.37)

Dr. Siegesmund was a member of several associations including the American Academy of Forensic Sciences. (R.L.6) Notably, State's witness Englert noted that the Academy had very "stringent" requirements for membership. (R.K.57) As for his training, Dr. Siegesmund stated that he attended the one week conference given by the American Academy. (R.L.20) Dr. Siegesmund testified

that in addition to working in the Glendale crime lab, he had taught forensic science and that he considered himself to be a forensic expert in a variety of areas including blood splatter and luminol testing. (R.L.16,L.22)

Dr. Siegesmund stated that he gave courses to sheriffs in the police department and that as part of the course, he would demonstrate blood splatter. (R.L.29) When asked whether he attended any formal course taught by law enforcement agencies, Siegesmund stated "I'm teaching. I don't take courses from them." (R.L.29)

Dr. Siegesmund had a scientific background and had received special training in the area of blood splatter and luminol testing. Dr. Siegesmund's experience and qualifications afforded him knowledge beyond that of a layperson.

The fact that Dr. Siegesmund had never been to a crime scene had no impact upon his qualifications to testify as an expert witness. Initially, it must be stressed that Mitch Rea and Rod Englert were asked to examine pieces of clothing and physical evidence, not a crime scene. Further, Dr. Siegesmund explained that he had never gone to a crime scene because by the time he is consulted the crime scene is gone. (R.L.18,L.20) Further, examination of a crime scene was not a prerequisite to applying scientific principles concerning blood and how it splattered.

The State's questioning concerning Dr. Siegesmund not having taken any courses from the police or F.B.I. was misleading. Dr. Siegesmund had not received any training in luminol testing or blood splatter from the police or the F.B.I. (R.L.26,L.28) Further,

the doctor denied having taken any courses on how to luminol an object at a crime scene or ever having done luminol at a crime scene. (R.L.27) Dr. Siegesmund, however, gave classes to law enforcement personnel so it would make no sense then to require Dr. Siegesmund to take courses from "his students." (R.L.29)

Even if one assumes arguendo that Dr. Siegesmund had not taken formal courses in blood splatter or luminol testing, Dr. Siegesmund testified that he had performed luminol testing well over a hundred times and conducted luminol testing three weeks before. (R.L.5,L.27) Dr. Siegesmund further stated that he had performed dozens of experiments in blood splatter. (R.L.28)

In ruling that Dr. Siegesmund was not an expert, the judge commented that Dr. Siegesmund was a "jack of all trades and master of none." (R.L.40) In fact, Dr. Siegesmund had been qualified as an expert witness in caustic substances and in hair examination. Additionally, Dr. Siegesmund stated that he was qualified to testify as an expert in the area of blood splatter 20 to 30 times and in the area of forensics 250 times. (R.L.8,L.37)

### Not Allowing Dr. Siegesmund to Testify Denied Defendant a Fair Trial

Dr. Siegesmund would have rebutted both State's witnesses Mitch Rea and Rod Englert. In contradiction to Mitch Rea, Dr. Siegesmund would have informed the jury that there were confirmatory tests which could have been performed subsequent to the initial luminol testing. (R.L.71) Specifically, Dr. Siegesmund would have stated that the additional testing should have been performed to determine whether the illuminating substance was in

blood, and if so, whether it was either decedent's or defendant's. (R.L.71-72) In response to Rod Englert's testimony, Dr. Siegesmund would have advised the jury that in his opinion there was almost no indication of blood splatter on the jacket and that the blue jeans contained smears in the knee area indicative of lateral activity. (R.L.72)

Additionally, Dr. Siegesmund would have testified that the majority of decedent's blood would have been deposited on the bed prior to, and not after, her death. (R.L.72) Hence, Dr. Siegesmund would have opined that the offender in the instant case would have been dramatically covered with blood based on the particular type of attack. (R.L.72) This testimony would have been in contrast to Englert's testimony that the majority of blood in decedent's bed would have "seeped" out after she was dead. (R.K.134)

Decedent's blood was found in two spots on defendant's jacket and in the knee area of the pants found in the trunk of defendant's car. According to the defense theory, decedent's blood was transferred to defendant's jacket when defendant picked up the bag from the back of the apartment building and placed in the bag in his trunk. The bag subsequently transferred blood to the pants lying in defendant's trunk. Defendant at the time noted that the bag was damp and later discovered that it was bloody. (R.K.203,K.219-220) The State's theory was that defendant's pants and jackets were stained with decedent's blood as a result of defendant having attacked decedent.

A pivotal issue for the jury to resolve was whether there

was also "splatter" on the pants found in defendant's trunk and
on defendant's jacket. According to Rod Englert, the substance on
defendant's pants was blood splatter and was received while
attacking decedent. According to Dr. Siegesmund, the blood on
defendant's pants was not splatter but transfer smears indicative
of lateral activity. Englert opined that defendant's jacket con-
tained splatter around the cuffs. In contrast to Englert, Dr.
Siegesmund would have testified that the defendant's jacket
contained almost no indication of splatter. Due to the divergence
of opinions on the pivotal question of splatter, permitting Dr.
Siegesmund's testimony on the luminating substance on defendant's
clothing was critical.

A further area for the jury to analyze was whether decedent's
attacker would have had a substantial amount of blood on him or
her. Decedent's blood was found on two small stains on defend-
ant's jacket and on two stains in the knee area of the pants
found in defendant's trunk. Decedent's blood was found on no
other clothing. (R.J.53) Critically, police checked defendant's
boots and did not detect any blood or bloodstains on them. (R.J.
53,J.63) Englert acknowledged that there was a "great deal" of
blood in decedent's bed. (R.K.134) It was Englert's opinion that
decedent bled in her bed after the attack was over and that very
little blood may have gotten on the attacker. In contrast to
Englert, who did not have a scientific background, Dr. Siegesmund
would have been able to testify that decedent bled while alive.
(R.L.72) Consequently, it was Dr. Siegesmund's opinion that
decedent's attacker would have been dramatically covered in

blood. (R.L.72)

Defendant was not allowed to counter the State's expert witnesses. The result was that the testimony of the State's experts wrongly overpersuaded the jury in favor of the prosecution. The evidence against defendant was not overwhelming. Neither defendant's fingerprints nor blood were found in decedent's apartment. Further, although it was undisputed that there was blood on the floor of Ms. Nielsen's apartment, no blood was found on defendant's shoes. Defendant's testimony that he merely found the bag of items and did not steal them or kill anyone to get them was consistent with Ron Larry seeing defendant in the back yard of the apartment building carrying a bag. Notably, Ron Larry never saw defendant go inside or come out of the Nielsen apartment. Defendant was denied a fair trial.

The instant issue was not raised to the highest State court. Petitioner asserts that failure to be the result of the State appointed Public Defender's failure to raise the issue while representing petitioner. This ineffectiveness constitutes cause.

Petitioner further asserts, as the foregoing argument establishes, this issue would have reversed his case had this issue been raised to the highest State court. Counsel's failure to do so prejudiced petitioner in that his case would have been reversed and remanded for a new trial.

The State courts decisions were contrary to and involved an unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States. The courts factual findings are unreasonable in the light of clear and con-

vincing evidence in the record. The State courts factual findings
were not only debatable or arguably wrong, but were "clearly
wrong."

(F)  <u>GROUND SIX</u>:  The Court Erred in Allowing Mitch Rea to Testify
an an Expert for the State in Luminol Testing Where Rea Had Never
Taken a College Level Chemistry Course, Did Not Know How to
Perform a Confirmatory Test to Determine Whether the Substance
That Luminesced Was in Fact Blood, and Did Not Make the Chemical
Luminol Mixture Himself but Obtained Pre-Packaged Chemicals from
a Private Chemist.

<u>FACTS</u>:  The State called Mitch Rea to the stand to testify for
the State as an expert in the area of luminol and luminol testing.
(R.K.25) When asled whether he had ever taken a college level
course in biology and chemistry, Rea stated that he had taken a
"very basic" biology calss "long ago" but not a chemistry course.
(R.K.21) Over objection, the court accepted Rea as an expert in
the field of luminol testing. (R.K.26) The trial judge erred in
permitting Rea to testify as an expert, thus denying defendant
his right to a fair trial.

     In the case at bar, Mitch Rea acknowledged that he perfor-
med no confirmatory follow up testing on the portions of clothing
which liminesced. Rea conceded that luminol was not specific to
blood but could react with other substances such as some metals,
cleaning agents, and plant materials. Although Rea did not explain
how the reaction differed, Rea averred that luminol reacts dif-
ferently to blood than to cleaning agents or copper metals.

     To determine whether an area that luminesces is blood or

another substance, further testing is required. Because the
luminol chemical is not completely specific for blood, in inter-
preting luminol results, further testing is used to assess whether
the luminating area was blood. Further, "because of the need to
interpret the cause and meaning of a given luminol reaction as it
occurs, the need to collect and analyze samples when possible,
and testimony that might be required with regard to the luminol
examination and any subsequent analyses, our laboratory prefers
that a serologist conduct or at least be in attendance during
luminol examinations. Due to the possibility of "false reactions,"
luminol testing "call[s] for the use of trained personnel to
conduct the luminol test."

According to Rea, luminol testing is used to detect blood
that cannot be seen. (R.K.10-11) Rea opined that the areas that
luminated in the instant case were consistent with reactions that
he had observed in the past for blood. (R.K.39) Rea, however,
performed no follow-up testing on the areas that luminated to
verify that the luminating areas contained blood. When asked
whether he knew "how to personally perform any confirmatory
testing," Rea admitted that he did not. (R.K.24,K.40) Further,
not only was Rea not a serologist, Rea had not even taken any
college level chemistry courses. Notably, the luminol mixture
used was prepared and pre-packaged by a chemist. (R.K.30)

The error in allowing Rea to testify as an expert was not
harmless. Rea's substandard testing served as a basis for State
expert Englert's testimony. Englert could not offer an opinion as
to blood splatter without Rea's testimony. The serious flaw in

the State's "house of cards" was that based on Rea's examination of the pants and coat it could not be determined with certainty that the substance that luminated was blood. "Something" luminated, but Rea was not qualified to make the determination that that "something" was blood and not merely, for example, remnants of laundry detergent from the clothing's last washing.

Without Rea's testimony, Englert would have had no basis for his testimony. The foundation of Englert's testimony was that the areas that glowed were blood. (R.K.122) The State commented extensively in closing argument about defendant's pants and jacket and the testing that was performed on the clothing. (R.L. 84,L.112-114)

The trial judge abused his discretion in ruling that Mitch Rea was qualified as an expert in luminol testing. Defense counsel objected at trial to Rea's qualifications. Although the error was not included in defendant's post-trial motion, the error may be review under the plain error doctrine. Where the substance that luminated on defendant's clothing formed the cornerstone of the State's theory of prosecution, the error in allowing Mitch Rea to testify as an expert denied defendant a fair trial.

The instant issue was not raised to the highest State court. Petitioner asserts that failure to be the result of the State appointed Public Defender's failure to raise the issue while representing petitioner. This ineffectiveness constitutes cause.

Petitioner further asserts, as the foregoing argument establishes, this issue would have reversed his case had this issue been raised to the highest State court. Counsel's failure to do

so prejudiced petitioner in that his case would have been reversed
and remanded for a new trial.

The State courts decisions were contrary to and involved an
unreasonable application of clearly established Federal law, as
determined by the Supreme Court of the United States. The courts
factual findings are unreasonable in the light of clear and con-
vincing evidence in the record. The State courts factual findings
were not only debatable or arguably wrong, but were "clearly
wrong."

(G)  GROUND SEVEN:  Where the Crux of Defendant's Case Was That
Any "Blood Splatter" Was a Result of Defendant Having Been in
Fist Fights Rather than by Any Alleged Attack on Decedent, the
Judge Erred in Not Allowing Defendant to Present Evidence That
Defendant's Girlfriend Had Been with Defendant on Several Occa-
sions When Defendant Had Been Wearing His Quilted Coat While
Fighting and the Other Person Had Bled.

FACTS:  The right to offer the testimony of witnesses "is in
plain terms ... the right to present a defense, the right to
present the defendant's version of the facts as well as the
prosecution's to the jury so that it may decide where the truth
lies." Thus, defendant was denied his constitutional right to
compulsory process and due process.

In the case at bar, the State's theory of prosecution was
that the blood in defendant's jacket was decedent's. To rebut the
State's case, defendant sought to present evidence that the blood
on defendant's jacket was the result of defendant having engaged
in fist fights where defendant's opponent had bled. Defendant was

-6(X)-

denied a fair trial where the judge precluded defendant from presenting testimony that defendant's girlfriend had been with defendant when he had gotten into fights, that defendant had been wearing his quilted jacket, and that blood had been shed during the fight.

Defendant called Pam Hines as a defense witness. Ms. Hines testified that at the time of Henry's arrest she and he were girlfriend and boyfriend. (R.K.152) Ms. Hines and Henry had previously lived together but had not been living together at the time of his arreest. (R.K.152) Ms. Hines stated that she had last seen defendant in 1989, at defendant's first trial, and that she was not involved in defendant's life. (R.K.152-153)

Ms. Hines stated that Henry dressed the same every day, wearing flannel shirts, jeans, a jacket, and boots. (R.K.154) When defense counsel attempted to elicit from Ms. Hines that she had been with defendant on seven or eight different occasions when defendant had got into fist fights, where punches being thrown and people bleeding, the judge precluded the testimony. (R.K.154,169) Before concluding the examination of Hines, defense counsel asked to be heard at sidebar and the court denied the request. (R.K.157)

Following Hines' testimony and the stipulated testimony of Elizabeth Finuchi, defense counsel asked for a short recess which the court permitted. (R.K.168) At the recess, defense counsel made an offer of proof concerning the line of questioning he sought to pose to Ms. Hines. (R.K.168) Defense counsel sought to elicit that Hines had been with defendant on seven or eight

occasions, where defendant had gotten into fights while wearing his quilted jacket, and where punches were thrown and people were bleeding. (R.K.169) Defense counsel emphasized that the luminol testing at best revealed that the substance on the jacket was blood but that the testing could not determine whose blood. (R.K.169) Contrary to the State's theory that splattered blood on the jacket was Ms. Nielsen's, defense counsel sought to give the jury the alternative that the splattered blood was not Nielsen's but that of someone with whom defendant had gotten into a fist fight. (R.K.169-170)

In response to defendant's counsel's argument, the court stated that Ms. Hines stated that the last time she saw defendant was six months before the murder and defense counsel's theory of defense was "not probable." (R.K.170) "For clarification," the State noted that Ms. Hines testified that she had not lived with defendant for six months prior to the incident and had not seen defendant for a month before. (R.K.170) The judge stated that the "supposed fights" were "just too remote." (R.K.170) After defense counsel told the court that he could not get past the first question to lay a foundation, the court denied defendant's motion for mistrial. (R.K.171)

Contrary to the judge's assertion, the fist fights were not "too remote." Hines had been with defendant for many months prior to mid-March of 1987. Blood can last of a surface for months or years. Since the blood from fist fights could have remained on defendant's jacket for a lengthy period, the court's conclusion that the fights were "too remote" was without basis.

Pam Hines' testimony was critical to rebut the state's theory that the blood on defendant's coat was a result of defendant having attacked and killed decedent. Defendant attempted to establish that any blood that had been splattered on defendant's coat was a result of having been engaged in fist fights where blood was present, and not because of any attack on decedent. Defendant had the constitutional right to present his theory of defense to the jury. There simply was no reason for the court to preclude defendant from presenting his defense.

This error was not harmless. Considering that forensic serologist Pam Fish has been proven to commit perjury in favor of the State, it is even more egregarious than when first raised on direct appeal. Defendant testified himself to having been in fights the week of April 24th and that during those fights blood had been shed, the jury may have not credited defendant's testimony because of hismotivation to avert conviction. Hines, however, had no present connection with defendant and had not even seen defendant for over seven years. Ms Hines had no motivation to lie. Thus, her testimony would not only have corroborated defendant's testimony but itself would have presented the jury with an alternative to the State's theory of prosecution.

Where the court refused to allow defendant to present Hines' testimony concerning the fist fights and resulting blood, defendant was denied his right to a fair trial.

The instant issue was not raised to the highest State court. Petitioner asserts that failure to be the result of the State appointed Public Defender's failure to raise the issue while representing petitioner. This ineffectiveness constitutes cause.

Petitioner further asserts, as the foregoing argument establishes, this issue would have reversed his case had this issue been raised to the highest State court. Counsel's failure to do so prejudiced petitioner in that his case would have been reversed and remanded for a new trial.

The State courts decisions were contrary to and involved an unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States. The courts factual findings are unreasonable in the light of clear and convincing evidence in the record. The State courts factual findings were not only debatable or aguably wrong, but were "clearly wrong."

## PART IV – REPRESENTATION

Give the name and address, if known, of each attorney who represented you in the following stages of the judgment attacked herein: *PUBLIC DEFENDER*    *CHICAGO, Ill*

(A) At preliminary hearing *DARLENE Williams 2650 S. CALifORNIA 60608*
*PUBLIC DEFENDER*
(B) At arraignment and plea *MARTIN KELLY 2650 S. CALifORNIA chicago Ill, 60608*

(C) At trial *CHARLES G. MURPHY #25073 Address N/A*

(D) At sentencing *CHARLES G. MURPHY #25073 Address N/A*

(E) On appeal Debra R. Salinger, Ass.Pub.Def. 100 W. Randolph St.
Suite 5-500 Chicago, Il. 60601
(F) In any post-conviction proceeding Sarah Curry, Ass.Pub.Def. 203 N. LaSalle St.
24th Floor Chicago, Il. 60601
(G) Other (state): _____

## PART V – FUTURE SENTENCE

Do you have any future sentence to serve following the sentence imposed by this conviction?

YES ( )    NO (X)

Name and location of the court which imposed the sentence: Circ.N/A Court Cook County, Illinois

Date and length of sentence to be served in the future _____ N/A _____

WHEREFORE, petitioner prays that the court grant petitioner all relief to which he may be entitled in this proceeding.

Signed on: *Oct 16, 2007*
(Date)

_____ N/A _____
Signature of attorney (if any)

**I declare under penalty of perjury that the foregoing is true and correct.**

*Henry Kaczmarel*
(Signature of petitioner)

*N-95790*
(I.D. Number)

P.O. Box 711
(Address)
Menard, Illinois 62259-0711

7                                    Revised: 7/20/05

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

| | | DEPARTMENT *Crim* | |
|---|---|---|---|
| (ty) | (Municipal) | (Division) | (District) |

People of the State of Illinois

v.

*Henry Kaymarek*
            **Defendant**

NO. __87CR 6131 01__

I. R. # __291616__

S. L. D. # _____

## ORDER OF SENTENCE AND COMMITMENT TO
## ILLINOIS DEPARTMENT OF CORRECTIONS

The defendant having been adjudged guilty of committing the offense(s) enumerated below,

IT IS ORDERED that the defendant __*Henry Kaymarek*__ be and is hereby
ed to the ILLINOIS DEPARTMENT OF CORRECTIONS AS FOLLOWS:

*5/7/97 Judge Brody sentenced the defendant*
*with rifles I.D.O.C. (NATURAL LIFE)*
*edit 0 days*
*itt issue 5-12-97*

|  | Statutory Citation | | | |
|---|---|---|---|---|
| *Murder)* | 38 | ILCS 9-1 | 1 | A-1 |
| | | ILCS | / | |
| | | ILCS | / . | |
| | | ILCS | / | |

IT IS FURTHER ORDERED that the Clerk of the Court shall deliver a copy of this order to the Sheriff of Cook County

IT IS FURTHER ORDERED that the Sheriff of Cook County shall take the defendant into custody and deliver him/her to th
Department of Corrections.

IT IS FURTHER ORDERED that the Illinois Department of Corrections shall take the defendant into custody and confine him
he manner provided by law until the above sentence is fulfilled.

RED BY

Y CLERK

*502*      *5/7/97*

H COURT      DATE

ENTER: _____ *150*

JUDGE      JUDGE'S NO.

AURELIA PUCINSKI, CLERK OF THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

- B -
C293

1. FILE RECORD - COURT CLERK WILL ATTACH TO FILE      CCG-N305-20M-10/7/96(6342025)

IN THE UNITED STATES DISTRICT COURT
FOR THE __NORTHERN__    DISTRICT OF ILLINOIS

HENRY KACZMAREK, )
                Plaintiff, )
 )
 )
 )
v. )    No. _____
 )
 )
DONALD HULICK, Warden, )
 )    The Honorable
_____ )
 )
                Defendants. )    Judge Presiding.
 )

### NOTICE OF FILING

TO:

Clerk of the U.S. District Court

Prisoner Correspondence

219 South Dearborn Street
Chicago, Illinois 60604

    PLEASE TAKE NOTICE that on or before the __16__ day of
__Oct._____, __2007__, I shall file with the Clerk
of the U.S. District Court For The ___Northern___ District
of Illinois, the attached Plaintiff's _Petition for Writ of Habeas_
_Corpus, § 2254 petition, Motion for Leave to Proceed In Forma_
_Pauperis and Motion for Appointment of Counsel_____
a copy of which is hereby served upon you.

                                BY: _Henry Kaczmarek_
                                Register Number _~~N-95790~~ N-95790_
                                Post Office Box 711,
                                Menard, Illinois  62259

### CERTIFICATE OF SERVICE

    I, _____Henary Kaczmarek_____, being duly sworn aver
that I have served copies of the foregoing to the person named above
by placing such copies in the U.S. Mailbox at the Menard Correctional
Center on the __16__ day of __Oct_____, __2007__; postage
prepaid. UNDER THE PENALTY OF PERJURY THE FOREGOING IS TRUE AND
CORRECT.

                                _Henry Kaczmarek_
                                Affiant