IN THE
UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

_____

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| ex rel. HENRY KACZMAREK, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | No. 07 C 6126 |
| | ) | |
| DONALD HULICK, Warden, | ) | |
| Menard Correctional Center, | ) | The Honorable |
| | ) | Wayne R. Andersen, |
| Respondent. | ) | Judge Presiding. |

_____

## <u>ANSWER TO PETITIONER'S
PETITION FOR WRIT OF HABEAS CORPUS</u>

Pursuant to Rule 5 of the Rules Governing Section 2254 Cases in the

United States District Courts and this Court's order of November 19, 2007,

respondent DONALD HULICK, Warden of the Menard Correctional Center,

hereby files this Answer to the above-captioned Petition for Writ of Habeas

Corpus, and states as follows:

1.      Petitioner, Henry Kaczmarek, identified as prisoner No.

N95790, is currently incarcerated at the Menard Correctional Center, where

he is in the custody of respondent Donald Hulick, the Warden of that facility.

2.      Following a jury trial in the circuit court of Cook County,

Illinois, petitioner was convicted of murder, residential burglary, home

invasion, and armed robbery, and was sentenced to a term of natural life

imprisonment.  Exhibit A (*People v. Kaczmarek*, 741 N.E.2d 1131 (Ill.App. 2000)).  On direct appeal, the state appellate court reversed petitioner's murder conviction and remanded for a new trial.  *Id.*  Following a retrial by jury, petitioner was again found guilty of murder, and, based upon a trial court finding that the victim's murder was exceptionally brutal and heinous, he again received a sentence of natural life in prison.  *Id.*

3.     On direct appeal following his second trial, petitioner raised the following claims:

A.     the trial court erred in denying his motion to dismiss on the grounds that the delays prior to his retrial violated his constitutional right to a speedy trial;

B.     he was denied a fair trial by the court's evidentiary rulings relating to the State's blood-spatter evidence; and

C.     the penalty-enhancement scheme provided by Illinois law, under which he was sentenced to a term of natural life, violated *Apprendi v. New Jersey*, 530 U.S. 466 (2000).

*See* Exh. A.

4.     The state appellate court set forth the facts of the case as follows:

The relevant evidence presented at defendant's retrial establishes that in April 1987, the victim, 86-year old Millie Nielsen, lived on the first floor of a two-flat apartment building located at 3507 West Diversey Avenue in Chicago. Dan Lary, together with his then wife Margaret Fisher and Margaret's 19-year-old son John Fisher, lived on the second floor.

Defendant had been living with the Larys for about a month after moving out of the house of his former girlfriend, Pamela Hines.

At about 10:30 p.m. on April 24, 1987, Margaret and John returned home after a night of bowling. At the time, Dan was passed out intoxicated on a living room couch while defendant was watching television. Margaret stated that defendant was wearing light-colored jeans, a flannel shirt, a blue quilted work jacket and construction boots. Margaret assisted Dan to bed, and then went to bed herself at about 11 p.m. Defendant continued to watch television in the living room.

According to John, defendant left the apartment at about 11:30 p.m. and returned at about midnight. Upon returning, defendant asked John if Dan was awake. John replied that Dan was sleeping, and defendant left, stating he had to go find his car.

At about 12:15 a.m. on April 25, the Larys' front doorbell rang. Margaret answered the door and discovered Dan's brother, Ron Lary, who asked if Dan was home. Because she did not want Ron in her apartment, Margaret responded no and went back to bed.

Margaret was again awakened by the front doorbell at about 2:00 a.m. When she answered the door, Margaret saw defendant who asked if Dan was available. Margaret told defendant that Dan was asleep, and defendant left.

From time to time, Ron slept on the back porch of his brother's apartment. In the early morning hours of April 25, 1987, Ron went to Dan's back porch to sleep after a night of drinking at Patty's Lounge, a nearby bar. Shortly after 2:00 a.m., Ron observed defendant carrying a bag through the back yard toward his car, which was parked in the alley. According to Ron, defendant was wearing dark jeans and a dark jacket. Defendant placed the bag in the car's trunk and drove east down the alley.

Margaret awoke the morning of April 25 at about 7:00 a.m. and saw defendant sleeping on the living room couch. According to Margaret, defendant was wearing a clean pair of dark-colored jeans and a light-colored dress shirt. After making coffee, Margaret left for work at about 9:00 a.m.

At about 9:45 a.m., Ronald Sadlowski, a neighbor who helped Ms. Nielsen with errands and maintenance work around the building, noticed that the back porch door of Ms. Nielsen's

kitchen was open and that the window of her kitchen pantry was broken. Sadlowski further discovered that Ms. Nielsen's car was still parked in the garage although she had a beauty appointment scheduled early that morning. Concerned about Ms. Nielsen's well-being, Sadlowski called the police.

In response to Sadlowski's call, Ross Marsala, an officer with the Chicago Police Department, and his partner arrived at Ms. Nielsen's apartment at about 10 a.m. After speaking briefly to Sadlowski, Officer Marsala proceeded to the back porch of the apartment and noticed several pieces of glass that had been broken from the pantry window. Officer Marsala entered the kitchen and observed spots of blood on the kitchen floor leading to a nearby bedroom. Officer Marsala further noticed blood spots on the bedroom door frame, and found a kitchen knife, which was bloodstained, on a small table immediately outside the bedroom.

Inside the bedroom, Officer Marsala found Ms. Nielsen lying in bed, face up in a pool of blood. Officer Marsala observed blood on the floor and walls near the bed. The bedroom, including the rest of the apartment, had been ransacked, and no signs of forced entry were readily apparent.

Robert Baike, a forensic investigator who processed the crime scene, obtained several blood samples from the kitchen floor. Baike did not observe any bloody footprints in the apartment.

After working for the day, Ron returned to Dan's apartment and spoke with the police, describing for them defendant's activity in the back of the house earlier that morning. Chicago police detectives, accompanied by Ron, then left the apartment in search of defendant.

The detectives found defendant early the next morning asleep in his car. Chicago Police Detective Jerome Bogucki approached the vehicle and requested defendant to exit. As defendant exited, Detective Bogucki observed blood stains on the right and left sleeves of defendant's quilted jacket. The detectives placed defendant under arrest and, upon obtaining defendant's written consent, they searched the trunk of the vehicle. In the trunk, the detectives found jewelry boxes, which appeared to be stained with blood, jewelry, serving plates and platters. The detectives also discovered a pair of blood-stained jeans and several tools,

including a glass cutter. Detective Bogucki submitted the jeans and jacket to the crime lab for testing. Bogucki further checked defendant's work boots but did not observe any appearance of blood. The other items found in the trunk were taken to Area 5 headquarters, where they were later identified by Ms. Nielsen's family members as belonging to the victim.

A subsequent medical examination of Ms. Nielsen's body by Dr. Michael Chambliss disclosed numerous external and internal injuries. An external exam revealed several abrasions, incises and bruises about Ms. Nielsen's upper body, including her head, chest and arms. Stab wounds were also found on Ms. Nielsen's left thigh, the left part of her groin, and right forearm. An internal exam revealed injuries indicative of manual strangulation, including hemorrhages of the larynx, tongue and esophagus, hemorrhaging of the membrane of the brain and a fractured larynx.

Due to the condition of the body, Dr. Chambliss opined Ms. Nielsen died between 11:30 p.m. on April 24, 1987 and 2:30 a.m. on April 25, 1987. Dr. Chambliss concluded that Ms. Nielsen died as a result of manual strangulation with the contributing factors of blunt force injuries and stab wounds. Dr. Chambliss also stated that Ms. Nielsen could have died from the blunt force injuries.

Pamela Fish, an expert in electrophoresis, serology and DNA testing with the microanalysis unit of the Chicago Police Department, detailed the results of her examination conducted of the physical evidence back in 1987. Fish examined blood samples obtained from defendant, Ms. Nielsen, Ms. Nielsen's kitchen floor, and the knife found in the apartment. Fish also inspected the substances resembling blood found on defendant's jacket and jeans, and the jewelry boxes recovered from the trunk of defendant's vehicle. Fish determined that Ms. Nielsen had Type A blood and that defendant had Type B blood. Fish further determined that the substances taken from defendant's jeans and quilted jacket were human blood possessing Type A characteristics.

Fish additionally examined the blood samples to ascertain their particular genetic markers for purposes of making an identification. Fish testified that the blood found on the jeans and quilted jacket was consistent with Ms. Nielsen's blood and

could not have come from defendant. In fact, according to Fish, all the enzymes from the blood taken from defendant's clothing was consistent with those found in Ms. Nielsen's blood.

With respect to the substances found on the kitchen floor, the knife and the jewelry box, Fish was able to determine that the substances were human blood, but due to the small quantity provided, she was unable to ascertain the particular blood type. Fish explained she attempted to perform DNA testing on the blood samples provided years after her 1987 testing, but that their small size and degraded nature made testing ineffective.

Mitch Rea was called by the State as an expert in luminol testing and interpretation. During voir dire examination of his qualifications, Rea stated he is an insurance fraud investigator who had previously worked over 26 years as a police officer with the Phoenix Police Department in Arizona. Of his time at the department, Rea spent ten years working as a detective in the homicide unit where he processed over an estimated 350 murder crime scenes. Rea has received training in crime scene investigation and specialized training in chemical blood detection involving luminol. Rea has additionally attended and participated in numerous seminars dealing with luminol and luminol testing, has taught and trained other law enforcement officers in these fields, has conducted hundreds of experiments involving luminol, has participated in several workshops covering luminol testing, and has previously testified in court as a luminol expert.

Rea detailed the application and use of the luminol chemical as a detecting agent, and described its glowing effect when it reacts with particular substances, including blood. Rea acknowledged that luminol is not specific to blood and that it reacts with other substances, such as metals and cleansers.

Upon questioning by defense counsel, Rea acknowledged never being educated or trained in the field of chemistry. Rea further admitted that he does not perform any additional testing, like DNA analysis, to ensure the accuracy of results indicating the presence of blood.

Over defendant's objection, Rea was accepted by the court as an expert and testified that he performed luminol tests on defendant's quilted jacket in early 1994. Rea explained that an

application of luminol to the right front panel of the jacket produced a bright luminance of several small spots. According to Rea, these luminances indicated the presence of blood. Rea further observed luminances about sections of the jacket which had been previously removed for Fish's examination, the right sleeve and cuff, and both the elbow region and back portion of the left sleeve. Rea stated that each of the foregoing luminances were consistent with the presence of blood. On cross-examination, Rea explained he did not perform any additional tests to confirm that the luminol reactions he observed were in fact reactions to blood.

Rod Englert, an expert in crime scene reconstruction and blood splatter, described three different categories of blood splatter: low velocity splatter which result from drops of blood falling straight down; medium velocity splatter which results from blunt force trauma; and high velocity splatter which results from gunfire. With respect to medium velocity splatter, Englert explained that blood does not splatter on the first blow of force, and that regardless of the severity of the beating, very little blood gets on the offender although the scene may be terribly bloody. Englert explained that a minimal amount of blood would be found on the offender in such cases because the force is always directed away at the victim. Englert additionally discussed blood transfer stains, and explained that they occur when blood is swiped against someone or something.

Englert examined the physical evidence and photographs in the case and concluded that the blood on Ms. Nielsen's kitchen floor appeared smeared, indicative of a struggle in which someone bled. Englert stated that the absence of bloody shoe prints was not unusual given how quickly blood dries. Englert noted the blood on the kitchen wall immediately outside the bedroom represented classic medium velocity splatter suggestive of blunt force being inflicted upon the victim. Given the low angle of projection, Englert opined that Ms. Nielsen received numerous blows while on the kitchen floor.

Upon reviewing photos of defendant's jeans, Englert stated the blood on the left and right knee areas represented transfer stains, and not splatter. According to Englert, these stains were consistent with defendant coming into contact with the pool of blood surrounding the victim. As for the bottom of the pants, Englert observed several small specs of blood which in his

opinion were consistent with medium velocity splatter. Englert specifically stated the transfer and splatter stains were not consistent with defendant picking up a bag having blood on it or with such a bag being placed on top of the clothing. Englert further stated the stains were not consistent with defendant kneeing another person in the nose.

In examining photographs of the luminol testing performed on defendant's jacket by Rea, Englert stated the stains on the right and left sleeves and on the front of the jacket represented medium velocity splatter. Englert also observed transfer stains on the back of the sleeves and on the right front pocket.

In Englert's opinion, Ms. Nielsen was first attacked in the kitchen, near the entry of the bedroom, where she received numerous blows while on the floor. Englert believed the blood splatters on the bottom of defendant's pants occurred at this time. Ms. Nielsen, struggling to break free, was then taken to the bedroom and thrown on the bed where she was attacked again and ultimately killed. According to Englert, the bleeding represented by the amount of blood found in the bed would have occurred after Ms. Nielsen had died. Englert opined the physical evidence he examined was consistent with the person causing the death of the victim.

On cross-examination, Englert knew during his examination of defendant's pants and jacket that the substance present on the clothing has human blood, but presumed that the blood was that of Ms. Nielsen. Englert acknowledged that medium velocity splatter could very possibly occur during a fist fight, but explained that the medium splatter found in the case was consistent with Ms. Nielsen's attack. Englert additionally stated that, in attacks similar to that on Ms. Nielsen, blood may or may not get on the attacker's shoes.

After the State rested, defendant testified that in April 1987 he was unemployed and temporarily living with the Larys after moving out of his ex-girlfriend's house about a month earlier. Defendant stated he had been involved in three fights on the Wednesday prior to Ms. Nielsen's murder. Two of these fights involved friends Tom Szeszol and Bill Henderson, while the other involved an unidentified man who was attempting to break into defendant's car. In the former fight, defendant stated he sustained two cuts to his hand which bled, that Szeszol bled

from his mouth and nose, and that Henderson also bled from his mouth. In the latter fight, defendant stated he hit the man three or four times in the face and kneed him in the nose, causing the man to bleed. Defendant intimated that in all three fights he was wearing his blue quilted jacket; indeed, according to defendant, he had been in several fights while wearing his jacket.

In the afternoon of April 24, 1987, defendant and Dan, after spending the morning drinking, went to Szeszol's apartment to clean laundry, including defendant's jeans which had blood on them. Defendant was able to wash every article of clothing except his jeans before leaving. Defendant explained he wanted to soak his jeans before washing them, but was directed by Szeszol to leave the apartment before he had the opportunity to do so. Defendant was further unable to wash his quilted jacket. Upon leaving, defendant threw his clothing, including the jeans, into the trunk of his car. Defendant drove Dan to his apartment and then went to a nearby tavern to drink.

Defendant left the bar about 6:30 p.m. and, after buying a case of beer, went to Dan's apartment. Defendant and Dan drank together until about 11:45 p.m. when defendant left and went to a bar down the street. After having a couple of drinks, defendant went to another bar, Our Place. At about 2:00 a.m., defendant left and went to the Lary's apartment to see if Dan wanted to get some drinks.

Upon returning to the Larys, defendant parked his car in the alley behind the building to urinate. When he exited the vehicle, defendant heard a noise, like that of a door closing. Henry approached the house, but saw no one. As he urinated, defendant noticed a bag on the side of the house. Defendant looked inside and found a box of silverware. Defendant picked up the bag and carried it to his car where he placed it in the trunk. Defendant drove his car to the front of the house and went to see if Dan was awake.

After being told by Margaret that Dan was sleeping, defendant left and returned to the Our Place tavern. Defendant drank at the bar until about 4:00 a.m., and after dropping off two friends, he returned to the Lary's apartment and fell asleep on the living room couch.

Defendant awoke at about 8:00 a.m. on April 25, and later that morning he and Dan drove to the house of a friend, Bill Brown, in Melrose Park. Before entering Brown's house, defendant decided to look in the bag he had discovered earlier that morning. Defendant removed the bag's contents and noticed that some of the items were bloody. Defendant kept some items and disposed of others, including a bloody pillow case, in a dumpster. Defendant sold the items he kept to Brown for $60, and then drove Dan back to his apartment.

Defendant was ultimately arrested by the police early the next morning as he slept in his car. Defendant maintained his innocence and denied any responsibility in both the break-in of the Ms. Nielsen's apartment and in the victim's death.

Hines, defendant's former girlfriend, testified that defendant moved out of her apartment about a month before Ms. Nielsen's murder, and she acknowledged not seeing defendant during that period. Hines identified the quilted jacket recovered by police as belonging to defendant, and indicated that defendant wore the jacket every day.

During direct examination, defense counsel attempted to elicit testimony that Hines had witnessed defendant's involvement in numerous fights in which he was wearing his quilted jacket and where one of the participants had bled. However, the State successfully moved the court to bar this testimony.

In an offer of proof, defense counsel stated Hines would have testified that she was present with defendant on about seven or eight occasions when defendant was involved in a physical altercation with others; that defendant was wearing his quilted jacket on each of these occasions; and that one or more of the participants involved had bled. In response to counsel's offer, the court noted that Hines was never asked when these alleged fights occurred and, on that basis, concluded her testimony was too remote to be relevant.

To rebut the testimonies of Rea and Englert, the defense offered Dr. Kenneth Siegusmund as an expert in the fields of luminol processing and blood splatter analysis. During voir dire, Dr. Siegusmund testified he holds a Ph.D. and B.S. in biology and an undergraduate minor in chemistry. As his primary employ, Dr. Siegesmund works in the Department of Anatomy at the

Medical College of Wisconsin developing a scientific instrument used in the field of immunology. The doctor admitted that this work is unrelated to the forensic science field. Previously, Dr. Siegesmund worked in the Department of Biology at Marquette University in Milwaukee. Dr. Siegesmund additionally teaches a general forensic sciences course at a local university, and has given lectures in the field to law enforcement personnel. Dr. Siegesmund holds memberships in the American Academy of Forensic Scientists, the Midwest American Association of Anatomy, the Neuroloectic Society of America, and the American Association for the Advancement of Science.

Dr. Siegesmund has performed luminol testing well over a hundred times, and was "familiar" with the study of blood splatter. Dr. Siegesmund indicated that he had been qualified in court as an expert in forensic sciences about 250 times, and specifically as a blood splatter expert about 20 times. Dr. Siegesmund did not indicate whether he had ever been previously accepted as an expert in luminol application or testing.

On cross-examination, the State initially went to great lengths to undermine Dr. Siegesmund's credibility. When asked whether any court in Cook County had found him unqualified as an expert in any field, Dr. Siegesmund replied "I don't believe so," that "[t]here may have been a case where I wasn't qualified in a certain area but not with respect to the entire testimony that I gave." The prosecutor then demonstrated that the doctor could not remember being disqualified as a crime reconstruction expert in an unrelated criminal trial and as a ballistics expert in a federal civil case. The prosecutor further elicited testimony from the doctor that he could not remember giving certain testimony in those proceedings.

Dr. Siegesmund described himself as an expert in, among other areas, crime scene reconstruction, blood splatter, blood identification and luminol testing. The doctor has never taken a course in crime scene reconstruction and has never been to a crime scene under investigation. Dr. Siegesmund has never had any formal training in crime scene processing or in techniques of physical evidence collection. His only exposure in this area has been through yearly, one-week seminars held by the American Academy of Forensic Scientists. Dr. Siegesmund believed he last attended such a conference in 1994, but was not sure. The

prosecutor questioned Dr. Siegesmund further in this regard, noting for the doctor that he had previously testified in a 1996 criminal case indicating that he did not attend an Academy conference in 1994. The doctor could not recall making that statement.

Dr. Siegesmund stated he had conducted work at the Glendale Crime Lab in Wisconsin. Dr. Siegesmund denied that the Glendale Lab had not performed forensic work for ten years, and believed that the lab was still operating. The prosecutor then confronted Dr. Siegesmund with testimony he had given earlier that year in an unrelated criminal prosecution where he had stated that the Glendale Lab had not conducted forensic work since 1986. Dr. Siegesmund could not recall making that statement.

Dr. Siegesmund has not received any formal forensic training. Dr. Siegesmund explained his training in the area comes from attending the yearly conferences held by the Academy and from reading a monthly Academy publication and text books on the subject.

With respect to luminol processing, Dr. Siegesmund has never received any training from the police or FBI, has never taken any course teaching luminol application at a crime scene, and has never performed any luminol testing for a crime lab. Dr. Siegesmund stated he last performed an experiment using luminol sometime in late October 1996, about three weeks prior to the start of defendant's retrial.

Dr. Siegesmund has never received any formal training in blood splatter analysis, has never performed such work in a crime lab, and has not written any articles on the subject. His knowledge of blood splatter comes from attending the Academy conferences and through reading text books. The doctor has performed numerous experiments involving blood splatter in connection with his forensic science lectures given to law enforcement officers. When asked by the prosecutor if he had ever received any training on how to conduct such experiments, Dr. Siegesmund indicated no, responding he was the teacher and that he did not take courses from the officers. Further, when asked if it was sensible to learn how to conduct the experiments before he taught them, the doctor replied that he is a scientist and that he "believed" he could perform the work properly on the

basis of the information he had learned from the conferences and written materials.

Responding to the defense's tender of Dr. Siegesmund as an expert, the court remarked that the doctor "appears to be a jack of all trades and [a] master of none." The court specifically commented on Dr. Siegesmund's credibility, stating that "his manner while testifying seemed disingenuous at times" undermining any attempt "to instill some confidence that someone is an expert in some kind of field." Finding the doctor's qualifications lacking, the court refused to accept Dr. Siegesmund as an expert in blood splatter analysis and luminol interpretation. The court, however, allowed Dr. Siegesmund to testify about the manner in which luminol testing is conducted.

Defense counsel did not proceed with Dr. Siegesmund as a witness, but instead made an offer of proof. Counsel explained Dr. Siegesmund would have testified that confirmatory testing is necessary when using luminol as a detecting agent for blood. In this regard, Dr. Siegesmund would have opined that Rea should have performed additional tests to confirm that the areas of luminance on defendant's jacket were in fact indicative of blood and, if so, a test to determine whether that blood was that of defendant. Dr. Siegesmund would have further refuted Englert's conclusions that the blood found on defendant's jacket represented splatter, and would have stated that the blood stains about the knee areas of defendant's jeans were indicative of lateral activity. The doctor would have also stated, contrary to Englert's opinion, that a majority of Ms. Nielsen's blood loss would have occurred prior to her death. On this basis, Dr. Siegesmund would have explained that the offender would have been covered in blood and, thus, would have likely left bloody shoe prints in the victim's apartment.

Following the presentation of rebuttal evidence by the State and the jury's deliberations, defendant was found guilty of murder and sentenced to a term of natural life imprisonment.

Exh. A, *Kaczmarek*, 741 N.E.2d at 1135.

5.     The appellate court rejected petitioner's speedy-trial claim, but

vacated his life sentence and remanded for resentencing, concluding that "the

penalty scheme set forth in section 5-8-1(a)(1)(b) of the Corrections Code offends the constitutional principles announced in *Apprendi*." Exh. A, 741 N.E.2d at 1131. The State filed a petition for leave to appeal (PLA) that the Illinois Supreme Court granted; petitioner asserted his federal speedy trial claim on cross-appeal. Exhibit B (State's Brief, *People v. Kaczmarek*, No. 90865); Exhibit C (Petitioner's Response and Cross-Brief, *People v. Kaczmarek*, No. 90865); Exhibit D (State's Reply and Cross-Response, *People v. Kaczmarek*, No. 90865); and Exhibit E (Petitioner's Cross-Reply, *People v. Kaczmarek*, No. 90865). The Illinois Supreme Court affirmed the denial of petitioner's speedy trial claim and reversed the state appellate court's decision vacating petitioner's sentence. Exh. F (*People v. Kaczmarek*, 798 N.E.2d 713 (Ill. 2003)).

6.      On November 23, 2003, petitioner filed a petition for a writ of certiorari to the United States Supreme Court; his petition was denied on February 23, 2004. Exhibit G (*Kaczmarek v. Illinois*, 540 U.S. 1199 (2004)).

7.      On March 24, 2004, petitioner filed a postconviction petition in the Circuit Court of Cook County pursuant to 725 ILCS 5/122-1, *et seq.*, raising the following claims:

> A.      his right to a fair trial was violated by the State's use of the perjured testimony of the State's expert witness, Pamela Fish; and

> B.      his trial and appellate counsel were ineffective for failing to challenge the admissibility of expert testimony regarding luminal testing and blood spatter evidence under *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923).

14

Exhibit H (Postconviction petition, *People v. Kaczmarek*, No. 87 CR 6131, Circuit Court of Cook County).

8.    Petitioner's postconviction petition was dismissed on June 14, 2004.  Petitioner appealed and raised the same grounds.  Exhibit I (Petitioner's Brief, *People v. Kaczmarek*, No. 1-04-2401); Exhibit J (State's Brief, *People v. Kaczmarek*, No. 1-04-2401); Exhibit K (Petitioner's Reply, *People v. Kaczmarek*, No. 1-04-2401).  On November 16, 2006, the appellate court affirmed.  Exhibit L (Rule 23 Order, *People v. Kaczmarek*, No. 1-04-2401 (Ill.App. 2006)).  Petitioner filed a PLA that the Illinois Supreme Court denied on May 31, 2007.  Exhibit M (PLA, *People v. Kaczmarek*, No. 104184); Exhibit N (Order Denying PLA, *People v. Kaczmarek*, No. 104184).  Petitioner did not seek review in the United States Supreme Court.

9.    The instant petition for a writ of habeas corpus was signed by petitioner on October 16, 2007, which is the earliest date on which petitioner could have mailed the petition from his correctional institution.  Giving petitioner the benefit of the doubt, the petition was "filed" on that date, *see, e.g., Jones v. Bertrand*, 171 F.3d 499, 501 (7th Cir. 1999), and is therefore timely under 28 U.S.C. § 2244(d)(1).  The petition raises the following claims:

    A.    petitioner's constitutional right to a speedy trial was violated by a three-and-one-half year delay between his first and second trials;

    B.    petitioner's sentence is unconstitutional under *Apprendi v. New Jersey* because the facts used to impose an extended-term sentence were not charged in the indictment and proved beyond a reasonable doubt;

C.    petitioner's perjury claim should not have been summarily dismissed because newspaper articles are sufficient evidence for a pro se postconviction petition to survive summary dismissal under the Illinois postconviction statute;

D.    petitioner's trial counsel was constitutionally ineffective for not moving for a *Frye* hearing concerning the scientific techniques of luminol testing and blood spatter analysis;

E.    petitioner was denied a fair trial when the trial court barred petitioner's putative expert witness, Dr. Siegesmund, from testifying about blood-spatter evidence;

F.    the trial court abused its discretion by qualifying Mitch Rea as an expert on the topic of luminol testing; and

G.    petitioner was denied a fair trial when his girlfriend was barred from testifying as to an alternative source of blood on his jacket.

Pet. at 5-6.

10.    Petitioner has exhausted his state court remedies because no avenues remain available by which petitioner may present the constitutional claims raised in this habeas petition to the state courts.  *See* 725 ILCS 5/122-1, *et seq.*

11.    The following materials are being filed with this Court under separate cover:

Exhibit A:    *People v. Kaczmarek*, No. 1-97-2557, 741 N.E.2d 1131 (2000);

Exhibit B:    State's Brief, *People v. Kaczmarek*, No. 90865;

Exhibit C:    Petitioner's Response and Cross-Brief, *People v. Kaczmarek*, No. 90865;

Exhibit D:     State's Reply Brief and Cross-Response, *People v. Kaczmarek*, No. 90865;

Exhibit E:     Petitioner's Cross-Reply Brief, *People v. Kaczmarek*, No. 90865;

Exhibit F:     *People v. Kaczmarek*, 798 N.E.2d 713 (Ill. 2003);

Exhibit G:     *Kaczmarek v. Illinois*, 540 U.S. 1199 (2004);

Exhibit H:     Postconviction petition, *People v. Kaczmarek*, No. 87 CR 6131, Circuit Court of Cook County;

Exhibit I:     Petitioner's Brief, *People v. Kaczmarek*, No. 1-04-2401;

Exhibit J:     State's Brief, *People v. Kaczmarek*, No. 1-04-2401;

Exhibit K:     Petitioner's Reply, *People v. Kaczmarek*, No. 1-04-2401;

Exhibit L     Rule 23 Order, *People v. Kaczmarek*, No. 1-04-2401 (Ill.App. 2006);

Exhibit M:     PLA, *People v. Kaczmarek*, No. 104184;

Exhibit N:     Order Denying PLA, *People v. Kaczmarek*, No. 104184;

Exhibit O:     Petitioner's Brief, *People v. Kaczmarek*, No. 97-2557;

Exhibit P:     State's Brief, *People v. Kaczmarek*, No. 97-2557; and

Exhibit Q:     Petitioner's Reply Brief, *People v. Kaczmarek*, No. 97-2557.

## ANSWER TO PETITIONER'S PETITION FOR WRIT OF HABEAS CORPUS

## STANDARD OF REVIEW

## Procedural Requirements

The federal habeas statute ordinarily demands that a petitioner exhaust available state remedies before pursuing federal habeas relief. *See* 28 U.S.C. § 2254(b)(1) ("[a]n application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that – (A) the applicant has exhausted the remedies available in the courts of the State; or (B)(i) there is an absence of available State corrective process; or (ii) circumstances exist that render such process ineffective to protect the rights of the applicant"); *see also, e.g., Woodford v. Ngo*, 126 S. Ct. 2378, 2386-87 (2006) (quoting *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999)).

A claim is not exhausted for the purposes of Section 2254(b) unless it is "fully and fairly presented" to the state courts. A fully presented claim is one that is invoked in "one complete round of the State's established appellate review process." *Boerckel*, 526 U.S. at 845-46. In Illinois, a complete round of appellate review includes presenting a claim on appeal to the Illinois appellate court and in a PLA to the Illinois Supreme Court. *See id.* A fairly presented claim is one where the operative facts and legal principles were argued to the state court in accordance with state procedural rules. *See Keeney v. Tamayo-Reyes*, 504 U.S. 1, 10 (1992).

"In habeas, state-court remedies are described as having been 'exhausted' when they are no longer available, regardless of the reason for their unavailability." *Ngo*, 126 S. Ct. at 2387 (citing *Gray v. Netherland*, 518 U.S. 152, 161 (1996)). "[E]xhaustion in this sense does not automatically entitle the habeas petitioner to litigate his or her claims in federal court. Instead, if the petitioner procedurally defaulted those claims, the prisoner generally is barred from asserting those claims in a federal habeas proceeding." *Ngo*, 126 S. Ct. at 2387.

A claim may be procedurally defaulted because a state court has determined that it is barred under state procedural law. *See, e.g., Coleman v. Thompson*, 501 U.S. 722, 729-30 (1991). A claim may also be procedurally defaulted, even when a state court has not issued a procedural ruling on the claim, if the claim could no longer be raised in state court because a state court would determine, if presented with the claim, that it is procedurally barred under state law. *See id.* at 735 n.1; *accord Jenkins v. Gramley*, 8 F.3d 505, 507 (7th Cir. 1993).

Procedural default may be excused when there is cause for the default and prejudice as a result of the alleged violation of federal law, or where a refusal to consider the claim would result in a fundamental miscarriage of justice. *See, e.g., Dellinger v. Bowen*, 301 F.3d 758, 767 (7th Cir. 2002).

To show cause for a default, a petitioner must offer an "external" excuse, *i.e.*, one that cannot fairly be attributed to him. *See, e.g., Harris v.*

*McAdory*, 334 F.3d 665, 669 (7th Cir. 2003).  In order to establish prejudice, a petitioner must demonstrate that the alleged constitutional violation establishes a reasonable probability that the result would have been different but for the violation.  *See Richardson v. Briley*, 401 F.3d 794, 801 (7th Cir. 2005) (quoting *Strickler v. Greene*, 527 U.S. 263, 289 (1999)).

To establish a fundamental miscarriage of justice, a petitioner must adduce evidence making it "'more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt.'"  *House v. Bell*, 126 S. Ct. 2064, 2077 (2006) (quoting *Schlup v. Delo*, 513 U.S. 298, 327 (1995)).  This standard is "demanding and permits review only in the 'extraordinary' case."  *House*, 126 S. Ct. at 2077 (internal quotations omitted).  Due to the prior finding of guilt by the factfinder, a petitioner alleging a fundamental miscarriage of justice bears the burden of proof with respect to his purported innocence.  *See Buie v. McAdory*, 341 F.3d 623, 626-27 (7th Cir. 2003).

**Adjudication of the Merits Under 28 U.S.C. § 2254(d)**

Section 2254(d) provides that "[a]n application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim — (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme

Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).

A judgment is "contrary to" Supreme Court precedent if the state court made a statement of law inconsistent with one made by the Supreme Court, or if the state court decided a case with "materially indistinguishable facts" differently from the Supreme Court.  *Huynh v. Bowen*, 374 F.3d 546, 548 (7th Cir. 2004) (citing *Williams v. Taylor*, 529 U.S. 362, 413 (2000)).

A state court decision is an "unreasonable application of" clearly established federal law "if the state court identifies the correct governing legal principle from the [Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case."  *Cossel v. Miller*, 229 F.3d 649, 654 (7th Cir. 2000) (citing *Williams*, 529 U.S. at 413).  The Seventh Circuit has repeatedly instructed that the unreasonable application prong of Section 2254(d)(1) is "a difficult standard to meet."  *See, e.g., Floyd v. Hanks*, 364 F.3d 847, 850 (7th Cir. 2003).  A federal court is not permitted to substitute its independent judgment as to the correct outcome; it may only ask if the state court's decision was reasonable.  *See Washington v. Smith*, 219 F.3d 620, 628 (7th Cir. 2000); *see also Huynh*, 374 F.3d at 548 ("An unreasonable application is not simply what we might deem to be an incorrect or erroneous application of federal law.").

"Unreasonableness also serves as the touchstone against which state court decisions based upon determinations of fact in light of the evidence presented are evaluated.  28 U.S.C. § 2254(d)(2).  As is the case under § 2254(d)(1), a petitioner's challenge to a decision based on a factual determination will not succeed if the petitioner merely evidences that the state court committed error.  Instead, he must further establish that the state court committed unreasonable error."  *Ward v. Sternes*, 334 F.3d 696, 703-704 (7th Cir. 2003).

## CLAIMS RAISED BY PETITIONER

**I.     Petitioner Was Denied His Constitutional Right To A Speedy Trial.**

**Merits**

The Illinois Supreme Court rejected petitioner's claim on the merits:

Both the United States Constitution and the Constitution of Illinois guarantee an accused the right to a speedy trial. U.S. Const., amend. VI; Ill. Const. 1970, art. I, § 8. In *Barker v. Wingo*, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972), the United States Supreme Court addressed the nature of the constitutional right to a speedy trial and recognized the need to set out "criteria by which [a constitutional] speedy trial right is to be judged." *Barker*, 407 U.S. at 516, 92 S.Ct. at 2185, 33 L.Ed. 2d at 109. This court has acknowledged the competing interests recognized in *Barker*'s discussion of the constitutional right to speedy trial, and we consider in our own analysis the "four factors" identified in that case "together with such other circumstances as may be relevant." *Barker*, 407 U.S. at 533, 92 S.Ct. at 2193, 33 L.Ed.2d at 118; *People v. Crane*, 195 Ill.2d 42, 46-48, 252 Ill.Dec. 687, 743 N.E.2d 555 (2001).

As we observed in *Crane*:

"[T]he right to a speedy trial is 'a more vague concept than other
procedural rules,' which makes it 'impossible to determine with
precision when the right has been denied.' *Barker*, 407 U.S. at
521, 92 S.Ct. at 2187, 33 L.Ed.2d at 112. Instead, determining
whether an accused's constitutional right to a speedy trial has
been violated 'necessitates a functional analysis of the right in
the particular context of the case.' *Barker*, 407 U.S. at 522, 92
S.Ct. at 2188, 33 L.Ed.2d at 112. Because of the seriousness of
the remedy — 'a defendant who may be guilty of a serious crime
will go free, without having been tried' — the right to a speedy
trial should always be in balance, and not inconsistent, with the
rights of public justice. *Barker*, 407 U.S. at 522, 92 S.Ct. at 2188,
33 L.Ed.2d at 112." *Crane*, 195 Ill.2d at 47, 743 N.E.2d 555.

In order to strike a proper analytical balance between society's
interests and those of an accused, the Supreme Court in *Barker*
identified four factors to be considered: the length of the delay;
the reasons for the delay; defendant's assertion of his right; and
the prejudice, if any, to the defendant. *Barker*, 407 U.S. at 530,
92 S.Ct. at 2192, 33 L.Ed.2d at 116-17. No one factor is
dispositive. *Barker*, 407 U.S. at 530-33, 92 S.Ct. at 2192-93, 33
L.Ed.2d at 116-19; *Crane*, 195 Ill.2d at 52, 252 Ill.Dec. 687, 743
N.E.2d 555. The ultimate determination of whether a
defendant's constitutional speedy-trial right has been violated is
subject to de novo review. *Crane*, 195 Ill.2d at 52, 252 Ill.Dec.
687, 743 N.E.2d 555. Applying the *Barker* factors to the facts of
this case, it is clear that defendant's constitutional right to a
speedy trial has not been violated.

On March 31, 1993, the appellate court filed an opinion in which
it reversed the defendant's murder conviction and remanded for
a new trial. The appellate court's mandate was filed in the
circuit court on July 19, 1993. Defendant's retrial commenced on
November 18, 1996.

When assessing a constitutional speedy-trial claim, the first
consideration is the length of the delay. In general, courts have
recognized a delay approaching one year to be "presumptively
prejudicial." *Barker*, 407 U.S. at 530-31, 92 S.Ct. at 2192, 33
L.Ed.2d at 117; *Crane*, 195 Ill.2d at 52-53, 252 Ill.Dec. 687, 743
N.E.2d 555. Obviously, the delay in this case qualifies as
presumptively prejudicial. A finding of "presumptive prejudice,"

however, does not imply that the delay will be found to have actually prejudiced the defendant. Rather, it simply marks the point at which courts deem the delay unreasonable enough to trigger the full *Barker* inquiry. *Doggett v. United States*, 505 U.S. 647, 656, 112 S.Ct. 2686, 2693, 120 L.Ed.2d 520, 531 (1992); *Crane*, 195 Ill.2d at 53, 252 Ill.Dec. 687, 743 N.E.2d 555. Therefore, we next address the second *Barker* factor, the reason for the delay.

During the period beginning on May 28, 1993, and ending November 18, 1996, the common law record evinces 39 continuances by agreement of the parties, 3 by order of the court, and 3 granted on motion of defendant. The case was continued four times because defense counsel failed to appear. During this period of time, defendant was represented by six different attorneys-three with the Cook County public defender's office and three private attorneys-all of whom required time to familiarize themselves with, what one described as, "two to three feet" of discovery and the voluminous record after they assumed responsibility for defendant's representation. Although the common law record is not a model of clarity, we have considered it, together with the transcripts contained in the record on appeal, so that we may do justice to both the State and the defendant. *See People v. Mayo*, 198 Ill.2d 530, 536, 261 Ill.Dec. 910, 764 N.E.2d 525 (2002). It would needlessly lengthen this opinion if we were to specifically address the circumstances of each continuance in this case; however, we have reviewed individually the circumstances of each delay, and we conclude that no more than three months of delay can be attributed to causes independent of the actions of defendant's attorneys.

A delay is considered to have been occasioned by the defendant when the defendant's acts caused or contributed to the delay. *Mayo*, 198 Ill.2d at 537, 261 Ill.Dec. 910, 764 N.E.2d 525. When a defense attorney requests a continuance on behalf of a defendant, any delay caused by that continuance will obviously be attributed to the defendant. *Mayo*, 198 Ill.2d at 537, 261 Ill.Dec. 910, 764 N.E.2d 525. Moreover, an agreement to continue the case is properly chargeable to defendant. *People v. Kliner*, 185 Ill.2d 81, 115, 121, 235 Ill.Dec. 667, 705 N.E.2d 850 (1998); *see People v. Plair*, 292 Ill.App.3d 396, 398, 400, 226 Ill.Dec. 679, 686 N.E.2d 28 (1997). Further, when a defendant's attorney fails to appear in court at the appointed time, his absence causes a delay attributable to the defendant. *Kliner*, 185

Ill.2d at 117, 235 Ill.Dec. 667, 705 N.E.2d 850. Applying the foregoing principles to the facts of this case, we find that the defendant caused or contributed to nearly all the pretrial delay at issue.

Defendant's suggestion that the lengthy delay between remand and retrial was the result of the State's failure to timely disclose material in discovery is belied by those transcripts that have been made a part of the record on appeal which reveal no pertinent objections or complaints by defendant's attorneys with respect to the State's disclosure of materials. This observation also applies to defendant's contention that the protracted delay resulted solely from the State's efforts to obtain additional testing of bloodstained evidentiary items. Until defendant's final attorney filed a motion for discharge on speedy-trial grounds just before trial, defendant's preceding attorneys seemed perfectly content to continue the case by agreement or on defense motion, either because they were unprepared to proceed, or because they wanted to see if blood testing would corroborate defendant's testimony from his first trial, which suggested that the blood on his clothing had come from a source other than Nielsen. While it is true that the State used the period between remand and retrial to pursue further testing, defendant cannot escape the consequences of his attorneys' conduct which caused or contributed to most of the delay.

With respect to the third *Barker* factor, the defendant's assertion of his speedy-trial right, we note that a defendant is bound by the actions of his attorney, unless the defendant clearly and convincingly asserts his right to discharge his attorney. *Mayo*, 198 Ill.2d at 537, 261 Ill.Dec. 910, 764 N.E.2d 525; *Kliner*, 185 Ill.2d at 118, 235 Ill.Dec. 667, 705 N.E.2d 850. As this court observed in *People v. Bowman*, 138 Ill.2d 131, 141, 149 Ill.Dec. 263, 561 N.E.2d 633 (1990): "In criminal proceedings, an attorney is authorized to act for his client and determine for him procedural matters and decisions involving trial strategy and tactics. [Citations.] Thus, the affirmative acts of a defendant's counsel cannot be separated from the defendant's own acts." Defendant in this case was at all pertinent times represented by counsel.

Defendant at various times attempted to assert his right to a speedy trial; however, until shortly before retrial, he did so against the wishes of his attorneys, who were not prepared or

inclined to proceed. Generally, the decision to demand a speedy trial and to seek dismissal of the State's charges on such grounds are matters left to the sound strategic decision of counsel. *See People v. Ramey*, 151 Ill.2d 498, 523-24, 177 Ill.Dec. 449, 603 N.E.2d 519 (1992). As this court observed in *Bowman*, "[d]efendant cannot contend that it was unfair to force him to choose between a speedy trial and effective assistance of counsel. Defendant may have a right, even of constitutional dimensions, to pursue whichever course he chooses, but the Constitution does not forbid requiring him to choose nonetheless." *Bowman*, 138 Ill.2d at 148, 149 Ill.Dec. 263, 561 N.E.2d 633. Defendant made his choice in this matter.

Defendant first "asserted" his right to a speedy trial on July 21, 1993, when appointed counsel informed the court that defendant, "on his own motion," was demanding a speedy trial. Counsel told the court, "I certainly would not be ready at this point professionally." The court warned the defendant of the dangers of proceeding with an attorney who was not prepared. Defendant responded, "I'll wait." He explicitly agreed to a continuance.

On October 12, 1994, defendant made an oral, pro se motion for discharge on statutory speedy-trial grounds. The circuit court advised defendant to put his motion in writing. Defendant subsequently filed a written, pro se motion on November 18, 1994, claiming a violation of "the speedy trial act." Defendant, acting in a pro se capacity, announced he was ready for trial on that date. He was given the opportunity to argue his pro se motion, but admitted he was not ready to do so and requested a continuance. The court denied defendant's request for a "bar association lawyer." Defendant did not ask to discharge appointed counsel and proceed pro se.

Hearing on defendant's pro se motion was later continued again because defendant was not prepared to proceed. We find nothing in the record which would indicate that defendant's motion was ever argued or that the court rendered a ruling thereon. The same is true with respect to a second pro se motion for appointment of a "bar association attorney." Defendant never attempted to assert his right to discharge his attorney and proceed to an immediate trial. The record unequivocally shows that defendant wanted the assistance of counsel in preparing his defense for trial. Thus, defendant is bound by the actions of his

attorneys. *See Mayo*, 198 Ill.2d at 537, 261 Ill.Dec. 910, 764 N.E.2d 525.

The fourth and final consideration in the *Barker* analysis is prejudice to the defendant. Prejudice must be assessed in the light of the interests of defendants which the speedy-trial right was designed to protect. *Barker*, 407 U.S. at 532, 92 S.Ct. at 2193, 33 L.Ed.2d at 118. Those interests are (1) the prevention of oppressive pretrial incarceration, (2) the minimization of defendant's anxiety and concern about the pending charge, and (3) the limitation of the possibility that the defense will be impaired by the delay. *Barker*, 407 U.S. at 532, 92 S.Ct. at 2193, 33 L.Ed.2d at 118; *Crane*, 195 Ill.2d at 59, 252 Ill.Dec. 687, 743 N.E.2d 555. The third factor has been recognized by the Supreme Court as the most serious " 'because the inability of a defendant adequately to prepare his case skews the fairness of the entire system.'" *Doggett*, 505 U.S. at 654, 112 S.Ct. at 2692, 120 L.Ed.2d at 530, quoting *Barker*, 407 U.S. at 532, 92 S.Ct. at 2193, 33 L.Ed.2d at 118.

In this case, defendant has not specified how his ability to prepare his defense was impaired or adversely affected by the delay in retrying the murder charge. If witnesses die or disappear during a delay, prejudice is obvious. Clearly, there is also prejudice if defense witnesses are unable to recall accurately events of the distant past. *See Barker*, 407 U.S. at 532. We see no evidence of such prejudice in this case. With the exception of additional blood-splatter evidence in defendant's second trial, the evidence adduced by both sides at defendant's second trial was substantially the same as the evidence properly presented at his first trial. The State's use of blood-splatter evidence at the second trial does not qualify as impairment of defendant's ability to present his defense.

Defendant also claims that he experienced anxiety while awaiting retrial. We note that this factor is present to some extent in every case and absent some unusual showing, this inconvenience alone is of slight import. *People v. Wills*, 153 Ill.App.3d 328, 337. No doubt much of the anxiety defendant experienced was the result of having been already once tried by a jury, having been found guilty of Nielsen's murder, and having been sentenced to a term of natural life imprisonment. We are of the opinion that the weight to be accorded the first two components of the fourth Barker factor is minimal under the

circumstances of this case.

> The balancing that we are required to perform must take into account the rights of the defendant, but does not preclude the rights of public justice. *Crane*, 195 Ill.2d at 62. Although the delay between remand and retrial was indeed lengthy, and the State admittedly used that time to its advantage, the defendant cannot escape responsibility for causing or contributing to most of the delay. Considering that fact, together with lack of any showing that the delay impaired the presentation of a defense, we conclude that defendant's constitutional right to a speedy trial was not violated. We therefore affirm the judgment of the appellate court in this respect.

Exh. F, *Kaczmarek*, 798 N.E.2d at 717-21.

The Illinois Supreme Court's resolved petitioner's claim on the merits, so review of that claim is governed by 28 U.S.C. § 2254(d), which provides that federal habeas relief may not be granted unless the state court's adjudication of a claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," § 2254(d)(1), or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," § 2254(d)(2).  Petitioner has not established that the Illinois Supreme Court's resolution of his speedy-trial claim was contrary to or an unreasonable application of clearly established Federal law, nor has he shown that the decision was based on an unreasonable determination of the facts.

The Illinois Supreme Court's decision was not contrary to clearly established federal law.  It correctly identified *Baker v. Wingo*, 407 U.S. 514

(1972), as the applicable legal authority.  *See, e.g., Williams v. Bartow*, 481

F.3d 492, 505 (7th 2007) (*Barker* is controlling authority for speedy-trial

claims).  As noted by the Illinois Supreme Court, *Barker* identified four

relevant factors in assessing a speedy-trial claim:  (1) the length of the delay;

(2) the reasons for the delay; (3) the defendant's assertion of his right; and (4)

prejudice to the defendant.  Exh. F, *Kaczmarek*, 798 N.E.2d at 717-18 (citing

*Barker*, 407 U.S. at 516); *see also Bartow*, 481 F.3d at 505 (under *Barker*, "a

court must consider the '[l]ength of delay, the reason for the delay, the

defendant's assertion of his right, and prejudice to the defendant'") (quoting

*Barker*, 407 U.S. at 516).  In addition, the facts of petitioner's case do not

closely resemble those of *Barker*, where there was nearly five years of delay

between arrest and trial, of which only seven months was justifiable.  *Barker*,

407 U.S. at 533-34.  In this case, petitioner's delay was less than four years,

and the bulk of the delay was the product of continuances by agreement of

the parties.  Exh. F, *Kaczmarek*, 798 N.E.2d at 718.  Thus, the state court did

not cite a rule contrary to Supreme Court precedent, or confront a set of facts

indistinguishable from the applicable precedent.  Petitioner is not entitled to

habeas relief under § 2254(d)(1)'s "contrary to" clause.

Nor was the Illinois Supreme Court's decision an unreasonable

application of *Barker*.  Having considered the length of the delay (*Barker*'s

first factor) to be sufficient to trigger a full *Barker* inquiry, the Illinois

Supreme Court proceeded to faithfully apply the remaining *Barker* factors.

With respect to the second factor — the reasons for the delay — the Illinois Supreme Court determined that "no more than three months of delay can be attributed to causes independent of the actions of defendant's attorneys." *Id.* at 719.  This was not an unreasonable determination of the facts in light of the record.  *See* 28 U.S.C. § 2254(d)(2).  The common law record demonstrated that 39 continuances were by agreement of the parties, three were by order of the court, and three were granted on motion of defendant, and that, on four separate occasions, defense counsel failed to appear before the court.  Exh. F, *Kaczmarek*, 798 N.E.2d at 718-19.

Petitioner argues that the Illinois Supreme Court erred when it attributed the acts of his publicly-appointed attorney to him instead of to the State.  Pet. at 5B.  However, counsel's acquiescence in the continuances would be attributable to the State only if such conduct constituted ineffective assistance.  *See, e.g., United States v. Oriedo*, 498 F.3d 593, 599 (7th Cir. 2007); *see also United States v. Taylor*, 196 F.3d 854, 863 (7th Cir. 1999). Petitioner has not established this necessary predicate claim of ineffective assistance because, as the Illinois Supreme Court reasonably determined on the basis of the record evidences, these continuances were necessary for petitioner's attorney to adequately prepare for trial.  Exh. F, *Kaczmarek*, 798 N.E.2d at 718-19.

With respect to the third factor — the defendant's assertion of his speedy-trial right — the Illinois Supreme Court determined that petitioner

was bound by the acts of his attorneys, who agreed to the continuances. *Id.* at 719-20. While petitioner filed several pro se speedy trial motions, those motions were either withdrawn or perpetually continued because petitioner "was not prepared to proceed." *Id.* at 720. Petitioner "never attempted to assert his right to discharge his attorney and proceed to an immediate trial." *Id.* Since petitioner wanted the assistance of counsel, the court's determination with respect to the third *Barker* factor was reasonable.

With respect to the final factor — prejudice to the defendant — the Illinois Supreme Court held that the delay did not impair petitioner's ability to prepare his defense. *Id.* at 721. Petitioner does not dispute this finding — his only allegation of prejudice is that he suffered anxiety from the delay. Pet. at 5D, 5E. However, the Illinois Supreme Court considered and reasonably rejected this claim, noting that anxiety "is present to some extent in every case and absent some unusual showing, this inconvenience alone is of slight import." Exh. F, *Kaczmarek*, 798 N.E.2d at 300. In resolving this prong of the *Barker* inquiry, the Illinois Supreme Court relied upon *United States v. Doggett*, 505 U.S. 654 (1992), which teaches that the primary consideration when assessing prejudice is whether the defense has been impaired by the delay. Exh. F, *Kaczmarek*, 798 N.E.2d at 300 (citing *Doggett*, 505 U.S. at 654). Since petitioner's defense was not impaired, and he did not experience any unusual anxiety from the delay, the Illinois Supreme Court properly determined that he was not prejudiced by the delay.

In short, the Illinois Supreme Court applied the proper legal standard to the unrebutted facts, and its resolution of petitioner's speedy trial claim under that standard was reasonable.  Section 2254(d) does not permit this Court to grant habeas relief on this claim under such circumstances.

## II.    The Illinois Statute Under Which Petitioner Was Sentenced Violates *Apprendi*.

<u>**Merits**</u>

The Illinois Supreme Court rejected petitioner's *Apprendi* claim on the merits:

> The State's *Apprendi* argument in this case has changed with our evolving *Apprendi* jurisprudence. The State's original brief was filed prior to our decisions in *People v. Swift*, 202 Ill.2d 378, 269 Ill.Dec. 495, 781 N.E.2d 292 (2002), *People v. Thurow*, 203 Ill.2d 352, 272 Ill.Dec. 185, 786 N.E.2d 1019 (2003), and *People v. Crespo*, 203 Ill.2d 335, 273 Ill.Dec. 241, 788 N.E.2d 1117 (2001). Relying upon our decisions in *People v. Ford*, 198 Ill.2d 68, 260 Ill.Dec. 552, 761 N.E.2d 735 (2001), and *People v. Hopkins*, 201 Ill.2d 26, 40, 265 Ill.Dec. 869, 773 N.E.2d 633 (2002) ("when any statutory enhancing aggravating factor is proved to exist beyond a reasonable doubt, * * * the original sentencing range increases according to the statutory scheme"), the State initially argues that the jury's findings of guilt on charges of residential burglary, home invasion, and armed robbery at defendant's first trial were sufficient to expand the sentencing range in this case and thus satisfy the requirements of *Apprendi* as interpreted by this court in *Ford* and *Hopkins*.
>
> The State reasons that the first jury's findings were the equivalent of finding that defendant committed the murder in the course of another felony, an aggravating factor that would have made the defendant eligible for the death penalty. See Ill.Rev.Stat.1985, ch. 38, par. 9-1(b)(6). Pursuant to this court's decisions in *Ford* and *Hopkins*, a sentence of natural life would thus have been within the allowable sentencing range, and a finding that defendant had engaged in brutal and heinous behavior indicative of wanton cruelty could have been used to

set the specific sentence within the allowable range. Alternatively, in its original brief, citing, *inter alia*, *Neder v. United States*, 527 U.S. 1 (1999), the State argued that any *Apprendi* error in this case could be considered harmless because "the record clearly reflects that defendant murdered 86-year-old Millie Nielsen 'in a brutal or heinous fashion indicative of wanton cruelty' when he repeatedly beat, stabbed and strangled her after breaking into her apartment."

In its reply brief, the State acknowledged this court's holding in *Swift* — defendant's 80-year sentence violated *Apprendi* because it was based on the trial judge's factual finding that the behavior was exceptionally brutal or heinous — but bolstered its position by reference to this court's decision in *Thurow*, wherein this court, for the first time, held that an *Apprendi* error could be deemed harmless. *See Thurow*, 203 Ill.2d at 369-71, 272 Ill.Dec. 185, 786 N.E.2d 1019. The State later obtained leave to cite this court's decision in *Crespo* as additional authority. In *Crespo*, this court held that the virtually identical *Apprendi* error, that had warranted reversal in *Swift*, was not plain error that would warrant reversal. The court reasoned:

"On the basis of this overwhelming evidence that the crime was brutal and heinous, there is no basis for concluding that the *Apprendi* violation 'seriously affected the fairness, integrity or public reputation of judicial proceedings.' We have no doubt that a jury, presented with these facts, would have found that the crime was committed in a brutal and heinous manner, indicative of wanton cruelty. Accordingly, defendant has failed to show that the error was prejudicial." *Crespo*, 203 Ill.2d at 348-49, 273 Ill.Dec. 241, 788 N.E.2d 1117.

Clearly, after *Swift* there can be no doubt that the sentencing judge in this case violated principles of *Apprendi* when he sentenced defendant to an enhanced term of natural life based upon his finding that the murder was committed in a brutal and heinous manner indicative of wanton cruelty. However, it is equally clear, after *Thurow* and *Crespo*, that an *Apprendi* violation of this kind will not warrant resentencing where there is overwhelming evidence that the crime was committed in a brutal and heinous manner indicative of wanton cruelty. The conduct of the defendant in this instance qualifies as exceptionally brutal and heinous behavior indicative of wanton cruelty under any definition. Thus, defendant-who failed to

object at trial-cannot demonstrate prejudice for purposes of plain error analysis.

The medical examination of Nielsen's body by Dr. Chambliss revealed extensive external and internal injuries. In the course of his external examination, Chambliss found multiple abrasions, bruises and incises about Nielsen's upper body, including her head, chest and arms. Stab wounds were also found on her left thigh, the left part of her groin, and right forearm. Two additional incise wounds were noted on her left leg. An internal exam revealed injuries indicative of manual strangulation, including hemorrhages of the larynx, tongue and esophagus, as well as numerous blunt trauma injuries, including hemorrhaging of the membrane of the brain and a fractured larynx. Although Chambliss concluded that Nielsen died as a result of manual strangulation, with contributing factors of blunt force injuries and stab wounds, he believed the blunt force injuries were so severe that she could have died from them alone. From Chambliss' testimony, it is clear that Nielsen's body was literally covered with bruises. Physical evidence in this case suggests an intense and prolonged struggle that began in Nielsen's kitchen and ended in her bedroom.

This court defines "heinous" behavior as behavior that is hatefully or shockingly evil; grossly bad; enormously and flagrantly criminal. *People v. Nielson*, 187 Ill.2d 271, 299, 240 Ill.Dec. 650, 718 N.E.2d 131 (1999); *People v. Lucas*, 132 Ill.2d 399, 445, 139 Ill.Dec. 447, 548 N.E.2d 1003 (1989); *People v. La Pointe*, 88 Ill.2d 482, 501, 59 Ill.Dec. 59, 431 N.E.2d 344 (1981). "Brutal" behavior is behavior that is grossly ruthless, devoid of mercy or compassion; cruel and cold-blooded. *Nielson*, 187 Ill.2d at 299, 240 Ill.Dec. 650, 718 N.E.2d 131; *Lucas*, 132 Ill.2d at 445, 139 Ill.Dec. 447, 548 N.E.2d 1003; *La Pointe*, 88 Ill.2d at 501, 59 Ill.Dec. 59, 431 N.E.2d 344. Finally, "wanton cruelty" requires proof that the defendant consciously sought to inflict pain and suffering on the victim of the offense. *Nielson*, 187 Ill.2d at 299, 240 Ill.Dec. 650, 718 N.E.2d 131; *People v. Pastewski*, 164 Ill.2d 189, 194, 207 Ill.Dec. 316, 647 N.E.2d 278 (1995).

The senseless, vicious murder of this elderly woman, effected by means of beating, stabbing and strangling, in order to perpetrate a robbery that could have been easily accomplished without killing her, undoubtedly qualifies as exceptionally

> brutal and heinous behavior. The manner of the murder clearly
> indicates that the defendant consciously inflicted unnecessary
> mental and physical suffering on his victim, indicative of wanton
> cruelty. We have no doubt that a jury, presented with these
> facts, would have found that the crime was committed in a
> brutal and heinous manner, indicative of wanton cruelty.
> Accordingly, we find that the failure to comply with the dictates
> of *Apprendi* does not require resentencing. In this respect, the
> judgment of the appellate court is reversed, the remainder of the
> appellate court's judgment is affirmed, and the judgment of the
> circuit court is affirmed.

*Kaczmarek*, 798 N.E.2d at 721-23.

The Illinois Supreme Court's resolved petitioner's claim on the merits, so review of that claim is governed by 28 U.S.C. § 2254(d). Petitioner has not established that the Illinois Supreme Court's resolution of his *Apprendi* claim was contrary to or an unreasonable application of clearly established Federal law, nor has he shown that the decision was based on an unreasonable determination of the facts.

The Illinois Supreme Court's decision was not contrary to or an unreasonable application of clearly established federal law. It correctly identified *Apprendi v. New Jersey*, 530 U.S. 466 (2000) as the applicable legal authority, and in fact found *Apprendi* error. The Illinois Supreme Court further applied its own cases holding that *Apprendi* errors were subject to harmless-error analysis. Exh. F, *Kaczmarek*, 798 N.E.2d at 721 (citing *People v. Thurow*, 786 N.E.2d 1019 (2003) and *People v. Crespo*, 788 N.E.2d 1117 (2001)). Since no United States Supreme Court case at that time held that *Apprendi* errors could not be deemed harmless, the Illinois Supreme Court's

decision cannot have been contrary to "clearly established Federal law, as determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d)(1); *see also Coulter v. McCann*, 484 F.3d 459, 465 (7th Cir. 2007) ("'clearly established Federal law' in § 2254(d)(1) 'refers to the holdings, as opposed to the dicta, of this Court's decisions as of the time of the relevant state-court decision") (quoting *Carey v. Musladin*, 127 S.Ct. 649, 653 (2006)). In any event, the Illinois Supreme Court's resolution of the harmless-error question was correct, as the United States Supreme Court subsequently determined that a jury's failure to determine a sentence-enhancing fact is amenable to harmless-error review.  *See Washington v. Recuenco*, 126 S.Ct. 2546 (2006); *see also United States v. Williams*, 493 F.3d 763, 765 (7th Cir. 2007) ("We review the Sixth Amendment error under the harmless error standard") (citing *Recuenco*, 126 S.Ct. 2546).

The Illinois Supreme Court's determination that the *Apprendi* error was harmless was not an unreasonable determination of the facts in light of the overwhelming evidence that the crime was brutal and heinous.  The medical examination of the victim's body "revealed extensive external and internal injuries."  Exh. H, *Kaczmarek*, 798 N.E.2d at 722.  The victim was stabbed, strangled, and subjected to blunt force injuries that were severe enough to have caused her death in the absence of being strangled.  *Id.*  In short, "the senseless, vicious murder of this elderly woman, effected by means of beating, stabbing, and strangling, in order to perpetrate a robbery that

could have been easily accomplished without killing her, undoubtedly

qualifies as exceptionally brutal and heinous behavior." *Id.* at 723. And, in

light of these unrebutted facts surrounding the brutality of this murder,

petitioner cannot show that an *Apprendi* error had a "substantial or injurious

effect or influence in determining [the] jury's verdict." *Brecht v. Abrahamson*,

507 U.S. 619, 623 (1993).

### III.    The Postconviction Trial Court Erroneously Dismissed Petitioner's Perjury Claim On The Grounds That It Was Not Accompanied By Sufficient Evidence.

### <u>Not Cognizable</u>

Petitioner claims that the trial court misconstrued state law in

summarily dismissing his postconviction petition. Pet. at 6. This

claim is based in Illinois law, and thus is not a cognizable basis for

habeas relief. *See Dellinger v. Bowen*, 301 F.3d 758, 764 (7th Cir.

2002) ("Federal habeas relief is . . . . unavailable to remedy errors of

state law"); *see also Evans v. Leibach,* No. 03 C 2320, 2003 WL

21730116, at *3 n.2 (N.D.Ill. July 18.2003) (Aspen, J.) (trial court's

putative error in applying standard of review under state

postconviction act is not cognizable federal habeas claim).

Petitioner is not assisted by the fact that his claim of state-law error

concerns a postconviction petition that included putative federal claims. *Cf.*

*Lewis v. Sternes*, 390 F.3d 1019, 1026 (7th Cir. 2004). Petitioner does make

reference to his due process right to a fair trial in his discussion of the

purported state law error, but that discussion is too cursory to warrant federal habeas review.  Even though a pro se petition should be construed generously, Rule 2(c) of the Rules Governing Section 2254 Cases requires pleading in particularity.  *See Mayle v. Felix*, 545 U.S. 644, 655 (2005) ("Habeas Corpus Rule 2(c) is more demanding [than Fed. R. Civ. P. 8(a)].  It provides that the petition must 'specify all the grounds for relief available to the petitioner' and 'state the facts supporting each ground.'").  Petitioner has not supported the underlying fair-trial claim with any evidence (he has not even attached the newspaper articles to his petition) — he is only arguing, at best, that he should have had the opportunity to present this evidence in state court.

Finally, petitioner maintains that the stage-one dismissal of his postconviction petition without appointing counsel and conducting an evidentiary hearing was a denial of due process.  Pet. at 6G.  However, petitioner has no right to postconviction proceedings at all, much less a right to counsel or an evidentiary hearing.  *See, e.g., Pennsylvania v. Finley*, 481 U.S. 551, 558 (1987); 28 U.S.C. § 2254(i).  And a state's failure to follow its own procedures or rules does not independently violate the Due Process Clause.  *See, e.g. Archie v. Racine*, 847 F.2d 1211, 1217 (7th Cir. 1988).

In short, petitioner's claim, as presented to this court, is not a cognizable federal claim because it is couched in state-law terms and is not accompanied by any evidence that would support a finding of perjury.

**Procedural Default**

In the alternative, petitioner's claim is procedurally defaulted for two independent reasons:  (1) it was denied by the state appellate court on an independent and adequate state ground (failure to attach affidavits or other valid evidence to the postconviction petition), *see* Exh. L; and (2) it was not fairly presented as a federal constitutional claim for a full round of state appellate review.  *See Boerckel*, 526 U.S. at 845-46 (full round includes presenting claim in a PLA); *see also Keeney*, 504 U.S. at 10.

First, the state appellate court determined that petitioner's perjury claim was procedurally defective because it was not supported by "affidavits, records or other evidence," and did not "explain their absence."  Exh. L. Under Illinois law, a petitioner's failure to either attach affidavits, records, or other evidence, or offer an explanation for the absence of the documentation, in and of itself, is a justification for summarily dismissing a postconviction petition.  *See, e.g., People v. Collins*, 782 N.E.2d 195 (2002).  The state appellate court's determination that newspaper articles do not satisfy the evidentiary requirements of 725 ILCS 5/122-2 is an independent and adequate state ground that bars federal habeas review.  *Moore v. Bryant*, 295 F.3d 771, 774 (7th Cir. 2002); *Edwards v. Sternes*, No. 04 C 1610, 2005 WL 3447773, at * 3 (N.D. Ill. Dec. 13, 2005); *Johnson v. Sternes*, No. 03 C 5110, 2004 WL 527117, at * 5 (N.D. Ill. Mar. 10, 2004) (state appellate court's decision not to hear the merits of a petitioner's claims, relying on *Collins* and

§ 122-2 of the postconviction statute, is independent and adequate state procedural ground for the state appellate court's decision).

Second, petitioner's postconviction PLA addressed a pure state-law issue — whether the newspaper articles that petitioner attached to his postconviction petition satisfied the "support" requirement of Section 122-2 of the state's postconviction statute. Exh. M. While petitioner identified the federal nature of his claim in his brief submitted to the state appellate court, his PLA makes no mention of the claim vis-à-vis the federal constitution. Exh. M. In fact, the PLA states only that the newspaper articles proved that "the State presented the perjured testimony of criminalist Pamela Fish to secure his conviction." *Id.* at 11. This is insufficient to satisfy the standard for fair presentment of a claim. *See Baldwin*, 541 U.S. at 32 (a claim is not fairly presented as federal claim to state's highest court by virtue of its presentation as a federal claim to state appellate court).

The Seventh Circuit uses a four-part test to determine whether a petitioner has fairly presented a claim to the state judiciary: "1) whether the petitioner relied on federal cases that engage in a constitutional analysis; 2) whether the petitioner relied on state cases which apply a constitutional analysis to similar facts; 3) whether the petitioner framed the claim in terms so particular as to call to mind a specific constitutional right; and 4) whether the petitioner alleged a pattern of facts that is well within the mainstream of constitutional litigation." *Harrison v. McBride*, 428 F.3d 652, 660 (7th Cir.

2005) (quoting *Ellsworth v. Levenhagen*, 248 F.3d 634, 639 (7th Cir. 2001)).

"'The presence of any one of these factors . . . . does not automatically avoid a waiver; the court must consider the facts of each case.'" *Momient-El v. DeTella*, 118 F.3d 535, 538 (7th Cir. 1997) (quoting *Verdin v. O'Leary*, 972 F.2d 1467, 1474 (7th Cir. 1992)).  Instead of assigning determinative weight to the presence or absence of one factor, the critical question in assessing fair presentment is "'whether the state court was sufficiently alerted to the federal constitutional nature of the issue to permit it to resolve that issue on a federal basis.'" *Harrison*, 428 F.3d at 660 (quoting *Ellsworth*, 248 F.3d at 639).

The Seventh Circuit has clarified that this four-part test is consistent with *Baldwin v. Reese*, 541 U.S. 27 (2004).  *See Harrison*, 428 F.3d at 661 (noting that the four-part test "closely resembles the introductory language employed by the Supreme Court in *Reese*").  *Baldwin* teaches that a state court must be alerted to the federal nature of a claim by the pleadings or the cases cited in the pleadings.  *Id.*, 541 U.S. at 32 (claim labeled ineffective assistance of appellate counsel where pleadings do not mention federal constitution or caselaw not fairly presented as federal claim even if presented as federal claim to lower court).  *Baldwin* further states that a claim not identified in some way as federal, in the context of a pleading where other claims in the same document are explicitly identified as federal, is not fairly presented.  *Id.* (claim is not fairly presented when "[t]he petition refers to

provisions of the Federal Constitution in respect to other claims but not in respect to [another claim]" and when "[t]he petition provides no citation of any case that might have alerted the court to the alleged federal nature of the claim").

Relatedly, fair presentment requires some specificity as to the constitutional basis for the claim.  A petition that references abstract concepts of a "fair trial" or "due process," without any mention of specific federal constitutional rights, is insufficient to fairly present a federal constitutional claim to the state courts.  *See, e.g., Perruquet v. Briley*, 390 F.3d 505, 520 n.3 (7th Cir. 2004) (reference to generic right to fair trial without mentioning federal constitutional cases or provisions does not alert state courts to federal nature of claim); *accord Riggins v. McGinnis*, 50 F.3d 492, 494 (7th Cir. 1995) ("It is not enough to scatter the words 'due process' in a brief: counsel must sketch an argument about why the conviction violates that clause."); *see also id.* ("'Due process' is such a ductile concept that phrase-dropping is the equivalent of no argument at all.  A lawyer need not develop a constitutional argument at length, but he must make one; the words 'due process' are not an argument.") (citing *United States v. Agurs*, 427 U.S. 97 (1976)).

With these principles in mind, it is apparent that petitioner did not fairly present his perjury claim as a federal constitutional claim.  He did not rely on any federal or state cases which engage in a constitutional analysis.

He did not frame the claim in terms so particular to call to mind a specific constitutional right — his PLA does not even suggest that Fish's testimony denied him a "fair trial" or "due process." *See* Exh. M.  The pattern of facts was not well within the mainstream of constitutional litigation.  In short, the state court was not sufficiently alerted to the federal constitutional nature of the issue to permit it to resolve that issue on a federal basis.  *See Harrison*, 428 F.3d at 660.  Because petitioner failed to present his newspaper article/perjury claim as a federal claim in his PLA, it is procedurally defaulted.  *Boerckel*, 526 U.S. at 845-46; *White v. Godinez*, 192 F.3d 607, 608 (7th Cir. 1999) (*Boerckel* applies to PLAs filed on state postconviction review).

Petitioner has not established cause for this default.  Nor can he established prejudice, as he has not shown that the State knowingly used perjured testimony.  *See Napue v. Illinois*, 360 U.S. 264, 269 (1959); *see also United States v. Agurs*, 427 U.S. 97, 103 (1976).  There are three elements of a so-called *Napue* claim: (1) the prosecution presented perjured testimony; (2) the prosecution knew or should have known of the perjury; and (3) some likelihood that the false testimony impacted the jury's verdict.  *Martin v. Evans*, 384 F.3d 848, 855 (7th Cir. 2004) (citing *Agurs*, 427 U.S. at 103).

The first element is proof of perjury, which, in this context, means proof of false testimony.  *See Shasteen v. Saver*, 252 F.3d 929, 933 (7th Cir. 2001).  Petitioner has not established that Fish testified falsely at his trial; at best, he refers to newspaper articles alleging that she testified falsely in

other trials.  *See* Pet. at 6F.  As petitioner implicitly acknowledges, this is an issue that goes to her credibility, but is not proof of perjury.  *See id.* at 6G. Petitioner has also failed to establish the second element of a constitutional claim, that the State knew or should of known of the perjury.  The State is not "strictly liable" for perjured statements, *Santiago*, 798 F.2d at 247.  And the only "evidence" of perjury is a series of newspaper articles published in 2001, well after petitioner's second trial.   Thus, there is no basis to conclude that the State knew, or should have known, of the alleged perjury.

Since petitioner has not proven that the statements in his case were perjured, or that the State knew or should have known that it presented perjured testimony, he cannot establish prejudice for his default.

Finally, petitioner has not demonstrated that a failure to excuse this default would result in a "fundamental miscarriage of justice."  *See House*, 126 S. Ct. at 2077 (fundamental miscarriage of justice standard is "demanding and permits review only in the 'extraordinary' case") (internal quotations omitted); *see also See Hayes v. Battaglia*, 403 F.3d 935, 938 (7th Cir. 2005) ("Proof of innocence must be considerably more than the proof required to establish prejudice") (internal citations omitted).

To summarize, petitioner's claim that the newspaper articles attached to his postconviction petition were sufficient evidence to forestall summary dismissal under state law is not cognizable on federal habeas review.  In the alternative, this claim is procedurally defaulted because petitioner did not

fairly present as a federal constitutional claim to the Illinois Supreme Court

on state postconviction review.  Petitioner has not established cause of

prejudice for his default.  And, even if he had fairly raised the claim, his

claim should be denied on the merits for the same reasons that he had failed

to demonstrate prejudice for his default.

**IV.    The Trial Court Erroneously Dismissed Petitioner's Postconviction Petition Because Petitioner Stated the Gist of an Ineffective Assistance of Counsel Claim Relating To Counsel's Failure to Request a *Frye* Hearing.**

<u>**Procedural Default**</u>

This claim (generously read as involving the Sixth Amendment right to

counsel and the state postconviction trial court's alleged failure to adjudicate

it properly) is procedurally defaulted because it was not presented for a full

round of appellate review in state court.  *See Boerckel*, 526 U.S. at 845-46.

Petitioner raised this claim in a pro se postconviction petition.  Pet. at 6H.

However, he failed to raise this claim in his postconviction PLA, where he

argued only that the trial court erred in dismissing his perjury claim on the

grounds that newspaper reports are insufficient evidentiary support under

state law.  *See* Exh. M.  It is therefore defaulted under *Boerckel* and *White*.

Petitioner has not established cause and prejudice.  He has no external

explanation why he did omitted this ineffective assistance of counsel claim

from his postconviction PLA.  Petitioner has no right to effective counsel on

postconviction review; thus, any omission by counsel in this regard is

attributable to petitioner, and does not constitute "cause" for the default.

*See, e.g., Pitsonbarger v. Gramley*, 141 F.3d 728, 737 (7th Cir. 1998) (citing

*Coleman v. Thompson*, 501 U.S. 722, 756-57).

Petitioner has not established prejudice because his ineffective

assistance of counsel claim is meritless.  In *Strickland v. Washington*, 466

U.S. 668 (1984), the Supreme Court established the framework under which

claims of ineffective assistance of counsel are analyzed:

> First, the defendant must show that counsel's performance was
> deficient. This requires showing that the counsel made errors so
> serious that counsel was not functioning as the 'counsel'
> guaranteed by the Sixth Amendment. Second, the defendant
> must show that the deficient performance prejudiced the
> defense. This requires showing that counsel's errors were so
> serious as to deprive the defendant of . . . . a trial whose result is
> reliable.  Unless a defendant makes both showings, it cannot be
> said that the conviction . . . . resulted from a breakdown in the
> adversary process that renders the result unreliable.

466 U.S. at 687.

To satisfy the first prong, petitioner must show that "counsel's

representation fell below an objective standard of reasonableness." *Id.* at

688.  Courts are to "indulge a strong presumption" of competence such that

"the defendant must overcome the presumption that, under the

circumstances, the challenged action might be considered sound trial

strategy." *Id.* at 689 (internal quotation marks and citation omitted).  With

respect to the second prong, petitioner must demonstrate prejudice by some

"reasonable probability." *Id.* at 694.  Petitioner has failed to demonstrate

unreasonable performance or prejudice.

Counsel was not ineffective for failing to request a *Frye* hearing on the admissibility of expert testimony regarding blood spatter and luminol testing because the trial court would have determined that such evidence was not novel.  *See, e.g., People v. Cumbee*, 851 N.E.2d 934, 948 (Ill.App. 2006) (luminol testing is generally accepted in scientific community); *People v. Evans*, 859 N.E.2d 642, 651 (Ill.App. 2006) (blood-spatter analysis generally accepted in law-enforcement and scientific community).  In addition, petitioner has offered no evidence that, if the trial court had conducted a *Frye* hearing, it would have determined that the challenged techniques were inadmissible.  Finally, even if the challenged testimony were deemed inadmissible, petitioner cannot establish prejudice due to the substantial evidence supporting his conviction:  petitioner's pants from the night of the murder were covered with blood; he was in possession of some of the victim's bloodstained personal belongings; he was seen in the backyard of the victim's apartment on the night of the murder carrying a bag that he placed in the trunk of his car; he changed his clothes between 2:00 a.m. and 7:00 a.m. on the night of the murder to conceal the bloodstains on his pants; and his explanation for the bloodstains on his clothes and his possession of the victim's personal effects was incredible.  Exh. F, *Kaczmarek*, 798 N.E.2d at 716; Exh. A, *Kaczmarek*, 741 N.E.2d at 1135.  Excluding testimony of blood splatter and luminol testing techniques would not have diluted any of this strong and independent inculpatory evidence, so there was no prejudice.

Nor does this issue trigger the "fundamental miscarriage of justice" exception. As noted above, petitioner has failed to demonstrate prejudice (either *Strickland* prejudice or prejudice under the "cause and prejudice" exception), and thus he cannot satisfy the more demanding proof for a fundamental miscarriage of justice. *See House*, 126 S. Ct. at 2077 (fundamental miscarriage of justice standard is "demanding and permits review only in the 'extraordinary' case.") (internal quotations omitted); *see also See Hayes v. Battaglia*, 403 F.3d 935, 938 (7th Cir. 2005).

**V.      Petitioner Was Denied A Fair Trial When The Trial Court Barred Petitioner's Putative Expert Witness, Dr. Siegesmund, From Testifying About Blood-Spatter Evidence.**

**<u>Not Cognizable</u>**

Petitioner claims that the trial court misconstrued state evidentiary law when it erroneously excluded his putative expert, Dr. Siegesmund. Pet. at 6N. This claim is based in Illinois law, and thus is not a cognizable basis for habeas relief. *See Dellinger*, 301 F.3d at 764; *see also Woodruff v. Lane*, 818 F.2d 1369, 1373 (7th Cir. 1987) (evidentiary rulings by trial court rarely rise to the level of constitutional violation); *Milone v. Camp*, 22 F.3d 693, 702 (7th Cir. 1994) ("The admissibility of evidence is generally a matter of state law"). Claims that are, in essence, state law claims, cannot be given constitutional "window dressing" in order to circumvent this basic limitation on habeas actions. *See, e.g. Archie*, 847 F.2d at 1217.

**Procedural Default**

Alternatively, this claim is procedurally defaulted because it was not presented for a full round of appellate review in state court. *See Boerckel*, 526 U.S. at 845-46; *see also* Pet. at 6H (conceding claim was not presented to Illinois Supreme Court on direct appeal). Petitioner has not established cause and prejudice for this default.

Petitioner argues that his appellate attorney's failure to raise this claim on appeal constitutes "cause" for his default (presumably because he was entitled to state-appointed counsel on appeal and that counsel's failure to raise this claim constituted ineffective assistance). Pet. at 6M. However, petitioner has defaulted this excuse of ineffective assistance by failing to present a claim of ineffective assistance of appellate counsel to the state courts for a full round of postconviction review. *See Edwards v. Carpenter*, 529 U.S. 446, 451-52 (2000) (claim that ineffective assistance was "cause" for a procedural default can itself be procedurally defaulted if it is not properly presented to state courts). Petitioner cannot use post-conviction counsel's failure to raise an ineffective assistance of appellate counsel claim as an excuse (for defaulting his excuse of ineffective assistance of counsel) because there is no right to postconviction counsel, and thus counsel's ineffectiveness is not attributable to the State. *See, e.g., Pitsonbarger*, 141 F.3d at 737. Petitioner has offered no other justification for failing to properly exhaust this claim in state court.

Petitioner has also failed to establish prejudice because his underlying claim is without merit. The governing legal standard for due process claims relating to a trial court's expert-witness rulings is that a petitioner must demonstrate that the trial court's evidentiary ruling violated his "right to due process by denying him a fundamentally fair trial." *Milone*, 22 F.3d at 702 (citing *Haas v. Abrahamson*, 910 F.2d 384, 389 (7th Cir. 1990)). The standard, therefore, is not whether the trial court properly applied state evidentiary law, but instead whether the trial court's exclusion of his putative expert witness resulted in a fundamentally unfair trial. Since the trial court's ruling was consistent with state evidentiary law, it follows that petitioner was not denied due process because petitioner is not advancing a facial challenge to the state law.

Illinois law deems expert testimony admissible if the proffered expert is qualified as an expert by knowledge, skill, experience, training, or education in a field. *See, e.g., Snelson v. Kamm*, 787 N.E.2d 796, 809 (Ill. 2003). The test for competency of an expert is whether or not the witness exhibits sufficient knowledge of the subject matter. *Id.* The trial court had sound reasons for determining that Dr. Siegesmund was not an expert in the fields of blood splatter analysis and luminol interpretation. First, Dr. Siegesmund lacked credibility, exhibiting a pattern of claiming expertise on the basis of limited credentials. Exh. A, *Kaczmarek*, 741 N.E.2d at 1137. During voir dire, cross-examination revealed that Dr. Siegesmund had been

disqualified as a crime reconstruction expert in an unrelated criminal trial
and as a ballistics expert in a federal civil case. *Id.* The trial court found Dr.
Siegesmund's inability to remember his involvement in those cases
"disingenuous" and damaging to his overall credibility. *Id.* Dr. Siegesmund
had also stated that he gained experience in forensic work through the
Glendale Crime Lab in Wisconsin. *Id.* However, on cross-examination, he
was confronted with testimony he had given in an unrelated criminal
prosecution in which he admitted that the Glendale Lab had not conducted
forensic work since 1986. *Id.*

Second, Dr. Siegesmund lacked the necessary qualifications or
experience to testify as an expert on blood spatter analysis or luminol testing.
He never received any formal forensic training; he had not been formally
trained in blood splatter analysis; he had never performed such work in a
crime lab; he had never written any scholarly articles on the subject; and the
sum of his alleged expertise on the subjects came from self-education. *Id.*
Given this evidence, the trial court properly determined that Dr. Siegesmund
was not a qualified expert.

In sum, the claim is not a cognizable ground for federal habeas relief.
And, even if the claim were open to federal review, it is defaulted. Petitioner
has not established cause for his default. The trial court's ruling was correct
under the state rules of evidence, meaning that petitioner has not established
prejudice. And, as discussed above in Claim IV, petitioner does not qualify

for the "fundamental miscarriage of justice" exception because he has not demonstrated "actual innocence."

## VI.   The Trial Court Abused Its Discretion When It Permitted Mitch Rea To Testify As An Expert Witness For the State.

**Not Cognizable**

Petitioner claims that the trial court abused its discretion when it permitted Mitch Rea to testify as an expert witness for the State.  Pet. at 6U. This claim is based in Illinois law, and thus is not a cognizable basis for habeas relief.  *See Dellinger*, 301 F.3d at 764; *Wilson v. Briley*, 243 F.3d 325, 328 (7th Cir. 2001) ("'Abuse of discretion' and 'improper factors' are not terms that Illinois lawyers and judges, by quirk of local legal idiom, use to articulate constitutional arguments.  To the contrary, abuse-of-discretion arguments are ubiquitous, and most often they have little or nothing to do with constitutional safeguards.").

**Procedural Default**

This claim is also procedurally defaulted because it was not presented for a full round of appellate review in state court.  *See Boerckel*, 526 U.S. at 845-46; Pet. at 6W (conceding this claim has never been presented to the Illinois Supreme Court on direct appeal).  Petitioner has not established cause and prejudice for this default.  As previously explained, petitioner has defaulted the excuse of ineffective assistance of counsel by not raising this ground of ineffective assistance for a full round of postconviction review.  *See Edwards*, 529 U.S. at 451-52.  Petitioner cannot use post-conviction counsel's

failure to raise an ineffective assistance of appellate counsel claim as an excuse (for defaulting his excuse of ineffective assistance of counsel) because there is no right to postconviction counsel, and thus counsel's ineffectiveness is not attributable to the State. *See, e.g., Pitsonbarger*, 141 F.3d at 737; 28 U.S.C. § 2254(i). Petitioner has offered no other justification for failing to properly exhaust this claim in state court, and it is therefore procedurally defaulted.

In addition, petitioner has failed to establish prejudice, as the trial court's decision to qualify Rea as an expert did not make his trial fundamentally unfair. *Milone*, 22 F.3d at 702. Rea had extensive experience as a detective in the homicide unit in the Phoenix Police Department where he processed approximately 350 crime scenes. Exh. A, *Kaczmarek*, 741 N.E.2d at 1138. He received formal training in crime scene investigation and specialized training in chemical blood detection involving luminol. *Id.* Rea also attended and lectured at numerous seminars involving luminol testing and had previously been permitted to testify in court as a luminol expert. *Id.* Finally, Rea was forthcoming with his absence of formal training in the fields of chemistry and DNA analysis. *Id.* On the basis of the above evidence, the trial court properly qualified Rea as a luminol expert.

Petitioner's default should not be excused. He has not established cause for his default. In addition, the trial court's ruling was correct under the state rules of evidence, meaning that petitioner has not established

prejudice. And, as discussed above in Claim IV, petitioner does not qualify for the "fundamental miscarriage of justice" exception.

**VII.    Petitioner Was Denied A Fair Trial When The Trial Court Barred His Former Girlfriend From Testifying That She Had Observed Petitioner Wear His Quilted Coat While He Was Involved In A Fight That Resulted In Bloodshed.**

Petitioner maintains that his due process rights were violated when the trial court excluded testimony from his former girlfriend that there was an alternative source of blood on his jacket. Pet. at 6X.

**Procedural Default**

This claim is procedurally defaulted because it was not presented for a full round of appellate review in state court. *See Boerckel*, 526 U.S. at 845-46; *see also* Pet. at 6W (conceding that claim had never been presented to the Illinois Supreme Court on direct appeal). As previously explained, petitioner has defaulted the excuse of ineffective assistance of counsel by not raising this ground of ineffective assistance for a full round of postconviction review. *See Edwards*, 529 U.S. at 451-52. Petitioner cannot use post-conviction counsel's failure to raise an ineffective assistance of appellate counsel claim as an excuse (for defaulting his excuse of ineffective assistance of counsel) because there is no right to postconviction counsel, and thus counsel's ineffectiveness is not attributable to the State. *See, e.g., Pitsonbarger*, 141 F.3d at 737; 28 U.S.C. § 2254(i). Petitioner has offered no other justification for failing to properly exhaust this claim in state court, and it is therefore procedurally defaulted.

Petitioner has not established prejudice because the trial court's evidentiary ruling did not render his trial fundamentally unfair.  At best, petitioner's girlfriend's testimony would have established that he could have gotten blood on his jacket during a previous bar fight.  Pet. at 6AA.  But this testimony would not explain the presence of blood on the pants that petitioner wore on the night of the murder.  And it would not explain away the eyewitness testimony placing petitioner at the building or petitioner's possession of the victim's bloody personal effects.  Given the strong evidence that would have discredited petitioner's alternative explanation for the blood on his coat, the exclusion of his ex-girlfriend's testimony did not render his trial fundamentally unfair.

## <u>CONCLUSION</u>

This Court should deny the instant petition for writ of habeas corpus with prejudice.  Claims I-II are without merit, and Claims III-VII are procedurally defaulted.

 January 18, 2007                              Respectfully submitted,

                                              LISA MADIGAN
                                              Attorney General of Illinois

                          By:   <u>s/Eric W. Truett</u>
                                ERIC W. TRUETT, Bar # 6291213
                                Assistant Attorney General
                                100 W. Randolph Street, 12th Floor
                                Chicago, Illinois 60601-3218
                                PHONE: (312) 814-4684
                                FAX: (312) 814-2253
                                E-MAIL: etruett@atg.state.il.us

<u>CERTIFICATE OF SERVICE</u>

I hereby certify than on January 18, 2007, I electronically filed respondent's **ANSWER** with the Clerk of the United States District Court for the Northern District of Illinois, Eastern Division, and I hereby certify that on that same day, I mailed by United States Postal Service the above-referenced motion to the following non-registered party:

Henry Kaczmarek
No. N95790
Menard Correctional Center
711 Kaskaskia Street
P.O. Box 711
Menard, IL 62259

Respectfully submitted,

LISA MADIGAN
Attorney General of Illinois

By:    s/Eric W. Truett
ERIC W. TRUETT, Bar # 6291213
Assistant Attorney General
100 W. Randolph Street, 12th Floor
Chicago, Illinois 60601-3218
PHONE: (312) 814-4684
FAX: (312) 814-2253
E-MAIL: etruett@atg.state.il.us

IN THE
UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

_____

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| ex rel. HENRY KACZMAREK, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | No. 07 C 6126 |
| | ) | |
| DONALD HULICK, Warden, | ) | |
| Menard Correctional Center, | ) | The Honorable |
| | ) | Wayne R. Andersen, |
| Respondent. | ) | Judge Presiding. |

_____

## <u>TO THE CLERK OF THE UNITED STATES DISTRICT COURT</u>

Pursuant to Rule 5 of the Rules Governing Section 2254 Cases in the

United States District Courts, the attached Exhibits to respondent's Answer

to the above-captioned Petition for Writ of Habeas Corpus are hereby filed

with this Court:

Exhibit A:   *People v. Kaczmarek*, No. 1-97-2557, 741 N.E.2d 1131 (2000);

Exhibit B:   State's Brief, *People v. Kaczmarek*, No. 90865;

Exhibit C:   Petitioner's Response and Cross-Brief, *People v. Kaczmarek*, No. 90865;

Exhibit D:   State's Reply Brief and Cross-Response, *People v. Kaczmarek*, No. 90865;

Exhibit E:     Petitioner's Cross-Reply Brief, *People v. Kaczmarek*, No. 90865;

Exhibit F:     *People v. Kaczmarek*, 798 N.E.2d 713 (Ill. 2003);

Exhibit G:     *Kaczmarek v. Illinois*, 540 U.S. 1199 (2004);

Exhibit H:     Postconviction petition, *People v. Kaczmarek*, No. 87 CR 6131, Circuit Court of Cook County;

Exhibit I:     Petitioner's Brief, *People v. Kaczmarek*, No. 1-04-2401;

Exhibit J:     State's Brief, *People v. Kaczmarek*, No. 1-04-2401;

Exhibit K:     Petitioner's Reply, *People v. Kaczmarek*, No. 1-04-2401;

Exhibit L     Rule 23 Order, *People v. Kaczmarek*, No. 1-04-2401 (Ill.App. 2006);

Exhibit M:     PLA, *People v. Kaczmarek*, No. 104184;

Exhibit N:     Order Denying PLA, *People v. Kaczmarek*, No. 104184;

Exhibit O:     Petitioner's Brief, *People v. Kaczmarek*, No. 97-2557;

Exhibit P:     State's Brief, *People v. Kaczmarek*, No. 97-2557; and

Exhibit Q:     Petitioner's Reply Brief, *People v. Kaczmarek*, No. 97-2557.

January 18, 2007