

741 N.E.2d 1131                                                                    Page 1

318 Ill.App.3d 340, 741 N.E.2d 1131, 251 Ill.Dec. 953
**(Cite as: 318 Ill.App.3d 340, 741 N.E.2d 1131)**

►
People v. Kaczmarek
Ill.App. 1 Dist.,2000.

Appellate Court of Illinois,First District, Third
Division.
The PEOPLE of the State of Illinois,
Plaintiff-Appellee,
v.
Henry KACZMAREK, Defendant-Appellant.
No. 1-97-2557.

Dec. 27, 2000.

Defendant was convicted in the Circuit Court, Cook
County, Michael B. Getty, J., of murder, residential
burglary, home invasion, and armed robbery, and he
appealed. The Appellate Court, Cerda, J., 243
Ill.App.3d 1067, 184 Ill.Dec. 661, 613 N.E.2d 1253,
reversed and remanded. Prior to retrial, defendant
moved to dismiss charges on speedy trial grounds.
After denying defendant's motion, the Circuit Court,
Cook County, John Brady, J., again convicted him
of murder and sentenced him to natural life
imprisonment, based upon finding that murder was
exceptionally brutal or heinous. Defendant
appealed. The Appellate Court, Cerda, J., held that:
(1) defendant did not waive appellate review of his
challenge to constitutionality of sentencing statute
by failing to raise such challenge in his original
appeal; (2) the United States Supreme Court
decision in *Apprendi v. New Jersey* applied
retroactively to defendant's appeal; (3) sentencing
statute whereby defendant's sentence was subject to
enhancement effectively created separate,
aggravated offense of murder; and (4) enhancement
of defendant's sentence based upon finding by trial
court violated defendant's constitutional right to
have aggravating factor treated as element of
underlying offense and presented to jury.

Affirmed in part, reversed in part, and remanded
with directions.
West Headnotes

**[1] Indictment and Information 210 ☜113**

210 Indictment and Information
    210V Requisites and Sufficiency of Accusation
        210k113 k. Matter of Aggravation in
General. Most Cited Cases

**Jury 230 ☜34(6)**

230 Jury
    230II Right to Trial by Jury
        230k30 Denial or Infringement of Right
            230k34 Restriction or Invasion of
Functions of Jury
                230k34(5) Sentencing Matters
                    230k34(6) k. In General. Most
Cited Cases
    (Formerly 230k24)
Accused criminal has the constitutional right to
have any statutory enhancement fact that, if found,
increases the penalty for a crime beyond the
prescribed maximum to be treated as an element of
the underlying offense, that is, charged in the
indictment and tried to the jury. U.S.C.A.
Const.Amends. 5, 6, 14.

**[2] Criminal Law 110 ☜632(3.1)**

110 Criminal Law
    110XX Trial
        110XX(A) Preliminary Proceedings
            110k632 Dockets and Pretrial Procedure
                110k632(3) Motions
                    110k632(3.1) k. In General. Most
Cited Cases
As a general rule, parties may not argue new points
in a petition for rehearing.

**[3] Criminal Law 110 ☜632(3.1)**

110 Criminal Law
    110XX Trial
        110XX(A) Preliminary Proceedings
            110k632 Dockets and Pretrial Procedure

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

741 N.E.2d 1131                                                                Page 2

318 Ill.App.3d 340, 741 N.E.2d 1131, 251 Ill.Dec. 953
**(Cite as: 318 Ill.App.3d 340, 741 N.E.2d 1131)**

110k632(3) Motions
      110k632(3.1) k. In General. Most Cited Cases
Exception to the general rule that parties may not argue new points in a petition for rehearing exists where the new matter raised attacks the constitutionality of a criminal statute; such challenges may be raised at any time, because it would be fundamentally unfair to uphold a criminal conviction pursuant to an unconstitutional statute.

**[4] Criminal Law 110 &#8650;1180**

110 Criminal Law
   110XXIV Review
      110XXIV(T) Subsequent Appeals
         110k1180 k. In General. Most Cited Cases
Murder defendant did not waive appellate review of his challenge to constitutionality of sentencing statute, pursuant to which he received enhanced natural life sentence based on a finding by the trial court, by failing to raise such challenge in his original appeal, where United States Supreme Court case on which defendant's challenge was based had not been released at time of defendant's original appeal and was not merely restatement of that Court's prior holdings. S.H.A. 730 ILCS 5/5-8-1.

**[5] Sentencing and Punishment 350H &#8650;2275**

350H Sentencing and Punishment
   350HXII Reconsideration and Modification of Sentence
      350HXII(C) Proceedings
         350HXII(C)1 In General
            350Hk2274 Motion or Application
               350Hk2275 k. In General. Most Cited Cases
Exception to the general rule that parties may not argue new points in a petition for rehearing for new matter attacking the constitutionality of a criminal statute applies to cases where a defendant attacks his sentence on the basis that it was imposed pursuant to an unconstitutional sentencing procedure.

**[6] Courts 106 &#8650;100(1)**

106 Courts

106II Establishment, Organization, and Procedure
   106II(H) Effect of Reversal or Overruling
      106k100 In General
         106k100(1) k. In General; Retroactive or Prospective Operation. Most Cited Cases
Judicial decision announcing a new constitutional rule applicable to criminal cases is to be applied retroactively to all cases pending on direct review at the time the new constitutional rule is declared.

**[7] Courts 106 &#8650;100(1)**

106 Courts
   106II Establishment, Organization, and Procedure
      106II(H) Effect of Reversal or Overruling
         106k100 In General
            106k100(1) k. In General; Retroactive or Prospective Operation. Most Cited Cases
For retroactivity of a judicial decision announcing a new constitutional rule applicable to criminal cases to be triggered, two factors must be present: (1) the case to which the new rule is to be applied was pending on direct review or was otherwise not final when the rule was declared; and (2) the rule to be applied retroactively is of constitutional dimension.

**[8] Courts 106 &#8650;100(1)**

106 Courts
   106II Establishment, Organization, and Procedure
      106II(H) Effect of Reversal or Overruling
         106k100 In General
            106k100(1) k. In General; Retroactive or Prospective Operation. Most Cited Cases
The United States Supreme Court decision in *Apprendi v. New Jersey,* in which the Court held that an accused criminal has constitutional right to have any statutory enhancement fact that, if found, increases the penalty for crime beyond prescribed maximum to be charged in the indictment and tried to the jury, applied retroactively to defendant's appeal from murder conviction with respect to which he received, on rehearing, enhanced natural life sentence based upon trial court's finding that murder had been exceptionally brutal or heinous; defendant raised *Apprendi* challenge in timely filed

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

741 N.E.2d 1131                                                                                Page 3

318 Ill.App.3d 340, 741 N.E.2d 1131, 251 Ill.Dec. 953
**(Cite as: 318 Ill.App.3d 340, 741 N.E.2d 1131)**

rehearing petition and at earliest possible opportunity, and rule announced in *Apprendi* was of constitutional dimension. S.H.A. 730 ILCS 5/5-8-1.

**[9] Courts 106 ☞100(1)**

106 Courts
    106II Establishment, Organization, and Procedure
      106II(H) Effect of Reversal or Overruling
        106k100 In General
          106k100(1) k. In General; Retroactive or Prospective Operation. Most Cited Cases
Rule announced by the United States Supreme Court in *Apprendi v. New Jersey,* providing that an accused criminal has constitutional right to have any statutory enhancement fact that, if found, increases penalty for crime beyond prescribed maximum to be treated as element of underlying offense, that is, charged in the indictment and tried to the jury, was of constitutional dimensions, for purposes of determining whether the *Apprendi* decision was subject to retroactive application; decision itself stated that rule was grounded in the Fifth, Sixth and Fourteenth Amendments, and all discussion and analysis pertained to federal Constitutional issues rather than interpretation of state statute at issue or facts of case. U.S.C.A. Const.Amends. 5, 6, 14.

**[10] Homicide 203 ☞1562**

203 Homicide
    203XIV Sentence and Punishment
      203k1561 Constitutional and Statutory Provisions
        203k1562 k. In General. Most Cited Cases
    (Formerly 203k358(3), 203k354(1))

**Indictment and Information 210 ☞113**

210 Indictment and Information
    210V Requisites and Sufficiency of Accusation
      210k113 k. Matter of Aggravation in General. Most Cited Cases
Statutory sentencing range for first-degree murder was 20 to 40 years' imprisonment, as provided in first-degree murder statute in effect at time of defendant's conviction, rather than 20 years to life imprisonment or death, for purposes of determining

whether separate sentencing statute whereby defendant's sentence was subject to enhancement to natural life imprisonment upon finding of aggravating factor effectively created separate, aggravated offense of murder; enhancement of sentence beyond 20- to 40-year range required finding of additional aggravating factors not contained in first-degree murder statute itself. S.H.A. 730 ILCS 5/5-8-1(a)(1)(a, b).

**[11] Indictment and Information 210 ☞113**

210 Indictment and Information
    210V Requisites and Sufficiency of Accusation
      210k113 k. Matter of Aggravation in General. Most Cited Cases

**Jury 230 ☞34(6)**

230 Jury
    230II Right to Trial by Jury
      230k30 Denial or Infringement of Right
        230k34 Restriction or Invasion of Functions of Jury
          230k34(5) Sentencing Matters
            230k34(6) k. In General. Most Cited Cases
    (Formerly 230k24)
Constitutional principle that an accused criminal has the right to have any statutory enhancement fact that, if found, increases the penalty for a crime beyond the prescribed maximum to be charged in the indictment and tried to the jury is limited to noncapital cases. U.S.C.A. Const.Amends. 5, 6, 14.

**[12] Indictment and Information 210 ☞113**

210 Indictment and Information
    210V Requisites and Sufficiency of Accusation
      210k113 k. Matter of Aggravation in General. Most Cited Cases

**Jury 230 ☞34(7)**

230 Jury
    230II Right to Trial by Jury
      230k30 Denial or Infringement of Right
        230k34 Restriction or Invasion of Functions of Jury

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

741 N.E.2d 1131                                                          Page 4

318 Ill.App.3d 340, 741 N.E.2d 1131, 251 Ill.Dec. 953
**(Cite as: 318 Ill.App.3d 340, 741 N.E.2d 1131)**

230k34(5) Sentencing Matters
230k34(7) k. Particular Cases in
General. Most Cited Cases
(Formerly 230k24)
Highest theoretical punishment for first-degree
murder, death or life imprisonment, was not the "
statutory maximum" for purposes of rule entitling
defendant to have statutory enhancement fact, effect
of which was to increase penalty for first-degree
murder beyond statutory maximum, charged in the
indictment and tried to the jury. S.H.A. 730 ILCS
5/5-8-1(a)(1)(b).

**[13] Criminal Law 110 ⟸796**

110 Criminal Law
110XX Trial
110XX(G)    Instructions:    Necessity,
Requisites, and Sufficiency
110k796 k. Punishment. Most Cited Cases
(Formerly 203k311)

**Indictment and Information 210 ⟸113**

210 Indictment and Information
210V Requisites and Sufficiency of Accusation
210k113    k.    Matter    of    Aggravation    in
General. Most Cited Cases

**Jury 230 ⟸34(7)**

230 Jury
230II Right to Trial by Jury
230k30 Denial or Infringement of Right
230k34 Restriction    or    Invasion    of
Functions of Jury
230k34(5) Sentencing Matters
230k34(7) k. Particular Cases in
General. Most Cited Cases
(Formerly 230k24)
Sentencing statute whereby defendant's sentence for
first-degree murder was subject to enhancement to
natural life imprisonment upon finding that murder
was accompanied by "exceptionally brutal or
heinous behavior indicative of wanton cruelty"
required    additional    factual    determination,
effectively creating separate, aggravated offense of
murder, and entitling defendant to have aggravating
factor presented to and found by a jury. S.H.A. 730

ILCS 5/5-8-1(a)(1)(b).

**[14] Homicide 203 ⟸540**

203 Homicide
203II Murder
203k539 First Degree, Capital, or Aggravated
Murder
203k540 k. In General. Most Cited Cases
(Formerly 203k22(1))
"Exceptionally    brutal    or    heinous"    aggravating
circumstance applicable to first-degree murder
charge is most accurately characterized for
constitutional purposes as an element of a greater
crime, rather than a mere factor to be considered at
sentencing. S.H.A. 730 ILCS 5/5-8-1(a)(1)(b).

**[15] Indictment and Information 210 ⟸113**

210 Indictment and Information
210V Requisites and Sufficiency of Accusation
210k113    k.    Matter    of    Aggravation    in
General. Most Cited Cases

**Sentencing and Punishment 350H ⟸322**

350H Sentencing and Punishment
350HII Sentencing Proceedings in General
350HII(F) Evidence
350Hk322 k. Degree of Proof. Most Cited
Cases
If the state wishes to seek an enhanced sentence for
murder on the grounds that the offense was "
exceptionally brutal or heinous," it must allege that
factual circumstance in the relevant charging
instrument and prove it to a jury beyond a
reasonable doubt. S.H.A. 730 ILCS 5/5-8-1(a)(1)(b)

**[16] Indictment and Information 210 ⟸113**

210 Indictment and Information
210V Requisites and Sufficiency of Accusation
210k113    k.    Matter    of    Aggravation    in
General. Most Cited Cases

**Jury 230 ⟸31.3(1)**

230 Jury

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

741 N.E.2d 1131                                                    Page 5

318 Ill.App.3d 340, 741 N.E.2d 1131, 251 Ill.Dec. 953
**(Cite as: 318 Ill.App.3d 340, 741 N.E.2d 1131)**

230II Right to Trial by Jury
    230k30 Denial or Infringement of Right
        230k31.3 Practice and Procedure in
Criminal Cases
            230k31.3(1) k. In General. Most Cited
Cases
Enhancement of defendant's sentence for
first-degree murder to natural life imprisonment
upon finding by trial court that murder was
accompanied by "exceptionally brutal or heinous
behavior indicative of wanton cruelty" violated
defendant's constitutional right to have aggravating
factor treated as element of underlying offense,
charged in indictment and presented to jury, where
jury had not been required to find, and did not
specifically find, that defendant's conduct
accompanying victim's murder was exceptionally
brutal or heinous. U.S.C.A. Const.Amends. 5, 6, 14
; S.H.A. 730 ILCS 5/5-8-1(a)(1)(b).
West                CodenotesHeld        Unconstitutional
Ill.Rev.Stat.1985, ch. 38, par. 1005-8-1(a)(1)(b)

**1134 ***956 *340 Michael J. Pelletier, Deputy
Defender, Debra R. Salinger, Assistant Appellate
Defender, Chicago, for Appellant.
*341 Richard A. Devine, State's Attorney, Chicago (
Renee Goldfarb; Alan J. Spellberg and Christine
Cook, of counsel), for Appellee.

### *OPINION ON DENIAL OF REHEARING*
Justice CERDA delivered the opinion of the court:
Following a jury trial in July 1989, defendant,
**HenryKaczmarek,** was convicted of murder,
residential burglary, home invasion, and armed
robbery and was sentenced to a term of natural life
imprisonment on the murder conviction.
Defendant appealed, and on March 31, 1993, this
court reversed the murder conviction and remanded
for a new trial.[FN1] *People v. Kaczmarek,* 243
Ill.App.3d 1067, 1082, 184 Ill.Dec. 661, 613
N.E.2d 1253, 1264 (1993)*(Kaczmarek I).*

        FN1. Defendant also challenged his
        convictions for burglary, home invasion
        and armed robbery on the basis of
        insufficient evidence. Because no
        sentence was imposed on these verdicts,
        this court dismissed defendant's appeals for

want of finality. *Kaczmarek I,* 243
Ill.App.3d at 1082, 184 Ill.Dec. 661, 613
N.E.2d at 1264.

Prior to the start of his second trial in November
1996, defendant unsuccessfully moved to dismiss
the State's charges on the grounds that his
constitutional and statutory rights to a speedy trial
had been violated. Following a retrial by jury,
defendant was again found guilty of murder and,
following a finding by the sentencing judge that the
victim's murder was "exceptionally brutal or
heinous," defendant received an enhanced term of
natural life in prison under section 5-8-1(a)(1)(b) of
the Unified Code of Corrections (Corrections Code)
(Ill.Rev.Stat.1985, ch. 38, par. 1005-8-1(a)(1)(b)).

Defendant appeals, arguing (1) the trial court erred
in denying his motion for speedy-trial dismissal of
the State's charges, and (2) he was denied a fair trial
when the court (a) accepted a State witness as an
expert in the area of chemical luminol testing and
interpretation; (b) refused to accept a defense
witness as an expert in the fields of luminol
interpretation and blood splatter analysis; and (c)
precluded the testimony of a defense witness
concerning certain physical altercations defendant
had been involved in with other individuals prior to
the victim's murder. Defendant additionally
challenges the validity of this life sentence,
claiming the penalty enhancing scheme provided by section
5-8-1(a)(1)(b) of the Corrections Code is
constitutionally infirm in light of in light of the
United States Supreme Court's recent decision in
**1135***957*Apprendi v. New Jersey,* 530 U.S.
466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000).

For the following reasons, we reject, in an
unpublished portion of this opinion, defendant's
speedy trial and trial error claims and affirm
defendant's conviction for murder. However,
because the penalty *342 scheme set forth in
section 5-8-1(a)(1)(b) of the Corrections Code
offends the constitutional principles announced in
*Apprendi,* we vacate defendant's life sentence and
remand for resentencing.

**(The following material is nonpublishable under
Supreme Court Rule 23)**

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

741 N.E.2d 1131                                                                    Page 6

318 Ill.App.3d 340, 741 N.E.2d 1131, 251 Ill.Dec. 953
**(Cite as: 318 Ill.App.3d 340, 741 N.E.2d 1131)**


## BACKGROUND

The relevant evidence presented at defendant's retrial establishes that in April 1987, the victim, 86-year old Millie Nielsen, lived on the first floor of a two-flat apartment building located at 3507 West Diversey Avenue in Chicago. Dan Lary, together with his then wife Margaret Fisher and Margaret's 19-year-old son John Fisher, lived on the second floor. Defendant had been living with the Larys for about a month after moving out of the house of his former girlfriend, Pamela Hines.

At about 10:30 p.m. on April 24, 1987, Margaret and John returned home after a night of bowling. At the time, Dan was passed out intoxicated on a living room couch while defendant was watching television. Margaret stated that defendant was wearing light-colored jeans, a flannel shirt, a blue quilted work jacket and construction boots. Margaret assisted Dan to bed, and then went to bed herself at about 11 p.m. Defendant continued to watch television in the living room.

According to John, defendant left the apartment at about 11:30 p.m. and returned at about midnight. Upon returning, defendant asked John if Dan was awake. John replied that Dan was sleeping, and defendant left, stating he had to go find his car.

At about 12:15 a.m. on April 25, the Larys' front doorbell rang. Margaret answered the door and discovered Dan's brother, Ron Lary, who asked if Dan was home. Because she did not want Ron in her apartment, Margaret responded no and went back to bed.

Margaret was again awakened by the front doorbell at about 2:00 a.m. When she answered the door, Margaret saw defendant who asked if Dan was available. Margaret told defendant that Dan was asleep, and defendant left.

From time to time, Ron slept on the back porch of his brother's apartment. In the early morning hours

of April 25, 1987, Ron went to Dan's back porch to sleep after a night of drinking at Patty's Lounge, a nearby bar. Shortly after 2:00 a.m., Ron observed defendant carrying a bag through the back yard toward his car, which was parked in the alley. According to Ron, defendant was wearing dark jeans and a dark jacket. Defendant placed the bag in the car's trunk and drove east down the alley.

Margaret awoke the morning of April 25 at about 7:00 a.m. and saw defendant sleeping on the living room couch. According to Margaret, defendant was wearing a clean pair of dark-colored jeans and a light-colored dress shirt. After making coffee, Margaret left for work at about 9:00 a.m.

At about 9:45 a.m., Ronald Sadlowski, a neighbor who helped Ms. Nielsen with errands and maintenance work around the building, noticed that the back porch door of Ms. Nielsen's kitchen was open and that the window of her kitchen pantry was broken. Sadlowski further discovered that Ms. Nielsen's car was still parked in the garage although she had a beauty appointment scheduled early that morning. Concerned about Ms. Nielsen's well-being, Sadlowski called the police.

In response to Sadlowski's call, Ross Marsala, an officer with the Chicago Police Department, and his partner arrived at Ms. Nielsen's apartment at about 10 a.m. After speaking briefly to Sadlowski, Officer Marsala proceeded to the back porch of the apartment and noticed several pieces of glass that had been broken from the pantry window. Officer Marsala entered the kitchen and observed spots of blood on the kitchen floor leading to a nearby bedroom. Officer Marsala further noticed blood spots on the bedroom door frame, and found a kitchen knife, which was bloodstained, on a small table immediately outside the bedroom.

Inside the bedroom, Officer Marsala found Ms. Nielsen lying in bed, face up in a pool of blood. Officer Marsala observed blood on the floor and walls near the bed. The bedroom, including the rest of the apartment, had been ransacked, and no signs of forced entry were readily apparent.

Robert Baike, a forensic investigator who processed

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

741 N.E.2d 1131                                                                    Page 7

318 Ill.App.3d 340, 741 N.E.2d 1131, 251 Ill.Dec. 953
**(Cite as: 318 Ill.App.3d 340, 741 N.E.2d 1131)**

the crime scene, obtained several blood samples from the kitchen floor. Baike did not observe any bloody footprints in the apartment.

After working for the day, Ron returned to Dan's apartment and spoke with the police, describing for them defendant's activity in the back of the house earlier that morning. Chicago police detectives, accompanied by Ron, then left the apartment in search of defendant.

The detectives found defendant early the next morning asleep in his car. Chicago Police Detective Jerome Bogucki approached the vehicle and requested defendant to exit. As defendant exited, Detective Bogucki observed blood stains on the right and left sleeves of defendant's quilted jacket. The detectives placed defendant under arrest and, upon obtaining defendant's written consent, they searched the trunk of the vehicle. In the trunk, the detectives found jewelry boxes, which appeared to be stained with blood, jewelry, serving plates and platters. The detectives also discovered a pair of blood-stained jeans and several tools, including a glass cutter.

Detective Bogucki submitted the jeans and jacket to the crime lab for testing. Bogucki further checked defendant's work boots but did not observe any appearance of blood. The other items found in the trunk were taken to Area 5 headquarters, where they were later identified by Ms. Nielsen's family members as belonging to the victim.

A subsequent medical examination of Ms. Nielsen's body by Dr. Michael Chambliss disclosed numerous external and internal injuries. An external exam revealed several abrasions, incises and bruises about Ms. Nielsen's upper body, including her head, chest and arms. Stab wounds were also found on Ms. Nielsen's left thigh, the left part of her groin, and right forearm. An internal exam revealed injuries indicative of manual strangulation, including hemorrhages of the larynx, tongue and esophagus, hemorrhaging of the membrane of the brain and a fractured larynx.

Due to the condition of the body, Dr. Chambliss opined Ms. Nielsen died between 11:30 p.m. on April 24, 1987 and 2:30 a.m. on April 25, 1987. Dr. Chambliss concluded that Ms. Nielsen died as a result of manual strangulation with the contributing factors of blunt force injuries and stab wounds. Dr. Chambliss also stated that Ms. Nielsen could have died from the blunt force injuries.

Pamela Fish, an expert in electrophoresis, serology and DNA testing with the microanalysis unit of the Chicago Police Department, detailed the results of her examination conducted of the physical evidence back in 1987. Fish examined blood samples obtained from defendant, Ms. Nielsen, Ms. Nielsen's kitchen floor, and the knife found in the apartment. Fish also inspected the substances resembling blood found on defendant's jacket and jeans, and the jewelry boxes recovered from the trunk of defendant's vehicle. Fish determined that Ms. Nielsen had Type A blood and that defendant had Type B blood. Fish further determined that the substances taken from defendant's jeans and quilted jacket were human blood possessing Type A characteristics.

Fish additionally examined the blood samples to ascertain their particular genetic markers for purposes of making an identification. Fish testified that the blood found on the jeans and quilted jacket was consistent with Ms. Nielsen's blood and could not have come from defendant. In fact, according to Fish, all the enzymes from the blood taken from defendant's clothing was consistent with those found in Ms. Nielsen's blood.

With respect to the substances found on the kitchen floor, the knife and the jewelry box, Fish was able to determine that the substances were human blood, but due to the small quantity provided, she was unable to ascertain the particular blood type. Fish explained she attempted to perform DNA testing on the blood samples provided years after her 1987 testing, but that their small size and degraded nature made testing ineffective.

Mitch Rea was called by the State as an expert in luminol testing and interpretation. During *voir dire* examination of his qualifications, Rea stated he is an insurance fraud investigator who had previously worked over 26 years as a police officer with the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

741 N.E.2d 1131

Page 8

318 Ill.App.3d 340, 741 N.E.2d 1131, 251 Ill.Dec. 953
**(Cite as: 318 Ill.App.3d 340, 741 N.E.2d 1131)**

Phoenix Police Department in Arizona. Of his time at the department, Rea spent ten years working as a detective in the homicide unit where he processed over an estimated 350 murder crime scenes. Rea has received training in crime scene investigation and specialized training in chemical blood detection involving luminol.

Rea has additionally attended and participated in numerous seminars dealing with luminol and luminol testing, has taught and trained other law enforcement officers in these fields, has conducted hundreds of experiments involving luminol, has participated in several workshops covering luminol testing, and has previously testified in court as a luminol expert.

Rea detailed the application and use of the luminol chemical as a detecting agent, and described its glowing effect when it reacts with particular substances, including blood. Rea acknowledged that luminol is not specific to blood and that it reacts with other substances, such as metals and cleansers.

Upon questioning by defense counsel, Rea acknowledged never being educated or trained in the field of chemistry. Rea further admitted that he does not perform any additional testing, like DNA analysis, to ensure the accuracy of results indicating the presence of blood.

Over defendant's objection, Rea was accepted by the court as an expert and testified that he performed luminol tests on defendant's quilted jacket in early 1994. Rea explained that an application of luminol to the right front panel of the jacket produced a bright luminance of several small spots. According to Rea, these luminances indicated the presence of blood. Rea further observed luminances about sections of the jacket which had been previously removed for Fish's examination, the right sleeve and cuff, and both the elbow region and back portion of the left sleeve. Rea stated that each of the foregoing luminances were consistent with the presence of blood. On cross-examination, Rea explained he did not perform any additional tests to confirm that the luminol reactions he observed were in fact reactions

to blood.

Rod Englert, an expert in crime scene reconstruction and blood splatter, described three different categories of blood splatter: low velocity splatter which result from drops of blood falling straight down; medium velocity splatter which results from blunt force trauma; and high velocity splatter which results from gunfire. With respect to medium velocity splatter, Englert explained that blood does not splatter on the first blow of force, and that regardless of the severity of the beating, very little blood gets on the offender although the scene may be terribly bloody. Englert explained that a minimal amount of blood would be found on the offender in such cases because the force is always directed away at the victim. Englert additionally discussed blood transfer stains, and explained that they occur when blood is swiped against someone or something.

Englert examined the physical evidence and photographs in the case and concluded that the blood on Ms. Nielsen's kitchen floor appeared smeared, indicative of a struggle in which someone bled. Englert stated that the absence of bloody shoe prints was not unusual given how quickly blood dries. Englert noted the blood on the kitchen wall immediately outside the bedroom represented classic medium velocity splatter suggestive of blunt force being inflicted upon the victim. Given the low angle of projection, Englert opined that Ms. Nielsen received numerous blows while on the kitchen floor.

Upon reviewing photos of defendant's jeans, Englert stated the blood on the left and right knee areas represented transfer stains, and not splatter. According to Englert, these stains were consistent with defendant coming into contact with the pool of blood surrounding the victim. As for the bottom of the pants, Englert observed several small specs of blood which in his opinion were consistent with medium velocity splatter. Englert specifically stated the transfer and splatter stains were not consistent with defendant picking up a bag having blood on it or with such a bag being placed on top of the clothing. Englert further stated the stains were not consistent with defendant kneeling another

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

741 N.E.2d 1131

318 Ill.App.3d 340, 741 N.E.2d 1131, 251 Ill.Dec. 953
**(Cite as: 318 Ill.App.3d 340, 741 N.E.2d 1131)**

person in the nose.

In examining photographs of the luminol testing performed on defendant's jacket by Rea, Englert stated the stains on the right and left sleeves and on the front of the jacket represented medium velocity splatter. Englert also observed transfer stains on the back of the sleeves and on the right front pocket.

In Englert's opinion, Ms. Nielsen was first attacked in the kitchen, near the entry of the bedroom, where she received numerous blows while on the floor. Englert believed the blood splatters on the bottom of defendant's pants occurred at this time. Ms. Nielsen, struggling to break free, was then taken to the bedroom and thrown on the bed where she was attacked again and ultimately killed. According to Englert, the bleeding represented by the amount of blood found in the bed would have occurred after Ms. Nielsen had died. Englert opined the physical evidence he examined was consistent with the person causing the death of the victim.

On cross-examination, Englert knew during his examination of defendant's pants and jacket that the substance present on the clothing has human blood, but presumed that the blood was that of Ms. Nielsen. Englert acknowledged that medium velocity splatter could very possibly occur during a fist fight, but explained that the medium splatter found in the case was consistent with Ms. Nielsen's attack. Englert additionally stated that, in attacks similar to that on Ms. Nielsen, blood may or may not get on the attacker's shoes.

After the State rested, defendant testified that in April 1987 he was unemployed and temporarily living with the Larys after moving out of his ex-girlfriend's house about a month earlier. Defendant stated he had been involved in three fights on the Wednesday prior to Ms. Nielsen's murder. Two of these fights involved friends Tom Szeszol and Bill Henderson, while the other involved an unidentified man who was attempting to break into defendant's car. In the former fight, defendant stated he sustained two cuts to his hand which bled, that Szeszol bled from his mouth and nose, and that Henderson also bled from his mouth. In the latter fight, defendant stated he hit the man

three or four times in the face and kneed him in the nose, causing the man to bleed. Defendant intimated that in all three fights he was wearing his blue quilted jacket; indeed, according to defendant, he had been in several fights while wearing his jacket.

In the afternoon of April 24, 1987, defendant and Dan, after spending the morning drinking, went to Szeszol's apartment to clean laundry, including defendant's jeans which had blood on them. Defendant was able to wash every article of clothing except his jeans before leaving. Defendant explained he wanted to soak his jeans before washing them, but was directed by Szeszol to leave the apartment before he had the opportunity to do so. Defendant was further unable to wash his quilted jacket. Upon leaving, defendant threw his clothing, including the jeans, into the trunk of his car. Defendant drove Dan to his apartment and then went to a nearby tavern to drink.

Defendant left the bar about 6:30 p.m. and, after buying a case of beer, went to Dan's apartment. Defendant and Dan drank together until about 11:45 p.m. when defendant left and went to a bar down the street. After having a couple of drinks, defendant went to another bar, Our Place. At about 2:00 a.m., defendant left and went to the Lary's apartment to see if Dan wanted to get some drinks.

Upon returning to the Larys, defendant parked his car in the alley behind the building to urinate. When he exited the vehicle, defendant heard a noise, like that of a door closing. Henry approached the house, but saw no one. As he urinated, defendant noticed a bag on the side of the house. Defendant looked inside and found a box of silverware. Defendant picked up the bag and carried it to his car where he placed it in the trunk. Defendant drove his car to the front of the house and went to see if Dan was awake.

After being told by Margaret that Dan was sleeping, defendant left and returned to the Our Place tavern. Defendant drank at the bar until about 4:00 a.m., and after dropping off two friends, he returned to the Lary's apartment and fell asleep on the living room couch.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

741 N.E.2d 1131

318 Ill.App.3d 340, 741 N.E.2d 1131, 251 Ill.Dec. 953
**(Cite as: 318 Ill.App.3d 340, 741 N.E.2d 1131)**

Defendant awoke at about 8:00 a.m. on April 25, and later that morning he and Dan drove to the house of a friend, Bill Brown, in Melrose Park. Before entering Brown's house, defendant decided to look in the bag he had discovered earlier that morning. Defendant removed the bag's contents and noticed that some of the items were bloody. Defendant kept some items and disposed of others, including a bloody pillow case, in a dumpster. Defendant sold the items he kept to Brown for $60, and then drove Dan back to his apartment.

Defendant was ultimately arrested by the police early the next morning as he slept in his car. Defendant maintained his innocence and denied any responsibility in both the break-in of the Ms. Nielsen's apartment and in the victim's death.

Hines, defendant's former girlfriend, testified that defendant moved out of her apartment about a month before Ms. Nielsen's murder, and she acknowledged not seeing defendant during that period. Hines identified the quilted jacket recovered by police as belonging to defendant, and indicated that defendant wore the jacket every day.

During direct examination, defense counsel attempted to elicit testimony that Hines had witnessed defendant's involvement in numerous fights in which he was wearing his quilted jacket and where one of the participants had bled. However, the State successfully moved the court to bar this testimony.

In an offer of proof, defense counsel stated Hines would have testified that she was present with defendant on about seven or eight occasions when defendant was involved in a physical altercation with others; that defendant was wearing his quilted jacket on each of those occasions; and that one or more of the participants involved had bled. In response to counsel's offer, the court noted that Hines was never asked when these alleged fights occurred and, on that basis, concluded her testimony was too remote to be relevant.

To rebut the testimonies of Rea and Englert, the defense offered Dr. Kenneth Siegusmund as an expert in the fields of luminol processing and blood

splatter analysis. During *voir dire,* Dr. Siegusmund testified he holds a Ph.D. and B.S. in biology and an undergraduate minor in chemistry. As his primary employ, Dr. Siegesmund works in the Department of Anatomy at the Medical College of Wisconsin developing a scientific instrument used in the field of immunology. The doctor admitted that this work is unrelated to the forensic science field. Previously, Dr. Siegesmund worked in the Department of Biology at Marquette University in Milwaukee. Dr. Siegesmund additionally teaches a general forensic sciences course at a local university, and has given lectures in the field to law enforcement personnel. Dr. Siegesmund holds memberships in the American Academy of Forensic Scientists, the Midwest American Association of Anatomy, the Neuroloectic Society of America, and the American Association for the Advancement of Science.

Dr. Siegesmund has performed luminol testing well over a hundred times, and was "familiar" with the study of blood splatter. Dr. Siegesmund indicated that he had been qualified in court as an expert in forensic sciences about 250 times, and specifically as a blood splatter expert about 20 times. Dr. Siegesmund did not indicate whether he had ever been previously accepted as an expert in luminol application or testing.

On cross-examination, the State initially went to great lengths to undermine Dr. Siegesmund's credibility. When asked whether any court in Cook County had found him unqualified as an expert in any field, Dr. Siegesmund replied "I don't believe so," that "[t]here may have been a case where I wasn't qualified in a certain area but not with respect to the entire testimony that I gave." The prosecutor then demonstrated that the doctor could not remember being disqualified as a crime reconstruction expert in an unrelated criminal trial and as a ballistics expert in a federal civil case. The prosecutor further elicited testimony from the doctor that he could not remember giving certain testimony in those proceedings.

Dr. Siegesmund described himself as an expert in, among other areas, crime scene reconstruction, blood splatter, blood identification and luminol

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

741 N.E.2d 1131                                                        Page 11

318 Ill.App.3d 340, 741 N.E.2d 1131, 251 Ill.Dec. 953
**(Cite as: 318 Ill.App.3d 340, 741 N.E.2d 1131)**

testing. The doctor has never taken a course in crime scene reconstruction and has never been to a crime scene under investigation. Dr. Siegesmund has never had any formal training in crime scene processing or in techniques of physical evidence collection. His only exposure in this area has been through yearly, one-week seminars held by the American Academy of Forensic Scientists. Dr. Siegesmund believed he last attended such a conference in 1994, but was not sure. The prosecutor questioned Dr. Siegesmund further in this regard, noting for the doctor that he had previously testified in a 1996 criminal case indicating that he did not attend an Academy conference in 1994. The doctor could not recall making that statement.

Dr. Siegesmund stated he had conducted work at the Glendale Crime Lab in Wisconsin. Dr. Siegesmund denied that the Glendale Lab had not performed forensic work for ten years, and believed that the lab was still operating. The prosecutor then confronted Dr. Siegesmund with testimony he had given earlier that year in an unrelated criminal prosecution where he had stated that the Glendale Lab had not conducted forensic work since 1986. Dr. Siegesmund could not recall making that statement.

Dr. Siegesmund has not received any formal forensic training. Dr. Siegesmund explained his training in the area comes from attending the yearly conferences held by the Academy and from reading a monthly Academy publication and text books on the subject.

With respect to luminol processing, Dr. Siegesmund has never received any training from the police or FBI, has never taken any course teaching luminol application at a crime scene, and has never performed any luminol testing for a crime lab. Dr. Siegesmund stated he last performed an experiment using luminol sometime in late October 1996, about three weeks prior to the start of defendant's retrial.

Dr. Siegesmund has never received any formal training in blood splatter analysis, has never performed such work in a crime lab, and has not written any articles on the subject. His knowledge

of blood splatter comes from attending the Academy conferences and through reading text books. The doctor has performed numerous experiments involving blood splatter in connection with his forensic science lectures given to law enforcement officers. When asked by the prosecutor if he had ever received any training on how to conduct such experiments, Dr. Siegesmund indicated no, responding he was the teacher and that he did not take courses from the officers. Further, when asked if it was sensible to learn how to conduct the experiments before he taught them, the doctor replied that he is a scientist and that he " believed" he could perform the work properly on the basis of the information he had learned from the conferences and written materials.

Responding to the defense's tender of Dr. Siegesmund as an expert, the court remarked that the doctor "appears to be a jack of all trades and [a] master of none." The court specifically commented on Dr. Siegesmund's credibility, stating that "his manner while testifying seemed disingenuous at times" undermining any attempt "to instill some confidence that someone is an expert in some kind of field." Finding the doctor's qualifications lacking, the court refused to accept Dr. Siegesmund as an expert in blood splatter analysis and luminol interpretation. The court, however, allowed Dr. Siegesmund to testify about the manner in which luminol testing is conducted.

Defense counsel did not proceed with Dr. Siegesmund as a witness, but instead made an offer of proof. Counsel explained Dr. Siegesmund would have testified that confirmatory testing is necessary when using luminol as a detecting agent for blood. In this regard, Dr. Siegesmund would have opined that Rea should have performed additional tests to confirm that the areas of luminance on defendant's jacket were in fact indicative of blood and, if so, a test to determine whether that blood was that of defendant. Dr. Siegesmund would have further refuted Englert's conclusions that the blood found on defendant's jacket represented splatter, and would have stated that the blood stains about the knee areas of defendant's jeans were indicative of lateral activity. The doctor would have also stated, contrary to

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

741 N.E.2d 1131

318 Ill.App.3d 340, 741 N.E.2d 1131, 251 Ill.Dec. 953
**(Cite as: 318 Ill.App.3d 340, 741 N.E.2d 1131)**

Englert's opinion, that a majority of Ms. Nielsen's blood loss would have occurred prior to her death. On this basis, Dr. Siegesmund would have explained that the offender would have been covered in blood and, thus, would have likely left bloody shoe prints in the victim's apartment.

Following the presentation of rebuttal evidence by the State and the jury's deliberations, defendant was found guilty of murder and sentenced to a term of natural life imprisonment.

### ANALYSIS

#### I

Defendant initially contends that the trial court erred in denying his motion to dismiss the State's charges due to alleged speedy-trial violations. Although defendant asserts violations of both his constitutional and statutory rights to a speedy trial in his motion, he challenges only the denial of his constitutional claim on appeal.[FN2] Accordingly, we will limit our review to this issue.

> FN2. The State asserts defendant never raised his constitutional speedy-trial claim before the trial court, and maintains that this issue is thus waived for our review. The State, however, ignores defendant's speedy-trial motion, filed November 18, 1996, which specifically contains a claim based on the constitutional speedy-trial clause.

According to defendant, the State deprived him of his constitutional right to a speedy trial by waiting more than 43 months after the reversal of his original murder conviction in March 1993 to bring him to retrial. The right to a speedy criminal prosecution is guaranteed a defendant under both the United States (U.S. Const., amend.VI) and Illinois constitutions (Ill. Const.1970., art. I, § 8). The issue presented by defendant's constitutional speedy-trial claim here is whether the State made a diligent good-faith effort in bringing the matter to

retrial without unreasonable and unnecessary delay. See *People v. Williams,* 299 Ill.App.3d 143, 147, 233 Ill.Dec. 225, 700 N.E.2d 753, 756 (1998). When a defendant's original case is reversed on appeal and the matter is remanded for a new trial, like here, the speedy-trial clause requires the State to retry the defendant within a reasonable time following the date of the reviewing court's decision. See *People v. Crane,* 307 Ill.App.3d 816, 818, 241 Ill.Dec. 277, 719 N.E.2d 138, 140 (1999).

Analysis of defendant's claim is conducted under the four-part balancing test set forth by the United States Supreme Court in *Barker v. Wingo,* 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972), in which the conduct of both the prosecution and the accused are considered and weighed. In particular, we examine (1) the length of the pretrial delay and whether that delay was uncommonly long; (2) the reasons for the delay and to which party the delay is more attributable; (3) whether the defendant asserted his right to a speedy trial in due course; and (4) the prejudice, if any, suffered by the defendant as a result of the delay. *Doggett v. United States,* 505 U.S. 647, 651, 112 S.Ct. 2686, 2690, 120 L.Ed.2d 520 (1992); *Barker,* 407 U.S. at 530, 92 S.Ct. at 2192; *People v. Norris,* 303 Ill.App.3d 163, 175, 236 Ill.Dec. 501, 707 N.E.2d 628, 637 (1999).

No one of the foregoing elements is dispositive. Instead, each factor must be weighed and considered in light of the circumstances of the case as reflected by an examination of the entire record. *People v. Rievia,* 307 Ill.App.3d 846, 853, 241 Ill.Dec. 674, 719 N.E.2d 1077, 1082 (1999); *People v. Wills,* 153 Ill.App.3d 328, 336, 106 Ill.Dec. 207, 505 N.E.2d 754, 759 (1987). The consideration of the *Barker* factors and the determination of whether the accused's constitutional right to a speedy trial was violated are matters left to the sound discretion of the trial court. *United States v. Anderson,* 902 F.2d 1105, 1110 (2nd Cir.1990); see also *People v. Belcher,* 186 Ill.App.3d 202, 208, 134 Ill.Dec. 240, 542 N.E.2d 419, 422 (1989) (applying abuse-of-discretion standard in reviewing accused's claimed deprivation of constitutional speedy-trial right).

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

741 N.E.2d 1131                                                    Page 13

318 Ill.App.3d 340, 741 N.E.2d 1131, 251 Ill.Dec. 953
**(Cite as: 318 Ill.App.3d 340, 741 N.E.2d 1131)**

The first factor presents the threshold inquiry of whether the amount of delay should be deemed presumptively prejudicial to the defendant. *Barker,* 407 U.S. at 530-31, 92 S.Ct. at 2192; *Williams,* 299 Ill.App.3d at 147, 233 Ill.Dec. 225, 700 N.E.2d at 756. The term "presumptively prejudicial" simply marks the point at which the law deems the time between the resolution of the defendant's original appeal and the commencement of the second trial to be unreasonably long enough so as to trigger consideration of the remaining three factors. See *Williams,* 299 Ill.App.3d at 147, 233 Ill.Dec. 225, 700 N.E.2d at 756.

As a threshold, the courts of this state presume prejudice where the pretrial delay equals or exceeds a period of one year. *Crane,* 307 Ill.App.3d at 818, 241 Ill.Dec. 277, 719 N.E.2d at 141; *Williams,* 299 Ill.App.3d at 148, 233 Ill.Dec. 225, 700 N.E.2d at 756; *People v. Lock,* 266 Ill.App.3d 185, 191, 203 Ill.Dec. 675, 640 N.E.2d 334, 338 (1994). Given this temporal benchmark, we find that the more than three and one-half year delay between our decision in *Kaczmarek I* and the commencement of the State's retrial was presumptively prejudicial to defendant. Accordingly, we will assess the remaining factors of the *Barker* enquiry to determine whether defendant was denied his constitutional right to a speedy trial in this case.

In considering the second factor, the reason for the delay, the State bears the burden of providing a justifiable explanation for the period of postponement, and the defendant need only show that the delay was not attributable to his actions. *Crane,* 307 Ill.App.3d at 818, 241 Ill.Dec. 277, 719 N.E.2d at 141; *People v. Prince,* 242 Ill.App.3d 1003, 1008-09, 183 Ill.Dec. 252, 611 N.E.2d 105, 109 (1993). Delay will be attributed to the defense where the defendant's actions in fact caused or contributed to the postponement of the trial. See *People v. Kliner,* 185 Ill.2d 81, 114, 235 Ill.Dec. 667, 705 N.E.2d 850, 868 (1998). In this regard, the accused is bound by the acts or omissions of his defense counsel (*People v. Brimmer,* 60 Ill.App.3d 214, 219, 17 Ill.Dec. 338, 376 N.E.2d 337, 341 (1978); see also *Kliner,* 185 Ill.2d at 114, 235 Ill.Dec. 667, 705 N.E.2d at 870; *People v. Staten,* 159 Ill.2d 419, 433, 203 Ill.Dec. 230, 639 N.E.2d

550, 557 (1994)), since an attorney in criminal proceedings is authorized to act on behalf of his client and to determine for him procedural matters and decisions involving trial strategy and tactics. See *People v. Bowman,* 138 Ill.2d 131-141, 149 Ill.Dec. 263, 561 N.E.2d 633, 638 (1990); see also *People v. Steiger,* 208 Ill.App.3d 979, 981, 153 Ill.Dec. 702, 567 N.E.2d 660, 662 (1991) (criminal defendant "speaks and acts through his attorney"). Accordingly, the affirmative acts of defense counsel cannot be separated from the defendant's own actions. See *Bowman,* 138 Ill.2d at 141, 149 Ill.Dec. 263, 561 N.E.2d at 638.

In the present matter, the record clearly establishes that the defense either caused or contributed to nearly all the pretrial delay at issue. Indeed, the only time period not attributable to defendant was a 26-day period occurring between June 3, 1993, the date the Illinois Supreme Court denied the State's appeal from *Kaczmarek I,* and June 29, 1993, the date of the trial court's first status hearing.[FN3] From the court's June 29 hearing up until the start of trial in November 1996, the case was delayed because of the defense's explicit requests for a continuance or express agreement with the prosecution thereto. Delay resulting from such requests and agreements are generally chargeable to the defendant. See *People v. Beard,* 271 Ill.App.3d 320, 328, 207 Ill.Dec. 655, 648 N.E.2d 111, 116 (1995) (delay caused by continuances either requested or agreed to by defense is attributable to defendant); *People v. Moore,* 263 Ill.App.3d 1, 8, 200 Ill.Dec. 168, 635 N.E.2d 507, 513 (1994) (same); *People v. Nolan,* 102 Ill.App.3d 895, 898-99, 58 Ill.Dec. 403, 430 N.E.2d 345, 349 (1981) (same); see also *Kliner,* 185 Ill.2d at 114, 235 Ill.Dec. 667, 705 N.E.2d at 869. Notably, the defense changed attorneys no less than six times during the postponement period, necessitating additional time being granted to new counsel so he or she could review discovery and familiarize himself or herself with the case. See *Norris,* 303 Ill.App.3d at 176, 236 Ill.Dec. at 510, 707 N.E.2d at 637 (delay resulting from time new counsel needed to become familiar with the accused's case was attributable to defense). As a further note, the case was continued on at least four occasions because of defense counsel's failure to

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

318 Ill.App.3d 340, 741 N.E.2d 1131, 251 Ill.Dec. 953
**(Cite as: 318 Ill.App.3d 340, 741 N.E.2d 1131)**

appear at scheduled court hearings. See *United States v. Brock*, 782 F.2d 1442, 1447 (7th Cir.1986) (charging defendant with delay resulting from defense counsel's absence from court); see also *Kliner*, 185 Ill.2d at 117, 235 Ill.Dec. 667, 705 N.E.2d at 870.

> FN3. The time in which the State's appeal was under consideration by the supreme court fully justifies the first two months of delay. See *Crane*, 307 Ill.App.3d at 818, 241 Ill.Dec. 277, 719 N.E.2d at 141.

Defendant accurately notes that the prosecution used the pretrial period to gather expert evidence regarding DNA testing and blood splatter analysis, and that it requested additional time from the court many times to secure these materials. On several of those occasions, however, defendant's attorneys explicitly agreed to the State's request. Indeed, defense counsels never objected to the State's attempt to secure its additional evidence. Rather, the record shows that the defense welcomed the State's blood evidence because of its possible exculpatory effect. The defense obviously viewed the State's evidence as possibly beneficial to its case and, for this reason, agreed to many of the continuances sought by the State. With respect to the remaining instances where the State requested additional time, defense counsel specifically sought continuances for his own reasons.

Turning to the third factor, the assertion of the accused's speedy-trial right, we note defendant made a *pro se* demand for a speedy trial at a hearing held July 21, 1993, a few months after reversal. Defendant's attorney at the time told the court that he was not making the demand on defendant's behalf and that defendant was acting in his own capacity in seeking a speedy trial. Counsel further informed the court that he was not ready to proceed with trial. The trial judge explained to defendant that his defense could be compromised if he proceeded to trial with counsel who was not adequately prepared. In light of the court's advisement, defendant stated he would wait for his attorney to become prepared and explicitly agreed to a continuance.

The record shows that defendant never made another demand for a speedy trial. Rather, defendant followed by moving *pro se* to dismiss the State's charges in November 1994 on the ground that his statutory speedy-trial right, implemented in this state's Speedy Trial Act (725 ILCS 5/103-5 (West 1994)), had been violated.[FN4] The Supreme Court has indicated that the filing of a motion for speedy-trial dismissal without making a prior demand does not alone establish that the accused has appropriately asserted his rights. *United States v. Loud Hawk*, 474 U.S. 302, 314, 106 S.Ct. 648, 655, 88 L.Ed.2d 640 (1986). While such assertions by the accused are entitled to strong evidentiary weight, these assertions must be viewed in light of the accused's other conduct. *Loud Hawk*, 474 U.S. at 314, 106 S.Ct. at 656.

> FN4. The trial court should not have permitted defendant to file his *pro se* motion because defendant was represented by counsel at the time. The law is clear that a criminal defendant has no right to both self-representation and the assistance of counsel (*People v. Williams*, 97 Ill.2d 252, 267, 73 Ill.Dec. 360, 454 N.E.2d 220, 227 (1983)), and thus has no right to some sort of hybrid representation, whereby he is allowed to accept his attorney's services and still be permitted to file *pro se* motions. *People v. Handy*, 278 Ill.App.3d 829, 836, 216 Ill.Dec. 114, 664 N.E.2d 1042, 1046 (1996).

Following the filing of defendant's motion, the defense either requested or agreed to continue the case until the matter was ultimately brought to trial in November 1996. Defendant's claim here that he had an actual interest in receiving a prompt and speedy resolution of the State's charges is undermined by his conduct proceeding his motion's filing. See *Loud Hawk*, 474 U.S. at 315-16, 106 S.Ct. at 656 (finding third factor weighed against the defense where the defendants filed a number of frivolous petitions and motions, which caused delay, at the same time they moved to dismiss the government's charges on speedy-trial grounds); *Beard*, 271 Ill.App.3d at 329, 207 Ill.Dec. 655, 648

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

741 N.E.2d 1131                                                                                     Page 15

318 Ill.App.3d 340, 741 N.E.2d 1131, 251 Ill.Dec. 953
**(Cite as: 318 Ill.App.3d 340, 741 N.E.2d 1131)**

N.E.2d at 116 (same where, although the defendant continued to demand a speedy trial, he agreed to a number of continuances).

Defendant attempts to distance himself from the conduct of his attorneys by stressing that, notwithstanding the their decisions, he wanted a speedy trial. Because he wanted a speedy trial, defendant argues this factor should weigh heavily in his favor. We disagree. Generally, the decision to demand a speedy trial and to seek dismissal of the State's charges on such grounds are matters left to the sound strategic decision of counsel. See *People v. Ramey,* 151 Ill.2d 498, 523-24, 177 Ill.Dec. 449, 603 N.E.2d 519, 529 (1992); *People v. Keys,* 195 Ill.App.3d 370, 373, 141 Ill.Dec. 917, 552 N.E.2d 285, 287 (1990). Further, as previously discussed, defendant spoke and acted through his attorneys and was bound by their conduct during the pretrial proceedings. Importantly, defendant never sought the discharge of his attorneys to pursue his speedy-trial claims on his own. Indeed, the record unequivocally shows that defendant wanted the assistance of counsel in preparing his defense for trial.

Finally, in assessing the fourth factor, the prejudice to the accused, we consider the interests sought to be protected by the speedy-trial right, namely: (1) the prevention of lengthy and oppressive pretrial incarceration; (2) the minimization of anxiety and concern on the part of the accused; and (3) the limitation of the possibility that the accused's defense will be impaired. *Barker,* 407 U.S. at 532, 92 S.Ct. at 2193; *Moore,* 263 Ill.App.3d at 9, 200 Ill.Dec. 168, 635 N.E.2d at 513. The latter interest has been recognized by the Supreme Court as the most serious "because the inability of a defendant adequately to prepare his case skews the fairness of the entire system." *Doggett,* 505 U.S. at 654, 112 S.Ct. at 2692, quoting *Barker,* 407 U.S. at 532, 92 S.Ct. at 2193.

Except for certain instances where the presumption of prejudice remains due to some form of unjustifiable conduct on the part of the State, causing excessive delay which presumptively compromises the reliability of the trial proceedings, (see *Doggett,* 505 U.S. at 655-58, 112 S.Ct. at

2692-94; *Prince,* 242 Ill.App.3d at 1010, 183 Ill.Dec. 252, 611 N.E.2d at 110), a showing of prejudice is required to establish a violation of the defendant's constitutional speedy-trial right. *Reed v. Farley,* 512 U.S. 339, 353, 114 S.Ct. 2291, 2299, 129 L.Ed.2d 277 (1994); *Beard,* 271 Ill.App.3d at 328, 207 Ill.Dec. 655, 648 N.E.2d at 116.

We are mindful that defendant was in custody for almost the entire time between remand and the commencement of his second trial, and we understand that such lengthy periods of pretrial incarceration may have adverse effects on an accused. See *Crane,* 307 Ill.App.3d at 819-20, 241 Ill.Dec. 277, 719 N.E.2d at 142. This fact alone, however, is insufficient to establish prejudice and must be viewed in light of the other relevant considerations.

Defendant stresses he experienced a great deal of anxiety while incarcerated awaiting trial. Anxiety on the part of the accused, as one court has explained, is "present to some extent in every case and absent some unusual showing, this inconvenience alone is of slight import." *Wills,* 153 Ill.App.3d at 337, 106 Ill.Dec. 207, 505 N.E.2d at 760. This factor will weigh in the defendant's favor "only if it is shown there was a rather special situation giving rise to an inordinate amount of anxiety." *People v. Jackson,* 162 Ill.App.3d 476, 481, 113 Ill.Dec. 581, 515 N.E.2d 390, 394 (1987). The record fails to reveal such a situation in this case.

Significantly, defendant never claims his ability to prepare and present a defense was in any way impaired by the delay. The defense was wholly or partially responsible for the delays experienced in bringing the matter to trial, and nothing in the record indicates that the delay was intentionally contrived by the prosecution for purposes of impairing the defense. Moreover, it was in the best interests of the defense to wait until the State obtained the results of its blood testing since the findings could have excluded defendant as the offender.

Under the circumstances presented, we find no error in the trial court's determination that defendant was

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

741 N.E.2d 1131                                                              Page 16

318 Ill.App.3d 340, 741 N.E.2d 1131, 251 Ill.Dec. 953
**(Cite as: 318 Ill.App.3d 340, 741 N.E.2d 1131)**

not denied his constitutional right to a speedy retrial.

## II.

Defendant next asserts error in the rulings of the trial court regarding (1) the presentation of expert testimony by a witness offered by the State and (2) the nonacceptance of his tendered expert, Dr. Siegesmund.

An individual will be allowed to testify as an expert if his experience and qualifications afford him knowledge beyond that of the average person, and where his testimony will aid, and not invade, the province of the trier of fact in reaching its conclusions. *People v. Miller,* 173 Ill.2d 167, 186, 219 Ill.Dec. 43, 670 N.E.2d 721, 730 (1996); *People v. Sargeant,* 292 Ill.App.3d 508, 511, 226 Ill.Dec. 501, 685 N.E.2d 956, 958 (1997). The degree and manner of knowledge and experience required of the alleged expert is directly related to the complexity of the subject matter and the corresponding likelihood of error by one insufficiently familiar with the field. *People v. Huddleston,* 176 Ill.App.3d 18, 32, 125 Ill.Dec. 606, 530 N.E.2d 1015, 1024 (1988).

The courts do not employ any predetermined formula for how an expert acquires specialized skill or knowledge, and the indicia of expertise is not an assigned level of academic training. *People v.. Novak,* 163 Ill.2d 93, 104, 205 Ill.Dec. 471, 643 N.E.2d 762, 768 (1994). An expert may acquire his expertise from a variety of outlets, including practical experience, scientific study, education, training and/or research. *Miller,* 173 Ill.2d at 186, 219 Ill.Dec. 43, 670 N.E.2d at 730. Regardless of how such knowledge is acquired, the witness should be allowed to testify where the subject matter of his testimony exceeds the knowledge of an average person and where the testimony would assist the trier of fact in evaluating the evidence. *Novak,* 163 Ill.2d at 104, 205 Ill.Dec. 471, 643 N.E.2d at 768; *People v. Shaw,* 278 Ill.App.3d 939, 948, 215 Ill.Dec. 700, 664 N.E.2d 97, 103 (1996).

The burden of establishing the qualifications of a witness as an expert is on the proponent of the

witnesses's testimony. *Novak,* 163 Ill.2d at 104, 205 Ill.Dec. 471, 643 N.E.2d at 768. Determinations regarding the adequacy of a witness's qualifications to testify as an expert is a matter reserved to the sound discretion of the trial court. (*Novak,* 163 Ill.2d at 104, 205 Ill.Dec. 471, 643 N.E.2d at 768), which will not be disturbed on review absent a clear abuse of discretion resulting in manifest prejudice to the accused. *People v. Petitt,* 245 Ill.App.3d 132, 145, 184 Ill.Dec. 766, 613 N.E.2d 1358, 1369 (1993); *Huddleston,* 176 Ill.App.3d at 32, 125 Ill.Dec. 606, 530 N.E.2d at 1024.

### A.

Defendant first challenges Rea's acceptance as an expert. We find this issue waived. The law is well settled that both a trial objection and a post-trial motion raising the alleged trial error is required to preserve the matter for review. *People v. Thomas,* 178 Ill.2d 215, 234, 227 Ill.Dec. 410, 687 N.E.2d 892, 900 (1997); *People v. Enoch,* 122 Ill.2d 176, 186, 119 Ill.Dec. 265, 522 N.E.2d 1124, 1129-30 (1988). Errors objected to at trial but not raised in a post-trial motion or before the court at a post-trial hearing are deemed waived. *Thomas,* 178 Ill.2d at 234, 227 Ill.Dec. 410, 687 N.E.2d at 900. Although defendant voiced on objection to Rea's acceptance as an luminol expert, he did not raise this point in his post-trial motion.

Wavier aside, we find no error in the trial court's decision. Based on his extensive work experience, training and independent study, Rea possessed knowledge not commonly known to the average person that would have assisted the jury in making its determinations concerning defendant's guilt. Although Rea has never taken a college-level chemistry course as defendant correctly observes, the law is clear that an expert is not required to have any particular level of academic training, and that the witness may acquire his particular expertise and training through other means. Notably, defendant fails to explain the importance a general chemistry class would serve in understanding and performing testing with luminol.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

318 Ill.App.3d 340, 741 N.E.2d 1131, 251 Ill.Dec. 953
**(Cite as: 318 Ill.App.3d 340, 741 N.E.2d 1131)**

Defendant additionally notes that Rea never performs follow-up tests to confirm his findings. Defendant's claim is misplaced because it does not reflect upon Rea's qualifications to testify as an expert, but rather concerns the reliability of the specific testing procedures used by him. As such, defendant's argument goes to the weight of the evidence and not to the degree of knowledge and expertise held by Rea. Importantly, defense counsel extensively cross-examined Rea concerning his limited knowledge on how to perform confirmatory testing and his practice of not conducting such tests on defendant's clothing in the instant case.

Defendant's claim hints that the testing procedure is unreliable and consequently fails to satisfy the federal *Frye* standard adopted by this state's courts in determining whether a scientific principle, technique or test is sufficiently reliable and generally accepted by the relevant scientific community to be admitted. See *People v. Eyler,* 133 Ill.2d 173, 139 Ill.Dec. 756, 549 N.E.2d 268 (1989). To the extent defendant makes this argument, we find it waived. Defendant merely objected at trial to Rea's expert qualifications and did not raise the matter of testing reliability to the court. Defendant further has provided no argument in support of this argument in his opening brief.

### B.

Defendant additionally challenges the court's ruling finding Dr. Siegesmund unqualified to testify as an expert in luminol interpretation and blood splatter analysis.

A review of the record shows that Dr. Siegesmund simply possesses a general knowledge of forensic studies, and does not hold any specialized understanding of luminol interpretation and blood splatter analysis. Indeed, the doctor never stated he knew how to interpret particular luminol reactions, and merely explained that he has conducted numerous luminol testing without indicating whether he ever interpreted the results. Although not determinative, Dr. Siegesmund additionally has received no training in luminol application and interpretation and has never performed such work in

any crime lab.

With respect to blood splatter analysis, Dr. Siegesmund merely stated he was "familiar" with the subject. He has neither received training in the field nor performed such work in a crime lab setting. Dr. Siegesmund explained that his knowledge and self-described expertise in the subject comes from, among other things, yearly, one-week seminars held by the Academy of Forensic Scientists. Yet, the doctor conceded he had not been to an Academy conference for at least six years. Although he has conducted dozens of experiments in blood splatter, Dr. Siegesmund has received no training on how to conduct such experiments and "believed" his simulations were accurate based on information he has read in journals and text books.

An obvious import of the trial judge's comments is that he had serious concerns as to Dr. Siegesmund's credibility. The court's observations were well-founded, amply supported by the record. In particular, Dr. Siegesmund's inability to remember when he last attended an Academy conference, where the doctor explained that these conferences are the primary source of the knowledge for which he was being tendered, and the doctor's misstatements regarding the operations of the Glendale Crime Lab, directly reflect upon the doctor's credentials as an expert witness.

We find no error in the trial court's determination that, based on the testimony presented, Dr. Siegesmund did not possess a sufficient level of knowledge and expertise to testify as an expert in the fields of luminol interpretation and blood splatter analysis.

### III.

Defendant further argues that the trial court erred in precluding Hines from testifying about fights involving defendant that had occurred before Ms. Nielsen's murder. According to defendant, this evidence was relevant to rebut the State's theory that the blood found on the jacket was the blood of Ms. Nielsen and to raise the possibility that the blood

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

741 N.E.2d 1131                                                                                      Page 18

318 Ill.App.3d 340, 741 N.E.2d 1131, 251 Ill.Dec. 953
**(Cite as: 318 Ill.App.3d 340, 741 N.E.2d 1131)**

came from someone with whom he had fought previously.

A criminal defendant has the right to present a defense, present witnesses to establish his theory of the case, and present his version of the events to the trier of fact. *People v. Wright,* 218 Ill.App.3d 764, 771, 161 Ill.Dec. 444, 578 N.E.2d 1090, 1095 (1991). This right, however, is not unqualified, and the trial court may properly limit the presentation of evidence on grounds of relevancy. *People v. Turner,* 179 Ill.App.3d 510, 521, 128 Ill.Dec. 159, 534 N.E.2d 179, 186 (1989). Evidence is relevant if it tends to prove or disprove a disputed fact material to the case or render the matter in issue more or less probable. *People v. Childress,* 158 Ill.2d 275, 295, 198 Ill.Dec. 794, 633 N.E.2d 635, 643 (1994); *People v. Agee,* 307 Ill.App.3d 902, 904, 241 Ill.Dec. 390, 719 N.E.2d 251, 253 (1999). Contrary to defendant's contention that this issue should be reviewed *de novo,* the law is well established that evidentiary rulings are within the sound discretion of the trial court which will not be reversed absent a clear abuse of discretion resulting in manifest prejudice to the accused. *People v. Reid,* 179 Ill.2d 297, 313, 228 Ill.Dec. 179, 688 N.E.2d 1156, 1164 (1997); *People v. Dow,* 240 Ill.App.3d 392, 400-01, 181 Ill.Dec. 186, 608 N.E.2d 259, 266 (1992); *Wright,* 218 Ill.App.3d at 771, 161 Ill.Dec. 444, 578 N.E.2d at 1096.

Contrary to the trial court's determination, defendant's proffered evidence was not irrelevant due to remoteness. Given the ability of a blood stain to persist over time, especially on clothing that goes untreated, the blood from the alleged altercations could have remained on defendant's jacket until a time well after Ms. Nielsen's death. We find it difficult to understand how the trial court could have found this evidence too remote where defense counsel was not even allowed to ask Hines when the alleged altercations occurred.

Notwithstanding, we find the court's error harmless. In determining whether an accused has been prejudiced by the rejection or exclusion of certain evidence, so as to require a new trial, we review the entire record of proceedings to determine whether

the rejected evidence could have reasonably affected the jury's verdict. *People v. Montes,* 263 Ill.App.3d 680, 691, 200 Ill.Dec. 571, 635 N.E.2d 910, 917 (1994). Reversal is not warranted where the accused's guilt is shown beyond of reasonable doubt or where, based upon the evidence, a different result could not have been reached. *Montes,* 263 Ill.App.3d at 691, 200 Ill.Dec. 571, 635 N.E.2d at 917. In other words, "the erroneous exclusion of evidence is ground for a new proceeding where it can be said that the excluded evidence, if considered, would have altered the outcome of the proceeding." *People v. Sims,* 167 Ill.2d 483, 516, 212 Ill.Dec. 931, 658 N.E.2d 413, 428 (1995); see also *People v. Amos,* 204 Ill.App.3d 75, 81-82, 149 Ill.Dec. 411, 561 N.E.2d 1107, 1113 (1990).

Here, the State's evidence, specifically the testimony of Fish, established that blood extracted from defendant's clothing was consistent in blood type and various genetic markers with the blood of the victim. Hines' precluded testimony would have merely raised the possibility that some other person's blood may have been on defendant's clothing, and it would have done nothing to refute the State's evidence linking defendant to Ms. Nielsen's murder. Given this fact, and in light of the evidence contained in the record, we conclude the erroneously excluded testimony of Hines would not have altered the outcome of the case and, therefore, did not manifestly prejudice defendant.

IV.

**(The preceding material is nonpublishable under Supreme Court Rule 23)**

The primary issue presented by defendant's appeal is whether the sentencing scheme set forth in section 5-1-8(a)(1)(b) of Corrections Code, which allows for an enhanced sentence for first degree murder under certain court-determined circumstances, offends the constitutional mandates announced by the Supreme Court in *Apprendi v. New Jersey,* 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000).

At sentencing in May 1997, the State urged the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

741 N.E.2d 1131

318 Ill.App.3d 340, 741 N.E.2d 1131, 251 Ill.Dec. 953
**(Cite as: 318 Ill.App.3d 340, 741 N.E.2d 1131)**

court to impose a life sentence based on its contention that the victim's murder was " exceptionally brutal" and "heinous" within the meaning of section 5-8-1(a)(1)(b) contained in the 1985 version of the Corrections Code. That version of section 5-8-1 generally enumerates the imprisonment terms for felony offenses and specifically sets forth a sentence of "not less than 20 years and not more than 40 years" in prison for the offense of first degree murder. Ill.Rev.Stat.1985 ch. 38, par. 1005-8-1(a)(1)(a).[FN5] Under paragraph (1)(b) of this provision, a sentence of natural life is authorized where the sentencing judge finds that "the murder was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty." Ill.Rev.Stat.1985 ch. 38, par. 1005-8-1(a)(1)(b).

> FN5. In its response brief, the State indicates that defendant is subject to a prison sentence of between 20 and 60 years. The murder of the victim in the instant matter occurred in April 1997. At that time, section 5-8-1 provided a sentencing range for first degree murder of 20 to 40 years. By amendment effective January 1, 1988, this sentencing range was increased to the current term of 60 years. Contrary to the State's suggestion, the amended version of section 5-8-1 that became effective in January 1988, or the current version of that provision, cannot be retroactively applied to defendant's case because such an application would be violative of the *ex post facto* clauses of the United States and Illinois Constitutions ( U.S. Const., art. I, § 9, cl. 3; Ill. Const.1970, art. I, § 16). See *Fletcher v. Williams,* 179 Ill.2d 225, 233, 227 Ill.Dec. 942, 688 N.E.2d 635, 640 (1997) (any statute that, *inter alia,* makes more burdensome the punishment for a crime after its commission is prohibited as *ex post facto*).

The sentencing judge in the instant case agreed with the State's characterization of the crime and, specifically drawing upon his recollection of the

evidentiary proofs adduced at trial, he found the conduct of defendant accompanying the murder of Ms. Nielsen to be brutal and heinous as contemplated by the Corrections Code. Based on its finding, the court sentenced defendant to life in prison.

*343 In *Apprendi,* the accused, Charles Apprendi, pled guilty to, among other offenses, two counts of second degree possession of a firearm for an unlawful purpose. Under New Jersey's sentencing scheme, a second-degree offense carried a penalty range of 5 to 10 years in prison. As part of the plea agreement, the prosecution reserved the right, however, to seek a greater sentence on one of the two firearm possession counts under a hate crime statute that allowed for an enhanced sentence where the offense was committed with a biased purpose. For a second-degree offense, the hate crime law provided for a prison term of between 10 and 20 years.

Following a hearing, the sentencing court found, by a preponderance of the evidence, that the firearm possession offense**1136 ***958 committed by Apprendi was motivated by a racial bias. Relying on the hate crime enhancement provision, the court sentenced Apprendi to a term of 12 years, two years beyond the statutory maximum penalty for such an offense.

Apprendi challenged the validity of his sentence to the state appellate and supreme courts, arguing that the sentencing scheme provided in the hate crime law was unconstitutional. The state courts disagreed and upheld Apprendi's sentence. The Supreme Court reversed, finding that New Jersey's sentencing scheme infringed upon the due process and notice and right to jury clauses of the Constitution by impermissibly allowing the sentencing judge, rather than the jury, to determine, under a relaxed evidentiary standard, a fact which is most appropriately characterized as an element of the underlying offense.

After discussing at length the constitutional rights of every defendant in a criminal case to a trial by jury in which the State is required to prove every element of the offense charged beyond a reasonable

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

741 N.E.2d 1131

318 Ill.App.3d 340, 741 N.E.2d 1131, 251 Ill.Dec. 953
**(Cite as: 318 Ill.App.3d 340, 741 N.E.2d 1131)**

doubt (U.S. Const. amends. V, VI, XIV; *Apprendi,* 530 U.S. at ----, 120 S.Ct. at 2355-56, 147 L.Ed.2d at 446-48), the Court examined the term " sentencing factor," a term it first coined in *McMillan v. Pennsylvania,* 477 U.S. 79, 106 S.Ct. 2411, 91 L.Ed.2d 67 (1986), in light of the novelty of legislative schemes, referred to as "sentence enhancements," that remove from the jury the determination of a fact that, if found, exposes a defendant to a penalty exceeding the maximum he would receive if punished according to the facts reflected by the jury verdict alone. *Apprendi,* 530 U.S. at ----, 120 S.Ct. at 2356-60, 147 L.Ed.2d at 448-52. According to the Court, a "sentencing factor" is "a circumstance, which may be either aggravating or mitigating in character, that supports a specific sentence within a range authorized by the jury's finding that the defendant is guilty of a particular offense." (Emphasis omitted.) 530 U.S. at ---- n. 19, 120 S.Ct. at 2365 n. 19, 147 L.Ed.2d at 457 n. 19. A "sentence enhancement," on the other **\*344** hand, refers to a factual determination that results in "an increase beyond the maximum authorized statutory sentence." *Apprendi,* 530 U.S. at ---- n. 19, 120 S.Ct. at 2365, n. 19, 147 L.Ed.2d at 457, n. 19.

The Court explicitly recognized that the effect of sentence enhancement legislation on a defendant's punishment raises serious constitutional concerns in light of its prior precedent in the area and the history upon which those decisions rely. *Apprendi,* 530 U.S. at ----, 120 S.Ct. at 2360, 147 L.Ed.2d at 452. For the first time, the Court squarely confronted the issue of whether such enhancement schemes run afoul of well-established constitutional principles. Traditionally, according to the Court, any circumstance that exposed an accused to a higher degree of punishment had to be pled in the charging instrument and presented and proven to the jury beyond a reasonable doubt. *Apprendi,* 530 U.S. at ----, 120 S.Ct. at 2357, 147 L.Ed.2d at 449. Further, the fact that judges have historically enjoyed the discretion of fixing a punishment within a prescribed statutory range (*Apprendi,* 530 U.S. at ----, 120 S.Ct. at 2358, 147 L.Ed.2d at 449-50) demonstrated that their role in sentencing was " constrained at its outer limits by the facts alleged in the indictment and found by the jury. * * * [F]acts

that expose a defendant to a punishment greater than that otherwise legally prescribed were by definition 'elements' of a separate legal offense." *Apprendi,* 530 U.S. at ---- n. 10, 120 S.Ct. at 2359 n. 10, 147 L.Ed.2d at 451 n. 10. The Court explained:

"If a defendant faces punishment beyond that provided by statute when an offense is committed under certain circumstances but not others, it is obvious that both the loss of liberty and the stigma attaching to the offense [and suffered by the defendant] are heightened; it necessarily follows that the defendant should not-at the moment the State is put to proof of those circumstances-be **\*\*1137 \*\*\*959** deprived of protections that have, until that point, unquestionably attached." *Apprendi,* 530 U.S. at ----, 120 S.Ct. at 2359, 147 L.Ed.2d at 451.

Relying on the principles established by its prior decisions, the Court concluded the Constitution forbids " 'a legislature [from] remov[ing] from the jury the assessment of facts that increase the prescribed range of penalties to which a criminal defendant is exposed.' " *Apprendi,* 530 U.S. at ----, 120 S.Ct. at 2363, 147 L.Ed.2d at 455, quoting *Jones v. United States,* 526 U.S. 227, 252, 119 S.Ct. 1215, 1228, 143 L.Ed.2d 311, 332 (1999). (Stevens, J. concurring). According to the Court, the Constitution mandates that " 'such facts * * * be established by proof beyond a reasonable doubt.' " *Apprendi,* 530 U.S. at ----, 120 S.Ct. at 2363, 147 L.Ed.2d at 455, quoting *Jones,* 526 U.S. at 253, 119 S.Ct. at 1229, 143 L.Ed.2d at 332. (Stevens, J., concurring). The **\*345** Court held that "any fact [other than the fact of a prior conviction] that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." [FN6]
*Apprendi,* 530 U.S. at ----, 120 S.Ct. at 2362-63, 147 L.Ed.2d at 455.[FN7]

FN6. The Court's holding finally established the constitutional principle it suggested, but had avoided to pronounce, in its earlier decision of *Jones v. United States,* 526 U.S. 227, 243 n. 6, 119 S.Ct.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

741 N.E.2d 1131                                                                    Page 21

318 Ill.App.3d 340, 741 N.E.2d 1131, 251 Ill.Dec. 953
**(Cite as: 318 Ill.App.3d 340, 741 N.E.2d 1131)**

1215, 1224 n. 6, 143 L.Ed.2d 311, 326 n. 6 (1999), where in *dictum* the Court stated:
"under the Due Process Clause of the Fifth Amendment and the notice and jury trial guarantees of the Sixth Amendment, any fact (other than prior conviction) that increases the maximum penalty for a crime must be charged in an indictment, submitted to a jury, and proven beyond a reasonable doubt."

FN7. It must be noted that the rule announced by *Apprendi* makes no mention of any obligation on the part of the prosecution to allege the enhancing factor in the indictment. The Court's holding only provides that any fact other than a prior conviction that increases the punishment for a crime beyond the statutory maximum must be presented to the jury and proved beyond a reasonable doubt. The Court never expressly indicated that such a fact need also be alleged in the indictment. Nonetheless, when the Court's ruling is viewed as a whole, and when it is specifically considered together with the Court's statement in *Jones,* it becomes clear that facts that expose a defendant to a penalty beyond the maximum must also be pled in the indictment. Indeed, several federal courts have read *Apprendi* this way. See *United States v. Meshack,* 225 F.3d 556, 575 n. 15 (5th Cir.2000); *United States v. Aguayo-Delgado,* 220 F.3d 926, 933 (8th Cir.2000); *United States v. Murphy,* 109 F .Supp.2d 1059, 1062 (D.Minn.2000); *United States v. Henderson,* 105 F.Supp.2d 523, 535 (S.D.W.Va.2000).

In applying its ruling, the Court explained the relevant inquiry does not depend on the formal structure of the statute at issue, but of the statute's effect on the defendant's sentence-that is, "does the required finding expose the defendant to a greater punishment than that authorized by the jury's guilty verdict?" *Apprendi,* 530 U.S. at ----, 120 S.Ct. at 2365, 147 L.Ed.2d at 457. If so, then the fact upon which the enhancement is based must be alleged in the charging instrument and proven before the jury beyond a reasonable doubt. In such cases, the enhancement factor is the "functional equivalent of an element of a greater offense than the one covered by the jury's verdict" (*Apprendi,* 530 U.S. at ---- n. 19, 120 S.Ct. at 2365 n. 19, 147 L.Ed.2d at 457 n. 19), and as such becomes the " 'tail which wags the dog of the substantive offense.' " *Apprendi,* 530 U.S. at ----, 120 S.Ct. at 2365, 147 L.Ed.2d at 458, quoting *McMillan,* 477 U.S. at 88, 106 S.Ct. at 2417, 91 L.Ed.2d at 77. Conversely, since *Apprendi's* holding is expressly limited to instances where the enhancing factor has the effect*346 of increasing the penalty beyond the prescribed statutory maximum set, a court-determined fact may permissibly alter a defendant's sentence within the range provided for by the applicable statute.

[1] The *Apprendi* ruling marks a stark departure from the approach the Court has traditionally employed in differentiating between an element of an offense and a sentencing factor. The *Apprendi* Court **1138 ***960 explicitly recognized for the first time that an accused criminal has the constitutional right to have any statutory enhancement fact that, if found, increases the penalty for a crime beyond the prescribed maximum to be treated as an element of the underlying offense. In previous decisions, the Court did not concern itself with the constitutional implications of sentencing enhancement schemes but, rather, resorted to principles of statutory interpretation. In those cases, the Court undertook a microanalysis of the relevant statute's language, structure and history in an effort to determine whether it defined a distinct offense or whether it merely set forth a factor that could be properly considered in imposing an enhanced punishment. Within its analysis, the Court also frequently considered the related matter of whether the particular enhancement factor at issue was traditionally or typically considered by the courts as a sentencing factor. See *Castillo v. United States,* 530 U.S. 120, ----, 120 S.Ct. 2090, 2092-96, 147 L.Ed.2d 94, 98-103 (2000) (in a case decided three weeks before *Apprendi* was issued, the Court, in determining whether a federal statute which dramatically increased the penalty for the use or possession of a firearm when the weapon at issue is

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

741 N.E.2d 1131                                                    Page 22

318 Ill.App.3d 340, 741 N.E.2d 1131, 251 Ill.Dec. 953
**(Cite as: 318 Ill.App.3d 340, 741 N.E.2d 1131)**

a "machinegun" constituted a separate offense, concerned itself primarily with the intent of Congress, examining the literal language the statute and the statute's legislative history; the Court also considered whether the type of firearm in question had been typically or traditionally viewed as a sentencing factor); *Jones,* 526 U.S. at 232-40, 251-52, 119 S.Ct. at 1219-22, 1228, 143 L.Ed.2d at 319-24, 331 (in determining whether the federal carjacking statute, which increased the maximum punishment of 15 years where either "serious bodily injury" or "death" resulted from the offense, constituted a single offense or three distinct crimes, the Court turned to statutory interpretation to ascertain Congress' intent and specifically relied on the statutory construction principle of constitutional doubt to construe the statute as establishing three separate offenses; the Court further considered whether the facts of "serious bodily injury" and " death" had been traditionally considered sentencing factors); *Almendarez-Torres v. United States,* 523 U.S. 224, 229-35, 118 S.Ct. 1219, 1224-26, 140 L.Ed.2d 350, 359-63 (1998) (the Court resorted to principles of statutory interpretation,**347** and specifically looked to the statute's language, structure, subject matter, context, and history, to determine whether Congress intended a federal law, which elevated the maximum penalty for a deported alien reentering the country beyond a two-year prison term if the alien's initial deportation resulted from an aggravated felony conviction, to define a separate crime or simply an enhanced penalty; the Court also examined whether recidivism was a typical sentencing factor).

[2][3] Turning to the case at hand, we initially consider the State's argument that defendant has waived the matter of his sentence's validity for our review. As the State notes, defendant did not raise his *Apprendi* challenge in his original appeal and raised that matter for the first time in his timely filed rehearing petition. As a general rule, parties may not argue new points in a petition for rehearing. *People v. Wright,* 194 Ill.2d 1, 22-23, 251 Ill.Dec. 469, 740 N.E.2d 755 (2000). In *Wright,* the supreme court has recognized an exception to this rule where the new matter raised attacks the constitutionality of a criminal statute. *Wright,* 194 Ill.2d at 22-23, 251 Ill.Dec. 469, 740

N.E.2d 755. According to the court, such challenges may be raised at any time because it would be fundamentally unfair to uphold a criminal conviction pursuant to an unconstitutional statute. *Wright,* 194 Ill.2d at 22-23, 251 Ill.Dec. 469, 740 N.E.2d 755.

[4][5] We believe *Wright,* while involving a challenge to the validity of a criminal statute, equally applies to cases, like the instant matter, where a defendant attacks his sentence on the basis that it was imposed pursuant to an unconstitutional sentencing**1139 ***961 procedure set forth in the Corrections Code. The fundamental unfairness to a defendant explicitly recognized by *Wright* would similarly be present in such instances. This court, in fact, has recently declined to find waiver of a defendant's *Apprendi* challenge to his sentence imposed pursuant to the mandatory Class X sentencing scheme found in section 5-5-3(c)(8) of the Corrections Code despite that challenge being raised for the first by defendant in his rehearing petition. *People v. Lathon,* 317 Ill.App.3d 573, 578-79, 251 Ill.Dec. 296, 740 N.E.2d 377 (2000); see also *People v. Wooters,* 188 Ill.2d 500, 510, 243 Ill.Dec. 33, 722 N.E.2d 1102, 1108 (1999) (permitting defendant's challenge on appeal to validity of section 5-8-1(a)(1)(c)(ii) of the Corrections Code where that attack, asserted for the first time on appeal, warranted consideration given its constitutional dimension).

We further note *Apprendi* had yet to be released when we issued our original decision in the matter. Defendant thus did not have the benefit of *Apprendi* during the original portion of his appeal. Notwithstanding, the State argues the ruling in *Apprendi* is nothing new but, rather, is a restatement of the holdings announced earlier by the Court in *Jones* and *Almendarez-Torres.* The State unsuccessfully asserted the same argument before this court in *348Lathon,* 317 Ill.App.3d at 578, 251 Ill.Dec. 296, 740 N.E.2d 377 (noting *Jones* and *Almendarez-Torres* were each decided as a matter of statutory interpretation of federal sentencing guidelines, where *Apprendi* applied the principles established by those cases for the first time to state prosecutions), and more recently in *People v. Sutherland,* 317 Ill.App.3d 1117, 1128-29, 252

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

318 Ill.App.3d 340, 741 N.E.2d 1131, 251 Ill.Dec. 953
**(Cite as: 318 Ill.App.3d 340, 741 N.E.2d 1131)**

Ill.Dec. 851, 743 N.E.2d 1007 (2000). We likewise reject the State's argument here, and declining to apply waiver, we will address the merits of defendant's challenge to his sentence.

[6][7] We must next resolve the question of *Apprendi's* applicability to defendant's case. The law provides that a judicial decision announcing a new constitutional rule applicable to criminal cases is to be applied retroactively to all cases pending on direct review at the time the new constitutional rule is declared. *People v. Erickson,* 117 Ill.2d 271, 288, 111 Ill.Dec. 924, 513 N.E.2d 367, 374 (1987), citing *Griffith v. Kentucky,* 479 U.S. 314, 328, 107 S.Ct. 708, 716, 93 L.Ed.2d 649, 661 (1987). In particular, for retroactivity to be triggered, two factors must be present: (1) the case to which the new rule is to be applied was pending on direct review or was otherwise not final when the rule was declared and (2) the rule to be applied retroactively is of constitutional dimension. *People v. Dean,* 175 Ill.2d 244, 253, 222 Ill.Dec. 413, 677 N.E.2d 947, 951 (1997); *Erickson,* 117 Ill.2d at 289, 111 Ill.Dec. 924, 513 N.E.2d at 374.

[8] We find both factors present in the instant case. Defendant's case was still pending on direct review and was not yet final when *Apprendi* was decided. The term "final" has been defined in the retroactivity context as " 'a case in which a judgment of conviction has been rendered, the availability of appeal exhausted, and the time for a petition for certiorari elapsed or a petition for certiorari finally denied.' " *People v. Holman,* 132 Ill.2d 128, 141, 138 Ill.Dec. 155, 547 N.E.2d 124, 128 (1989), quoting *Griffith,* 479 U.S. at 321 n. 6, 107 S.Ct. at 712 n. 6, 93 L.Ed.2d at 657 n. 6. Defendant raised his *Apprendi* challenge in a timely filed rehearing petition and at the earliest possible opportunity. Defendant's case, while at the rehearing stage, nonetheless remains before this court on direct review.

[9] Secondly, the Supreme Court's ruling clearly announced a new rule of constitutional dimensions. Such a finding is readily apparent from the *Apprendi* opinion itself, as well as from the Court's break from its past method of resolving the proper characterization of a particular penalty enhancement

statute. The *Apprendi* **1140 ***962 Court expressly predicated its holding on the Constitution's due process clauses of the fifth and fourteenth amendments and the notice and jury trial guarantees of the sixth amendment. The right of a criminal defendant to have all facts, except the fact of a prior conviction, that increase the statutory maximum penalty for an offense pled in the indictment and proved to a jury beyond a reasonable doubt is, according to the Court, deeply rooted in the Constitution and its jurisprudence.

*349 Furthermore, in determining the validity of the New Jersey sentencing scheme under which Apprendi was punished, the Court did not seek to ascertain the state legislature's intent in enacting the statute by examining its language, structure, subject matter, context, and history. Neither did the Court place any weight on whether the enhancement fact at issue, *i.e.,* a biased purpose on the part of the offender, has been traditionally or typically viewed as a sentencing factor. Rather, the Court concerned itself solely with the principles that have developed in light of the rights guaranteed by the fifth and sixth amendments and the limits those constitutional provisions place on a state legislature's ability to remove the determination of certain facts from the province of the jury which, if found, would elevate the penalty for a particular offense above its statutorily prescribed maximum.[FN8]

> FN8. Several federal courts have held that *Apprendi's* holding represents a new rule of constitutional law. See *United States v. Aguayo-Delgado,* 220 F.3d 926, 931-32 (8th Cir., 2000) ("[i]n *Apprendi,* the Supreme Court made it clear that the principle discussed in *Jones* is a rule of constitutional law"); *Sustache-Rivera v. United States,* 221 F.3d 8, 15 (1st Cir.2000) (recognizing same); *United States v. Murphy,* 109 F.Supp.2d 1059, 1062 (D.Minn.2000) (recognizing same); *United States v. Kelly,* 105 F.Supp.2d 1107, 1112 (S.D.Cal.2000) (recognizing same); *United States v. Rogers,* 228 F.3d 1318, 1325-26 (11th Cir.2000) (recognizing same); *United States v.*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

741 N.E.2d 1131                                                                                       Page 24

318 Ill.App.3d 340, 741 N.E.2d 1131, 251 Ill.Dec. 953
**(Cite as: 318 Ill.App.3d 340, 741 N.E.2d 1131)**

*Nordby,* 225 F.3d 1053, 1059 (9th Cir.2000) (indicating that *Apprendi* established a new constitutional rule and applying the decision retroactively pursuant to *Griffith*).

Because defendant's case remains pending, and since *Apprendi* reflects the establishment of a new constitutional principle, we find *Apprendi* applicable to the instant matter. *Lathon,* 317 Ill.App.3d at 578-79, 251 Ill.Dec. 296, 740 N.E.2d 377 (applying *Apprendi* retroactively where defendant raised issue in petition for rehearing); *People v. Clifton,* Nos. 1-98-2126, 1-98-2384 cons., slip op. at 51 n. 6, --- Ill.App.3d ----, ----, ---Ill.Dec. ----, ---N.E.2d ---- (September 29, 2000) (applying *Apprendi* retroactively to case pending on review).

Pursuant to *Apprendi,* the question presented here is whether section 5-8-1(a)(1)(b) defines a separate, aggravated offense of murder or whether that provision merely represents a factor that a court may properly consider in imposing a sentence. In resolving this question, our duty is to ascertain the effect section 5-8-1(a)(1)(b) has on the statutory prescribed maximum imposed for a murder offense as set forth in paragraph (a)(1)(a) of that provision.

[10] The State makes several attempts to demonstrate that the instant case is not covered by *Apprendi.* Each of the State's claims is based on the contention that defendant's life sentence is not beyond, but rather falls within, the prescribed statutory maximum for first degree murder. The State first contends that section 5-8-1(a)(1)(a) **\*350** simply provides the " typical" sentencing range for murder, and that the statutory maximum is actually life imprisonment or the death penalty as provided in section 9-1(b) of the Criminal Code of 1963 (Criminal Code) (Ill.Rev.Stat.1985 ch. 38, par. 9-1(b)). Based on its reading of the Corrections Code, the State asserts the applicable sentencing range should be referred to as 20 years in prison up to and including the death penalty.

The position posited by the State has been recently rejected by this court in *People v. Beachem,* 317 Ill.App.3d 693, 708, 251 Ill.Dec. 308, 740 N.E.2d 389 **\*\*\*963** (2000). **\*\*1141** There, the defendant,

who was convicted of first degree murder, argued that her extended-term sentence of 90 years' imprisonment imposed under section 5-8-2(a) of the Corrections Code (730 ILCS 5/5-8-2(a) (West 1996)) ran afoul of the mandates of *Apprendi.* In asserting *Apprendi's* inapplicability, the State claimed, like here, that the defendant's 90-year sentence did not exceed the maximum penalty for first degree murder, which, according to the State, was life or the death penalty.

This court rejected the State's reading of the Corrections Code, finding the current version of section 5-8-1(a)(1)(a), which provides a sentencing range of 20 to 60 years, reflects the prescribed statutory maximum penalty for a first degree murder offense. *Beachem,* 317 Ill.App.3d at 706-707, 251 Ill.Dec. 308, 740 N.E.2d 389. The court noted that for any punishment exceeding 60 years, including either a term of life or the death penalty, to be imposed, additional aggravating factors must be found to exist. *Beachem,* 317 Ill.App.3d at 307, 251 Ill.Dec. 308, 740 N.E.2d 389. The court's conclusion was further buttressed by the specific language of the extended-term provision, which explicitly provides that " 'a judge shall not sentence an offender to a term of imprisonment *in excess of the maximum sentence authorized by Section 5-8-1*' " unless certain aggravating factors are present. (Emphasis in original.) *Beachem,* 317 Ill.App.3d at 706-707, 251 Ill.Dec. 308, 740 N.E.2d 389, quoting 730 ILCS 5/5-8-2(a)(1) (West 1996).

*Beachem* commands rejection of the State's contention in the present case. The predecessor version of section 5-1-8(a)(1), which is at issue here, expressly provides for a prison term of 20 to 40 years' imprisonment for first degree murder. Like the statutory schemes examined in *Beachem,* the 1985 version of the sentencing laws similarly authorizes a sentence in excess of 40 years only upon additional findings. See Ill.Rev.Stat.1985 ch. 38, par. 1005-8-1(a)(1)(b) (term of life imprisonment permitted if offense was " exceptionally brutal or heinous," or where any aggravating factors specified in section 9-1 of the Criminal Code, which lists the eligibility factors for a penalty of death, are present; Ill.Rev.Stat.1985 ch. 38, par. 1005-8-1(a)(1)(c) (term of life

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

741 N.E.2d 1131                                                                Page 25

318 Ill.App.3d 340, 741 N.E.2d 1131, 251 Ill.Dec. 953
**(Cite as: 318 Ill.App.3d 340, 741 N.E.2d 1131)**

authorized where defendant *351 has previously been convicted of murder or where he was found guilty of murdering more than one victim); Ill.Rev.Stat.1985 ch. 38, par. 1005-8-2(a)(1) (extended term of 40 to 80 years' imprisonment allowed where aggravating factors set forth in section 5-5-3.2 of Corrections Code are found to be present); Ill.Rev.Stat.1985 ch. 38, par. 9-1(b) (death penalty warranted where defendant has been convicted of murder while 18 years of age or older and where certain statutory aggravating factors are found). Additionally, the 1985 version of the extended-term provision found in section 5-8-2(a) sets forth verbatim the sentencing limitation found in the current legislation and discussed by the *Beachem* court. See Ill.Rev.Stat.1985 ch. 38, par. 1005-8-2(a) (expressly referring to section 5-8-1 as setting forth the maximum punishment for first degree murder).

The State alternatively contends that *Apprendi* stands for the proposition that the prescribed statutory maximum for first degree murder, from a constitutional standpoint, and seemingly notwithstanding the express language of the enhanced penalty provision at issue in the case, must be viewed in all instances as the imposition of the death penalty. In this regard, the State argues " as the elements of first degree murder are the same regardless of whether a defendant is facing the death penalty * * *, it would be absurd to find that a murder defendant facing the death penalty has no sixth amendment right to have a jury find the statutory aggravating eligibility factors, while all other murder defendants have the constitutional right to have a jury * * * find the statutory factors **1142 ***964 authorizing an extended term sentence or natural life imprisonment."

[11] The State essentially maintains that the dictates of *Apprendi* must apply equally to capital and noncapital defendants. The Supreme Court, however, specifically limited its holding in *Apprendi* to noncapital cases and was careful to note that its decision does not disturb its earlier ruling in *Walton v. Arizona,* 497 U.S. 639, 639-40, 110 S.Ct. 3047, 3049-50, 111 L.Ed.2d 511, 519-20 (1990), where the Court rejected the argument that the Constitution mandated that judge-authorized

findings of aggravating factors necessary for the imposition of the death penalty be made by a jury, and further dismissed the contention that those factors were "elements" of the underlying offense, which, according to the Court, merely represented standards to guide the decision of choosing between verdicts of death or another lesser form of punishment. *Apprendi,* 530 U.S. at ----, 120 S.Ct. at 2366, 147 L.Ed.2d at 459. Thus, while it appears *Apprendi* extends greater constitutional protections to noncapital, rather than capital, defendants,*352 the Court has endorsed this precise principle, and we are in no position to secondguess that decision here.[FN9]

> FN9. Notably, the Illinois death penalty statute expressly provides that the eligibility factors for such a punishment must be proved by the State beyond a reasonable doubt. Ill.Rev.Stat.1985 ch. 38, par. 9-1(f). In this regard, the death penalty statute conforms to the rule in *Apprendi.* The statute, however, does not require the State to give a defendant pretrial notice of the eligibility factors sought to be established. Our supreme court has specifically held that no constitutional right exists entitling a criminal defendant to such notification. *People v. Jones,* 123 Ill.2d 387, 426, 123 Ill.Dec. 944, 528 N.E.2d 648, 666 (1988); *People v. Crews,* 122 Ill.2d 266, 293, 119 Ill.Dec. 308, 522 N.E.2d 1167, 1180 (1988).

[12] In a final attempt to show that the statutory maximum was not exceeded in this case, the State relies on the Seventh Circuit's recent decision in *United States v. Smith,* 223 F.3d 554 (7th Cir .2000) , for the proposition that the theoretical possibility of a certain statutory penalty of a given offense represents that offense's maximum punishment. Because a conviction of first degree murder carries the theoretical possibility of either a sentence of death or life in prison under Illinois law, the State maintains that death or life is the maximum penalty for murder.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

318 Ill.App.3d 340, 741 N.E.2d 1131, 251 Ill.Dec. 953
**(Cite as: 318 Ill.App.3d 340, 741 N.E.2d 1131)**

We do not share the State's reading of *Smith.* Contrary to the State's contention, nothing in *Smith* suggests that the highest theoretical punishment for a particular crime constitutes the statutory maximum for purposes of applying *Apprendi.* Moreover, the sentencing statute in *Smith* concerned the imposition of a mandatory minimum under certain circumstances. See *Smith,* 223 F.3d at 562-63 (statute authorized range of 30 years' imprisonment to life upon a finding that the defendant participated in a continuing criminal enterprise, but set forth a mandatory minimum sentence of life for any defendant who, *inter alia,* was a principal or otherwise was a leader in such enterprise). The *Smith* court specifically indicated that *Apprendi* did not apply, and noted that the Supreme Court, in *McMillan,* expressly upheld the validity of such mandatory minimum sentencing legislation. *Smith,* 223 F.3d at 565-66. The sentencing scheme in this case does not involve the imposition of a mandatory minimum punishment but, rather, authorizes an enhanced penalty upon the finding of certain specified factual circumstances.

[13] We must now decide whether that enhancement procedure is constitutional under *Apprendi* and must specifically consider whether the sentencing factor reflected in section 5-8-1(a)(1)(b), *i.e.,* whether the murder was accompanied by "exceptionally brutal or heinous behavior indicative of wanton cruelty," represents a factual determination, and, if so, whether that determination*353 increases the maximum penalty for murder.

**\*\*1143 \*\*\*965** [14][15] Certainly, the question of whether a particular murder was accompanied by " exceptionally brutal or heinous behavior" necessarily involves an examination of, and is based upon, the factual circumstances presented by the evidentiary proofs. Further, a court's finding that a murder was accompanied by such behavior significantly increases the statutory maximum penalty from a term of 40 years' imprisonment to a term of natural life. Based on the foregoing, the " exceptionally brutal or heinous" inquiry presented by section 5-8-1(a)(1)(b) is most accurately characterized for constitutional purposes as an element of a greater crime, rather than a mere factor

to be considered at sentencing. Accordingly, if the State wishes to seek an enhanced sentence for murder on the grounds that the offense was " exceptionally brutal or heinous," it must allege that factual circumstance in the relevant charging instrument and prove it to a jury beyond a reasonable doubt.FN10 We note that a different division of this court in *People v. Lee,* 318 Ill.App.3d 417, 422, 252 Ill.Dec. 863, 743 N.E.2d 1019 (2000), and the Second District Appellate Court in *People v. Joyner,* 317 Ill.App.3d 93, 110, 250 Ill.Dec. 831, 739 N.E.2d 594 (2000), have recently determined that section 5-8-1(a)(1)(b) is constitutionally infirm under *Apprendi.*

> FN10. We make no comment on whether such a procedure is properly available to the State under current Illinois law.

[16] Considering the merits of defendant's challenge, the crime of murder as defined in section 9-1 of the Criminal Code did not require a finding by the jury that defendant's conduct accompanying the victim's murder was "exceptionally brutal or heinous." It is of no surprise then that the State's charging instruments make no mention of such circumstances. Further, the record is clear that defendant's jury made no finding concerning the nature of the victim's murder and specifically reveals that the jurors never considered and passed on the question of whether defendant acted brutally or heinously.

The highest punishment defendant could receive based solely on the facts reflected by the jury's verdict was the maximum term of 40 years' imprisonment. The jury's verdict authorized no greater penalty. Only when the sentencing judge, proceeding under a relaxed evidentiary standard, found an additional factual circumstance related to the crime did defendant become subject to a prison term well in excess of the maximum. That procedure, as *Apprendi* dictates, offends constitutional principles and is invalid as applied to defendant in this case. See *Beachem,* 317 Ill.App.3d at 708, 251 Ill.Dec. 308, 740 N.E.2d 389 (noting the *Apprendi* Court never declared the New Jersey statute void on its face but, rather, referred to

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

318 Ill.App.3d 340, 741 N.E.2d 1131, 251 Ill.Dec. 953
**(Cite as: 318 Ill.App.3d 340, 741 N.E.2d 1131)**

it as creating an unconstitutional procedure).

**\*354** Since the State never alleged and proved to
the jury beyond a reasonable doubt that defendant
acted in an "exceptionally brutal or heinous"
fashion when he murdered the victim, we vacate
defendant's life sentence and remand for a sentence
that is consistent with this opinion.

### CONCLUSION

We affirm defendant's conviction for murder based
on the reasons expressed in the unpublished portion
of this opinion. We further vacate defendant's
sentence of life and remand for the imposition of a
new prison term that is consistent with this opinion.

Affirmed in part and reversed in part; cause
remanded with directions.

CAHILL, P.J., and WOLFSON, J., concur.
Ill.App. 1 Dist.,2000.
People v. Kaczmarek
318 Ill.App.3d 340, 741 N.E.2d 1131, 251 Ill.Dec.
953

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.