NO. _____

IN THE

SUPREME COURT OF ILLINOIS

|  |  |  |
|---|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) ) ) ) | Appeal from the Appellate Court of Illinois, First District, Third Division, |
| Plaintiff-Appellant, | ) ) | Appellate Court No. 97-2557 |
|  | ) ) | ———— |
| vs. | ) ) ) | There Heard on Appeal from the Circuit Court |
| HENRY KACZMAREK, | ) ) ) | of Cook County, Criminal Division. |
|  | ) ) | ———— |
| Defendant-Appellee. | ) ) ) | Honorable John Brady, Judge Presiding. |

**PETITION FOR APPEAL AS A MATTER OF RIGHT
OR IN THE ALTERNATIVE, PETITION FOR LEAVE TO APPEAL**

JAMES E. RYAN,
  Attorney General
  State of Illinois
WILLIAM L. BROWERS,
  Assistant Attorney General
  100 West Randolph Street, Suite 1200
  Chicago, Illinois 60601

  <u>Attorneys for Plaintiff-Appellant.</u>

RICHARD A. DEVINE,
  State's Attorney
  County of Cook
  309 Richard J. Daley Center
  Chicago, Illinois 60602
RENEE G. GOLDFARB,
WILLIAM D. CARROLL,
ALAN J. SPELLBERG,
  Assistant State's Attorneys,
  <u>Of Counsel.</u>

EXHIBIT B

IN THE

SUPREME COURT OF ILLINOIS

|  |  |  |
|---|---|---|
| | ) | Appeal from the |
| | ) | Appellate Court |
| | ) | of Illinois, |
| PEOPLE OF THE STATE OF ILLINOIS, | ) | First District, |
| | ) | Third Division, |
| | ) | Appellate Court No. 97-2557 |
| Plaintiff-Appellant, | ) | |
| | ) | ——————— |
| | ) | |
| vs. | ) | There Heard on Appeal |
| | ) | from the Circuit Court |
| | ) | of Cook County, |
| HENRY KACZMAREK, | ) | Criminal Division. |
| | ) | |
| | ) | ——————— |
| Defendant-Appellee. | ) | Honorable |
| | ) | John Brady, |
| | ) | Judge Presiding. |

## I.

## BASIS OF APPEAL AS A MATTER OF RIGHT

Pursuant to the provisions of Supreme Court Rules 315 and 317, the People of the State

of Illinois respectfully appeal to this Honorable Court as a matter of right, or in the alternative, ask

for leave to appeal from the judgment entered in the above-entitled cause by the Appellate Court,

First District, Third Division.

The instant appeal should be accepted as a matter of right because the Appellate Court

held that section 5-8-1(a)(1)(b) of the Unified Code of Corrections is unconstitutional pursuant to

the recent United States Supreme Court decision of <u>Apprendi v. New Jersey</u>, 530 U.S. 466, 120

S. Ct. 2348 (2000). See <u>People v. Kaczmarek</u>, ___ Ill. App.3d ___ (No. 1-97-2557 December 27,

1

2000). Specifically, the Appellate Court held that section 5-8-1(a)(1)(b) is unconstitutional because a finding by the trial court that defendant committed the instant murder in an exceptionally brutal or heinous manner indicative of wanton cruelty authorized a sentence for first degree murder beyond the 40 year maximum provided for in section 5-8-1(a)(1)(a). Slip op. at 59-61. Because the determination that section 5-8-1(a)(1)(b) was unconstitutional arose for the first time and as a result of the Appellate Court's ruling, the People maintain that appeal as a matter of right is appropriate in the instant case. Supreme Court Rule 317. (134 Ill. 2d R. 317).

Furthermore, this Honorable Court should reverse the lower court's ruling that section 5-8-1(a)(1)(b) is unconstitutional in light of Apprendi because that conclusion is inconsistent with Apprendi and other rulings by the United States Supreme Court and other courts recognizing that the "prescribed statutory maximum" for first degree murder is the death penalty and that judicial fact-finding at sentencing is constitutionally permissible, even if those facts tend to lengthen the actual time of imprisonment, provided the sentence imposed is within the "prescribed statutory maximum." See Apprendi, 120 S.Ct. at 2361, 2365; See also Walton v. Arizona, 479 U.S. 639, 110 S.Ct. 3047 (1990); McMillan v. Pennsylvania, 477 U.S. 79, 106 S.Ct. 2411 (1986); United States v. Dunigan, 507 U.S. 87, 113 S.Ct. 1111 (1993); Edwards v. United States, 523 U.S. 511, 118 S.Ct. 1475 (1998); United States v. Watts, 519 U.S. 148, 117 S.Ct. 633 (1997); Hernandez v. United States, 226 F.3d 839 (7th Cir. 2000); United States v. Smith, et al., 223 F. 3d 554 (7th Cir. 2000); State v. Conley, ___ Kan. ___, 2000 Kan. LEXIS 810 (No. 82,380 October 27, 2000); and State v. Grooms, ___ S.C. ___, 2000 S.C. LEXIS 218, at *8-9 (No. 25211 November 7, 2000).

In the alternative, the People respectfully request this Honorable Court to grant leave to appeal in order to provide guidance to Illinois courts and litigants as to the proper interpretation

of the United States Supreme Court's opinion in <u>Apprendi</u>.    Moreover, as the Appellate Court's

ruling may be inconsistent with this Court's forthcoming resolution of the issue in <u>People v. Eric</u>

<u>Ford</u>, case no. 90083 (petition for leave to appeal granted November 29, 2000), the People

respectfully request this Honorable Court to hold the instant matter until <u>Ford</u> is resolved.

## II.

## HISTORY IN THE APPELLATE COURT

On June 28, 2000, the Appellate Court, First District, Third Division, affirmed defendant's conviction and his sentence of natural life imprisonment for first degree murder in a unpublished order pursuant to Supreme Court rule 23. Thereafter on July 18, 2000, defendant filed a petition for rehearing and supplemental brief alleging that his natural life sentence imposed under section 5-8-1(b) of the Unified Code of Corrections (730 ILCS 5/5-8-1(b)) is unconstitutional pursuant to Apprendi v. New Jersey, 530 U.S. 466, 120 S. Ct. 2348 (2000). After hearing additional oral argument, on December 27, 2000, the Appellate Court withdrew its earlier unpublished order and issued a published opinion affirming defendant's conviction but vacating his natural life sentence and remanding the matter for resentencing. See People v. Kaczmarek, ___ Ill. App.3d ___ (No. 1-97-2557 December 27, 2000), Slip op. at 59-61. On January 17, 2001, an affidavit stating the People's intention to seek an appeal as a matter of right, or in the alternative leave to appeal, to this Honorable Court was filed with the Appellate Court, First District, Third Division, pursuant to Supreme Court Rule 368(b).

## III.

### POINTS RELIED UPON FOR REVERSAL

The Appellate Court, First District, Third Division held section 5-8-1(b) of the Unified Code of Corrections (730 ILCS 5/5-8-1(b)) unconstitutional pursuant to the recent United States Supreme Court decision of <u>Apprendi v. New Jersey</u>, 530 U.S. 466, 120 S. Ct. 2348 (2000). This conclusion is inconsistent with the <u>Apprendi</u> opinion itself as well as other rulings by the United States Supreme Court and other courts recognizing that the "prescribed statutory maximum" for first degree murder is the death penalty and that judicial fact-finding at sentencing is constitutionally permissible, even if those facts tend to lengthen the actual time of imprisonment, provided the sentence imposed is within the "prescribed statutory maximum."

5

## IV.

## STATEMENT OF FACTS

Defendant Henry Kaczmarek Defendant was charged and convicted of the 1987 stabbing murder of 86 year-old Millie Nielson. (R.C. Vol. I C35)  On direct appeal, the Illinois Appellate Court reversed and remanded this cause for a new trial. <u>People v. Kaczmarek</u>, 243 Ill. App. 3d 1067, 613 N.E.2d 1252 (1st Dist. 1993).  On remand, defendant was again convicted by a jury of first degree murder and was sentenced to natural life imprisonment. (R.C. Vol. II C152, C293)

Then, on December 27, 2000, the Appellate Court, First District, Third Division affirmed defendant's conviction for first degree murder, but vacated his natural life sentence and remanded for resentencing. <u>People v. Kaczmarek</u>, ___ Ill. App.3d ___ (No. 1-97-2557 December 27, 2000), Slip op. at 59-61..  This appeal followed.

# V.

## ARGUMENT

**THIS HONORABLE COURT SHOULD EXERCISE ITS JURISDICTION OVER THE INSTANT APPEAL BECAUSE THE APPELLATE COURT'S HOLDING THAT SECTION 5-8-1(a)(1)(b) OF THE UNIFIED CODE OF CORRECTIONS IS UNCONSTITUTIONAL IN LIGHT OF APPRENDI IS INCONSISTENT WITH APPRENDI AND OTHER RULINGS BY THE UNITED STATES SUPREME COURT.**

This Honorable Court should exercise its jurisdiction over the instant appeal either pursuant to Supreme Court Rule 317 or Supreme Court Rule 315 because the Appellate Court's conclusion that section 5-8-1(a)(1)(b) is unconstitutional in light of Apprendi is inconsistent with the Apprendi decision itself and other rulings by the United States Supreme Court recognizing the legitimacy of judicial fact-finding at sentencing, even if those facts tend to lengthen the actual time of imprisonment, provided the sentence imposed is within the "prescribed statutory maximum."

In Apprendi, the defendant pled guilty to the second degree offense of unlawful firearm possession, but because the trial judge at the sentencing hearing made the factual finding that the defendant had committed the crime with a biased purpose, the court imposed a sentence based on an extended range of 10-20 years rather than the 5-10 year range generally applicable to the second degree offenses. Apprendi v. New Jersey, 530 U.S. ___, 120 S. Ct. 2348 (2000). After the defendant's appeals were rejected by the New Jersey state courts, the United States Supreme Court reversed, holding that the Constitution requires that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury and proved beyond a reasonable doubt." Id., 120 S.Ct. at 2362-63.

In reliance on this holding, the Appellate Court in the instant case held that section 5-8-1(a)(1)(b) is unconstitutional because a finding by the trial court that the defendant committed the murder in an exceptionally brutal or heinous manner indicative of wanton cruelty permitted the court to impose a sentence for first degree murder beyond 40 years imprisonment. People v. Kaczmarek, ___ Ill. App.3d ___ (No. 1-97-2557  December 27, 2000), Slip op. at 59-61. The People maintain that the Appellate Court's holding is inconsistent with the Apprendi decision itself and other rulings by the United States Supreme Court recognizing that the "prescribed statutory maximum" for first degree murder is the death penalty and that judicial fact-finding at sentencing is constitutionally permissible, even if those facts tend to lengthen the actual time of imprisonment, provided the sentence imposed is within the "prescribed statutory maximum."[1]   As such, application of Apprendi to Illinois first degree murder provision is both unnecessary and incorrect.

It is true that the Apprendi majority held that the United States Constitution requires that any fact that increases the penalty for a crime beyond the prescribed statutory maximum, other than the fact of a prior conviction, must be submitted to a jury and proved beyond a reasonable doubt. Id., 120 S.Ct. at 2362-63. However, the People maintain that in imposing a sentence of natural life imprisonment because the murder was accompanied by brutal and heinous behavior indicative of

---

[1]The People also maintain that defendant has waived this issue because he never challenged the constitutionality of his sentence. See 730 ILCS 5-8-1 (c) (1994); People v. Reed, 177 Ill.2d 389, 686 N.E.2d 584 (1997). Accordingly, the People maintain that defendant's challenge to his sentence is waived and should be summarily rejected.  Similarly, in regard to any claim that the charging instrument was deficient, the People point out that a failure to challenge a charging instrument prior to the conclusion of the trial will result in waiver of the issue unless the defendant can prove that he was prejudiced by the deficiency. See People v. Thingvold, 145 Ill. 2d 441, 448, 584 N.E.2d 89 (1991);  People v. Gilmore, 63 Ill. 2d 23, 29, 344 N.E.2d 456 (1976). Because defendant has never even alleged that he was prejudiced by the alleged deficiency in the indictment, all of defendant's arguments should be deemed waived.

wanton cruelty, the trial court **did not** impose a sentence which was "beyond the prescribed statutory maximum."

First, unlike all the other offenses listed in the Criminal Code of 1961, first degree murder is **not** part of a particular class of felony such as Class X or Class 1. Rather, it is by definition a "separate class of felony." 730 ILCS 5/5-5-1(b)(1). Therefore, first degree murder is unique and must be treated as such. Thus, while section 5-8-1(a)(1) of the Unified Code of Corrections (730 ILCS 5/5-8-1(a)(1)) delineates the statutory maximum sentences for all the other classes of felonies, section 5-8-1(a)(1)(a) simply provides the typical sentencing range for first degree murder. This is true because the legislature has clearly stated that the maximum sentence available for the offense of first degree murder is the death penalty. See 720 ILCS 5/9-1(b), 730 ILCS 5/5-8-1(a)(1)(c). Similarly, the legislature has clearly stated that defendants convicted of first degree murder may be sentenced to a term of natural life imprisonment in certain types of cases. See 730 ILCS 5/5-8-1(a)(1)(b),(c). Thus, the range of sentencing for first degree murder should more appropriately be referred to as 20 years of imprisonment up to and including the death penalty.

Furthermore, the Apprendi decision itself indicates that from a constitutional standpoint, the "prescribed statutory maximum" for first degree murder is the imposition of the death penalty. In response to the dissent's assertion that the Apprendi holding was in direct conflict with the Court's earlier decision in Walton v. Arizona, 479 U.S. 639, 110 S.Ct. 3047 (1990) (where the Court approved an Arizona statutory scheme authorizing the trial judge rather than the jury to find the existence of the requisite aggravating factor in order to find the defendant eligible for the death penalty), the Apprendi majority explained:

9

"Neither the cases cited, nor any other case, permits a judge to determine the existence of a factor which makes a crime a capital offense. What the cited cases hold is that, once a <u>jury</u> has found the defendant <u>guilty</u> of <u>all the elements</u> of an offense which carries as its maximum penalty the sentence of death, it may be left to the judge to decide whether that maximum penalty, rather than a lesser one, ought to be imposed . . . . The person who is charged with actions that expose him to the death penalty has an absolute entitlement to jury trial on <u>all the elements</u> of the charge."

<u>Apprendi</u>, 120 S.Ct. at 2366 (quoting <u>Almendarez-Torres v. United States</u>, 523 U.S. 224, 257 n.2, 118 S. Ct. 1219, 1237 n.2 (1998) (Scalia, J., dissenting)) (emphasis in <u>Almendarez-Torres</u>).

Thus, by its own terms, the holding of <u>Apprendi</u> does not apply to Illinois' first degree murder statute because once a defendant has been found guilty of that offense, the only remaining question is what sentence should be imposed, be it the death penalty or a lesser sentence such as life imprisonment or a term of years. As the elements of first degree murder are the same regardless of whether a defendant is facing the death penalty (see 720 ILCS 5/9-1(a)), it would be absurd to find that a murder defendant facing the death penalty has no sixth amendment right to have the jury[2] find the statutory aggravating eligibility factors, while all other murder defendants have the constitutional right to have a jury find the statutory factors authorizing an extended term sentence or natural life imprisonment. Certainly, nothing in the <u>Apprendi</u> opinion or the rest of the Supreme

_____

[2]In Illinois, the right to have a jury determine a defendant's eligibility for the death penalty is one of statutory creation and not constitutionally based. See <u>People v. Ramey</u>, 152 Ill. 2d 41, 65, 604 N.E.2d 275, 286 (1992)

Court's jurisprudence indicates that capital defendants are entitled to **fewer** constitutional protections than non-capital defendants.

Moreover, despite the oft-cited holding, it is clear that the <u>Apprendi</u> decision does **not** prohibit all judicial fact-finding at sentencing, even if those facts tend to lengthen the actual time of imprisonment. Rather, the <u>Apprendi</u> court expressly stated that the constitution permits such sentencing determinations as long as the sentence imposed is within the prescribed statutory range. See <u>Id.</u>,120 S.Ct. at 2365 (citing <u>McMillan v. Pennsylvania</u>, 477 U.S. 79, 106 S.Ct. 2411 (1986)).

In <u>McMillan</u>, the Court held that a defendant's constitutional rights are not infringed by a legislative enactment calling for a mandatory minimum sentence whenever the sentencing judge found a specific fact to be in existence. The Court stated that even though the defendant would be subject to a higher minimum sentence (and therefore serve a longer period of imprisonment) than he would have been without the judge's finding, the constitutional requirements that each element of the offense be proven beyond a reasonable doubt and found by a jury did not apply because the legislature had merely identified a particular "sentencing factor" and provided the appropriate weight to be given to that factor. <u>Id.</u> at 86-88, 106 S.Ct. at 2416-17. The <u>McMillan</u> court qualified its holding, however, by pointing out that the statute did not "expose [defendants] to greater or additional punishment" by "alter[ing] the <u>maximum penalty</u> for the crime committed." <u>Id.</u> at 87-88, 106 S.Ct. at 2417 (emphasis added).

The majority opinion in <u>Apprendi</u> specifically refers to this qualification of the holding in <u>McMillan</u> and points out that it is not overruling <u>McMillan</u>, but "limit[ing] its holding to cases that do not involve the imposition of a sentence more severe than the statutory maximum for the offense established by the jury's verdict -- a limitation identified in the <u>McMillan</u> opinion itself."

11

Apprendi, 530 U.S. at ___, 120 S.Ct. at 2361, n.13. Thus, it is clear that the Apprendi decision by its own terms permits judicial fact-finding at sentencing even if those facts have the effect of lengthening the actual time of imprisonment served by the defendant.

Consistent with this interpretation, the Seventh Circuit has held that as long as a sentence is theoretically possible under the statute, McMillan rather than Apprendi controls. Hernandez v. United States, 226 F.3d 839 (7th Cir. 2000); United States v. Smith, 223 F. 3d 554 (7th Cir. 2000). In Hernandez, the defendant argued that his enhanced sentence for kidnaping was unconstitutional under Apprendi because the additional facts that supported the upward adjustments under the Federal Sentencing Guidelines "were facts that should have been charged in the indictment, submitted to the jury and proven beyond a reasonable doubt." Hernandez, 226 F.3d at 841. In rejecting that argument, the Seventh Circuit pointed out that the defendant had "overlook[ed] the distinction between the prescribed statutory maximum and the various levels of punishment authorized by the Sentencing Guidelines." Id. The court then held that because the prescribed statutory maximum under the kidnaping statute is life imprisonment, "[t]he fact that different levels under the statutory maximum depend on proof of various aggravating facts is not enough to make those facts 'elements of the offense' rather than 'sentencing factors.'" Id.

Similarly, in rejecting the defendants' arguments that their life sentences for continuing criminal enterprise convictions violated the rule in Apprendi, the Seventh Circuit stated in Smith:

> [W]e must decide whether § 848(b) has the kind of "increased punishment"
> effect that triggers the Apprendi rule. This is a difficult inquiry. On the one
> hand, § 848(a) authorizes a range of imprisonment of 30 years to life, and §
> 848(b) simply eliminates anything in that range below a life sentence for the
> principal administrator, organizer or leader when the required quantities or

12

value of drugs are involved. Thus, at the time the Governor defendants went to trial, they knew that they faced the risk of a life sentence.   On the other hand, as Justice Thomas wrote in his concurring opinion in <u>Apprendi</u>, at a certain level of generality one can surely say that a fact that increases the prosecution's entitlement is an element, not a sentencing factor. Ex ante, the expected punishment the defendant will receive is necessarily greater if the range has been shrunk from 30 years to life, to mandatory life: "The mandatory minimum entitles the government to more than it would otherwise be entitled (5 to 10 years, rather than 0 to 10 and the risk of a sentence below 5). Thus, the fact triggering the mandatory minimum is part of the punishment sought to be inflicted."

<u>We must decide, therefore, whether the literal fact that these defendants faced at least a risk of a life term is enough to make § 848(b) a sentencing statute under Apprendi.</u> Such a decision would, of course, amount to a rejection of the theory of increased expected punishment articulated by Justices Thomas and Scalia in <u>Apprendi</u> -- a theory that the other three justices in the majority had no occasion to discuss, given the nature of the New Jersey law actually before them. In the end, however, it is our best guess that the rest of the majority would not have gone this far (and it seems clear that the four dissenters would have no trouble finding a sentencing factor under the circumstances now before us). <u>The language of the principal opinion refers not to the defendant's expected punishment, but to the "prescribed statutory maximum." That sounds to us like a reference to the text of the statute, and there is no doubt here that a life sentence was possible under § 848(a), even if it was not a certainty.</u>

We agree entirely with Justice Thomas's observation that the predicted sentence would often be lower, if the judge knew she could select a sentence below life. Indeed, we have often remanded cases for resentencing if a district court makes an error in calculating either offense level or criminal history

under the Sentencing Guidelines, and (for example) that error has the effect of moving the defendant from level 43 (mandatory life) to level 42 at any criminal history category (360 months to life). The defendant is entitled in those cases to a chance to persuade the judge to select something less than life, even though the risk of a new life sentence remains. Nevertheless, the Court has reiterated several times that it has not overruled McMillan, and it seems to us that the rationale of McMillan applies with equal force to § 848: "[The statute] operates to divest the judge of discretion to impose any sentence of less than [life] for the underlying felony; it does not authorize a sentence in excess of that otherwise allowed for that offense." See 477 U.S. at 81-82. We therefore reject the Governor defendants' argument that the indictment should have charged that they satisfied the criteria of § 848(b) and that the jury should have found those facts beyond a reasonable doubt.

Smith, 223 F.3d at 565-66 (emphasis added) (citations omitted).

Similarly, in State v. Conley, ___ Kan. ___, 11 P.3d 1147 (No. 82,380 October 27, 2000), the Kansas Supreme Court rejected the defendant's arguments that his "hard 40" sentence for first degree premeditated murder (meaning that he would not be eligible for parole for 40 years rather than the typical 25) violated Apprendi because it was based upon a finding by the trial judge of certain statutory aggravating factors, including that "'the defendant committed the offense in an especially heinous, atrocious or cruel manner'" (Id., 11 P.3d at 1155 (quoting K.S.A. 21-436(f)). The Conley court explained that the defendant's constitutional rights were not violated even though the judge's finding resulted in an extra 15 years of imprisonment because it did not increase the maximum penalty. Id. 11 P.3d at 1158-59 (citing McMillan). See also State v. Grooms, ___ S.C. ___, 2000 S.C. LEXIS 218, at *8-9 (No. 25211 November 7, 2000) (holding that McMillan rather than Apprendi applies to determinations as to whether or not the evidence warranted the

14

defendant's eligibility for early parole "[b]ecause the maximum penalty   for voluntary manslaughter is not increased by [the early release provision]").

Moreover, numerous other cases recently decided by the United States Supreme Court demonstrate that the constitution is not violated when trial courts make factual findings at sentencing which serve to lengthen the defendant's sentence, provided the sentence imposed is within the prescribed statutory maximum. For example, in Edwards v. United States, 523 U.S. 511, 514-16, 118 S.Ct. 1475, 1477-78 (1998), the Court unanimously held that a sentencing judge could legally make the determination as to whether a defendant had been convicted of conspiracy to possess powder cocaine or crack cocaine even though the jury did not make such a distinction and the minimum sentence for crack cocaine was higher than that for powder cocaine. The Court pointed out, however, that the defendants' "constitutional claims would make a difference if it were possible to argue . . . that the sentences imposed exceeded the maximum that the statutes permit for cocaine-only conspiracy." Id. at 515, 118 S.Ct. at 1477 (emphasis added).[3]

Similarly, in United States v. Dunigan, 507 U.S. 87, 97-98, 113 S.Ct. 1111, 1118-19 (1993), the Court unanimously held that a defendant's constitutional rights are not violated when a federal court imposes a mandatory enhancement to a sentence - but still within the statutory range - based on the finding that the defendant perjured himself at trial even though the defendant had never been charged with perjury and the jury was never instructed to make a finding that the defendant had perjured himself.

---

[3]The Apprendi majority specifically referred to the Court's unanimous ruling in Edwards to indicate that the Federal Sentencing Guidelines do not violate the holding of Apprendi as long as the sentence imposed does not exceed the statutory maximum. See Apprendi, 120 S.Ct. at 2366, n. 21.

Finally, in <u>United States v. Watts</u>, 519 U.S. 148, 156-57, 117 S.Ct. 633, 637 (1997), the Court relied upon <u>McMillan</u> when it held that the constitution does not prohibit sentencing courts from imposing lengthier sentences based on a finding that the defendant had committed additional criminal conduct <u>even though the defendant had previously been acquitted for those offenses</u>.

Thus, it is clear that <u>Apprendi</u> does not in any way prohibit judicial fact-finding at sentencing, even if the result is a longer period of imprisonment for the defendant. The <u>only</u> restriction is that specifically identified by <u>Apprendi</u> and <u>McMillan</u>: that a court may not impose a sentence beyond the prescribed statutory maximum. However, because the Illinois legislature has authorized the imposition of the death penalty and natural life imprisonment for the offense of first degree murder, the mere fact that the extended term sentencing and life imprisonment provisions call for the trial judge rather than a jury to make the requisite findings is meaningless.

Moreover, because the <u>Apprendi</u> majority specifically noted that state legislatures may set a high maximum penalty and then give the trial judges "guided discretion as to a few specially selected factors within that range" (<u>Id.</u>, 120 S.Ct. at 2363, n.16), the People maintain Illinois' statutory scheme authorizing several ranges of sentencing for first degree murder <u>within</u> the boundaries of 20 years' imprisonment up to and including the death penalty wholly comports with the constitution. Thus, as with the federal statutes at issue in <u>Hernandez</u> and <u>Smith</u> or the Kansas provision at issue in <u>Conley</u>, every first degree murder case in Illinois carries the theoretical possibility of either the death penalty or life imprisonment being imposed. Accordingly, it cannot be said that a sentence has exceeded the "prescribed statutory maximum" when a sentencing judge imposes a sentence longer than 60 years' imprisonment for first degree murder.

16

The People acknowledge that the Appellate Court has rejected similar arguments in People v. Beachem, ___ Ill. App. 3d ___, 2000 Ill. App. LEXIS 868 (No. 1-99-0852 Nov. 8, 2000) (holding that the defendant's 90 year sentence violated Apprendi) and People v. Joyner, ___ Ill. App. 3d ___, 2000 Ill. App. LEXIS 885 (No. 2-99-0433 Nov. 8, 2000) (holding that the defendant's sentence of natural life imprisonment was unconstitutional).  However, neither the Beachem nor the Joyner opinion, nor the Appellate Court's ruling in the instant case provide any explanation as to how their holdings were consistent with the Apprendi court's clear statement that both Walton and McMillan are still good law.  Rather, the courts blindly applied the general holding of Apprendi without any reference to the clear distinctions made by the Apprendi Court itself.  By doing so, the Appellate Court in the instant case as well as in Beachem and Joyner has disregarded the carefully balanced approach adopted by the Supreme Court; that Apprendi's holding should be construed in conjunction with Walton and McMillan rather than in contravention to them. Similarly, the Appellate Court has ignored the clear guidance offered by both the Seventh Circuit in Hernandez and Smith and the Kansas Supreme Court in Conley as to how Apprendi should be interpreted consistently with the Supreme Court's previous decisions.

Furthermore, the Appellate Court's opinion in People v. Clifton, ___ Ill. App. 3d ___, 2000 Ill. App. LEXIS 804 (1st Dist. Nos. 1-98-2126 & 1-98-2384 (cons.) September 29, 2000) (holding that the consecutive sentencing provision of the Unified Code of Corrections (730 ILCS 5/5-8-4(a)) violates Apprendi), has also misinterpreted the holding of Apprendi.  While it is true that Apprendi states that "the relevant inquiry is not one of form, but of effect"(120 S.Ct. at 2365), Clifton's reliance on this reference to support the conclusion that any factual finding which results in a longer term of imprisonment violates Apprendi (Id. 2000 Ill. App. LEXIS 804 at *70) is

17

inappropriate. When viewed in context, the <u>Apprendi</u> court was merely stating that it is irrelevant as to whether or not a factor which increases the sentencing range beyond the prescribed statutory maximum is referred to as an "element" or a "sentencing factor" because it must nevertheless comport with the requirements imposed by the Due Process Clause and the Sixth Amendment. However, nowhere in the opinion does the Supreme Court hold that the "effect" of permitting a longer period of imprisonment <u>within the prescribed statutory maximum</u> based on judicial fact finding would violate the constitutional mandate. Rather, the Court expressly rejected such a proposition when it reaffirmed <u>McMillan</u>.

Moreover, although the <u>Clifton</u> court referred to the "stigma and loss of liberty attached to [the imposition of consecutive sentences]" (<u>Clifton</u>, 2000 Ill. App. LEXIS 804 at *70-71 (citing <u>Apprendi</u>, 120 S.Ct. at 2359)), the People maintain that such a consideration is relevant only in situations where the sentence imposed is beyond the prescribed statutory range. To apply it in other circumstances would mean that trial courts should <u>never</u> make any factual findings at sentencing, even if only deciding what sentence to impose within a particular range, because those facts would have resulted in an improper stigma and loss of liberty. Thus, taken to its logical extreme, the <u>Clifton</u> rationale would effectively prevent sentencing judges from considering any facts or arguments in aggravation which would support a lengthier sentence, thereby negating the judges' broad discretion to impose the appropriate sentence. Certainly, such a result would be absurd and wholly contradicts <u>Apprendi</u>'s clear statement that judges retain their discretion to impose sentences within the statutory range (<u>Apprendi</u>, 120 S.Ct. at 2358) as well as the Court's express reliance upon both <u>McMillan</u> and <u>Edwards</u>.

18

Accordingly, for all the foregoing reasons, the People respectfully request that this Honorable Court accept the instant appeal as a matter of right. In the alternative, the People request this Honorable Court to grant leave to appeal in order to provide guidance to Illinois courts and litigants as to the proper interpretation of the United States Supreme Court's opinion in Apprendi. Moreover, as the Appellate Court's ruling may be inconsistent with this Court's forthcoming resolution of the issue in People v. Eric Ford, case no. 90083 (petition for leave to appeal accepted November 29, 2000), the People respectfully request this Honorable Court to hold the instant matter until Ford is resolved.

## CONCLUSION

The People of the State of Illinois respectfully request this Honorable Court accept the instant appeal as a matter of right, or in the alternative, grant leave to appeal.

Respectfully submitted,

JAMES E. RYAN,
  Attorney General
  State of Illinois
WILLIAM L. BROWERS,
  Assistant Attorney General
  100 West Randolph Street, Suite 1200
  Chicago, Illinois 60601

Attorneys for Plaintiff-Appellant.

RICHARD A. DEVINE,
  State's Attorney
  County of Cook
  309 Richard J. Daley Center
  Chicago, Illinois 60602
RENEE G. GOLDFARB,
WILLIAM D. CARROLL,
ALAN J. SPELLBERG,
  Assistant State's Attorneys,
    Of Counsel.

20

THIRD DIVISION
DECEMBER 27, 2000

NOTICE

The text of this opinion may be
changed or corrected prior to the
time for filing of a Petition for
Rehearing or the disposition of
the same.

No. 1-97-2557

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County |
| | ) | |
| v. | ) | |
| | ) | |
| HENRY KACZMAREK, | ) | Honorable |
| | ) | John Brady, |
| Defendant-Appellant. | ) | Judge Presiding. |

## OPINION ON DENIAL OF REHEARING

JUSTICE CERDA delivered the opinion of the court:

Following a jury trial in July 1989, defendant, Henry
Kaczmarek, was convicted of murder, residential burglary, home
invasion, and armed robbery and was sentenced to a term of
natural life imprisonment on the murder conviction. Defendant
appealed, and on March 31, 1993, this court reversed the murder
conviction and remanded for a new trial. People v. Kaczmarek,
243 Ill. App. 3d 1067, 1082, 613 N.E.2d 1253, 1264 (1993)
(Kaczmarek I).

Prior to the start of his second trial in November 1996,
defendant unsuccessfully moved to dismiss the State's charges on

_____

[1]     Defendant also challenged his convictions for burglary,
home invasion and armed robbery on the basis of insufficient
evidence.  Because no sentence was imposed on these verdicts,
this court dismissed defendant's appeals for want of finality.
Kaczmarek I, 243 Ill. App. 3d at 1082, 613 N.E.2d at 1264.

1-97-2557

the grounds that his constitutional and statutory rights to a
speedy trial had been violated. Following a retrial by jury,
defendant was again found guilty of murder and, following a
finding by the sentencing judge that the victim's murder was
"exceptionally brutal or heinous," defendant received an enhanced
term of natural life in prison under section 5-8-1(a)(1)(b) of
the Unified Code of Corrections (Corrections Code) (Ill. Rev.
Stat. 1985, ch. 38, par. 1005-8-1(a)(1)(b)).

Defendant appeals, arguing (1) the trial court erred in
denying his motion for speedy-trial dismissal of the State's
charges, and (2) he was denied a fair trial when the court (a)
accepted a State witness as an expert in the area of chemical
luminol testing and interpretation; (b) refused to accept a
defense witness as an expert in the fields of luminol
interpretation and blood splatter analysis; and (c) precluded the
testimony of a defense witness concerning certain physical
altercations defendant had been involved in with other
individuals prior to the victim's murder. Defendant additionally
challenges the validity of this life sentence, claiming the
penalty enhancing scheme provided by section 5-8-1(a)(1)(b) of
the Corrections Code is constitutionally infirm in light of in
light of the United States Supreme Court's recent decision in
Apprendi v. New Jersey, 530 U.S. __, 147 L. Ed. 2d 435, 120 S.
Ct. 2348 (2000).

For the following reasons, we reject, in an unpublished

2

1-97-2557

portion of this opinion, defendant's speedy trial and trial error

claims and affirm defendant's conviction for murder.  However,

because the penalty scheme set forth in section 5-8-1(a)(1)(b) of

the Corrections Code offends the constitutional principles

announced in Apprendi, we vacate defendant's life sentence and

remand for resentencing.

(The following material is nonpublishable under Supreme Court
Rule 23)

## BACKGROUND

The relevant evidence presented at defendant's retrial

establishes that in April 1987, the victim, 86-year old Millie

Nielsen, lived on the first floor of a two-flat apartment

building located at 3507 West Diversey Avenue in Chicago.  Dan

Lary, together with his then wife Margaret Fisher and Margaret's

19-year-old son John Fisher, lived on the second floor.

Defendant had been living with the Larys for about a month after

moving out of the house of his former girlfriend, Pamela Hines.

At about 10:30 p.m. on April 24, 1987, Margaret and John

returned home after a night of bowling.  At the time, Dan was

passed out intoxicated on a living room couch while defendant was

watching television.  Margaret stated that defendant was wearing

light-colored jeans, a flannel shirt, a blue quilted work jacket

and construction boots.  Margaret assisted Dan to bed, and then

went to bed herself at about 11 p.m.  Defendant continued to

watch television in the living room.

3

1-97-2557

According to John, defendant left the apartment at about 11:30 p.m. and returned at about midnight. Upon returning, defendant asked John if Dan was awake. John replied that Dan was sleeping, and defendant left, stating he had to go find his car.

At about 12:15 a.m. on April 25, the Larys' front doorbell rang. Margaret answered the door and discovered Dan's brother, Ron Lary, who asked if Dan was home. Because she did not want Ron in her apartment, Margaret responded no and went back to bed.

Margaret was again awakened by the front doorbell at about 2:00 a.m. When she answered the door, Margaret saw defendant who asked if Dan was available. Margaret told defendant that Dan was asleep, and defendant left.

From time to time, Ron slept on the back porch of his brother's apartment. In the early morning hours of April 25, 1987, Ron went to Dan's back porch to sleep after a night of drinking at Patty's Lounge, a nearby bar. Shortly after 2:00 a.m., Ron observed defendant carrying a bag through the back yard toward his car, which was parked in the alley. According to Ron, defendant was wearing dark jeans and a dark jacket. Defendant placed the bag in the car's trunk and drove east down the alley.

Margaret awoke the morning of April 25 at about 7:00 a.m. and saw defendant sleeping on the living room couch. According to Margaret, defendant was wearing a clean pair of dark-colored jeans and a light-colored dress shirt. After making coffee, Margaret left for work at about 9:00 a.m.

4

1-97-2557

At about 9:45 a.m., Ronald Sadlowski, a neighbor who helped Ms. Nielsen with errands and maintenance work around the building, noticed that the back porch door of Ms. Nielsen's kitchen was open and that the window of her kitchen pantry was broken. Sadlowski further discovered that Ms. Nielsen's car was still parked in the garage although she had a beauty appointment scheduled early that morning. Concerned about Ms. Nielsen's well-being, Sadlowski called the police.

In response to Sadlowski's call, Ross Marsala, an officer with the Chicago Police Department, and his partner arrived at Ms. Nielsen's apartment at about 10 a.m. After speaking briefly to Sadlowski, Officer Marsala proceeded to the back porch of the apartment and noticed several pieces of glass that had been broken from the pantry window. Officer Marsala entered the kitchen and observed spots of blood on the kitchen floor leading to a nearby bedroom. Officer Marsala further noticed blood spots on the bedroom door frame, and found a kitchen knife, which was bloodstained, on a small table immediately outside the bedroom.

Inside the bedroom, Officer Marsala found Ms. Nielsen lying in bed, face up in a pool of blood. Officer Marsala observed blood on the floor and walls near the bed. The bedroom, including the rest of the apartment, had been ransacked, and no signs of forced entry were readily apparent.

Robert Baike, a forensic investigator who processed the crime scene, obtained several blood samples from the kitchen

5

1-97-2557

floor. Baike did not observe any bloody footprints in the
apartment.

After working for the day, Ron returned to Dan's apartment
and spoke with the police, describing for them defendant's
activity in the back of the house earlier that morning. Chicago
police detectives, accompanied by Ron, then left the apartment in
search of defendant.

The detectives found defendant early the next morning asleep
in his car. Chicago Police Detective Jerome Bogucki approached
the vehicle and requested defendant to exit. As defendant
exited, Detective Bogucki observed blood stains on the right and
left sleeves of defendant's quilted jacket. The detectives
placed defendant under arrest and, upon obtaining defendant's
written consent, they searched the trunk of the vehicle. In the
trunk, the detectives found jewelry boxes, which appeared to be
stained with blood, jewelry, serving plates and platters. The
detectives also discovered a pair of blood-stained jeans and
several tools, including a glass cutter.

Detective Bogucki submitted the jeans and jacket to the
crime lab for testing. Bogucki further checked defendant's work
boots but did not observe any appearance of blood. The other
items found in the trunk were taken to Area 5 headquarters, where
they were later identified by Ms. Nielsen's family members as
belonging to the victim.

A subsequent medical examination of Ms. Nielsen's body by

1-97-2557

Dr. Michael Chambliss disclosed numerous external and internal injuries.  An external exam revealed several abrasions, incises and bruises about Ms. Nielsen's upper body, including her head, chest and arms.  Stab wounds were also found on Ms. Nielsen's left thigh, the left part of her groin, and right forearm.  An internal exam revealed injuries indicative of manual strangulation, including hemorrhages of the larynx, tongue and esophagus, hemorrhaging of the membrane of the brain and a fractured larynx.

Due to the condition of the body, Dr. Chambliss opined Ms. Nielsen died between 11:30 p.m. on April 24, 1987 and 2:30 a.m. on April 25, 1987.  Dr. Chambliss concluded that Ms. Nielsen died as a result of manual strangulation with the contributing factors of blunt force injuries and stab wounds.  Dr. Chambliss also stated that Ms. Nielsen could have died from the blunt force injuries.

Pamela Fish, an expert in electrophoresis, serology and DNA testing with the microanalysis unit of the Chicago Police Department, detailed the results of her examination conducted of the physical evidence back in 1987.  Fish examined blood samples obtained from defendant, Ms. Nielsen, Ms. Nielsen's kitchen floor, and the knife found in the apartment.  Fish also inspected the substances resembling blood found on defendant's jacket and jeans, and the jewelry boxes recovered from the trunk of defendant's vehicle.  Fish determined that Ms. Nielsen had Type A

7

1-97-2557

blood and that defendant had Type B blood.  Fish further

determined that the substances taken from defendant's jeans and

quilted jacket were human blood possessing Type A

characteristics.

Fish additionally examined the blood samples to ascertain

their particular genetic markers for purposes of making an

identification.  Fish testified that the blood found on the jeans

and quilted jacket was consistent with Ms. Nielsen's blood and

could not have come from defendant.  In fact, according to Fish,

all the enzymes from the blood taken from defendant's clothing

was consistent with those found in Ms. Nielsen's blood.

With respect to the substances found on the kitchen floor,

the knife and the jewelry box, Fish was able to determine that

the substances were human blood, but due to the small quantity

provided, she was unable to ascertain the particular blood type.

Fish explained she attempted to perform DNA testing on the blood

samples provided years after her 1987 testing, but that their

small size and degraded nature made testing ineffective.

Mitch Rea was called by the State as an expert in luminol

testing and interpretation.  During voir dire examination of his

qualifications, Rea stated he is an insurance fraud investigator

who had previously worked over 26 years as a police officer with

the Phoenix Police Department in Arizona.  Of his time at the

department, Rea spent ten years working as a detective in the

homicide unit where he processed over an estimated 350 murder

8

1-97-2557

crime scenes.  Rea has received training in crime scene investigation and specialized training in chemical blood detection involving luminol.

Rea has additionally attended and participated in numerous seminars dealing with luminol and luminol testing, has taught and trained other law enforcement officers in these fields, has conducted hundreds of experiments involving luminol, has participated in several workshops covering luminol testing, and has previously testified in court as a luminol expert.

Rea detailed the application and use of the luminol chemical as a detecting agent, and described its glowing effect when it reacts with particular substances, including blood.  Rea acknowledged that luminol is not specific to blood and that it reacts with other substances, such as metals and cleansers.

Upon questioning by defense counsel, Rea acknowledged never being educated or trained in the field of chemistry.  Rea further admitted that he does not perform any additional testing, like DNA analysis, to ensure the accuracy of results indicating the presence of blood.

Over defendant's objection, Rea was accepted by the court as an expert and testified that he performed luminol tests on defendant's quilted jacket in early 1994.  Rea explained that an application of luminol to the right front panel of the jacket produced a bright luminance of several small spots.  According to Rea, these luminances indicated the presence of blood.  Rea

1-97-2557

further observed luminances about sections of the jacket which had been previously removed for Fish's examination, the right sleeve and cuff, and both the elbow region and back portion of the left sleeve. Rea stated that each of the foregoing luminances were consistent with the presence of blood. On cross-examination, Rea explained he did not perform any additional tests to confirm that the luminol reactions he observed were in fact reactions to blood.

Rod Englert, an expert in crime scene reconstruction and blood splatter, described three different categories of blood splatter: low velocity splatter which result from drops of blood falling straight down; medium velocity splatter which results from blunt force trauma; and high velocity splatter which results from gunfire. With respect to medium velocity splatter, Englert explained that blood does not splatter on the first blow of force, and that regardless of the severity of the beating, very little blood gets on the offender although the scene may be terribly bloody. Englert explained that a minimal amount of blood would be found on the offender in such cases because the force is always directed away at the victim. Englert additionally discussed blood transfer stains, and explained that they occur when blood is swiped against someone or something.

Englert examined the physical evidence and photographs in the case and concluded that the blood on Ms. Nielsen's kitchen floor appeared smeared, indicative of a struggle in which someone

10

1-97-2557

bled.  Englert stated that the absence of bloody shoe prints was
not unusual given how quickly blood dries.  Englert noted the
blood on the kitchen wall immediately outside the bedroom
represented classic medium velocity splatter suggestive of blunt
force being inflicted upon the victim.  Given the low angle of
projection, Englert opined that Ms. Nielsen received numerous
blows while on the kitchen floor.

Upon reviewing photos of defendant's jeans, Englert stated
the blood on the left and right knee areas represented transfer
stains, and not splatter.  According to Englert, these stains
were consistent with defendant coming into contact with the pool
of blood surrounding the victim.  As for the bottom of the pants,
Englert observed several small specs of blood which in his
opinion were consistent with medium velocity splatter.  Englert
specifically stated the transfer and splatter stains were not
consistent with defendant picking up a bag having blood on it or
with such a bag being placed on top of the clothing.  Englert
further stated the stains were not consistent with defendant
kneeing another person in the nose.

In examining photographs of the luminol testing performed on
defendant's jacket by Rea, Englert stated the stains on the right
and left sleeves and on the front of the jacket represented
medium velocity splatter.  Englert also observed transfer stains
on the back of the sleeves and on the right front pocket.

In Englert's opinion, Ms. Nielsen was first attacked in the

11

1-97-2557

kitchen, near the entry of the bedroom, where she received
numerous blows while on the floor.  Englert believed the blood
splatters on the bottom of defendant's pants occurred at this
time.  Ms. Nielsen, struggling to break free, was then taken to
the bedroom and thrown on the bed where she was attacked again
and ultimately killed.  According to Englert, the bleeding
represented by the amount of blood found in the bed would have
occurred after Ms. Nielsen had died.  Englert opined the physical
evidence he examined was consistent with the person causing the
death of the victim.

On cross-examination, Englert knew during his examination of
defendant's pants and jacket that the substance present on the
clothing has human blood, but presumed that the blood was that of
Ms. Nielsen.  Englert acknowledged that medium velocity splatter
could very possibly occur during a fist fight, but explained that
the medium splatter found in the case was consistent with Ms.
Nielsen's attack.  Englert additionally stated that, in attacks
similar to that on Ms. Nielsen, blood may or may not get on the
attacker's shoes.

After the State rested, defendant testified that in April
1987 he was unemployed and temporarily living with the Larys
after moving out of his ex-girlfriend's house about a month
earlier.  Defendant stated he had been involved in three fights
on the Wednesday prior to Ms. Nielsen's murder.  Two of these
fights involved friends Tom Szeszol and Bill Henderson, while the

12

1-97-2557

other involved an unidentified man who was attempting to break into defendant's car.  In the former fight, defendant stated he sustained two cuts to his hand which bled, that Szeszol bled from his mouth and nose, and that Henderson also bled from his mouth. In the latter fight, defendant stated he hit the man three or four times in the face and kneed him in the nose, causing the man to bleed.  Defendant intimated that in all three fights he was wearing his blue quilted jacket; indeed, according to defendant, he had been in several fights while wearing his jacket.

In the afternoon of April 24, 1987, defendant and Dan, after spending the morning drinking, went to Szeszol's apartment to clean laundry, including defendant's jeans which had blood on them.  Defendant was able to wash every article of clothing except his jeans before leaving.  Defendant explained he wanted to soak his jeans before washing them, but was directed by Szeszol to leave the apartment before he had the opportunity to do so.  Defendant was further unable to wash his quilted jacket. Upon leaving, defendant threw his clothing, including the jeans, into the trunk of his car.  Defendant drove Dan to his apartment and then went to a nearby tavern to drink.

Defendant left the bar about 6:30 p.m. and, after buying a case of beer, went to Dan's apartment.  Defendant and Dan drank together until about 11:45 p.m. when defendant left and went to a bar down the street.  After having a couple of drinks, defendant went to another bar, Our Place.  At about 2:00 a.m., defendant

13

1-97-2557

left and went to the Lary's apartment to see if Dan wanted to get some drinks.

Upon returning to the Larys, defendant parked his car in the alley behind the building to urinate. When he exited the vehicle, defendant heard a noise, like that of a door closing. Henry approached the house, but saw no one. As he urinated, defendant noticed a bag on the side of the house. Defendant looked inside and found a box of silverware. Defendant picked up the bag and carried it to his car where he placed it in the trunk. Defendant drove his car to the front of the house and went to see if Dan was awake.

After being told by Margaret that Dan was sleeping, defendant left and returned to the Our Place tavern. Defendant drank at the bar until about 4:00 a.m., and after dropping off two friends, he returned to the Lary's apartment and fell asleep on the living room couch.

Defendant awoke at about 8:00 a.m. on April 25, and later that morning he and Dan drove to the house of a friend, Bill Brown, in Melrose Park. Before entering Brown's house, defendant decided to look in the bag he had discovered earlier that morning. Defendant removed the bag's contents and noticed that some of the items were bloody. Defendant kept some items and disposed of others, including a bloody pillow case, in a dumpster. Defendant sold the items he kept to Brown for $60, and then drove Dan back to his apartment.

14

1-97-2557

Defendant was ultimately arrested by the police early the next morning as he slept in his car.  Defendant maintained his innocence and denied any responsibility in both the break-in of the Ms. Nielsen's apartment and in the victim's death.

Hines, defendant's former girlfriend, testified that defendant moved out of her apartment about a month before Ms. Nielsen's murder, and she acknowledged not seeing defendant during that period.  Hines identified the quilted jacket recovered by police as belonging to defendant, and indicated that defendant wore the jacket every day.

During direct examination, defense counsel attempted to elicit testimony that Hines had witnessed defendant's involvement in numerous fights in which he was wearing his quilted jacket and where one of the participants had bled.  However, the State successfully moved the court to bar this testimony.

In an offer of proof, defense counsel stated Hines would have testified that she was present with defendant on about seven or eight occasions when defendant was involved in a physical altercation with others; that defendant was wearing his quilted jacket on each of these occasions; and that one or more of the participants involved had bled.  In response to counsel's offer, the court noted that Hines was never asked when these alleged fights occurred and, on that basis, concluded her testimony was too remote to be relevant.

To rebut the testimonies of Rea and Englert, the defense

15

1-97-2557

offered Dr. Kenneth Siegusmund as an expert in the fields of luminol processing and blood splatter analysis. During voir dire, Dr. Siegusmund testified he holds a Ph.D. and B.S. in biology and an undergraduate minor in chemistry. As his primary employ, Dr. Siegesmund works in the Department of Anatomy at the Medical College of Wisconsin developing a scientific instrument used in the field of immunology. The doctor admitted that this work is unrelated to the forensic science field. Previously, Dr. Siegesmund worked in the Department of Biology at Marquette University in Milwaukee. Dr. Siegesmund additionally teaches a general forensic sciences course at a local university, and has given lectures in the field to law enforcement personnel. Dr. Siegesmund holds memberships in the American Academy of Forensic Scientists, the Midwest American Association of Anatomy, the Neuroloectic Society of America, and the American Association for the Advancement of Science.

Dr. Siegesmund has performed luminol testing well over a hundred times, and was "familiar" with the study of blood splatter. Dr. Siegesmund indicated that he had been qualified in court as an expert in forensic sciences about 250 times, and specifically as a blood splatter expert about 20 times. Dr. Siegesmund did not indicate whether he had ever been previously accepted as an expert in luminol application or testing.

On cross-examination, the State initially went to great lengths to undermine Dr. Siegesmund's credibility. When asked

16

1-97-2557

whether any court in Cook County had found him unqualified as an expert in any field, Dr. Siegesmund replied "I don't believe so," that "[t]here may have been a case where I wasn't qualified in a certain area but not with respect to the entire testimony that I gave." The prosecutor then demonstrated that the doctor could not remember being disqualified as a crime reconstruction expert in an unrelated criminal trial and as a ballistics expert in a federal civil case. The prosecutor further elicited testimony from the doctor that he could not remember giving certain testimony in those proceedings.

Dr. Siegesmund described himself as an expert in, among other areas, crime scene reconstruction, blood splatter, blood identification and luminol testing. The doctor has never taken a course in crime scene reconstruction and has never been to a crime scene under investigation. Dr. Siegesmund has never had any formal training in crime scene processing or in techniques of physical evidence collection. His only exposure in this area has been through yearly, one-week seminars held by the American Academy of Forensic Scientists. Dr. Siegesmund believed he last attended such a conference in 1994, but was not sure. The prosecutor questioned Dr. Siegesmund further in this regard, noting for the doctor that he had previously testified in a 1996 criminal case indicating that he did not attend an Academy conference in 1994. The doctor could not recall making that statement.

17

1-97-2557

Dr. Siegesmund stated he had conducted work at the Glendale
Crime Lab in Wisconsin.  Dr. Siegesmund denied that the Glendale
Lab had not performed forensic work for ten years, and believed
that the lab was still operating.  The prosecutor then confronted
Dr. Siegesmund with testimony he had given earlier that year in
an unrelated criminal prosecution where he had stated that the
Glendale Lab had not conducted forensic work since 1986.  Dr.
Siegesmund could not recall making that statement.

Dr. Siegesmund has not received any formal forensic
training.  Dr. Siegesmund explained his training in the area
comes from attending the yearly conferences held by the Academy
and from reading a monthly Academy publication and text books on
the subject.

With respect to luminol processing, Dr. Siegesmund has never
received any training from the police or FBI, has never taken any
course teaching luminol application at a crime scene, and has
never performed any luminol testing for a crime lab.  Dr.
Siegesmund stated he last performed an experiment using luminol
sometime in late October 1996, about three weeks prior to the
start of defendant's retrial.

Dr. Siegesmund has never received any formal training in
blood splatter analysis, has never performed such work in a crime
lab, and has not written any articles on the subject.  His
knowledge of blood splatter comes from attending the Academy
conferences and through reading text books.  The doctor has

18

1-97-2557

performed numerous experiments involving blood splatter in
connection with his forensic science lectures given to law
enforcement officers.  When asked by the prosecutor if he had
ever received any training on how to conduct such experiments,
Dr. Siegesmund indicated no, responding he was the teacher and
that he did not take courses from the officers.  Further, when
asked if it was sensible to learn how to conduct the experiments
before he taught them, the doctor replied that he is a scientist
and that he "believed" he could perform the work properly on the
basis of the information he had learned from the conferences and
written materials.

    Responding to the defense's tender of Dr. Siegesmund as an
expert, the court remarked that the doctor "appears to be a jack
of all trades and [a] master of none."  The court specifically
commented on Dr. Siegesmund's credibility, stating that "his
manner while testifying seemed disingenuous at times" undermining
any attempt "to instill some confidence that someone is an expert
in some kind of field."  Finding the doctor's qualifications
lacking, the court refused to accept Dr. Siegesmund as an expert
in blood splatter analysis and luminol interpretation.  The
court, however, allowed Dr. Siegesmund to testify about the
manner in which luminol testing is conducted.

    Defense counsel did not proceed with Dr. Siegesmund as a
witness, but instead made an offer of proof.  Counsel explained
Dr. Siegesmund would have testified that confirmatory testing is

19

1-97-2557

necessary when using luminol as a detecting agent for blood.  In
this regard, Dr. Siegesmund would have opined that Rea should
have performed additional tests to confirm that the areas of
luminance on defendant's jacket were in fact indicative of blood
and, if so, a test to determine whether that blood was that of
defendant.  Dr. Siegesmund would have further refuted Englert's
conclusions that the blood found on defendant's jacket
represented splatter, and would have stated that the blood stains
about the knee areas of defendant's jeans were indicative of
lateral activity.  The doctor would have also stated, contrary to
Englert's opinion, that a majority of Ms. Nielsen's blood loss
would have occurred prior to her death.  On this basis, Dr.
Siegesmund would have explained that the offender would have been
covered in blood and, thus, would have likely left bloody shoe
prints in the victim's apartment.

Following the presentation of rebuttal evidence by the State
and the jury's deliberations, defendant was found guilty of
murder and sentenced to a term of natural life imprisonment.

**ANALYSIS**

I

Defendant initially contends that the trial court erred in
denying his motion to dismiss the State's charges due to alleged
speedy-trial violations.  Although defendant asserts violations
of both his constitutional and statutory rights to a speedy trial
in his motion, he challenges only the denial of his

20

1-97-2557

constitutional claim on appeal.[2]  Accordingly, we will limit our
review to this issue.

According to defendant, the State deprived him of his
constitutional right to a speedy trial by waiting more than 43
months after the reversal of his original murder conviction in
March 1993 to bring him to retrial.  The right to a speedy
criminal prosecution is guaranteed a defendant under both the
United States (U.S. Const., amend. VI) and Illinois constitutions
(Ill. Const.1970., art. I, § 8).  The issue presented by
defendant's constitutional speedy-trial claim here is whether the
State made a diligent good-faith effort in bringing the matter to
retrial without unreasonable and unnecessary delay.  See People
v. Williams, 299 Ill. App. 3d 143, 147, 700 N.E.2d 753, 756
(1998).  When a defendant's original case is reversed on appeal
and the matter is remanded for a new trial, like here, the
speedy-trial clause requires the State to retry the defendant
within a reasonable time following the date of the reviewing
court's decision.  See People v. Crane, 307 Ill. App. 3d 816,
818, 719 N.E.2d 138, 140 (1999).

Analysis of defendant's claim is conducted under the four-
part balancing test set forth by the United States Supreme Court

---

[2]     The State asserts defendant never raised his
constitutional speedy-trial claim before the trial court, and
maintains that this issue is thus waived for our review.  The
State, however, ignores defendant's speedy-trial motion, filed
November 18, 1996, which specifically contains a claim based on
the constitutional speedy-trial clause.

1-97-2557

in Barker v. Wingo, 407 U.S. 514, 92 S. Ct. 2182, 33 L. Ed. 2d

101 (1972), in which the conduct of both the prosecution and the

accused are considered and weighed.  In particular, we examine

(1) the length of the pretrial delay and whether that delay was

uncommonly long; (2) the reasons for the delay and to which party

the delay is more attributable; (3) whether the defendant

asserted his right to a speedy trial in due course; and (4) the

prejudice, if any, suffered by the defendant as a result of the

delay.  Doggett v. United States, 505 U.S. 647, 651, 112 S. Ct.

2686, 2690, 120 L. Ed. 2d 520 (1992); Barker, 407 U.S. at 530, 92

S. Ct. at 2192; People v. Norris, 303 Ill. App. 3d 163, 175, 707

N.E.2d 628, 637 (1999).

        No one of the foregoing elements is dispositive.  Instead,

each factor must be weighed and considered in light of the

circumstances of the case as reflected by an examination of the

entire record.  People v. Rievia, 307 Ill. App. 3d 846, 853, 719

N.E.2d 1077, 1082 (1999); People v. Wills, 153 Ill. App. 3d 328,

336, 505 N.E.2d 754, 759 (1987).  The consideration of the Barker

factors and the determination of whether the accused's

constitutional right to a speedy trial was violated are matters

left to the sound discretion of the trial court.  United States

v. Anderson, 902 F. 2d 1105, 1110 (2nd Cir. 1990); see also

People v. Belcher, 186 Ill. App. 3d 202, 208, 542 N.E.2d 419, 422

(1989) (applying abuse-of-discretion standard in reviewing

accused's claimed deprivation of constitutional speedy-trial

1-97-2557

right).

The first factor presents the threshold inquiry of whether the amount of delay should be deemed presumptively prejudicial to the defendant. Barker, 407 U.S. at 530-31, 92 S. Ct. at 2192; Williams, 299 Ill. App. 3d at 147, 700 N.E.2d at 756. The term "presumptively prejudicial" simply marks the point at which the law deems the time between the resolution of the defendant's original appeal and the commencement of the second trial to be unreasonably long enough so as to trigger consideration of the remaining three factors. See Williams, 299 Ill. App. 3d at 147, 700 N.E.2d at 756.

As a threshold, the courts of this state presume prejudice where the pretrial delay equals or exceeds a period of one year. Crane, 307 Ill. App. 3d at 818, 719 N.E.2d at 141; Williams, 299 Ill. App. 3d at 148, 700 N.E.2d at 756; People v. Lock, 266 Ill. App. 3d 185, 191, 640 N.E.2d 334, 338 (1994). Given this temporal benchmark, we find that the more than three and one-half year delay between our decision in Kaczmarek I and the commencement of the State's retrial was presumptively prejudicial to defendant. Accordingly, we will assess the remaining factors of the Barker enquiry to determine whether defendant was denied his constitutional right to a speedy trial in this case.

In considering the second factor, the reason for the delay, the State bears the burden of providing a justifiable explanation for the period of postponement, and the defendant need only show

23

1-97-2557

that the delay was not attributable to his actions.  Crane, 307

Ill. App. 3d at 818, 719 N.E.2d at 141; People v. Prince, 242

Ill. App. 3d 1003, 1008-09, 611 N.E.2d 105, 109 (1993).  Delay

will be attributed to the defense where the defendant's actions

in fact caused or contributed to the postponement of the trial.

See People v. Kliner, 185 Ill. 2d 81, 114, 705 N.E.2d 850, 868

(1998).  In this regard, the accused is bound by the acts or

omissions of his defense counsel (People v. Brimmer, 60 Ill. App.

3d 214, 219, 376 N.E.2d 337, 341 (1978); see also Kliner, 185

Ill. 2d at 114, 705 N.E.2d at 870; People v. Staten, 159 Ill. 2d

419, 433, 639 N.E.2d 550, 557 (1994)), since an attorney in

criminal proceedings is authorized to act on behalf of his client

and to determine for him procedural matters and decisions

involving trial strategy and tactics.  See People v. Bowman, 138

Ill. 2d 131 141, 561 N.E.2d 633, 638 (1990); see also People v.

Steiger, 208 Ill. App. 3d 979, 981, 567 N.E.2d 660, 662 (1991)

(criminal defendant "speaks and acts through his attorney").

Accordingly, the affirmative acts of defense counsel cannot be

separated from the defendant's own actions.  See Bowman, 138 Ill.

2d at 141, 561 N.E.2d at 638.

     In the present matter, the record clearly establishes that

the defense either caused or contributed to nearly all the

pretrial delay at issue.  Indeed, the only time period not

attributable to defendant was a 26-day period occurring between

June 3, 1993, the date the Illinois Supreme Court denied the

1-97-2557

State's appeal from <u>Kaczmarek I</u>, and June 29, 1993, the date of the trial court's first status hearing.[3]  From the court's June 29 hearing up until the start of trial in November 1996, the case was delayed because of the defense's explicit requests for a continuance or express agreement with the prosecution thereto. Delay resulting from such requests and agreements are generally chargeable to the defendant.  See <u>People v. Beard</u>, 271 Ill. App. 3d 320, 328, 648 N.E.2d 111, 116 (1995) (delay caused by continuances either requested or agreed to by defense is attributable to defendant); <u>People v. Moore</u>, 263 Ill. App. 3d 1, 8, 635 N.E.2d 507, 513 (1994) (same); <u>People v. Nolan</u>, 102 Ill. App. 3d 895, 898-99, 430 N.E.2d 345, 349 (1981) (same); see also <u>Kliner</u>, 185 Ill. 2d at 114, 705 N.E.2d at 869.  Notably, the defense changed attorneys no less than six times during the postponement period, necessitating additional time being granted to new counsel so he or she could review discovery and familiarize himself or herself with the case.  See <u>Norris</u>, 303 Ill. App. 3d at 176, 707 N.E.2d at 510 (delay resulting from time new counsel needed to become familiar with the accused's case was attributable to defense).  As a further note, the case was continued on at least four occasions because of defense counsel's failure to appear at scheduled court hearings.  See <u>United States</u>

---

[3]    The time in which the State's appeal was under consideration by the supreme court fully justifies the first two months of delay.  See <u>Crane</u>, 307 Ill. App. 3d at 818, 719 N.E.2d at 141.

1-97-2557

v. Brock, 782 F. 2d 1442, 1447 (7th Cir. 1986) (charging defendant with delay resulting from defense counsel's absence from court); see also Kliner, 185 Ill. 2d at 117, 705 N.E.2d at 870.

Defendant accurately notes that the prosecution used the pretrial period to gather expert evidence regarding DNA testing and blood splatter analysis, and that it requested additional time from the court many times to secure these materials. On several of those occasions, however, defendant's attorneys explicitly agreed to the State's request. Indeed, defense counsels never objected to the State's attempt to secure its additional evidence. Rather, the record shows that the defense welcomed the State's blood evidence because of its possible exculpatory effect. The defense obviously viewed the State's evidence as possibly beneficial to its case and, for this reason, agreed to many of the continuances sought by the State. With respect to the remaining instances where the State requested additional time, defense counsel specifically sought continuances for his own reasons.

Turning to the third factor, the assertion of the accused's speedy-trial right, we note defendant made a pro se demand for a speedy trial at a hearing held July 21, 1993, a few months after reversal. Defendant's attorney at the time told the court that he was not making the demand on defendant's behalf and that defendant was acting in his own capacity in seeking a speedy

26

1-97-2557

trial. Counsel further informed the court that he was not ready
to proceed with trial. The trial judge explained to defendant
that his defense could be compromised if he proceeded to trial
with counsel who was not adequately prepared. In light of the
court's advisement, defendant stated he would wait for his
attorney to become prepared and explicitly agreed to a
continuance.

The record shows that defendant never made another demand
for a speedy trial. Rather, defendant followed by moving pro se
to dismiss the State's charges in November 1994 on the ground
that his statutory speedy-trial right, implemented in this
state's Speedy Trial Act (725 ILCS 5/103-5 (West 1994)), had been
violated.[4] The Supreme Court has indicated that the filing of a
motion for speedy-trial dismissal without making a prior demand
does not alone establish that the accused has appropriately
asserted his rights. United States v. Loud Hawk, 474 U.S. 302,
314, 106 S. Ct. 648, 655, 88 L. Ed. 2d 640 (1986). While such
assertions by the accused are entitled to strong evidentiary
weight, these assertions must be viewed in light of the accused's

---

[4]    The trial court should not have permitted defendant to
file his pro se motion because defendant was represented by
counsel at the time. The law is clear that a criminal defendant
has no right to both self-representation and the assistance of
counsel (People v. Williams, 97 Ill. 2d 252, 267, 454 N.E.2d 220,
227 (1983)), and thus has no right to some sort of hybrid
representation, whereby he is allowed to accept his attorney's
services and still be permitted to file pro se motions. People
v. Handy, 278 Ill. App. 3d 829, 836, 664 N.E.2d 1042, 1046
(1996).

27

1-97-2557

other conduct.  <u>Loud Hawk</u>, 474 U.S. at 314, 106 S. Ct. at 656.

Following the filing of defendant's motion, the defense either requested or agreed to continue the case until the matter was ultimately brought to trial in November 1996.  Defendant's claim here that he had an actual interest in receiving a prompt and speedy resolution of the State's charges is undermined by his conduct proceeding his motion's filing.  See <u>Loud Hawk</u>, 474 U.S. at 315-16, 106 S. Ct. at 656 (finding third factor weighed against the defense where the defendants filed a number of frivolous petitions and motions, which caused delay, at the same time they moved to dismiss the government's charges on speedy-trial grounds); <u>Beard</u>, 271 Ill. App. 3d at 329, 648 N.E.2d at 116 (same where, although the defendant continued to demand a speedy trial, he agreed to a number of continuances).

Defendant attempts to distance himself from the conduct of his attorneys by stressing that, notwithstanding the their decisions, he wanted a speedy trial.  Because he wanted a speedy trial, defendant argues this factor should weigh heavily in his favor.  We disagree.  Generally, the decision to demand a speedy trial and to seek dismissal of the State's charges on such grounds are matters left to the sound strategic decision of counsel.  See <u>People v. Ramey</u>, 151 Ill. 2d 498, 523-24, 603 N.E.2d 519, 529 (1992); <u>People v. Keys</u>, 195 Ill. App. 3d 370, 373, 552 N.E.2d 285, 287 (1990).  Further, as previously discussed, defendant spoke and acted through his attorneys and

28

1-97-2557

was bound by their conduct during the pretrial proceedings.
Importantly, defendant never sought the discharge of his
attorneys to pursue his speedy-trial claims on his own.  Indeed,
the record unequivocally shows that defendant wanted the
assistance of counsel in preparing his defense for trial.

Finally, in assessing the fourth factor, the prejudice to
the accused, we consider the interests sought to be protected by
the speedy-trial right, namely: (1) the prevention of lengthy and
oppressive pretrial incarceration; (2) the minimization of
anxiety and concern on the part of the accused; and (3) the
limitation of the possibility that the accused's defense will be
impaired.  Barker, 407 U.S. at 532, 92 S. Ct. at 2193; Moore, 263
Ill. App. 3d at 9, 635 N.E.2d at 513.  The latter interest has
been recognized by the Supreme Court as the most serious "because
the inability of a defendant adequately to prepare his case skews
the fairness of the entire system." Doggett, 505 U.S. at 654,
112 S. Ct. at 2692, quoting Barker, 407 U.S. at 532, 92 S. Ct. at
2193.

Except for certain instances where the presumption of
prejudice remains due to some form of unjustifiable conduct on
the part of the State, causing excessive delay which
presumptively compromises the reliability of the trial
proceedings, (see Doggett, 505 U.S. at 655-58, 112 S. Ct. at
2692-94; Prince, 242 Ill. App. 3d at 1010, 611 N.E.2d at 110), a
showing of prejudice is required to establish a violation of the

29

1-97-2557

defendant's constitutional speedy-trial right.  Reed v. Farley,
512 U.S. 339, 353, 114 S. Ct. 2291, 2299, 129 L. Ed. 2d 277
(1994); Beard, 271 Ill. App. 3d at 328, 648 N.E.2d at 116.

We are mindful that defendant was in custody for almost the
entire time between remand and the commencement of his second
trial, and we understand that such lengthy periods of pretrial
incarceration may have adverse effects on an accused.  See Crane,
307 Ill. App. 3d at 819-20, 719 N.E.2d at 142.  This fact alone,
however, is insufficient to establish prejudice and must be
viewed in light of the other relevant considerations.

Defendant stresses he experienced a great deal of anxiety
while incarcerated awaiting trial.  Anxiety on the part of the
accused, as one court has explained, is "present to some extent
in every case and absent some unusual showing, this inconvenience
alone is of slight import."  Wills, 153 Ill. App. 3d at 337, 505
N.E.2d at 760.  This factor will weigh in the defendant's favor
"only if it is shown there was a rather special situation giving
rise to an inordinate amount of anxiety."  People v. Jackson, 162
Ill. App. 3d 476, 481, 515 N.E.2d 390, 394 (1987).  The record
fails to reveal such a situation in this case.

Significantly, defendant never claims his ability to prepare
and present a defense was in any way impaired by the delay.  The
defense was wholly or partially responsible for the delays
experienced in bringing the matter to trial, and nothing in the
record indicates that the delay was intentionally contrived by

30

1-97-2557

the prosecution for purposes of impairing the defense.  Moreover,

it was in the best interests of the defense to wait until the

State obtained the results of its blood testing since the

findings could have excluded defendant as the offender.

Under the circumstances presented, we find no error in the

trial court's determination that defendant was not denied his

constitutional right to a speedy retrial.

II.

Defendant next asserts error in the rulings of the trial

court regarding (1) the presentation of expert testimony by a

witness offered by the State and (2) the nonacceptance of his

tendered expert, Dr. Siegesmund.

An individual will be allowed to testify as an expert if his

experience and qualifications afford him knowledge beyond that of

the average person, and where his testimony will aid, and not

invade, the province of the trier of fact in reaching its

conclusions.  People v. Miller, 173 Ill. 2d 167, 186, 670 N.E.2d

721, 730 (1996); People v. Sargent, 292 Ill. App. 3d 508, 511,

685 N.E.2d 956, 958 (1997).  The degree and manner of knowledge

and experience required of the alleged expert is directly related

to the complexity of the subject matter and the corresponding

likelihood of error by one insufficiently familiar with the

field.  People v. Huddleston, 176 Ill. App. 3d 18, 32, 530 N.E.2d

1015, 1024 (1988).

The courts do not employ any predetermined formula for how

31

1-97-2557

an expert acquires specialized skill or knowledge, and the indicia of expertise is not an assigned level of academic training. People v. Novak, 163 Ill. 2d 93, 104, 643 N.E.2d 762, 768 (1994). An expert may acquire his expertise from a variety of outlets, including practical experience, scientific study, education, training and/or research. Miller, 173 Ill. 2d at 186, 670 N.E.2d at 730. Regardless of how such knowledge is acquired, the witness should be allowed to testify where the subject matter of his testimony exceeds the knowledge of an average person and where the testimony would assist the trier of fact in evaluating the evidence. Novak, 163 Ill. 2d at 104, 643 N.E.2d at 768; People v. Shaw, 278 Ill. App. 3d 939, 948, 664 N.E.2d 97, 103 (1996).

The burden of establishing the qualifications of a witness as an expert is on the proponent of the witnesses's testimony. Novak, 163 Ill. 2d at 104, 643 N.E.2d at 768. Determinations regarding the adequacy of a witness's qualifications to testify as an expert is a matter reserved to the sound discretion of the trial court. (Novak, 163 Ill. 2d at 104, 643 N.E.2d at 768), which will not be disturbed on review absent a clear abuse of discretion resulting in manifest prejudice to the accused. People v. Petitt, 245 Ill. App. 3d 132, 145, 613 N.E.2d 1358, 1369 (1993); Huddleston, 176 Ill. App. 3d at 32, 530 N.E.2d at 1024.

A.

32

1-97-2557

Defendant first challenges Rea's acceptance as an expert. We find this issue waived. The law is well settled that both a trial objection and a post-trial motion raising the alleged trial error is required to preserve the matter for review. People v. Thomas, 178 Ill. 2d 215, 234, 687 N.E.2d 892, 900 (1997); People v. Enoch, 122 Ill. 2d 176, 186, 522 N.E.2d 1124, 1129-30 (1988). Errors objected to at trial but not raised in a post-trial motion or before the court at a post-trial hearing are deemed waived. Thomas, 178 Ill. 2d at 234, 687 N.E.2d at 900. Although defendant voiced on objection to Rea's acceptance as an luminol expert, he did not raise this point in his post-trial motion.

Wavier aside, we find no error in the trial court's decision. Based on his extensive work experience, training and independent study, Rea possessed knowledge not commonly known to the average person that would have assisted the jury in making its determinations concerning defendant's guilt. Although Rea has never taken a college-level chemistry course as defendant correctly observes, the law is clear that an expert is not required to have any particular level of academic training, and that the witness may acquire his particular expertise and training through other means. Notably, defendant fails to explain the importance a general chemistry class would serve in understanding and performing testing with luminol.

Defendant additionally notes that Rea never performs follow-up tests to confirm his findings. Defendant's claim is misplaced

33

1-97-2557

because it does not reflect upon Rea's qualifications to testify as an expert, but rather concerns the reliability of the specific testing procedures used by him.  As such, defendant's argument goes to the weight of the evidence and not to the degree of knowledge and expertise held by Rea.  Importantly, defense counsel extensively cross-examined Rea concerning his limited knowledge on how to perform confirmatory testing and his practice of not conducting such tests on defendant's clothing in the instant case.

Defendant's claim hints that the testing procedure is unreliable and consequently fails to satisfy the federal <u>Fyre</u> standard adopted by this state's courts in determining whether a scientific principle, technique or test is sufficiently reliable and generally accepted by the relevant scientific community to be admitted.  See <u>People v. Eyler</u>, 133 Ill. 2d 173, 549 N.E.2d 268 (1989).  To the extent defendant makes this argument, we find it waived.  Defendant merely objected at trial to Rea's expert qualifications and did not raise the matter of testing reliability to the court.  Defendant further has provided no argument in support of this argument in his opening brief.

B.

Defendant additionally challenges the court's ruling finding Dr. Siegesmund unqualified to testify as an expert in luminol interpretation and blood splatter analysis.

A review of the record shows that Dr. Siegesmund simply

34

1-97-2557

possesses a general knowledge of forensic studies, and does not
hold any specialized understanding of luminol interpretation and
blood splatter analysis. Indeed, the doctor never stated he knew
how to interpret particular luminol reactions, and merely
explained that he has conducted numerous luminol testing without
indicating whether he ever interpreted the results. Although not
determinative, Dr. Siegesmund additionally has received no
training in luminol application and interpretation and has never
performed such work in any crime lab.

With respect to blood splatter analysis, Dr. Siegesmund
merely stated he was "familiar" with the subject. He has neither
received training in the field nor performed such work in a crime
lab setting. Dr. Siegesmund explained that his knowledge and
self-described expertise in the subject comes from, among other
things, yearly, one-week seminars held by the Academy of Forensic
Scientists. Yet, the doctor conceded he had not been to an
Academy conference for at least six years. Although he has
conducted dozens of experiments in blood splatter, Dr. Siegesmund
has received no training on how to conduct such experiments and
"believed" his simulations were accurate based on information he
has read in journals and text books.

An obvious import of the trial judge's comments is that he
had serious concerns as to Dr. Siegesmund's credibility. The
court's observations were well-founded, amply supported by the
record. In particular, Dr. Siegesmund's inability to remember

35

1-97-2557

when he last attended an Academy conference, where the doctor
explained that these conferences are the primary source of the
knowledge for which he was being tendered, and the doctor's
misstatements regarding the operations of the Glendale Crime Lab,
directly reflect upon the doctor's credentials as an expert
witness.

We find no error in the trial court's determination that,
based on the testimony presented, Dr. Siegesmund did not possess
a sufficient level of knowledge and expertise to testify as an
expert in the fields of luminol interpretation and blood splatter
analysis.

III.

Defendant further argues that the trial court erred in
precluding Hines from testifying about fights involving defendant
that had occurred before Ms. Nielsen's murder.  According to
defendant, this evidence was relevant to rebut the State's theory
that the blood found on the jacket was the blood of Ms. Nielsen
and to raise the possibility that the blood came from someone
with whom he had fought previously.

A criminal defendant has the right to present a defense,
present witnesses to establish his theory of the case, and
present his version of the events to the trier of fact.  People
v. Wright, 218 Ill. App. 3d 764, 771, 578 N.E.2d 1090, 1095
(1991).  This right, however, is not unqualified, and the trial
court may properly limit the presentation of evidence on grounds

36

1-97-2557

of relevancy.  People v. Turner, 179 Ill. App. 3d 510, 521, 534
N.E.2d 179, 186 (1989).  Evidence is relevant if it tends to
prove or disprove a disputed fact material to the case or render
the matter in issue more or less probable.  People v. Childress,
158 Ill. 2d 275, 295, 633 N.E.2d 635, 643 (1994); People v. Agee,
307 Ill. App. 3d 902, 904, 719 N.E.2d 251, 253 (1999).  Contrary
to defendant's contention that this issue should be reviewed de
novo, the law is well established that evidentiary rulings are
within the sound discretion of the trial court which will not be
reversed absent a clear abuse of discretion resulting in manifest
prejudice to the accused.  People v. Reid, 179 Ill. 2d. 297, 313,
688 N.E.2d 1156, 1164 (1997); People v. Dow, 240 Ill. App. 3d
392, 400-01, 608 N.E.2d 259, 266 (1992); Wright, 218 Ill. App. 3d
at 771, 578 N.E.2d at 1096.

Contrary to the trial court's determination, defendant's
proffered evidence was not irrelevant due to remoteness.  Given
the ability of a blood stain to persist over time, especially on
clothing that goes untreated, the blood from the alleged
altercations could have remained on defendant's jacket until a
time well after Ms. Nielsen's death.  We find it difficult to
understand how the trial court could have found this evidence too
remote where defense counsel was not even allowed to ask Hines
when the alleged altercations occurred.

Notwithstanding, we find the court's error harmless.  In
determining whether an accused has been prejudiced by the

37

1-97-2557

rejection or exclusion of certain evidence, so as to require a
new trial, we review the entire record of proceedings to
determine whether the rejected evidence could have reasonably
affected the jury's verdict. People v. Montes, 263 Ill. App. 3d
680, 691, 635 N.E.2d 910, 917 (1994). Reversal is not warranted
where the accused's guilt is shown beyond of reasonable doubt or
where, based upon the evidence, a different result could not have
been reached. Montes, 263 Ill. App. 3d at 691, 635 N.E.2d 917.
In other words, "the erroneous exclusion of evidence is ground
for a new proceeding where it can be said that the excluded
evidence, if considered, would have altered the outcome of the
proceeding." People v. Sims, 167 Ill. 2d 483, 516, 658 N.E.2d
413, 428 (1995); see also People v. Amos, 204 Ill. App. 3d 75,
81-82, 561 N.E.2d 1107, 1113 (1990).

Here, the State's evidence, specifically the testimony of
Fish, established that blood extracted from defendant's clothing
was consistent in blood type and various genetic markers with the
blood of the victim. Hines' precluded testimony would have
merely raised the possibility that some other person's blood may
have been on defendant's clothing, and it would have done nothing
to refute the State's evidence linking defendant to Ms. Nielsen's
murder. Given this fact, and in light of the evidence contained
in the record, we conclude the erroneously excluded testimony of
Hines would not have altered the outcome of the case and,
therefore, did not manifestly prejudice defendant.

1-97-2557

IV.

(The preceding material is nonpublishable under Supreme Court
Rule 23)

The primary issue presented by defendant's appeal is whether
the sentencing scheme set forth in section 5-1-8(a)(1)(b) of
Corrections Code, which allows for an enhanced sentence for first
degree murder under certain court-determined circumstances,
offends the constitutional mandates announced by the Supreme
Court in <u>Apprendi v. New Jersey</u>, 530 U.S. __, 147 L. Ed. 2d 435,
120 S. Ct. 2348 (2000).

At sentencing in May 1997, the State urged the court to
impose a life sentence based on its contention that the victim's
murder was "exceptionally brutal" and "heinous" within the
meaning of section 5-8-1(a)(1)(b) contained in the 1985 version,
of the Corrections Code. That version of section 5-8-1 generally
enumerates the imprisonment terms for felony offenses and
specifically sets forth a sentence of "not less than 20 years and
not more than 40 years" in prison for the offense of first degree
murder. Ill. Rev. Stat. 1985 ch. 38, par. 1005-8-1(a))(1)(a).[5]

---

[5]    In its response brief, the State indicates that
defendant is subject to a prison sentence of between 20 and 60
years. The murder of the victim in the instant matter occurred
in April 1997. At that time, section 5-8-1 provided a sentencing
range for first degree murder of 20 to 40 years. By amendment
effective January 1, 1988, this sentencing range was increased to
the current term of 60 years.
    Contrary to the State's suggestion, the amended version of
section 5-8-1 that became effective in January 1988, or the
current version of that provision, cannot be retroactively
applied to defendant's case because such an application would be

39

1-97-2557

Under paragraph (1)(b) of this provision, a sentence of natural life is authorized where the sentencing judge finds that "the murder was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty." Ill. Rev. Stat. 1985 ch. 38, par. 1005-8-1(a)(1)(b).

The sentencing judge in the instant case agreed with the State's characterization of the crime and, specifically drawing upon his recollection of the evidentiary proofs adduced at trial, he found the conduct of defendant accompanying the murder of Ms. Nielsen to be brutal and heinous as contemplated by the Corrections Code. Based on its finding, the court sentenced defendant to life in prison.

In _Apprendi_, the accused, Charles Apprendi, pled guilty to, among other offenses, two counts of second degree possession of a firearm for an unlawful purpose. Under New Jersey's sentencing scheme, a second-degree offense carried a penalty range of 5 to 10 years in prison. As part of the plea agreement, the prosecution reserved the right, however, to seek a greater sentence on one of the two firearm possession counts under a hate crime statute that allowed for an enhanced sentence where the offense was committed with a biased purpose. For a second-degree

---

violative of the _ex post facto_ clauses of the United States and Illinois Constitutions (U.S. Const., art. I, § 9, cl. 3; Ill. Const.1970, art. I, § 16). See _Fletcher v. Williams_, 179 Ill. 2d 225, 233, 688 N.E.2d 635, 640 (1997) (any statute that, _inter alia_, makes more burdensome the punishment for a crime after its commission is prohibited as _ex post facto_).

1-97-2557

offense, the hate crime law provided for a prison term of between 10 and 20 years.

Following a hearing, the sentencing court found, by a preponderance of the evidence, that the firearm possession offense committed by Apprendi was motivated by a racial bias. Relying on the hate crime enhancement provision, the court sentenced Apprendi to a term of 12 years, two years beyond the statutory maximum penalty for such an offense.

Apprendi challenged the validity of his sentence to the state appellate and supreme courts, arguing that the sentencing scheme provided in the hate crime law was unconstitutional. The state courts disagreed and upheld Apprendi's sentence. The Supreme Court reversed, finding that New Jersey's sentencing scheme infringed upon the due process and notice and right to jury clauses of the Constitution by impermissibly allowing the sentencing judge, rather than the jury, to determine, under a relaxed evidentiary standard, a fact which is most appropriately characterized as an element of the underlying offense.

After discussing at length the constitutional rights of every defendant in a criminal case to a trial by jury in which the State is required to prove every element of the offense charged beyond a reasonable doubt (U.S. Const. amends. V, VI, XIV; Apprendi, 530 U.S. at __, 147 L. Ed. 2d at 446-48, 120 S. Ct. at 2355-56), the Court examined the term "sentencing factor," a term it first coined in McMillan v. Pennsylvania, 477 U.S. 79,

1-97-2557

91 L. Ed. 2d 67, 106 S. Ct. 2411 (1986), in light of the novelty

of legislative schemes, referred to as "sentence enhancements,"

that remove from the jury the determination of a fact that, if

found, exposes a defendant to a penalty exceeding the maximum he

would receive if punished according to the facts reflected by the

jury verdict alone. Apprendi, 530 U.S. at __, 147 L. Ed. 2d at

448-52, 120 S. Ct. at 2356-60. According to the Court, a

"sentencing factor" is "a circumstance, which may be either

aggravating or mitigating in character, that supports a specific

sentence within a range authorized by the jury's finding that the

defendant is guilty of a particular offense." (Emphasis

omitted.) 530 U.S. at __ n.19, 147 L. Ed. 2d at 457 n.19, 120 S.

Ct. at 2365 n.19. A "sentence enhancement," on the other hand,

refers to a factual determination that results in "an increase

beyond the maximum authorized statutory sentence." Apprendi, 530

U.S. at __ n.19, 147 L. Ed. 2d at 457, n.19, 120 S. Ct. at 2365,

n.19.

The Court explicitly recognized that the effect of sentence

enhancement legislation on a defendant's punishment raises

serious constitutional concerns in light of its prior precedent

in the area and the history upon which those decisions rely.

Apprendi, 530 U.S. at __, 147 L. Ed. 2d at 452, 120 S. Ct. at

2360. For the first time, the Court squarely confronted the

issue of whether such enhancement schemes run afoul of well-

established constitutional principles. Traditionally, according

42

1-97-2557

to the Court, any circumstance that exposed an accused to a
higher degree of punishment had to be pled in the charging
instrument and presented and proven to the jury beyond a
reasonable doubt. <u>Apprendi</u>, 530 U.S. at __, 147 L. Ed. 2d at
449, 120 S. Ct. at 2357. Further, the fact that judges have
historically enjoyed the discretion of fixing a punishment within
a prescribed statutory range (<u>Apprendi</u>, 530 U.S. at __, 147 L.
Ed. 2d at 449-50, 120 S. Ct. at 2358) demonstrated that their
role in sentencing was "constrained at its outer limits by the
facts alleged in the indictment and found by the jury. ***
[F]acts that expose a defendant to a punishment greater than that
otherwise legally prescribed were by definition 'elements' of a
separate legal offense." <u>Apprendi</u>, 530 U.S. at __ n.10, 147 L.
Ed. 2d at 451 n.10, 120 S. Ct. at 2359 n.10. The Court
explained:

> "If a defendant faces punishment beyond that
> provided by statute when an offense is
> committed under certain circumstances but not
> others, it is obvious that both the loss of
> liberty and the stigma attaching to the
> offense [and suffered by the defendant] are
> heightened; it necessarily follows that the
> defendant should not - at the moment the
> State is put to proof of those circumstances
> - be deprived of protections that have, until

43

1-97-2557

that point, unquestionably attached."

<u>Apprendi</u>, 530 U.S. at __, 147 L. Ed. 2d at
451, 120 S. Ct. at 2359.

Relying on the principles established by its prior
decisions, the Court concluded the Constitution forbids "'a
legislature [from] remov[ing] from the jury the assessment of
facts that increase the prescribed range of penalties to which a
criminal defendant is exposed.'" <u>Apprendi</u>, 530 U.S. at __, 147
L. Ed. 2d at 455, 120 S. Ct. at 2363, quoting <u>Jones v. United
States</u>, 526 U.S. 227, 252, 143 L. Ed. 2d 311, 332, 119 S. Ct.
1215, 1228 (1999). (Stevens, J. concurring). According to the
Court, the Constitution mandates that "'such facts *** be
established by proof beyond a reasonable doubt.'" <u>Apprendi</u>, 530
U.S. at __, 147 L. Ed. 2d at 455, 120 S. Ct. at 2363, quoting
<u>Jones</u>, 526 U.S. at 253, 143 L. Ed. 2d at 332, 119 S. Ct. at 1229.
(Stevens, J., concurring). The Court held that "any fact [other
than the fact of a prior conviction] that increases the penalty
for a crime beyond the prescribed statutory maximum must be
submitted to a jury, and proved beyond a reasonable doubt."[6]

---

[6]    The Court's holding finally established the
constitutional principle it suggested, but had avoided to
pronounce, in its earlier decision of <u>Jones v. United States</u>, 526
U.S. 227, 243 n.6, 119 S. Ct. 1215, 1224 n.6, 143 L. Ed. 2d 311,
326 n.6 (1999), where in <u>dictum</u> the Court stated: "under the Due
Process Clause of the Fifth Amendment and the notice and jury
trial guarantees of the Sixth Amendment, any fact (other than
prior conviction) that increases the maximum penalty for a crime
must be charged in an indictment, submitted to a jury, and proven
beyond a reasonable doubt."

44

1-97-2557

Apprendi, 530 U.S. at __, 147 L. Ed. 2d at 455, 120 S. Ct. at 2362-63.[7]

In applying its ruling, the Court explained the relevant inquiry does not depend on the formal structure of the statute at issue, but of the statute's effect on the defendant's sentence - that is, "does the required finding expose the defendant to a greater punishment than that authorized by the jury's guilty verdict?" Apprendi, 530 U.S. at __, 147 L. Ed. 2d at 457, 120 S. Ct. at 2365. If so, then the fact upon which the enhancement is based must be alleged in the charging instrument and proven before the jury beyond a reasonable doubt. In such cases, the enhancement factor is the "functional equivalent of an element of a greater offense than the one covered by the jury's verdict" (Apprendi, 530 U.S. at __ n.19, 147 L. Ed. 2d at 457 n.19, 120 S. Ct. at 2365 n.19), and as such becomes the "'tail which wags the

---

[7]   It must be noted that the rule announced by Apprendi makes no mention of any obligation on the part of the prosecution to allege the enhancing factor in the indictment. The Court's holding only provides that any fact other than a prior conviction that increases the punishment for a crime beyond the statutory maximum must be presented to the jury and proved beyond a reasonable doubt. The Court never expressly indicated that such a fact need also be alleged in the indictment. Nonetheless, when the Court's ruling is viewed as a whole, and when it is specifically considered together with the Court's statement in Jones, it becomes clear that facts that expose a defendant to a penalty beyond the maximum must also be pled in the indictment. Indeed, several federal courts have read Apprendi this way. See United States v. Meshack, 225 F.3d 556, 575 n.15 (5th Cir. 2000); United States v. Aguayo-Delgado, 220 F.3d 926, 933 (8th Cir. 2000); United States v. Murphy, 109 F. Supp. 2d 1059, 1062 (D. Minn. 2000); United States v. Henderson, 105 F. Supp. 2d 523, 535 (S.D. W. Va. 2000).

45

1-97-2557

dog of the substantive offense.'" Apprendi, 530 U.S. at __, 147
L. Ed. 2d at 458, 120 S. Ct. at 2365, quoting McMillan, 477 U.S.
at 88, 91 L. Ed. 2d at 77, 106 S. Ct. at 2417.  Conversely, since
Apprendi's holding is expressly limited to instances where the
enhancing factor has the effect of increasing the penalty beyond
the prescribed statutory maximum set, a court-determined fact may
permissibly alter a defendant's sentence within the range
provided for by the applicable statute.

The Apprendi ruling marks a stark departure from the
approach the Court has traditionally employed in differentiating
between an element of an offense and a sentencing factor.  The
Apprendi Court explicitly recognized for the first time that an
accused criminal has the constitutional right to have any
statutory enhancement fact that, if found, increases the penalty
for a crime beyond the prescribed maximum to be treated as an
element of the underlying offense.  In previous decisions, the
Court did not concern itself with the constitutional implications
of sentencing enhancement schemes but, rather, resorted to
principles of statutory interpretation.  In those cases, the
Court undertook a microanalysis of the relevant statute's
language, structure and history in an effort to determine whether
it defined a distinct offense or whether it merely set forth a
factor that could be properly considered in imposing an enhanced
punishment.  Within its analysis, the Court also frequently
considered the related matter of whether the particular

46

1-97-2557

enhancement factor at issue was traditionally or typically

considered by the courts as a sentencing factor.  See <u>Castillo v.</u>

<u>United States</u>, 530 U.S. __, __, 147 L. Ed. 2d 94, 98-103, 120 S.

Ct. 2090, 2092-96 (2000) (in a case decided three weeks before

<u>Apprendi</u> was issued, the Court, in determining whether a federal

statute which dramatically increased the penalty for the use or

possession of a firearm when the weapon at issue is a

"machinegun" constituted a separate offense, concerned itself

primarily with the intent of Congress, examining the literal

language the statute and the statute's legislative history; the

Court also considered whether the type of firearm in question had

been typically or traditionally viewed as a sentencing factor);

<u>Jones</u>, 526 U.S. at 232-40, 251-52, 143 L. Ed. at 319-24, 331, 119

S. Ct. at 1219-22, 1228 (in determining whether the federal

carjacking statute, which increased the maximum punishment of 15

years where either "serious bodily injury" or "death" resulted

from the offense, constituted a single offense or three distinct

crimes, the Court turned to statutory interpretation to ascertain

Congress' intent and specifically relied on the statutory

construction principle of constitutional doubt to construe the

statute as establishing three separate offenses; the Court

further considered whether the facts of "serious bodily injury"

and "death" had been traditionally considered sentencing

factors); <u>Almendarez-Torres v. United States</u>, 523 U.S. 224, 229-

35, 140 L. Ed. 2d 350, 359-63, 118 S. Ct. 1219, 1224-26 (1998)

1-97-2557

(the Court resorted to principles of statutory interpretation,
and specifically looked to the statute's language, structure,
subject matter, context, and history, to determine whether
Congress intended a federal law, which elevated the maximum
penalty for a deported alien reentering the country beyond a two-
year prison term if the alien's initial deportation resulted from
an aggravated felony conviction, to define a separate crime or
simply an enhanced penalty; the Court also examined whether
recidivism was a typical sentencing factor).

Turning to the case at hand, we initially consider the
State's argument that defendant has waived the matter of his
sentence's validity for our review.  As the State notes,
defendant did not raise his Apprendi challenge in his original
appeal and raised that matter for the first time in his timely
filed rehearing petition.  As a general rule, parties may not
argue new points in a petition for rehearing.  People v. Wright,
No. 8711, slip op. at 17 (February 17, 2000).  In Wright, the
supreme court has recognized an exception to this rule where the
new matter raised attacks the constitutionality of a criminal
statute.  Wright, slip op. at 17.  According to the court, such
challenges may be raised at any time because it would be
fundamentally unfair to uphold a criminal conviction pursuant to
an unconstitutional statute.  Wright, Slip Op. at 17.

We believe Wright, while involving a challenge to the
validity of a criminal statute, equally applies to cases, like

48

1-97-2557

the instant matter, where a defendant attacks his sentence on the

basis that it was imposed pursuant to an unconstitutional

sentencing procedure set forth in the Corrections Code.  The

fundamental unfairness to a defendant explicitly recognized by

Wright would similarly be present in such instances.  This court,

in fact, has recently declined to find waiver of a defendant's

Apprendi challenge to his sentence imposed pursuant to the

mandatory Class X sentencing scheme found in section 5-5-3(c)(8)

of the Corrections Code despite that challenge being raised for

the first by defendant in his rehearing petition.  People v.

Lathon, 1-99-0261, slip op. at 5 (November. 6, 2000); see also

People v. Wooters, 188 Ill. 2d 500, 510, 722 N.E.2d 1102, 1108

(1999) (permitting defendant's challenge on appeal to validity of

section 5-8-1(a)(1)(c)(ii) of the Corrections Code where that

attack, asserted for the first time on appeal, warranted

consideration given its constitutional dimension).

We further note Apprendi had yet to be released when we

issued our original decision in the matter.  Defendant thus did

not have the benefit of Apprendi during the original portion of

his appeal.  Notwithstanding, the State argues the ruling in

Apprendi is nothing new but, rather, is a restatement of the

holdings announced earlier by the Court in Jones and Almendarez-

Torres.  The State unsuccessfully asserted the same argument

before this court in Lathon, slip op. at 5 (noting Jones and

Almendarez-Torres were each decided as a matter of statutory

49

1-97-2557

interpretation of federal sentencing guidelines, where <u>Apprendi</u>
applied the principles established by those cases for the first
time to state prosecutions), and more recently in <u>People v.
Sutherland</u>, 1-98-3802, slip op. at 15 (December. 1, 2000).  We
likewise reject the State's argument here, and declining to apply
waiver, we will address the merits of defendant's challenge to
his sentence.

We must next resolve the question of <u>Apprendi</u>'s
applicability to defendant's case.  The law provides that a
judicial decision announcing a new constitutional rule applicable
to criminal cases is to be applied retroactively to all cases
pending on direct review at the time the new constitutional rule
is declared.  <u>People v. Erickson</u>, 117 Ill. 2d 271, 288, 513
N.E.2d 267, 374 (1987), citing <u>Griffith v. Kentucky</u>, 479 U.S.
314, 328, 93 L. Ed. 2d 649, 661, 107 S. Ct. 708, 716 (1987).  In
particular, for retroactivity to be triggered, two factors must
be present: (1) the case to which the new rule is to be applied
was pending on direct review or was otherwise not final when the
rule was declared and (2) the rule to be applied retroactively is
of constitutional dimension.  <u>People v. Dean</u>, 175 Ill. 2d 244,
253, 677 N.E.2d 947, 951 (1997); <u>Erickson</u>, 117 Ill. 2d at 289,
513 N.E.2d at 374.

We find both factors present in the instant case.
Defendant's case was still pending on direct review and was not
yet final when <u>Apprendi</u> was decided.  The term "final" has been

50

1-97-2557

defined in the retroactivity context as "'a case in which a
judgment of conviction has been rendered, the availability of
appeal exhausted, and the time for a petition for certiorari
elapsed or a petition for certiorari finally denied.'"  People v.
Holman, 132 Ill. 2d 128, 141, 547 N.E.2d 124, 128 (1989), quoting
Griffith, 479 U.S. at 321 n.6, 93 L. Ed. 2d at 657 n.6, 107 S.
Ct. at 712 n.6.  Defendant raised his Apprendi challenge in a
timely filed rehearing petition and at the earliest possible
opportunity.  Defendant's case, while at the rehearing stage,
nonetheless remains before this court on direct review.

        Secondly, the Supreme Court's ruling clearly announced a new
rule of constitutional dimensions.  Such a finding is readily
apparent from the Apprendi opinion itself, as well as from the
Court's break from its past method of resolving the proper
characterization of a particular penalty enhancement statute.
The Apprendi Court expressly predicated its holding on the
Constitution's due process clauses of the fifth and fourteenth
amendments and the notice and jury trial guarantees of the sixth
amendment.  The right of a criminal defendant to have all facts,
except the fact of a prior conviction, that increase the
statutory maximum penalty for an offense pled in the indictment
and proved to a jury beyond a reasonable doubt is, according to
the Court, deeply rooted in the Constitution and its
jurisprudence.

        Furthermore, in determining the validity of the New Jersey

51

1-97-2557

sentencing scheme under which Apprendi was punished, the Court

did not seek to ascertain the state legislature's intent in

enacting the statute by examining its language, structure,

subject matter, context, and history.  Neither did the Court

place any weight on whether the enhancement fact at issue, i.e.,

a biased purpose on the part of the offender, has been

traditionally or typically viewed as a sentencing factor.

Rather, the Court concerned itself solely with the principles

that have developed in light of the rights guaranteed by the

fifth and sixth amendments and the limits those constitutional

provisions place on a legislature's ability to remove the

determination of certain facts from the province of the jury

which, if found, would elevate the penalty for a particular

offense above its statutorily prescribed maximum.[8]

Because defendant's case remains pending, and since Apprendi

reflects the establishment of a new constitutional principle, we

find Apprendi applicable to the instant matter.  Lathon, slip op.

_____

[8]    Several federal courts have held that Apprendi's
holding represents a new rule of constitutional law.  See United
States v. Aguayo-Delgado, 220 F.3d 926, 931-32 (8th Cir. 2000)
("[i]n Apprendi, the Supreme Court made it clear that the
principle discussed in Jones is a rule of constitutional law");
Sustache-Rivera v. United States, 221 F.3d 8, 15 (1st Cir. 2000)
(recognizing same); United States v. Murphy, 109 F. Supp. 2d
1059, 1062 (D. Minn. 2000) (recognizing same); United States v.
Kelly, 105 F. Supp. 2d 1107, 1112 (S.D. Cal. 2000) (recognizing
same); United States v. Rogers, 228 F.3d 1318, 1325-26 (11th Cir.
2000) (recognizing same); United States v. Nordby, 225 F.3d 1053,
1059 (9th Cir. 2000) (indicating that Apprendi established a new
constitutional rule and applying the decision retroactively
pursuant to Griffith).

1-97-2557

at 5 (applying <u>Apprendi</u> retroactively where defendant raised
issue in petition for rehearing); <u>People v. Clifton</u>, Nos. 1-98-
2126, 1-98-2384 cons., slip op. at 51 n.6 (September 29, 2000)
(applying <u>Apprendi</u> retroactively to case pending on review).

Pursuant to <u>Apprendi</u>, the question presented here is whether
section 5-8-1(a)(1)(b) defines a separate, aggravated offense of
murder or whether that provision merely represents a factor that
a court may properly consider in imposing a sentence.   In
resolving this question, our duty is to ascertain the effect
section 5-8-1(a)(1)(b) has on the statutory prescribed maximum
imposed for a murder offense as set forth in paragraph (a)(1)(a)
of that provision.

The State makes several attempts to demonstrate that the
instant case is not covered by <u>Apprendi</u>.  Each of the State's
claims is based on the contention that defendant's life sentence
is not beyond, but rather falls within, the prescribed statutory
maximum for first degree murder.  The State first contends that
section 5-8-1(a)(1)(a) simply provides the "typical" sentencing
range for murder, and that the statutory maximum is actually life
imprisonment or the death penalty as provided in section 9-1(b)
of the Criminal Code of 1963 (Criminal Code) (Ill. Rev. Stat.
1985 ch. 38, par. 9-1(b)).  Based on its reading of the
Corrections Code, the State asserts the applicable sentencing
range should be referred to as 20 years in prison up to and
including the death penalty.

53

1-97-2557

The position posited by the State has been recently rejected
by this court in <u>People v. Beachem</u>, No. 1-99-0852, slip op. at 21
(November. 8, 2000). There, the defendant, who was convicted of
first degree murder, argued that her extended-term sentence of 90
years' imprisonment imposed under section 5-8-2(a) of the
Corrections Code (730 ILCS 5/5-8-2(a) (West 1996)) ran afoul of
the mandates of <u>Apprendi</u>. In asserting <u>Apprendi</u>'s
inapplicability, the State claimed, like here, that the
defendant's 90-year sentence did not exceed the maximum penalty
for first degree murder, which, according to the State, was life
or the death penalty.

This court rejected the State's reading of the Corrections
Code, finding the current version of section 5-8-1(a)(1)(a),
which provides a sentencing range of 20 to 60 years, reflects the
prescribed statutory maximum penalty for a first degree murder
offense. <u>Beachem</u>, slip op. at 23-24. The court noted that for
any punishment exceeding 60 years, including either a term of
life or the death penalty, to be imposed, additional aggravating
factors must be found to exist. <u>Beachem</u>, slip op. at 21-22. The
court's conclusion was further buttressed by the specific
language of the extended-term provision, which explicitly
provides that "'a judge shall not sentence an offender to a term
of imprisonment <u>in</u> <u>excess</u> <u>of</u> <u>the</u> <u>maximum</u> <u>sentence</u> <u>authorized</u> <u>by</u>
<u>Section</u> <u>5-8-1</u>'" unless certain aggravating factors are present.
(Emphasis in original.)   <u>Beachem</u>, slip op. at 22, quoting 730

54

1-97-2557

ILCS 5/5-8-2(a)(1) (West 1996).

Beachem commands rejection of the State's contention in the
present case.  The predecessor version of section 5-1-8(a)(1),
which is at issue here, expressly provides for a prison term of
20 to 40 years' imprisonment for first degree murder.  Like the
statutory schemes examined in Beachem, the 1985 version of the
sentencing laws similarly authorizes a sentence in excess of 40
years only upon additional findings.  See Ill Rev. Stat. 1985 ch.
38, par. 1005-8-1(a)(1)(b) (term of life imprisonment permitted
if offense was "exceptionally brutal or heinous," or where any
aggravating factors specified in section 9-1 of the Criminal
Code, which lists the eligibility factors for a penalty of death,
are present); Ill. Rev. Stat. 1985 ch. 38, par. 1005-8-1(a)(1)(c)
(term of life authorized where defendant has previously been
convicted of murder or where he was found guilty of murdering
more than one victim); Ill. Rev. Stat. 1985 ch. 38, par. 1005-8-
2(a)(1) (extended term of 40 to 80 years' imprisonment allowed
where aggravating factors set forth in section 5-5-3.2 of
Corrections Code are found to be present); Ill. Rev. Stat. 1985
ch. 38, par. 9-1(b) (death penalty warranted where defendant has
been convicted of murder while 18 years of age or older and where
certain statutory aggravating factors are found).  Additionally,
the 1985 version of the extended-term provision found in section
5-8-2(a) sets forth verbatim the sentencing limitation found in
the current legislation and discussed by the Beachem court.  See

55

1-97-2557

Ill. Rev. Stat. 1985 ch. 38, par. 1005-8-2(a) (expressly
referring to section 5-8-1 as setting forth the maximum
punishment for first degree murder).

The State alternatively contends that Apprendi stands for
the proposition that the prescribed statutory maximum for first
degree murder, from a constitutional standpoint, and seemingly
notwithstanding the express language of the enhanced penalty
provision at issue in the case, must be viewed in all instances
as the imposition of the death penalty.  In this regard, the
State argues "as the elements of first degree murder are the same
regardless of whether a defendant is facing the death penalty
***, it would be absurd to find that a murder defendant facing
the death penalty has no sixth amendment right to have a jury
find the statutory aggravating eligibility factors, while all
other murder defendants have the constitutional right to have a
jury *** find the statutory factors authorizing an extended term
sentence or natural life imprisonment."

The State essentially maintains that the dictates of
Apprendi must apply equally to capital and noncapital defendants.
The Supreme Court, however, specifically limited its holding in
Apprendi to noncapital cases and was careful to note that its
decision does not disturb its earlier ruling in Walton v.
Arizona, 497 U.S. 639, 639-40, 111 L. Ed. 2d 511, 519-20, 110 S.
Ct. 3047, 3049-50 (1990), where the Court rejected the argument
that the Constitution mandated that judge-authorized findings of

56

1-97-2557

aggravating factors necessary for the imposition of the death penalty be made by a jury, and further dismissed the contention that those factors were "elements" of the underlying offense, which, according to the Court, merely represented standards to guide the decision of choosing between verdicts of death or another lesser form of punishment. <u>Apprendi</u>, 530 U.S. at __, 147 L. Ed. 2d at 459, 120 S. Ct. at 2366. Thus, while it appears <u>Apprendi</u> extends greater constitutional protections to noncapital, rather than capital, defendants, the Court has endorsed this precise principle, and we are in no position to secondguess that decision here.[9]

In a final attempt to show that the statutory maximum was not exceeded in this case, the State relies on the Seventh Circuit's recent decision in <u>United States v. Smith</u>, 223 F.3d 554 (7th Cir. 2000), for the proposition that the theoretical possibility of a certain statutory penalty of a given offense represents that offense's maximum punishment. Because a conviction of first degree murder carries the theoretical

---

[9] Notably, the Illinois death penalty statute expressly provides that the eligibility factors for such a punishment must be proved by the State beyond a reasonable doubt. Ill. Rev. Stat. 1985 ch. 38, par. 9-1(f). In this regard, the death penalty statute conforms to the rule in <u>Apprendi</u>. The statute, however, does not require the State to give a defendant pretrial notice of the eligibility factors sought to be established. Our supreme court has specifically held that no constitutional right exists entitling a criminal defendant to such notification. <u>People v. Jones</u>, 123 Ill. 2d 387, 426, 528 N.E.2d 648, 666 (1988); <u>People v. Crews</u>, 122 Ill. 2d 266, 293, 522 N.E.2d 1167, 1180 (1988).

1-97-2557

possibility of either a sentence of death or life in prison under
Illinois law, the State maintains that death or life is the
maximum penalty for murder.

We do not share the State's reading of <u>Smith</u>.  Contrary to
the State's contention, nothing in <u>Smith</u> suggests that the
highest theoretical punishment for a particular crime constitutes
the statutory maximum for purposes of applying <u>Apprendi</u>.
Moreover, the sentencing statute in <u>Smith</u> concerned the
imposition of a mandatory minimum under certain circumstances.
See <u>Smith</u>, 223 F.3d at 562-63 (statute authorized range of 30
years' imprisonment to life upon a finding that the defendant
participated in a continuing criminal enterprise, but set forth a
mandatory minimum sentence of life for any defendant who, <u>inter
alia</u>, was a principal or otherwise was a leader in such
enterprise).  The <u>Smith</u> court specifically indicated that
<u>Apprendi</u> did not apply, and noted that the Supreme Court, in
<u>McMillan</u>, expressly upheld the validity of such mandatory minimum
sentencing legislation.  <u>Smith</u>, 223 F.3d at 565-66.  The
sentencing scheme in this case does not involve the imposition of
a mandatory minimum punishment but, rather, authorizes an
enhanced penalty upon the finding of certain specified factual
circumstances.

We must now decide whether that enhancement procedure is
constitutional under <u>Apprendi</u> and must specifically consider
whether the sentencing factor reflected in section 5-8-

58

1-97-2557

1(a)(1)(b), _i.e._, whether the murder was accompanied by "exceptionally brutal or heinous behavior indicative of wanton cruelty," represents a factual determination, and, if so, whether that determination increases the maximum penalty for murder.

Certainly, the question of whether a particular murder was accompanied by "exceptionally brutal or heinous behavior" necessarily involves an examination of, and is based upon, the factual circumstances presented by the evidentiary proofs. Further, a court's finding that a murder was accompanied by such behavior significantly increases the statutory maximum penalty from a term of 40 years' imprisonment to a term of natural life. Based on the foregoing, the "exceptionally brutal or heinous" inquiry presented by section 5-8-1(a)(1)(b) is most accurately characterized for constitutional purposes as an element of a greater crime, rather than a mere factor to be considered at sentencing. Accordingly, if the State wishes to seek an enhanced sentence for murder on the grounds that the offense was "exceptionally brutal or heinous," it must allege that factual circumstance in the relevant charging instrument and prove it to a jury beyond a reasonable doubt.[10]  We note that a different division of this court in People v. Lee, Nos. 1-98-3631, 1-99-2203 cons., slip op. at 9 (December. 14, 2000), and the Second District Appellate Court in People v. Joyner, No. 2-99-0433, slip

---

[10]    We make no comment on whether such a procedure is properly available to the State under current Illinois law.

59

1-97-2557

op. at 22 (November. 8, 2000), have recently determined that section 5-8-1(a)(1)(b) is constitutionally infirm under <u>Apprendi</u>.

Considering the merits of defendant's challenge, the crime of murder as defined in section 9-1 of the Criminal Code did not require a finding by the jury that defendant's conduct accompanying the victim's murder was "exceptionally brutal or heinous." It is of no surprise then that the State's charging instruments make no mention of such circumstances. Further, the record is clear that defendant's jury made no finding concerning the nature of the victim's murder and specifically reveals that the jurors never considered and passed on the question of whether defendant acted brutally or heinously.

The highest punishment defendant could receive based solely on the facts reflected by the jury's verdict was the maximum term of 40 years' imprisonment. The jury's verdict authorized no greater penalty. Only when the sentencing judge, proceeding under a relaxed evidentiary standard, found an additional factual circumstance related to the crime did defendant become subject to a prison term well in excess of the maximum. That procedure, as <u>Apprendi</u> dictates, offends constitutional principles and is invalid as applied to defendant in this case. See <u>Beachem</u>, slip op. at 25 (noting the <u>Apprendi</u> Court never declared the New Jersey statute void on its face but, rather, referred to it as creating an unconstitutional procedure).

Since the State never alleged and proved to the jury beyond

60

1-97-2557

a reasonable doubt that defendant acted in an "exceptionally brutal or heinous" fashion when he murdered the victim, we vacate defendant's life sentence and remand for a sentence that is consistent with this opinion.

CONCLUSION

We affirm defendant's conviction for murder based on the reasons expressed in the unpublished portion of this opinion. We further vacate defendant's sentence of life and remand for the imposition of a new prison term that is consistent with this opinion.

Affirmed in part and reversed in part; cause remanded with directions.

CAHILL, P.J., and WOLFSON, J., concur.