No. 90865

IN THE

SUPREME COURT OF ILLINOIS

| | | |
|---|---|---|
| **PEOPLE OF THE STATE OF ILLINOIS,** | ) | Appeal from the Appellate Court of Illinois, First District, No. 97-2557 |
| Plaintiff-Appellant, | ) ) ) | |
| -vs- | ) ) ) ) | There heard on Appeal from the Circuit Court of Cook County, Illinois, No. 87 CR 6131. |
| **HENRY KACZMAREK,** | ) ) ) | Honorable John Brady, |
| Defendant-Appellee. | ) ) | Judge Presiding. |

---

**BRIEF FOR DEFENDANT-APPELLEE – CROSS RELIEF REQUESTED**

---

MICHAEL J. PELLETIER
Deputy Defender

DEBRA R. SALINGER
Assistant Appellate Defender
Office of the State Appellate Defender
203 North LaSalle Street - 24th Floor
Chicago, Illinois  60601
(312) 814-5472

COUNSEL FOR DEFENDANT-APPELLEE

**ORAL ARGUMENT REQUESTED**

EXHIBIT C

**POINTS AND AUTHORITIES**

Page

I.    **The Greatest Penalty Authorized By The Jury's Verdict Was 40 Years. Kaczmarek's Natural-Life Sentence For Murder Based On A Judicial Finding of Brutal And Heinous Must Be Vacated Where The Facts That Increased the Prescribed Range of Penalties Were Not Charged, Submitted To The Jury, Or Proved Beyond a Reasonable Doubt** ...................................... 21

Ill. Rev. Stat., ch. 38, sec. 9-1 (1987) ........................................ 21

Ill. Rev. Stat., ch. 38, sec. 1005-8-1(a)(1)(a)(1987) .................................. 21

Ill. Rev. Stat., ch. 38, sec. 1005-8-1(a)(1)(b)(1987) .................................. 21

U.S. Const. Amends. VI, XIV ............................................... 21

*Apprendi v. New Jersey*, 530 U.S. 466 (2000) ..................................... 21

*Ring v. Arizona*, 536 U.S. __, 122 S. Ct. 2428, 153 L.Ed 2d 556 (2002) ............... 21, 22

*People v. Kaczmarek*, 318 Ill. App. 340, 741 N.E.2d 1131 (1st Dist. 2000) ............... 21

*People v. Swift,* No. 91840, 2002 Ill. LEXIS 954 (Nov. 21, 2002) ..................... 22

1.    *Pursuant to Statute, 40 Years Was The Maximum Statutory Penalty For Murder* ................................................... 22

Ill. Rev. Stat., ch. 38, sec. 1005-8-1(a)(1)(1987) ..................................... 23

*People v. Swift*, No. 91840, 2002 Ill. LEXIS 954 (Nov. 21, 2002) ................... 22, 23

*People v. Brownell*, 79 Ill. 2d 508, 404 N.E.2d 181 (1980) ............................. 23

*People v. Davis*, No. 89704, 2002 Ill. LEXIS 286 (Feb. 22, 2002) ...................... 23

**2.      *This Case Does Not Fall Within the Ambit of Ford*** ................. **24**

Ill. Rev. Stat., ch. 38, sec. 9-1(b)(1987) .......................................... 24

Ill. Rev. Stat., ch. 38, sec. 9-1(d)(1987) .......................................... 24

*People v. Ford*, 198 Ill. 2d 68, 761 N.E.2d 735 (2001) ......................... 24

*People v. Hopkins*, 201 Ill. 2d 76, 773 N.E.2d 633 (2002) ..................... 24

**A.      *Jury's General Verdict Of Guilty of Murder Did Not Authorize Death*** ...... **25**

*People v. Mack*, 167 Ill. 2d 525, 658 N.E.2d 437 (1995) ....................... 26

*People v. Ramey*, 151 Ill. 2d 598, 603 N.E.2d 519 (1992) ...................... 25

*People v. Williams*, 193 Ill. 2d 1, 737 N.E.2d 230 (2000) ...................... 26

*People v. Crite*, 261 Ill. App. 3d 1041, 634 N.E.2d 487 (2nd Dist. 1994) ............... 26

*People v. Rivera*, __ Ill. App. 3d __, 777 N.E.2d 360 (2nd Dist. 2001) ............... 26-27

**B.      *Section 9-1(a)(3) Is Not Equivalent to Section 9-1(b)(6)*** ................. **27**

Ill. Rev. Stat., ch. 38, sec. 9-1(a)(3) .......................................... 27

Ill. Rev. Stat., ch. 38, sec. 9-1(b)(6) .......................................... 27

*People v. Fuller*, No. 89220, 2002 Ill. LEXIS 287 (Feb., 22, 2002) ..................... 29

I.P.I. Criminal 7B.07 (3rd Ed. 1992) .......................................... 28

**C.      *Residential Burglary Cannot Serve As A Basis for a Section 9-1(b)(6)
          Finding*** ...................................................... **29**

Ill. Rev. Stat., ch. 38, sec. 9-1(b)(6)(c)(1987) ................................. 30

*Schad v. Arizona*, 501 U.S. 624 (1991) ....................................... 30

*Stromberg v. California*, 283 U.S. 359 (1931) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*People v. Simms*, 143 Ill. 2d 154, 572 N.E.2d 947 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*In re Brown*, 71 Ill. 2d 151, 374 N.E.2d 209 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*People v. Kazcmarek*, 243 Ill. App. 3d 1067, 613 N.E.2d 1253 (1st Dist. 1993) . . . . . . . . . . . 31

*People v. Alexander*, 40 Ill. App. 3d 457, 352 N.E.2d 247 (1st Dist. 19976) . . . . . . . . . . . . . . 32

    **3.**      ***Kaczmarek Was Not Given Notice of The Element Used to Enhance His Sentence*** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ***32***

725 ILCS 5/111-3 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*United States v. Cotton*, 535 U.S. \_\_\_, 122 S. Ct 1781 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . 34

*People v. Brownell*, 79 Ill. 2d 508, 4040 N.E.2d 181 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*People v. Davis*, No. 89704, 2002 Ill. LEXIS 286 (Feb. 22, 2002) . . . . . . . . . . . . . . . . . . . . . . . 33

*People v. Holloway*, 177 Ill. 2d 1, 682 N.E.2d 59 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*People v. Thingvold*, 145 Ill. 2d 441, 584 N.E.2d 89 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*People v. Lucas*, 353 N.C. 568, 548 S.E.2d 712 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*People v. Martinez*, 32 P.3d 520 (Col. App. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*State v. Ouellette*, 145 N.H.489, 764 A.2d 914 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*State v. Seilert*, 28 P.3d 445 (Kan.App. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

    **4.**      ***The Element of Brutal and Heinous Was Not Charged, Submitted to a Jury, Nor Proven Beyond a Reasonable Doubt*** . . . . . . . . . . . . . . . . . . . . . ***35***

Ill. Rev. Stat., ch. 38, sec. 10050801(1)(a)(1)(b) (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*Apprendi v. New Jersey*, 530 U.S. 466 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*People v. Swift,* No. 91840, 2002 Ill. LEXIS 954 (Nov. 21, 2002) . . . . . . . . . . . . . . . . . . . . . . . 36

**5.** *The Failure to Find an Element of the Offense Cannot Constitute
Harmless Error* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **36**

*Arizona v. Fulminante*, 499 U.S. 279 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*Neder v. United States*, 527 U.S. 1 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37-38

*Sullivan v. Louisiana*, 508 U.S. 275 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*People v. Armstrong*, 183 Ill. 2d 130, 700 N.E.2d 960 (1998) . . . . . . . . . . . . . . . . . . . . . . 39

*People v. Jones*, 81 Ill. 2d 1, 405 N.E.2d 343 (1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*People v. Leger*, 149 Ill. 2d 355, 597 N.E.2d 586 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . 39

*People v. O'Neal*, 104 Ill. 2d 399, 472 N.E.2d 471 (1984) . . . . . . . . . . . . . . . . . . . . . . . . 36

*People v. Blackwell*, 325 Ill. App. 3d 354, 757 N.E.2d 589 (1st Dist. 2001) . . . . . . . . . . . . . 41

*People v. Bryant*, 325 Ill. App. 3d 448, 758 N.E.2d 430 (1st Dist. 2002) . . . . . . . . . . . . . . . 40

*People v. Carter*, 332 Ill. App. 3d 576, 773 N.E.2d 1140 (1st Dist. 2002) . . . . . . . . . . 39, 40, 41

*People v. Gholston*, 332 Ill. App. 3d 179, 772 N.E.2d 880 (1st Dist. 2002) . . . . . . . . . . . . . . 40

*People v. Peacock*, 324 Ill. App. 3d 749, 756 N.E.2d 261 (1st Dist. 2001) . . . . . . . . . . . . . . 41

*People v. Pearson*, 324 Ill. App. 3d 622, 756 N.E.2d 438 (4th Dist. 2001) . . . . . . . . . . . . . . 41

*U.S. v. Anderson*, 236 F.3d 427 (8th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

*U.S. v. Nance*, 236 F.3d 820 (7th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

*U.S. v. Terry*, 240 F.3d 65 (1st Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

**II.     Defendant's Constitutional Right to a Speedy Trial Was Denied Where Three and
One Half Years Elapsed Between Reversal of Defendant's Murder Conviction and
His Second Trial and Where Defendant Was Not Responsible for a Bulk of the
Delay** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **42**

U.S. Const., amends. VI, XIV . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

Ill. Const., art. I, sec. 8 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

725 ILCS 5/103-5(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

*Barker v. Wingo*, 407 U.S. 514 (1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Doggett v. U.S.*, 505 U.S. 647 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43, 50

*People v. Bazzell*, 68 Ill. 2d 177, 369 N.E.2d 48 (1977) . . . . . . . . . . . . . . . . . . . . . 42, 43

*People v. Crane*, 195 Ill. 2d 42, 743 N.E.2d 555 (2001) . . . . . . . . . . . . . . . . . . . 43, 51-52

*People v. Kliner*, 185 Ill. 2d 81, 705 N.E.2d 850 (1998) . . . . . . . . . . . . . . . . . . . . . . . 47

*People v. Staten,* 159 Ill. 2d 419, 639 N.E.2d 550 (1994) . . . . . . . . . . . . . . . . . . . . . . 47

*People v. Kaczmarek*, 243 Ill. App. 3d 1067, 613 N.E.2d 1253 (1st Dist. 1993) . . . . . . . . . . . 42

*People v. Kaczmarek*, 318 Ill. App. 3d 340, 741 N.E.2d 1131 (1st Dist. 2000) . . . . . . . . . *passim*

*People v. Singleton*, 278 Ill. App. 3d 296, 662 N.E.2d 580 (1st Dist. 1996) . . . . . . . . . . . . 42

*People v. Williams*, 299 Ill. App. 3d 143, 700 N.E.2d 753 (1st Dist. 1998) . . . . . . . . . . . . 42

*People v. Belcher*, 186 Ill. App. 3d 202, 542 N.E.2d 419 (2d Dist. 1989) . . . . . . . . . . . . . 43

*People v. Battles,* 311 Ill. App. 3d 911, 724 N.E.2d 997 (5th Dist. 2000) . . . . . . . . . . . . . 45

*People v. Brimmer*, 60 Ill. App. 3d 214, 376 N.E.2d 337 (1st Dist. 1978) . . . . . . . . . . . . . 47

*People v. Prince*, 242 Ill. App. 3d 1003, 611 N.E.2d 105 (3rd Dist. 1993) . . . . . . . . . . . . . 47

*Nickerson v. State* (Ala. App.), 629 So. 2d 60 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . 48

## NATURE OF THE CASE

In 1989, Henry Kaczmarek was convicted of first-degree murder after a jury trial and was sentenced to natural-life in prison. Defendant appealed and on March 31, 1993, the appellate court reversed defendant's murder conviction and remanded for a new trial. *People v. Kaczmarek*, 243 Ill. App. 3d 1067, 613 N.E.2d 1253 (1st Dist. 1993). Following a second jury trial in November of 1996, defendant was found guilty of murder. Defendant appealed and on December 27, 2000, the appellate court vacated defendant's natural-life sentence and remanded the cause for resentencing. *People v. Kaczmarek*, 318 Ill. App. 3d 340, 741 N.E.2d 1131 (1st Dist. 2000)(portions of the opinion were ordered to be unpublished pursuant to Supreme Court Rule 23). On May 30, 2002, this Court allowed the State's petition for leave to appeal.

An issue is raised concerning the challenging instrument. Cross-relief is being requested.

## STATUTES INVOLVED

Ill. Rev. Stat., ch. 38, sec. 9-1 (now codified as 720 ILCS 5/9-1).
**First degree murder -Death penalties -Exceptions -Separate hearings  – Proof - Findings - Appellate procedures -Reversals**

(**a**)  A person who kills an individual without lawful justifications commits first degree murder, if, in performing the acts which cause the death:

(1) He either intends to kill or do great harm ... or knows that such acts will cause death to that individual . . . or . . .

(2)  He knows that such acts create a strong probability of death or great bodily harm to that individual or another or

(3) He is attempting or committing a forcible felony other than second degree murder.

(**b**) Aggravating factors:
A defendant who at the age of the commission of the offense who has attained the age 18 or more and who has been found guilty of first degree murder may be sentenced to death if:

*       *       *

(6) the murdered individual was killed in the course of another felony if:
    (a) the murdered individual:
        (i) was actually killed by the defendant, or
        (ii) received physical injuries inflicted by the defendant
        substantially contemporaneously with physical injuries caused by one or
        more persons for whose the conduct the defendant is legally accountable
        caused the death ... or
    (b)  in performing the act which caused the death of the murdered individual...
    (c)  the other felony was one of the following:  armed robbery, robbery, aggravated criminal sexual assault, aggravated kidnaping, forcible detention, arson, aggravated arson, burglary, home invasion, or the attempt to commit any  of the felonies listed in this subsection (c).

(**c**) consideration of factors in aggravation and mitigation.

*       *       *

(**d**) Separate sentencing hearing

Where requested by the State, the court shall conduct a separate sentencing proceeding  to

-2-

determine the existence of factors set forth in subsection (b) and to consider any aggravating or mitigating factors as indicated in subsection (c). The proceedings shall be conducted:

(1) before the jury that determined the defendant's guilt; or

(2) before a jury impaneled for the purpose of the proceeding . . .

(f) Proof

The burden of proof of establishing the existence of any of the factors set forth in subsection (b) is on the State and shall not be satisfied unless established by proof beyond a reasonable doubt.

(g) Procedure- Jury

If at the separate sentencing proceeding the jury finds that none of the factors found in subsection (b) exists, the court shall sentence the defendant to a term of imprisonment under Chapter V of the Unified Code of Corrections. If there is a unanimous finding by the jury that one or more of the factors set forth in subsection (b) exist, the jury shall consider aggravating and mitigating factors as instructed by the court and shall determine whether the sentence of death shall be imposed. If the jury determines unanimously that there are no mitigating factors sufficient to preclude the imposition of the death sentence, the court shall sentence the defendant to death.

Unless the jury unanimously finds that there are no mitigating factors sufficient to preclude imposition of the death sentence, the court shall sentence the defendant to a term of imprisonment under Chapter V of the Code of Corrections.

(h) Procedure - No Jury

In a proceeding before the court alone, if the court finds that none of the factors found in subsection (b) exists, the court shall sentence the defendant to a term of imprisonment under Chapter V of the Unified Code of Corrections.

If the court determines that one or more of the factors set forth in subsection (b) exists, the court shall consider any aggravating and mitigation factors ... If the court determines that there are no mitigating factors sufficient to preclude the imposition of the death penalty, the Court shall sentence the defendant to death.

Unless the court finds that there are no mitigating factors sufficient to preclude the imposition of the sentence of death, the court shall sentence the defendant to a term of imprisonment under Chapter V of the Code of Corrections.

## Code of Corrections - Chapter V.  Sentencing

Ill. Rev. Stat., ch. 38, sec. 1005-8-1 (now codified as 730 ILCS 5/5-8-1)
**Sentence of Imprisonment for Felony**

(a) Except as otherwise provided in the statute defining the offense, a sentence of imprisonment for a felony shall be a determinate sentence set by the court under this Section, according to the following limitations:

(1) for first degree murder,

(a) a term shall not be less than 20 years and not more than 40 years, or

(b) if the court finds that the murder was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty, or, except as set forth in subsection (a)(1)(c) of this Section, that any of the aggravating factors listed in subsection (b) of Section 9-1 of the Criminal Code of 1961 are present, the court may sentence the defendant to a term of natural life imprisonment ***

## ISSUES PRESENTED FOR REVIEW

1.    Whether pursuant to *Apprendi v. New Jersey*, Mr. Kaczmarek's natural-life sentence for first-degree murder based on a judicial finding of brutal and heinous must be vacated where the jury's verdict authorized a maximum penalty of forty years and where the facts that increased the prescribed range of penalties were not charged, submitted to the jury, or proved beyond a reasonable doubt?

2.    Whether Mr. Kaczmarek's constitutional right to a speedy trial was denied where over three and one half years elapsed between reversal of defendant's murder conviction and his second trial and where defendant was not responsible for a bulk of the delay?

## STATEMENT OF FACTS

In the early morning hours of April 25, 1987, Millie Nielsen was killed in her apartment. Police arrested Henry Kaczmarek and he was subsequently charged with Ms. Nielsen's murder as well as with residential burglary, home invasion, and armed robbery.  (C. 34-51)  Following a jury trial in 1989, defendant was found guilty of all charges.  (C. 54)  Judge Michael Getty sentenced defendant to a term of natural life on the murder conviction.  (C. 54)  Defendant appealed.

On March 31, 1993, the appellate court reversed defendant's murder conviction and remanded for a new trial.  *People v. Kaczmarek*, 243 Ill. App. 3d 1067, 613 N.E.2d 1253 (1st Dist. 1993)(C. 54-78).  Following the denial of defendant's motion for discharge based on a speedy trial violation, the State, in November of 1996, retried defendant on five counts of murder.  Judge John Brady presided over the second jury trial.  The jury found defendant guilty of murder and the court sentenced defendant to natural-life imprisonment.  (C. 152, 293)  Defendant appealed.  On December 27, 2000, the appellate court vacated defendant's sentence and remanded for resentencing.  *People v. Kaczmarek*, 318 Ill. App. 3d 340, 741 N.E.2d 1131 (1st Dist. 2000)(2000 Ill. App. LEXIS 999).  Four of the issues raised on appeal were addressed in unpublished portions of the opinion while the fifth issue concerning the application of *Apprendi v. New Jersey* was addressed in the published opinion.

**Evidence At Trial**

Millie Nielsen lived on the first floor of a two-flat apartment building while Dan Larry,

his wife Margaret, and Margaret's then 19-year-old son, John Fisher, lived on the second floor.

(R. I179)  The 86-year-old Nielsen was the Larrys' landlady.  (R. I177-I179)

On April 24, 1987, a Friday, Margaret Larry saw Ms. Nielsen at around 5:00 or 5:30 p.m.

(R. I180)  At 6:15 p.m., Margaret went bowling with her son John.  (R. I181, I207)  Margaret and

John returned home at about 10:30 p.m.  (R. I181)  In the apartment, Margaret's husband was

passed out on the couch.  (R. I181)  Also in the apartment was Henry Kaczmarek, who was on

the couch watching television.  (R. I181, I207)  Henry was wearing light-colored jeans and a

blue, quilted work jacket, and construction boots.  (R. I179, I207, I211)  Henry had been living

with the Larrys for about a month after previously having lived at his girlfriend, Pam Hines'

house.  (R. K182)  At 11:00 p.m., Henry helped Margaret bring Dan to bed.  (R. I184, I209)

Margaret went to sleep and Henry left.

Margaret woke up that morning at around 7:00 or 7:30 a.m.  (R. I190)  Margaret saw

Henry sleeping on the couch.  (R. I190)  Shortly after, Henry woke up.  (R. I190)  Margaret stated

that Henry looked "kind of" nervous until he got his coffee after which he sat down and relaxed.

(R. I192)  Margaret stated that Henry was wearing a clean pair of dark-colored jeans and a light

dress shirt.  (R. I190)  Margaret did not pay attention to whether there were any stains on Henry's

clothing.  (R. I199)  Margaret admitted that the first time she told police about what Henry was

wearing on Saturday morning was two years after Millie's murder.  (R. I202)

At around 9:45 a.m., Ms. Nielsen's helper, Ronald Sadlowski, noticed that the back

pantry window of Millie's apartment had been broken and the back storm door was fully open.

(R. I163)  Ronald called the police.  (R. I164)  Police found Ms. Nielsen in the bedroom of her

apartment having been stabbed multiple times, strangled, and having sustained blunt force

injuries. (R. I119-121, I147)  Officer Marsala observed bloodspots on the floor and walls above

the bed where Ms. Nielsen was found, blood on the kitchen floor leading to the bedroom, and

bloodspots on the dust ruffle of the bed in the second bedroom. (R. I40-42, I51-53)  Marsala

found no signs of forced entry and no broken glass inside. (R. I43-44)

John woke up at 10:00 a.m. on Saturday morning when police came to question him. (R.

I210)  Detective Bogucki and partner Raymond Schalk conducted a follow-up investigation

regarding the murder of Millie Nielsen. (R. J29)  The detectives interviewed Dan and Margaret

Larry. (R. J29)  Ron Larry approached the detectives and talked to them. (R. J30)

In 1987, Ron Larry lived with his mother but would sleep on the back porch of Margaret

and Dan Larrys' apartment. (R. I64)  Ron Larry admitted being convicted of theft in February of

1980 and being placed on probation. (R. I61)  In April of 1980, Ron was convicted of burglary

and was sentenced to four years probation with a condition of probation being that he spend the

first four months in jail and pay $300 restitution. (R. I61)  Three years later, Ron was arrested

for theft and charged with violating his probation.  Ron was sentenced to three years in prison for

violating his probation and two years incarceration for felony theft. (R. I61-62)

On April 24th, Ron went to work and then went drinking at Patty's Lounge.  Ron left the

lounge at midnight or 1:00 a.m. (R. I68)  After getting something to eat, Ron went to his

brother's house and laid down on some padding on the second floor back porch to sleep. (R. I68)

At trial, Margaret testified that Ron had no permission to sleep on the Larrys' back porch. (R.

I196)  Ron did not see any bags or property in the gangway and did not pay attention to the first

floor door or windows. (R. I69)  Ron stated that when he was on the porch, the temperature was

in the 50's. (R. I96)  Ron admitted that he previously testified that it had been in the 60's. (R.

I96) The parties subsequently stipulated that the temperature at 3:00 a.m. was 37 degrees. (R. J126)

At 2:00 a.m., while on the porch, Ron heard the alarm from Patty's Lounge indicating its closing. (R. H72) Ron claimed that twenty to thirty minutes later, he saw Henry in the back yard of the building carrying a bag. (R. H64) He had known Henry for five or six years. (R. H64) Ron testified that Henry, who was wearing jeans and a dark jacket, was walking across the yard. (R. H73) Ron stated that Henry was carrying the bag with his arms out at a 90 degree angle. (R. H100) The bag, which looked like a garbage bag, did not have handles on it. (R. H100)

Ron went to sleep, waking up around 7:00 a.m. (R. H76) Ron used the back stairs and noticed nothing unusual. (R. H77) After going to work for a full day on Saturday April 25th, Ron went to Patty's Lounge for a few beers. (R. H82) At Patty's, Ron learned that Ms. Nielsen had been murdered. (R. H82) After Patty's, Ron went to the Larrys' where Ron spoke to police. (R. H83) Ron told the police about Henry and he went with police to find Henry. (R. H83, J31)

Police arrested Henry in his car on April 26th. (R. J33-J36) Henry was wearing a plaid shirt and blue jeans and had on leather work boots. (R. J36, J62) Police noted blood stains on the right and the left sleeve of Henry's coat. (R. J34) Henry signed a written consent form to search his car. (R. J40) In the trunk of Henry's car, police found jewelry boxes, plates and platters, a Marshall Fields bag, a pair of blue jeans with blood stains, and tools. (R. J42) Police did not find any gloves in the trunk or car and no other shoes. (R. J43)

Ms. Nielsen's niece Fern Briggs and great niece Barbara Tucker viewed the property taken from the trunk of Henry's car. (R. J57, J95, J105) Briggs and Tucker identified pieces of jewelry and serving dishes as their Aunt Millie Nielsen's. (R. J95-101, J105-108) Officer

-9-

Patterson, an expert in fingerprint identification, averred that a hand print taken from the bag found in the trunk of defendant's car was a print from defendant. (R. J121)

Henry gave his consent to have police take a blood sample from him. (R. J58) Defendant's blood sample was transferred to serologist Pam Fish. (R. J126) During Nielsen's autopsy, medical examiner Michael Chambliss took blood from decedent, also transferring it to serologist Pam Fish. (R. J126) Officer Kenneth Martin fingerprinted defendant. (J124)

Forensic investigator Robert Baike testified that he went to Nielsen's apartment on April 25th and observed blood splatters above the decedent on the wall by the bed and noted that the room had been ransacked. (R. J6) Baike photographed the area and collected evidence. (R. J8) Baike was unable to find any fingerprints. (R. J9) Baike did not see any bloody footprints. (R. J19)

Police checked Henry's shoes. (R. J53) Police did not notice any blood or brown or reddish stains on Henry's boots. (R. J53, J63) Officer Bogucki averred that no other clothing had blood on it. (R. J53)

Pam Fish, a serologist, testified that in 1987, Chicago was not doing DNA testing but was doing electrophoresis serology. (R. J155) Ms. Fish stated that she received from police investigating the Nielsen murder a jacket, a pair of jeans, jewelry boxes, and a knife. (R. J139) Based on blood standards she received from Henry and decedent, Ms. Fish determined that all the blood on defendant's jeans and jacket was consistent with Ms. Nielsen's blood and could not have come from defendant. (R. J153) In 1994, Chicago discontinued electrophoresis serology and began DNA typing. (R. J129) Ms. Fish tried to do DNA testing on the samples received in 1987 but the samples were too small or too degraded and results were inconclusive. (R. J161-

163)  Ms. Fish did not do luminol testing.  (R. J163)

Arizona insurance fraud investigator Mitch Rea testified that he was contacted by the Cook County State's attorney's office in Spring of 1994 to perform luminol testing in conjunction with the Nielsen murder.  (R. K7, K26)  Over objection, the court accepted Rea as an expert in the field of luminol testing.  (R. K25-26)  In May of 1994, Rea received a sealed box containing a dark-colored quilted jacket.  (R. K26-27)  After spraying segments of the jacket with the luminol chemicals and turning off the lights, Rea observed luminance in various sections of the jacket.  (R. K32-K37)  Rea took photographs of the jacket.  (R. K39)

The State called Rod Englert to testify concerning blood splatter.  Over objection, the court ruled that Englert was an expert in the field of crime scene reconstruction and blood splatter.  (R. K66)  Upon request from the Cook County State's Attorney, Englert reviewed the photographs of the Nielsen crime scene, the statements of witnesses, the luminol testing photographs prepared by Mitch Rea, and the physical evidence recovered.  (R. K66-69)

Concerning Ms. Nielsen's apartment, Englert noted that there was blood on the floor of the kitchen leading into Ms. Nielsen's bedroom.  (R. K91)  Englert also observed that "on the floor are smears of blood, as though a struggle took place, and one of the individuals on the floor was bleeding."  (R. K91)  When asked whether it was unusual not to have any footprints in the blood, Englert stated that it would not be unusual because blood dries very fast.  (R. K86-91)

Englert stated that the left and right knee areas of the pants contained a transfer stain and not splatter.  (R. K94)  The transfer does not involve energy but just a transfer of something that was bloody that touched against the pants.  (R. K95)  As for the bottom of the pants, Englert opined that there were numerous specks of blood consistent with medium velocity splatter.  (R.

-11-

K96) Englert stated that the blood on defendant's pants would not be consistent with a person

picking up a bloody bag in a gangway. (R. K100) Further, Englert opined that the blood on the

jeans would not be consistent with the wearer of the jeans "kneeing" someone in the nose. (R.

K102)

 In examining the luminol photographs of defendant's jacket, Englert stated that the stains

on the right and left arms contained splatter. (R. K109) Englert stated that over the front of the

jacket were little specks of projected blood. (R. K111) On the right pocket was a very light

transfer stain. (R. K111) Englert opined that the jewelry boxes had transfer stains that were

consistent with ransacking. (R. K114)

 Englert asserted that the manner of Nielsen's death was that she was attacked first in the

kitchen where she received many blows while on the floor, and that she, while still alive, was

taken into the bedroom and thrown on the bed. (R. K117) Englert acknowledged that there was

a great deal of blood in Ms. Nielsen's bed. (R. K134)

 Englert admitted that he was assuming that the blood splatter on defendant's jeans was

Nielsen's blood. (R. K123) Englert conceded that no report stated that the splatter on the lower

left leg was Nielsen's blood and that if it were someone else's blood he would have to reevaluate

his position. (R. K122-123) Englert testified that it was "very, very possible" to get medium

velocity splatter from a fight. (R. K125)

 Following Englert's testimony, the State rested. (R. J150) The court denied defendant's

motion for a directed finding. (R. J149)

 To rebut the testimony of State's witnesses Englert and Rea, defendant called Dr.

Kenneth Siegesmund on defendant's behalf. Outside the presence of the jury, the parties

-12-

inquired into Dr. Siegesmund's qualifications. Dr. Siegesmund testified that he had a Ph.D. in biology and that his undergraduate major was biology with a minor in chemistry. (R. L3) Dr. Siegesmund stated that he had performed luminol testing well over a hundred times and had lectured in forensic science. (R. L5) Dr. Siegesmund stated that he had been qualified to testify as an expert in the area of blood splatter 20 to 30 times. (R. L37) Following argument on Dr. Siegesmund's credentials, the court ruled that he would not recognize Siegesmund as an expert in the field of blood splatter and could not testify as to the interpretation of luminol testing. (R. L40)

Defense counsel made an offer of proof averring that Dr. Siegesmund would testify that in his opinion there was almost no indication of blood splatter on the jacket and that the blue jeans contained smears in the knee area indicative of lateral activity. (R. L72) Dr. Siegesmund would have testified that the majority of decedent's blood would have been deposited on the bed prior to, and not after, her death. (R. L72) Dr. Siegesmund would have further stated that in his opinion, the offender in the instant case would have been dramatically covered with blood based on the particular type of attack. (R. L72)

In defendant's case, Henry testified that in April 1987, he had been living with the Larry family. (R. K176) Before living with the Larrys, Henry had lived with his girlfriend, Pam Hines. (R. K182) When Henry left Pam's house, Henry took all his belongings including his clothes, flashlight, and work tools. (R. K182) Henry's work tools included a hammer, screwdrivers, channel locks, and a glass cutter. (R. K183) Henry's clothes included six pairs of jeans and eight or nine flannel shirts. (R. K260) Henry used a Marshall Fields bag for luggage. (R. K182) Henry had been living at the Larrys' for between two weeks and a month prior to decedent's

-13-

murder.  (R. K182, K214)

The week decedent was killed, Dan Larry had been suffering from a toothache for most of

that week.  (R. K178)  Henry and Dan went to bars and drank for most of that week.  (R. K178)

Henry had been laid off and was scheduled to begin work for Lee Willis the Monday following

Nielsen's death.  (R. K177)  Henry got into three fights on the Wednesday before April 24th.  (R.

K179, K251)  In each of these fights, someone bled.  (R. K180-K181)  Henry asserted that he had

owned his jacket for a year or more and that he had been in a lot of fights while wearing the

jacket.  (R. K210)  Henry related that he "went to a lot of bars" and "had a lot of fights in that

coat."  (R. K211)

On the morning of April 24th, Henry began drinking with Dan.  (R. K183)  In the

afternoon, Henry and Dan went to Tom Szeszol's house where Henry took a shower and did

laundry.  (R. K184)  Henry did not wash his stained jeans there because Henry wanted to soak

them and Tom's mother was coming and wanted everyone out.  (R. K184, K224)  When Henry

was told to leave, he tossed all his clothes back into the trunk of the car.  (R. K185)  Henry threw

the jeans which he was going to soak but did not, on the floor of the trunk.  (R. K185)  All of

Henry's clothes got washed except for his jacket and the pair of jeans that he was going to soak.

(R. K224-225)

After Szeszol's house, Henry dropped Dan off and went to Mike's Tavern on

Wrightwood.  (R. K187)  Henry stayed there until 6:30 p.m. drinking.  (R. K188)  After Mike's

Tavern, Henry went to the Larrys' house.  (R. K188)  When Henry got to the Larrys' house, Dan

was the only person there.  (R. K188)  Henry and Dan drank a case of beer together.  (R. K188)

Henry left the Larrys' at 11:45 p.m. and went to another bar.  (R. K188-189)  When Henry left

the Larrys', Margaret and John were in the house. (R. K189, K225)

After drinking two beers, Henry went to a bar called "Our Place" until 2:00 a.m. (R. K190) Henry estimated that there were 50 people at the bar. (R. K227) When asked to describe anyone at the bar, Henry stated that it was ten years before and that he would be lying if he had to describe anyone at the bar. (R. K227-228) At around 2:00 a.m., Henry went back to Dan's house to see if Dan wanted to drink some more. (R. K190) Although Henry had a key to Dan's house, Henry had to "pee" and parked in the alley behind Dan's house to urinate. (R. K191, K214)

After parking in the alley, Henry opened the car door, got out of the car, and heard a noise. (R. K191) The noise sounded like a door closing. (R. K229) Henry closed the car door and walked towards the house. (R. K191) Henry looked up thinking that the noise might have been Dan upstairs. (R. K191) After seeing no one up there, Henry kept walking towards the house and urinated close to the house. (R. K191) While urinating, Henry saw a bag on the side of the house. (R. K192) Henry looked inside the bag and saw a little box containing silverware. (R. K194-195, K216) Henry picked up the bag and carried the bag to his car where he threw it into the trunk of his car. (R. K195) When Henry picked up the bag it was damp or wet. (R. K219-210) Henry got into his car and drove around to the front of Dan's house. (R. K195)

Henry went upstairs and rang the Larrys' doorbell. (R. K196) Margaret told Henry that Dan was not awake and Henry left and went to "Our Place" bar. (R. K196) At the bar, Henry saw Liz and Dan Funkhauser. (R. K197) Henry stayed until closing at 4:00 a.m., and gave rides home to Liz and Dan. (R. K197) After parking his car across the street from the Larrys' apartment, Henry went upstairs and went to sleep on the Larrys' couch. (R. K197-198, K234)

Defendant went to sleep around 5:00 a.m. and woke up around 8:00 a.m. (R. K198) Henry slept in his clothes: jeans, flannel shirt, boots, and coat. (R. K198, K234) Henry had one pair of shoes which were boots. (R. K237)

On Saturday morning, Henry and Dan drove to Melrose Park to see Bill Brown. (R. K202) Henry wanted to show Bill his car and Henry owed Bill some money. (R. K202) At Brown's house, Henry opened the car trunk to see what was in the bag he found that morning. (R. K203) Dan was with Henry. (R. K203) Henry took everything out and put it on a bench. (R. 203) Henry stated that "it was all bloody." (R. K203) The bag and a pillow case was all bloody with dried blood. (R. K204) Henry separated the good things from the bad, throwing the bag, a pillow case, and some other things in a dumpster next door to Brown's house. (R. K204, K236) Henry did not throw into the dumpster any work gloves, clothes, or boots. (R. K236-237) Henry kept about four or five pieces and put the things back into the trunk. (R. K205, K238)

Henry showed Brown the silverware. (R. K205, 245) Brown gave Henry $30 for some coins Henry had and $30 for the silverware. (R. K205) Henry and Dan left and Henry dropped Dan off at home. (R. K206) Henry went to Frank's Tavern where Henry had a couple of beers. (R. K206) Henry left. He got sleepy, so he pulled his car over and went to sleep in his car. (R. K207)

The next thing Henry remembered was police banging on his car window. (R. K208) Henry got out of the car, at which time police patted Henry down and handcuffed him. (R. K208) Police took Henry to the station and talked to Henry at 3:15 a.m. (R. K218) Henry did not remember telling police that when he found the bag he saw jewelry and plates inside the bag. (R. K218) Henry stated that he did not tell police about hearing a noise in the backyard because

-16-

they did not ask. (R. K229)

Henry talked to an assistant State's attorney at 9:00 a.m. (R. K218) Henry did not recall telling the State's attorney that when Henry put the bag in the car that he knew that it contained jewelry. (R. K219) Henry did not remember telling Assistant State's Attorney Stevens that after ringing the Larrys' doorbell, he went upstairs to go to sleep. (R. K232) Henry did not recall telling police at 3:15 a.m or State's Attorney Stevens at 9:00 or 9:30 a.m. that he "could have killed the woman but that [he] didn't remember." (R. K256-257)

Henry stated that he had never been in Ms. Nielsen's apartment. (R. K209) Henry testified that he had seen the decedent one time when Henry had been watching television, and decedent was on the back porch talking to Margaret. (R. K208) Henry stated that that was the only time he had ever seen Ms. Nielsen. (R. K209) Henry knew that Ms. Nielsen was an older woman but did not know that she lived alone. (R. K220)

Henry denied killing Ms. Nielsen. (R. K209) Henry denied using a glass cutter to cut the window on the back of decedent's house. (R. K254) Henry denied beating, stabbing or strangling decedent. (R. K255)

Pam Hines testified that she had formerly been Henry's girlfriend. (R. K152) Hines was not living with Henry at the time of Henry's arrest. (R. K152) Pam identified Henry's jacket in court and stated that the whole time Pam knew Henry he had that jacket. (R. K153) Pam stated that Henry would dress the same every day and that daily dress would include a flannel shirt, jeans, the jacket, and boots. (R. K154)

Pam stated that Henry was a construction worker and that when they lived together Henry helped with the upkeep of the building. (R. K154) Henry had an assortment of tools to fix

-17-

things including hammers, screwdrivers, wrenches, glass cutters, and pliers. (R. K154) Hines

stated that Henry was familiar with how to cut glass. (R. K158) Pam Hines identified the

Marshall Fields bag found in the trunk of Henry's car as looking like the bag that Henry put his

clothes and personal items in when he left the apartment they were sharing. (R. K156, K159)

In lieu of Elizabeth Finuchi's live testimony, the parties stipulated that if Elizabeth

Finuchi were called to testify she would state that she knew Henry and that on April 15, 1987, at

around 2:00 to 2:30 a.m., she and Daniel Funkhauser were drinking at a bar called "Our Place,"

where she saw Henry. (R. K164-165) At 4:00 a.m., Henry gave Elizabeth and Dan a ride home.

(R. K165) Elizabeth did not notice anything unusual about Henry or his clothes. (R. K166)

In rebuttal, Officer Bogucki testified that he talked to defendant at 2:15 a.m. on April 26,

1987 and that Henry said that he had been in the alley behind the Larrys' apartment to urinate

when he walked through the back yard and noticed a bag. (R. L44) Seeing that the bag had

jewelry and plates inside, Henry picked up the bag and put it in the trunk of his car. (R. L45)

Henry then walked back to the front, rang the doorbell and spoke to Margaret. (R. L45) When

Margaret told Henry that Dan was asleep, Henry went back to the car and left. (R. L45) Bogucki

stated that when he asked Henry about the crime, Henry stated that may have done it, but did not

remember. (R. L45) Bogucki asserted that Henry never said that he heard a noise or that the bag

was bloody, or that there was a bloody pillow case inside the bag. (R. L45) Bogucki further

averred that Henry never mentioned anything about Melrose Park or throwing the bag and case in

a dumpster. (R. L46)

Bogucki conceded that there was no written statement of the April 26th, 3:15 a.m.

conversation. (R. L47) When asked about the handwriting and signature on the police general

-18-

progress report concerning the conversation with defendant, Bogucki stated that Detective Mook wrote the report and that Bogucki signed Detective Schalk's name to the report. (R. L50) Bogucki admitted that Mook was not present at the time Bogucki interviewed Henry. (R. L50)

Assistant State's Attorney Stevens testified in rebuttal that on April 26th at 9:00 a..m, he talked with Henry and that Henry told him that during the morning of April 25th he drove his car into the alley behind 3507 Diversey to "take a leak," and that he found a bag in the gangway, took it to his car, and dumped it out in the trunk of his car. (R. L59-60) Stevens said that Henry related that he discovered that the bag contained jewelry. (R. L60) Henry went to the front of the building, rang the bell, went up to the second floor, and spent the night. (R. L60) Henry told Stevens that the blood stains on his clothing may have been the result of getting into a lot of fights. (R. L60) According to Stevens, Henry said that he could have killed the woman, but he did not remember. (R. L60) Stevens stated that Henry never said he heard a noise, that the bag was bloody, that he later found a bloody pillow case, or that he later threw the bag, the pillow case and the other items in a dumpster in Melrose Park. (R. L60) Stevens admitted that he took no notes of his conversation with Henry. (R. L61) When asked whether he had any difficulty understanding Henry, Stevens admitted that Henry spoke slowly. (R. L64)

Following a jury instruction conference, the parties presented closing arguments. (R. L66-L120) The judge instructed the jury on the three theories of murder and presented the jury with a general verdict form for murder. The jury subsequently returned a guilty murder verdict. (R. L133)

The judge denied defendant's motion for a new trial. (R. N3) At sentencing, the State urged that the court impose a natural-life sentence due to the brutal and heinous nature of the

-19-

offense.  Following argument, the judge imposed a sentence of natural life.  (R. N13)

Henry Kaczmarek appealed his murder conviction and sentence.  On December 27, 2000, the appellate court affirmed his conviction but vacated his natural-life sentence.  On May 30, 2002, this Court granted the State's petition for leave to appeal.

**ARGUMENT**

I.    **The Greatest Penalty Authorized By The Jury's Verdict Was 40 Years.**

       **Kaczmarek's Natural-Life Sentence For Murder Based On A Judicial Finding of**

       **Brutal And Heinous Must Be Vacated Where The Facts That Increased the**

       **Prescribed Range of Penalties Were Not Charged, Submitted To The Jury, Or**

       **Proved Beyond a Reasonable Doubt.**

Pursuant to first-degree murder charges, a jury by general verdict found Mr. Kaczmarek guilty of murder. (S. R. L133); Ill. Rev. Stat., ch. 38, sec. 9-1 (1987). At the time of the offense, Illinois provided that an offender could be sentenced for first-degree murder to a term of imprisonment of not less than 20 years and not more than 40 years. Ill. Rev. Stat., ch. 38, sec. 1005-8-1(a)(1)(a)(1987). The jury's verdict only authorized a maximum penalty of 40 years. Based upon a belief that the murder was brutal and heinous, the trial judge, however, sentenced Kaczmarek to a term of natural-life imprisonment. (R. N13); Ill. Rev. Stat., ch. 38, sec. 1005-8-1(a)(1)(b). Because the aggravating factor used to impose a natural-life sentence was never charged, submitted to the jury, and proved beyond a reasonable doubt, Henry Kaczmarek was denied his right to due process, his right to notice, and his right to trial by jury. U.S. Const. Amends. VI, XIV; *Apprendi v. New Jersey*, 530 U.S. 466 (2000) and *Ring v. Arizona*, 536 U.S. __, 122 S. Ct. 2428, 153 L.Ed 2d 556 (2002).

In accord with the appellate court's decision, Mr. Kaczmarek's sentence must be reduced to a sentence within the statutory range of 20 to 40 years. *People v. Kaczmarek*, 318 Ill. App.

340, 741 N.E.2d 1131 (1st Dist. 2000). On matters of statutory interpretation, the standard of

review is *de novo*. *People v. Swift*, No. 91840, 2002 Ill. LEXIS 954, at *10 (Nov. 21, 2002).

### 1. *Pursuant to Statute, 40 Years Was The Maximum Statutory Penalty For Murder*

The State argues that defendant's natural-life sentence did not exceed the statutory

maximum because in Illinois there is but one form of murder for which the maximum

punishment is death. (St. Br. 30-32) The United States Supreme Court rejected this precise

argument in *Ring v. Arizona*. *Ring*, 122 S.Ct at 2440. Likewise, this Court rejected this

argument in *People v. Swift*, No. 91840, 2002 Ill. LEXIS 954, at *15-16 (Nov. 21, 2002); slip op.

at 8-9. *Ring* and *Swift* firmly established that where the jury does not make a finding of fact of an

aggravating factor beyond a reasonable doubt, it is a constitutional violation for the trial judge to

increase a defendant's sentence on the basis of that aggravating factor. 122 S. Ct. at 2443; *Swift*,

2002 Ill. LEXIS 954, at *8-9; slip op. at 4.

In *Ring*, the defendant was convicted of armed robbery and felony murder. 122 S.Ct at

2433. In order for the defendant to receive a death sentence, the trial judge had to make a finding

that one of a series of enumerated statutory factors existed. *Id.* at 2434-2435. The trial judge in

*Ring* found two such factors: a) the crime was committed for pecuniary value, and b) the crime

was committed in a heinous, cruel and depraved manner, and sentenced defendant to death. *Id.*

at 2435. On appeal, the government argued that under Arizona law, the statutory maximum for

murder was death or life imprisonment and therefore Ring's death sentence was within the

statutory range for first-degree murder. The United States Supreme Court rejected the

government's argument, holding that Arizona's first-degree murder statute authorized a

"maximum penalty of death only in a formal sense." 122 S.Ct at 2440. Reiterating that the inquiry is "not one of form but effect," the Supreme Court held that "a defendant may not be 'exposed...to a penalty *exceeding* the maximum he would receive if punished according to the facts reflected in the jury verdict alone.'" 122 S.Ct. at 2439. Hence, where the findings of fact used to enhance defendant's sentence were not made by the jury beyond a reasonable doubt, but by the trial judge after the jury had entered its verdict, the defendant's sentence was unconstitutional. *Id.* at 2443.[1]

In the instant case, in "addressing" *Ring*, the State, after discussing *People v. Brownell*, 79 Ill. 2d 508, 404 N.E.2d 181 (1980) and the cases applying *Brownell*, merely states "But see *Ring v. Arizona.*" (St. Br. 32) The State offers no explanation as to why *Brownell* and its progeny survive *Ring*. To the extent that this Court in *People v. Davis*, No. 89704, 2002 Ill. LEXIS 286 (Feb. 22, 2002), cited approvingly to *Brownell*, that portion of *Davis* is no longer valid in light of *Ring*.

In 1987, "the sentencing range" for a non-extended term of imprisonment for first-degree murder was 20 to 40 years. *Swift*, 2002 Ill. LEXIS 954, at *22; slip op. at 11; Ill. Rev. Stat., ch. 38, sec. 1005-8-1(a)(1)(1987). Pursuant to *Swift*, "this is the only range of sentence permissible based on an ordinary jury verdict of guilt." *Swift*, 2002 Ill. LEXIS 954, at *22-23; slip op. at 11. An increased penalty of natural-life imprisonment may only be imposed upon a finding of a qualifying fact in addition to the elements of first-degree murder. Ill. Rev. Stat., ch. 38, sections 1005-8-1(a)(1); 1005-8-2(a)(1)(1987). Contrary to the holdings in *Swift* and *Ring*, here the trial

---

[1]The appellate court below forecasted the decision in *Ring*, noting the difficulties in reconciling *Walton* with *Apprendi*. *Kaczmarek*, 318 Ill. App. 3d at 351-352. *Ring*, citing *Kazcmarek*, 122 S.Ct at 2436.

judge, not the jury, made the finding that the killing was brutal and heinous. Hence, where the instant jury did not make specific findings of fact as to the aggravating factor beyond a reasonable doubt, the sentence imposed by the trial court violated Kaczmarek's right to trial by jury and due process of law.

### 2.    *This Case Does Not Fall Within the Ambit of Ford*

In *People v. Ford*, 198 Ill. 2d 68, 761 N.E.2d 735 (2001), this Court held that when a defendant is found eligible for the death penalty by proof beyond a reasonable doubt, by a jury or after a jury waiver, the court's imposition of a sentence of any term of years is not beyond the statutory maximum for the offense. Specifically, after the defendant waived a jury for both phases of the capital sentencing hearing and the trial court found beyond a reasonable doubt that defendant was eligible for the death, "defendant faced a prescribed statutory maximum sentence of death." *Ford*, 198 Ill. 2d at 74. The *Ford* Court concluded that the judge's subsequent finding that the murder "was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty" did nothing to increase the penalty that defendant faced. *See also People v. Hopkins*, 201 Ill. 2d 76, 773 N.E.2d 633 (2002)(where one extended-term factor was an element of crime which was proven beyond a reasonable doubt and on which jury returned a verdict, any other extended-term factors did not increase the maximum authorized sentence.)

In the instant case, as the State concedes, the prosecution did not, and could not seek the death penalty. (St. Br. 44, note 5) After Kaczmarek was convicted on retrial, no death penalty proceedings were conducted. Unlike *Ford*, here death could never be the prescribed statutory maximum. The instant case was not a capital case. Ill. Rev. Stat., ch. 38, sec. 9-1(b); 9-

-24-

1(d)(1987).  Thus, the maximum sentence authorized by the jury's verdict was 40 years.

### A.    Jury's General Verdict Of Guilty of Murder Did Not Authorize Death

The State asks this Court to apply *Ford* to this case even though the jury made no finding

that the State proved a death-eligibility factor beyond a reasonable doubt.  (St. Br. 34)  The jury

returned only a general verdict finding Kaczmarek guilty of murder after being instructed that it

could convict defendant of murder on one of three theories:  intentional, knowing, or felony

murder.  (C. 152)  The State argues that this general verdict can be construed as a finding of a

death-eligibility factor authorizing imposition of a natural-life sentence.  (St. Br. 34)  No specific

finding, however, can be deduced from the general jury verdict.  Such a construction would

violate this Court's directive in *People v. Ramey*, 151 Ill. 2d 598, 545, 603 N.E.2d 519 (1992),

where the Court held that when the sentencing jury's verdict omitted a requisite mental state, the

general jury's verdict for murder could not act as a substitute, and the error could not be

considered harmless.

In *Ramey*, defendant was charged with alternative types of first-degree murder as well as

with home invasion, aggravated unlawful restraint, and possession of a motor vehicle.  The jury

returned a general verdict of guilty of murder and a guilty verdict as to the other felonies.  The

jury subsequently found defendant death eligible and found no factors to preclude the imposition

of the death penalty.  On appeal, defendant argued that the jury's verdict at the capital sentencing

hearing was legally insufficient because it omitted a necessary mental state.  The State argued

that the jury's general guilty verdict of murder at the guilt phase supported the imposition of the

death penalty.  *Ramey*, 151 Ill. 2d at 545.  In rejecting the State's argument, the *Ramey* Court

-25-

held that the general verdict could not cure the defective sentencing verdict. Further, the Court rejected the State's argument that defendant's intent could be found from the evidence. *Ramey*, 151 Ill. 2d at 545.

Likewise, in *People v. Mack*, 167 Ill. 2d 525, 658 N.E.2d 437 (1995), this Court found that where the jury's verdict at sentencing omitted a necessary mental state, a guilty determination at trial could not act as a substitute. The *Mack* Court stressed that because the jury never expressed a conclusion as to whether defendant possessed the required mental state, the eligibility verdict was legally insufficient. The court emphasized that the process of interpreting a jury's verdict "should not become a speculative attempt to reconstruct the jury's deliberation and divine its unexpressed conclusions." *Mack*, 167 Ill. 2d at 536. *See People v. Crite*, 261 Ill. App. 3d 1041, 1046, 634 N.E.2d 487, 490 (2nd Dist. 1994) ("It was not the trial court's function, nor is it ours to speculate on the jury's verdict.") *See* also *People v. Williams*, 193 Ill. 2d 1, 42-43, 737 N.E.2d 230 (2000)(Court recognized that although a general guilty verdict is sufficient to sustain a conviction as charged in the indictment, where a sentencing jury's verdict omits a requisite element such as mental state, the verdict is insufficient and the error not harmless.)

In the instant case, the State prosecuted Kaczmarek on murder only. The jury was given one jury verdict: guilty or not guilty of murder. (C. 155-156) The court did not give the jury specific verdicts for each theory of murder. Further, the State did not prosecute any of the underlying felonies nor was the jury given verdicts for any underlying felonies. The jury signed only one jury verdict: guilty of murder. (C. 152) Contrary to the State's argument, no specific finding of a death-eligibility factor can be deduced from a jury's general verdict of guilty at trial.

The State relies on *People v. Rivera*, ___ Ill. App. 3d ___, 777 N.E.2d 360 (2nd Dist. 2001),

to argue that in the instant case the jury found all the relevant facts necessary to authorize a death sentence. (St. Br. 32-33)  To the extent that it can be argued that *Rivera* survives *Ring* and *Swift*, *Rivera* is inapposite to the case at bar.  In *Rivera*, defendant was charged with murder under three different theories: intentional, knowing, and felony murder.  At trial, the court instructed the jury as to each theory.  Critically, the jury was provided with separate sets of jury verdicts allowing the jury to find defendant guilty or not guilty of each type of murder.  The *Rivera* jury specifically returned a verdict as to guilty of felony murder.  *Rivera*, 777 N.E.2d at 368.  The court imposed a natural-life sentence based upon the victim being under age 12 and the offense being brutal and heinous.  Although the State did not seek the death penalty, the *Rivera* Court held that the jury's felony-murder finding authorized a sentence up to natural-life imprisonment.

In contrast to *Rivera*, in the case at bar, the jury made no specific findings on the murder charges.  The jury did not make a separate finding on felony murder or the underlying felonies. Nothing can be deduced from the jury's general verdict of guilty of murder.  *Ramey*; *Mack*. Thus, the State's reliance on *Rivera* fails.

### B.   Section 9-1(a)(3) Is Not Equivalent to Section 9-1(b)(6)

*Rivera* was wrong to equate the section 9-1(a)(3) felony-murder provision with the section 9-1(b)(6) felony-murder finding necessary for death eligibility.  *Rivera*, 777 N.E.2d at 368-369; Ill. Rev. Stat., ch. 38, sec. 9-1(a)(3); 9-1(b)(6)(1987).  To make a finding of death eligibility based on felony murder, the trier of fact must find, in relevant part:

- that the murdered individual was killed in the course of another felony;

- the murdered individual was actually killed by the defendant or received physical injuries

personally inflicted by the defendant;

- defendant acted with the intent to kill the murdered individual or with the knowledge that his acts created a strong probability of death;

- defendant was over age 18; and

- the decedent was killed in one of the enumerated felonies.

Ill. Rev. Stat., ch. 38, sec. 9-1(b)(6) (1987). The Illinois pattern instructions specifically set forth what the jury must find to return a verdict that a defendant is death eligible. For death eligibility based on felony murder, the I.P.I. issues instruction reads:

> 7B.07    Issues Concerning Eligibility
>
> Before the defendant may be found eligible for a death sentence under the law, the State must prove the following propositions:
>
> First Proposition: That the defendant was 18 years old or older at the time of the commission of the murder of which he was found guilty at the trial of this case; and
>
> Second Proposition: That [the following statutory] aggravating factor exists:
> *          *          *
> [6] The murdered person was killed in the course of another felony if
> [a] the murdered person was actually killed by the defendant; and
> *          *          *
> [c] in performing the acts which caused the death of the murdered person, the defendant acted with the intent to kill the murdered person or with the knowledge that his acts created a strong probability of death or great bodily harm to the murdered person; and
> *          *          *
> [e] the other felony [was one or more of the following:] .... (armed robbery)(home invasion). I.P.I. Criminal 7B.07 (3rd Ed. 1992)

A section 9-1(b)(6) finding, thus, requires not only that the defendant commit a felony murder but also requires that defendant must meet an age requirement, that defendant personally inflict the injuries and not merely be accountable for someone else's acts, and that decedent be killed knowingly or intentionally.

Here, the jury never made a finding that defendant was over the age of 18, that the defendant committed the murder in the course of another felony or that decedent was killed knowingly or intentionally. A section 9-1(a)(3) finding is not equivalent to a finding of death eligibility under 9-1(b)(6). Clearly, the jury's verdict at trial cannot substitute for the requisite findings of death eligibility.

Further, the criminal code requires that statutory aggravating factors be proven beyond a reasonable doubt at a separate sentencing hearing. Ill. Rev. Stat., ch. 38, sec. 9-1(d). When the State seeks the death penalty, a separate sentencing hearing is required. *Swift*, 2002 Ill. LEXIS 954, at *13; slip op. at 7. It is only at this hearing that the fact-finder determines whether defendant is death eligible. The State is "yoked anew with the burden" of establishing death eligibility. *People v. Fuller*, No. 89220, 2002 Ill. LEXIS 287, at *58 (Feb. 22, 2002). In the case at bar, death was not sought and a separate section 9-1(d) hearing was not held. Thus, the State's argument that the range of sentence was 20 to death is untenable.

### C. *Residential Burglary Cannot Serve As A Basis For A Section 9-1(b)(6) Finding*

In the instant case, the jury made no specific factual findings. Further, even had the jury entered a specific finding as to felony murder, one of the grounds for felony murder that the jury was instructed on, was residential burglary. At the time of the offense, residential burglary was not a permissible basis for the death penalty. *People v. Simms*, 143 Ill. 2d 154, 572 N.E.2d 947 (1991) (defendant's death sentence vacated, where the jury could have found defendant death eligible based on residential burglary which was not a permissible basis at the time for the death penalty.)

-29-

In *Simms*, the jury was instructed that defendant was eligible for death if he committed a murder in the course of a residential burglary, as well as in the course of a home invasion, armed robbery, and aggravated criminal sexual assault. The jury returned a general verdict finding defendant eligible for the death penalty. At the time of defendant's sentencing hearing, residential burglary did not support death eligibility. Recognizing that the jury's death-eligible verdict may have been based on the fact that the murder occurred in the course of a residential burglary, the Court vacated defendant's death sentence. *Simms*, 143 Ill 2d at 169. *See also Stromberg v. California*, 283 U.S. 359, 361 (1931) (where defendant was found guilty upon a statute later held unconstitutional in part, the Court ruled that defendant's conviction based on a general guilty verdict could not stand because it was impossible to determine under which clause of the statute the conviction was obtained, and it could not be assumed that the defendant was found guilty under the constitutional clause.); *Schad v. Arizona*, 501 U.S. 624 (1991) (in discussing what constitutes an "unanimous verdict," Court recognized that a jury may convict a defendant of first-degree murder without agreeing on whether the defendant was guilty of premeditated murder or felony murder.)

In the case at bar, in addition to the jury being instructed on felony murder based upon the underlying felonies of home invasion and armed robbery, the jury was instructed that they could find defendant guilty of murder based upon residential burglary. (C. 167-168) In 1987, residential burglary was not an enumerated offense under the statutory aggravating factors. Ill. Rev. Stat., ch. 38, sec. 9-1(b)(6)(c)(1987). As the State concedes, defendant could not be found death eligible based upon murder in the course of a residential burglary. (St. Br. 44, n. 5) Thus, because the jury was instructed on residential burglary, even a specific finding as to felony

-30-

murder would have been insufficient to authorize a sentence greater than 40 years under *Simms* and *Stromberg*. Certainly, where a specific finding would not suffice, necessarily, then, a general verdict cannot suffice.

The State asserts that "at defendant's first trial, the jury expressly found defendant guilty of armed robbery and home invasion in addition to the murder." (St. Br. 33) Defendant strenuously objects to any reference to findings made by the jury at defendant's first trial. This Court should disregard all references made by the State to defendant's "initial trial." (St. Br. 32, 33-34, 44) The appellate court vacated that conviction and remanded for a new trial. *People v. Kazcmarek*, 243 Ill. App. 3d 1067, 613 N.E.2d 1253 (1st Dist. 1993). Thus, any determination made by the first jury is nonexistent. *See Simms,* 143 Ill. 2d at 173 (where court rejected State's suggestion to use findings made at prior proceeding which had been previously vacated by the court.)

The State misleadingly asserts that "the jury in defendant's second trial was not asked to find defendant guilty of armed robbery and home invasion since the appellate court had not ordered a new trial on those counts," and thus the jury on retrial was instructed only on intentional, knowing, and felony murder. (St. Br. 34) The appellate court did not order a new trial on the offenses of armed robbery, home invasion, and residential burglary, because no sentence had been entered and thus there was no final judgment being appealed on those counts. *Kazcmarek*, 243 Ill. App. 3d at 1082.[2] The State did not appeal the appellate court's decision

---

[2] Notably, in defendant's appeal following the first trial, defendant challenged defendant's home invasion, armed robbery, and residential burglary convictions on grounds of insufficiency of evidence. The appellate court found the evidence insufficient and reversed those convictions. (*see* discussion at C. 129-131) The appellate court subsequently, *sua sponte*, withdrew its opinion and its finding concerning the insufficiency of the evidence on the felonies,

concerning the underlying felonies and no sentence was ever entered. At defendant's second trial, the only charge the State pursued was murder. The State did not seek convictions for any underlying felonies. When the appellate court remanded the cause for a new trial, all findings made by the first jury were of no consequence.

The jury's general guilty verdict for murder authorized a maximum sentence of 40 years. Unlike *Ford*, the range of sentence here was not 20 to natural life or death, but 20 to 40 years. Mr. Kaczmarek's natural-life sentence exceeded the bounds of the jury's verdict.

### 3. Kaczmarek Was Not Given Notice of The Element Used to Enhance His Sentence

The State concedes that under the Sixth Amendment, a defendant is entitled to "reasonable notice of a charge." (St. Br. 35) The State argues that the defendant here received "adequate notice in the indictment that he could potentially receive the death penalty." (St. Br. 37) Specifically, the State contends that the indictment "gave sufficient notice that defendant was facing the death penalty based on the murder in the course of another felony aggravating factor." (St. Br. 34-39) The State cites to defendant's "initial trial" in 1989 where the State sought the death penalty to conclude that it "cannot be said that defendant was hindered in preparing his defense." (St. Br. 38-39)

The flaw in the State's argument is that at defendant's 1996 trial, defendant was not preparing for a range of sentence of 20 years to death – death was not a possibility. The State

---

ruling that since no sentences had been entered on the home invasion, armed robbery and residential burglary convictions, there was no final appealable order. *Kazcmarek*, 243 Ill. App. 3d at 1082. This Court can take judicial notice of these court records. *People v. Alexander*, 40 Ill. App. 3d 457, 352 N.E.2d 245, 247 (1st Dist. 1976); *In re Brown*, 71 Ill. 2d 151, 155, 374 N.E.2d 209 (1978).

-32-

could not seek the death penalty at defendant's second trial due to a double jeopardy bar. (St. Br. at 44, n. 5) The State, hence, cannot simultaneously allege both that "defendant received adequate notice in the indictment that he could potentially receive the death penalty," while also conceding that death was not an option. (St. Br. 37; 44, n. 5)

The charging instrument never put Kaczmarek on notice that he needed to defend against a finding of section 9-1(b)(6) aggravating factors. The State proceeded only on the charge of murder. The State's reliance on *People v. Brownell*, 79 Ill. 2d 508, 4040 N.E.2d 181 (1980), to argue that an indictment charging murder put defendant on notice that the State could seek the death penalty, is misplaced. (St. Br. 37) In *Brownell*, the Court held that the indictment need not include death-eligibility factors when a defendant is charged with murdering a decedent in the course of certain other felonies. The State, in *Brownell*, however, proceeded on the underlying felonies of aggravated kidnaping and rape as well as murder. In the case at bar, the State did not proceed on the underlying felonies. Further, although this Court in *People v. Davis*, No. 89704, 2002 Ill. LEXIS 286 (Feb. 22, 2002), cited approvingly to *Brownell*, unlike *Brownell* and *Davis*, here, defendant was only tried on murder. Therefore, the maximum prescribed sentence could under no circumstances have been death.

The State argues that defendant was not prejudiced by any defect in the indictment and that he has waived any challenge to the sufficiency of the charging instrument. (St. Br. 38). The State's citation to *People v. Thingvold*, 145 Ill. 2d 441, 584 N.E.2d 89 (1991), supports defendant's position. The *Thingvold* Court affirmed that the indictment or information "apprise[] the accused of the precise offense charged with sufficient specificity to prepare his defense..." *Thingvold*, 145 Ill. 2d at 148. Here, the indictment made no mention that defendant would have

-33-

to convince the jury that he was not death eligible.

Kaczmarek prepared a defense to murder. He had no notice that he would also be required to defend against death eligibility. Lacking knowledge of the precise offense with which he or she is charged, a defendant cannot make intelligent decisions on such critical matters as trial strategy, what defense to put on, what witnesses to call, what facts to concede, or what cross-examination to conduct. Additionally, a lack of information as to the charge a defendant is facing adversely affects decisions on whether to engage in plea-negotiations or not.

The United States Supreme Court's decision in *United States v. Cotton*, 535 U.S. ___, 122 S. Ct 1781 (2002), in which the Court held that a defendant is entitled to notice of sentencing enhancers, is instructive. Contrary to the State's contention, *Cotton*'s holding on notice is not merely applicable to federal courts but also state courts as illustrated by the state courts which, following *Apprendi*, require that defendant be given notice of additional sentencing enhancers. (St. Br. 35) *See State v. Seilert*, 29 Kan. App. 2d 489, 490, 28 P.3d 445 (2001) ("notice and jury trial guarantees of the Sixth amendment" must be satisfied); *People v. Martinez*, 32 P. 3d 520, 530 (Col. App. 2001) (no *Apprendi* violation where, *inter alia*, there was "proper notice to defendant"); *State v. Ouellette*, 145 N.H. 489, 491, 764 A.2d 914 (2000) (State failed to satisfy "*Apprendi's* indictment requirement"); *People v. Lucas*, 353 N.C. 568, 598, 548 S.E.2d 712 (2001) (statutory factors supporting an enhanced sentence must be charged in the indictment).

Should this Court accept the position that sentencing enhancers need not be charged, defendant would have to prepare for, submit evidence concerning, and argue at trial that unknown sentencing enhancers were not applicable, "just in case," he or she would have to later defend against such an allegation. Notably, since *Apprendi*, the Illinois general assembly has

-34-

amended the criminal code to specifically require that a defendant be given notice of the element

which is used to enhance a defendant's sentence. *See People v. Holloway*, 177 Ill. 2d 1, 11, 682

N.E.2d 59 (1997) (Court recognized that legislature's attempt to amend a statute could be viewed

as an attempt by the legislature to change the law in response to the court's decisions).

In 2001, the general assembly passed legislation amending the criminal code to provide

the constitutional protections required by *Apprendi*. The legislature enacted Public Act 91-953

which requires that any alleged fact used to increase the range of penalties beyond the statutory

maximum "must be included in the charging instrument or otherwise provided to the defendant

through a written notification before trial, submitted to a trier of fact as an aggravating factor, and

proved beyond a reasonable doubt." 725 ILCS 5/111-3 (2001). By enacting P.A. 91-953 on the

heels of *Apprendi*, the legislature recognized the constitutional infirmities in Illinois' criminal

code and the need to rectify the statutory structural defects.

Because death eligibility was never charged, submitted to the jury, and proved beyond a

reasonable doubt, Henry Kaczmarek's natural-life sentence must be vacated

### 4.    *The Element of Brutal and Heinous Was Not Charged, Submitted to A Jury, Nor Proven Beyond a Reasonable Doubt.*

At sentencing, the State argued that defendant should be given a natural-life sentence

based upon the offense being brutal and heinous. Following the State's argument, the judge

imposed a natural-life sentence. (R. N13) In its brief, the State asserts that defendant's natural-

life sentence was proper based on an extension of *Ford*. (St. Br. 32) Because the State only

advances arguments concerning death eligibility, the State implicitly concedes that a brutal and

heinous determination in the instant case could not serve as grounds for a natural-life sentence.

When a defendant is found guilty of "exceptionally brutal or heinous behavior" and "wanton cruelty," this adds additional "elements of the offense" transforming the ordinary offense into a greater offense with a more culpable *mens rea* and *actus reus* than the ordinary offense. Pursuant to *Swift* and *Apprendi*, a brutal and heinous determination is a factual finding which takes the sentence above the sentencing range and which must be proven to a jury beyond a reasonable doubt. *Swift*, 2002 Ill. LEXIS 954, at *23; slip op. at 12; *Apprendi*, 530 U.S. at 494.

Based upon a belief that the murder was brutal and heinous, the trial judge sentenced Kaczmarek to a term of natural-life imprisonment. (R. N13); Ill. Rev. Stat., ch. 38, sec. 1005-8-1(1)(a)(1)(b)(1987). Where the question of whether the offense was "exceptionally brutal or heinous indicative of wanton cruelty" was never charged, submitted to the jury and proved beyond a reasonable doubt, Henry Kaczmarek was denied his right to due process, his right to notice, and his right to trial by jury. Accordingly, defendant's sentence must be reduced to a sentence within the statutory range of 20 to 40 years.

### 5. *The Failure to Find an Element of the Offense Cannot Constitute Harmless Error*

The State alternatively argues that any error was harmless and that a "constitutional error does not automatically require reversal." (St. Br. 39) Initially, it should be noted that the State failed to make this argument in the appellate court and, thus, the argument is waived. *People v. O'Neal*, 104 Ill. 2d 399, 407, 472 N.E.2d 471 (1984) (principle of waiver applies to the State as well as defendant). Even were the issue not waived, the State's waiver argument is without basis.

-36-

The State contends that the record "clearly reflects" that defendant murdered decedent in a "brutal or heinous fashion indicative of wanton cruelty." (St. Br. 44)  The State further avers that "any rational trier of fact would have found that at least one of the death penalty eligibility factors were present in the instant case." (St. Br. 44)  The State, thus, concludes that any *Apprendi* violation was harmless because "one of the requisite factors" necessary to impose a natural-life sentence was established beyond a reasonable doubt. (St. Br. 45)

The flaw in the State's argument is its characterization of the jury's failure to make requisite factual findings as trial error, rather than structural error, and therefore, subject to a harmless error analysis. (St. Br. 40-45)  The State relies on *Neder v. United States*, 527 U.S. 1 (1999) and cases applying *Neder* to argue that the instant error was harmless. (St. Br. 40-42)  *Neder*, however, is inapplicable to the case at bar.

In *Neder*, the United States Supreme Court held that the judge's failure to instruct the jury on the "materiality" element of false statements by the defendant to lenders and tax authorities was harmless because the evidence supporting that element was overwhelming and defendant did not contest the issue.  The Court held that if the missing element was uncontested, and supported by overwhelming evidence, a harmless error analysis would apply.  *Neder*, 527 U.S. at 17.

*Neder* is altogether different from the instant case.  In *Neder*, the parties proceeded as if the element missing from the instructions was an essential part of the State's case.  The defendant had notice of the "materiality" element in the charging instrument, put on a defense that did not revolve around that element, and did not contest that element.  Conversely, in the case at bar, defendant did not proceed as if the cause was a capital case.  At the time the defendant was tried and sentenced, according to statute, the aggravating factors were <u>not</u>

-37-

elements of the offense. Unlike the circumstances in *Neder*, Kaczmarek had no reason to mount a defense against those factors, nor make a strategic decision as in *Neder* to not contest the materiality element.

The entire statutory scheme at issue produces "structural" rather than mere "trial" error. A mere "trial error" occurs during the presentation of the case to the jury and may be quantitatively assessed in the context of the evidence presented to determine if the error is harmless. *Arizona v. Fulminante*, 499 U.S. 279, 308 (1991). On the other hand, a "structural error" occurs when "the entire conduct of the trial from beginning to end is obviously affected" and the "criminal trial cannot reliably serve its function as a vehicle for determination of guilt or innocence, and no criminal punishment may be regarded as fundamentally fair." *Arizona v. Fulminante*, 499 U.S. at 309-310. Such errors violate a "basic protection whose precise effects are unmeasurable, but without which a criminal trial cannot reliably serve its function." *Sullivan v. Louisiana*, 508 U.S. 275, 281 (1993).

Where a defendant is charged and tried for one offense, only to be later found guilty of a greater offense by a preponderance of evidence, without a jury adjudication, this is a "structural error" infecting the entire trial process from beginning to end. One cannot know, from the evidence presented, what outcome would have occurred if the defense had pursued different strategies, introduced different evidence, engaged in differing cross-examination, and the like. The results of such misinformation are "unmeasurable," and so skew the entire trial process that the trial "cannot reliably serve its function," and is "fundamentally unfair." *See Arizona v. Fulminante*, 499 U.S. at 309.

The State argues that "at its core," the instant deprivation is the same as "a failure to

-38-

instruct the jury on all elements of an offense." (St. Br. 40)  The State's argument is flawed.

When an error is confined to the jury instructions, the reviewing court can look at the evidence

presented to determine whether a jury, if properly instructed, could have reached a different

determination.  In contrast, the error here was so global that a reviewing court cannot assess from

the evidence whether the error was harmless because the parties had no reason to proceed as if

the omitted elements were at issue.  Consequently, there is no way of knowing if the outcome of

the proceedings would have been the same because defendant did not know he also had to defend

against a brutal and heinous determination and death-eligibility determination in addition to

defending against the charges set forth in the indictment.

The State's reliance on harmless error cases in which the jury was not correctly instructed

is misplaced.  (St. Br. 40-41, 43, citing *People v. Jones*, 81 Ill. 2d 1, 405 N.E.2d 343 (1979);

*People v. Leger*, 149 Ill. 2d 355, 597 N.E.2d 586 (1992); *People v. Armstrong*, 183 Ill. 2d 130,

700 N.E.2d 960 (1998)).  *Jones*, *Leger* and *Armstrong*, were all jury instruction cases where the

failure to submit the intent element of the offenses to the jury was deemed harmless.  In those

cases, all of which pre-date *Apprendi*, the reviewing courts were able to determine from the

evidence adduced whether the error was harmless beyond a reasonable doubt.  *See People v.*

*Carter*, 332 Ill. App. 3d 576, 582, 773 N.E.2d 1140 (1st Dist. 2002) (in finding *Apprendi*

violation not harmless, court distinguishes *Jones*, *Leger* and *Armstrong*).  In the instant case,

defendant had no reason to defend at trial against a determination that the offense was

exceptionally brutal or heinous indicative of wanton cruelty or death eligibility.

In the cases relied on by the State, defendant's sentence was enhanced by a factor that

was easily discernible at trial, such as the age of the victim, or the quantity of drugs in

-39-

defendant's possession. (St. Br. 42-43) Here, the offense was enhanced based on the trial court's determination that the crime was exceptionally brutal and heinous. A finding that the crime was exceptionally brutal and heinous indicative of wanton cruelty is a factual question which involves weighing of the evidence at trial. *Carter*, 332 Ill. App. 3d at 581. "While one rational jury could find that an offense was exceptionally brutal and heinous, another could find the opposite based on the same evidence." *People v. Bryant*, 325 Ill. App. 3d 448, 457-458, 758 N.E.2d 430 (1st Dist. 2002). The terms "brutal" and "heinous" are subject to "various interpretations" and "reasonable juries could disagree." *Carter*, 332 Ill. App. 3d at 581; *Bryant*, 325 Ill. App. 3d at 458. Thus, a harmless error analysis is inapplicable.

The State's reliance on *People v. Gholston*, 332 Ill. App. 3d 179, 772 N.E.2d 880 (1st Dist. 2002), which discussed whether the failure to allow a jury to make a "brutal and heinous" determination could be harmless, is misplaced. (St. Br. 43) The *Gholston* Court, although declaring that no reasonable and rational jury would have found the crimes not to be brutal and heinous, was evaluating whether *Apprendi* should be applied retroactively on post-conviction appeal. *Gholston* was not deciding the merits of whether the safeguards in *Apprendi* were violated when defendant was sentenced to a greater sentence based upon the judge's finding of brutal and heinous. Notably, this Court in *Swift,* after finding that the judge's brutal and heinous determination exceeded the factual finding made at trial and thus violated *Apprendi*, remanded the cause for resentencing without a discussion of harmless error.

The State's reliance on the federal cases of *U.S. v. Nance*, 236 F.3d 820 (7th Cir. 2000), *U.S. v. Anderson*, 236 F.3d 427 (8th Cir. 2001), and *U.S. v. Terry*, 240 F.3d 65 (1st Cir. 2001), is likewise misplaced. (St. Br. 42-43) Those cases involved specific quantities of drugs in which

-40-

the reviewing courts held the error harmless. As held in *Carter*, unlike "an amount of narcotics, where there can be specific evidence presented at trial indicating the exact quantity of narcotics involved, a finding that the crime was exceptionally brutal and heinous indicative of wanton cruelty is a factual question involving weighing evidence." *Carter*, 332 Ill. App. 3d at 581. Likewise, *People v. Peacock*, 324 Ill. App. 3d, 756 N.E.2d 261 (1st Dist. 2001), *People v. Blackwell*, 325 Ill. App. 3d 354, 757 N.E.2d 589 (1st Dist. 2001), and *People v. Pearson*, 324 Ill. App. 3d 622, 756 N.E.2d 438 (4th Dist. 2001), all involved the age of the victim, another easily ascertainable fact. (St. Br. 43)  Notably, the *Peacock* Court contrasted the nature of a brutal-heinous determination with an age finding. *Peacock*, 324 Ill. App. 3d at 761.

The *Apprendi* violation in the instant case cannot be deemed harmless beyond a reasonable doubt. The error was a structural error that went to the foundation of defendant's fundamental rights. Here, where Kaczmarek did not know he had to defend against an aggravating factor used to impose a natural-life sentence, the error cannot be deemed harmless.

### Conclusion

The highest punishment Henry Kaczmarek could have received based solely on the facts reflected by the jury's verdict was 40 years' imprisonment. The jury's verdict authorized no greater penalty. *Kazcmarek*, 318 Ill. App. 3d at 353. The appellate court correctly held that defendant's constitutional rights were violated and that defendant's natural-life sentence must be vacated. Where Mr. Kaczmarek was denied his constitutional right to have all elements which increased his sentence submitted to a jury, proven beyond a reasonable doubt, and charged, Mr. Kaczmarek's sentence must be reduced to a sentence within the range of 20 to 40 years.

II.     **Defendant's Constitutional Right to a Speedy Trial Was Denied Where Three and One Half Years Elapsed Between The Reversal of Defendant's Murder Conviction and His Second Trial and Where Defendant Was Not Responsible for a Bulk of the Delay.**

On March 31, 1993, the appellate court reversed defendant's murder conviction and remanded the case for a new trial. *People v. Kaczmarek*, 243 Ill. App. 3d 1067, 613 N.E.2d 1253 (1st Dist. 1993). The State did not bring defendant to trial until November, 1996, over three and one half years after the reversal of his conviction. The State must make "a diligent good-faith effort in bringing the matter to retrial without unreasonable and unnecessary delay." *People v. Williams*, 299 Ill. App. 3d 143, 147, 700 N.E.2d 753, 756 (1st Dist. 1998). The criteria for evaluating a constitutional speedy trial violation was set out in *Barker v. Wingo*, 407 U.S. 514, 519 (1972). Pursuant to *Barker v. Wingo*, the lengthy delay in the instant case resulted in a violation of defendant's constitutional right to a speedy trial, and thus defendant's conviction must be reversed.

Both the Federal and Illinois Constitutions guarantee a right to a speedy trial. U.S. Const., amends. VI, XIV; Ill. Const., art. I, sec. 8; *People v. Singleton*, 278 Ill. App. 3d 296, 662 N.E.2d 580, 582 (1st Dist. 1996). Illinois' Speedy Trial Act implements the constitutional right to a speedy trial, but is not coextensive with it. *People v. Bazzell*, 68 Ill. 2d 177, 369 N.E.2d 48, 49 (1977). The speedy-trial right is "generically different" from other constitutionally guaranteed protections because "there is a societal interest in providing a speedy trial which exists separate from, and at times in opposition to, the interests of the accused." *Barker*, 407 U.S. at 519;

-42-

*People v. Crane*, 195 Ill. 2d 42, 47, 743 N.E.2d 555 (2001). Society's interests are not served "when delay in prosecution contributes to court backlog, allows defendants released on bail an opportunity to commit more crimes, prevents defendants from receiving rehabilitation, and lengthens pretrial detention, which causes overcrowding in jails and is costly." *Crane*, 195 Ill. 2d at 47, citing *Barker*, 407 U.S. at 520.

The four factors that courts should assess in determining whether a defendant has been deprived of his constitutional right to a speedy trial are: 1) length of delay; 2) reasons for the delay; 3) defendant's assertion of his right; and 4) prejudice to defendant. *Barker v. Wingo*, 407 U.S. at 530-532; *Bazzell*, 369 N.E.2d at 50. In the instant case, each of the four factors weighs in defendant's favor.

## FACTOR #1

The threshold question in a *Barker* analysis is whether the delay is presumptively prejudicial. If a delay is presumptively prejudicial, then the court should go on to balance the remaining three factors. *People v. Belcher*, 186 Ill. App. 3d 202, 542 N.E.2d 419, 422 (2d Dist. 1989). In the case at bar, the entire length of the delay between reversal of defendant's conviction and his second trial was about three and one half years. (C. 8; H32) One year is the generally recognized dividing point between ordinary and presumptively prejudicial delay. *Doggett v. United States*, 505 U.S. 647, 652, fn 1, (1992); *Singleton*, 662 N.E.2d at 582. The delay in this case was presumptively prejudicial. In evaluating the four *Barker* criteria, the appellate court correctly found the first factor presumptively prejudicial to the defendant. *People*

*v. Kaczmarek,* 2000 Ill. App. LEXIS 999, at *29.[3]

## FACTOR #2

The second *Barker* factor is reason for the delay. The basis for the bulk of the delay in the case at bar must be weighed against the State. For two years, the State was trying to get additional evidence to retry defendant. In its brief in the appellate court, the State conceded that "the record establishes that DNA testing was the cause for the delay." (St. Br. 53; app. no. 97-2557)

In November of 1993, the State advised the court that it was seeking a blood splatter expert. (S.R. 49, 54) In February, 1994, the State informed the court that it was still trying to get an expert for retrial. (S.R. 64) In June, 1994, the State requested a continuance to conduct DNA testing. (C. 248) The State told the court that it would have the results in August or September. (C. 250) In September, October, November, and December of 1994, the State averred that it was still waiting on the DNA testing. (C. 257, 261, 277, 283)

In January of 1995, the State filed a motion to compel defendant to tender previous written DNA findings to the State. (C. 106) In March of 1995, the State asserted that it needed more time because defendant had failed to turn over defense DNA test results done at the time of defendant's first trial. (S.R. 84) Defendant had in fact tendered the results of the DNA testing from the first trial in November of 1989. (S.R. III 34)

In May of 1995, the State advised the court that the Chicago Crime Lab was "in the

---

[3]The appellate court's discussion of the constitutional speedy trial violation was addressed in the unpublished portion of the opinion.

-44-

middle" of the DNA testing. (S.R. 93)  The prosecutor asserted that the State had "been waiting

for [defendant's DNA] results for 6 years, I mean it is time they tendered them to me." (S.R. 93)

In October of 1995, the State asserted that it still did not have the DNA results but had "expected

to have them done by this week." (C. 128)  At defendant's November, 1996 trial, Serologist Pam

Fish testified that the results of her DNA tests on defendant's jacket were inconclusive and the

sample from defendant's pants was too small and degraded to test.  (R. J163)

In *People v. Battles,* 311 Ill. App. 3d 911,724 N.E.2d 997 (5th Dist. 2000), the court

expressed its disapproval of delay caused by efforts to obtain DNA results.  In discussing Section

103-5(c) which permits an additional 120-day continuance to obtain DNA results upon a showing

of due diligence, the *Battles* Court emphasized that Section 103-5(c) did not provide a "refuge ...

for cases where the need for additional time to conduct testing stemmed from the State's neglect

or lack of effort." *Battles,* 724 N.E.2d at 999; 725 ILCS 5/103-5(c).  Concerning the length of

time necessary to conduct DNA testing, the court observed that the "**actual testing took less**

**than 22 days**." *Battles,* 724 N.E.2d at 1005 (emphasis added).

In accord with *Battles* where the actual testing took less than 22 days, here the State

pronounced that Serologist Fish's tests would only take "a few weeks." (S.R. 100)  In fact, the

State, at a very minimum, took 1 ½ years to obtain DNA results.  Contrary to the appellate

court's statements that defendant below either caused or contributed to nearly all the pre-trial

delay, it is clear that the delay was caused by DNA testing ordered at the State's behest.

Although *Battles* involved Section 103-5(c) and the instant case did not, the *Battles* Court

expressed its disapproval of the State's lack of effort in obtaining DNA results in a timely

fashion.  Further, the State's claim in March, 1995, that delay was required because of

-45-

defendant's failure to tender DNA material was disingenuous as defendant had tendered DNA results six years earlier in 1989. (S.R. III 34) By delaying trial for an unacceptable length of time under the posture of attempting to obtain DNA evidence, the State abrogated Mr. Kaczmarek's constitutional right to a speedy trial.

Additionally, it must be recognized that the State was not merely asking for more time to obtain DNA testing but also to secure a blood splatter expert. State witnesses Rodney Englert and Mitchell Rea examined the physical evidence in the Spring of 1994. (R. K26, K68) Defendant was tried in November of 1996. There would have been no tactical advantage for defense counsel to elect to wait for blood splatter results. Blood splatter evidence, rather than transfer stains, would not likely benefit defendant.

The appellate court's intimation that it was to defendant's advantage to wait and see what the DNA tests proved is without support. *Kaczmarek*, 2000 Ill. App. LEXIS 999, at *33. At defendant's first trial, defendant had already testified that he picked up a bag found in decedent's yard and carried it to his car trunk, thus explaining how he could have come to have gotten decedent's blood on his clothing. (S.R. 1153, 1185-1186) Additionally, at the time of defendant's first trial, defense counsel had already had DNA testing done and Cellmark found that no conclusive findings could be made. (S.R. 91)

Defendant was tried once without DNA evidence. DNA evidence was not introduced at defendant's second trial. Serologist Pam Fish testified that the results of her DNA tests on defendant's jacket were inconclusive and the sample from defendant's pants was too small and degraded to test. (R. J163) On retrial, defendant was not the party asking that the cause be continued in order to conduct DNA testing. Contrary to the appellate court's conclusion,

-46-

obtaining DNA results worked to the prosecution's advantage not defendant's.

In evaluating the second *Barker* factor, the appellate court confused statutory delay with constitutional delay. *Kaczmarek*, 2000 Ill. App. LEXIS 999, at *32. Defense counsel's acquiescence to continuances and those continuances being charged to defendant are factors in statutory speedy trial analysis – not in constitutional speedy trial analysis. Notably, the cases relied on by the appellate court, *People v. Kliner*, 185 Ill. 2d 81, 113,705 N.E.2d 850 (1998), *People v. Prince*, 242 Ill. App. 3d 1003, 1007, 611 N.E.2d 105 (3rd Dist. 1993), *People v. Brimmer*, 60 Ill. App. 3d 214,  376 N.E.2d 337 (1st Dist. 1978), and *People v. Staten*, 159 Ill. 2d 419, 639 N.E.2d 550, 557 (1994), all involved statutory speedy trial claims, rather than constitutional speedy trial allegations. *Kaczmarek*, 2000 Ill. App. LEXIS 999, at *32.

The appellate court's reliance on defendant having "no less than 6 attorneys" during the 3 ½ year delay as grounds for attributing delay to defendant is without foundation. *Kaczmarek*, 2000 Ill. App. LEXIS 999, at *32. The number of attorneys defendant had during the 44-month delay between reversal and retrial is of no consequence. A number of the attorneys would have been ready for trial, but for the State not having completed discovery with the DNA tests. (C. 259, 284) In part, defendant "went through" more than one attorney simply due to attrition from the public defender's office based upon the lengthy time lapse. (C. 289) Defendant himself, in his *pro se* motion for appointment of other counsel, commented on the lack of continuity among the assistant public defenders. (C. 82) Further, although defendant did ultimately hire and change private attorneys, the change occurred within one four-month period, from December, 1995, when the public defender was permitted to withdraw, to March, 1996, when Attorney Charles Murphy appeared and took the case to trial in November of 1996.

-47-

Notably, preparing for retrial would not have been as difficult as preparing for a new trial since defense counsel would have had the testimony of the witnesses from the first trial and the rulings made on pre-trial motions. In *Nickerson v. State (Ala. App.)*, 629 So.2d 60 (1993), the court recognized that ordinarily retrial does not require extra time to prepare. In ordering defendant's release based upon a constitutional speedy trial violation, the *Nickerson* Court noted that the state "had previously been prepared to go to trial in this case and was thus familiar with the appellant's case." *Nickerson*, 629 So.2d at 64.

The appellate court further contended that defendant was the basis for the delay because he either explicitly requested continuances or expressly agreed with the prosecution's request for delay. *Kaczmarek*, 2000 Ill. App. LEXIS 999, at *31-32. On several dates, defendant himself objected to the State's delay. (C. 262, 278, 284) At other times, the State represented to the court that the tests would be concluded within a specific time period. (S.R. 128: "have them done by this week"; S.R. 77: "have the results in August or in September"; S.R. 130: "be done by October 11th"). Based on the State's declarations to the court, defendant would not have a basis for disagreeing.

The ultimate responsibility for promptly bringing the defendant to trial rests with the government rather than the defendant. *Barker v. Wingo*, 407 U.S. at 531; *Singleton*, 662 N.E.2d at 583. In his motion for discharge, defendant noted that Section 103-5(c) allows the court to grant the State an additional 120 days or four months to obtain DNA evidence after a showing of due diligence. (C. 214) Here, without a showing of due diligence, the State asked for, and was granted, more than 16 additional months to obtain DNA testing. The approximate two-year-long delay in the State's effort to procure more evidence against defendant was not attributable to

-48-

defendant; thus, the lengthy delay must be weighed heavily against the State.

**FACTOR #3**

The third *Barker* factor, defendant's assertion of his right, must also weigh in defendant's favor. The appellate court issued its opinion on March 31, 1993, and its mandate on July 15, 1993. The court appointed the Office of the Public Defender. Defendant demanded a speedy trial on July 21, 1993. (C. 229) Defendant advised the court that he would wait and the cause was continued. In October, November, and December of 1994, defendant moved for discharge on the basis of a speedy trial violation. (C. 261, 277, 283) Defendant told the court that his counsel would not present his motion for discharge and asked for a bar association attorney. The court denied defendant's motion for other counsel. In November of 1996, while represented by private counsel, defense counsel filed a motion to dismiss based upon a violation of defendant's right to a speedy trial. (C. 199-291) The court denied the motion and subsequently denied defendant's post-trial motion which included a speedy trial violation claim. (C. 294) Where Mr. Kaczmarek asserted his right to a speedy trial, this third *Barker* factor weighs against the State and in defendant's favor.

The appellate court's claim that defendant never sought discharge of his own attorneys in order to pursue his speedy trial claims ignores the fact that defendant asked the court to appoint other counsel. (C. 240, 265, 287) The trial court below would not appoint other counsel and forced defendant to present his own *pro se* motions for discharge. (C. 279-281, 284-286) Without *Faretta* admonishments on proceeding *pro se*, defendant, short of discharging counsel altogether, did all he could to assert his right to a speedy trial. Defendant had no obligation to

-49-

bring himself to trial, rather, the State had that duty. *Barker*, 407 U.S. at 527.

**FACTOR #4**

The fourth and final factor, prejudice to defendant, also weighs in his favor. Prejudice is

assessed in light of the interests of defendants that the speedy trial right was designed to protect.

The United States Supreme Court has identified three such interests: 1) to prevent oppressive

pretrial incarceration; 2) to minimize anxiety and concern of the accused; and 3) to limit the

possibility that the defense will be impaired by diminishing memories and loss of exculpatory

evidence. *Barker v. Wingo*, 407 U.S. at 532; *Doggett v. United States*, 505 U.S. at 654.

In this case, defendant's anxiety was reflected in the record and noted by the court. In

February of 1994, the judge affirmed that defendant was anxious to be tried. (S.R. II 68)

Subsequently, in June and August of 1995, the judge again noted that defendant was anxious to

go to trial. (S.R. 113, 121) In defendant's motion for discharge, defendant asserted that

defendant had "been subjected to unwarranted, lengthy pretrial detention; dilatory tactics have

maximized his anxiety, and his defense has been impaired by the 44 months that have passed

since the appellate court's remand." (C. 214)

The appellate court's declaration that the delay was in defendant's "best interests" was

baseless. *Kaczmarek*, 2000 Ill. App. LEXIS 999, at *39. According to the lower court,

defendant would want to wait until the State obtained the results of its blood testing since the

findings could have excluded defendant as the offender. Contrary to the appellate court's

opinion, defendant would have had no such desire. Defendant had already explained at his first

trial how he could have come to have gotten decedent's blood on his clothing by picking up a bag

found in decedent's yard and carrying it to his car. DNA evidence was not introduced at either

defendant's first or second trial. This not a situation of delaying trial in hopes of witnesses

becoming available. Defendant had already been tried once. Testimony from unavailable

witnesses would have been already memorialized. (*See i.e.* Finuchi's testimony, S.R. K163-168)

Defendant had nothing to gain by waiting, as waiting merely allowed the State to attempt to

accumulate more evidence.

Each of the four *Barker* factors weighs in defendant's favor. The duration of the delay

was lengthy; the reason for the delay was due to the State's unpreparedness; the right to a speedy

trial was asserted; and prejudice to the defendant ensued. Thus, using the framework set forth in

*Barker v. Wingo*, the conclusion must be that defendant's constitutional right to a speedy trial

was violated.

## STANDARD OF REVIEW

In analyzing Mr. Kaczmarek's constitutional speedy trial deprivation, the appellate court

utilized an incorrect standard of review. *Kaczmarek*, 2000 Ill. App. LEXIS 999, at *28-29. The

court below held that the determination of whether defendant's right to a speedy trial was

violated was better left "to the sound discretion of the trial court." *Kaczmarek*, 2000 Ill. App.

LEXIS 999, at *28-29. In using an abuse of discretion standard to review defendant's claimed

deprivation of his constitutional speedy trial right, the appellate court found that the trial court

did not err in determining that defendant was not denied his right to a speedy trial. *Kaczmarek*,

2000 Ill. App. LEXIS 999, at *28-29.

In *People v. Crane*, 195 Ill. 2d 42, 743 N.E.2d 555 (2001), issued subsequent to the

decision in *Kaczmarek*, this Court discussed the appropriate standard of review for evaluating constitutional speedy trial violation claims.  When resolving a constitutional speedy-trial claim, any factual determinations made by the trial court, which are contained in the record, shall be upheld on review unless they are against the manifest weight of the evidence.  *Crane*, 195 Ill. 2d at 51.  However, when performing the *Barker* balancing test, the *Crane* Court stressed that the trial court is in no better position than the reviewing court to balance the competing concerns.  The *Crane* Court held that the ultimate determination of whether a defendant's constitutional speedy-trial right has been violated is subject to *de novo* review.  *Crane*, 195 Ill. 2d at 51-52.

In the instant case, Mr. Kaczmarek's constitutional right to a speedy trial was denied where approximately 3 ½ years elapsed between reversal of defendant's murder conviction and his second trial due to delay caused by the State.  When all four *Barker* factors are weighed, it becomes apparent that defendant's constitutional right to a speedy trial was denied. Consequently, this Court should reverse Henry Kaczmarek's murder conviction.

## CONCLUSION

For the foregoing reasons, Henry Kaczmarek, Defendant-Appellee, respectfully requests that this Court reverse his murder conviction and order his release. Alternatively, defendant asks that his sentence be reduced to a sentence within the non-extended range of 20 to 40 years.


Respectfully submitted,



MICHAEL J. PELLETIER
Deputy Defender


DEBRA R. SALINGER
Assistant Appellate Defender
Office of the State Appellate Defender
203 North LaSalle Street - 24th Floor
Chicago, Illinois 60601
(312) 814-5472

COUNSEL FOR DEFENDANT-APPELLEE