NO. 90865

IN THE

SUPREME COURT OF ILLINOIS

| | |
|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, | Appeal from the Appellate Court of Illinois, First District, Third Division, Appellate Court No. 97-2557 |
| Plaintiff-Appellant/Cross-Appellee, | |
| vs. | There Heard on Appeal from the Circuit Court of Cook County, Criminal Division. |
| HENRY KACZMAREK, | |
| Defendant-Appellee/Cross-Appellant. | Honorable John D. Brady, Judge Presiding. |

## REPLY BRIEF AND ARGUMENT FOR
## PLAINTIFF-APPELLANT/CROSS-APPELLEE

LISA MADIGAN,
Attorney General
State of Illinois
LISA HOFFMAN,
Assistant Attorney General
100 West Randolph Street, Suite 1200
Chicago, Illinois 60601

Attorneys for Plaintiff-Appellant/Cross-Appellee.

RICHARD A. DEVINE,
State's Attorney
County of Cook
309 Richard J. Daley Center
Chicago, Illinois 60602
RENEE G. GOLDFARB,
CHRISTINE COOK,
WILLIAM D. CARROLL,
ALAN J. SPELLBERG,
Assistant State's Attorneys,
Of Counsel.

EXHIBIT D

IN THE

SUPREME COURT OF ILLINOIS

| | |
|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, | Appeal from the Appellate Court of Illinois, First District, Third Division, Appellate Court No. 97-2557 |
| Plaintiff-Appellant/Cross-Appellee, | |
| vs. | There Heard on Appeal from the Circuit Court of Cook County, Criminal Division. |
| HENRY KACZMAREK, | |
| Defendant-Appellee/Cross-Appellant. | Honorable John D. Brady, Judge Presiding. |

**I.**

**THE APPELLATE COURT ERRED IN FINDING THAT DEFENDANT'S NATURAL LIFE SENTENCE VIOLATED <u>APPRENDI V. NEW JERSEY</u> BECAUSE SUCH A SENTENCE DOES NOT EXCEED THE MAXIMUM PUNISHMENT AUTHORIZED BY EITHER THE LEGISLATURE OR THE EXPRESS FINDINGS OF THE TRIER OF FACT.**

At the outset, the People acknowledge that due to an oversight, they neglected to include

in the opening brief a statement of the applicable standard of review as required by Supreme Court

Rule 341(e)(3).  The People apologize for the failure, but point out that this Honorable Court has

already made clear that claims pursuant to <u>Apprendi v. New Jersey</u>, 530 U.S. 466, 120 S. Ct. 2348

1

(2000) will be reviewed de novo. See e.g. People v. Hopkins, 201 Ill. 2d 26, 36, 773 N.E.2d 633 (2002).

In his brief, defendant asserts in his brief that the Appellate Court properly held that under Apprendi, his natural life sentence for murder is unconstitutional because the trial court imposed such a sentence after finding that the murder of Millie Nielsen was committed in a brutal and heinous manner indicative of wanton cruelty. He first contends that the Appellate Court's decision was correct because pursuant to this Court's decision in People v. Swift, 202 Ill. 2d 378, 781 N.E.2d 292 (2002), the maximum penalty he was subject to based upon the jury's verdict was 40 years. The People acknowledge that under Swift, any sentence longer than 40 years would violate Apprendi unless it was authorized by facts as found by the trier of fact beyond a reasonable doubt. Id. at 388.[1] As a result, the People hereby withdraw any assertion that the imposition of a sentence based on facts other than the basic elements for murder does not implicate Apprendi.

However, the People do not concede in any way that defendant's natural life sentence is unconstitutional. In Swift, this Honorable Court stated that Apprendi simply "requires that all facts necessary to establish the statutory sentencing range within which the defendant's sentence falls must be proven to a jury beyond a reasonable doubt." Id. at 383 (emphasis added). As a result, "[a] defendant's due process rights are violated by a sentence which exceeds the maximum sentence authorized by the facts found by the jury, whether imposition of the invalid sentence is

---

[1] As a result of this Court's decision in Swift, two of the cases relied upon by the People in their opening brief are no longer valid. See People v. Vida, 323 Ill. App. 3d 554, 752 N.E.2d 614 (1st Dist. 2001), vacated and remanded No. 92311 (Feb. 5, 2003), People v. Simmons, 331 Ill. App. 3d 416, 770 N.E.2d 1271 (2nd Dist. 2002), vacated and remanded No. 94345 (Feb. 5, 2003), (cited at pp. 31-32 of the People's opening brief). Accordingly, the People respectfully request that this Honorable Court ignore the citation of these decisions.

mandatory or discretionary with the judge." Id. (emphasis added). In other words, an extended sentence imposed by the trial court based upon a finding of brutal and heinous behavior "cannot stand unless [the defendant] was eligible for such a sentence *without* such a finding–*i.e.*, based solely on the facts found by the jury beyond a reasonable doubt." Id. at 384 (underlined emphasis added, italicized emphasis in original). See also People v. Hopkins, 201 Ill. 2d 26, 40, 773 N.E.2d 633 (2002) (expressly holding that once the rule of Apprendi has been satisfied, trial courts remain free to exercise their discretion to consider additional factors "when creating an appropriate sentence based on the facts of the crime"); People v. Ford, 198 Ill. 2d 68, 74, 761 N.E.2d 735 (2001) (holding that the fact that the brutal and heinous nature of the defendant's crime was not proved beyond a reasonable doubt was immaterial where the defendant had been proven eligible for the death penalty); Harris v. United States, 536 U.S. 545, 122 S. Ct. 2406, 2414 (2002) ("Apprendi said that any fact extending the defendant's sentence beyond the maximum authorized by the jury's verdict would have been considered an element of an aggravated crime -- and thus the domain of the jury -- by those who framed the Bill of Rights.") (plurality opinion) (emphasis added)); Ring v Arizona, 536 U.S. 584, 122 S. Ct. 2428, 2440 (2002) (reversing Walton v. Arizona because the required finding of a death penalty aggravating factor "exposed [the defendant] to a greater punishment than that authorized by the jury's guilty verdict.").

It is for this reason that Swift does not control the instant case. Unlike defendant here, the defendant in Swift was charged only with first degree murder and was found guilty of just that offense. Swift, 202 Ill.2d at 380. Therefore, the jury in Swift necessarily made no "additional fact findings" which would permit a sentence beyond 60 years. In the instant case, however, defendant was charged with two counts of home invasion, one count of armed robbery, five counts of

residential burglary, one count of aggravated unlawful restraint and three counts of armed violence *in addition to* six counts of murder (C. 35-51; S.R.1-89-3182 13-30) and was found guilty by the triers of fact of not only murder, but also residential burglary, home invasion and armed robbery. (R. L133; C. 152-53; S.R. 1-89-3182 1384)

As a result of all of these findings, defendant was necessarily eligible for a natural life sentence under section 5-8-1(a)(1)(b) of the Unified Code of Corrections because one "of the aggravating factors listed in subsection (b) of section 9-1 of the Criminal Code of 1961 [is] present."(Ill. Rev. Stat. 1985, ch. 38, par. 1005-8-1(a)(1)(b)). The juries' findings demonstrated beyond any doubt that defendant intentionally murdered the 86 year old victim while in the course of committing other felonies, specifically armed robbery and home invasion. In fact, since defendant does not contest the sufficiency of the evidence supporting the juries' findings, it is clear that he agrees that the People have satisfied their burden of proving these facts beyond a reasonable doubt.[2] Accordingly, the instant case is more similar to Ford and Hopkins than it is to Swift in that there were findings by a trier of fact in addition to the basic elements of the crime of murder.

---

[2] Defendant asserts that the People's reliance upon the findings of guilt for home invasion and armed robbery by the jury at his initial trial is improper. (Deft. Br. at 31) However, the record reveals that defendant had previously recognized that the jury's verdicts were "left undisturbed" by the Appellate Court's ruling since prior to commencing the second trial he expressly sought to preclude the trial court from entering sentence upon those findings. (R. H30-32) Moreover, defendant now recognizes that the Appellate Court expressly refused to address the validity of those findings and chastises the People for failing to seek further review of that ruling. (Deft. Br. at 31-32) However, as demonstrated by the current litigation, it was defendant and not the People who had an interest in reversing the Appellate Court's decision on this point. However, defendant never sought any further review and a party seeking to avoid a decision of the appellate court has only two avenues for relief: either file a petition for rehearing and/or seek leave to appeal to this Honorable Court. Harris Trust & Savings v. Otis Elevator Co., 297 Ill. App. 3d 383, 388, 696 N.E.2d 697 (1st Dist. 1998). Since defendant never exercised either of these options, he is bound by the Appellate Court's express ruling that it was not vacating the findings of guilt for residential burglary, home invasion and armed robbery.

Nevertheless, defendant asserts that Ford is inapplicable to the instant case because in Ford the defendant was found eligible for the death penalty by the trial court prior to being sentenced to 100 years imprisonment, and that therefore the prescribed statutory maximum in that case was the death penalty. (Deft. Br. at 24) Defendant then posits that since the People could not seek the death penalty at his second trial, the maximum penalty he faced was 40 years imprisonment. (Deft. Br. at 24-25) The People point out that such a limited understanding of the holding in Ford is unwarranted in that it places undue emphasis on the particular procedures involved as opposed to the determinative factor in that case; that a sentence greater than 60 years was authorized by factual findings by the trier of fact *in addition to* the basic elements of first degree murder. By doing so, defendant has failed to heed the admonition in Apprendi that "the relevant inquiry is one not of form, but of effect." See Apprendi, 530 U.S. at 494, 120 S. Ct. at 2365. See also Swift, 202 Ill. 2d at 391 (quoting Ring, 122 S. Ct. at 2440); People v. Wagener, 196 Ill. 2d 269, 286-87, 752 N.E.2d 430 (2001). Moreover, defendant's attempted explanation of Ford is wholly inconsistent with Hopkins, wherein this Honorable Court held that Apprendi permits extended term sentences if particular elements of other offenses found by the trier of fact beyond a reasonable doubt constitute factors which would have authorized such a sentence. See Hopkins 201 Ill. 2d at 39-40 (holding that the defendant was necessarily eligible for an extended term sentence for murder because the jury also found him guilty of aggravated battery of a person over 60 years of age). Accordingly, it is clear that under Apprendi, courts must consider all the factual findings made by the trier of fact when determining if a defendant was eligible for an extended term sentence.

5

Due to this relationship between the trier of fact's findings for all the offenses and the defendant's eligibility for an extended sentence, it becomes clear that the Second District Appellate Court's decision in People v. Rivera, 333 Ill. App. 3d 1092, 777 N.E.2d 360 (2nd Dist. 2001) is wholly consistent with Swift. The Rivera court held that the defendant's natural life sentence comported with Apprendi even though the prosecution did not seek the death penalty, because the jury had found beyond a reasonable doubt that the defendant intentionally and knowingly murdered the victim and that he had committed the murder in the course of another felony, aggravated criminal sexual assault. Id. at 1103. Given these findings by the jury, the Rivera court held that "based exclusively upon the evidence presented to the jury," the defendant was eligible for a natural life sentence. Id. (citing 730 ILCS 5/5-8-1(b), 720 ILCS 5/9-1(b)(6)).

Defendant attempts to discount Rivera by claiming that it was "wrong to equate" felony murder under section 9-1(a)(3) (720 ILCS 5/9-1(a)(3)) with the death penalty eligibility factor of murder in the course of a felony under section 9-1(b)(6) (720 ILCS 5/9-1(b)(6)). (Deft. Br. at 27-29) The People agree with defendant that findings under 9-1(a)(3) and 9-1(b)(6) are not co-extensive. However, nowhere in Rivera (or in the People's opening brief) is such a comparison ever made.[3] Rather, the court in Rivera expressly stated that it was relying upon the jury's verdict of felony murder based on aggravated criminal sexual assault *in conjunction with* the jury's other verdicts that the defendant intentionally and knowingly murdered the victim when it held that the

---

[3]In fact, given his extensive discussion as to why the jury's general verdict could not support a finding of death penalty eligibility since the jury was also instructed on residential burglary as a predicate felony for felony murder (Deft. Br. at 29-31), it appears that defendant has improperly equated sections 9-1(a)(3) and 9-1(b)(6). However, defendant's entire analysis on this point is irrelevant because, as stated below, the general verdict for murder must be viewed as a finding of intentional murder rather than felony murder.

6

jury's findings necessarily encompassed the requisite facts to authorize a natural life sentence. Rivera, 333 Ill. App. 3d at 1103-04. As this is precisely the same analysis conducted by this Honorable Court in Hopkins, it is clear that the Rivera court properly rejected that defendant's Apprendi challenge to his natural life sentence.

Defendant further asserts that Rivera is inapplicable because unlike the jury in Rivera, the jury in the instant case returned a general verdict and did not specifically indicate that defendant intentionally or knowingly murdered the victim, a factor necessary under section 9-1(b)(6) (Deft. Br. at 27, 29) While it is true that the jury in the instant case returned a general verdict, defendant is in error when he asserts that the jury never made the requisite findings regarding his mental state when he murdered 86 year old Millie Nielsen after breaking into her apartment.

Illinois law is well established that when a jury is instructed on intentional, knowing and felony murder and returns a general verdict, it is presumed that jury found that defendant intentionally murdered the victim. People v. Cardona, 158 Ill. 2d 403, 411-12, 634 N.E.2d 720 (1994); People v. Scott, 148 Ill. 2d 479, 555 (1992); People v. Thompkins, 121 Ill. 2d 401, 456, 521 N.E.2d 38 (1988). Moreover, this Honorable Court has repeatedly held that such a general verdict is sufficient to support a finding of eligibility section 9-1(b)(6).

In People v. Smith, 176 Ill. 2d 217, 229-30, 680 N.E.2d 291 (1997), this Court affirmed the defendant's eligibility finding on remand even though no evidence was presented regarding his mental state, because the trial court took judicial notice of the jury's earlier general verdict of guilty of first degree murder, which included the necessary finding of intent.[4]

---

[4]This is precisely what occurred at the eligibility phase of defendant's initial trial. S.R.1-89-3182 1443-44.

Similarly, in <u>People v. Shatner</u>, 174 Ill. 2d 133, 673 N.E.2d 258 (1996), this Court stated that where the jury's general verdict at the guilt phase "encompassed the necessary finding of intent" and the trial court took judicial notice of that verdict, the trial court's conclusion that the defendant acted with the requisite intent for eligibility "cannot be assailed." <u>Id.</u> at 150-51.  See also <u>People v. Johnson</u>, 149 Ill. 2d 118, 156-57, 594 N.E.2d 253 (1992) (same).

Finally, in <u>People v Johnson</u>, 159 Ill. 2d 97, 636 N.E.2d 485 (1994), this Court held that the People sustained their burden at the eligibility phase of the defendant's trial because defendant entered a general plea of guilt to a three-part indictment for first degree murder and therefore was considered to have pled guilty to intentional and knowing murder. <u>Id.</u> at 129-30.

Therefore, it is clear that defendant is wrong when he asserts that the jury never found that he intentionally murdered the victim. Furthermore, the record contains overwhelming evidence that defendant intentionally killed the 86-year old victim when he repeatedly beat, stabbed and strangled her after breaking into her apartment. Since it was established beyond any doubt that defendant "acted with the intent to kill the murdered individual or with the knowledge that his acts created a strong probability of death or great bodily harm to the murdered individual or another" (Ill. Rev. Stat. 1985, ch. 38, par. 9-1(b)(6)(b)), this Court should reject defendant's arguments that the jury did not find that he acted with the requisite mental state. Moreover, this finding, when considered in conjunction with the earlier verdicts as to home invasion and armed robbery, makes it clear that one "of the aggravating factors listed in subsection of section 9-1 of the Criminal Code of 1961 [is] present." Ill. Rev. Stat. 1985, ch. 38, par. 1005-8-1(a)(1)(b). As this is precisely the

8

same analysis engaged in by this Court in <u>Hopkins</u> and the Appellate Court in <u>Rivera</u>, the People

maintain that defendant's natural life sentence comports with <u>Apprendi</u>.[5]

Although defendant relies extensively upon <u>People v. Ramey</u>, 151 Ill. 2d 498, 603

N.E.2d 519 (1992) (Deft. Br. at 25-26) to support the proposition that a general verdict at the guilt

phase cannot be used to rectify an erroneous instruction at the death penalty eligibility phase, it is

clear that <u>Ramey</u> has absolutely no application to the instant case. In <u>Ramey</u>, this Court ruled that

the defendant was entitled to a new sentencing hearing because the trial court failed to properly

instruct the jury as to the requisite mental state for eligibility even though the defendant repeatedly

asserted that such an instruction was required.  Moreover, because <u>Ramey</u> involved questions of

the defendant's accountability for a co-defendant's actions, it was not possible to rely upon the

general verdict from the guilt phase because by failing to include the requisite mental state in the

instructions, the jury may have believed that the defendant could be eligible for the death penalty

simply because he was accountable for the actions of another even if he himself never intended to

kill.

---

[5]Defendant further asserts that in order to be found eligible for the death penalty, it must also be proven that the defendant was at least 18 years old at the time of the offense. (Deft. Br. at 29) The People do not disute that death eligibility requires proof of the defendant's age (see 720 ILCS 5/9-1(b)), but point out that eligiblity for a life sentence under section 5-8-1(a)(1)(b) is not identical to death penalty eligibility even though they are based upon the same factors. See <u>People v. Whitehead</u>, 116 Ill. 2d 425, 465, 508 N.E.2d 687 (1987). Section 5-8-1(a)(1)(b) does not state that a defendant must be found eligible for the death penalty before a court may impose a life sentence. Rather, it merely requires that one of the factors listed in section 9-1(b) be "present" and makes no mention of the additional requirement for death penalty eligibility that the defendant be over 18 years old. Thus, under the plain language of the statute, a defendant could be sentenced to life imprisonment even if he were only 17 years old. Because "a statute is to be interpreted and applied in the manner in which it is written . . . and is not to be rewritten by a court in an effort to render it consistent with the court's view of sound public policy" (<u>People v. Lewis</u>, 158 Ill. 2d 386, 391, 634 N.E.2d 717 (1994)), the People respectfully request that this Court reject defendant's implicit request to rewrite the statutory provision.

In contrast to <u>Ramey</u>, this Court in <u>People v. Armstrong</u>, 183 Ill. 2d 130, 150-52, 700 N.E.2d 960 (1998) held that where a defendant fails to object to the erroneous instruction, a general verdict from the guilt phase may be considered to determine if the requisite mental state was proven.

In the instant case, the record is clear that defendant never objected to the use of a general verdict form at his trial. Moreover, it cannot be questioned that defendant was found guilty based exclusively on his own actions and not those of an accomplice. Accordingly, <u>Ramey</u> is inapposite to the instant case.

Similarly, defendant's reliance upon <u>People v. Mack</u>, 167 Ill. 2d 525, 538, 658 N.E.2d 437 (1995) (Deft. Br. at 26) is misplaced because by its own terms <u>Mack</u> only applies where the parties attempt to use a special verdict form but fail to include all the elements of the offense. In contrast, <u>Mack</u> does not apply to situations involving general verdicts such as the one at issue in the instant case. Accordingly, <u>Mack</u> is also inapposite to the instant case.

Finally, it is irrelevant that the jury at the defendant's retrial was not asked to determine defendant's eligibility for the death penalty. <u>Apprendi</u> simply requires "that all facts necessary to establish the statutory sentencing range within which the defendant's sentence falls must be proven to a jury beyond a reasonable doubt." <u>Swift</u>, 202 Ill. 2d at 383 (citing <u>People v. Jackson</u>, 199 Ill. 2d 286, 296, 769 N.E.2d 21 (2002); <u>Ford</u>, 198 Ill. 2d at 73). Because the juries had already found beyond a reasonable doubt that he intentionally and knowingly murdered Millie Nielsen and that he committed the offenses of home invasion and armed robbery, the requisite facts to authorize a natural life sentence had already been established. Accordingly, defendant's natural life sentence was properly imposed and should be affirmed.

Defendant further argues that the indictment was deficient because it failed to give adequate notice of the possibility of a natural life sentence. (Deft. Br. at 32-35) However, as stated in the People's opening brief, this Honorable Court expressly rejected an identical claim in Ford. See People's Br. at 34-35 (quoting Ford, 198 Ill. 2d at 72 n.1 (citing Apprendi, 530 U.S. at 477 n.3, 120 S. Ct. at 2355 n.3)). Similarly, in People v. Thurow, ___ Ill. 2d ___, 2003 Ill. LEXIS 20 (No. 90911 February 6, 2003) this Court reiterated its holding in Ford, stating:

> With regard to defendant's "notice" argument, the Supreme Court in Apprendi specifically declined to address the indictment question. The Court noted that the defendant, Charles Apprendi, did not assert a constitutional claim based upon the indictment's failure to charge the sentence-enhancement factors. Instead, the defendant relied upon the due process clause of the fourteenth amendment, which the Court stated has never been construed to make the fifth amendment right to "presentment or indictment of a Grand Jury" applicable to the states. Indeed, Apprendi's central holding makes no mention of any indictment right. Instead, as previously noted, it focuses upon the rights to trial by jury and proof beyond a reasonable doubt. We therefore reject defendant's argument that Apprendi requires "notice of the sentence-enhancing facts."

Thurow, 2003 Ill. LEXIS 20 at * 21-22 (citations omitted).

Thus, contrary to defendant's assertion, it is clear that neither the United States Supreme Court nor this Honorable Court have ever held that sentencing factors must appear in the indictment. See also Ring, 122 S. Ct. at 2437 n.4 (noting that the petitioner did not contend that the indictment was constitutionally defective and pointing out that the fifth amendment indictment clause has not been construed against the states); People v. Davis, ___ Ill. 2d ___, 2002 Ill. LEXIS 286 at *47 (No. 89704 February 22, 2002) (holding that Apprendi does not require that the death penalty eligibility factors appear in the indictment).

11

Moreover, even if <u>Apprendi</u> did require sentencing factors to be pled in the indictment, the People point out that defendant does not dispute that he received adequate notice from the indictment that he could potentially receive the death sentence. (Deft. Br. at 33)  Instead, he argues that he was unaware that he might face life imprisonment at his second trial since the People were only proceeding on the murder charges.  Of course, defendant neglects to mention that he had been sentenced to natural life for murder following the initial trial and was aware that even though the People were precluded from seeking the death penalty under double jeopardy principles, the People still believed that the horrific offense required a significant sentence.  Moreover, as in <u>Ford</u>, where this Honorable Court held that <u>Apprendi</u> is not implicated where a defendant is sentenced to a lesser sentence than what he is legally eligible for, a defendant should not be heard to complain that he received notice that he could potentially be sentenced to a greater penalty than he ultimately is.

Also, the record is clear that defendant never once objected to the sufficiency of the indictment until after he was convicted at the second trial and the <u>Apprendi</u> decision was released while his appeal was pending in the Appellate Court. Defendant implicitly acknowledges this procedural default by speculating as to how defendants may be prejudiced in preparing their defense (Deft. Br. at 33-34), but makes no claim that he would have prepared for trial differently or that he suffered actual prejudice in any manner due to the alleged deficiency. See <u>Davis</u>, 2002 Ill. LEXIS 286 at *42; <u>People v. Thingvold</u>, 145 Ill. 2d 441, 448, 584 N.E.2d 89 (1991); <u>People v. Gilmore</u>, 63 Ill. 2d 23, 29, 344 N.E.2d 456 (1976).

Finally, defendant challenges the People's alternative argument that if defendant's sentence violates <u>Apprendi</u> any error was harmless beyond a reasonable doubt. Defendant claims that <u>Apprendi</u> errors are necessarily structural in nature and that as a result, can never be considered

12

harmless. (Deft. Br. at 36-41)[6] However, as this Honorable Court recently held in <u>Thurow</u>, an <u>Apprendi</u> violation must be considered a trial error rather than a structural one. The <u>Thurow</u> court explained that under <u>Neder v. United States</u>, 527 U.S. 1, 119 S.Ct. 1827 (1999) and <u>United States v. Cotton</u>, 535 U.S. 625, 122 S. Ct. 1781 (2002), <u>Apprendi</u> errors are subject to harmless error analysis because "'[u]nlike such defects as the complete deprivation of counsel or trial before a biased judge, an instruction that omits an element of the offense does not <u>necessarily</u> render a criminal trial fundamentally unfair or an unreliable vehicle for determining guilt or innocence.'" <u>Thurow</u>, 2003 Ill. LEXIS 20 at *18 (quoting <u>Neder</u>, 527 U.S. at 9, 119 S. Ct. at 1833) (emphasis in <u>Neder</u>). Accordingly, the <u>Thurow</u> court stated that it was "<u>compelled</u> by <u>Neder</u> to conclude that the <u>Apprendi</u> violation in the case at bar is subject to harmless-error review." <u>Id.</u>, 2003 Ill. LEXIS 20 at *25 (emphasis added)

In the instant case, since it is clear that <u>Apprendi</u> is subject to harmless error review, the only question remaining (assuming arguendo that defendant's sentence violates <u>Apprendi</u>), is

---

[6]Defendant further asserts that the People have waived their harmless error argument by failing to make such a claim in the Appellate Court. (Deft. Br. at 36) However, because the People were the appellee in the Appellate Court and did not define the issues in that court, the typical rule that arguments must first be raised in the lower court does not apply. <u>People v. Schott</u>, 145 Ill. 2d 188, 201, 582 N.E.2d 690 (1991). As this Court explained, "'[w]here the trial court is reversed by the Appellate Court and the appellee in that court brings the case here for further review, he may raise any question properly by the record to sustain the judgment of the trial court, <u>even though those questions were not raised or argued in the Appellate Court.</u>'" <u>Id.</u> (quoting <u>Mueller v. Elm Park Hotel Co.</u>, 391 Ill. 391, 399, 63 N.E.2d 365 (1945)) (emphasis added). Therefore, waiver cannot apply in the instant case. Moreover, the People point out that the instant case represents one of the first cases to address <u>Apprendi</u> in the Appellate Court and that because the law under <u>Apprendi</u> was developing throughout the entire country, a continuous re-evaluation of appropriate responses and arguments was required. Accordingly, assuming the People's harmless error argument had been waived, the People respectfully request this Honorable Court to consider this portion of the People's argument (if it is necessary) in order to provide a complete adjudication of the issues. See <u>Schatz v. Abbott Laboratories</u>, 51 Ill. 2d 143, 145, 281 N.E.2d 323 (1972) (ignoring waiver where it was "desirable to make a complete adjudication of the issues").

whether such error was harmless. Id.  The People point out, however, that defendant does not challenge the substance of the People's arguments as to why the alleged error was harmless beyond a reasonable doubt and instead relies exclusively upon his erroneous claim that Apprendi errors are structural in nature.

Nevertheless, the People reiterate that the record clearly reflects that defendant murdered 86 year old Millie Nielsen "in a brutal or heinous fashion indicative of wanton cruelty" when he repeatedly beat, stabbed and strangled her after breaking into her apartment.  Moreover, because it cannot be disputed that defendant committed the murder in the course of other felonies, specifically armed robbery and home invasion, the People maintain that any rational trier of fact would have found that at least one of the death penalty eligibility factors was present in the instant case.  Accordingly, as in Thurow, the People maintain that any rational trier of fact would have found beyond a reasonable doubt one of the requisite factors to impose a natural life sentence for murder.

For all the foregoing reasons, the People respectfully request that this Honorable Court reverse the Appellate Court's ruling and reinstate defendant's natural life sentence.

## II.

## THE APPELLATE COURT PROPERLY FOUND THAT DEFENDANT WAS NOT DENIED HIS CONSTITUTIONAL RIGHT TO A SPEEDY TRIAL WHERE THE RECORD IS CLEAR THAT DEFENSE COUNSEL AGREED TO THE DELAY OF TRIAL IN ORDER TO PREPARE THE DEFENSE.

In his cross-appeal, defendant claims that his constitutional right to a speedy trial was denied because it was 43 months from the date of the reversal of his first murder conviction to the date of his retrial. (Deft Br. 42)  The facts as applied to the law, however, show that the decision rendered by the Appellate Court, finding that there was no constitutional violation, was proper, as defendant's attorneys expressly sought the additional time in order to await potentially exculpatory DNA testing which would allow them to prepare the defense.[7]

The right to a speedy trial is guaranteed by the United States Constitution. (U.S. Const., amend. VI) and the Illinois Constitution (Ill. Const. 1970, art. I, sec. 8) Since defendant's original conviction was reversed on appeal and his cause remanded for a new trial, the speedy trial clause requires the People to retry defendant within a reasonable period of time following the date of the denial of the People's Petition for Leave to Appeal. Since the right to a speedy trial "cannot be defined in terms of an absolute or precise standard of time" this Court must analyze the "record in its totality" to determine whether the right to a speedy trial has been denied. People v. Crane, 195 Ill. 2d 42, 47-48, 743 N.E.2d 555 (2001).

This analysis is conducted under the four-part test set forth in Barker v. Wingo, 407 U.S. 514, 92 S.Ct. 2182 (1972).  The Barker Court identified four factors in determining whether the

---

[7] The speedy trial issue was rendered in the unpublished portion of the Appellate Court's decision (Slip op. at 20-31).

constitutional right to a speedy trial is violated: (1) the length of the delay; (2) the reason for the delay; (3) the defendant's assertion of his right to a speedy trial; and (4) the prejudice to the defendant. Barker, 407 U.S. at 530, 92 S.Ct. at 2192. The People maintain that the record in the instant case shows that the Appellate Court properly applied the four-part test set forth in Barker to the facts at issue and determined that defendant was not denied his constitutional right to a speedy trial.

Although defendant complains that the Appellate Court utilized the incorrect standard of review when this case was decided in 2000, this Court found in People v. Crane, 195 Ill. 2d 42, 50, 743 N.E.2d 555 (2001), that there was previously, "no definitive answer on this issue." This Court ultimately found that "when a trial court performs the Barker balancing test" by weighing the interests of the People against the interest of the defendant, the standard of review is de novo. Id. at 52.

### The Length of Delay

When balancing the Barker factors, no one factor is dispositive or sufficient to determine if the constitutional right to a speedy trial was violated. Barker, 407 U.S. at 533, 92 S.Ct. at 2193. In determining the length of the delay, the United States Supreme Court has held one year to be "presumptively prejudicial" such that it triggers the Barker inquiry. Doggett v. United States, 505 U.S. 647, 652 n.1, 112 S.Ct. 2686, 2691 n.1 (1992); Barker, 407 U.S. at 530-531, 92 S.Ct. at 2192.

In the instant case, the Appellate Court found that the length of the delay triggered the Barker inquiry regarding the last three prongs of the test. Although the delay triggers the analysis, it does not, however, imply that the delay actually prejudiced defendant. It "simply marks the point

16

at which courts deem the delay unreasonable enough to trigger the <u>Barker</u> enquiry." <u>Doggett</u>, 505 U.S. at 652 n.1, 112 S.Ct. at 2691 n.1.

### The Reason for Delay

The next inquiry for this Court to make is the reason for the delay. The People bear the burden of providing justification for any delay which has occurred, however, defendant needs to show that the delay was not attributable to his actions. <u>Crane</u>, 195 Ill. 2d at 53.

The Appellate Court properly determined that in this case, the "defense either caused or contributed to nearly all the pretrial delay at issue." Slip op. at 24. The record establishes that the Appellate Court's decision was correct, as it was based on the facts unfolding after remand and the denial of the People's Petition for Leave to Appeal.

After the Appellate Court reversed defendant's murder conviction and remanded the matter for a new trial on the murder charges, the People sought leave to appeal in this Honorable Court. This Court denied the People's Petition for Leave to Appeal on June 3, 1993.[8] The first status date following the denial of the PLA was June 29, 1993. This 26-day period was the only period that the Appellate Court found was "not attributable to defendant." Slip op. at 24-25. (However the June 29th date was set at an earlier a status hearing on May 28, 1993 where the court denied defendant's requested six week continuance and instead entered an agreed 30 day

---

[8] Defendant continues to use the date the Appellate Decision was issued, however, the date the People's PLA was denied is the proper time since the People's attempt to seek review of a lower court's decision has been held to be "fully justified" reason for delay in bringing a defendant to trial. <u>Crane</u>, 195 Ill. 2d at 54; <u>United States v. Loud Hawk</u>, 474 U.S. 302, 315, 106 S.Ct. 648, 656 (1986).

continuance even though this Court had not yet ruled on the PLA. (C. 216-21)). As to the

remaining time, the Appellate Court found that it was attributable to defendant.

> From the court's June 29 hearing up until the start of trial in November 1996,
> the case was delayed because of the defense's explicit requests for a
> continuance or express agreement with the prosecution thereto. Delay
> resulting from such requests and agreements are generally chargeable to the
> defendant. See, People v. Beard, 271 Ill. App. 3d 320, 328, 648 N.E.2d 111,
> 116 (1st Dist. 1995)(delay caused by continuances either requested or agreed
> to by defense is attributable to defendant); People v. Moore, 263 Ill. App. 3d
> 1, 8, 635 N.E.2d 507, 513 (1st Dist.1994) (same); People v. Nolan, 102 Ill.
> App. 3d 895, 898-99, 430 N.E.2d 345, 349 (1st Dist. 1981) (same).

Slip op. at 25.

DNA testing was the cause for the delay in bringing defendant to retrial. The rationale

for that cause, and its consequences, however, are critical. Defense counsels needed to know the

results of the DNA tests in order to prepare the defense. That is precisely the reason why so many

"by agreement" dates were made. Had the DNA results indicated that the blood found on

defendant's clothing was not that of Millie Nielsen, an acquittal was practically guaranteed. The

defense was, after all, that defendant's blood soaked clothes became stained as a result of several

fights he had with different men that week, not as a result of brutally beating, stabbing and

strangling 86-year old Millie Nielsen to death in her own home. (R. K180-182)

This Court, as was the Appellate Court, should be mindful of the fact that defendant

went through six attorneys and that the prosecution's DNA tests would have been more prompt had

the defense complied with the trial court's order to turn over results of the DNA tests that were

requested by defendant from his first trial.

The record shows that after the matter was remanded to the Circuit Court of Cook

County, defense counsel #1 (an assistant public defender) needed to obtain the transcripts from the

18

first trial in order to prepare the defense. (C. 232) He also indicated to the court that defendant wished to make a pro se motion for a speedy trial. (C. 2330 After the court informed defendant that his lawyer was not yet ready to proceed to trial and explained the risks of going to trial with an unprepared attorney, defendant stated that he would wait until his lawyer is ready and agree to the requested continuance. (C. 233-34)

The record further indicates that defense counsel did not obtain a complete set of transcripts until November 15, 1993, five months after the People's PLA was denied. (Vol. 3 S.R55)[9] In February 1994, the prosecutor indicated that an expert would be utilized in the case. Defense counsel wanted to wait to see what the expert would say before engaging his own expert on blood splatter. (Vol. 3 S.R.65-66) By June 30, 1994, one year after the first status date, the tests of some experts were complete and it was expected that DNA testing would be complete by September 1994. (Vol. 3 S.R. 77) In September, it was revealed that an expert was performing additional serology tests. Defense counsel specifically stated that he did not want to set a trial date until he saw that report. (C. 259)

In October 1994, the trial court was informed that DNA tests were not complete and another status date was held. (C. 262) Defendant made another pro-se oral request to dismiss his charges pursuant to the Speedy Trial Act. (C. 262) After being told that the motion had to be in writing (C. 262), defendant filed a written "Motion to Dismiss Charges [-] Violation of the Speedy Trial Act" (C265-70) asked for several continuances to obtain documents so he could argue his speedy trial motion. (C. 279-81, 284-85)

---

[9]"Vol. 3 S.R." refers to the third volume of supplemental record identified in the Appendix to the People's opening brief at page A66.

In January 1995, attorney #2 (an assistant public defender) was assigned to defendant's case. (C. 289) In March 1995, the People filed a Motion to Produce involving DNA testing that was done prior to defendant's first trial. (Vol. 3 S.R. 84) The DNA tests were still not complete at that time. In May 1995, the prosecutor still had not received the written findings from the DNA tests performed prior to defendant's first trial. Defense counsel #2 indicated that there were no written findings, but notes existed. (Vol. 3 S.R. 91) The prosecution informed the court that the DNA tests could not be completed until the results from defendant's DNA tests were revealed. (Vol. 3 S.R. 91-93) The trial court then ordered defense counsel to turn over the notes regarding the first DNA testing. (Vol. 3 S.R. 94)

Later that month, the prosecution was still asking for the DNA test results from the first trial. (Vol. 3 S.R. 99) It was also revealed that attorney #2 was moving out of state and would not try the case. (Vol. 3 S.R. 101) In June 1995, two years after the People's PLA was denied, defense attorney #3 (an assistant public defender) filed an appearance on defendant's behalf and stated that because defendant was "anxious to go to trial" she would review the materials as "quickly as possible." (Vol. 3 S.R. 113) By August of 1995, the prosecution finally received the missing discovery relating to defendant's DNA testing from his first trial. (Vol. 3 S.R. 120)

By October 1995, defense attorney #3 asked for another status date as she had outstanding subpoenas and was not "in a position to set this matter for trial." (Vol. 3 S.R. 136)

In December 1995, attorney #3 was granted leave to withdraw and defense attorney #4 (a private defense attorney) filed an appearance. (Vol. 3 S.R. 140) Attorney #5 (a private defense attorney) filed her appearance in January 1996 and attorney #4 was given leave to withdraw (Vol. 3 S.R. 163-64) In March 1996, attorney #6 (a private defense attorney) filed his appearance, and

20

subsequently obtained three continuances. (Vol. 3 S.R. 171, 175, 178) (Attorneys #6 continued to represent defendant through trial and sentencing with the assistance of Attorney #5.)

In June 1996, both sides indicated they would be ready for trial in August. (Vol. 3 S.R. 181) In July, it was indicated that the defense might hire an expert, which would set the trial date back. (Vol. 3 S.R. 184) Then, in August 1996, the prosecutor informed the court that defense counsel would be unable to appear that day because he had to attend a funeral. (Vol. 3 S.R. 188) The matter was continued until November 18, 1996, when defense counsel filed and argued a motion to dismiss the indictment based on a violation of defendant's constitutional right to a speedy trial. (Vol. 3 S.R. 188; C. 199-215; R. H4) The court denied the motion, stating that "[a]lthough [defendant] at times asked for a trial to start right away, in almost every instance, he then asked for a continuance because either in opposition of what his lawyer wanted to do or he wanted to argue the motion himself, which I gave him opportunity to do on several occasions." (R. H4) The court then heard other pre-trial motions and commenced jury selection. (R. H1)

Therefore, the record reveals that out of the 47 times this case appeared before the trial judge, there were 39 by agreement continuances, 3 continuances by order of court and 3 continuances at defendant's request.[10] There is not one "motion state" date in the record. (C. 1-15) Accordingly, the Appellate Court properly reviewed the record as a whole and held that defendant was responsible for the delay for retrial. The court stated:

> Notably, the defense changed attorneys not less than six times during the postponement period, necessitating additional time being granted to new counsel so he or she could review discovery and familiarize himself or herself with the case. As a further note, the case was continued on at least four

---

[10] The court half-sheets for two dates, December 7, 1995 and January 11, 1996, do not indicate the types of continuances taken.

21

occasions because of defense counsel's failure to appear at scheduled court hearings.

Defendant accurately notes that the prosecution used the pretrial period to gather expert evidence regarding DNA testing and blood splatter analysis, and that it requested additional time from the court many times to secure these materials. On several of those occasions, however, defendant's attorneys explicitly agreed to the State's request. Indeed, defense counsels never objected to the State's attempt to secure its additional evidence. Rather, the record shows that the defense welcomed the State's blood evidence because of its possible exculpatory effect. The defense obviously viewed the State's evidence as possibly beneficial to its case and, for this reason, agreed to many of the continuances sought by the State. With respect to the remaining instances where the State requested additional time, defense counsel specifically sought continuances for his own reasons.

Slip op. at 25-26 (citations omitted).

Defendant fails to apprise this Court of the significant facts in this case which established why defense counsels agreed to the continuance dates regarding the DNA testing. Rather, in his brief, defendant alleges that it was the People who sought the DNA test which was "ordered at the State's behest." (Deft. Br. 45) As the Appellate Court recognized, defendant had as much of a stake in the DNA tests as the prosecution. Had those tests revealed that the blood found on defendant's clothing did not belong to Millie Nielsen, defendant's acquittal was assured.

In this regard, the instant case is strikingly similar to Barker, because in that case the defense attorneys stated that they agreed to the more than four years of delay because they were "gambling on [a co-defendant's] acquittal." Barker, 407 U.S. at 535, 92 S.Ct. at 2194. The Court explained that "[t]he evidence was not very strong against [the co-defendant], as the reversals and hung juries suggest, and Barker undoubtedly thought that if [the co-defendant] were acquitted, he would never be tried." Id. The Court found this to be a legitimate reason even though in "hindsight"

22

it would have been a wiser course of action to demand an immediate trial. Id. at 535 n.39, 92 S.Ct. at 2194 n.39.

Defendant also asks this Court to find it persuasive that no DNA evidence was actually introduced into the second trial. (Deft. Br. 46)  Defendant's argument intimates that the People stalled the retrial for no legitimate reason.  The fact that the samples were too small and degraded does not undermine the legitimacy in making the request.

Defendant also claims that the Appellate Court's opinion that it was to his advantage to wait and see what the DNA tests proved was without support since defendant testified at his first trial that he could have gotten Millie Nielsen's blood on his clothing when he picked up a bag in her yard which was already blood soaked at the time. (Deft Br. 46)   The fact that defendant provided an explanation for having Millie Nielsen's blood on his clothing at his first trial has no relevance to preparing for the retrial.  First, the People had to prove defendant guilty beyond a reasonable doubt.  DNA evidence would go a long way in establishing that burden.  Second, the prosecutors could not have known in advance of trial if defendant would testify at his retrial. Presuming that defendant would repeat this testimony, or testify at all at retrial would have required the prosecutors to be clairvoyant.  Regarding the prior disclosure of the DNA testing at the first trial, the issue on remand was that the prosecutors repeatedly asked for the written results of the DNA tests as it was imperative to the scientists to see written results as opposed to verbal claims made by defense attorneys.

Dfendant further claims that the Appellate Court "confused statutory delay with constitutional delay." (Deft Br. 47)  He asserts that "[d]efense counsel's acquiescence to continuances and those continuances being charged to defendant are factors in statutory speedy trial

23

analysis-not in constitutional speedy trial analysis." (Deft. Br. 47) Defendant fails to provide this

Court with any case law supporting this claim. Moreover, <u>Barker</u> expressly refutes such a claim.

In <u>Barker</u>, the Court placed significant weight on the fact that the defendant had not

objected to the numerous continuances. The Court stated:

> Counsel was appointed for Barker immediately after his indictment and represented him throughout the period. No question is raised as to the competency of such counsel. Despite the fact that counsel had notice of the motions for continuances, the record shows no action whatever taken between October 21, 1958, and February 12, 1962, that could be construed as the assertion of the speedy trial right. On the latter date, in response to another motion for continuance, Barker moved to dismiss the indictment. The record does not show on what ground this motion was based, although it is clear that no alternative motion was made for an immediate trial. <u>Instead the record strongly suggests that while he hoped to take advantage of the delay in which he had acquiesced, and thereby obtain a dismissal of the charges, he definitely did not want to be tried.</u>

407 U.S. at 535-35, 92 S.Ct. at 2194 (emphasis added) (footnotes omitted). The Court then

explained:

> We do not hold that there may never be a situation in which an indictment may be dismissed on speedy trial grounds where the defendant has failed to object to continuances. There may be a situation in which the defendant was represented by incompetent counsel, was severely prejudiced, or even cases in which the continuances were granted *ex parte*. <u>But barring extraordinary circumstances, we would be reluctant indeed to rule that a defendant was denied this constitutional right on a record that strongly indicates, as does this one, that the defendant did not want a speedy trial.</u>

<u>Id.</u> at 536, 92 S.Ct. at 2195 (emphasis added). Thus, it is clear that defendant's assertion that his

acquiescence is irrelevant is wholly without merit. Moreover, as defendant does not make any

allegation of ineffective assistance of counsel (nor could he) based on his attorneys' agreement to

the continuances, he must share responsibility for the delay in bringing the matter to trial.

24

Defendant also finds it insignificant that he went through six attorneys, arguing that this fact "is of no consequence." (Deft. Br. 47) The record and common sense however, contradicts his claims. Defendant's attorneys specifically requested continuances so that they would be able to digest the complex history of the case and pending discovery. (C. 233-34; Vol. 3 S.R. 65-66, 136) The People take issue with defendant's claim that "[a] number of the attorneys would have been ready for trial, but for the State not having completed discovery with the DNA tests. (Deft Br. 47) Defendant's claim is hardly a candid assessment of the facts.

The first defense attorney needed a continuance to obtain transcripts from the first trial. (C. 232) When the prosecutor stated that an expert might be utilized in this case, defense counsel #1 wanted to wait and see the results of the People's expert before possibly engaging his own expert in blood splatter. (Vol. 3 S.R.65-66) Defense counsel did not want to set a trial date until he saw the additional blood tests. (C. 259) In March 1995, the prosecutors filed a Motion to Produce relating to the DNA tests allegedly performed at defendant's first trial. (Vol. 3 S.R. 84) Defense counsels #2 and 3 did not comply with that order until August 1995. (Vol. 3 S.R. 120) Attorney #3 asked for continuances as she had outstanding subpoenas and was not "in a position to set this matter for trial." (Vol. 3 S.R. 136) Attorney #4 filed an appearance in December 1995 and withdrew when #5 filed an appearance in January 1996. (Vol. 3 S.R. 163-64) Trial counsel, attorney #6, filed his appearance in March 1996. (Vol. 3 S.R. 171) It took counsel #6 several months to go through discovery. Both sides indicated they would be ready for trial in August, but then, in July 1996, defense counsel stated he might hire an expert which set the trial date back. (Vol. 3 S.R. 184) Defendant's claim that this revolving door of attorneys would have been ready for trial is refuted by the record and common sense.

According to defendant, "preparing for retrial would not have been as difficult as preparing for a new trial since defense counsel would have had the testimony of the witnesses from the first trial and the rulings made on pre-trial motions." (Deft. Br. 48)  The People fail to appreciate how appellate counsel's claim of defense ease established that his constitutional right to a speedy trial was violated.  Further, defense counsel on retrial was limited by what defendant claimed at his first trial.  Defense attorneys had to then investigate and find witnesses or experts that would have supported defendant's theory.  Since DNA evidence could have exonerated defendant, the testing was obviously seen as significant by all six defense attorneys representing defendant during this time.  Furthermore, the fact that DNA evidence was admissible on retrial does not make the testing procedure any less difficult or time consuming.

Defendant perverts the record by claiming that although the Appellate Court found that he "explicitly requested continuances or expressly agreed with the prosecution's request for delay" he himself objected to the delay on several dates. (Deft. Br. 48)  The record also shows, however, that when asked by the trial court, defendant himself sought additional time to prepare and argue his pro se motion (C. 279, 284-85, 289) and then apparently abandoned his pro se demand for a speedy trial because he never once raised the matter again before the trial court.  Accordingly, defendant's argument is disingenuous.

Moreover, Illinois law is clear that when a defendant is represented by counsel, he may not also attempt to proceed pro se; he must make an election between the two rights. People v. Williams, 97 Il. 2d 252, 267, 454 N.E.2d 220 (1983) (citing People v. Ephraim, 411 Ill. 118, 122, 103 N.E.2d 363 (1952). While defendant here did make pro se requests for a speedy trial, he also clearly indicated that he wanted to be represented by counsel. As this Honorable Court recently

held in People v. Mayo, 198 Ill. 2d 530, 764 N.E.2d 525 (2002), a defendant will be bound by his

attorney's request for a continuance unless he clearly and convincingly indicates that he wants to

assert his right to discharge his attorney and proceed to an immediate trial.   The rationale

underlying this rule is the recognition that very few decisions regarding the course of a criminal

trial belong to the defendant himself: what plea to enter (and whether to tender a lesser included

offense instruction); whether to waive a jury trial; whether to testify on his own behalf; whether

to seek an appeal. People v. Brocksmith, 162 Ill. 2d 224, 227, 642 N.E.2d 1230 (1994); People v.

Ramey, 152 Ill. 2d 41, 54, 604 N.E.2d 275 (1992)).  "'[B]eyond these four decisions, however, trial

counsel has the right to make the ultimate decision with respect to matters of tactics and strategy

after consulting with his client.'" Brocksmith, 162 Ill. 2d at 228 (quoting Ramey, 152 Ill. 2d at 54).

Because the decision of whether or not to demand an immediate trial is inextricably intertwined

with the attorney's responsibility to formulate trial strategy, it is clear that defendant's pro se

objections were ineffectual.

Based on the facts of the case, the Appellate Court's ruling was proper.  This Court

should affirm the ruling made by the Appellate Court as it was based on the well established law.


### Defendant's Assertion Of His Right For A Speedy Trial

The third factor to consider in assessing whether defendant was denied his constitutional

right to a speedy trial was his assertion of that right.  It has been held that "[t]he defendant's

assertion of his speedy trial right, then, is entitled to strong evidentiary weight in determining

whether the defendant is being deprived of the right." Barker, 407 U.S. at 531-532, 92 S.Ct. at

2192-93. While such assertions are entitled to strong evidentiary weight, they must be viewed in

light of the defendant's other conduct. United States v. Loud Hawk, 474 U.S. 302, 314, 106 S.Ct. 648, 656 (1986).

In the instant case, defendant made an oral assertion of his right to a speedy trial and then filed a pro-se Motion to Dismiss Charges on the same ground. The record shows and the Appellate Court found, however, that those assertions were made pro-se and that defendant's attorneys expressly refused to file such a motion as they were not in a trial posture.

On July 21, 1993, about six weeks after the People's PLA was denied, all parties were in court. Defense counsel #1 informed the trial judge that he was tracking down the original trial transcripts and needed time to conduct his own investigation into the case. (C. 232)

> **[Defense Counsel]:** [Defendant] indicated to me that on his own motion, he's demanding a speedy trial. I don't know if he's still standing by that motion. I certainly would not be ready at this point professionally.
> **The Court:** [Defense counsel], if [defendant] wants a speedy trial, I may be able to accommodate him and give him a very speedy trial. It's the equivalent of somebody committing suicide, but if that's what he wants to do.
> You see, what your lawyer is trying to tell you, [defendant], is the state already had their case. They've got a blueprint of the case. This man doesn't know anything about your case and has to learn.
> Now, if you want a lawyer who is going to be able to give you the best possible defense, you'd better listen to him. If you want to just rush through and go right back in as much of a hurry as you can with a very lengthy negative outcome for your case, well, then I'll set a date for you next week.
> Now, what will it be?
> **[Defendant]:** I'll wait.
> **The Court:** Are you going to listen to your lawyer?
> **[Defendant]:** Mm-humm.
> **The Court:** Okay. We'll agree to a continuance; is that right?
> **[Defendant]:** Yes. (C. 233-34)

In October-November 1994, the court was informed that DNA tests were not complete and another status date was held. Defendant made an oral request to dismiss his charges pursuant

to the Speedy Trial Act. (C. 262) Defendant told the trial court that his attorney refused to file the

motion. (C. 262) After he filed a written pro se motion at the court's direction, defendant stated

that he was unable to argue the motion until he received the transcripts. (C. 278-81) Defense

counsel specifically told the court that defendant was angry because defense counsel "won't file"

the Speedy Trial Motion. (C. 280)

Then, on the eve of trial, defense counsel submitted a motion to dismiss based upon

defendant's right to a speedy trial. The trial court denied the motion, noting that the earlier pro-se

requests were "in opposition to what his lawyer wanted." (Vol. I H4)

The Appellate Court properly found that this factor could not be decided in defendant's

favor due to the facts presented:

> Generally, the decision to demand a speedy trial and to seek dismissal of the
> State's charges on such ground are matters left to the sound strategic decision
> of counsel. See People v. Ramey, 151 Ill. 2d 498, 523-524, 603 N.E.2d 519
> (1992); People v. Keys, 195 Ill. App. 3d 370, 373, 552 N.E.2d 285 (1990).
> Further, as previously discussed, defendant spoke and acted through his
> attorneys and was bound by their conduct during the pretrial proceedings.
> Importantly, defendant never sought the discharge of his attorneys to pursue
> his speedy-trial claims on his own. Indeed, the record unequivocally shows
> that defendant wanted the assistance of counsel in preparing his defense for
> trial.

Slip op. at 28-29.

Although the record is clear that defendant asserted, then abandoned his pro se motion

to dismiss based on a violation of his right to a speedy trial, it is also abundantly clear that none

of defendant's six attorneys were ready to proceed to trial when defendant was making those

assertions. This is a crucial issue which defendant continues to ignore. See People v. Mayo, 198

Ill. 2d 530, 539-40, 764 N.E.2d 525 (2002). The record also establishes that the series of attorneys

needed DNA analysis to be completed and the final results of experts to be rendered before they could be prepared for trial. In light of these facts, the People maintain that the Appellate Court properly found that this factor weighed against defendant.


### Prejudice to Defendant

The last factor to consider is the prejudice suffered by defendant. The United States Supreme Court has found that the prejudice factor should be assessed in light of three interests of a defendant: (1) to prevent oppressive pretrial incarceration; (2) to minimize anxiety and concern of the accused and; (3) to limit the possibility that the defense will be impaired. Barker, 407 U.S. at 532, 92 S.Ct. at 2193. The most serious consideration is the last as "the inability of a defendant adequately to prepare his case skews the fairness of the entire system." Id.; Doggett, 505 U.S. at 654, 112 S.Ct. at 2692. Except for certain instances where the presumption of prejudice remains due to some form of unjustifiable conduct on the part of the prosecution, causing excessive delay which presumptively compromises the reliability of the trial proceedings a showing of prejudice is required to establish a violation of a defendant's constitutional right to a speedy trial. Doggett, 505 U.S. at 655-58, 112 S. Ct. at 2692-94; Reed v. Farley, 512 U.S. 339, 353, 114 S.Ct. 2291, 2299 (1994).

The Appellate Court addressed all three prongs of the prejudice analysis to defendant's case. The Court found that although defendant was in custody "for almost the entire time between remand and the commencement of his second trial," this fact alone was insufficient to establish prejudice and must be viewed with the other relevant considerations. Slip op. at 30.

30

Regarding the second factor, defendant claims that his "anxiety was reflected in the record and noted by the court." (Deft. Br. 50)  However, in addressing this precise claim, the Appellate Court found that anxiety is "present to some extent in every case and absent some unusual showing, this inconvenience alone is of slight import." Slip op. at 30 (citing People v. Wills, 153 Ill. App. 3d 328, 337, 505 N.E.2d 754 (2nd Dist. 1987)).  The Appellate Court further noted that this factor weighs in defendant's favor "only if it is shown there was a rather special situation giving rise to an inordinate amount of anxiety." Slip op. at 30 (citing People v. Jackson, 162 Ill. App. 3d 476, 481, 515 N.E.2d 390 (4th Dist. 1987)).

The People maintain that the Appellate Court properly rejected defendant's claims on this point.  Obviously defendant was stressed—any incarcerated inmate would be.  However, anxiety is not tantamount to prejudice, and as the Appellate Court properly noted, this record fails to reveal prejudice.

The Appellate Court also found that the delay never impaired the defense.  In fact, the defense had as much of a stake in the DNA results as the prosecution. The Appellate Court, in finding that the prejudice factor did not weigh in defendant's favor, stated:

> Significantly, defendant never claims his ability to prepare and present a defense was in any way impaired by the delay.  The defense was wholly or partially responsible for the delays experienced in bringing the matter to trial, and nothing in the record indicates that the delay was intentionally contrived by the prosecution for purposes of impairing the defense.  Moreover, it was in the best interests of the defense to wait until the State obtained the results of its blood testing since the findings could have excluded defendant as the offender.

Slip op. at 30-31.

31

Defendant challenges this conclusion as "baseless" because "defendant would have had no such desire" to wait for the DNA results because he had already explained at the first trial how the victim's blood ended up on his clothing. (Deft. Br. at 50)  However, defendant is either naïve in thinking that he did not have as much of a stake in the results of the blood test, or his argument is one of pure semantics.  The defense theory was that the blood on his clothes was the result of having several fights with different people the week Millie Nielsen was beaten and brutally murdered. Accordingly, all six defense attorneys acquiesced in the delay for this very reason, because the defense theory would become stronger if the tests revealed that the blood was not the victim's.  While it is true that defendant also had an alternative explanation just in case the blood was truly that of the victim's, such a fact does not negate the reality that defendant's attorneys were attempting to secure evidence which would enhance the likelihood of acquittal.  The fact that defendant himself did not want to wait for the blood results indicates that he himself failed to understand its vital role in his defense and does not negate its significance.

The decision of the Appellate Court should be affirmed.  The application of the specific facts of this case to the well established law demonstrates that there was no error in finding that defendant's constitutional right to a speedy trial was never jeopardized.

32

## CONCLUSION

The People of the State of Illinois respectfully request this Honorable Court reverse the Appellate Court's ruling vacating defendant's natural life sentence and affirm defendant's convictions and sentence as imposed by the Circuit Court of Cook County.

Respectfully submitted,

LISA MADIGAN,
  Attorney General
  State of Illinois
LISA HOFFMAN,
  Assistant Attorney General
  100 West Randolph Street, Suite 1200
  Chicago, Illinois 60601

Attorneys for Plaintiff-Appellant/Cross-Appellee.

RICHARD A. DEVINE,
  State's Attorney
  County of Cook
  309 Richard J. Daley Center
  Chicago, Illinois 60602
RENEE G. GOLDFARB,
CHRISTINE COOK,
WILLIAM D. CARROLL,
ALAN J. SPELLBERG,
  Assistant State's Attorneys,
      Of Counsel.