No. 1-04-2401

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| **PEOPLE OF THE STATE OF ILLINOIS,** | ) | Appeal from the Circuit Court |
| | ) | of Cook County, Illinois. |
| Respondent-Appellee, | ) | |
| | ) | |
| -vs- | ) | No. 87 CR 6131. |
| | ) | |
| **HENRY KACZMAREK,** | ) | Honorable |
| | ) | Lon William Shultz, |
| Petitioner-Appellant. | ) | Judge Presiding. |

BRIEF AND ARGUMENT FOR PETITIONER-APPELLANT

MICHAEL J. PELLETIER
Deputy Defender

SARAH CURRY
Assistant Appellate Defender
Office of the State Appellate Defender
203 North LaSalle Street - 24th Floor
Chicago, Illinois 60601
(312) 814-5472

COUNSEL FOR PETITIONER-APPELLANT

**ORAL ARGUMENT REQUESTED**

RECEIVED
CRIMINAL APPEALS

NOV - 9 2005

309 RICHARD J. DALEY CENTER
RICHARD A. DEVINE
STATE'S ATTORNEY'S OFFICE

EXHIBIT I

**POINTS AND AUTHORITIES**                 **Page**

I.    **HENRY KACZMAREK'S *PRO SE* POST-CONVICTION PETITION PRESENTED THE GIST OF A CONSTITUTIONAL CLAIM THAT THE STATE PRESENTED THE PERJURED TESTIMONY OF CRIMINALIST PAMELA FISH IN ORDER TO SECURE HIS CONVICTION FOR FIRST DEGREE MURDER. KACZMAREK'S PETITION THEREBY WARRANTS FURTHER PROCEEDINGS UNDER THE POST-CONVICTION HEARING ACT. . . . . . . 20**

*People v. Morgan*, 187 Ill.2d 500, 719 N.E.2d 681 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*People v. Johnson*, 191 Ill.2d 257, 730 N.E.2d 1107 (2000) . . . . . . . . . . . . . . . . . . . . . . . . 21

*People v. Gaultney*, 174 Ill. 2d 410, 675 N.E.2d 102 (1996) . . . . . . . . . . . . . . . . . . . . . . . . 21

*People v. Boclair*, 202 Ill.2d 89, 789 N.E.2d 734 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*People v. Edwards*, 197 Ill.2d 239, 757 N.E.2d 442 (2001) . . . . . . . . . . . . . . . . . . . . . . . . 21

*People v. Towns*, 182 Ill.2d 491, 503, 696 N.E.2d 1128 (1998) . . . . . . . . . . . . . . . . . . . . . . 21

*People v. Coleman*, 183 Ill.2d 366, 387-88, 701 N.E.2d 1063 (1998) . . . . . . . . . . . . . . . . . 21

*People v. Olinger*, 176 Ill.2d 326, 680 N.E.2d 321 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . 22

*People v. Smith*, 352 Ill.App.3d 1095, 817 N.E.2d 982 (1st Dist. 2004) . . . . . . . . . . . . . *in passim*

725 ILCS 5/122-1 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

725 ILCS 5/122-2.1 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Nicole Ziegler Dizon, *Crime Lab Supervisor Transferred*, The State Journal Register, August 16, 2001 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26,27

Robert C. Herguth, *Report Slams '80s Police Lab*, Chicago Suntimes, January 14, 2001 . . . . . 27

Maurice Possley and Steve Mills, *Disorganization Typified Crime Lab, Report Says*, Chicago Tribune, January 15, 2001 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

Steve Mills and Maurice Possley, *State Crime Lab Fraud Charged*, Chicago Tribune, January 14, 2001 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28



RECEIVED
CRIMINAL APPEALS
NOV - 9 2005
309 RICHARD J. DALEY CENTER
RICHARD A. DEVINE
STATE'S ATTORNEY'S OFFICE

**II.   HENRY KACZMAREK'S *PRO SE* POST-CONVICTION PETITION PRESENTED THE GIST OF A CONSTITUTIONAL CLAIM OF INEFFECTIVE ASSISTANCE OF TRIAL AND APPELLATE COUNSELS FOR FAILING TO CHALLENGE THE ADMISSIBILITY OF THE STATE'S EXPERT WITNESSES' TESTIMONY REGARDING LUMINOL TESTING AND BLOOD SPLATTER EVIDENCE UNDER *FRYE V. UNITED STATES*. KACZMAREK'S PETITION THEREBY WARRANTS FURTHER PROCEEDINGS UNDER THE POST-CONVICTION HEARING ACT.** ........................................... 33

U.S. Const. Amends. VI, XIV ................................................. 37

Ill. Const., Art. I, sec.8 .................................................. 37

*People v. Morgan*, 187 Ill.2d 500, 719 N.E.2d 681 (1999) ............................. 33

*People v. Johnson*, 191 Ill.2d 257, 730 N.E.2d 1107 (2000) ............................. 33

*People v. Gaultney*, 174 Ill. 2d 410, 675 N.E.2d 102 (1996) ............................. 33

*People v. Boclair*, 202 Ill.2d 89, 789 N.E.2d 734 (2002) ............................. 34

*People v. Edwards*, 197 Ill.2d 239, 757 N.E.2d 442 (2001) ............................. 34

*People v. Towns*, 182 Ill.2d 491, 696 N.E.2d 1128 (1998) ............................. 34

*People v. Coleman*, 183 Ill.2d 366, 701 N.E.2d 1063 (1998) ............................. 34

*Strickland v. Washington*, 466 U.S. 688, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) .......... 37

*People v. Albanese*, 104 Ill.2d 504, 473 N.E.2d 1246 (1984) ............................. 37

*People v. Steidl*, 177 Ill.2d 239, 685 N.E.2d 1335 (1997) ............................. 37

*People v. West*, 187 Ill.2d 418, 719 N.E.2d 664 (1999) ................................. 37

*People v. Coleman*, 168 Ill.2d 509, 660 N.E.2d 919 (1995) ............................. 37

*Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923) ................................. 37,38

*Donaldson v. Central Ill. Pub. Serv. Co.*, 199 Ill.2d 63, 767 N.E.2d 314 (2002) ......... 37,38

*People v. Henne*, 165 Ill.App.3d 315, 518 N.E.2d 1276 (4th Dist. 1988) ................. 38

*People v. Hendricks*, 145 Ill.App.3d 71, 495 N.E.2d 85 (4th Dist. 1986) . . . . . . . . . . . . . . . . . 39

*People v. Wheeler*, 777 N.E.2d 961 (3rd Dist. 2001), *supplemental opinion at People v. Wheeler*, 334 Ill.App.3d 273, 777 N.E.2d 961 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*People v. Owens*, 155 Ill.App.3d 990, 508 N.E.2d 1088 (4th Dist. 1987) . . . . . . . . . . . . . . . . . 39

*People v. Knox*, 121 Ill.App.3d 579, 459 N.E.2d 1077 (3rd Dist. 1984) . . . . . . . . . . . . . . . . . 39

725 ILCS 5/122-1(2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

725 ILCS 5/122-2.1 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

## NATURE OF THE CASE

Henry Kaczmarek, Petitioner-Appellant, appeals from a judgment dismissing his petition for post-conviction relief.

No issue is raised concerning the charging instrument. However, an issue is raised concerning the sufficiency of the post-conviction pleadings.

## ISSUES PRESENTED FOR REVIEW

1.    Whether Henry Kaczmarek's *pro se* post-conviction petition presented the gist of a constitutional claim that the State presented the perjured testimony of criminalist Pamela Fish in order to secure his conviction for first degree murder.

2.    Whether Henry Kaczmarek's *pro se* post-conviction petition presented the gist of a constitutional claim of ineffective assistance of trial and appellate counsels for failing to challenge the admissibility of the State's expert witnesses' testimony regarding luminol testing and blood splatter evidence under *Frye v. United States*.

## JURISDICTION

Henry Kaczmarek, Petitioner-Appellant, appeals the dismissal of his post-conviction petition. The judgment being appealed was entered on June 14, 2004. (C. 106, 107) Notice of appeal was timely filed on July 13, 2004. (C. 114) Jurisdiction therefore lies in this Court pursuant to Article VI, Section 6, of the Illinois Constitution, and Supreme Court Rule 651 (a).

## STATEMENT OF FACTS

In the early morning hours of April 25, 1987, Millie Nielsen was killed in her apartment. Police arrested Henry Kaczmarek and he was subsequently charged with Ms. Nielsen's murder. (Second Trial C. 34-51)[1] Following a jury trial in 1989, defendant was found guilty of murder. (Second Trial C. 54) Judge Michael Getty sentenced defendant to a term of natural life. (Second Trial C. 54) Defendant appealed.

On March 31, 1993, the appellate court reversed defendant's murder conviction and remanded for a new trial. *People v. Kaczmarek*, 243 Ill. App. 3d 1067, 613 N.E.2d 1253 (1st Dist. 1993). Following the denial of defendant's motion for discharge based on a speedy trial violation, the State, in November of 1996, retried defendant on five counts of murder. Judge John Brady presided over the second jury trial. The jury found defendant guilty of murder and the court sentenced defendant to natural-life imprisonment. (C. 152, 293) Defendant appealed. On December 27, 2000, the appellate court vacated defendant's sentence and remanded for resentencing. *People v. Kaczmarek*, 318 Ill. App. 3d 340, 741 N.E.2d 1131 (1st Dist. 2000). The Illinois Supreme Court reversed the Appellate Court's decision regarding defendant's sentence, and affirmed the judgment of the trial court. *People v. Kaczmarek*, 207 Ill.2d 288, 798 N.E.2d 713 (2003).

On March 24, 2004, Henry filed a *pro se* petition for post-conviction relief. (C. 76) Henry's petition was summarily dismissed on June 14, 2004. (R. B11)

---

[1]The common law record containing Henry Kaczmarek's post-conviction petition and the report of proceedings pertaining thereto will be cited as (C. __) and (R. __). The record from Henry's first trial, Appellate Court No. 89-3182, will be cited to as (First Trial C. __) and (First Trial R. __). The record from Henry's second trial, Appellate Court No. 97-2557, will be cited to as (Second Trial C. __) and (Second Trial R. __).

**Evidence At Trial**

Millie Nielsen lived on the first floor of a two-flat apartment building while Dan Larry, his wife Margaret, and Margaret's then 19-year-old son, John Fisher, lived on the second floor. (Second Trial R. I179) The 86-year-old Nielsen was the Larrys' landlady. (Second Trial R. I177-I179)

On April 24, 1987, a Friday, Margaret Larry saw Ms. Nielsen at around 5:00 or 5:30 p.m. (Second Trial R. I180) At 6:15 p.m., Margaret went bowling with her son John. (Second Trial R. I181, I207) Margaret and John returned home at about 10:30 p.m. (Second Trial R. I181) In the apartment, Margaret's husband was passed out on the couch. (Second Trial R. I181) Also in the apartment was Henry Kaczmarek, who was on the couch watching television. (Second Trial R. I181, I207) Henry was wearing light-colored jeans and a blue, quilted work jacket, and construction boots. (Second Trial R. I179, I207, I211) Henry had been living with the Larrys for about a month after previously having lived at his girlfriend, Pam Hines' house. (Second Trial R. K182) At 11:00 p.m., Henry helped Margaret bring Dan to bed. (Second Trial R. I184, I209) Margaret went to sleep and Henry left. (Second Trial R. I184, I209)

Margaret woke up that morning at around 7:00 or 7:30 a.m. (Second Trial R. I190) Margaret saw Henry sleeping on the couch. (Second Trial R. I190) Shortly after, Henry woke up. (Second Trial R. I190) Margaret stated that Henry looked "kind of" nervous until he got his coffee after which he sat down and relaxed. (Second Trial R. I192) Margaret stated that Henry was wearing a clean pair of dark-colored jeans and a light dress shirt. (Second Trial R. I190) Margaret did not pay attention to whether there were any stains on Henry's clothing. (Second Trial R. I199) Margaret admitted that the first time she told police about what Henry was

-5-

wearing on Saturday morning was two years after Millie's murder.  (Second Trial R. I202)

At around 9:45 a.m., Ms. Nielsen's helper, Ronald Sadlowski, noticed that the back

pantry window of Millie's apartment had been broken and the back storm door was fully open.

(Second Trial R. I163)  Ronald called the police.  (Second Trial R. I164)  Police found Ms.

Nielsen in the bedroom of her apartment having been stabbed multiple times, strangled, and

having sustained blunt force injuries.  (Second Trial R. I119-121, I147)  Officer Marsala

observed bloodspots on the floor and walls above the bed where Ms. Nielsen was found, blood

on the kitchen floor leading to the bedroom, and bloodspots on the dust ruffle of the bed in the

second bedroom.  (Second Trial R. I40-42, I51-53)  Marsala found no signs of forced entry and

no broken glass inside.  (Second Trial R. I43-44)

John woke up at 10:00 a.m. on Saturday morning when police came to question him.

(Second Trial R. I210)  Detective Bogucki and partner Raymond Schalk conducted a follow-up

investigation regarding the murder of Millie Nielsen.  (Second Trial R. J29)  The detectives

interviewed Dan and Margaret Larry.  (Second Trial R. J29)  Ron Larry approached the

detectives and talked to them.  (Second Trial R. J30)

In 1987, Ron Larry lived with his mother but would sleep on the back porch of Margaret

and Dan Larry's apartment.  (Second Trial R. I64)  Ron Larry admitted being convicted of theft

in February of 1980 and being placed on probation.  (Second Trial R. I61)  In April of 1980, Ron

was convicted of burglary and was sentenced to four years probation with a condition of

probation being that he spend the first four months in jail and pay $300 restitution.  (Second Trial

R. I61)  Three years later, Ron was arrested for theft and charged with violating his probation.

Ron was sentenced to three years in prison for violating his probation and two years incarceration

for felony theft.  (Second Trial R. I61-62)

On April 24th, Ron went to work and then went drinking at Patty's Lounge.  Ron left the

lounge at midnight or 1:00 a.m.  (Second Trial R. I68)  After getting something to eat, Ron went

to his brother's house and laid down on some padding on the second floor back porch to sleep.

(Second Trial R. I68)  At trial, Margaret testified that Ron had no permission to sleep on the

Larrys' back porch.  (Second Trial R. I196)  Ron did not see any bags or property in the gangway

and did not pay attention to the first floor door or windows.  (Second Trial R. I69)  Ron stated

that when he was on the porch, the temperature was in the 50's.  (Second Trial R. I96)  Ron

admitted that he previously testified that it had been in the 60's.  (Second Trial R. I96)  The

parties subsequently stipulated that the temperature at 3:00 a.m. was 37 degrees.  (Second Trial

R. J126)

At 2:00 a.m., while on the porch, Ron heard the alarm from Patty's Lounge indicating its

closing.  (Second Trial R. H72)  Ron claimed that twenty to thirty minutes later, he saw Henry in

the back yard of the building carrying a bag.  (Second Trial R. H64)  He had known Henry for

five or six years.  (Second Trial R. H64)  Ron testified that Henry, who was wearing jeans and a

dark jacket, was walking across the yard.  (Second Trial R. H73)  Ron stated that Henry was

carrying the bag with his arms out at a 90 degree angle.  (Second Trial R. H100)  The bag, which

looked like a garbage bag, did not have handles on it.  (Second Trial R. H100)

Ron went to sleep, waking up around 7:00 a.m.  (Second Trial R. H76)  Ron used the

back stairs and noticed nothing unusual.  (Second Trial R. H77)  After going to work for a full

day on Saturday April 25th, Ron went to Patty's Lounge for a few beers.  (Second Trial R. H82)

At Patty's, Ron learned that Ms. Nielsen had been murdered.  (Second Trial R. H82)  After

Patty's, Ron went to the Larrys' where Ron spoke to police. (Second Trial R. H83) Ron told the police about Henry and he went with police to find Henry. (Second Trial R. H83, J31)

Bogucki and Schalk arrested Henry in his car on April 26th. (Second Trial R. J33-J36) Henry was wearing a plaid shirt and blue jeans and had on leather work boots. (Second Trial R. J36, J62) Police noted blood stains on the right and the left sleeve of Henry's coat. (Second Trial R. J34) Henry signed a written consent form to search his car. (Second Trial R. J40) In the trunk of Henry's car, police found jewelry boxes, plates and platters, a Marshall Fields bag, a pair of blue jeans with blood stains, and tools. (Second Trial R. J42) Police did not find any gloves in the trunk or car and no other shoes. (Second Trial R. J43)

Ms. Nielsen's niece Fern Briggs and great niece Barbara Tucker viewed the property taken from the trunk of Henry's car. (Second Trial R. J57, J95, J105) Briggs and Tucker identified pieces of jewelry and serving dishes as their Aunt Millie Nielsen's. (Second Trial R. J95-101, J105-108) Officer Patterson, an expert in fingerprint identification, averred that a hand print taken from the bag found in the trunk of defendant's car was a print from defendant. (Second Trial R. J121)

Henry gave his consent to have police take a blood sample from him. (Second Trial R. J58) Defendant's blood sample was transferred to serologist Pam Fish. (Second Trial R. J126) During Nielsen's autopsy, medical examiner Michael Chambliss took blood from decedent, also transferring it to serologist Pam Fish. (Second Trial R. J126) Officer Kenneth Martin fingerprinted defendant. (J124)

Forensic investigator Robert Baike testified that he went to Nielsen's apartment on April 25th and observed blood splatters above the decedent on the wall by the bed and noted that the

room had been ransacked. (Second Trial R. J6) Baike photographed the area and collected

evidence. (Second Trial R. J8) Baike was unable to find any fingerprints. (Second Trial R. J9)

Baike did not see any bloody footprints. (Second Trial R. J19)

Police checked Henry's shoes. (Second Trial R. J53) Police did not notice any blood or

brown or reddish stains on Henry's boots. (Second Trial R. J53, J63) Officer Bogucki averred

that no other clothing had blood on it. (Second Trial R. J53)

Pam Fish, a serologist, testified that in 1987, Chicago was not doing DNA testing but was

doing electrophoresis serology. (Second Trial R. J155) Ms. Fish stated that she received from

police investigating the Nielsen murder a jacket, a pair of jeans, jewelry boxes, and a knife.

(Second Trial R. J139) Based on blood standards she received from Henry and decedent, Ms.

Fish determined that all the blood on defendant's jeans and jacket was consistent with Ms.

Nielsen's blood and could not have come from defendant. (Second Trial R. J153) In 1994,

Chicago discontinued electrophoresis serology and began DNA typing. (Second Trial R. J129)

Ms. Fish tried to do DNA testing on the samples received in 1987 but the samples were too small

or too degraded and results were inconclusive. (Second Trial R. J161-163) Ms. Fish did not do

luminol testing. (Second Trial R. J163)

Arizona insurance fraud investigator Mitch Rea testified that he was contacted by the

Cook County State's Attorney's Office in Spring of 1994 to perform luminol testing in

conjunction with the Nielsen murder. (Second Trial R. K7, K26) Over objection, the court

accepted Rea as an expert in the field of luminol testing. (Second Trial R. K25-26) In May of

1994, Rea received a sealed box containing a dark-colored quilted jacket. (Second Trial R. K26-

27) After spraying segments of the jacket with the luminol chemicals and turning off the lights,

Rea observed luminance in various sections of the jacket. (Second Trial R. K32-K37) Rea took photographs of the jacket. (Second Trial R. K39)

The State called Rod Englert to testify concerning blood splatter. Over objection, the court ruled that Englert was an expert in the field of crime scene reconstruction and blood splatter. (Second Trial R. K66) Upon request from the Cook County State's Attorney, Englert reviewed the photographs of the Nielsen crime scene, the statements of witnesses, the luminol testing photographs prepared by Mitch Rea, and the physical evidence recovered. (Second Trial R. K66-69)

Concerning Ms. Nielsen's apartment, Englert noted that there was blood on the floor of the kitchen leading into Ms. Nielsen's bedroom. (Second Trial R. K91) Englert also observed that "on the floor are smears of blood, as though a struggle took place, and one of the individuals on the floor was bleeding." (Second Trial R. K91) When asked whether it was unusual not to have any footprints in the blood, Englert stated that it would not be unusual because blood dries very fast. (Second Trial R. K86-91)

Englert stated that the left and right knee areas of the pants contained a transfer stain and not splatter. (Second Trial R. K94) The transfer does not involve energy but just a transfer of something that was bloody that touched against the pants. (Second Trial R. K95) As for the bottom of the pants, Englert opined that there were numerous specks of blood consistent with medium velocity splatter. (Second Trial R. K96) Englert stated that the blood on defendant's pants would not be consistent with a person picking up a bloody bag in a gangway. (Second Trial R. K100) Further, Englert opined that the blood on the jeans would not be consistent with the wearer of the jeans "kneeing" someone in the nose. (Second Trial R. K102)

In examining the luminol photographs of defendant's jacket, Englert stated that the stains on the right and left arms contained splatter. (Second Trial R. K109)  Englert stated that over the front of the jacket were little specks of projected blood. (Second Trial R. K111)  On the right pocket was a very light transfer stain. (Second Trial R. K111)  Englert opined that the jewelry boxes had transfer stains that were consistent with ransacking. (Second Trial R. K114)

Englert asserted that the manner of Nielsen's death was that she was attacked first in the kitchen where she received many blows while on the floor, and that she, while still alive, was taken into the bedroom and thrown on the bed. (Second Trial R. K117)  Englert acknowledged that there was a great deal of blood in Ms. Nielsen's bed. (Second Trial R. K134)

Englert admitted that he was assuming that the blood splatter on defendant's jeans was Nielsen's blood. (Second Trial R. K123)  Englert conceded that no report stated that the splatter on the lower left leg was Nielsen's blood and that if it were someone else's blood he would have to reevaluate his position. (Second Trial R. K122-123)  Englert testified that it was "very, very possible" to get medium velocity splatter from a fight. (Second Trial R. K125)

Following Englert's testimony, the State rested. (Second Trial R. J150)  The court denied defendant's motion for a directed finding. (Second Trial R. J149)

To rebut the testimony of State's witnesses Englert and Rea, defendant called Dr. Kenneth Siegesmund on defendant's behalf.  Outside the presence of the jury, the parties inquired into Dr. Siegesmund's qualifications.  Dr. Siegesmund testified that he had a Ph.D. in biology and that his undergraduate major was biology with a minor in chemistry. (Second Trial R. L3)  Dr. Siegesmund stated that he had performed luminol testing well over a hundred times and had lectured in forensic science. (Second Trial R. L5)  Dr. Siegesmund stated that he had

-11-

been qualified to testify as an expert in the area of blood splatter 20 to 30 times. (Second Trial R. L37) Following argument on Dr. Siegesmund's credentials, the court ruled that he would not recognize Siegesmund as an expert in the field of blood splatter and could not testify as to the interpretation of luminol testing. (Second Trial R. L40)

Defense counsel made an offer of proof averring that Dr. Siegesmund would testify that in his opinion there was almost no indication of blood splatter on the jacket and that the blue jeans contained smears in the knee area indicative of lateral activity. (Second Trial R. L72) Dr. Siegesmund would have testified that the majority of decedent's blood would have been deposited on the bed prior to, and not after, her death. (Second Trial R. L72) Dr. Siegesmund would have further stated that in his opinion, the offender in the instant case would have been dramatically covered with blood based on the particular type of attack. (Second Trial R. L72)

In defendant's case, Henry testified that in April 1987, he had been living with the Larry family. (Second Trial R. K176) Before living with the Larrys, Henry had lived with his girlfriend, Pam Hines. (Second Trial R. K182) When Henry left Pam's house, Henry took all his belongings including his clothes, flashlight, and work tools. (Second Trial R. K182) Henry's work tools included a hammer, screwdrivers, channel locks, and a glass cutter. (Second Trial R. K183) Henry's clothes included six pairs of jeans and eight or nine flannel shirts. (Second Trial R. K260) Henry used a Marshall Fields bag for luggage. (Second Trial R. K182) Henry had been living at the Larrys' for between two weeks and a month prior to decedent's murder. (Second Trial R. K182, K214)

The week decedent was killed, Dan Larry had been suffering from a toothache for most of that week. (Second Trial R. K178) Henry and Dan went to bars and drank for most of that week.

-12-

(Second Trial R. K178) Henry had been laid off and was scheduled to begin work for Lee Willis the Monday following Nielsen's death. (Second Trial R. K177) Henry got into three fights on the Wednesday before April 24th. (Second Trial R. K179, K251) In each of these fights, someone bled. (Second Trial R. K180-K181) Henry asserted that he had owned his jacket for a year or more and that he had been in a lot of fights while wearing the jacket. (Second Trial R. K210) Henry related that he "went to a lot of bars" and "had a lot of fights in that coat." (Second Trial R. K211)

On the morning of April 24th, Henry began drinking with Dan. (Second Trial R. K183) In the afternoon, Henry and Dan went to Tom Szeszol's house where Henry took a shower and did laundry. (Second Trial R. K184) Henry did not wash his stained jeans there because Henry wanted to soak them and Tom's mother was coming and wanted everyone out. (Second Trial R. K184, K224) When Henry was told to leave, he tossed all his clothes back into the trunk of the car. (Second Trial R. K185) Henry threw the jeans which he was going to soak but did not, on the floor of the trunk. (Second Trial R. K185) All of Henry's clothes got washed except for his jacket and the pair of jeans that he was going to soak. (Second Trial R. K224-225)

After Szeszol's house, Henry dropped Dan off and went to Mike's Tavern on Wrightwood. (Second Trial R. K187) Henry stayed there until 6:30 p.m. drinking. (Second Trial R. K188) After Mike's Tavern, Henry went to the Larrys' house. (Second Trial R. K188) When Henry got to the Larrys' house, Dan was the only person there. (Second Trial R. K188) Henry and Dan drank a case of beer together. (Second Trial R. K188) Henry left the Larrys' at 11:45 p.m. and went to another bar. (Second Trial R. K188-189) When Henry left the Larrys', Margaret and John were in the house. (Second Trial R. K189, K225)

-13-

After drinking two beers, Henry went to a bar called "Our Place" until 2:00 a.m. (Second Trial R. K190) Henry estimated that there were 50 people at the bar. (Second Trial R. K227) When asked to describe anyone at the bar, Henry stated that it was ten years before and that he would be lying if he had to describe anyone at the bar. (Second Trial R. K227-228) At around 2:00 a.m., Henry went back to Dan's house to see if Dan wanted to drink some more. (Second Trial R. K190) Although Henry had a key to Dan's house, Henry had to "pee"and parked in the alley behind Dan's house to urinate. (Second Trial R. K191, K214)

After parking in the alley, Henry opened the car door, got out of the car, and heard a noise. (Second Trial R. K191) The noise sounded like a door closing. (Second Trial R. K229) Henry closed the car door and walked towards the house. (Second Trial R. K191) Henry looked up thinking that the noise might have been Dan upstairs. (Second Trial R. K191) After seeing no one up there, Henry kept walking towards the house and urinated close to the house. (Second Trial R. K191) While urinating, Henry saw a bag on the side of the house. (Second Trial R. K192) Henry looked inside the bag and saw a little box containing silverware. (Second Trial R. K194-195, K216) Henry picked up the bag and carried the bag to his car where he threw it into the trunk of his car. (Second Trial R. K195) When Henry picked up the bag it was damp or wet. (Second Trial R. K219-210) Henry got into his car and drove around to the front of Dan's house. (Second Trial R. K195)

Henry went upstairs and rang the Larrys' doorbell. (Second Trial R. K196) Margaret told Henry that Dan was not awake and Henry left and went to "Our Place" bar. (Second Trial R. K196) At the bar, Henry saw Liz and Dan Funkhauser. (Second Trial R. K197) Henry stayed until closing at 4:00 a.m., and gave rides home to Liz and Dan. (Second Trial R. K197) After

-14-

parking his car across the street from the Larrys' apartment, Henry went upstairs and went to sleep on the Larrys' couch. (Second Trial R. K197-198, K234) Defendant went to sleep around 5:00 a.m. and woke up around 8:00 a.m. (Second Trial R. K198) Henry slept in his clothes: jeans, flannel shirt, boots, and coat. (Second Trial R. K198, K234) Henry had one pair of shoes which were boots. (Second Trial R. K237)

On Saturday morning, Henry and Dan drove to Melrose Park to see Bill Brown. (Second Trial R. K202) Henry wanted to show Bill his car and Henry owed Bill some money. (Second Trial R. K202) At Brown's house, Henry opened the car trunk to see what was in the bag he found that morning. (Second Trial R. K203) Dan was with Henry. (Second Trial R. K203) Henry took everything out and put it on a bench. (Second Trial R. 203) Henry stated that "it was all bloody." (Second Trial R. K203) The bag and a pillow case were all bloody with dried blood. (Second Trial R. K204) Henry separated the good things from the bad, throwing the bag, a pillow case, and some other things in a dumpster next door to Brown's house. (Second Trial R. K204, K236) Henry did not throw into the dumpster any work gloves, clothes, or boots. (Second Trial R. K236-237) Henry kept about four or five pieces and put the things back into the trunk. (Second Trial R. K205, K238)

Henry showed Brown the silverware. (Second Trial R. K205, 245) Brown gave Henry $30 for some coins Henry had and $30 for the silverware. (Second Trial R. K205) Henry and Dan left and Henry dropped Dan off at home. (Second Trial R. K206) Henry went to Frank's Tavern where Henry had a couple of beers. (Second Trial R. K206) Henry left. He got sleepy, so he pulled his car over and went to sleep in his car. (Second Trial R. K207)

The next thing Henry remembered was police banging on his car window. (Second Trial

-15-

R. K208) Henry got out of the car, at which time police patted Henry down and handcuffed him.
(Second Trial R. K208) Police took Henry to the station and talked to Henry at 3:15 a.m.
(Second Trial R. K218) Henry did not remember telling police that when he found the bag he
saw jewelry and plates inside the bag. (Second Trial R. K218) Henry stated that he did not tell
police about hearing a noise in the backyard because they did not ask. (Second Trial R. K229)

Henry talked to an assistant State's attorney at 9:00 a.m. (Second Trial R. K218) Henry
did not recall telling the State's attorney that when Henry put the bag in the car he knew that it
contained jewelry. (Second Trial R. K219) Henry did not remember telling Assistant State's
Attorney Stevens that after ringing the Larrys' doorbell, he went upstairs to go to sleep. (Second
Trial R. K232) Henry did not recall telling police at 3:15 a.m or State's Attorney Stevens at 9:00
or 9:30 a.m. that he "could have killed the woman but that [he] didn't remember." (Second Trial
R. K256-257)

Henry stated that he had never been in Ms. Nielsen's apartment. (Second Trial R. K209)
Henry testified that he had seen the decedent one time when Henry had been watching television,
and decedent was on the back porch talking to Margaret. (Second Trial R. K208) Henry stated
that that was the only time he had ever seen Ms. Nielsen. (Second Trial R. K209) Henry knew
that Ms. Nielsen was an older woman but did not know that she lived alone. (Second Trial R.
K220)

Henry denied killing Ms. Nielsen. (Second Trial R. K209) Henry denied using a glass
cutter to cut the window on the back of decedent's house. (Second Trial R. K254) Henry denied
beating, stabbing or strangling decedent. (Second Trial R. K255)

Pam Hines testified that she had formerly been Henry's girlfriend. (Second Trial R.

K152)  Hines was not living with Henry at the time of Henry's arrest.  (Second Trial R. K152)

Pam identified Henry's jacket in court and stated that the whole time Pam knew Henry he had

that jacket.  (Second Trial R. K153)  Pam stated that Henry would dress the same every day and

that daily dress would include a flannel shirt, jeans, the jacket, and boots.  (Second Trial R.

K154)

Pam stated that Henry was a construction worker and that when they lived together Henry

helped with the upkeep of the building.  (Second Trial R. K154)  Henry had an assortment of

tools to fix things including hammers, screwdrivers, wrenches, glass cutters, and pliers.  (Second

Trial R. K154)  Hines stated that Henry was familiar with how to cut glass.  (Second Trial R.

K158)  Pam Hines identified the Marshall Fields bag found in the trunk of Henry's car as looking

like the bag that Henry put his clothes and personal items in when he left the apartment they were

sharing.  (Second Trial R. K156, K159)

In lieu of Elizabeth Finuchi's live testimony, the parties stipulated that if Elizabeth

Finuchi were called to testify she would state that she knew Henry and that on April 15, 1987, at

around 2:00 to 2:30 a.m., she and Daniel Funkhauser were drinking at a bar called "Our Place,"

where she saw Henry.  (Second Trial R. K164-165)  At 4:00 a.m., Henry gave Elizabeth and Dan

a ride home.  (Second Trial R. K165)  Elizabeth did not notice anything unusual about Henry or

his clothes. (Second Trial R. K166)

In rebuttal, Officer Bogucki testified that he talked to defendant at 2:15 a.m. on April 26,

1987, and that Henry said that he had been in the alley behind the Larrys' apartment to urinate

when he walked through the back yard and noticed a bag.  (Second Trial R. L44)  Seeing that the

bag had jewelry and plates inside, Henry picked up the bag and put it in the trunk of his car.

(Second Trial R. L45)  Henry then walked back to the front, rang the doorbell and spoke to

Margaret.  (Second Trial R. L45)  When Margaret told Henry that Dan was asleep, Henry went

back to the car and left.  (Second Trial R. L45)  Bogucki stated that when he asked Henry about

the crime, Henry stated that he may have done it, but did not remember.  (Second Trial R. L45)

Bogucki asserted that Henry never said that he heard a noise or that the bag was bloody, or that

there was a bloody pillow case inside the bag.  (Second Trial R. L45)  Bogucki further averred

that Henry never mentioned anything about Melrose Park or throwing the bag and case in a

dumpster.  (Second Trial R. L46)

    Bogucki conceded that there was no written statement of the April 26th, 3:15 a.m.

conversation.  (Second Trial R. L47)  When asked about the handwriting and signature on the

police general progress report concerning the conversation with defendant, Bogucki stated that

Detective Mook wrote the report and that Bogucki signed Detective Schalk's name to the report.

(Second Trial R. L50)  Bogucki admitted that Mook was not present at the time Bogucki

interviewed Henry.  (Second Trial R. L50)    Assistant State's Attorney Stevens testified in

rebuttal that on April 26th at 9:00 a..m, he talked with Henry and that Henry told him that during

the morning of April 25th he drove his car into the alley behind 3507 Diversey to "take a leak,"

and that he found a bag in the gangway, took it to his car, and dumped it out in the trunk of his

car.  (Second Trial R. L59-60)  Stevens said that Henry related that he discovered that the bag

contained jewelry.  (Second Trial R. L60)  Henry went to the front of the building, rang the bell,

went up to the second floor, and spent the night.  (Second Trial R. L60)  Henry told Stevens that

the blood stains on his clothing may have been the result of getting into a lot of fights.  (Second

Trial R. L60)  According to Stevens, Henry said that he could have killed the woman, but he did

not remember. (Second Trial R. L60) Stevens stated that Henry never said he heard a noise, that the bag was bloody, that he later found a bloody pillow case, or that he later threw the bag, the pillow case and the other items in a dumpster in Melrose Park. (Second Trial R. L60) Stevens admitted that he took no notes of his conversation with Henry. (Second Trial R. L61) When asked whether he had any difficulty understanding Henry, Stevens admitted that Henry spoke slowly. (Second Trial R. L64)

Following a jury instruction conference, the parties presented closing arguments. (Second Trial R. L66-L120) The judge instructed the jury on the three theories of murder and presented the jury with a general verdict form for murder. The jury subsequently found Henry guilty of murder. (Second Trial R. L133)

The judge denied defendant's motion for a new trial. (Second Trial R. N3) At sentencing, the State urged that the court impose a natural-life sentence due to the brutal and heinous nature of the offense. Following argument, the judge imposed a sentence of natural life. (Second Trial R. N13) Henry's conviction and sentence were ultimately affirmed on direct appeal. *People v. Kaczmarek*, 207 Ill.2d 288, 798 N.E.2d 713 (2003).

On March 24, 2004, Henry filed a *pro se* post-conviction petition. (C. 76-104) In his petition, among other things, Henry alleged that he was denied his right to due process where the State presented the perjured testimony of serologist Pamela Fish, and that he was denied his right to the effective assistance of trial and appellate counsels where his attorneys failed to challenge the admissibility of the State's experts' testimonies. (C. 76-104) Henry's petition was summarily dismissed by the circuit court as frivolous and patently without merit. (C. 106, 107-113; R. B11)

-19-

**ARGUMENT**

I.    **HENRY KACZMAREK'S *PRO SE* POST-CONVICTION PETITION PRESENTED THE GIST OF A CONSTITUTIONAL CLAIM THAT THE STATE PRESENTED THE PERJURED TESTIMONY OF CRIMINALIST PAMELA FISH IN ORDER TO SECURE HIS CONVICTION FOR FIRST DEGREE MURDER. KACZMAREK'S PETITION THEREBY WARRANTS FURTHER PROCEEDINGS UNDER THE POST-CONVICTION HEARING ACT.**

In his *pro se* post-conviction petition, Henry Kaczmarek alleged that the State presented the perjured testimony of criminalist Pamela Fish in order to secure Henry's conviction for first degree murder. (C. 78-82) This error is cognizable under the Post-Conviction Hearing Act ("Act") because it amount to "a substantial denial" of Henry's constitutional rights as required by the Act. *See* 725 ILCS 5/122-1(a)(2004). However, the circuit court dismissed Henry's petition as frivolous and patently without merit. In so ruling, the trial court erred, because the petition alleged constitutional errors that were not substantively rebutted by the record. Therefore, this Court should reverse the circuit court's dismissal of the post-conviction petition, and remand this cause for second-stage proceedings pursuant to the Act.

Post-conviction petitions are governed by the Illinois Post-Conviction Hearing Act, 725 ILCS 5/122-1 *et seq.* (2004), which provides a remedy for criminal defendants who claim that a substantial violation of their constitutional rights occurred at the proceedings resulting in their convictions. *People v. Morgan*, 187 Ill.2d 500, 527 719 N.E.2d 681 (1999); *People v. Johnson*, 191 Ill.2d 257, 268, 730 N.E.2d 1107 (2000). The Act creates a three-tiered process for the adjudication of claims of constitutional deprivation. *People v. Gaultney*, 174 Ill. 2d 410, 417, 675 N.E.2d 102 (1996). At the first-stage of the process, when the defendant files a *pro se* post-conviction petition, the Act allows the trial court to review the pleading without input from the

State for a 90-day period to assess its adequacy. 725 ILCS 5/122-2.1(a). The trial court's review

is limited to a singular inquiry: is the pleading "frivolous and patently without merit?" 725 ILCS

5/122-2.1(a)(2); *People v. Boclair*, 202 Ill.2d 89, 789 N.E.2d 734 (2002); *People v. Edwards*,

197 Ill.2d 239, 757 N.E.2d 442 (2001). If it is, the court orders its dismissal; if not, counsel is

appointed, and the matter proceeds to the second-stage under the Act. 725 ILCS 5/122-2.1(b),

122-4 *et seq.*

The Illinois Supreme Court has held that a post-conviction petition is considered

frivolous or patently without merit only if the allegations in the petition, taken as true and

liberally construed, fail to present the "gist of a constitutional claim." *People v. Edwards*, 197

Ill.2d at 244. In adopting the more relaxed gist standard, the Court rejected the prior "sufficient

facts" test and stated that "requiring this type of full or complete pleading is contrary to this

court's holding that the *pro se* defendant need only present a limited amount of detail." *Id.* at

245. Hence, the "gist" standard is a low threshold, requiring only a limited amount of detail and

a claim need not be set forth in its entirety. *Id.* Additionally, all well-pleaded facts in the

petition are taken as true. *People v. Towns*, 182 Ill.2d 491, 503, 696 N.E.2d 1128 (1998).

The standard of review in an appeal from an order dismissing a post-conviction petition is

plenary or *de novo* review, because inquiry into the sufficiency of the allegations is legal in

nature. *People v. Coleman*, 183 Ill.2d 366, 387-88, 701 N.E.2d 1063 (1998).

In his petition, Henry alleged that his right to due process was violated when the State

presented the perjured testimony of criminalist Pam Fish in order to secure his conviction for first

degree murder. A conviction obtained by the knowing use of perjured testimony violates due

process and must be set aside if there is any reasonable likelihood that the false testimony could

-21-

have affected the jury's verdict. *People v. Olinger*, 176 Ill.2d 326, 345, 680 N.E.2d 321 (1997).

However, in order to establish a violation of due process, the prosecutor actually trying the case

need not have known that the testimony was false. *Olinger*, 176 Ill.2d at 348. Rather,

knowledge on the part of any representative or agent of the prosecution is enough. *Olinger*, 176

Ill.2d at 348. Therefore, if in fact the allegation of perjured testimony by Pam Fish (an employee

of the Crime Lab Division of the Chicago Police Department at the time of the first trial and an

employee of the Forensic Science Center run by the Illinois State Police at the time of the second

trial) affecting the jury's verdict is proven by Henry, whether known or unknown to the

prosecution, a due process violation occurred since the prosecution is charged with knowledge of

its agents, including the police. *See People v. Smith*, 352 Ill.App.3d 1095, 817 N.E.2d 982 (1st

Dist. 2004).

In this case, Pam Fish testified at both Henry's first and second trials. At the first trial,

Fish was qualified as an expert in the field of serology. (First Trial R. 855) In order to conduct

her testing, Fish received Henry's jacket, Henry's jeans, blood that was taken from Minnie

Nielsen's kitchen floor, a knife that was recovered from Nielsen's apartment, three jewelry boxes

recovered from Nielsen's apartment, and samples of both Henry's and Nielsen's blood. (First

Trial R. 859-862) Fish made two cuttings from the knees of the jeans and cuttings from each arm

panel of the jacket where she observed reddish-brown stains. (First Trial R. 856-858)

Fish testified that Nielsen's blood was Type A, and Henry's blood was Type B. (First

Trial R. 864) Fish determined that the blood on the kitchen floor was Type A human blood, the

blood on the knife was human blood, and the blood on the jewelry boxes was human blood.

(First Trial R. 867-869) Fish was unable to conduct any further testing on the blood samples

from the floor, knife and boxes. (First Trial R. 867-869)

Fish determined that the reddish brown stains that she found on Henry's jacket and pants were Type A human blood. (First Trial R. 864-865) Fish testified that she was also able to perform electrophoresis on the blood samples taken from Henry's jacket and pants, as well as on the known blood standards of Henry and Nielsen. (First Trial R. 870) Fish tested the samples for nine enzymes and hemoglobin. (First Trial R. 884) Fish was only able to get a reading on eight of the enzymes and hemoglobin. (First Trial R. 873) The samples from Henry's pants and jacket were too degraded to get a reading on the GLO enzyme. (First Trial R. 873) Of the enzymes she was able to test, the enzymes from the blood samples taken from Henry's pants and jacket matched the enzymes from Nielsen's blood. (First Trial R. 873-874) Also, of the enzymes she was able to test, all but one of the enzymes in Nielsen's and Henry's blood were identical. (First Trial R. 906)

Based on her testing, Fish concluded that the blood on Henry's jacket and pants was not his own blood. (First Trial R. 873) Fish testified that about eight in one thousand people would have the same blood type and enzyme types that Nielsen had. (First Trial R. 913)

At the second trial, Fish was qualified as an expert in the fields of electrophoresis, serology, and DNA testing. (Second Trial R. J133) Fish gave similar testimony at the second trial regarding her blood type testing and enzyme testing of the various samples that she received in this case. Her conclusions were the same as the conclusions that she presented at the first trial — that Henry could not have been the contributor of the blood found on his pants and jacket, but that the blood found on the jacket and pants was consistent with Nielsen's blood. (Second Trial R. J127-J154)

-23-

Fish testified that since Henry's first trial, the Chicago Police Department had converted to DNA testing. (Second trial J160) Fish attempted to conduct DNA testing on the remaining samples that she had in this case. (Second Trial R. J160) Fish made additional cuttings on the lower left leg of Henry's pants where she observed some very small stains. (Second Trial R. J162) Fish was able to extract a very small amount of human DNA from these samples, but was unable to conduct any further testing because the samples were too small and degraded, and because it is difficult to conduct DNA testing on samples taken from blue jeans. (Second trial R. J163) Fish tried to conduct DNA testing on the blood samples taken from Henry's jacket, but her results indicated a mixture of blood samples that were consistent and therefore uninterpretable. (Second Trial R. J163)

Pam Fish's testimony that the blood found on Henry's pants and jacket was consistent with Nielsen's blood was critical to the State's case against Henry because it was the only evidence placing Henry inside Nielsen's apartment. There were no fingerprints or shoeprints found in Nielsen's home connecting Henry to the murder. No one testified that they saw Henry entering or leaving Nielsen's apartment. The police did not recover a weapon from Henry connecting him to the murder.

Henry testified that he had never been in Nielsen's apartment and he denied killing her. (Second Trial. K209) Henry explained how he came into possession of Nielsen's things. Henry testified that around 2:00 a.m., on the night of the murder, he returned to Dan Larry's house from a bar because he had to go to the bathroom and he wanted to see if Dan wanted to go out drinking. (Second Trial R. K190, K227-228) Henry parked his car behind Dan's house and went to urinate on the side of the house. (Second Trial R. K191, K214) While urinating, Henry saw a

bag and looked inside.  (Second trial R. K192, K194)  Henry, seeing a box containing silverware

in the bag, picked up the bag and threw it into the trunk of his car.  (Second Trial R. K195)  He

did not look at the bag again until the next day when he sorted through it at his friend Bill

Brown's house.  (Second Trial R. K203-205)  With this plausible explanation for Henry's

possession of Nielsen's things, evidence that Nielsen's blood may have been present on Henry's

pants and jacket was a critical element of the State's case.

     In fact, the State consistently argued the importance of Fish's testimony in both opening

statement and closing argument.  The prosecutor concluded his opening statement at the second

trial with the following:

> On Sunday morning, you are going to hear about Pam Fish.  She's a
> serologist who, at that time, worked for the Chicago Police Department, was
> called at home, called down specially to work on this case.
>     Millie Nielsen is Type A blood.  The defendant is Type B.  The blood on
> the jacket was tested for blood.  It was blood,  It was Type A, just like Millie's.
> The blood on the jeans was Type A, just like Millie's, and you are going to hear
> from Miss Fish over the next two weeks that she performed a process called
> electrophoresis, which is the predecessor of the crime lab's DNA testing.
>     But back in 1987, they were doing electrophoresis, and they test for
> enzymes in the blood, and Miss Fish was able to test for nine known enzymes in
> the victim, Millie Nielsen's blood.
>     Wouldn't you know that the bloodstain on the defendant's right jacket
> sleeve, as I said, was A, and every enzyme matched that of the blood of Millie
> Nielsen.
>     And the blood stain on his left jacket sleeve was A, and every enzyme,
> all nine enzymes, matched those of the blood of Millie Nielsen.
>     And the stain on his right thigh area was A, just like Millie Nielsen, and
> all nine enzymes tested the same as enzymes of the known blood standard of Millie
> Nielsen and, once again, when they tested the left leg, they tested the enzyme activity,
> and all nine enzymes tested, tested and matched those of Millie Nielsen.
> (Second Trial R. I19-20)

During closing, the prosecutor argued:

> And later on, you heard that Pam Fish performed electrophoresis, the

process that was used at that time.  If I can remember from her testimony the other day, from the items that she cut out the blood on the defendant's clothes was consistent in all 9 categories of enzyme activity with the victim Millie Nielsen's blood on his clothes cannot be his because it's type A, he's type B.  He's immediately excluded.  (Second Trial R. L83)

   And circumstantially we can say well if the blood in that cut out on his right sleeve is consistent with all the enzymes of Millie Nielsen, blood that lights up right now next to that cut out, couldn't you infer that's also the blood of Millie Nielsen?  Couldn't you also infer that the specks are the blood of Millie Nielsen.  (Second Trial R. L84-85)

   Now in [Nielsen's] struggle for life, she left you the clues to find him guilty.  Because she left her blood on his jacket and on his pants.  (Second Trial R. L88)

Clearly, the State relied heavily on Fish's testimony and expert opinions in its effort to connect

Henry to the crime.

   In his post-conviction petition, Henry claimed that Pam Fish's testimony was perjured.

(C. 78-82)

   The only evidence of any substance in this case is the testimony of Pam Fish, who[se] credibility is now called into question, not just in the present case, but in all cases that she testified on the State's behalf.  It has now been proven that Ms. Fish has repeatedly lied to and mislead juries and courts to ensure convictions for the State.  She is under investigation, she is being sued and all cases that Ms. Fish has testified in are being called into question.  (C. 81)

In support of his allegation, Henry attached four newspaper articles to his petition.  (C. 92-98)

The first article reports that Pam Fish had been transferred to an administrative job within the

Illinois State Police crime lab in research and development where she would review proposed

projects and help write grants.  Nicole Ziegler Dizon, *Crime Lab Supervisor Transferred*, The

State Journal Register, August 16, 2001.  Fish had been the supervisor of the biochemistry

division of the Illinois State Police crime lab which handled DNA and trace evidence. *Id.* The

article reported that this transfer came after Fish's work had been questioned in several high-

profile rape cases, and that several civil suits had been filed against Fish claiming that Fish

misled juries and ignored evidence that could have exonerated defendants. *Id.*

The second article describes a report[2], authored by Edward T. Blake and Alan Keel, which had been filed in federal court accusing Pam Fish of providing false testimony in nine cases, including one involving Billy Wardell and Donald Reynolds, who were wrongfully convicted of the 1986 rape of two University of Chicago students. Robert C. Herguth, *Report Slams '80s Police Lab*, Chicago Suntimes, January 14, 2001. The two men were later exonerated by DNA. *Id.* The report was filed as part of a civil lawsuit being brought by Wardell and Reynolds. *Id.* The report also stated that Fish gave contradictory and questionable testimony in the case of the four men convicted of the 1986 rape and murder of medical student Lori Roscetti on the West Side. *Id.* The article pointed out that Fish had first come under scrutiny when it was revealed that she failed to disclose that John Willis, who was wrongly convicted of rape, had a different blood type from the actual offender. *Id.*

The third article describes the report authored by Blake and Keel regarding Fish and another report authored by Dr. Howard Harris regarding the Chicago Police Department crime laboratory. Both of these reports were filed in federal court in connection with the civil suit filed by Billy Wardell and Donald Reynolds. Maurice Possley and Steve Mills, *Disorganization Typified Crime Lab, Report Says*, Chicago Tribune, January 15, 2001. The report pertaining to the Chicago Police Department crime lab concluded that the lab "'displayed serious deviations from established crime laboratory standards for care of crime laboratories in 1986.'" *Id.* The report pertaining to Fish alleged that she "falsely testified about the results of blood tests

---

[2]Appellant's Motion to Supplement the Record on Appeal with the Blake and Keel report was denied by this Court on September 30, 2005.

-27-

performed for the Reynolds and Wardell case, as well as the cases of seven other men." *Id.*

The final article also discusses the Blake and Keel report. Steve Mills and Maurice Possley, *State Crime Lab Fraud Charged*, Chicago Tribune, January 14, 2001. The article quotes the report as stating, "'In many of these cases, Ms. Fish misrepresented the scientific significance of her findings either directly or by omission. . . . The nature of these errors are such that a reasonable investigator, attorney or fact finder would be misled. . . . And always, she offered the opinion most damaging to the defendant.'" *Id.* According to the article, in the Willis case, Fish testified that her test results were inconclusive, but her lab notes later showed that the tests excluded Willis as a suspect. *Id.* In the cases of Larry and Calvin Ollins, who were accused of the rape and murder of Lori Roscetti, Fish's testimony helped to convict the brothers even though her tests ruled them out as having any link to the semen found in Roscetti, a fact that Fish failed to disclose to the jury. *Id.* In an interview, Blake told the Chicago Tribune that he was surprised that the disclosures in past cases had not generated investigation into all of Fish's cases. *Id.*

In *People v. Smith*, 352 Ill.App.3d 1095, 817 N.E.2d 982 (1st Dist. 2004), the defendant filed a post-conviction petition alleging that he had been denied his right to due process where the State presented the perjured testimony of Pamela Fish in order to secure his conviction for murder. The defendant's petition was dismissed at the second stage of post-conviction proceedings. *Smith*, 352 Ill.App.3d at 1098. On appeal, the defendant argued that the circuit court erred in dismissing his post-conviction petition. *Smith*, 352 Ill.App.3d at 1097. In response, the State first argued that the defendant had failed to show any constitutional violation because the testimony provided by Fish was not material at his trial. The court disagreed,

pointing out that Fish's testimony did connect the defendant to the crime, and the State relied on

Fish's testimony in both opening statement and closing argument to argue to the jury that Fish's

testimony connected the defendant to the crime. *Smith*, 352 Ill.App.3d at 1102-1105.

The State in *Smith* also argued that the defendant's petition was properly dismissed

because the defendant failed to provide documentation supporting his allegation of false or

perjured testimony. *Smith*, 352 Ill.App.3d at 1105. The appellate court disagreed with this

contention as well. The defendant attached to his petition the "Petition to Vacate Judgment"

from *People v. Willis*, No. 90 CR 23912. *Smith*, 352 Ill.App.3d at 1107. The court found that

the *Willis* petition demonstrated that Fish testified that the results of her tests in that case were

inconclusive, which was similar to the testimony she had given regarding her test results in

*Smith*. *Smith*, 352 Ill.App.3d at 1107-1108.

> It was not until April of 1998 that defense attorneys in the *Willis* case
> discovered, by reviewing Fish's notes of test results, that her testing did not produce
> inconclusive results, but actually exonerated Willis. . . . Pamela Fish incorrectly
> reported the results as 'inconclusive' and repeated this assertion at trial. The forensic
> results in fact excluded Willis, which defense counsel discovered after trial when
> given the opportunity to examine the notes of the test results.
>
> *     *     *
>
> Without a hearing it cannot be determined whether Fish's testimony in the
> instant case regarding inconclusive test results was factually accurate or factually false
> as it was found to be in the *Willis* case. Without a hearing, it cannot be determined
> whether Fish's testimony that she was unable to type some of the blood samples in
> the instant case due to insufficient size was accurate or factually false.
>
> Fish also conducted an electrophoresis enzyme test on the blood found on
> Smith's underpants and on cross-examination she testified that for 6 of the 10
> subcategories of enzymes she tested for she got no reaction. However, on re-direct
> she claimed that the enzymes she did recover from the defendant's underwear were
> consistent with the victim's blood. Fish's testimony that she got no reaction from the
> test is similar to her testimony in the *Willis* case where she reported her test results as
> inconclusive. As previously noted, the forensic results in fact were inaccurately
> reported by Fish as inconclusive and in fact excluded Willis. Without a hearing, it
> cannot be determined whether Fish's testimony in the instant case that she got no

-29-

reaction was factually accurate or factually false.

*    *    *

Fish further testified she did not conduct DNA testing of any of the blood samples because the blood sample was 'degraded.' Without a hearing, it cannot be determined whether Fish's inability to conduct DNA testing for the reason provided at trial was in fact accurate or, as alleged by defendant, factually false, as similar testimony was found to be in the *Willis* case. *Smith*, 352 Ill.App.3d at 1108.

The appellate court found that the defendant had made a substantial showing of a constitutional violation warranting an evidentiary hearing. *Smith*, 352 Ill.App.3d at 1112. The court remanded the case for an evidentiary hearing to determine whether or not the defendant had in fact been denied due process and unfairly convicted as the result of the perjured testimony provided by Pamela Fish. *Smith*, 352 Ill.App.3d at 1113.

The articles Henry attached to his petition and this Court's decision in *Smith* support Henry's allegation that Pam Fish testified falsely at his trial. These documents give numerous examples of cases where Fish either testified falsely or gave misleading testimony, always in support of the State's case against the defendants. The newspaper articles detail the many cases in which Fish's testimony aided in the conviction of certain defendants who were later exonerated of the crimes for which they were convicted. The articles also discuss how Fish was transferred to an administrative position within the crime lab after the allegations of her misconduct were revealed.

The report from Alan Keel and Edward Blake, as reported in the articles, concludes that in many of the cases in which Fish's testimony was critical to the State's case, she misrepresented the scientific significance of her findings either directly or by omission to such an extent that a reasonable investigator, attorney or fact finder would have been misled concerning the ability of her work to include or exclude relevant individuals as potential sources of

-30-

biological evidence.

Moreover, the facts of *Smith*, and those of *Willis* as described in *Smith*, are strikingly similar to the facts in this case. First, as in *Smith* and *Willis*, part of Fish's test results in this case were inconclusive. Fish's results from the DNA testing that she did on Henry's jacket were inconclusive. Thus, like *Smith* and *Willis*, without a hearing, it cannot be determined whether Fish's testimony regarding inconclusive test results was factually accurate or factually false.

Second, as in *Smith* and *Willis*, Fish testified that she got "no reaction" for one out of the nine enzymes that she tested for on Henry's pants and jacket. Fish testified that she was not able to determined the type of GLO enzyme present in the samples taken from Henry's pants and jacket. Also, as in *Smith* and *Willis*, Fish testified that of the enzymes she was able to recover, they were all consistent with Nielsen's blood. Thus, like *Smith* and *Willis*, without a hearing, it cannot be determined whether Fish's testimony that she got no reaction was factually accurate or factually false.

Finally, as in *Smith* and *Willis*, Fish testified that she could not conduct DNA testing on many of the blood samples because the samples were "degraded." Fish testified that she was not able to obtain a DNA profile from the blood samples taken from Henry's pants because the samples were too small or degraded. Thus, like *Smith* and *Willis*, without a hearing, it cannot be determined whether Fish's inability to conduct DNA testing for the reason provided at trial was in fact accurate or was factually false.

While the issue before this Court in *Smith* and in this case is the same, it is important to note that the post-conviction petition in *Smith* had been dismissed at the second stage of post-conviction proceedings, while Henry's petition was dismissed at the first stage. Therefore, the

court in *Smith* had to determine whether the defendant had demonstrated a substantial showing of a constitutional violation warranting an evidentiary hearing, while in this case, this Court need only determine whether Henry has stated the gist of a constitutional violation. *See Smith*, 352 Ill.App.3d at 1099. Based on the similarities between the facts of this case and those of *Smith*, Henry has clearly satisfied this low standard.

As in *Smith*, this Court should reverse the dismissal of Henry's *pro se* post-conviction petition and remand for further post-conviction proceedings. Henry has alleged facts in his petition, unrebutted by the record and support by documentation, that Pamela Fish gave perjured testimony that led to his conviction for first degree murder. This perjury by an agent of the State constitutes a due process violation and is therefore cognizable under the Act. Therefore, this Court must reverse the dismissal of Henry Kaczmarek's post-conviction petition and remand for further proceedings under the Post-Conviction Hearing Act.

II.    **HENRY KACZMAREK'S *PRO SE* POST-CONVICTION PETITION PRESENTED THE GIST OF A CONSTITUTIONAL CLAIM OF INEFFECTIVE ASSISTANCE OF TRIAL AND APPELLATE COUNSELS FOR FAILING TO CHALLENGE THE ADMISSIBILITY OF THE STATE'S EXPERT WITNESSES' TESTIMONY REGARDING LUMINOL TESTING AND BLOOD SPLATTER EVIDENCE UNDER *FRYE V. UNITED STATES*. KACZMAREK'S PETITION THEREBY WARRANTS FURTHER PROCEEDINGS UNDER THE POST-CONVICTION HEARING ACT.**

In his *pro se* post-conviction petition, Henry Kaczmarek alleged that he received the ineffective assistance of counsel where his appellate and trial counsels failed to challenge the trial court's erroneous acquiescence to the expert testimonies of the State's witnesses Mitch Rea and Rod Englert. (C. 84-85)  Where both trial and appellate counsel failed to challenge these witnesses' testimonies under *Frye v. United States*, Henry stated the gist of a constitutional claim cognizable under the Post-Conviction Hearing Act ("Act").  *See* 725 ILCS 5/122-1(a)(2004). However, the circuit court dismissed Henry's petition as frivolous and patently without merit.  In so ruling, the trial court erred, because the petition alleged constitutional errors that were not substantively rebutted by the record.  Therefore, this Court should reverse the circuit court's dismissal of the post-conviction petition, and remand this cause for second-stage proceedings pursuant to the Act.

Post-conviction petitions are governed by the Illinois Post-Conviction Hearing Act, 725 ILCS 5/122-1 *et seq.* (2004), which provides a remedy for criminal defendants who claim that a substantial violation of their constitutional rights occurred at the proceedings resulting in their convictions. *People v. Morgan*, 187 Ill.2d 500, 527 719 N.E.2d 681 (1999); *People v. Johnson*, 191 Ill.2d 257, 268, 730 N.E.2d 1107 (2000).  The Act creates a three-tiered process for the adjudication of claims of constitutional deprivation. *People v. Gaultney*, 174 Ill. 2d 410, 417,

-33-

675 N.E.2d 102 (1996). At the first-stage of the process, when the defendant files a *pro se* post-conviction petition, the Act allows the trial court to review the pleading without input from the State for a 90-day period to assess its adequacy. 725 ILCS 5/122-2.1(a). The trial court's review is limited to a singular inquiry: is the pleading "frivolous and patently without merit?" 725 ILCS 5/122-2.1(a)(2); *People v. Boclair*, 202 Ill.2d 89, 789 N.E.2d 734 (2002); *People v. Edwards*, 197 Ill.2d 239, 757 N.E.2d 442 (2001). If it is, the court orders its dismissal; if not, counsel is appointed, and the matter proceeds to the second-stage under the Act. 725 ILCS 5/122-2.1(b), 122-4 *et seq.*

The Illinois Supreme Court has held that a post-conviction petition is considered frivolous or patently without merit only if the allegations in the petition, taken as true and liberally construed, fail to present the "gist of a constitutional claim." *People v. Edwards*, 197 Ill.2d at 244. In adopting the more relaxed gist standard, the Court rejected the prior "sufficient facts" test and stated that "requiring this type of full or complete pleading is contrary to this court's holding that the *pro se* defendant need only present a limited amount of detail." *Id.* at 245. Hence, the "gist" standard is a low threshold, requiring only a limited amount of detail and a claim need not be set forth in its entirety. *Id.* Additionally, all well-pleaded facts in the petition are taken as true. *People v. Towns*, 182 Ill.2d 491, 503, 696 N.E.2d 1128 (1998).

The standard of review in an appeal from an order dismissing a post-conviction petition is plenary or *de novo* review, because inquiry into the sufficiency of the allegations is legal in nature. *People v. Coleman*, 183 Ill.2d 366, 387-88, 701 N.E.2d 1063 (1998).

In his *pro se* post-conviction petition, Henry alleged that the trial judge was biased against him as evidenced by the judge allowing the State's expert witnesses to testify as experts

despite their credentials suggesting that they were not in fact experts. (C. 84) Henry further

alleged in his petition that his trial and appellate counsels were ineffective for failing to challenge

these experts' testimonies at both the trial and appellate levels. (C. 84)

The two State expert witnesses at issue were Mitch Rea and Rod Englert. Mitch Rea, an

Arizona fraud investigator, testified that he was contacted by the Cook County State's Attorney's

Office in the Spring of 1994 to perform luminol testing in conjunction with the Nielsen murder.

(Second Trial R. K7, K26) The trial court accepted Rea as an expert in the field of luminol

testing. (Second Trial R. K25-26) Rea testified that luminol testing is a chemical test for the

presence of blood. (Second Trial R. K9) In the forensic context, Rea testified, luminol testing is

primarily used to find blood that you cannot see. (Second Trial R. K10-11) Rea described that

when the test is conducted, the luminol will produce a fleeting luminance or glow where blood is

present. (Second Trial R. K12) Rea admitted that luminol will react not only with human blood,

but animal blood, certain metals, cleansers, common household agents, bleach, and some plant

materials as well. (Second Trial R. K17)

Rea conducted luminol testing on Henry's jacket and he testified that he observed a

luminance consistent with blood on the right front arm, right front panel, left front panel, and left

front sleeve of Henry's jacket. (Second Trial R. K26-27, K32-37) Rea took photographs of the

jacket and pants showing the locations of the glow. (Second Trial R. K39)

Rod Englert testified on behalf of the State regarding blood splatter evidence. The court

ruled that Englert was an expert in the field of crime scene reconstruction and blood splatter.

(Second Trial R. K66) Upon request from the Cook County State's Attorney, Englert reviewed

the photographs of the Nielsen crime scene, the statements of witnesses, the luminol testing

photographs prepared by Mitch Rea, and the physical evidence recovered in the case. (Second Trial R. K66-69)

Concerning Ms. Nielsen's apartment, Englert noted that there was blood on the floor of the kitchen leading into Ms. Nielsen's bedroom. (Second Trial R. K91) Englert also observed that "on the floor are smears of blood, as though a struggle took place, and one of the individuals on the floor was bleeding." (Second Trial R. K91) When asked whether it was unusual not to have any footprints in the blood, Englert stated that it would not be unusual because blood dries very fast. (Second Trial R. K86-91)

Englert stated that the left and right knee areas of Henry's pants contained transfer stains and not splatter. (Second Trial R. K94) The transfer does not involve energy but just a transfer of something that was bloody that touched against the pants. (Second Trial R. K95) As for the bottom of the pants, Englert opined that there were numerous specks of blood consistent with medium velocity splatter. (Second Trial R. K96) Englert stated that the blood on defendant's pants would not be consistent with a person picking up a bloody bag in a gangway. (Second Trial R. K100) Further, Englert opined that the blood on the jeans would not be consistent with the wearer of the jeans "kneeing" someone in the nose. (Second Trial R. K102)

In examining the luminol photographs of Henry's jacket, Englert stated that the stains on the right and left arms contained splatter. (Second Trial R. K109) Englert stated that over the front of the jacket were little specks of projected blood. (Second Trial R. K111) On the right pocket was a very light transfer stain. (Second Trial R. K111)

Englert asserted that the manner of Nielsen's death was that she was attacked first in the kitchen where she received many blows while on the floor, and that she, while still alive, was

taken into the bedroom and thrown on the bed. (Second Trial R. K117) Englert acknowledged

that there was a great deal of blood in Ms. Nielsen's bed. (Second Trial R. K134)

Englert admitted that he was assuming that the blood splatter on Henry's jeans was

Nielsen's blood. (Second Trial R. K123) Englert conceded that no report stated that the splatter

on the lower left leg was Nielsen's blood and that if it were someone else's blood he would have

to reevaluate his position. (Second Trial R. K122-123) Englert testified that it was "very, very

possible" to get medium velocity splatter from a fight. (Second Trial R. K125)

While trial and appellate counsels challenged the expertise of Rea and Englert, trial

counsel did not request a *Frye* hearing to determine the admissibility of luminol testing and

blood splatter evidence, nor did appellate counsel raise this issue on appeal. It is well established

that the right to counsel guaranteed by both the United States and Illinois Constitutions includes

the right to the effective assistance of counsel. U.S. Const. Amends. VI, XIV; Ill. Const., Art. I,

sec.8; *Strickland v. Washington*, 466 U.S. 688, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *People v.*

*Albanese*, 104 Ill.2d 504, 473 N.E.2d 1246 (1984). Consequently, post-conviction relief may be

sought on the basis of ineffective assistance of trial counsel. *See People v. Steidl*, 177 Ill.2d 239,

685 N.E.2d 1335 (1997). Claims of ineffective assistance of appellate counsel are measured

against the same standard as those dealing with ineffective assistance of trial counsel. *People v.*

*West*, 187 Ill.2d 418, 435, 719 N.E.2d 664 (1999). A defendant who contends that appellate

counsel rendered ineffective assistance must show that the failure to raise the issue was

objectively unreasonable. *People v. Coleman*, 168 Ill.2d 509, 523, 660 N.E.2d 919 (1995).

In Illinois, the exclusive test for the admission of expert testimony is governed by *Frye v.*

*United States,* 293 F. 1013 (D.C. Cir. 1923). *Donaldson v. Central Ill. Pub. Serv. Co.*, 199 Ill.2d

-37-

63, 76-77, 767 N.E.2d 314 (2002). The *Frye* standard, commonly called the "general acceptance" test, provides that scientific evidence is only admissible at trial if the methodology or scientific principle upon which the opinion is based is "sufficiently established to have gained general acceptance in the particular field in which it belongs." *Donaldson*, 199 Ill.2d at 77, *quoting Frye*, 293 F. At 1014. In determining general acceptance, the focus is on the underlying methodology used to generate the conclusion, not the ultimate conclusion itself. *Donaldson*, 199 Ill.2d at 77. The initial inquiry focuses on *what* has been generally accepted by the relevant scientific community. *Donaldson*, 199 Ill.2d at 77-78. General acceptance does not require that the methodology be accepted by unanimity, consensus or even a majority of the experts. *Donaldson*, 199 Ill.2d at 78. "The *Frye* rule is meant to exclude methods new to science that undeservedly create a perception of certainty when the basis for the evidence or opinion is actually invalid." *Donaldson*, 199 Ill.2d at 78.

The *Frye* test is to be applied when the scientific principle, technique or test offered by the expert to support his or her conclusion is new or novel. *Donaldson*, 199 Ill.2d at 78-79. A scientific technique will be considered new or novel if is it original or striking or does not resemble something formerly known or used. *Donaldson*, 199 Ill.2d at 79. Once a principle, technique, or test has gained general acceptance in the particular scientific community, its general acceptance is presumed in subsequent litigation, and further *Frye* hearings will not be required. *Donaldson*, 199 Ill.2d at 79.

No reported cases in Illinois have addressed the admissibility of luminol testing. Two cases mention the use of luminol testing, but neither of these cases address the admissibility of the test results. *See People v. Henne*, 165 Ill.App.3d 315, 518 N.E.2d 1276 (4th Dist. 1988);

-38-

*People v. Hendricks*, 145 Ill.App.3d 71, 495 N.E.2d 85 (4th Dist. 1986).  In *People v. Wheeler*, 777 N.E.2d 961 (3rd Dist. 2001), *supplemental opinion at People v. Wheeler*, 334 Ill.App.3d 273, 777 N.E.2d 961 (2002), a police technician testified regarding LMG (Leuco-Malachite Green) testing that he conducted on certain evidence in the case.  LMG testing is a similar test to that of luminol testing in that it involves the spraying of a chemical mixture on a surface in order to detect latent blood.  *Wheeler*, 777 N.E.2d at 963, 965, 968.  Initially, the appellate court remanded the cause for a *Frye* hearing finding no reported cases in Illinois addressing the admissibility of LMG evidence.  *Wheeler*, 777 N.E.2d at 968.  On remand, the *Frye* hearing established a positive LMG reaction indicates a broad range of possible substances present on the material tested, but that it does not permit the tester to presume the presence of any particular substance.  *Wheeler*, 777 N.E.2d at 970.  Thus, the court found that LMG testing was generally accepted as a preliminary test for the presence of blood and not an accepted method for presuming the presence of blood.  *Wheeler*, 777 N.E.2d at 970.

 The admissibility of blood splatter evidence has also not been established in Illinois under *Frye*.  In *People v. Owens*, 155 Ill.App.3d 990, 994, 508 N.E.2d 1088 (4th Dist. 1987), a crime scene technician testified that based on the location of blood splatters on a milk carton found at the scene, the victim was either standing or sitting behind the milk carton at the time he was shot, a key to the State's case against the defendant.  The appellate court reversed the defendant's conviction and remanded the cause for a new trial finding no cases in which Illinois courts have taken judicial notice of the reliability of blood-splatter analysis evidence.  *Owens*, 155 Ill.App.3d at 998.  *Compare People v. Knox*, 121 Ill.App.3d 579, 459 N.E.2d 1077 (3rd Dist. 1984), *Justice Stouder dissenting* (court found that the blood splatter evidence presented in that case was not of

such a complex nature as to require a more detailed scientific foundation than what the State

provided).

Thus, the admissibility of luminol testing and blood splatter evidence in Illinois has not

been established under *Frye*. As such, defense counsel should have demanded a *Frye* hearing

before Rea and Englert testified at Henry's trial, and appellate counsel should have raised the

issue of trial counsel's ineffectiveness for not doing so on appeal. A *Frye* hearing could have

resulted in a finding that one or both of the luminol testing or blood splatter evidence was

inadmissible at Henry's trial because such testing had not gained general acceptance in the

community. Or, as in *Wheeler*, the court may have found the evidence to be admissible but only

in a limited capacity that would have been made clear to the jury. Counsels' failure to challenge

this evidence under *Frye* was unreasonable.

Moreover, Henry was prejudiced as a result of his trial and appellate counsel's

ineffectiveness. Rea's and Englert's testimonies were extremely damaging to Henry's case.

Rea's testimony served as a basis for Englert's testimony. The foundation for Englert's

testimony was that the areas on Henry's jacket and pants that glowed were blood, Nielsen's

blood. Englert then opined that the "splatter" on the bottom of Henry's pants and the cuffs of his

jacket was consistent with medium velocity splatter, and not picking up a bloody bag in a

gangway, as Henry contended. Moreover, the State relied heavily on Rea's and Englert's

testimonies in its closing argument:

> We had the jacket tested for luminol to see if other stains showed up, if
> there was any other indicia of blood on the jacket. And on that jacket you have
> splatter and blood which was pointed out by Mr. [Rea] and Mr. Englert [ ] who is
> an expert in crime scene reconstruction and blood splatter and was able to explain to
> you how the defendant got the blood on his clothes. And circumstantially we can

say well if the blood in that cut out on his right sleeve is consistent with all the enzymes of Millie Nielsen, blood that light up right now next to that cut out, couldn't you infer that's also the blood of Millie Nielsen? (Second Trial R. L84)

You heard Mr. Rod Englert he looked at the evidence and interpreted it for you. That interpretation was consistent with every piece of evidence. As Mr. Englert told you, he looks at all the pieces of the puzzle, this puzzle fit together. This puzzle when you put the pieces together portray the image of the defendant standing, beating up and choking Millie Nielsen in her room. (Second Trial R. L112)

Not only is that reasonable, but Rod Englert told you about that blood that she had during the attacks. Just because there may be a lot of blood at the scene, doesn't mean that at the moment of the attack, the individual gets blood soaked. It doesn't mean that at all. And he told you about the experiments he's conducted. (Second Trial R. L113)

Or is the more reasonable account for what happened as told to you by Rod Englert as borne out by the evidence when he talked about the transfer stains, the wipes, the swipes is the more reasonable account. That Millie as she's trying to fend off her attack and you look at the sleeves of this garment, you look a[t] the hand area of this garment. What do you see? Blood. You sweep this against the hands and the arms of the offender who is trying to take the life out of your body, there's your transfer stain. That explains it. (Second Trial R. L114)

The luminol testing and blood splatter evidence were critical to the State in refuting Henry's claim that he found the bag of Nielsen's things in the gangway and merely carried it to his car. Rea's testimony that the luminol testing showed blood splatters on Henry's pants and jacket was the basis for Englert's testimony that the blood stains found on Henry's jacket and pants could not have come from carrying a bloody bag, but rather were consistent with Henry's being Nielsen's killer.

Henry's *pro se* post-conviction petition, alleging that his trial and appellate counsels were ineffective for failing to challenge the trial court's acquiescence to the testimonies of Rea and Englert, stated the gist of a meritorious constitutional claim of ineffective assistance of counsel. Because luminol testing and blood splatter analysis have not achieved general acceptance in Illinois, trial counsel should have demanded a *Frye* hearing before this evidence was admitted at

Henry's trial, and having failed to do so, appellate counsel should have raised the issue of trial counsel's ineffectiveness on appeal.  Rea's and Englert's testimonies regarding the luminol testing and blood splatter analysis were critical to the State's case against Henry, and Henry was thereby severely prejudiced by his counsels' ineffectiveness.  Therefore, this Court must reverse the dismissal of Henry Kaczmarek's post-conviction petition and remand for further proceedings under the Post-Conviction Hearing Act.

## CONCLUSION

For the foregoing reasons, Henry Kaczmarek, Petitioner-Appellant, respectfully requests that this Court reverse the trial court's decision dismissing Henry's *pro se* petition for post-conviction relief, and remand this cause for the appointment of counsel and further proceedings pursuant to sections 122-4 through 122-6 of the Post-Conviction Hearing Act.

Respectfully submitted,

MICHAEL J. PELLETIER
Deputy Defender

SARAH CURRY
Assistant Appellate Defender
Office of the State Appellate Defender
203 North LaSalle Street - 24th Floor
Chicago, Illinois  60601
(312) 814-5472

COUNSEL FOR PETITIONER-APPELLANT

## **APPENDIX TO THE BRIEF**

Index to the Record . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  A-1

Certified Report of Disposition . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  A-11

Notice of Appeal . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  A-12

# INDEX TO THE RECORD

**Common Law Record ("C")**                                                    **Page**

Memorandum of Orders ("Half Sheet") . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 26

Certified Statement of Conviction/Disposition . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Opinion Order (October 2, 2003, March 4, 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31, 45

Petition for Post Conviction Relief (March 24, 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . 77

Chicago Police Department Laboratory Report . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 90

Certified Report of Disposition (June 21, 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 106

Order . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 107

Notice of Appeal (July 13, 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 114

**Supplemental Commonlaw Record ("SC")**

Correspondence from Forensic Science Associates . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

**Report of Proceedings ("R")**

|  | Direct | Cross | Redir. | Recr. |
|---|---|---|---|---|
| May 19, 2004 |  |  |  |  |
| Continuance |  |  |  | B2 |
| June 14, 2004 |  |  |  |  |
| Petition for Post-Conviction Relief - Denied |  |  |  | B11 |

**Direct Appeal Record**
**Common Law Record ("SC")**                                                    **Page**

Court No. 97-2557

Memorandum of Orders ("Half Sheet") . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Indictment (May 18, 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

Appellate Court's Opinion (March 31, 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

Motion to Reduce Bail (September 30, 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 79

A-1

Pro Se Motion for Appointment of Other Counsel (January 31, 1994) . . . . . . . . . . . . . . . . . 82

Pro Se Motion to Secure Expert Witness (January 31, 1994) . . . . . . . . . . . . . . . . . . . . . . . . 86

Motion for Bond Reduction (February 23, 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 90

Motion for Judgment Notwithstanding the Verdict (September 13, 1994) . . . . . . . . . . . . . . 91

Motion to Dismiss Based Upon Speedy Trial Violation (November 18, 1994) . . . . . . . . . . . 93

State's Motion to Compel Discovery (January 27, 1995) . . . . . . . . . . . . . . . . . . . . . . . 104, 116

Order (April 6, 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 107

Documents Tendered by the State (June 27, 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 104, 116

Order (April 6, 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 107

Documents Tendered by the State (June 27, 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 109

State's Supplemental Answer to Discovery (January 27, 1995) . . . . . . . . . . . . . . . . . . . . . . 111

Certificate Adjudging Named Person to be Material Witness (August 8, 1995) . . . . . . . . . . 121

Report of Proceedings (October 11, 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 126

Bond . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 135

Renewed Motion to Revoke or Increase Defendant's Bond . . . . . . . . . . . . . . . . . . . . . . . . . 147

Jury Instructions and Verdicts (November 22, 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 152

Motion in Limine (November 18, 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 195

Motion to Dismiss with Exhibits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 199

Motion to Grand Bond Pending Appeal . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 201

Sentencing Order . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 201

Motion for New Trial (January 17, 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 294

Notice of Appeal (May 7, 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 296


**Direct Appeal**
**Report of Proceedings ("SR")**

| | Direct | Cross | Redir. | Recr. | |
|---|---|---|---|---|---|
| Jury Selection | | | | | H32 |

|  | **Direct** | **Cross** | **Redir.** | **Recr.** |
|---|---|---|---|---|
| Opening Statements | | | | |
| State | | | | I9 |
| Defendant | | | | I21 |
| States Witnesses | | | | |
| Officer Marsala | I32 | I51 | | |
| Ronald Larry | I60 | I85 | I101 | |
| Michael Chambliss | I103 | I147 | I155 | I156 |
| Margaret Fisher | I176 | I194 | I203 | |
| John Fisher | I204 | I211 | | |
| Mary Ann Furlong | I213 | I229 | | |
| Robert Baike | J3 | J20 | | |
| Jerome Bogucki | J27 | J61 | | |
| Robert Davie | J70 | J86 | | |
| Fern Briggs | J95 | | | |
| Barbara Briggs | J103 | | | |
| Theatrice Patterson | J110 | J121 | J123 | |
| Pam Fish | J127 | J164 | J170 | |
| Mitch Rea | K6, K26 | K21, K40 | K43 | |
| Rod Englert | K47, K66 | K64, K121 | K146 | K147 |
| Defense Witnesses | | | | |
| Pam Hines | K151 | K157 | | |
| Henry Kaczmarek | L172 | K213 | K258 | |
| Elizabeth Finuchi | | | | K163 |
| Dr. Kenneth Siegesmund | L3 | L9 | L35 | |

A-3

|  | **Direct** | **Cross** | **Redir.** | **Recr.** | |
|---|---|---|---|---|---|
| Defense Rests | | | | | L42 |
| State's Rebuttal | | | | | |
|     Detective Bogucki | L42 | L46 | L52 | L54 | |
|     Richard Stevens | L56 | L61 | L64 | | |
| Closing Arguments | | | | | |
|     State | | | | | L74 |
|     Defendant | | | | | L88 |
|     State | | | | | L106 |
| **Verdict** | | | | | L133 |
| Motion for New Trial | | | | | N3 |
| **Imposition of Sentence** | | | | | N13 |

**Direct Appeal Record**
**Common Law Record ("SC")**                                          **Page**

**Court No.  89-3182**

Arrest Report  (April 26, 1987 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Complaint  (April 27, 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Order Committing Defendant to Cook County Department of Corrections to be Held Without
Bail  (April 27, 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Indictment (May 18, 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

State's Motion for Discovery (May 20, 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

Placita (May 29, 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

**Direct Appeal Record**
**Common Law Record ("SC")**                                                    **Page**

State's Answer to Discovery (June 25, 1987) ................................... 35

State's Motion for Disclosure (July 9, 1987) ...................................... 40

Order (July 9, 1987) .............................................................. 41

Defendant's Answer to Discovery (July 9, 1987) ................................. 42

Motion to Advance and Reset (September 1, 1987) ............................... 47

Defendant's Motion for Discovery (November 12, 1987) ......................... 50

Motion to Quash Arrest and Suppress Evidence (November 12, 1987) .................. 55

Motion to Allow Inspection of Police Evidence Files (December 16, 1987) .............. 58

Subpoena (December 16, 1987) ................................................... 62

Order (December 17, 1987) ...................................................... 96

Defendant's Motion for Appointment of Certain Experts (February 23, 1987) ........... 98

State's Amended Answer to Discovery (October 26, 1988) .......................... 102

Motion to Suppress Statements (October 26, 1988) ............................... 104

Motion to Produce Testable Sample of Blood Stains and Blood (October 26, 1988) ...... 107

State's Response to the Defendant's Motion to Produce Testable Samples of Blood Stains
and Blood (November 2, 1988) ................................................... 109

State's Motion to Compel Discovery (March 22, 1989) ............................ 113

Order (April 6, 1989) ........................................................... 119

Motion to Advance and Reset Court Date (May 31, 1989) ......................... 122

Motion to Appoint the Public Defender as Counsel or Otherwise Provide for the Legal
Representation of Defendant (May 31, 1989) ..................................... 126

Motion to Appoint Midwest Center to Institutions and Alternatives to Prepare
Sentencing Plan (May 31, 1989) ................................................. 129

Arrest Warrant for Thomas Szeszol and Danny Funkhauswer (June 5, 1989) ........... 132

Defendant's Answer to Discovery (June 5, 1989) ................................. 134

State's Second Amended Answer to Discovery (June 5, 1989) ...................... 134

**Direct Appeal Record**
**Common Law Record ("SC")**                                        **Page**

Jury Waiver as to Death Penalty Hearing (June 5, 1989) ........................ 137

Order (June 6, 1989) ........................................................ 138

Defendant's Amended Answer to Discovery (June 6, 1989) ...................... 139

Defendant's Motion to Produce Evidence (June 6, 1989) ....................... 141

Defendant's Motion for Discovery and a Bill of Particulars as to Aggravation
(June 6, 1989) .............................................................. 144

Motion for Attorney Participation in Voir Dire (June 6, 1989) ............... 145

Motion to Compel State to Disclose Any Non-Statutory Aggravating Factor (June 6, 1989)   147

Motion for Order Declaring Separate Sentencing Hearing Provision of the Death Penalty
Unconstitutional (June 6, 1989) ............................................. 148

Voir Dire Questions (June 6, 1989) ......................................... 182

Defendant's Amended Discovery Answer (June 12, 1989) ....................... 186

Jury Instructions (June 13, 1989) .......................................... 187

Notes from Jury (June 13, 1989) ............................................ 230

Verdicts (June 14, 1989) ................................................... 232

Order (June 14, 1989) ...................................................... 236

Motion to Prohibit Consideration of Arrests Not Resulting in Conviction (July 13, 1989) .. 239

Motion to Allow Defendant Right of Allocution (July 13, 1989) .............. 244

Motion for Discovery and Bill of Particulars as to Aggravation (July 13, 1989) ........ 245

Motion to Allow Defense to Present Opening Close and Rebuttal Argument at Phase
Two of Death Penalty Hearing (July 13, 1989) ............................... 247

Judge's Notes to Jury (July 13, 1989) ...................................... 249

Pre-Sentencing Investigation (July 13, 1989) ............................... 251

State's Answer to Discovery for Death Penalty Hearing (July 18, 1989) ...... 258

Order (July 25, 1989) ...................................................... 259

A-6

**Direct Appeal Record**
**Common Law Record ("SC")**                                    **Page**

Motion to Appoint Doctor to Conduct Neuropsychological Battery on Defendant
(September 20, 1987) ................................................ 263

Sentencing Order (November 21, 1989) ................................ 267

Notice of Appeal (November 21, 1989) ................................ 268

Notice of Notice of Appeal (November 21, 1989) ..................... 269

Appointment of State Appellate Defender (November 21, 1989) ........ 271

Impounding Order (July 13, 1989) .................................... 274

Exhibits (July 13, 1989) ............................................ 285

Sentencing Report for Defendant  (July 13, 1989) ................... 292

**Direct Appeal**
**Report of Proceedings ("SR")**

|                              | Direct | Cross | Redir. | Recr. |        |
|------------------------------|--------|-------|--------|-------|--------|
| **Court No. 89-3182**        |        |       |        |       | H32    |
| Motion to Quash Arrest and Suppress |  |    |        |       |        |
| Stipulation                  |        |       |        |       | 115    |
| State Rests                  |        |       |        |       | 133    |
| Arguments                    |        |       |        |       |        |
|     Defense |     |       |        |       | 134    |
|     State |      |       |        |       | 148    |
| **Ruling**                   |        |       |        |       | 162    |
| Motion to Suppress Statements |       |       |        |       |        |
| Witnesses                    |        |       |        |       |        |
|     Jerome Bogucki | 174 | 183 | 212, 215 | 213, 215 |  |
|     Raymond Schalk | 216 | 226 |        |       |        |
|     Edmund R. Mook | 234 | 240 |        |       |        |
|     Richard Stevens | 246 | 252 |       |       |        |

A-7

**Direct Appeal**
**Report of Proceedings ("SR")**

| | Direct | Cross | Redir. | Recr. |
|---|---|---|---|---|
| **Ruling** | | | | 256 |
| **Trial** | | | | |
| Voir Dire | | | | 219 |
| Motion in Limine | | | | 373 |
| Opening Statements | | | | |
|    State | | | | 382 |
|    Defendant | | | | 390 |
| State's Witnesses | | | | |
|    Ronald Sadlowski | 408 | 416 | 425 | |
|    Officer Ross Marsala | 425 | 438 | | |
|    Officer Dennis Veneigh | 448 | 470 | 480 | 483 |
|    Margaret Fisher | 485 | 497 | 518 | |
|    John Fisher | 534 | 542 | 564 | 567 |
|    Detective Jerome Bogucki | 569 | 606, 623 | 660 | 665 |
|    Robert Davie | 675 | 691 | 703 | 733 |
|    Mary Ann Furlong | 705 | 725 | 758 | |
|    Fern Briggs | 759 | | | |
|    Joe Taylor | 770 | 774 | | |
|    Barbara Tucker | 778 | | | |
|    Michael Chamblis | 786 | 825 | 836 | 836 |
|    Pam Fish | 843 | 874 | 913, 938 | 919, 941 |
| Defense Witnesses | | | | |
|    Roanld Larry | 976 | 1012 | | |
|    Daniel Larry | 1019 | 1033 | | |

A-8

**Direct Appeal**
**Report of Proceedings ("SR")**

|  | Direct | Cross | Redir. | Recr. |
|---|---|---|---|---|
| Elizabeth Finuchi | 1038 | 1042 | | |
| Daniel Funkhauser | 1044 | 1047 | 1049 | |
| Thomas Szeszol | 1050 | 1054 | 1060 | |
| Julia Dillow | 1061 | 1066 | | |
| William Brown | 1069 | 1075 | | |
| William Kaupert | 1079 | | | |
| Robert Davie | 1104 | 1110 | | |
| Pamela Hines | 1113 | 1121 | | |
| Henry Kaczmarek | 1129 | 1169 | 1208 | 1216 |
| Defense Rests | | | | |
| State's Rebuttal | | | | 1233 |
| Thomas Szeszol | 1233 | 1234 | | |
| Richard Stevens | 1254 | 1261 | 1271 | |
| Closing Arguments | | | | |
| State | | | | 1277 |
| Defendant | | | | 1294 |
| State | | | | 1336 |
| **Verdict** | | | | 1384 |
| Motion for New Trial | | | | 1401 |
| **Ruling** | | | | 1440 |
| **Sentencing Hearing** | | | | 1443 |
| State's Witnesses | | | | |
| Pamela Hines | 1445 | 1454 | | |
| Max Stelle | 1462 | 1468 | 1478 | |

A-9

**Direct Appeal**
**Report of Proceedings ("SR")**

|  | Direct | Cross | Redir. | Recr. |
|---|---|---|---|---|
| Edmond J. Reardon | 1479 | 1484 | | |
| Defense Witnesses | | | | |
| Mary Deslover | 1494 | 1516 | | |
| Marianne Grieco | 1530 | 1540 | | |
| Henry Kaczmarek | 1547 | | | |
| Closing Arguments | | | | |
| State | | | | 1548 |
| Defense | | | | 1553 |
| State | | | | 1559 |
| **Sentence** | | | | 1561 |

A-10

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT – CRIMINAL DIVISION

PEOPLE OF THE STATE OF ILLINOIS )
)
VS. )    CASE NO. 87CR06131-01
)
HENRY  KACZMAREK )
)

## CERTIFIED REPORT OF DISPOSITION

The following disposition was rendered before the Honorable Judge
LON SHULTZ ON JUNE 14, 2004 POST CONVICTION PETITION DENIED.

hereby certify that the foregoing has been entered of record on the above
ptioned case.

te:  JUNE 21, 2004

, Clerk of the Circuit Court

CLERK OF THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

'OSTCONVICTION).WP

In the Circuit Court of the _____ Judicial Circuit
_____Cook County_____ County, Illinois
(Or in the Circuit Court of Cook County).

RECEIVED

JUL 1 3 2004

CLERK OF THE CIRCUIT COURT
CRIMINAL DIVISION

THE PEOPLE OF THE )
STATE )
OF ILLINOIS )
)
v. )
)
)
)
Henry Kaczmarek )
Defendant/Appellant

No. _87 CR 06131-01_

FILED

JUL 1 3 2004

DOROTHY BROWN
CLERK OF CIRCUIT COURT

### Notice of Appeal

An appeal is taken from the order or judgment described below:

(1) Court to which appeal is taken: _First District Appellate Court_

_____

(2) Name of appellant and address to which notices shall be sent:
Name: _Henry Kaczmarek, N-95790_
Address: _P.O. Box 711, Menard, IL 62259_

(3) Name and address of appellant's attorney on appeal:
Name: _Pro-Se_
Address: _____
If appellant is indigent and has no attorney, does he want one appointed?
_Request Appointment of Appellate Defender_

(4) Date of judgment or order: _June 14, 2004_

(5) Offense of which convicted: _Murder_

(6) Sentence: _Natural Life_

(7) If appeal is not from a conviction, nature of order appealed from: _____
_Petition for Post-Convict Relief 725 ILCS 5/5-122-1et. seq._

Signed _Henry Kaczmarek_
(May be signed by appellant, attorney for appellant, or clerk of circuit court)