NO. 1-04-2401

IN THE

APPELLATE COURT OF ILLINOIS

FIRST JUDICIAL DISTRICT

---

PEOPLE OF THE STATE OF ILLINOIS,

> Respondent-Appellee,

vs.

HENRY KACZMAREK,

> Petitioner-Appellant.

---

Appeal from the Circuit Court of Cook County, Criminal Division.
Honorable **Lon William Shultz**, Judge Presiding.

BRIEF AND ARGUMENT FOR
RESPONDENT-APPELLEE

———

RICHARD A. DEVINE,
State's Attorney,
County of Cook,
Room 309 - Richard J. Daley Center,
Chicago, Illinois 60602

<u>Attorney for Respondent-Appellee</u>

JAMES E. FITZGERALD,
HAREENA MEGHANI-WAKELY,
JOAN F. FRAZIER,
Assistant State's Attorneys,
<u>Of Counsel.</u>

EXHIBIT J

S957

IN THE

APPELLATE COURT OF ILLINOIS

FIRST JUDICIAL DISTRICT

---

PEOPLE OF THE STATE OF ILLINOIS,

Respondent-Appellee,

vs.

HENRY KACZMAREK,

Petitioner-Appellant.

---

### POINTS AND AUTHORITIES

### I.

**THE TRIAL COURT PROPERLY DISMISSED DEFENDANT'S POST-CONVICTION PETITION AS FRIVOLOUS AND PATENTLY WITHOUT MERIT WHERE DEFENDANT'S CLAIM OF PERJURY IS UNSUPPORTED AND POSITIVELY REBUTTED BY THE TRIAL COURT RECORD** ............................. **25**

People v. Coleman, 183 Ill.2d 366,
    701 N.E.2d 1063 (1998) ........................................................ 25

### A.

**Defendant Failed To Raise A Factual Dispute Concerning Whether Pam Fish Gave Perjured Testimony at his Trial** ...................................... **25**

People v. Henry Kaczmarek, 243 Ill.App.3d 1067,
    613 N.E.2d 1253 (1st Dist. 1993) ................................................ 28

People v. Kaczmarek, 318 Ill.App.3d 340,
    741 N.E.2d 1131 (1st Dist. 2000) ............................................ 28

1

People v. Kaczmarek, 207 Ill.2d 288,
    798 N.E.2d 713 (2003) .......................................................... 28

**B. Defendant's Perjury Claim**....................... **29**

People v. Haynes, 192 Ill.2d 437,
    737 N.E.2d 169 (2000) .......................................................... 29

People v. Edwards, 197 Ill.2d 239,
    757 N.E.2d 442 (2001) .......................................................... 31

People v. Coleman, 183 Ill.2d 366,
    701 N.E.2d 1063 (1998) .......................:...................... 31,33

People v. LeCompte, 38 Ill.App.3d 513,
    347 N.E.2d 797 (5th Dist. 1976) .............................. 32

People v. Orange, 168 Ill.2d 138,
    659 N.E.2d 935 (1995) .......................................................... 32,34

People v. Gendron, 41 Ill.2d 518,
    244 N.E.2d 149 (1969) .......................................................... 32

People v. Graham, 48 Ill.App.3d 689,
    363 N.E.2d 124 (5th Dist. 1977) .............................. 33

People v. Hobley, 159 Ill.2d 272,
    637 N.E.2d 992 (1994) .......................................................... 34

Steve Mills and Maurice Possley, State Crime Lab Fraud Charged,
    Chicago Tribune, January 14, 2001........................................ 30

Robert Herguth, Report Slams '80's Police Lab;
    Chicago Sun-Times, January 14, 2001 ................................... 30

Maurice Possley and Steve Mills, Disorganization Typified
    Crime Lab, Report Says, Chicago Tribune, January 15, 2001    30

Nicole Ziegler Dizon, Crime Lab Supervisor Transferred,
    The State Journal-Register, August 16, 2001......................... 30

Maurice Possley, Crime Lab Defends Itself, Analyst City Unit
    Cited In Allegations, Chicago Tribune, July 20, 2001 ............. 31

**C. Smith Is Inapposite** ................................... **34**

2

People v. Smith, 352 Ill.App.3d 1095,
        817 N.E.2d 982 (1st Dist. 2004) .............................................. *passim*

People v. Coleman, 183 Ill.2d 366,
        701 N.E.2d 1063 (1998) ........................................................ 39

## II.

### DEFENSE COUNSEL AND APPELLATE COUNSEL WERE NOT INEFFECTIVE IN CHOOSING NOT TO CHALLENGE THE ADMISSIBILITY UNDER *FRYE* OF LUMINOL TESTING AND BLOOD PATTERN ANALYSIS, BECAUSE NEITHER PROCEDURE IS NEW OR NOVEL ........................................................................ 41

Frye v. United States, 54 App. D.C. 46,
        293 F. 1013 (D.C.Cir. 1923) ...................................................... 41

### A.

### Defendant Has Waived This Argument ........................................................ 41

People v. Haynes, 192 Ill.2d 437, 737 N.E.2d 169 (2000) ................... 41

People v. Whitfield, 217 Ill.2d 177, 840 N.E.2d 658 (2005) ................. 41

People v. Kaczmarek, 318 Ill.App.3d 340,
        741 N.E.2d 1131 (1st Dist. 2000) ............................................ 42

People v. Simons, 213 Il.2d 523, 821 N.E.2d 1184 (2004) ................... 42,43

Donaldson v. Central Illinois Public Service Company, 199 Ill.2d 63,
        767 N.E.2d 314 (2002) ............................................................ 42,43

725 ILCS 5/122-3 (2005) ....................................................... 41

Webster's Third New International Dictionary 1546 (1993) ................. 44

### B.

### Luminol Testing and Blood Pattern Analysis Are Not New or Novel Scientific Methodologies ..................... 44

3

Donaldson v. Central Illinois Public Service Company, 199 Ill.2d 63,
    767 N.E.2d 314 (2002)............................................................. 44,45

Bachman v. General Motors Corporation, 332 Ill.App.3d 760,
    776 N.E.2d 262 (4th Dist. 2002) ................................................ 44

State v. Canaan, 265 Kan. 835,
    964 P.2d 681 (Kan.Sup.Ct. 1998).............................................. 44

People v. Wooten, 283 A.D.2d 931,
    725 N.Y.S.2d 767 (N.Y. App. Div. 2001).................................... 44

People v. Watson, 288 P.2d 184, opn vacated on other grounds,
    46 Cal.2d 818, 299 P.2d 243 ..................................................... 45

U.S. ex rel. Savory v. Lane, 832 F.2d 1011 (7th Cir. 1987) .................. 45

People v. Hendricks, 145 Ill.App.3d 71,
    495 N.E.2d 85 (4th Dist. 1986), rvsd. on other grounds,
    137 Ill.2d 31, 560 N.E.2d 611 (1990)......................................... 45

People v. Henne, 165 Ill.App.3d 315,
    518 N.E.2d 1276 (4th Dist. 1988) .............................................. 45

Mowbray v. Cameron County, 274 F.3d 269 (5th Cir. 2001) ................ 45

Mansfield v. Dornire, 202 F.3d 1018 (8th Cir. 2000).............................. 45

Brown v. French, 147 F.3d 307 (4th Cir. 1998)...................................... 45

Paradis v. Arave, 130 F.3d 385 (9th Cir. 1997)...................................... 45

Cliff St. Joseph v. Borg, 1995 U.S. Dist. LEXIS 19425 (N.D. Cal. 1995) 45

United States v. Schlamer, 47 M.J. 670,
    1997 CCA LEXIS 531 (N-M.C.C.A. 1997) ................................. 45

Ex parte Land, 678 So.2d 224, 1996 Ala. LEXIS 60 (Ala. 1996) .......... 45

State v. Hyde, 186 Ariz. 252, 921 P.2d 655 (Ariz.Sup.Ct. 1996) .......... 45

Green v. Superior Court, 40 Cal.3d 126,
    707 P.2d 248 (Cal.Sup.Ct. 1985)............................................... 45

State v. Jones, 213 Neb. 1, 328 N.W.2d 166 (Neb.Sup.Ct. 1982):........ 45

4

State v. White, 293 N.C. 91,
    235 S.E.2d 55 (N.C. Sup.Ct. 1977)............................................. 45

State v. Kersting, 50 Ore.App. 461,
    623 P.2d 1095 (Or.Ct.App. 1981) .............................................. 45

People v. Enis, 139 Ill.2d 264,
    564 N.E.2d 1155 (1990).............................................................. 46

People v. Kaczmarek, 318 Ill.App.3d 340,
    741 N.E.2d 1131 (1st Dist. 2000) .............................................. 46,47

Mackerley v. Florida, 900 So.2d 662,
    2005 Fla. App. LEXIS 4674 (Fla. Dist .Ct.  App.4th Dist. 2005).. 46

United States v. Holt, 46 M.J. 853,
    1997 CCA LEXIS 195 (N-M.C.C.A. 1997) ................................. 46

People v. Wheeler, 777 N.E.2d 961,
    2001 Ill.App. LEXIS 3956 (3rd Dist. 2001) ................................. 47

State v. Sheppard, 100 Ohio App. 399,
    128 N.E.2d 504 (Ohio 1955)....................................................... 48

New York v. Harris, 84 A.D.2d 63,
    445 N.Y.S.2d 520 (N.Y. APP. Div. 2nd Dept. 1981) ................... 49

People v. Haywood, 209 Mich. App. 217,
    530 N.W.2d 497 (Mich. App. 1995)............................................. 49

Minnesota v. Moore, 458 N.W.2d 90 (Minn. 1990) ............................... 49

People v. Erickson, 89 Ill.App.3d 56,
    411 N.E.2d 44 (2nd Dist. 1980).................................................... 49

People v. Knox, 121 Ill.App.3d 579,
    459 N.E.2d 1077 (3rd Dist. 1984) ................................................ 49,50

People v. Owens, 155 Ill.App.3d 990,
    508 N.E.2d 1088 (4th Dist. 1987) ............................................... 49

People v. Smith, 261 Ill.App.3d 117,633 N.E.2d 69 (4th Dist. 1994) ..... 50

Minnesota v. Moore, 458 N.W.2d 90,
    1990 Minn. LEXIS 196 (Minn. Sup. Ct. 1990)............................ 50

Lewis v. State,  737 S.W.2d 857,
    1987 Tex. App. LEXIS 7988 (Tex. Ct. App. 1987)..................... 50

Farris v. State, 1983 OK CR 141,
    670 P.2d 995 (Okla. Crim. App. 1983)....................................... 50

State v. Melson, 638 S.W.2d 342,
    1982 Tenn. LEXIS 431 (Tenn. Sup. Ct. 1982)........................... 50

Smith v. Virginia, 265 Va. 250, 576 S.E.2d 465  (Va. Sup. Ct. 2003)... 50

Amy P. Bunk, and Guy A. Talia, *Admissibility of Results
    of Presumptive Tests Indicating Presence of Blood on Object*,
    82 A.L.R.5[th] 67 (2005)................................................................. 44

29A Am. Jur. 2d Evidence sec. 1001 (2006) ......................................... 46

Danny R. Veilleux, *Admissibility, In Criminal Prosecution, of
    Expert Opinion Evidence As To "Blood Splatter" Interpretation*,
    9 A.L.R.5[th] 369 (2006)................................................................ 48

Matthew Bender & Co., Inc., Bloodspatter Analysis,
    2-24 Scientific Evidence Supp. Sec. 24-12, 13 (2005) .............. 48

## C.

### Defense and Appellate Counsel
### Were Not Ineffective

    ......................................... 51

Strickland v. Washington, 466 U.S. 668 (1984)...................................... 51

People v. Wilson, 191 Ill.2d 363, 732 N.E.2d 498 (2000) ...................... 51

People v. Kaczmarek, 318 Ill.App.3d 340,
    741 N.E.2d 1131 (1st Dist. 2000) ............................................ 51

People v. Bushong, 351 Ill.App.3d 807,
    815 N.E.2d 103 (2nd Dist. 2004)................................................ 52

## ISSUES PRESENTED FOR REVIEW

1. Whether the trial court properly dismissed defendant's post-conviction petition as frivolous and patently without merit where defendant's claim of perjury is unsupported and positively rebutted by the trial court record.

2. Whether defense counsel and appellate counsel were ineffective in failing to challenge the admissibility under <u>Frye</u> of luminol testing and blood pattern analysis, where neither procedure is new or novel.

## STATEMENT OF FACTS

Defendant was tried and convicted in 1989 for the murder of 86-year old Millie Nielsen in her home. This conviction was reversed on direct appeal because of an evidentiary error. <u>People v. Henry Kaczmarek</u>, 243 Ill.App.3d 1067, 613 N.E.2d 1253 (1st Dist. 1993).

Defendant was retried in 1997 and again convicted for Mrs. Nielsen's murder. (R.L133)[1] In 2004, defendant filed a *pro se* petition for post-conviction relief, in which he argued that one of the State's expert witnesses committed perjury at his trial, and that certain scientific evidence should not have been admitted without holding a <u>Frye</u>[2]

---

[1] The transcript of proceedings on defendant's post-conviction petition is designated as (Tr./). The common law record from defendant's post-conviction proceeding is cited as (PCC./).

    The transcript of proceedings of defendant's 1995 trial is cited as (R./). The common law record from defendant's 1995 trial is designated as (C./).

    There are three supplemental records in this case. Following the penciled designations already written on the volumes, they are cited as (Supp. /), (Supp.II /) and (Supp.III /)

    The transcript of defendant's 1989 trial is cited as (R1./). The common law record from defendant's first trial in 1989 is designated as (C1./).

[2] <u>Frye v. United States</u>, 293 F. 1013 (D.C. Cir. 1923).

hearing. The trial court summarily dismissed defendant's petition as frivolous and patently without merit. (PCC.B11) Defendant now appeals.

**State's Case**

In April, 1987, defendant was unemployed and residing temporarily at 3507 West Diversey in Chicago with Dan and Margaret Lary, and Margaret's son, John Fisher. (R.I64,I177,K177) (Margaret was divorced from Dan Lary by the time of trial and is hereafter referred to as Margaret Fisher.) (R.I178) The building is a two-flat which was owned by Millie Nielsen, who rented out the second floor to the Larys. (R.I179) Mrs. Nielsen lived on the first floor of the building. (R.I65)

At 5:30 p.m. on April 24, 1987, Margaret Fisher stopped off at Millie Nielsen's apartment to ask whether she needed anything from the grocery store. (R.I180) Mrs. Nielsen was fine and had no injuries. (R.I81) Margaret Fisher went home, then left at 6:30 p.m. with her son to go bowling. (R.I181) When they left, Dan Lary was passed out on the couch and defendant was watching television. (R.I182) Defendant was dressed the same way he dressed almost every day, which was in jeans and a blue, quilted work jacket. (R.I182,I198-I199,I203) Margaret Fisher did not notice any stains on defendant's jeans or jacket, but she was not particularly looking, either. (R.I182,I199)

Margaret Fisher returned home at 11:00 p.m. (R.I184) Defendant, who was still there watching television, helped her carry Dan Lary to bed because he was still passed out on the couch. (R.I184) John Fisher saw defendant leave the apartment at 11:30 p.m., then return about a half hour later. (R.I210)

8

At about 2:00 a.m. that night, defendant rang the front doorbell and asked for Ron or Dan Lary. (R.I18,I64) Margaret Fisher said they were not available and went back to bed. (R.I189) She later testified at trial that defendant seemed to be behaving normally. (R.I203). Ron Lary, Dan's brother, sometimes spent the night sleeping on the back porch of the Lary's apartment. (R.I64) Ron Lary knew defendant, as they both worked for Chuck Lary, and played basketball and went drinking together. (R.I65,I87)

At about midnight or 1:00 a.m. on April 24, 1987, Ron Lary went to sleep on the Lary's back porch after a night of heavy drinking at a nearby bar called Patty's Lounge. (R.I67) He did not notice any bags in the gangway when he walked through it. (R.I69) There was light coming from the alley. (R.I70) He lay down on some padding on the porch. (R.I69) At 2:00 a.m., the alarm check sounded at Patty's Lounge, as it did every night. (I71-I72)

About 20 minutes later, Ron Lary saw defendant cross the backyard carrying a bag, about ten feet from the back porch. (R.I173-I174) Defendant was dressed in jeans and a dark jacket. (R.I73) He opened the gate and walked through the alley to his car. (R.I75) Lary heard defendant open and close his car trunk, then open and close his car door. (R.I75) Then defendant drove away. (R.I76) Ron Lary had not heard any screams or noises to indicate that a struggle was taking place on the first floor beneath him. (R.I93)

The following morning, Margaret Fisher found defendant sitting asleep on the couch in her apartment. (R.I190) He was wearing different clothing than he had been the night before. (R.I190) When defendant woke up, he seemed nervous. (R.I193)

9

Later that morning, neighbor Ron Sadlowski noticed that Millie Nielsen's car was still in her garage, which was unusual because she always went to the beauty salon on Saturday mornings. (R.I164) He called police, who found Millie Nielsen dead, lying in her bed in a pool of blood. (R.I39) There was bloodspatter on the wall above Mrs. Nielsen, blood on the frame of her bedroom door, on the floor outside the bedroom door, and on the kitchen floor. (R.J6-J7,I40-I41) Police found a serrated knife with blood on it on a kitchen cabinet, and there were bloodstains on the cabinet as well. (R.I47,J14) The apartment had been ransacked, including a second bedroom where a blood smear was left on a bed's dust ruffle, consistent with someone looking underneath the bed. (R.I39,I42,K140-K141) The kitchen window had been broken, and glass was stacked up outside on the back porch. (R.I43,I163,I169,J25)

Police processed Mrs. Nielsen's apartment for prints, but found none, with the exception of cloth impressions found on the glass on the back porch and on a wood frame. (R.J9) The shape of the cloth impressions could have been made by a gloved finger. (R.J9)

A medical examiner testified that the cause of Millie Nielsen's death was manual strangulation, and the manner of her death was homicide. (R.I146-I147) She sustained multiple stab wounds and blunt force injuries, including multiple contusions and abrasions to her lips, eyes, and face; bruising on the front, sides, and back of her neck; hemorrhaging in her epiglottis, esophagus, vocal cords, thyroid gland, scalp, brain, and base of her tongue; a fractured larynx; and multiple bruising all over her torso and arms. (R.I122-I141) The medical examiner testified that the incised and stab wounds were consistent with having been caused by the serrated knife found in Mrs.

10

Nielsen's kitchen. (R.I143) Her blunt trauma injuries could have been caused by a gloved fist or hand. (R.I145-I146) The state of her rigor mortis was consistent with having been murdered between 11:30 p.m. and 2:30 a.m. on April 24-25, 1997. (R.I144)

Later on the day that Millie Nielsen's body was found, Ron Lary told Detectives Jerome Bogucki and Raymond Schalk that he saw defendant in the back yard the night before, carrying a bag to his car. (R.I82-I83) Even before talking to Ron Lary, the detectives had been looking to interview defendant. (R.J30) Lary told the detectives where they might be able to find defendant, who was subsequently found by police sleeping in his car at Wrightwood and Altgeld Streets. (R.I84,J31)

The detectives asked defendant to step out of his car. (R.J33) He had what looked like bloodstains on the right and left sleeves of his jacket, but no apparent bloodstains on his boots. (R.J34,J62) The detectives placed defendant under arrest and gave him *Miranda* warnings. (R.J38) Defendant did not appear to be under the influence of alcohol. (R.J37) Defendant was taken to Area 5, where he affirmed that he understood his rights, agreed to talk, and gave police written consent to search his car. (R.J39-J40,J64)

There was nothing unusual inside defendant's car, but the car trunk was filled with items including jewelry and jewelry boxes, a stick pin with the initials MN, brooches, serving plates, platters, bowls, an alarm clock, a Marshall Field's bag containing serving pieces, and more. (R.J42,J47-J50) The jewelry boxes had what looked like smudges of blood on them. (R.J55) Mrs. Nielsen's family members, none of whom lived with her, were able to identify some of the property as hers, including a

flag pin, lapel pin, stick pins, necklace, gift box, clock, and serving dishes. (R.J57,J100-J101,J106-J110) There were no shoes or work gloves in defendant's car trunk, but detectives recovered a pair of jeans with bloodstains by the knee, as well as a glass cutter and other tools. (R.J42-J51) The pants that defendant was wearing when he was arrested did not appear to have blood on them. (R.J53) Police recovered the quilted jacket defendant was wearing when they found him in his car. (R.J34-J35,J65)

Police tested the contents of defendant's trunk but were only able to lift one print from a serving bowl. (R.J76) That print was later determined to be unsuitable for comparison. (R.J76) The bloodstained jeans were sent to the Chicago police department Crime Lab (Crime Lab). (R.J53)

Officer Theatrice Patterson, a latent print examiner, testified that he analyzed palm prints found on the Marshall Field's bag recovered from defendant's trunk, and his opinion to a reasonable degree of scientific certainty was that the prints matched defendant's palm prints. (R.J121)

Pam Fish, who was qualified at trial as an expert in the field of serology, electrophoresis, and DNA testing, testified concerning her serological testing of evidence in this case. (R.J32) Fish has analyzed blood in thousands of criminal cases, and has been qualified as an expert in court approximately 150 times. (R.J132) Her training includes advanced degrees in science and molecular biology, training with the Crime Lab, the Midwest Academy of Forensic Scientists, FBI, and Scotland Yard, as well as participation in numerous professional workshops. (R.J129-J131)

12

Fish stated that her forensic testing, which she conducted in 1987, showed that the bloodstains found on defendant's jeans and jacket were type A human blood. (R.J141,J144) Since defendant has type B blood and Mrs. Nielsen had type A blood, the serology testing effectively eliminated defendant as the contributor of the blood found on his jeans and jacket. (R.J152) There were pinpoint bloodspatter stains on the bottom left leg of defendant's jeans. (R.J142)

In addition, Pam Fish testified that her serological testing showed that a swab taken from Mrs. Nielsen's kitchen floor tested positive for the presence of human blood type A. (R.J144-J145) Three paper boxes or jewelry boxes found in defendant's car trunk tested positive for the presence of blood, but the amount of blood was too small for any additional testing. (R.J146-J151) Similarly, Fish determined that the blood on the serrated knife found in Mrs. Nielsen's kitchen was human blood, but the bloodstain was too small for further testing. (R.J146) Fish sent the knife to the Crime Lab's latent fingerprint development unit for further testing. (R.J147)

Next, Fish testified that she performed electrophoresis testing on the known blood of Millie Nielsen and defendant, and defendant's jeans and jacket. (R.J150-J151) The results of that testing, which involved the analysis of blood enzymes, showed that Millie Nielsen was the contributor of the blood found on defendant's jeans and jacket. (R.J154-J155) Specifically, all of the nine enzyme results that Fish obtained matched the known enzymes of Millie Nielsen. (R.J170)

Fish testified that she did not conduct DNA testing on the forensic samples in 1987 because the Crime Lab was using electrophoresis testing at the time, and not yet DNA testing. (R.J156) To the best of her knowledge, the only lab performing DNA

13

testing at that time was Cellmark Diagnostics in Germantown, Maryland. (R.J156;C1.107-108)

After she finished analyzing the various blood specimens in this case, Fish gave half the remaining blood samples to the defense, who wanted them for independent testing. (R.J156) Defendant sent those samples to Cellmark Diagnostics for testing. (R.J157) Fish eventually received some lab notes and X-rays films from Cellmark, but never received a final report from the lab on the testing in defendant's case. (R.J157-J160)

Later, after the Crime Lab converted from electrophoresis testing to DNA testing following defendant's first trial, Pam Fish tried in 1994 to conduct DNA testing on defendant's evidence, but was unable to obtain any results because the blood had degraded by then and there was little left over. (R.J161-J163,J167)

Mitch Rea testified for the State as an expert in luminol testing. (R.K25-K26) Luminol testing involves spraying a chemical on forensic samples or at a crime scene in order to locate otherwise hidden bloodstains. (R.K11) When luminol comes into contact with blood, it luminesces, peaking gradually in intensity until it fades away after a minute or two. (R.K16) Luminol testing does not, however, show how long a bloodstain has been on an item. (R.K42)

Rea testified that he performed luminol testing on defendant's jacket, and noted a reaction on the right sleeve, left sleeve, and right front panel of the jacket. (R.K27-K39) After conducting his testing, Rea did not send the jacket to another laboratory for confirmatory testing. (R.K40) Photographs of the luminol testing were introduced into evidence. (R.K33)

14

Rod Englert was qualified at trial as an expert in the field of bloodspatter and crime scene reconstruction. (R.K66) Englert explained to the jurors that low velocity bloodspatter is cast off blood that drops straight down on a wall. (R.K70) Medium velocity spatter occurs from blunt trauma, and is usually most dense where an assault has occurred. (R.K71) High velocity spatter, which is characterized by the breaking of blood into very fine particles, results only from gunshot wounds. (R.K72)

Based on photographs of the crime scene, Rod Englert concluded that a struggle took place on Millie Nielsen's kitchen floor, with one person on the floor bleeding. (R.K91) There was medium velocity blood spatter on the counter or cabinet where the serrated knife was found, and also towards the bottom of the wall facing Mrs. Nielsen's bedroom. (R.K92) This pattern of blood spatter indicated to Englert that Millie Nielsen was initially attacked in her kitchen outside her bedroom, and that she received many blows while lying on her kitchen floor. (R.K92,K117) The medium velocity bloodspatter on the wall facing her bedroom came from being struck while lying on the floor, which was likely when defendant got bloodspatter on the bottom of his pants. (R.K117) The blood smeared underneath Mrs. Nielsen as she struggled. (R.K117)

Englert believed that after the assault took place in the kitchen, Mrs. Nielsen's assailant threw her onto her bed. (R.K93,K117) She was still alive and struggling at that point. (R.K93,K117) The bloodspatter on Mrs. Nielsen's bedroom wall indicated that her assailant stabbed her there. (R.K119) There was also medium velocity bloodspatter on the bed in a circle around Mrs. Nielsen's body, further indication of the stabbing. (R.K93)

15

Englert examined photographs of defendant's jeans, and noted that there was a transfer stain on both the left and right knees of the pants. (R.K94) These transfer stains were consistent with the pants moving or coming into contact with Mrs. Nielsen and the blood on her bed. (R.K94-K95) It showed that defendant was close to and involved with the incident. (R.K94-K95) On the lower portion of defendant's pants, Englert said, there were numerous specks of blood, or medium velocity spatter. (R.K96) This was projected blood that flew through the air. (R.K97) Englert said this meant that the pants were in close proximity to Mrs. Nielsen as she was beaten, suggesting that her attacker stood over her as she lay on the floor. (R.K98,K130)

Englert stated that the spatters and transfers on defendant's pants were inconsistent with having occurred from someone dropping a bag with blood on it onto a pair of jeans sitting in defendant's car trunk. (R.K100,K102) The stains on the jeans also were not consistent with the wearer of the jeans kneeing someone in the face. (R.K102)

Englert testified that his review of the luminol photographs taken by Mitch Rea showed transfer stains and spatter stains on both sleeves of defendant's jacket, projected blood all over the top of his jacket, and transfer stains on and in the pocket. (R.K110-K112) The stains could not have occurred from the wearer picking up a bag with blood on it. (R.K113) Englert said the jewelry boxes found in defendant's trunk had transfer stains on them that could have come from a person wearing a glove. (R.K114-K115) There was medium velocity spatter on the front of Mrs. Nielsen's nightgown, but not on the back of it. (R.K115-K116) This meant that Mrs. Nielsen was on her back when she was attacked. (R.K115-K116)

16

Based on the bloodstains, bloodspatter, and transfer stains, Englert concluded that the person wearing the jacket and pants was consistent with the person who murdered Millie Nielsen. (R.K120)

**Defense Case**

In the defense case, defendant denied murdering Millie Nielsen, and while he admitted that he was found in possession of the bag containing her property, he said he found the bag just sitting by the side of Mrs. Nielsen's house. (R.K192,K209) Defendant denied telling Detectives Bogucki and Schalk that maybe he committed the crime, but he could not remember. (R.K256) Defendant also denied telling ASA Richard Stevens that he could have been in Millie Nielsen's apartment on the night she was murdered, and could have killed her, but he did not remember. (R.K257)

According to defendant, the blood on his pants was the result of three fistfights he had been in the week before Mrs. Nielsen was murdered. (R.K179) His opponents bled during the course of those fights, defendant said. (R.K180-K182) Defendant said that in one of the fights, he kneed a man in his face. (R.K181,K252) Defendant said that he was wearing his jacket when he got into the fistfights. (R.K211)

Defendant claimed that the jeans identified at trial as his were not the pants he was wearing on the night Millie Nielsen was murdered. (R.K251) He acknowledged at trial that the jeans identified as his did indeed belong to him, but he said the blood on the pants came from one of the fistfights he got into that week. (R.K186) Defendant said he used the Marshall Field's bag found in his trunk to carry his belongings after he moved out of his girlfriend's house. (R.K182-K182)

17

Defendant said that on April 24, 1987, he and Dan Lary had drinks and then went to Tom Szeszol's house. (R.K184) Defendant showered and washed his clothes there. (R.K184) Defendant did not wash his jeans, however, because he wanted to soak them but wound up not having time to do so. (R.K185) He did not wash his jacket, either. (R.K224) Defendant threw his clothes into his car trunk after washing them. (R.K186)

Defendant said he spent the night of April 24, 1987 drinking, after which he went back to the Lary's house to ask Dan Lary to go drinking with him. (R.K190) Defendant parked in the alley by Lary's house because he had to urinate. (R.K191) He heard a noise like a door closing and thought it might be Dan Lary, but when he looked up, he did not see anyone. (R.K191,K229)

After defendant urinated, he noticed a bag sitting a few feet from the gate by the side of the house. (R.K192) He looked inside the bag and saw a box containing forks and spoons. (R.K195) He picked up the bag and threw it into the trunk of his car. (R.K195) Defendant said he drove around to the front of the house, rang the doorbell, and asked Margaret Fisher whether Dan Lary was up. (R.K196) He was not, so defendant went to a tavern, then later returned home to the Lary's to sleep. (R.K197-K198) Defendant said he was dressed in the same clothing he wore when he left Tom Szeszol's house earlier that day. (R.K200)

At about 8:00 a.m. on April 25, 1987, defendant said, he and Dan Lary went to Bill Brown's tavern in Melrose Park. (R.K202) Brown was not there so they went to his house and parked in his driveway. (R.K203) Defendant took everything out of the bag and put it on a bench. (R.K203) The bag was bloody, and there was a bloody

18

pillowcase inside it. (R.K203) Defendant testified that he threw the bag and pillowcase into a dumpster, separating the good items from the bad. (R.K204) He said he then noticed for the first time that there was jewelry in the bag. (R.K235) Bill Brown paid defendant $60 for some silverware. (R.K205,K245) Defendant denied that Brown is a "fence." (R.K245) Defendant admitted at trial that the bag contained property that was identified as belonging to Millie Nielsen. (R.K237-K240) He said he had no idea how the serving dishes got in his car. (R.K245)

Defendant testified that next he dropped off Dan Lary, then he went drinking at Frank's Tavern, where he got into a fight with someone. (R.K205) While at the tavern, defendant called Dan Lary, who informed him that Millie Nielsen had been killed. (R.K205) Defendant said he went to the Lary's apartment, but no one answered the door. (R.K207) Defendant got into his car and fell asleep or passed out. (R.K207) The next thing defendant knew, the police were banging on his car window. (R.K208)

Defendant denied that after his arrest, he told ASA Richard Stevens that he knew that the bag he found contained jewelry. (R.K219) Defendant admitted that he knew Millie Nielsen lived in the first floor apartment, and knew she was an older woman, but claimed he did not know she lived alone. (R.K220) Defendant acknowledged that he was good at using his fists, knew how to use his fists to hurt someone, and won a lot of fistfights. (R.K221) He did not call the police to tell them about the bloody bag he found even after learning that Millie Nielsen had been murdered. (R.K249)

Defendant further admitted at trial that he did not tell the detectives or ASA Stevens that he heard a noise when he was in back of the Lary's house. (R.K230)

19

Defendant said he did not remember telling ASA Stevens that when he rang the Lary's doorbell in the middle of the night, he went upstairs and went to sleep. (R.K231-K234) He said that he told the police and ASA Stevens that the bag and pillow case were bloody, and that he threw them both in a dumpster by Bill Brown's house. (R.K258-K259) Defendant could not remember or describe anyone who was at Our Place at the same time that he said he was there on the night of April 24, 1987. (R.K226-K227,K230)

After defendant testified, he sought to have his witness, Dr. Kenneth Siegusmund, testify as an expert witness on the subject of luminol testing and bloodspatter analysis. (R.L8) Following questioning, however, the trial court determined that Dr. Siegusmund lacked the qualifications to testify as an expert. (R.L9,L40)

Pamela Hines testified that she and defendant used to live together. (R.K152) When they parted, defendant used a Marshall Field's bag like the one introduce at trial to tote his belongings from her home. (R.K156) Hines admitted that she spoke with defendant about the Field's bag before talking to the police. (R.K162) In addition, Hines affirmed that defendant owned a glass cutter, and she agreed that it was fair to say that he knew how to use it to cut glass. (R.K158)

Elizabeth Finuchi testified that she saw defendant at Our Place on April 25, 1987, between 2:00 a.m. and 2:30 a.m. (R.K165) She did not know what time he got there. (R.K165) Finuchi drank alcohol continuously for four or five hours that night. (R.K168) She said that at around 4:00 a.m., defendant gave her and a friend a ride home. (R.K165-K166) He was able to find his car and drive without any problem.

20

(R.K167-K168) He did not seem nervous or upset. (R.K166) Finuchi did not notice any blood on his clothing. (R.K166)

**State's Rebuttal Case**

Detective Bogucki testified in the State's rebuttal case that defendant told him he may have committed the crime, but he did not remember. (R.L45)

Detective Bogucki said that defendant told him that he noticed a bag lying on the sidewalk by Lary's house. (R.L44) It contained jewelry and plates. (R.L44) He picked up the bag and put it in his car trunk. (R.L45) Defendant told Detective Bogucki that he rang the Lary's doorbell, and after learning that Dan Lary was asleep, left. (R.L45)

Defendant never told Detective Bogucki that he heard a noise when he got out of his car; that the bag he found was bloody; that he took the bag to Melrose Park; or that he kept some items from the bag and threw away the rest in a dumpster. (R.L45-L46) Detective Bogucki did not prepare a statement for defendant to sign, but he recorded a summary of it in his supplementary report and submitted it for approval that same day. (R.L47,L56)

ASA Stevens, who worked on Felony Review, interviewed defendant at 9:00 a.m. on April 26, 1987. (R.L57) ASA Stevens testified that after defendant was advised of his rights, he said that he found the bag and dumped its contents in the trunk of his car. (R.L60) After that, he rang the Lary's doorbell, went in, and went to sleep. (R.L60) Defendant told ASA Stevens that he could have been in the first floor apartment that night or early morning, and could have killed the woman, but he did not remember.

(R.L60,L63) ASA Stevens testified that defendant told him he could have gotten the blood on his clothing from his many fistfights. (R.L60)

Defendant never told ASA Stevens that he heard a noise when he got out of his car in the alley; never said anything about a bloody bag or bloody pillowcase; and never said that he threw jewelry, the bloody bag, and the bloody pillowcase into a dumpster in Melrose Park. (R.L60-L61) ASA Stevens did not present defendant with a statement to sign, but he summarized his statement in a memo immediately after they talked. (R.L61)

Following closing argument and deliberations, the jurors found defendant guilty of murder. (R.L133) Following a sentencing hearing, the trial court sentenced defendant to a term of natural life imprisonment. (R.N13) The trial court implicitly affirmed the finding of the judge in defendant's first trial in 1989 trial that his conduct was brutal and heinous. (R.N13)

**Post-Trial**

On direct appeal of his conviction, defendant argued that the trial court erred in denying his motion for speedy trial dismissal of the State's charges; erred in accepting Mitch Rea as a an expert in the field of luminol testing; erred in refusing to qualify Dr. Siegusmund as a defense expert in the field of luminol interpretation and bloodspatter analysis; erred in precluding evidence concerning defendant's fistfights prior to Millie Nielsen's murder; and argued that his sentence was constitutionally infirm under *Apprendi*.[3] People v. Henry Kaczmarek, 318 Ill.App.3d 340, 741 N.E.2d 1131 (1st Dist. 2000). The appellate court affirmed defendant's conviction, but vacated his sentence

---

[3] Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348 (2000).

based on the *Apprendi* violation, and remanded the case for resentencing. 741 N.E.2d at 1143.

The State appealed the trial court's *Apprendi* ruling, and defendant cross-appealed on the basis of the asserted speedy trial violation. People v. Henry Kaczmarek, 207 Ill.2d 288, 798 N.E.2d 713 (2003). The Illinois Supreme Court rejected defendant's speedy trial argument, and concluded that even though the trial judge did commit *Apprendi* error in sentencing defendant, the error was harmless because there was overwhelming evidence that defendant's murder of Millie Nielsen was brutal and heinous. 798 N.E.2d at 721-723.

Defendant's subsequent petition for writ of *certiorari* to the U.S. Supreme Court was denied. Kaczmarek v. Illinois, 540 U.S. 1199 (2004).

On March 16, 2004, defendant filed a *pro se* petition for post-conviction relief, in which he argued that: 1) trial and appellate counsel were ineffective for failing to raise an issue concerning an October 22, 1995 lab report which allegedly disproved Pamela Fish's trial testimony; 2) the State knowingly elicited false and misleading testimony from Pam Fish based on the October 22, 1995 lab report; 3) that defendant is actually innocent because Pam Fish's credentials have been called into question in some other cases, and there is newly discovered evidence questioning the credibility of Detective Schalk; 4) that the trial judge was biased against defendant; and 5) that the trial court lacked subject matter jurisdiction. (C.76-104) In support of his petition, defendant appended four newspaper articles, the October 22, 1995 lab report, and several crime scene photographs. (C.90-104)

On June 14, 2004, the trial court summarily dismissed defendant's post-conviction petition as frivolous and patently without merit. (C.B4-B10) The court stated in its written order that defendant misapprehended the nature of the October 22, 1995 lab report, because it fails to refute Pam Fish's trial testimony. (C.B9) The trial court summarily dismissed defendant's remaining claims as utterly without merit, conclusory, and "insufficient to advance the petition or grant an evidentiary hearing." (B.10)

Defendant now appeals from the summary dismissal of his post-conviction petition.

ARGUMENT

I.

**THE TRIAL COURT PROPERLY DISMISSED DEFENDANT'S POST-CONVICTION PETITION AS FRIVOLOUS AND PATENTLY WITHOUT MERIT WHERE DEFENDANT'S CLAIM OF PERJURY IS UNSUPPORTED AND POSITIVELY REBUTTED BY THE TRIAL COURT RECORD.**

Defendant argues that because serologist Pam Fish has been charged in the past with testifying falsely at some criminal trials, the trial court erred in summarily dismissing his post-conviction petition alleging that she committed perjury at his trial. (C.92-98) Because defendant has utterly no evidence to support his charge, and because the record positively rebuts any charge of perjury, the trial court did not err in summarily dismissing defendant's post-conviction petition. (C.B4-B10)

The summary dismissal of a post-conviction petition is reviewed *de novo*. People v. Coleman, 183 Ill.2d 366, 701 N.E.2d 1063 (1998).

A.

**Defendant Failed To Raise A Factual Dispute Concerning Whether Pam Fish Gave Perjured Testimony At His Trial.**

There is not one whit of evidence, much less a factual dispute, that Pam Fish testified falsely at defendant's trial. In summary, Fish was qualified at defendant's trial as an expert in the fields of electrophoresis, serology, and DNA testing. (R.J132) She has analyzed blood in thousands of criminal cases, and has been qualified in court as an expert approximately 150 times. (R.J132) Her training includes advanced degrees in science and molecular biology, training with the Crime Lab, the Midwest Academy of

25

Forensic Scientists, FBI, and Scotland Yard, as well as participation in numerous professional workshops. (R.J129-J131)

Fish stated that her 1987 testing in this case showed that the bloodstains found on defendant's jeans and jacket were type A human blood. (R.J141,J144) Defendant has type B blood and Mrs. Nielsen had type A blood. (R.J138) Therefore, the serology testing effectively eliminated defendant as the contributor of the blood found on his jacket and pants. (R.J152)

Fish testified that her serological testing also showed that a swab taken from Mrs. Nielsen's kitchen floor tested positive for the presence of human blood type A. (R.J144-J145) Three jewelry boxes found in defendant's car trunk tested positive for the presence of blood, but the amount of blood recovered was too small for any additional testing. (RR.J146-J151) Similarly, Fish determined that the blood on the serrated knife found in Mrs. Nielsen's kitchen was human blood, but again the bloodstain was too small for further testing. (R.J146)

Fish further testified that she performed electrophorèsis testing on the known blood of Millie Nielsen and defendant, and defendant's jeans and jacket. (R.J150-J151) The results of that testing, which involved the analysis of blood enzymes, showed that Millie Nielsen was the contributor of the blood found on defendant's jeans and jacket. (R.J154-J155) Specifically, all nine enzymes identified in the blood matched the known enzymes of Millie Nielsen. (R.J170)

Fish testified that she did not conduct DNA testing on the evidence in 1987 because the Crime Lab was not yet using DNA testing at that time. (R.J156) Instead, it was using electrophoresis then. (R.J156) To the best of Fish's knowledge, the only lab

26

performing DNA testing at that time was Cellmark Diagnostics in Germantown, Maryland. (R.J156)

After she finished analyzing the blood specimens in this case, Pam Fish gave half the remaining samples to defendant. (R.J156) That included samples of the known blood of defendant and Millie Nielsen, as well as cuttings from defendant's jeans and jacket. (R.J157) When Fish did her testing, she purposely tried to conserve sample so that defendant could use the rest for independent testing. (R.1885) She also preserved threads and patches from defendant's coat and jacket so that someone else could test them. (R1.914-915)

Defendant sent the samples to Cellmark Diagnostics for DNA testing. (R.J157) Fish eventually received lab notes and X-ray films showing some of the results Cellmark Diagnostics obtained, but she never received or reviewed any final report from Cellmark regarding DNA testing conducted on defendant's evidence. (R.J157-J160)

In 1994, after the Crime Lab converted from electrophoresis testing to DNA testing, Pam Fish attempted to conduct DNA testing on the evidence in this case using the PCR (polymerase chain reaction) amplification method of DNA testing. (R.J155,J160) Fish testified that she was inhibited in her testing because she only had left over very small amounts of defendant's and Mrs. Nielsen's blood standards, having given parts of that sample to the defendant. (R.J161) In addition, the blood that was left had degraded over time. (R.J161)

Therefore, even using PCR testing, Fish was unable to identify known DNA profiles for defendant or Mrs. Nielsen from the blood standards. (R.J161-J163,J167)

Fish said she was able to extract a very small amount of DNA from defendant's lower left pant leg, and could ascertain that it was human DNA, but she could not obtain any other result. (R.J162) Fish explained that it can be very difficult to conduct DNA testing on blue jeans because the dye and sizing used in making jeans gets into the DNA molecule. (R.J163,J168) Fish said that she attempted to do DNA testing on defendant's jacket, but the testing did not yield results because the blood samples she found were mixed and she could not differentiate the types. (R.J163)

Even though, as defendant concedes, Fish's trial testimony was essentially the same as that she gave at his first trial in 1989, he did not charge then that she committed perjury at his trial, or raise this claim on direct appeal from that conviction. (Def.Br.23) (R1.843-941) People v. Henry Kaczmarek, 243 Ill.App.3d 1067, 613 N.E.2d 1253 (1st Dist. 1993). Having had years to research Fish's testimony, defendant still did not charge at his second trial that her testimony was perjured. Defendant notes in connection with this claim that defense counsel repeatedly objected to Pam Fish's qualification to testify as an expert. (PCC.78) To the contrary, defense counsel did not object at all to Fish's qualifications to testify as an expert, or even ask her a single question concerning her qualifications to testify as an expert witness. (R.J132) Defendant did not raise a claim of perjury on direct appeal from his second conviction, People v. Kaczmarek, 318 Ill.App.3d 340, 741 N.E.2d 1131 (1st Dist. 2000), or raise this claim in the Illinois Supreme Court, either. People v. Kaczmarek, 207 Ill.2d 288, 798 N.E.2d 713 (2003).

This argument has therefore been waived or procedurally defaulted.

28

## B. Defendant's Perjury Claim.

It was not until defendant filed his 2004 post-conviction petition that he raised the claim that Pam Fish committed perjury at his trial. (C.90-104) Defendant's scant evidence in support of this claim is Fish's October 22, 1995 supplemental lab report, a handful of newspaper articles, and some crime scene photographs from his trial. (PCC.90-91)

According to defendant, the supplemental lab report refuted Fish's trial testimony because "[t]his report clearly shows that DNA evidence was isolated and no matches were found." (PCC.81) As the trial judge correctly found, however, the lab report did not refute anything. (PCC.B9) Written after defendant's first trial, the report appears to have been completed in preparation for defendant's second trial. (PCC.B9) (See Appendix 'A' for lab report) Fish's report states, "No DNA profile was obtained from the blue jeans. Inconclusive results were obtained from the jacket." (PCC.90) This conclusion does not contradict Fish's testimony at defendant's first trial because she did not do any DNA testing then. (R.J156) Furthermore, it does not refute her testimony at defendant's second trial because there she testified that while she was able to extract a small amount of DNA from the jeans, she could not obtain any additional results; and DNA testing on defendant's jacket yielded inconclusive results. (R.J160-163) In short, there was no contradiction in Fish's DNA testimony or the 1995 report.

Next, defendant's claim of perjury based on the photographs from his trial is waived because defendant clearly could have raised this argument on direct appeal from his conviction. People v. Haynes, 192 Ill.2d 437, 737 N.E.2d 169 (2000). In any

29

event, the presence or absence of items in the photographs is unremarkable given that officers were investigating Millie Nielsen's murder when the photographs were taken, and likely collecting specimens from the scene for testing. This argument is purely speculative and defendant has not specifically explained how it supports his claim of perjury.

Defendant also bases his perjury charge on four newspaper articles, none of which have anything to do with this trial or this defendant. (C.92-98) See Steve Mills and Maurice Possley, State Crime Lab Fraud Charged, Chicago Tribune, January 14, 2001, at 1; Robert Herguth, Report Slams '80's Police Lab; Chicago Sun-Times, January 14, 2001, at 1; Maurice Possley and Steve Mills, Disorganization Typified Crime Lab, Report Says, Chicago Tribune, January 15, 2001, at 1; Nicole Ziegler Dizon, Crime Lab Supervisor Transferred, The State Journal-Register, August 16, 2001, at 1. None of these newspaper articles were written by scientists, or even by journalists purporting to specialize in the area of science. (C.92-98) They are simply articles criticizing Pam Fish for her work in a scant few of the thousands of criminal cases she has worked on. Fish is particularly criticized for her work in a case involving a defendant named John Willis, but neither defendant nor the articles he cites offer specifics concerning exactly what transpired in that case, under what circumstances Fish's work came under fire, or whether her asserted error may have been inadvertent.

Moreover, at the same time that defense experts in defendant's newspaper articles criticize Fish, other people hold a different opinion. For example, in a Chicago Tribune article not cited by defendant, but written at the same time as the other newspaper articles, one source said of Fish, "Dr. Fish has never been found to have

30

testified falsely or reported false forensic results," and "[w]e have confidence in [Fish's] work. We've seen nothing to believe otherwise." Maurice Possley, <u>Crime Lab Defends Itself, Analyst City Unit Cited In Allegations</u>, Chicago Tribune, July 20, 2001. An attorney for the City of Chicago further commented that despite the fact that Pam Fish had never been found to have testified falsely, "[d]espite this, unproven allegations have ruined the career and reputation of a dedicated public servant and a smart, educated, forward-thinking scientist." *Id.* Significantly, the Crime Lab was audited by outside experts before it was subsumed by the Illinois State Police, and those outside auditors praised Fish. *Id*

Defendant's allegation of perjury, based on the foregoing randomly-selected newspaper articles, cannot possibly be viewed as raising a factual dispute concerning Pam Fish's work in this case. In order to state the gist of a meritorious constitutional claim, a *pro se* defendant need only present a limited amount of detail. <u>People v. Edwards</u>, 197 Ill.2d 239, 245, 757 N.E.2d 442, 446 (2001). A trial court must take all well-pleaded facts in the petition and affidavits as true. <u>People v. Coleman</u>, 183 Ill.2d 366, 701 N.E.2d 1063, 1070 (1988). "Unless positively rebutted by the record, factual disputes raised by the pleadings cannot be resolved without an evidentiary hearing." 701 N.E.2d at 1071-1072. On the other hand, "[n]onfactual and nonspecific assertions which merely amount to conclusions are not sufficient to require a hearing under the Act." <u>Coleman</u>, 701 N.E.2d 1063,1072. In addition, courts have consistently upheld the dismissal of post-conviction petitions where the allegations are contradicted by the record of the original trial proceedings. 701 N.E.2d at 1072.

With specific regard to perjury allegations, a petition or accompanying affidavit "must identify with reasonable certainty the sources, character and availability of the alleged evidence supporting the petitioner's allegation." People v. LeCompte, 38 Ill.App.3d 513, 347 N.E.2d 797, 799 (5th Dist. 1976); People v. Orange, 168 Ill.2d 138, 150-151, 659 N.E.2d 935 (1995) (generalized allegations of torture insufficient); People v. Gendron, 41 Ill.2d 518, 244 N.E.2d 149, 150 (1969).

In this case, defendant has no support at all for his claim of perjury beyond a few dated newspaper articles. He can point to nothing in Pam Fish's testimony that raises questions concerning the integrity of her work. He can point to nothing in her testimony that suggests contradictory or inconsistent results. In addition, even though defendant had the same forensic samples as Fish did, and submitted them for testing at Cellmark Diagnostics, he has nothing to show from those results that suggest her work in this case should be second-guessed. In short, he has no evidence, unrebutted or not, that Pam Fish committed perjury at his trial.

Courts have not hesitated to summarily dismiss *pro se* post-conviction petitions in other cases where defendants' perjury allegations have fallen short. Thus, in People v. LeCompte, *supra*, the court held that defendant's claim of perjury in his *pro se* post-conviction petition was properly dismissed even though the defendant supported his claim with his father's affidavit stating that he saw police officers instructing witnesses how to testify. 347 N.E.2d at 799. In affirming the dismissal, the reviewing court noted that defendant was not present when the police officer allegedly told the witnesses what to say, and that the father's affidavit failed to particularize any facts concerning the time, place, testimony or people involved in the perjury. 347 N.E.2d at 800. In

32

addition, the court noted, review of the trial court transcript failed to show any corroborating facts. 347 N.E.2d at 800.

Similarly, in People v. Graham, 48 Ill.App.3d 689, 363 N.E.2d 124 (5th Dist. 1977), the court held that the bare allegation that a witness perjured himself under pressure of various governmental officials and police personnel fell short of serving as grounds for an evidentiary hearing. 363 N.E.2d at 128. The court characterized defendant's allegation of perjury as "conclusory and unsupported by any assertion of specific facts available to establish the veracity of the claim."[4] 363 N.E.2d at 128.

In contrast, in People v. Coleman, *supra*, the Court held that defendant's post-conviction petition should not have been dismissed without an evidentiary hearing where defendant's perjury allegations were supported by an affidavit from a witness who said that the police told her whom to identify in a lineup, and who further alleged that a prosecutor and investigator called her repeatedly to make sure she did not change her story. 701 N.E.2d 1063, 1070. The trial court record did not controvert defendant's charge of perjury, or the defendant's charge that the State suppressed favorable evidence. 701 N.E.2d at 1076. The Coleman court therefore concluded that the defendant made a substantial showing of a constitutional violation and that an evidentiary hearing was therefore required. 701 N.E.2d at 1079.

Even though defendant in this case had only to make the gist of a constitutional claim, his evidence does not approach the level of the perjury allegations in the foregoing cases. He has no supporting affidavits. His newspaper articles appear to

---

[4] Because the court ordered an evidentiary hearing on another issue the defendant raised in his petition in Graham, the court allowed defendant a hearing on his perjury issue too. 817 N.E.2d at 128. The court specifically stated, however, that there would have been no evidentiary hearing if the perjury claim was the only claim that defendant raised. 817 N.E.2d at 128.

33

have been arbitrarily chosen and have nothing to do with this case. Defendant's perjury allegations are generalized and do not point to any specific evidence as having been perjured. In sum, defendant's charge amounts to nothing more than a bald allegation of perjury based on hearsay from other cases.

By analogy, in cases where defendants have alleged police torture, courts have usually not viewed generalized allegations of coercive activity, without more, as relevant evidence. People v. Orange, 659 N.E.2d 935, 941. Thus, in People v. Hobley, 159 Ill.2d 272, 637 N.E.2d 992, 1010 (1994), the Court did not find charges of police brutality to be relevant evidence where the allegations of brutality were not similar to the challenging defendant's allegations of brutality, and had occurred three years earlier. 659 N.E.2d at 941.

As in these police abuse cases, defendant's allegation of perjury at bar is too generalized and unsupported to warrant any further proceedings.

### C. Smith Is Inapposite.

In support of his claim, however, defendant relies on  People v. Smith, 352 Ill.App.3d 1095, 817 N.E.2d 982 (1st Dist. 2004), where the court held that defendant was entitled to an evidentiary hearing on his *pro se* post-conviction petition alleging that Pam Fish gave false testimony at his trial. 817 N.E.2d at 986. Smith is distinguishable from this case in every significant respect.

Like defendant at bar, the defendant in Smith had no evidence that Fish perjured herself at his trial. Instead, the defendant relied on the same sort of newspaper articles as does defendant in this case. 817 N.E.2d at 992-993. In addition, the defendant in Smith appended to his petition a "Petition to Vacate Judgment" from

People v. Willis, No. 90 CR 23912, a case where Fish testified that her test results were inconclusive, but attorneys later learned that her test results actually exonerated the defendant in that case. 817 N.E.2d at 994-995. The trial court in Smith found these supporting documents insufficient to state the gist of a constitutional claim and summarily dismissed defendant's petition. 817 N.E.2d at 986.

On review, the Smith court implicitly acknowledged that defendant's supporting documentation was inadequate, stating that it was "mindful that a petition that is not supported by affidavits, records, or other evidence is properly dismissed without an evidentiary hearing unless the defendant's allegation is uncontradicted and supported by the record." Smith, 817 N.E.2d at 993. The court excused the defendant's lack of supporting affidavits, however, on the grounds that the State blocked defendant's attempt in the trial court to obtain supporting information. 817 N.E.2d at 993.

The defendant in Smith had subpoenaed three sets of documents from the State, including the State's Attorney Office's entire file on the defendant, information regarding the SAO computer docketing system, and information concerning Pam Fish. 817 N.E.2d at 993. In addition, the defendant in Smith, subpoenaed Fish for a deposition. 817 N.E.2d at 993. The State filed a motion to quash these documentary requests, and the trial court granted it and quashed all of the defense subpoenas. 817 N.E.2d at 993.

The Smith Court concluded that the State's motion to quash effectively prevented the defendant from obtaining supporting documentation for his petition, and said, "[a]ccordingly, regarding the deposition of Fish the record reflects why the deposition is not attached to the petition and thereby complies with section 122-2 of

35

the Act, which requires the records be attached to a petition or an explanation 'why the same are not attached.'" 817 N.E.2d at 994, *citing* 725 ILCS 5/122-2 (1998).

It is therefore fair to conclude that absent the State's motion to quash in <u>Smith</u>, the court almost certainly would have affirmed the trial court's dismissal of the defendant's post-conviction petition. Indeed, the <u>Smith</u> court expressly declined to address the accuracy of the newspaper articles.[5] 817 N.E.2d at 997.

In this case, defendant has no similar excuse. There have been no post-conviction defense motions for deposition or records, and the State never weighed in on this issue prior to this appeal.

In point of fact, the most significant difference between this case and <u>Smith</u> is that defendant at bar actually had the same forensic samples as Pam Fish did, and he was therefore free to conduct whatever sort of blood typing, electrophoresis, or DNA testing that he wanted to. (R.J157) And that is precisely what he did. In 1988, prior to his first trial, defendant moved for production of "a testable sample" of blood stains found on his clothing, as well as a "testable sample" of Millie Nielsen's blood. (R1.257,C1.107-108) Defendant advised the trial judge that he wanted to have independent testing performed on those samples at Cellmark Diagnostics. (C1.108) On November 2, 1988, the trial court ordered the State to comply with defendant's request, over the State's objection. (C1.110-111,114,119) Defendant's 1989 trial was

---

[5] One of the reasons why the <u>Smith</u> court declined to consider defendant's newspaper articles was because defendant did not include with his petition the report apparently quoted in his newspaper articles, which was written by Dr. Edward Black and criminalist Alan Keel. <u>Smith</u>, 817 N.E.2d 98, 997. In this case, defendant did not append Black and Keel's report to his petition, either. On appeal, defendant moved to supplement the record with the report, but this Court denied that motion on September 30, 2005. Defendant's argument based on the Black and Keel report should therefore be disregarded. (Def.Br.27-28, 30)

continued for three months while defendant awaited the result of that testing at Cellmark. (C1.114)

On March 2, 1989, after the Cellmark test results had come back, defense counsel advised the State that the results of the testing were inconclusive. (C1.114;R.91) Defense counsel refused, however, to give the State any specific information about the testing. (C1.114;R.91) The trial court ordered that Cellmark was to discuss its findings with the prosecution and also send its notes and the exemplars to the prosecution. (C1.120)

Notwithstanding that, the State filed a motion six years later, prior to defendant's second trial, stating that Cellmark never tendered to the State any written findings, notes, or exemplars from defendant's testing. (Supp.R.84,91-93;C.116-118) The State alleged that defense counsel from defendant's first trial indicated that Cellmark was under direction to discuss their findings only with him, and that defense counsel directed Cellmark not to prepare a final report or write up results that were unfavorable to defendant. (Supp.100;C.117) At defendant's 1997 trial, defense counsel acknowledged that Cellmark had been given that direction. (Supp.101)

At the trial court's direction, the defense turned over its Cellmark notes to the State, but they were incomplete. (Supp.99) Those notes did not include the autorads or any summary of conclusions drawn from the autorads. (Supp.99) Furthermore, the notes did not designate with any specificity which forensic samples had been tested. (Supp.99)

Ultimately both parties met in 1995 with Pam Fish at the Chicago Crime Lab. (Supp.120-121) Cellmark subsequently turned over to the State the autorads and

37

whatever remaining documents were still outstanding. (Supp.124) Those Cellmark documents were not introduced at trial and are not of record.

Therefore, because defendant had his evidence independently tested, and because his attorney met with Pam Fish, defendant is not at the loss for information about her lab work that the defendant was in <u>Smith</u>. 817 N.E.2d 982, 994. The court in <u>Smith</u> was willing to extend to the defendant the presumption that he might have found evidence of a factual dispute if he had access to the relevant materials, but in this case defendant had complete access to the forensic samples, the original lab reports, and in addition, defense counsel spoke with Pam Fish at the Crime Lab.

Because defendant was never precluded from investigating Fish's testimony, and because defendant has no grounds to justify the absence of actual supporting evidence in his post-conviction petition, the trial court did not err in summarily dismissing defendant's petition. In <u>Smith</u>, it was not possible to determine whether Fish's testimony was accurate without an evidentiary hearing. 817 N.E.2d at 995. In this case, defendant has already thoroughly tested her results.

Next, unlike the instant case, the <u>Smith</u> court found that defendant's post-conviction petition presented a factual dispute because the defendant alleged that neither trial counsel nor appellate counsel had Fish's lab reports or lab notes. 817 N.E.2d 982, 995-996. Defendant has not made the same allegation at bar, and indeed the record reflects that defendant had all relevant documents prior to his first trial. The record reflects that defense counsel said, "We subpoenaed various documents from the Chicago Police Crime Lab and I am satisfied that there is, the subpoena had been complied; the State has complied with the documents that we requested." (R1.10) The

38

State further noted at defendant's 1989 trial that Fish's report had been tendered to the defense, together with her microfiche, notes, and evidence receipts. (R1.939,950,975) In addition, defense counsel personally discussed the case with Pam Fish before she testified at defendant's 1989 trial. (R1.926-938,940-942)

Subsequently, at defendant's 1997 trial, the State turned over to defendant, *inter alia*, a three-page serology lab report, together with 16 pages of notes. (C.110) Therefore, unlike the defendant in Smith, defendant at bar was not lacking background information concerning Fish's forensic testing. 817 N.E.2d 982, 995-996.

This case is also inapposite to Smith because there the court placed great weight on the fact that Fish testified that her results in that case were inconclusive, which was similar to the testimony she evidently gave in the Willis case. 817 N.E.2d at 994-995. The Smith court concluded that without a hearing, it was not possible to determine whether her report of inconclusiveness was accurate. 817 N.E.2d at 994-995. But in this case, Fish did not say her blood typing or electrophoresis testing yielded inconclusive results. To the contrary, she obtained conclusive results using both tests concerning the blood types she found and the enzymatic makeup of the bloodstains. (R.J144-J170) As for her DNA testing, Fish said that her testing on defendant's jacket yielded inconclusive results, but defense counsel told the State that Cellmark's DNA testing yielded inconclusive results as well. (PCC.90;C1.114;R.91)

This case is also distinguishable from Smith because defendant's allegations of perjury are positively rebutted by the record. Smith, 817 N.E.2d 982, 993; Coleman, 701 N.E.2d 1063, 1070. Defendant argues in his petition that Pam Fish's October 22, 1995, lab report refutes her trial testimony, but as discussed above, Fish's inability in

39

1994 to obtain testable DNA profiles from small quantities of old and degraded blood samples is not inconsistent with her finding that those blood samples were type A like Millie Nielsen's blood, or inconsistent with her finding that electrophoresis testing showed that the enzymes in the blood samples were consistent with Mrs. Nielsen's. (R.J152-J155)

Therefore, defendant's assertion that the 1995 lab report could have been used to impeach Fish is rebutted by the record, as is his assertion that the State knowingly presented false testimony. (PCC.78-80) Furthermore, if the court in <u>Smith</u> was willing to find that the State's objection to the defendant's various depositions constituted evidence of a factual dispute, then the absence of the Cellmark DNA results in the record should be viewed as evidence of lack of a factual dispute.

Lastly, defendant argues that his petition should not have been summarily dismissed because of purported similarities between this case and <u>Willis</u>. The facts in <u>Willis</u> are not spread of record in this case or in the <u>Smith</u> decision either. Indeed, <u>Smith</u> refers only to a Petition to Vacate Judgment which was apparently filed in <u>Willis</u>. 817 N.E.2d 982, 995. Without a full recitation of facts, it is futile and indeed unfair to attempt a comparison of <u>Willis</u> and this case. Regardless, for the reasons stated above, <u>Willis</u> is inapposite and defendant has failed to raise even the gist of a constitutional claim.

For these reasons, the trial court properly summarily dismissed as frivolous and patently without merit defendant's claim that the State presented the perjured testimony of Pam Fish in order to support his conviction for first degree murder.

40

II.

## DEFENSE COUNSEL AND APPELLATE COUNSEL WERE NOT INEFFECTIVE IN CHOOSING NOT TO CHALLENGE THE ADMISSIBILITY UNDER *FRYE* OF LUMINOL TESTING AND BLOOD PATTERN ANALYSIS, BECAUSE NEITHER PROCEDURE IS NEW OR NOVEL.

Defendant contends that the trial court erred in summarily denying his post-conviction petition because trial counsel and appellate counsel were ineffective in failing to challenge the admissibility under Frye v. United States, 54 App. D.C. 46, 293 F. 1013 (D.C.Cir. 1923), of the State's expert testimony on the subjects of luminol testing and blood pattern analysis.

### A.

### Defendant Has Waived This Argument.

This claim has been waived because it was not raised in defendant's post-conviction petition. Section 122-3 of the Post-Conviction Hearing Act provides that "[a]ny claim of substantial denial of constitutional rights not raised in the original or an amended petition is waived." 725 ILCS 5/122-3 (2005). Since this claim was not raised in defendant's petition, and therefore never ruled upon by the trial court, it is waived. 5/122-3. The claim is further waived because appellate counsel's alleged ineffective assistance in failing to raise this claim in defendant's first appeal, could have been raised by appellate counsel in defendant's second appeal. People v. Haynes, 192 Ill.2d 437, 737 N.E.2d 169 (2000).

Furthermore, defendant's challenge to the luminol evidence has been procedurally defaulted. People v. Whitfield, 217 Ill.2d 177, 840 N.E.2d 658, 663 (2005). In

41

the appellate court's 2000 decision in this case, the court noted that defendant "hints that the [luminol] testing procedure is unreliable and consequently fails to satisfy the federal Frye standard...". People v. Kaczmarek, 741 N.E.2d 1131, *43. The court ruled that the claim was waived because defendant did not challenge the reliability of Mitch Rea's testing in the trial court, and because defendant failed to provide supporting argument in his brief. Kaczmarek, 741 N.E.2d 1131, *43.

In any event, should this Court choose to reach the merits of this claim, it will find it to be without merit. In People v. Simons, 213 Il.2d 523, 821 N.E.2d 1184 (2004), the Illinois Supreme Court announced a new, dual standard of review for claims involving Frye hearings: The decision whether an expert witness is qualified to testify on a certain subject, and whether that testimony is relevant, is reviewed under an abuse of discretion standard. Simons, 821 N.E.2d at 1189. A trial court's Frye analysis, however, is subject to a *de novo* review. 821 N.E.2d at 1189.

Under the general acceptance test enunciated in Frye, scientific evidence is admissible at trial only if the methodology or scientific principle upon which the testimony is based is "sufficiently established to have gained general acceptance in the particular field in which it belongs." 293 F. at 1014. The focus is not on the expert's ultimate scientific conclusion; for "[i]f the underlying method used to generate an expert's opinion [is] reasonably relied upon by the experts in the field, the fact finder may consider the opinion – despite the novelty of the conclusion rendered by the expert." Donaldson v. Central Illinois Public Service Company, 199 Ill.2d 63, 767 N.E.2d 314, 324 (2002). A particular scientific methodology need not be universally accepted in order for it to be considered generally accepted in a field. 767 N.E.2d at 324. Once a scientific

42

methodology or principle is recognized as having gained general acceptance, its general acceptance is presumed in subsequent litigation as a matter of law. 767 N.E.2d at 325.

Key to this argument, a trial judge applies the Frye test only where the court determines that the proffered scientific evidence is new or novel. Donaldson, 767 N.E.2d 314, 324. The Illinois Supreme Court in Donaldson acknowledged the difficulty of determining whether a scientific principle or methodology is considered new or novel. 767 N.E.2d at 325. The Court said, "[g]enerally, however, a scientific technique is 'new' or 'novel' if it is 'original or striking' or does 'not resemble something formerly known or used.'" 767 N.E.2d at 325, *citing* Webster's Third New International Dictionary 1546 (1993); see also In re K.T., *et al*. v. B.T., 361 Ill.App.3d 187, 836 N.E.2d 769, 781 (1st Dist. 2005) (scientific technique new or novel if original or striking or does not resemble something formerly known or used).

With the foregoing principles in mind, there was no reason for defense counsel to move for a Frye hearing in this case, or for appellate counsel to raise the issue on appeal, because luminol testing and bloodspatter analysis are neither new nor novel. Even if they are considered new or novel, both procedures are generally accepted in the scientific community. In People v. Simons, 821 N.E.2d 1184, the Illinois Supreme Court ruled that there was no error in foregoing a Frye hearing where the scientific evidence at issue in that case, which was actuarial risk assessment, was generally accepted. 821 N.E.2d at 1192. The same rule should apply here.

43

**B.**

## Luminol Testing and Blood Pattern Analysis Are Not New or Novel Scientific Methodologies.

Neither luminol testing nor blood pattern analysis (referred to as bloodspatter or spatter[6]), is new or novel. There was accordingly no need for either to be tested at a <u>Frye</u> hearing. <u>Donaldson</u>, 767 N.E.2d 314, 324; <u>Bachman v. General Motors Corporation</u>, 332 Ill.App.3d 760, 776 N.E.2d 262, 281 (4th Dist. 2002).

***Luminol Testing is Not New or Novel***

Luminol is a chemical used at crime scenes or on forensic evidence as a means of revealing the presumptive presence of occult blood, or blood that is not visible to the human eye. (R.K9) It is just one of a number of chemicals used to test for the presumptive presence of blood. Amy P. Bunk, and Guy A. Talia, *Admissibility of Results of Presumptive Tests Indicating Presence of Blood on Object*, 82 A.L.R.5[th] 67, *1 (2005).

There is nothing new or novel about luminol testing. According to the State's expert witness, Mitch Rea, it was discovered in the 1930's that luminol reacts to the presence of blood. (R.K10) Rea said that luminol was converted to use as a forensic tool about 15 years later. (R.K10) An expert witness in a Kansas case cited an earlier date, testifying that luminol testing has been used by forensic scientists for approximately 80 years, and scientific papers on luminol testing were published as early as the 1920's. <u>State v. Canaan</u>, 265 Kan. 835, 964 P.2d 681, 693 (Kan.Sup.Ct. 1998). According to a New York court, <u>People v. Wooten</u>, 283 A.D.2d 931, 725 N.Y.S.2d 767 (N.Y. App. Div.

---

[6] Although variously referred to as spatter, splatter, bloodspatter, or blood pattern analysis, expert witness Rod Englert used the term "spatter" at trial. (R.K53) <u>See generally</u> Matthew Bender & Co., Inc., <u>Bloodspatter Analysis</u>, 2-24 Scientific Evidence Sec. 24-12 (2005), *at* http://www.lexis.com.

2001), the first reported case involving luminol was in 1955. See People v. Watson, 288 P.2d 184, *opn vacated on other grounds*, 46 Cal.2d 818, 299 P.2d 243).

Luminol has been used as a forensic tool in Illinois for at least 30 years. See U.S. ex rel. Savory v. Lane, 832 F.2d 1011 (7th Cir. 1987) (referring to luminol testing that took place in 1977); People v. Hendricks, 145 Ill.App.3d 71, 495 N.E.2d 85, 97 (4th Dist. 1986), *rvsd, on other grounds*, People v. Hendricks, 137 Ill.2d 31, 560 N.E.2d 611 (1990) (luminol testing used at crime scene 20 years ago); People v. Henne, 165 Ill.App.3d 315, 518 N.E.2d 1276 (4th Dist. 1988) (luminol testing used in 1986 crime). Even though it was primarily Mitch Rea who testified about luminol testing at defendant's trial, Pam Fish and Rod Englert were familiar with luminol testing as well. (R.J163,K9,K68) Luminol testing has been used across the country for years as a forensic tool and there is absolutely nothing "new" or "novel" about it. See Mowbray v. Cameron County, 274 F.3d 269 (5th Cir. 2001); Mansfield v. Dornire, 202 F.3d 1018 (8th Cir. 2000); Brown v. French, 147 F.3d 307 (4th Cir. 1998); Paradis v. Arave, 130 F.3d 385 (9th Cir. 1997); Cliff St. Joseph v. Borg, 1995 U.S. Dist. LEXIS 19425 (N. D. Cal. 1995); United States v. Schlamer, 47 M.J. 670, 1997 CCA LEXIS 531 (N-M.C.C.A. 1997); *Ex parte* Land, 678 So.2d 224, 1996 Ala. LEXIS 60 (Ala. 1996); State v. Hyde, 186 Ariz. 252, 921 P.2d 655 (Ariz.Sup.Ct. 1996); Green v. Superior Court, 40 Cal.3d 126, 707 P.2d 248 (Cal.Sup.Ct. 1985); State v. Jones, 213 Neb. 1, 328 N.W.2d 166 (Neb.Sup.Ct. 1982); State v. White, 293 N.C. 91, 235 S.E.2d 55 (N.C. Sup.Ct. 1977); State v. Kersting, 50 Ore.App. 461, 623 P.2d 1095 (Or.Ct.App. 1981).

Since it is clear that luminol testing is not new or novel, there was no need to submit it for a Frye analysis. Donaldson, 767 N.E.2d 314, 324. Instead, the question of its

45

admissibility was properly assessed under expert witness principles. <u>See generally</u> <u>People v. Enis</u>, 139 Ill.2d 264, 564 N.E.2d 1155 (1990) (setting forth principles for admission of expert witness testimony). Defense counsel thoroughly tested Rea's qualifications, and indeed in 2000, the Illinois appellate court ruled that Mitch Rea was properly accepted as an expert witness at defendant's trial. (R.K21-K25) <u>People v. Kaczmarek</u>, 741 N.E.2d 1131, *41-42.

Even if luminol testing is considered new or novel, there was no need for a <u>Frye</u> hearing because it is evident that luminol testing is generally accepted in the scientific community. <u>Simons,</u> 821 N.E.2d at 1192. The admissibility of evidence about luminol testing was challenged in <u>State v. Canaan</u>, *supra*, where the trial court ruled that defendant was not entitled to a <u>Frye</u> hearing on the issue because the court found that luminol testing was universally accepted. 964 P.2d at 691-692. The Kansas Supreme Court upheld that trial court's ruling, holding that "[o]nly when there is a doubt as to the scientific reliability of evidence must the State prove the reliability and acceptance of the science." 964 P.2d at 692. <u>See also</u> 29A Am. Jur. 2d Evidence sec. 1001 (citing <u>Canaan</u> for proposition that luminol testing has been generally accepted as reliable in scientific community, thus satisfying <u>Frye</u> test); <u>Wooten</u>, 725 N.Y.S.2d 767, 769 (luminol testing "universally accepted"); <u>Mackerley v. Florida</u>, 900 So.2d 662, 663, 2005 Fla. App. LEXIS 4674 (Fla. Dist .Ct. App. 4th Dist. 2005) (luminol testing generally accepted in scientific community); <u>United States v. Holt</u>, 46 M.J. 853, 1997 CCA LEXIS 195, *11 (N-M.C.C.A. 1997) (luminol testing accepted by the scientific community).

The State acknowledges that the Illinois Appellate Court for the Third District reached a different conclusion concerning the admissibility of leuco-malachite green

(LMG) testing in People v. Wheeler, 777 N.E.2d 961, 2001 Ill.App. LEXIS 3956 (3rd Dist. 2001). In Wheeler, the defendant argued that the trial judge erred in denying his request for a Frye test concerning the use of LMG to identify the presence of blood on an object. 777 N.E.2d at 965. Like luminol, the application of LMG to a surface can reveal the presumptive presence of blood. 777 N.E.2d at 965. The appellate court held that there was a question whether LMG testing was generally accepted in the scientific community, and ordered that the trial court hold a Frye hearing on remand. 777 N.E.2d at 965. Following the hearing on remand, the Wheeler court held that LMG testing was not generally accepted in the scientific community as a means of raising a presumption of the presence of blood, and that the evidence was therefore inadmissible. Wheeler, 777 N.E.2d 961, 971.

Wheeler should not be followed because it involves LMG, not luminol testing. More importantly, the Wheeler court wholly failed to consider whether LMG is "new" or "novel" evidence, which should have been the threshold inquiry. 777 N.E.2d 961. Luminol testing is a decades-old procedure, and any questions concerning the conclusions to be drawn from it go to the weight or reliability of the evidence, not its admissibility. In the 2000 appeal in this case, defendant charged that Mitch Rea should not have been admitted as an expert witness because he did not perform confirmatory procedures on his luminol testing. People v. Kaczmarek, 741 N.E.2d 1131, *41-42. The court held that defendant's argument was misplaced because the decision not to perform follow-up tests did not reflect upon Rea's qualifications to testify, but instead, simply went to the weight of the evidence. 741 N.E.2d 1131, *42-43. That analysis still applies. Furthermore, it was

47

made clear to the jurors in this case at trial that Mitch Rea did not perform confirmatory testing on his luminol tests. (R.K40)

### Bloodspatter Analysis Is not New or Novel

Bloodspatter analysis is not new or novel either. Bloodspatter analysis was described by Rod Englert at trial as the interpretation of three specific categories of bloodspatter – low, medium, and high velocity - that can occur where a violent crime has taken place. (R.K70) "[B]lood splatter interpretation includes the process of examining blood that has struck a surface, and applying knowledge regarding the characteristics of blood and the shapes or patterns made by its impact, in order to determine matters such as the direction, angle, and the speed of its flight prior to impact, and, ultimately, to assist in reconstructing events occurring in connection with an alleged crime." Danny R. Veilleux, *Admissibility, In Criminal Prosecution, of Expert Opinion Evidence As To "Blood Splatter" Interpretation*, 9 A.L.R.5[th] 369 (2006).

The interpretation of bloodspatter has been around for a very, very long time, having been identified as far back as in European Paleolithic cave paintings. Matthew Bender & Co., Inc., <u>Bloodspatter Analysis</u>, 2-24 Scientific Evidence Supp. to Sec. 24-12 (2005), *at* http://www.lexis.com. In 1971, a landmark book on the subject, entitled *Flight Characteristics and Stain Patterns of Human Blood*, was published by the U.S. Department of Justice. <u>Bloodspatter Analysis</u>, 2-24 Scientific Evidence Sec. 24-12. By 1996, there were over 550 texts devoted to the subject of bloodspatter analysis. *Id*. In a seminal case involving the use of bloodspatter evidence, the defense famously attempted to use spatter analysis in the mid-1950's appeal of Dr. Sam Sheppard for the murder of his wife. <u>State v. Sheppard</u>, 100 Ohio App. 399, 128 N.E.2d 504, 514 (Ohio

48

1955), *app. dismissed*, 164 Ohio St. 428, 131 N.E.2d 837 (1956); <u>Bloodspatter Analysis</u>, *supra.*, In another noted case, <u>New York v. Harris</u>, 84 A.D.2d 63, 445 N.Y.S.2d 520, 536-537 (N.Y. App. Div. 2nd Dept. 1981), the defense used bloodspatter interpretation in the 1980's Scarsdale Diet Doctor murder case. There is a large body of law on the subject of bloodspatter analysis, and "the overwhelming majority of decisions uphold the admission of testimony about blood spatter analysis." <u>Bloodspattter Analysis</u>, 2-24 Scientific Evidence Sec. 24-13(B). Indeed, the reliability of bloodspatter analysis has been the subject of judicial notice in some states. <u>People v. Haywood</u>, 209 Mich. App. 217, 530 N.W.2d 497 (Mich. App. 1995); <u>Minnesota v. Moore</u>, 458 N.W.2d 90 (Minn. 1990).

In Illinois, the subject of bloodspatter interpretation was discussed 26 years ago, in <u>People v. Erickson</u>, 89 Ill.App.3d 56, 411 N.E.2d 44 (2nd Dist. 1980), where evidence of "impact splatter" on the defendant's clothing was cited as evidence of his guilt for murdering his wife. 411 N.E.2d at 45. In <u>People v. Knox</u>, 121 Ill.App.3d 579, 459 N.E.2d 1077 (3rd Dist. 1984), evidence was admitted from a "blood-flight specialist" in connection with a 1982 murder. 459 N.E.2d at 1080. In <u>Knox</u>, the defendant argued that the "blood-flight" testimony should not have been admitted at his trial because it was not an admissible area of expertise in Illinois. 459 N.E.2d at 1080. The appellate court disagreed, finding that there was an adequate foundation for the expert's testimony, and that the bloodstain testimony was properly admitted. 459 N.E.2d at 1081.

In contrast, in <u>People v. Owens</u>, 155 Ill.App.3d 990, 508 N.E.2d 1088 (4th Dist. 1987), the court held that it was error to admit bloodspatter testimony because no court had taken judicial notice of the technique, and the prosecution failed to establish the witness's qualifications for giving bloodspatter testimony. 508 N.E.2d at 1094. The

Owens court failed to reconcile its conclusion, however, with the fact that the court in

Knox found that bloodspatter testimony was admissible. Knox, 459 N.E.2d at 1081.

Moreover, in People v. Smith, 261 Ill.App.3d 117, 633 N.E.2d 69 (4th Dist. 1994), the

Fourth District determined that bloodspatter testimony was indeed admissible, albeit

more limited bloodspatter testimony. 633 N.E.2d at 73. Even if the Smith court had not

modified its position in Owens, this case would still be distinguishable from Owens,

because Rod Englert's qualifications as a leading expert in the field of bloodspatter was

established by testimony concerning his training, his vast experience in the field, and his

having been qualified as an expert witness hundreds of times. (R.K47—K66)

Therefore, because testimony based on the interpretation of bloodspatter has

been around for years, it cannot be accurately characterized as either "new" or "novel" for

purposes of Frye testing. Donaldson, 767 N.E.2d 314, 324.

Even if bloodspatter interpretation is considered new or novel, a Frye hearing

was unnecessary at bar because it has already been determined in Illinois that

bloodspatter interpretation is generally accepted in the scientific community. See People

v Knox, supra; 9 A.L.R.5[th] 369, *6a (noting that court in Knox implicitly determined that

bloodspatter interpretation has been generally accepted); see also Minnesota v. Moore,

458 N.W.2d 90, 1990 Minn. LEXIS 196 (Minn. Sup. Ct. 1990) (bloodspatter analysis

generally accepted in scientific and judicial community); Lewis v. State,   737 S.W.2d

857, 1987 Tex. App. LEXIS 7988 (Tex. Ct. App. 1987); Farris v. State, 1983 OK CR 141,

670 P.2d 995 (Okla. Crim. App. 1983); State v. Melson, 638 S.W.2d 342, 1982 Tenn.

LEXIS 431 (Tenn. Sup. Ct. 1982); Smith v. Virginia, 265 Va. 250, 576 S.E.2d 465  (Va.

Sup. Ct. 2003).

Therefore because bloodspatter is generally accepted in the scientific community, there was no need for defense counsel in this case to ask for a <u>Frye</u> hearing, or for appellate counsel to raise this issue on appeal. <u>Donaldson</u>, *supra*.

## C.

## Neither Defense Counsel Nor Appellate Counsel Was Ineffective.

Defense counsel and appellate counsel should not be held to have afforded defendant deficient representation at bar because, for the reasons stated above, a request for a <u>Frye</u> hearing would have been denied had it been made. Defense counsel is not deficient for failing to make a motion that would not have succeeded. <u>Strickland v. Washington</u>, 466 U.S. 668, 694 (1984). Nor is appellate counsel deficient for choosing not to raise an issue on appeal that would not have succeeded. <u>People v. Wilson</u>, 191 Ill.2d 363, 732 N.E.2d 498, 507 (2000).

Notably, even though defendant argues that defense and appellate counsel should have asked for a <u>Frye</u> hearing, doubtless in the hopes of precluding admission of the luminol and bloodspatter evidence, defendant sought admission of the very same evidence at trial: Dr. Kenneth Siegusmund, whom defendant attempted to introduce as an expert witness in his case, represented himself as an expert in luminol testing, having performed it over 100 times, and also an expert in bloodspatter, having been qualified as an expert in that field about 20 times. (R.L5-L7) The trial court declined to qualify Dr. Siegusmund as an expert in luminol testing or bloodspatter, however, which ruling the Illinois Supreme Court upheld. (R.40) <u>People v. Kaczmarek</u>, 741 N.E.2d 1131, *45-46.

Nonetheless, the fact remains that defense counsel made a strategic decision to counter the State's expert testimony by presenting his own expert, albeit unsuccessfully. Clearly, defense counsel could not exclude the State's luminol and bloodspatter evidence and then present his own evidence on the very same subjects from Dr. Siegusmund. This is the classic sort of strategic choice that cannot form the basis for an ineffective assistance claim. In <u>People v. Bushong</u>, 351 Ill.App.3d 807, 815 N.E.2d 103 (2nd Dist. 2004), the defendant argued that his attorney was ineffective for failing to move for a <u>Frye</u> hearing to determine the admissibility at trial of evidence generated by certain actuarial instruments. 815 N.E.2d at 112. The reviewing court declined to decide whether that evidence was admissible under <u>Frye</u> because, *inter alia*, defendant's own expert used the same sort of actuarial instruments in his report and in his trial testimony. 815 N.E.2d at 113. The court concluded that because reliance on the instruments was a matter of trial strategy, defendant was precluded from arguing that the instruments were inadmissible. 815 N.E.2d at 113-114.

Moreover, even if defense and appellate counsel were held to be deficient at bar with respect to the <u>Frye</u> issue, defendant was not thereby prejudiced because the result of his trial would not have been different had a <u>Frye</u> hearing been held. For the reasons discussed above, if the hearing had been held, the court would have found that luminol testing and bloodspatter analysis were generally accepted in the scientific community and therefore admissible.

And even if the trial court had precluded admission of the luminol testing and bloodspatter testimony, defendant would still have been convicted. Even without that scientific testimony, defendant would have been convicted by evidence that blood

52

consistent with Millie Nielsen's blood type and enzymatic makeup was found on defendant's jeans and jacket; that defendant was seen near her apartment carrying some of her property, that Mrs. Nielsen's belongings were found in the trunk of defendant's car, including jewelry boxes bearing bloody smudges on them; that defendant told Detective Bogucki that he might have committed the crime, but he did not remember (R.L45); and that defendant told ASA Stevens that he could have been in the first floor apartment that night or early morning, and could have killed the woman, but he did not remember. (R.L60,L63)

For these reasons, this Court should reject defendant's claim that trial and appellate counsel afforded him ineffective assistance of counsel.

## CONCLUSION

The People of the State of Illinois respectfully request that this Honorable Court affirm the trial court's summary dismissal of defendant's post-conviction petition.

Pursuant to <u>People v. Nicholls</u>, 71 Ill. 2d 166, 374 N.E.2d 194 (1978) and relevant statutory provisions 725 ILCS 5/110-7(h)(1992); 725 ILCS 130/13 (1992); 55 ILCS 5/4-2002.1 (1992), the People of the State of Illinois respectfully request that this Court grant the People costs and incorporate as part of its judgment and mandate a fee of $100.00 for defending this appeal.  In addition, pursuant to <u>People v. Agnew</u>, 105 Ill. 2d 275, 473 N.E.2d 1319 (1985) and 55 ILCS 5/4-2002.1 (1992), the People respectfully request that this Court also grant the People an additional fee of $50.00 in the event oral argument is held in this case.

Respectfully Submitted,

RICHARD A. DEVINE,
State's Attorney,
County of Cook,
Rm.309 – Richard J. Daley Center,
Chicago, Illinois 60602

<u>Attorney for Respondent-Appellee</u>

JAMES E. FITZGERALD,
HAREENA MEGHANI-WAKELY,
JOAN F. FRAZIER,
Assistant State's Attorneys.
    <u>Of Counsel</u>.

54

**APPENDIX 'A'**

<u>Pam Fish's Lab Report Dated October 22, 1995</u>

*EXHIBIT*
*A*
*Pg. 1*

CHICAGO POLICE DEPARTMENT
CRIME LABORATORY DIVISION
1121 SOUTH STATE STREET, CHICAGO, ILLINOIS 60605

# LABORATORY REPORT

J170913
Millie Nielsen
HOMICIDE
SUPPLEMENTARY REPORT I
(see original report dated 7 May 1987)

22 October 1995

The evidence listed below was subjected to DNA analysis.

| EXHIBIT | DESCRIPTION |
|---------|-------------|
| K-1 | Blood standard: Millie Nielsen |
| Q-1 | Blood standard: Henry Kaczmarek |

The evidence listed below was received from Investigator J. Lewandowski on 12 May 1994 for DNA analysis.

| EXHIBIT | DESCRIPTION |
|---------|-------------|
| Q-2 | Blue jeans identified as the property of Henry Kaczmarek. |
| Q-3 | Quilted jacket identified as the property of Henry Kaczmarek. |

FINDINGS

| K-1 | Submitted as a standard for comparison. DNA isolated. |
|-----|------|
| Q-1 | Submitted as a standard for comparison. DNA isolated. |
| Q-2 | Blood identified. DNA isolated. |
| Q-3 | Blood identified. DNA isolated. |

RESULTS

DNA isolated from each exhibit was amplified by the Polymerase Chain Reaction (PCR) at the following loci: HLA DQ-alpha, LDLR, GYPA, HBGG, D7S8 and GC.

No DNA profile was obtained from the blue jeans. Inconclusive results were obtained from the jacket.

C90

*EXHIBIT*
*A*
*Pg.2*

CHICAGO POLICE DEPARTMENT
CRIME LABORATORY DIVISION
1121 SOUTH STATE STREET, CHICAGO, ILLINOIS 60605

# LABORATORY REPORT

J170913
Millie Nielsen
Homicide
page 2

## CONCLUSIONS
No DNA comparisons were made.

## EVIDENCE DISPOSITION
DNA evidence will remain in the laboratory.

*Pamela Fish*
Pamela Fish
Supervising Criminalist

C91