1-97-2557

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the Circuit Court |
| | ) | of Cook County, Illinois. |
| Plaintiff-Appellee, | ) | |
| | ) | |
| -vs- | ) | Indictment No. 87 CR 6131. |
| | ) | |
| HENRY KACZMAREK, | ) | Honorable |
| | ) | John Brady, |
| | ) | Judge Presiding. |
| Defendant-Appellant. | ) | |

## BRIEF AND ARGUMENT FOR DEFENDANT-APPELLANT

MICHAEL J. PELLETIER
Deputy Defender

DEBRA R. SALINGER
Assistant Appellate Defender
Office of the State Appellate Defender
100 West Randolph Street - Suite 5-500
Chicago, Illinois  60601
(312) 814-5472

COUNSEL FOR DEFENDANT -APPELLANT

**ORAL ARGUMENT REQUESTED**

EXHIBIT O

POINTS AND AUTHORITIES                                      Page

I.      **The State Presented The Testimony of Two Former Police Officers as Experts in Luminol Testing and Blood Splatter. Defendant Sought to Rebut the State's Witnesses with the Testimony of Dr. Siegesmund Who Himself Gave Training Seminars to Police Officers in Blood Splatter and Had Done Luminol Testing. Where the State's Case Turned on the Location and Quantity of Blood Found on Defendant's Clothes, the Judge Erred in Prohibiting Dr. Siegesmund from Testifying for the Defense** ........................ 28

Taylor v. Illinois, 484 U.S. 400 (1988) ........................................... 28

Chapman v. California, 386 U.S. 18 (1967) ....................................... 35

People v. Jordan, 103 Ill. 2d 192, 469 N.E.2d 569 (1984) ............................... 28

People v. Novak, 163 Ill. 2d 93, 643 N.E.2d 762 (1994) ........................... 29,31

People v. Linscott 142 Ill. 2d 22, 566 N.E.2d 1355 (1991) ............................. 33

People v. Rayford, 43 Ill. App. 3d 283, 356 N.E.2d 1274 (5th Dist. 1976) ............ ..... 28

People v. Daniels, 75 Ill. App. 3d 35, 393 N.E.2d 667 (1st Dist. 1979) ................... 28

People v. Knox, 121 Ill. App. 3d 579, 459 N.E.2d 1077 (3rd Dist. 1984) ............... 29

People v. Partee, 157 Ill. App. 3d 231, 511 N.E.2d 1165 (1st Dist. 1987) ............... 29

Ralston v. Plogger, 132 Ill. App. 3d 90, 476 N.E.2d 1378 (4th Dist. 1985) ............... 33

People v. Smith, 241 Ill. App. 3d 446, 608 N.E.2d 1259 (2nd Dist. 1993) ............... 33

People v. Perry, 147 Ill. App. 3d 272, 498 N.E.2d 1167 (1st Dist. 1986) ................. 35

People v. Garriott, 253 Ill. App. 3d 1048, 625 N.E.2d 780 (4th Dist. 1998) ............... 36

II.    The Court Erred in Allowing Mitch Rea to Testify as an Expert for the State in Luminol Testing Where Rea, Had Never Taken a College Level Chemistry Course, Did Not Know Had to Perform a Confirmatory Test to Determine Whether the Substance That Luminesced Was in Fact Blood, and Did Not Make the Chemical Luminol Mixture Himself but Obtained Pre-Packaged Chemicals from a Private Chemist ..................... 37

People v. Hendricks, 145 Ill. App. 3d 71, 495 N.E.2d 85 (1st Dist. 1986) ................. 37

Lytle, "Chemiluminescense in the Visualization of Forensic Bloodstains," 23 Journal of Forensic Sciences 550 (July 1978) ......................................... 38

III.    Where the Crux of Defendant's Case Was That Any "Blood Splatter" Was a Result of Defendant Having Been in Fist Fights Rather than by Any Alleged Attack on Decedent, the Judge Erred in Not Allowing Defendant to Present Evidence That Defendant's Girlfriend Had Been with Defendant on Several Occasions Where Defendant Had Being Wearing His Quilted Coat While Fighting and the Other Person Had Bled ........... 40

Chambers v. Mississippi, 410 U.S. 284 (1973) ..................................... 40

Washington v. Texas, 388 U.S. 14 (1967) ......................................... 40

Chapman v. California, 386 U.S. 18 (1967) ....................................... 44

Taylor v. Illinois, 484 U.S. 400 (1988) ........................................... 40

People v. Foskey, 136 Ill. 2d 66, 554 N.E.2d 192 (1980) ............................. 44

People v. Szudy, 262 Ill. App. 3d 695, 635 N.E.2d 801 (1st Dist. 1994) ................. 43

IV.    Defendant's Constitutional Right to a Speedy Trial Was Denied Where Over Three

**and One Half Years Elapsed Between Reversal of Defendant's Murder Conviction and His**

**Second Trial and Where He Was Not Responsible for a Bulk of the Delay** . . . . . . . . . . . . 45

U.S. Const., amends. VI, XIV; Ill. Const., art. I, sec. 8 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

Barker v. Wingo, 407 U.S. 514 (1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

Doggett v. United States, 505 U.S. 647 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

People v. Bazzell, 68 Ill. 2d 177, 369 N.E.2d 48 (1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

People v. Kaczmarek, 243 Ill. App. 3d 1067, 613 N.E.2d 1253 (1st Dist. 1993) . . . . . . . . . . . 45

People v. Garriott, 253 Ill. App. 3d 1048, 625 N.E.2d 780 (4th Dist. 1993) . . . . . . . . . . . . . . 45

People v. Singleton, 278 Ill. App. 3d 296, 662 N.E.2d 580 (1st Dist. 1996) . . . . . . . . . . . . . . 45

People v. Belcher, 186 Ill. App. 3d 202, 542 N.E.2d 419 (2d Dist. 1989) . . . . . . . . . . . . . . . . 46

## NATURE OF THE CASE

Henry Kaczmarek was convicted of murder after a jury trial and was sentenced to natural life in prison.

This is a direct appeal from the judgment of the court below.  No issue is raised challenging the charging instrument.

## ISSUES PRESENTED FOR REVIEW

1.    The State presented two former police officers as experts in luminol testing and blood splatter.  Defendant sought to rebut the State's experts with the testimony of Dr. Siegesmund who himself gave training seminars to police officers in blood splatter and had done luminol testing.  Where the State's case turned on the location and quantity of blood found on defendant's clothes, did the judge err in prohibiting Dr. Siegesmund from testifying for the defense?

2.    The judge below allowed Mitch Rea to testify as an expert for the State in luminol testing.  Rea, however, had never taken a college level chemistry course, did not know had to perform a confirmatory test to determine whether the substance that luminesced was in fact blood, and did not make the chemical luminol mixture himself but obtained pre-packaged chemicals from a private chemist.  Did the court err in qualifying Rea as an expert witness?

3.    The crux of defendant's case was that any "blood splatter" was a result of defendant having been in fist fights rather than of any alleged attack on decedent.  The judge did not allow defendant, however, to present evidence that defendant's girlfriend had been with defendant on several occasions where defendant had being wearing his quilted coat while fighting and the other person had bled.  Did the judge err in not permitting defendant to present evidence to support his theory of defense to the jury?

-2-

4.      Whether defendant's constitutional right to a speedy trial was denied where over three and one half years elapsed between reversal of defendant's murder conviction and his second trial and where defendant was not responsible for a bulk of the delay?

## JURISDICTION

Henry Kaczmarek appeals from a final judgment of conviction in a criminal case. He was sentenced on May 7, 1996. (R. N13) Notice of appeal was timely filed on May 7, 1996. (C. 296) Jurisdiction lies in this Court pursuant to Article VI, Section 6, of the Illinois Constitution, and Supreme Court Rules 603 and 606.

## STATEMENT OF FACTS

In the early morning hours of April 25, 1987, Millie Nielsen was killed in her apartment. On April 26, 1987, defendant was arrested and subsequently charged with Ms. Nielsen's murder as well as with residential burglary, home invasion, and armed robbery.  (C. 34-51)  Following a jury trial in 1989, defendant was found guilty of all charges.  (C. 54)  Judge Michael Getty sentenced defendant to a term of natural life on the murder conviction.  (C. 54)  Defendant appealed.

On March 31, 1993, the Appellate Court reversed defendant's murder conviction and remanded for a new trial.  People v. Kaczmarek, 243 Ill. App. 3d 1067, 613 N.E.2d 1253 (1st Dist. 1993)( C. 54-78).  Following the denial of defendant's motion for discharge based on a speedy trial violation, the State, in November of 1996, retried defendant on five counts of murder.  Judge John Brady presided over the second jury trial.  The jury found defendant guilty of murder and the court sentenced defendant to natural life imprisonment.  (C. 152, 293) Defendant appeals this second conviction and sentence.

**Evidence At Trial**

Millie Nielsen lived on the first floor of a two-flat apartment building at 3507 Diversey Avenue.  (R. I177-179)  Dan Larry, his wife Margaret, and Margaret's then 19-year-old son, John Fisher, lived on the second floor.  (R. I179)  The 86-year-old Nielsen was the Larrys' landlady. (R. I179)  Ronald Sadlowski, who had known Ms. Nielsen for thirty years, helped Ms. Nielsen take care of the building and did errands for her.  (R. I159)

On April 24, 1987, a Friday, Margaret Larry saw Ms. Nielsen at around 5:00 or 5:30 p.m. (R. I180) At 6:15 p.m., Margaret went bowling with her son John. (R. I181, I207) Margaret and John returned home at about 10:30 p.m. (R. I181) In the apartment, Margaret's husband was passed out on the couch. (R. I181) Also in the apartment was Henry Kaczmarek who was on the couch watching television. (R. I181, I207) Henry was wearing light colored jeans and a blue, quilted work jacket, and construction boots. (R. I179, I207, I211) Henry had been living with the Larrys for about a month after previously having lived at his girlfriend, Pam Hines' house. (R. K182)

At 11:00 p.m., Henry helped Margaret bring Dan to bed. (R. I184, I209) Margaret went to bed and Henry went back to watching television. (R. I184) At 11:30 p.m., the doorbell rang but Margaret did not answer it. (R. I186) At 12:15 a.m., the doorbell rang and Margaret answered the door and spoke to her brother-in-law Ron Larry. (R. I186, I188) Ron asked Margaret if Henry was home to which Margaret said "no." (R. I194) Margaret did not notice whether Henry was on the couch. (R. I187) John stated that Henry left the apartment at 11:30 p.m. on Friday night and returned at midnight. (R. I210) According to John, after Henry asked John about Dan, Henry left, and John went to sleep. (R. I210)

At 2:00 a.m., the Larrys' doorbell rang again. (R. I189) Margaret answered the door and saw Henry. (R. I189) Henry asked whether Dan was awake and after Margaret said "no," Henry left. (R. I189) Margaret went back to sleep. Margaret did not hear any noise and was not awakened by someone vomiting. (R. I198)

Margaret woke up that morning at around 7:00 or 7:30 a.m. (R. I190) Margaret saw Henry sleeping on the couch. (R. I190) Shortly after, Henry woke up. (R. I190) Margaret stated

that Henry looked "kind of" nervous until he got his coffee after which he sat down and relaxed. (R. I192) Margaret stated that Henry was wearing a clean pair of dark colored jeans and a light dress shirt. (R. I190) Margaret did not pay attention to whether there were any stains on Henry's clothing. (R. I199) Margaret admitted that the first time she told police about what Henry was wearing on Saturday morning was two years after Millie's murder. (R. I202)

Before leaving for work, Margaret opened the back door but did not go on the back porch. (R. I197) She did not see Ron. (R. I198) Margaret left for work where she was later contacted and told to come home. (R. I192)

On Saturday morning at around 9:45 a.m., Ms. Nielsen's helper, Ronald, noticed that the back pantry window of Millie's apartment was broken and the back storm door was fully open. (R. I163) Ronald called the police. (R. I164) Police found Ms. Nielsen in the bedroom of her apartment having been stabbed multiple times, strangled, and having sustained blunt force injuries. (R. I119-121, I147) Officer Marsala observed bloodspots on the floor and walls above the bed where Ms. Nielsen was found, blood on the kitchen floor leading to the bedroom, and bloodspots on the dust ruffle of the bed in the second bedroom. (R. I40-42, I51-53) Marsala found no signs of forced entry and no broken glass inside. (R. I43-44)

John woke up at 10:00 a.m. on Saturday morning when police came to question him. (R. I210) Detective Bogucki and partner Raymond Schalk conducted a follow-up investigation regarding the murder of Millie Nielsen. (R. J29) In the morning of April 25th, the detectives interviewed Dan and Margaret Larry. (R. J29) Ron Larry approached the detectives and talked to them. (R. J30)

In 1987, Ron Larry lived with his mother but would sleep on the back porch of Margaret

-7-

and Dan Larrys' apartment. (R. I64)  Ron Larry admitted being convicted of theft in February of 1980 and being placed on probation. (R. I61)  In April of 1980, Ron was convicted of burglary and was sentenced to four years probation with a condition of probation being that he spend the first four months in jail and pay $300 restitution. (R. I61)  Three years later, Ron was arrested for theft and charged with violating his probation. Ron was sentenced to three years in prison for violating his probation and two years incarceration for felony theft. (R. I61-62)

On April 24th, Ron went to work and then went drinking at Patty's lounge which was located across the street from his brother Dan's apartment. (R. I63, I68)  At the bar, Ron shot pool and had eight to ten drinks. (R. I67)  When asked if he ever left Patty's to go to his brother's house and ask for Dan or Henry, Ron stated "maybe." (R. I102)

Ron left the lounge at midnight or 1:00 a.m. (R. I68)  After getting something to eat, Ron went to his brother's house and laid down on some padding on the second floor back porch to sleep. (R. I68)  At trial, Margaret testified that Ron had no permission to sleep on the Larrys' back porch. (R. I196)  Ron did not see any bags or property in the gangway and did not pay attention to the first floor door or windows. (R. I69)  Ron stated that when he was on the porch, the temperature was in the 50's. (R. I96)  Ron admitted that he previously testified that it had been in the 60's. (R. I96)  The parties subsequently stipulated that the temperature at 3:00 a.m. was 37 degrees. (R. J126)

While on the porch, Ron felt sick and vomited over the railing. Ron laid back down again. (R. H70)  At 2:00 a.m., Ron heard the alarm from Patty's lounge indicating its closing. (R. H72)  Ron claimed that twenty to thirty minutes later, he saw Henry in the back yard of the building carrying a bag. (R. H64)  He had known Henry for five or six years. (R. H64)

Ron testified that Henry, who was wearing jeans and a dark jacket, was walking across the yard. (R. H73) Ron stated that Henry was carrying the bag with his arms out at a 90 degree angle. (R. H100) The bag which looked like a garbage bag did not have handles on it. (R. H100)

Ron went to sleep, waking up around 7:00 a.m. (R. H76) Ron used the back stairs and noticed nothing unusual. (R. H77) After going to work for a full day on Saturday April 25th, Ron went to Patty's Lounge for a few beers. (R. H82) At Patty's, Ron learned that Ms. Nielsen had been murdered. (R. H82) After Patty's, Ron went to the Larrys' where Ron spoke to police. (R. H83) Ron told the police about Henry and he went with police to find Henry. (R. H83, J31) After finding Henry's car, Ron went back to the bar. (R. H84)

Police began surveillance of Henry's car. (R. J32) At 1:00 a.m. on April 26th, after seeing movement inside the car, police went over to the car and saw Henry inside sleeping. (R. J33) Henry was wearing a plaid shirt and blue jeans and had on leather work boots. (R. J36, J62) Police noted blood stains on the right and the left sleeve of Henry's coat. (R. J34) The officers placed defendant under arrest. (R. J36)

Henry signed a written consent form to search his car. (R. J40) In the trunk of Henry's car, police found jewelry boxes, plates and platters, a Marshall Fields bag, a pair of blue jeans with blood stains, and tools. (R. J42) Police did not find any gloves in the trunk or car and no other shoes. (R. J43) Police took photographs, however no photograph of the entire contents on the car's trunk was taken. (R. J66)

Ms. Nielsen's niece Fern Briggs and great niece Barbara Tucker viewed the property taken from the trunk of Henry's car. (R. J57, J95, J105) Briggs and Tucker identified pieces of

jewelry and serving dishes as their Aunt Millie Nielsen's. (R. J95-101, J105-108)  Officer

Patterson, an expert in fingerprint identification, averred that a hand print taken from the bag

found in the trunk of defendant's car was a print from defendant. (R. J121)

Henry gave his consent to have police take a blood sample from him. (R. J58)

Defendant's blood sample was transferred to serologist Pam Fish. (R. J126)  During Nielsen's

autopsy, medical examiner Michael Chambliss took blood from decedent, also transferring it to

serologist Pam Fish. (R. J126)  Officer Kenneth Martin fingerprinted defendant. (J124)

Forensic investigator Robert Baike testified that he went to Nielsen's apartment on April

25th and observed blood splatters above the decedent on the wall by the bed and noted that the

room had been ransacked. (R. J6)  Baike photographed the area and collected evidence. (R. J8)

Baike was unable to find any fingerprints. (R. J9)  Baike noted that elderly people do not secrete

as much oil as a younger person and thus would not necessarily leave fingerprints. (R. J10)

Baike stated that he found a cloth impression on the broken glass. (R. J9)  Baike observed an

eight inch long knife in the kitchen and blood on the kitchen floor and door frame. (R. J11)

Baike did not see any bloody footprints. (R. J19)

Police checked Henry's shoes. (R. J53)  Police did not notice any blood or brown or

reddish stains on Henry's boots. (R. J53, J63)  Officer Bogucki averred that no other clothing

had blood on it. (R. J53)

Pam Fish, a serologist, testified that in 1987, Chicago was not doing D.N.A. testing but

was doing electrophoresis serology. (R. J155)  Ms. Fish stated that she received from police

investigating the Nielsen murder a jacket, a pair of jeans, jewelry boxes, and a knife. (R. J139)

Based on blood standards she received from Henry and decedent, Ms. Fish determined that

-10-

defendant had a "B" blood type with "CA" enzymes and decedent had an "A" blood type with "BA" enzymes. (R. J153) Ms. Fish examined the items for specific enzymes and blood types finding that the blood on defendant's jeans and jacket had type "A" blood. (R. J142-143) The blood on the floor of decedent's apartment was type "A." (R. J144) Ms. Fish testified that all the blood found was consistent with Ms. Nielsen's blood and could not have come from defendant. (R. J153) In 1994, Chicago discontinued electrophoresis serology and began D.N.A. typing. (R. J129) Ms. Fish tried to do D.N.A. testing on the samples received in 1987 but the samples were too small or too degraded and results were inconclusive. (R. J161-163) Ms. Fish did not do luminol testing. (R. J 163)

Arizona insurance fraud investigator Mitch Rea testified that he was contacted by the Cook County State's attorney's office in Spring of 1994 to perform luminol testing in conjunction with the Nielsen murder. (R. K7, K26) In conjunction with whether Rea was qualified to testify as an expert, Rea stated that he had been a police officer for 26 years and had extensive training in processing crime scenes. (R. K7) Rea stated that he had taught crime scene reconstruction, blood scene detection, and chemical blood detection or luminol testing. (R. K9) Rea conceded that he was not a chemist and had taken no chemistry classes. (R. K21) After stating that he was a member of the International Association of Blood Stain Pattern Analysis, Rea admitted that there was no examination for membership. (R. K21) Rea testified that he had been qualified as an expert in court twelve times. (R. K 20) Over objection, the court accepted Rea as an expert in the field of luminol testing. (R. K25-26)

Rea stated that the chemical luminol reacts to blood by producing a glow which lasts a couple of minutes. (R. K12-13) Rea noted that luminol was not specific to blood and that it

would react to some metals, cleaning agents, and plant materials. (R. K17) Luminol also would

react to either human or animal blood. (R. K17)

Rea testified that in May of 1994, he received a sealed box containing a dark-colored

quilted jacket. (R. K26-27) Rea set up camera equipment and mixed the chemicals needed for

luminol detection of blood. (R. K29) Rea obtained the chemicals from a criminalist who was

also a chemist. (R. K30) After spraying segments of the jacket with the luminol chemicals and

turning off the lights, Rea observed bright luminance in spots on the right arm of the jacket and

right cuff. (R. K32, K37) Rea noted a few, very small, little dots on the right side of the front

panel of the jacket that luminated as well as a haze across the pocket of the jacket. (R. K35) Rea

noted a large glowing portion next to the zipper on the left side but stated that although the

luminol was reacting, it did not react quite right for blood, but he did not know what the

substance was. (R. K36) Rea also noted that there was some luminance on the left sleeve and

cuff. (R. K39)

On cross-examination, defense counsel asked Rea whether he knew "how to personally

perform any confirmatory testing on a garment if it tested presumptively for the presence of

blood." (R. K24) Rea responded "no, I don't do that." (R. K24, K40) Rea also conceded that

the glow can somewhat distort the size of the area that is presumptively registering for blood. (R.

K42)

The State called Rod Englert to testify concerning blood splatter. Englert stated that he

was currently self-employed as president of Rodney Forensic Consultants in Oregon. (R. K47)

Englert obtained an undergraduate degree in police administration and had taken forensics and

criminalistic courses in graduate school. (R. K48) As a police officer from 1963 to 1995,

Englert had processed over 300 homicide crime scenes. (R. K48) Englert stated that he was a member of the American Academy of Forensic Scientists and that the rules for admission were very stringent. (R. K57) For admission to the Academy, Englert had to present several papers. (R. K57) Englert stated that he has been qualified as an expert in blood splatter about 100 times. (R. K59-60)

On cross-examination, Englert admitted that he was not a scientist and did not have a masters degree. (R. K64) Over objection, the court ruled that Englert was an expert in the field of crime scene reconstruction and blood splatter. (R. K66)

Englert testified that he was retained by the Cook County State's Attorney in the murder of Millie Nielsen. (R. K66) Englert's fee was $175 an hour plus expenses and his approximate bill would be $15,000. (R. K67, K121) Englert testified that he reviewed the photographs of the crime scene, the statements of witnesses, the luminol testing photographs prepared by Mitch Rea, and the physical evidence recovered. (R. K68-69)

Englert stated that there were three different types of blood splatter: low, medium, and high velocity splatter. (R. K70-71) Low velocity splatter involves blood that drops straight down; medium velocity splatter concerns blunt trauma; and high velocity splatter involves gunfire. (R. K70-73) Further, Englert stated that on the first blow there is no blood to splatter. (R. K71) Englert additionally averred that no matter how severe a beating, if someone beats someone with a fist, club or some type of weapon, very little blood gets back on the attacker although the scene can be terribly bloody. (R. K72)

The elongation of a blood drop indicates the direction and angle of impact. (R. K75) A transfer or swipe of blood is involved where a person who, for example, had blood all over, grabs

-13-

another person and gives them a bear hug. (R. K87)  The blood on the second person would be a transfer. (R. K87)  Englert averred that the second person would not have nearly as much blood on him as the first person. (R. K87)  Englert noted that if, for example, he were to hit the court reporter continually, he might get blood on his legs and shoes in addition to on his cuffs and sleeves. (R. K81)

As for Ms. Nielsen's apartment, Englert noted that there was blood on the floor of the kitchen leading into Ms. Nielsen's bedroom. (R. K91)  Englert also observed that "on the floor are smears of blood, as though a struggle took place, and one of the individuals on the floor was bleeding." (R. K91)  When asked whether it was unusual not to have any footprints in the blood, Englert stated that it would not be unusual because blood dries very fast. (R. K86-91)

Englert stated that the blood on the wall in the kitchen was classic medium velocity splatter. (R. K92)  Based upon the low height of the splatter on the wall, Englert opined that the person who received the numerous blows was down on the floor when she was hit outside of the bedroom. (R. K92)  Englert further averred that the position of Ms. Nielsen in the bedroom was consistent with being taken from the kitchen and being thrown on the bed. (R. K93)

Examining a blow-up photograph of defendant's pants, Englert stated that the left and right knee areas of the pants contained a transfer stain and not splatter. (R. K94)  The transfer does not involve energy but just a transfer of something that was bloody that touched against the pants. (R. K95)  As for the bottom of the pants, Englert opined that there were numerous specks of blood consistent with medium velocity splatter. (R. K96)  Englert counted 25 to 30 fine droplets of blood that had been airborne and projected onto the lower leg of the pants. (R. K97)  Englert stated that the blood on defendant's pants would not be consistent with a person picking

-14-

up a bloody bag in a gangway. (R. K100) Further, Englert opined that the blood on the jeans would not be consistent with the wearer of the jeans "kneeing" someone in the nose. (R. K102)

In examining the luminol photographs of defendant's jacket, Englert stated that the stains on the right and left arms contained splatter. (R. K109) Englert stated that over the front of the jacket were little specks of projected blood. (R. K111) On the right pocket was a very light transfer stain. (R. K111) Englert opined that the jewelry boxes had transfer stains that were consistent with ransacking. (R. K114)

Englert asserted that the manner of Nielsen's death was that she was attacked first in the kitchen where she received many blows while on the floor, and that she, while still alive, was taken into the bedroom and thrown on the bed. (R. K117) Englert acknowledged that there was a great deal of blood in Ms. Nielsen's bed. (R. K134)

Englert admitted that he was assuming that the blood splatter on defendant's jeans was Nielsen's blood. (R. K123) Englert conceded that no report stated that the splatter on the lower left leg was Nielsen's blood and that if it were someone else's blood he would have to reevaluate his position. (R. K122-123) Englert testified that it was "very, very possible" to get medium velocity splatter from a fight. (R. K125)

When asked how the attacker was positioned when Nielsen was down on the kitchen floor being struck, Englert retorted that he did not know exactly how the attacker was standing. (R. K126) Englert stated that he had conducted hundreds of experiments in identical type cases and sometimes there is blood on the shoes and sometimes there is not blood on the shoes. (R. K129)

Following Englert's testimony, the State rested. (R. J150) The court denied defendant's

-15-

motion for a directed finding. (R. J149)

      To rebut the testimony of State's witnesses Englert and Rea, defendant called Dr.

Kenneth Siegesmund on defendant's behalf. Outside the presence of the jury, the parties

inquired into Dr. Siegesmund's qualifications. Dr. Siegesmund testified that he had a Ph.D. in

biology and that his undergraduate major was biology with a minor in chemistry. (R. L3) Dr.

Siegesmund stated that he had performed luminol testing well over a hundred times and had

lectured in forensic science. (R. L5) Dr. Siegesmund testified that he was a member of the

American Academy of Forensic Scientists, the Midwest American Association of Anatomy, the

Neuroloectic Society of America, and the American Association for the Advancement of

Science. (R. L6)

      Dr. Siegesmund testified that he had taught forensic science and that he considered

himself to be a forensic expert in a variety of areas including blood splatter and luminol testing.

(R. L16)  The doctor explained that he had never gone to a crime scene because by the time he is

consulted the crime scene is gone. (R. L18, L20) Dr. Siegesmund stated that he attended the

American Academy's one week long conference two or three years before. (R. L20) The State

questioned Dr. Siegesmund about testimony given in the trial of People v. Bobby Murphy where

the doctor was asked whether he attended the "academy in 1995," and that the doctor said "no, I

don't believe so," or the seminar in 1994 and the doctor stated "no" as well. (R. L21-22) Dr.

Siegesmund testified that he did not remember being asked that question and that he had attended

the conference held in New Orleans in either 1994 or 1995. (R. L21)

      When asked if he had ever worked in a crime lab, Dr. Siegesmund stated that he worked

in the Glendale Crime Lab. (R. L22) Dr. Siegesmund denied that the lab had not done any

forensic work for 10 years. (R. L23) When asked whether he had given previous testimony that

the Glendale Crime Lab had not done any forensic work for 20 years, the doctor stated that he did

not recall saying "I'm not sure that's true. We haven't done anything for 10 years." (R. L23)

Dr. Siegesmund stated that he did not receive any training in luminol testing or blood

splatter from the police or the F.B.I. (R. L26, L28) The doctor further denied having taken any

courses on how to luminol an object at a crime scene or ever having done luminol at a crime

scene. (R. L26) Dr. Siegesmund stated that the last time he conducted luminol testing was three

weeks before. (R. L27) Dr. Siegesmund averred that he had performed dozens of experiments in

blood splatter. (R. L28)

Dr. Siegesmund stated that gave courses to sheriffs in the police department and that as

part of the course, he would demonstrate blood splatter. (R. L29) When asked whether he

attended any formal course taught by law enforcement agencies, Siegesmund stated "I'm

teaching. I don't take courses from them." (R. L29) When asked whether it would make sense

to learn how to do it before you taught a subject, Dr. Siegesmund declared that he was a scientist

and that he believed that he could do it properly. (R. L29)

Midway through the State's cross-examination of Siegesmund on his qualifications, the

court asked to see both lawyers outside the hearing of Siegesmund and asked defense counsel

whether he "want[ed] to put this guy through anymore of this" to which counsel said "yes." (R.

L32) Dr. Siegesmund stated that he had been qualified to testify as an expert in the area of blood

splatter 20 to 30 times. (R. L37)

Following argument on Dr. Siegesmund's credentials, the court ruled that he would not

recognize Siegesmund as an expert in the field of blood splatter. (R. L40) The court further

ruled that Dr. Siegesmund could testify on the process of luminol testing but not the

interpretation of it. (R. L40)

Defense counsel subsequently made an offer of proof averring that Dr. Siegesmund

would have testified in contradiction to Mitch Rea that there were confirmatory tests which could

have been performed past the initial luminol testing. (R. L71) Further, that additional testing

should have been performed to determine whether the illuminating substance was in fact blood,

and if it were blood, whether it was defendant's. (R. L71-72) Additionally, Dr. Siegesmund

would testify that in his opinion there was almost no indication of blood splatter on the jacket

and that the blue jeans contained smears in the knee area indicative of lateral activity. (R. L72)

Dr. Siegesmund would have testified that the majority of decedent's blood would have been

deposited on the bed prior to, and not after, her death. (R. L72) Dr. Siegesmund would have

further stated, that in his opinion, the offender in the instant case would have been dramatically

covered with blood based on the particular type of attack. (R. L72)

In defendant's case, defendant and his former girlfriend Pamela Hines testified.

Henry Kaczmarek testified that after one year of high school, he went to mechanics school. (R.

K173) Henry stated that as a result of being hit with a pole he had problems with his speech and

thought. (R. K173) Henry worked as a construction worker for 12 years. (R. K175) Two

months a year he was laid off. (R. K175)

In April 1987, Henry had been living with the Larry family. (R. K176) Before living

with the Larrys, Henry had lived with his girlfriend, Pam Hines. (R. K182) Henry went straight

from Pam's house to the Larrys'. (R. K182) When Henry left Pam's house, Henry took all his

belongings including his clothes, flashlight, and work tools. (R. K182) Henry's work tools

-18-

included a hammer, screwdrivers, channel locks, and a glass cutter. (R. K183) Henry's clothes included six pairs of jeans and eight or nine flannel shirts. (R. K260) Henry used a Marshall Fields bag for luggage. (R. K182) Henry had been living at the Larrys' for between two weeks and a month prior to decedent's murder. (R. K182, K214)

Henry had been on public aid and gave the Larrys money from his mother. (R. K177) The court sustained the State's objection to the reason Henry was living with the Larrys. (R. K177) Henry had been laid off and was scheduled to begin work for Lee Willis the Monday following Nielsen's death. (R. K177)

The week decedent was killed, Dan Larry had been suffering from a toothache for most of that week. (R. K178) Henry and Dan went to bars and drank for most of that week. (R. K178)

Henry got into three fights on the Wednesday before April 24th. (R. K179, K251) The fights were with Henry's friend Tom Szeszol and Bill Henderson. (R. K179) During the fist fight in the alley behind 3507 Diversey, Henry received two gashes in his hand, Szeszol bled from his mouth and nose, and Henderson bled from his mouth. (R. K180) Henry also fought a man who was trying to mess with Henry's car. (R. K181) The fight occurred near Wrightwood and Central Park. (R. K181) When Henry saw the person try to mess with the car handles of Henry's car, Henry hit him three or four times and kicked him a few times with his knee. (R. K181) Henry stated that they were rolling around and the "guy" was bleeding from his face. (R. K181) Henry asserted that he had owned his jacket for a year or more and that he had been in a lot of fights while wearing the jacket. (R. K210) Henry related that he "went to a lot of bars and ... had a lot of fights in that coat." (R. K211)

On the morning of April 24th, Henry began drinking with Dan. (R. K183) In the

afternoon, Henry and Dan went to Tom Szeszol's house. (R. K184) Tom Henderson and a woman named Julie were also at Szeszol's house. (R. K184) Henry took a shower there and did laundry. (R. K184) Henry did not wash his stained jeans there because Henry wanted to soak them and Tom's mother was coming and wanted everyone out. (R. K184, K224) When Henry was told to leave, he threw all his clothes back into the trunk of the car. (R. K185) Henry threw the jeans which he was going to soak but did not, on the floor of the trunk. (R. K185) All of Henry's clothes got washed except for his jacket and the pair of jeans that he was going to soak. (R. K224-225)

After Szeszol's house, Henry dropped Dan off and went to Mike's tavern on Wrightwood. (R. K187) Henry stayed there until 6:30 p.m. drinking. (R. K188) After Mike's tavern, Henry went to the Larrys' house. (R. K188) When Henry got to the Larrys' house, Dan was the only person there. (R. K188) Henry and Dan drank a case of beer together. (R. K188) Henry left the Larrys' at 11:45 p.m. and went to another bar. (R. K188-189) When Henry left the Larrys', Margaret and John were in the house. (R. K189, K225) Henry saw Margaret help Dan into bed. (R. K226)

After drinking two beers, Henry went to a bar called "Our Place" until 2:00 a.m. (R. K190) Henry estimated that there were 50 people at the bar. (R. K227) When asked to describe anyone at the bar, Henry stated that it was ten years before and that he would be lying if he had to describe anyone at the bar. (R. K227-228) At around 2:00 a.m., Henry went back to Dan's house to see if Dan wanted to drink some more. (R. K190) Although Henry had a key to Dan's house, Henry had to "pee" and parked in the alley behind Dan's house to urinate. (R. K191, K214)

-20-

After parking in the alley, Henry opened the car door, got out of the car, and heard a

noise. (R. K191) The noise sounded like a door closing. (R. K229) Henry closed the car door

and walked towards the house. (R. K191) Henry looked up thinking that the noise might have

been Dan upstairs. (R. K191) After seeing no one up there, Henry kept walking towards the

house and urinated close to the house. (R. K191) While urinating, Henry saw a bag on the side

of the house. (R. K192) Henry looked inside the bag. (R. K194) Henry saw a little box

containing silverware. (R. K195, K216) Henry picked up the bag and carried the bag to his car

where he threw it into the trunk of his car. (R. K195) When Henry picked up the bag it was

damp or wet. (R. K219-210) Henry then got into his car and drove around to the front of Dan's

house. (R. K195)

Henry went upstairs and rang the Larrys' doorbell. (R. K196) After Margaret told Henry

that Dan was not awake, Henry left and went to "Our Place" bar. (R. K196) At the bar, Henry

saw Liz and Dan Funkhauser. (R. K197) Henry stayed until closing at 4:00 a.m., and gave rides

home to Liz and Dan. (R. K197) After parking his car across the street from the Larrys'

apartment, Henry went upstairs and went to sleep on the Larrys' couch. (R. K197-198, K234)

Defendant went to sleep around 5:00 a.m. and woke up around 8:00 a.m. (R. K198) Henry slept

in his clothes: jeans, flannel shirt, boots, and coat. (R. K198, K234) Henry had one pair of

shoes which were boots. (R. K237)

Henry woke up Saturday morning and saw Margaret making coffee. (R. K199) Henry

did not change clothes. (R. K199) Henry and Dan drove to Melrose Park to see Bill Brown. (R.

K202) Henry had seen Bill hundreds of times. (R. K234) Henry wanted to show Bill his car and

Henry owed Bill some money. (R. K202) Henry went to the tavern that Brown owned and was

told that Brown had gone fishing. (R. K202) Henry and Dan began drinking. (R. K202) At around 1:00 in the afternoon, the two went over to Brown's house. (R. K202)

At Brown's house, Henry opened the car trunk to see what was in the bag he found that morning. (R. K203) Dan was with Henry. (R. K203) Henry took everything out and put it on a bench. (R. 203) Henry stated that "it was all bloody." (R. K203) The bag and a pillow case was all bloody with dried blood. (R. K204) Henry separated the good things from the bad, throwing the bag, a pillow case, and some other things in a dumpster next door to Brown's house. (R. K204, K236) Henry did not throw into the dumpster any work gloves, clothes, or boots. (R. K236-237) Henry kept about four or five pieces and put the things back into the trunk. (R. K205, K238)

Brown, a construction worker who also owned a bar, came back and Henry showed Brown the silverware. (R. K205, 245) Brown gave Henry $30 for some coins Henry had and $30 for the silverware. (R. K205) Bill had never bought anything from Henry before. (R. K235) Henry denied that Brown was a fence. (R. K244) Before leaving, Henry and Dan went back to Bill Brown's bar to drink. (R. K206)

Henry and Dan left and Henry dropped Dan off at home. (R. K206) Henry went to Frank's tavern where Henry had a couple of beers. (R. K206) At Frank's, Henry called Dan who told Henry that the lady downstairs had been killed. (R. K206) Henry went back to Dan's house and rang the door bell but nobody answered. (R. K207) Henry went across the street and called the Larrys' house but no one answered the telephone. (R. K207) Henry started to drive to Mike's tavern but got sleepy so he pulled over and went to sleep in his car. (R. K207)

The next thing Henry remembered were police banging on his window. (R. K208) Henry

-22-

got out of the car, at which time police patted Henry down and handcuffed him. (R. K208)

Police took Henry to the station and talked to Henry at 3:15 a.m. (R. K218) Henry did not

remember telling police that when he found the bag he saw jewelry and plates inside the bag. (R.

K218) Henry stated that he did not tell police about hearing a noise in the backyard because they

did not ask. (R. K229)

Henry talked to an assistant State's attorney at 9:00 a.m. (R. K218) Henry did not recall

telling the State's attorney that when Henry put the bag in the car that he knew that it contained

jewelry. (R. K219) Henry did not remember telling assistant State's attorney Stevens that after

ringing the Larrys' doorbell, he went upstairs to go to sleep. (R. K232) Henry did not recall

telling police at 3:15 a.m or State's Attorney Stevens at 9:00 or 9:30 a.m. that he "could have

killed the woman but that [he] didn't remember." (R. K256-257)

Henry stated that he had never been in Ms. Nielsen's apartment. (R. K209) Henry

testified that he had seen the decedent one time when Henry had been watching television, and

decedent was in the back porch talking to Margaret. (R. K208) Henry stated that that was the

only time he had ever seen Ms. Nielsen. (R. K209) Henry knew that Ms. Nielsen was an older

woman but did not know that she lived alone. (R. K220)

Henry denied killing Ms. Nielsen. (R. K209) Henry denied using a glass cutter to cut the

window on the back of decedent's house. (R. K254) Henry denied beating, stabbing or

strangling decedent. (R. K255) When asked about a whether a clock found in the trunk of

Henry's car was decedent's, Henry stated that the clock was his. (R. K237)

Pam Hines testified that she had formerly been Henry's girlfriend. (R. K152) Hines was

not living with Henry at the time of Henry's arrest. (R. K152) Pam identified Henry's jacket in

court and stated that the whole time Pam knew Henry he had that jacket. (R. K153) Pam stated that Henry would dress the same every day and that daily dress would include a flannel shirt, jeans, the jacket, and boots. (R. K154)

Pam stated that Henry was a construction worker and that when they lived together Henry helped with the upkeep of the building. (R. K154) Pam asserted that Henry had an assortment of tools to fix things including hammers, screwdrivers, wrenches, glass cutters, and pliers. (R. K154) Hines stated that Henry was familiar with how to cut glass. (R. K158)

Defense counsel asked Ms. Hines if she ever was with Henry when he got into a fight. (R. K154) The court sustained the State's objection. (R. K154) The witness said "yeah" and then asked whether she should answer, to which the court said "no." (R. K155) Defense counsel asked to be heard and the court said to "ask the next question." (R. K155) The court sustained the State's objections to defense counsel's questions concerning whether Hines had ever been with Henry while he got into a fist fight and whether Henry was wearing his quilted coat. (R. K155) Defense counsel asked to be heard at sidebar which the court denied. (R. K155) Defense counsel tried to ask whether Hines had been with Henry when Henry got into a fight and someone was bleeding. (R. K155) The court sustained the State's objection. (R. K155)

Pam Hines identified the Marshall Fields bag found in the trunk of Henry's car as looking like the bag that Henry put his clothes and personal items in when he left the apartment they were sharing. (R. K156, K159) Defense counsel asked to be heard at sidebar and the court said "no." (R. K157) Defense counsel stated that he had no further questions. (R. K157)

On cross-examination, Hines was asked whether she had told anyone from the police department or State's attorney's office about the bag. (R. K162) Hines stated that no one from

the police department or State's attorney's office talked to her until just before trial. (R. K162) When asked whether it was true that she had not seen Henry for at least a month prior to April of 1987, Hines stated, "If that's what I said. That must have been it....I don't remember." (R. K161-162)

At recess, defense counsel stated as an offer of proof, that Pam Hines would have testified that she was with Henry on seven or eight different occasions when he got into fist fights and people were bleeding. (R. K169) Hines would stated that Henry had on his quilted jacket during each and every fight she observed. (R. K169) Because the luminol testing at best revealed unidentified blood on the jacket, counsel contended that the theories presented at trial hinged on whether or not the blood on the quilted coat was Millie Nielsen's. (R. K169) Consequently, counsel averred, the jurors should have been given the alternative to learn that some of the splattered blood on the coat was not decedent's. (R. K169) The court stated that the supposed fights were too remote and denied defendant's motion for mistrial. (R. K171)

In lieu of Elizabeth Finuchi's live testimony, the parties stipulated that if Elizabeth Finuchi were called to testify she would state that she knew Henry and that on April 15, 1987, at around 2:00 to 2:30 a.m., she and Daniel Funkhauser were drinking at a bar called "Our Place," where she saw Henry. (R. J164-165) At 4:00 a.m., defendant gave Elizabeth and Dan a ride home. (R. J165) Elizabeth did not notice anything unusual about Henry or his clothes. (R. J166)

In rebuttal, Officer Bogucki testified that he talked to defendant at 2:15 a.m. on April 26, 1987 and that Henry said that he had been in the alley behind the Larrys' apartment to urinate when he walked through the back yard and noticed a bag. (R. L44) Seeing that the bag had jewelry and plates inside, Henry picked up the bag and put it in the trunk of his car. (R. L45)

-25-

Henry then walked back to the front, rang the doorbell and spoke to Margaret. (R. L45)  When

Margaret told Henry that Dan was asleep, Henry went back to the car and left. (R. L45)  Bogucki

stated that when he asked Henry about the crime, Henry stated that may have done it, but did not

remember. (R. L45)  Bogucki asserted that Henry never said that he heard a noise or that the bag

was bloody, or that there was a bloody pillow case inside the bag. (R. L45)  Bogucki further

averred that Henry never mentioned anything about Melrose Park or throwing the bag and case in

a dumpster. (R. L46)

 Bogucki conceded that there was no written statement of the April 26th, 3:15 a.m.,

conversation. (R. L 47)  When asked about the handwriting and signature on the police general

progress report concerning the conversation with defendant, Bogucki stated that Detective Mook

wrote the report and that Bogucki signed Detective Schalk's name to the report. (R. L50)

Bogucki admitted that Mook was not present at the time Bogucki interviewed Henry. (R. L50)

When defense counsel tried to ask Bogucki whether the report made reference to Henry not

remembering anything, the court sustained the State's objection. (R. L52)  The court also

sustained the State's objections to defense counsel's questions concerning whether Schalk or

Mook were in Chicago or still policemen. (R. L52)  When the State asked Bogucki about a

summary of defendant's statements prepared at 8:00 p.m. on April 26th, the court failed to grant

defendant a sidebar. (R. L53-54)

 Assistant State's Attorney Stevens testified in rebuttal that on April 26th at 9:00 a..m, he

talked with Henry and that Henry told him that during the morning of April 25th he drove his car

into the alley behind 3507 Diversey to "take a leak," and that he found a bag in the gangway,

took it to his car, and dumped it out in the trunk of his car. (R. L59-60)  Stevens said that Henry

related that he discovered that the bag contained jewelry. (R. L60) Henry went to the front of the building, rang the bell, went up to the second floor, and spent the night. (R. L60) Henry told Stevens that the blood stains on his clothing may have been the result of getting into a lot of fights. (R. L60) According to Stevens, Henry said that he could have killed the woman, but he did not remember. (R. L60) Stevens stated that Henry never said he heard a noise, that the bag was bloody, that he later found a bloody pillow case, or that he later threw the bag, the pillow case and the other items in a dumpster in Melrose Park. (R. L60) Stevens admitted that he took no notes of his conversation with Henry. (R. L61) When asked whether he had any difficulty understanding Henry, Stevens admitted that Henry spoke slowly. (R. L64)

Following a jury instruction conference, the parties presented closing arguments. (R. L66-L120) The judge instructed the jury and the jury subsequently returned a guilty murder verdict. (R. L133)

The judge denied defendant's motion for a new trial. (R. N3) Following a sentencing hearing, the judge imposed a sentence of natural life. (R. N13)

Defendant-appellant, Henry Kaczmarek, appeals his murder conviction and sentence.

# ARGUMENT

I. **The State Presented The Testimony of Two Former Police Officers as Experts in Luminol Testing and Blood Splatter.  Defendant Sought to Rebut the State's Witnesses with the Testimony of Dr. Siegesmund Who Himself Gave Training Seminars to Police Officers in Blood Splatter and Had Done Luminol Testing. Where the State's Case Turned on the Location and Quantity of Blood Found on Defendant's Clothes, the Judge Erred in Prohibiting Dr. Siegesmund from Testifying for the Defense.**

"Few rights are more fundamental than that of an accused to present witnesses in his own defense." Taylor v. Illinois, 484 U.S. 400 (1988).  Because the basic purpose of a trial is the determination of truth, "the exclusion of evidence is a drastic measure." People v. Rayford, 43 Ill. App. 3d 283, 356 N.E.2d 1274, 1277 (5th Dist. 1976).  Where a defendant is wrongly precluded from presenting evidence on his own behalf, defendant must be given a new trial. People v. Daniels, 75 Ill. App. 3d 35, 393 N.E.2d 667, 674 (1st Dist. 1979).  In the instant case, where the judge precluded defendant from presenting the testimony of Dr. Kenneth Siegesmund to rebut the State's expert witnesses, Mitch Rea and Rod Englert, Henry Kaczmarek was denied a fair trial.  Consequently, this Court must remand the cause for a new trial.

The test for the admissibility of expert opinion testimony is that an expert may testify "if his experience and qualifications afford him knowledge which is not common to lay persons and where such testimony will aid the trier of fact in reaching its conclusion." People v. Jordan, 103 Ill. 2d 192, 208, 469 N.E.2d 569, 576 (1984).  An expert need only have knowledge and

experience beyond that of the average citizen. People v. Novak, 163 Ill. 2d 93, 104, 643 N.E.2d

762, 768 (1994). There is no predetermined formula for how an expert acquires specialized

knowledge or experience and the expert can gain such through practical experience, scientific

study, education, training or research. Novak, 643 N.E.2d at 768.

In People v. Knox, 121 Ill. App. 3d 579, 459 N.E.2d 1077, 1081 (3rd Dist. 1984), the

court held that the trial court properly permitted a police officer to testify as a blood-flight

specialist. In Knox, over objection, police officer Ganda was permitted to testify that the

decedent was stabbed while lying down in bed and that there were two different blood types in

the bedroom. Ganda testified that he had attended a school in blood-flight splashing and patterns

at Elmira College in New York and had attended a blood-flight workshop at the St. Louis

Medical Examiner's Officer. Ganda also stated that he conducted experiments with human

blood. In addition, Ganda had read literature in the field, had observed bloodstain evidence at

crime scenes and had previously testified as a blood-flight specialist. In rejecting defendant's

argument on appeal that Ganda was not qualified as an expert in the field of blood-flight, the

Knox Court held that the record established Ganda's qualifications as an expert in the field of

bloodstain evidence. Knox, 459 N.E.2d at 1081.

A contrary example of where a witness was not qualified to give expert testimony arose

in People v. Partee, 157 Ill. App. 3d 231, 511 N.E.2d 1165 (1st Dist. 1987). In Partee, defendant

sought to present expert testimony in the area of electrophoresis. When the defense witness was

questioned on his qualifications in the area of electrophoresis, the witness stated that he a lawyer

with no medical or scientific background. The witness further noted that he had also not received

any special training, skill, or experience in testing or evaluating electrophoretic techniques. The

<u>Partee</u> Court held that the trial court did not abuse its discretion by excluding the defense witness

as an expert. <u>Partee</u>, 511 N.E.2d at 1187. The <u>Partee</u> Court affirmed that an individual will be

permitted to testify as an expert if his experience and qualifications afford him knowledge which

is not common to laypersons and that a witness "may be qualified as an expert by reason of

knowledge, skill and experience, training or education." <u>Partee</u>, 511 N.E.2d at 1186.

Accordingly, the <u>Partee</u> Court affirmed that a professor with a background in analytical

biochemistry and serology, was properly permitted to testify as an expert defense witness in the

area of electrophoresis testing. <u>Partee</u>, 511 N.E.2d at 1187.

In the case at bar, following argument on Dr. Siegesmund's credentials, the court ruled

that he would not recognize Siegesmund as an expert in the field of blood splatter. (R. L40) The

court further ruled that Dr. Siegesmund could testify on the process of luminol testing but not the

interpretation of it. (R. L40) The judge below erred in not permitting defense expert Kenneth

Siegesmund from presenting testimony in order to rebut the testimony of the State's experts. (R.

L40)

## The Judge Below Was Acting Under A Misapprehension of Law Concerning Experts

The judge's ruling that Dr. Kenneth Siegesmund was not an expert must be disregarded

where the court was acting under a misapprehension as to what qualified a witness to be an

expert. The judge's statement concerning the standard by which to evaluate whether a person

was qualified to testify as an expert was in direct contravention of the mandate of the Illinois

Supreme Court. (R. L40)

-30-

Courts have consistently held that an expert need only have knowledge and experience beyond that of the average citizen. People v. Novak, 163 Ill. 2d 93, 104, 643 N.E.2d 762, 768 (1994). The judge below stated "The fact that someone has some knowledge that some in the public sector may not have doesn't make somebody an expert." (R. L40) The judge's standard for admissibility was directly at odds with the standard articulated by the courts. Not only was the judge incorrect concerning the measure by which to evaluate an expert's qualifications to testify, but he was also incorrect in his ultimate ruling that Dr. Siegesmund should not be allowed to testify.

### Dr. Siegesmund Was Qualified to Testify About Luminol Testing And Blood Splatter

Dr. Siegesmund testified that he had a doctorate in biology, having majored in his undergraduate studies in biology and minored in chemistry. (R. L3) Dr. Siegesmund stated that he had performed luminol testing well over a hundred times and had lectured in forensic science. (R. L5) Dr. Siegesmund stated that the last time he conducted luminol testing was three weeks before. (R. L27) Dr. Siegesmund further averred that he had performed dozens of experiments in blood splatter and that he had been qualified to testify as an expert in the area of blood splatter 20 to 30 times. (R. L28, L37)

Dr. Siegesmund was a member of several associations including the American Academy of Forensic Sciences. (R. L6) Notably, State's witness Englert noted that the Academy had very "stringent" requirements for membership. (R. K57) As for his training, Dr. Siegesmund stated that he attended the one week conference given by the American Academy. (R. L20) Dr.

-31-

Siegesmund testified that in addition to working in the Glendale crime lab, he had taught forensic science and that he considered himself to be a forensic expert in a variety of areas including blood splatter and luminol testing. (R. L16, L22)

Dr. Siegesmund stated that he gave courses to sheriffs in the police department and that as part of the course, he would demonstrate blood splatter. (R. L29) When asked whether he attended any formal course taught by law enforcement agencies, Siegesmund stated "I'm teaching. I don't take courses from them." (R. L29)

In contrast to the witness in Partee whom the court ruled was not an expert, Dr. Siegesmund had a scientific background and had received special training in the area of blood splatter and luminol testing. Consistent with the decision in Knox, Dr. Siegesmund's experience and qualifications afforded him knowledge beyond that of a layperson.

The fact that Dr. Siegesmund had never been to a crime scene had no impact upon his qualifications to testify as an expert witness. Initially, it must be stressed that Mitch Rea and Rod Englert were asked to examine pieces of clothing and physical evidence, not a crime scene. Further, Dr. Siegesmund explained that he had never gone to a crime scene because by the time he is consulted the crime scene is gone. (R. L18, L20) Further, examination of a crime scene was not a prerequisite to applying scientific principles concerning blood and how it splattered.

The State's questioning concerning Dr. Siegesmund not having taken any courses from the police or F.B.I. was misleading. Dr. Siegesmund had not received any training in luminol testing or blood splatter from the police or the F.B.I. (R. L26, L28) Further, the doctor denied having taken any courses on how to luminol an object at a crime scene or ever having done luminol at a crime scene. (R. L27) Dr. Siegesmund, however, gave classes to law enforcement

personnel, so it would make no sense then to require Dr. Siegesmund to take courses from "his students." (R. L29)

Even if one assumes arguendo that Dr. Siegesmund had not taken formal courses in blood splatter or luminol testing, Dr. Siegesmund testified that he had performed luminol testing well over a hundred times and conducted luminol testing three weeks before. (R. L5, L27) Dr. Siegesmund further stated that he had performed dozens of experiments in blood splatter. (R. L28) Based upon scientific principles and experimentation, Dr. Siegesmund had knowledge beyond that of a lay person. See Ralston v. Plogger, 132 Ill. App. 3d 90, 476 N.E.2d 1378, 1383 (4th Dist. 1985) (practical experience can make an individual an expert.)

In ruling that Dr. Siegesmund was not an expert, the judge commented that Dr. Siegesmund was a "jack of all trades and master of none." (R. L40) In fact, Dr. Siegesmund had been qualified as an expert witness in caustic substances in People v. Smith, 241 Ill. App. 3d 446, 608 N.E.2d 1259 (2nd Dist. 1993), and in hair examination in People v. Linscott 142 Ill. 2d 22, 566 N.E.2d 1355 (1991). Additionally, Dr. Siegesmund stated that he was qualified to testify as an expert in the area of blood splatter 20 to 30 times and in the area of forensics 250 times. (R. L8, L37)

Not Allowing Dr. Siegesmund to Testify Denied Defendant a Fair Trial

Dr. Siegesmund would have rebutted both State's witnesses Mitch Rea and Rod Englert. In contradiction to Mitch Rea, Dr. Siegesmund would have informed the jury that there were confirmatory tests which could have been performed subsequent to the initial luminol testing.

-33-

(R. L71) Specifically, Dr. Siegesmund would have stated that the additional testing should have been performed to determine whether the illuminating substance was in fact blood, and if so, whether it was either decedent's or defendant's. (R. L71-72) In response to Rod Englert's testimony, Dr. Siegesmund would have advised the jury that in his opinion there was almost no indication of blood splatter on the jacket and that the blue jeans contained smears in the knee area indicative of lateral activity. (R. L72)

Additionally, Dr. Siegesmund would have testified that the majority of decedent's blood would have been deposited on the bed prior to, and not after, her death. (R. L72) Hence, Dr. Siegesmund would have opined that the offender in the instant case would have been dramatically covered with blood based on the particular type of attack. (R. L72) This testimony would have been in contrast to Englert's testimony that the majority of the blood in decedent's bed would have "seeped" out after she was dead. (R. K134)

Decedent's blood was found in two spots on defendant's jacket and in the knee area of the pants found in the trunk of defendant's car. According to the defense theory, decedent's blood was transferred to defendant's jacket when defendant picked up the bag from the back of the apartment building and placed the bag in his trunk. The bag subsequently transferred blood to the pants lying in defendant's trunk. Defendant at the time noted that the bag was damp and later discovered that it was bloody. (R. K203, K219-220) The State's theory was that defendant's pants and jackets were stained with decedent's blood as a result of defendant having attacked decedent.

A pivotal issue for the jury to resolve was whether there was also "splatter" on the pants found in defendant's trunk and on defendant's jacket. According to Rod Englert, the substance

-34-

on defendant's pants was blood splatter and was received while attacking decedent.  According

to Dr. Siegesmund, the blood on defendant's pants was not splatter but transfer smears indicative

of lateral activity.  Englert opined that defendant's jacket contained splatter around the cuffs.  In

contrast to Englert, Dr. Siegesmund would have testified that the defendant's jacket contained

almost no indication of splatter.  Due to the divergence of opinions on the pivotal question of

splatter, permitting Dr. Siegesmund's testimony on the luminating substance on defendant's

clothing was critical.

A further area for the jury to analyze was whether decedent's attacker would have had a

substantial amount of blood on him or her.  Decedent's blood was found on two small stains on

defendant's jacket and on two stains in the knee area of the pants found in defendant's trunk.

Decedent's blood was found on no other clothing.  (R. J53)  Critically, police checked

defendant's boots and did not detect any blood or bloodstains on them.  (R. J53, J63)  Englert

acknowledged that there was a "great deal" of blood in decedent's bed.  (R. K134)  It was

Englert's opinion that decedent bled in her bed after the attack was over and that very little blood

may have gotten on the attacker.  In contrast to Englert, who did not have a scientific

background, Dr. Siegesmund would have been able to testify that decedent bled while alive.  (R.

L72)  Consequently, it was Dr. Siegesmund's opinion that decedent's attacker would have been

dramatically covered in blood.  (R. L72)

An error of constitutional magnitude mandates reversal unless the reviewing court can

determine that it was harmless beyond a reasonable doubt.  Chapman v. California, 386 U.S. 18

(1967).  This Court must be mindful that expert testimony is particularly prejudicial because it

tends to overpersuade in favor of the party introducing it.  People v. Perry, 147 Ill. App. 3d 272,

498 N.E.2d 1167, 1169 (1st Dist. 1986). Defendant included the error in his post-trial motion. As there are no factual questions in dispute, this Court can review the cause <u>de novo</u>. <u>People v. Garriott</u>, 253 Ill. App. 3d 1048, 625 N.E.2d 780, 783 (4th Dist. 1998).

Defendant was not allowed to counter the State's expert witnesses. The result was that the testimony of the State's experts wrongly overpersuaded the jury in favor of the prosecution. The evidence against defendant was not overwhelming. Neither defendant's fingerprints nor blood were found in decedent's apartment. Further, although it was undisputed that there was blood on the floor of Ms. Nielsen's apartment, no blood was found on defendant's shoes. Defendant's testimony that he merely found the bag of items and did not steal them or kill anyone to get them was consistent with Ron Larry seeing defendant in the back yard of the apartment building carrying a bag. Notably, Ron Larry never saw defendant go inside or come out of the Nielsen apartment. Here, where the judge precluded defendant from presenting evidence to rebut the State's expert witnesses, the cause must be remanded for a new trial.

**II.** **The Court Erred in Allowing Mitch Rea to Testify as an Expert for the State in Luminol Testing Where Rea Had Never Taken a College Level Chemistry Course, Did Not Know How to Perform a Confirmatory Test to Determine Whether the Substance That Luminesced Was in Fact Blood, and Did Not Make the Chemical Luminol Mixture Himself but Obtained Pre-Packaged Chemicals from a Private Chemist.**

The State called Mitch Rea to the stand to testify for the State as an expert in the area of luminol and luminol testing. (R. K25) When asked whether he had ever taken a college level course in biology and chemistry, Rea stated that he had taken a "very basic" biology class "long ago" but not a chemistry course. (R. K21) Over objection, the court accepted Rea as an expert in the field of luminol testing. (R. K26) The judge below erred in permitting Rea to testify as an expert, thus denying defendant his right to a fair trial.

In People v. Hendricks, 145 Ill. App. 3d 71, 102, 495 N.E.2d 85 (1st Dist. 1986) rev'd on other grounds 137 Ill. 2d 31, 560 N.E.2d 611 (1990), crime scene technician Dodwell testified that he tested a crime scene with luminol. In utilizing the chemical mixture luminol throughout the house where decedents were found, he discovered in part that the entire bottom of the tub and the dresser handles in the master bedroom reacted. Dodwell stated that the luminol reacts to copper or carbon alloys as well to radishes, bleach, Cascade, Snowbol, and other similar cleaning items. Dodwell declared that luminol was a preliminary test for blood and that it could not positively identify blood. Consequently, Dodwell could not conclude that the luminescence in the tub and shower was caused by the presence of blood. Hendricks, 495 N.E.2d at 97.

-37-

In the case at bar, Mitch Rea acknowledged that he performed no confirmatory follow-up testing on the portions of clothing which luminesced. Rea conceded that luminol was not specific to blood but could react with other substances such as some metals, cleaning agents, and plant materials. Although Rea averred that luminol reacts differently to blood than to cleaning agents or copper metals, Rea did not explain how the reaction differed.

To determine whether an area that luminesces is blood or another substance, further testing is required. Lytle, "Chemiluminescense in the Visualization of Forensic Bloodstains," 23 Journal of Forensic Sciences 550, 554 (July 1978). Because the luminol chemical is not completely specific for blood, in interpreting luminol results, further testing is used to assess whether the luminating area was blood. Further, "because of the need to interpret the cause and meaning of a given luminol reaction as it occurs, the need to collect and analyze samples when possible, and testimony that might be required with regard to the luminol examination and any subsequent analyses, our laboratory prefers that a serologist conduct or at least be in attendance during luminol examinations." 23 Journal at 559-561. Due to the possibility of "false reactions," luminol testing "call[s] for the use of trained personnel to conduct the luminol test." 23 Journal at 555.

According to Rea, luminol testing is used to detect blood that cannot be seen. (R. K10-11) Rea opined that the areas that luminated in the instant case were consistent with reactions that he had observed in the past for blood. (R. K39) Rea, however, performed no follow-up testing on the areas that luminated to verify that the luminating areas contained blood. When asked whether he knew "how to personally perform any confirmatory testing," Rea admitted that he did not. (R. K24, K40) Further, not only was Rea not a serologist, Rea had not even taken

any college level chemistry courses. Notably, the luminol mixture Rea used was prepared and pre-packaged by a chemist. (R. K30)

The error in allowing Rea to testify as an expert was not harmless. Rea's substandard testing served as a basis for State expert Englert's testimony. Englert could not offer an opinion as to blood splatter without Rea's testimony. The serious flaw in the State's "house of cards" was that based on Rea's examination of the pants and coat it could not be determined with certainty that the substance that luminated was blood. "Something" luminated, but Rea was not qualified to make the determination that that "something" was blood and not merely, for example, remnants of laundry detergent from the clothing's last washing.

Without Rea's testimony, Englert would have had no basis for his testimony. The foundation of Englert's testimony was that the areas that glowed were blood. (R. K122) The State commented extensively in closing argument about defendant's pants and jacket and the testing that was performed on the clothing. (R.L84, L112-114)

The judge abused his discretion in ruling that Mitch Rea was qualified as an expert in luminol testing. Defense counsel at trial objected to Rea's qualifications. Although the error was not included in defendant's post-trial motion, if this Court finds that the error was not properly preserved, this Court may review the error under the plain error doctrine of Supreme Court Rule 615. Where the substance that luminated on defendant's clothing formed the cornerstone of the State's theory of prosecution, the error in allowing Mitch Rea to testify as an expert denied defendant a fair trial. Consequently, the cause must be remanded for a new trial.

III.    **Where the Crux of Defendant's Case Was That Any "Blood Splatter" Was a Result of Defendant Having Been in Fist Fights Rather than by Any Alleged Attack on Decedent, the Judge Erred in Not Allowing Defendant to Present Evidence That Defendant's Girlfriend Had Been with Defendant on Several Occasions When Defendant Had Being Wearing His Quilted Coat While Fighting and the Other Person Had Bled.**

"Few rights are more fundamental than that of an accused to present witnesses in his own defense." Chambers v. Mississippi, 410 U.S. 284, 302 (1973). The right to offer the testimony of witnesses "is in plain terms ... the right to present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the jury so that it may decide where the truth lies." Washington v. Texas, 388 U.S. 14, 19 (1967). This right is grounded in the compulsory process clause of the Sixth Amendment and is a fundamental component of due process. Taylor v. Illinois, 484 U.S. 400, 408-409 (1988).

In the case at bar, the State's theory of prosecution was that the blood on defendant's jacket was decedent's. To rebut the State's case, defendant sought to present evidence that the blood on defendant's jacket was the result of defendant having engaged in fist fights where defendant's opponent had bled. Defendant was denied a fair trial where the judge precluded defendant from presenting testimony that defendant's girlfriend had been with defendant when he had gotten into fights, that defendant had been wearing his quilted jacket, and that blood had been shed during the fight.

Defendant called Pam Hines as a defense witness. Ms. Hines testified that at the time of

Henry's arrest she and he were girlfriend and boyfriend. (R. K152) Ms. Hines and Henry had

previously lived together but had not been living together at the time of his arrest. (R. K152)

Ms. Hines stated that she had last seen defendant in 1989, at defendant's first trial, and that she

was not involved in defendant's life. (R. K152-153)

Ms. Hines stated that Henry dressed the same every day, wearing flannel shirts, jeans, a

jacket, and boots. (R. K154) When defense counsel attempted to elicit from Ms. Hines that she

had been with defendant on seven or eight different occasions when defendant had got into fist

fights, where punches being thrown and people bleeding, the judge precluded the testimony. (R.

K154, 169) The questioning was as follows:

[DEFENSE COUNSEL]: Were you ever with Henry when he got into a fight?

[STATE]: Objection.

[COURT]: Sustained.

[HINES]: Yeah.

[DEFENSE COUNSEL]: May I be heard?

[HINES]: Do I answer?

[COURT]: No. Ask the next question.

[DEFENSE COUNSEL]: Were you ever with Henry when he got into a fist fight with another person?

[STATE]: Objection.

[COURT]: Sustained.

[DEFENSE COUNSEL]: Were you ever with Henry when he was wearing People's Number 45 in evidence, that quilted coat, when he got into a fist fight with another person?

[STATE]: Objection.

[COURT]: Sustained.

[DEFENSE COUNSEL]: I would ask to be heard at a sidebar, Judge.

[COURT]: Ask the next question.

[DEFENSE COUNSEL]: Were you ever with Henry when he was wearing People's Number 45 in evidence, that quilted coat, when either he or someone else that he was with was bleeding?

[STATE]: Objection.

[COURT]: Sustained. (R. K154-155)

Before concluding the examination of Hines, defense counsel asked to be heard at sidebar and the court denied the request. (R. K157)

Following Hines' testimony and the stipulated testimony of Elizabeth Finuchi, defense counsel asked for a short recess which the court permitted. (R. K168) At the recess, defense counsel made an offer of proof concerning the line of questioning he sought to pose to Ms. Hines. (R. K168). Defense counsel sought to elicit that Hines had been with defendant on seven or eight occasions, where defendant had gotten into fights while wearing his quilted jacket, and where punches were thrown and people were bleeding. (R. K169) Defense counsel emphasized that the luminol testing at best revealed that the substance on the jacket was blood but that the testing could not determine whose blood. (R. K169) Contrary to the State's theory that splattered blood on the jacket was Ms. Nielsen's, defense counsel sought to give the jury the alternative that the splattered blood was not Nielsen's but that of someone with whom defendant had gotten into a fist fight. (R. K169-170)

In response to defense counsel's argument, the court stated that Ms. Hines stated that the last time she saw defendant was six months before the murder and defense counsel's theory of defense was "not probable." (R. K170) "For clarification," the State noted that Ms. Hines testified that she had not lived with defendant for six months prior to the incident and had not seen defendant for a month before. (R. K170)[1] The judge stated that the "supposed fights" were "just too remote." (R. K170) After defense counsel told the court that he could not get past the first question to lay a foundation, the court denied defendant's motion for mistrial. (R. K171)

Contrary to the judge's assertion, the fist fights were not "too remote." Hines had been with defendant for many months prior to mid-March of 1987. Blood can last on a surface for months or years. See People v. Szudy, 262 Ill. App. 3d 695, 635 N.E.2d 801 (1st Dist. 1994). Since the blood from fist fights could have remained on defendant's jacket for a lengthy period, the court's conclusion that the fights were "too remote" was without basis.

Pam Hines' testimony was critical to rebut the State's theory that the blood on defendant's coat was a result of defendant having attacked and killed decedent. Defendant attempted to establish that any blood that had been splattered on defendant's coat was a result of having been engaged in fist fights where blood was present, and not because of any attack on decedent. Defendant had the constitutional right to present his theory of defense to the jury. There simply was no reason for the court to preclude defendant from presenting his defense.

Before a federal constitutional error can be held harmless, the State must establish beyond

---

[1] When asked whether it was true that she had last lived with defendant the previous summer, 1986, Ms. Hines stated "I don't even remember. I don't remember the years." (R. K161) When questioned whether it was correct that she did not see defendant for at least a month prior to April of 1987, Ms. Hines asserted, "If that's what I said. That must have been it... Probably. I don't remember." (R. K161-162)

a reasonable doubt that the error did not contribute to the defendant's conviction. Chapman v. California, 386 U.S. 18 (1967). The error here was not harmless beyond a reasonable doubt. Although defendant himself testified to having been in fights the week of April 24th and that during those fights blood had been shed, the jury may have not credited defendant's testimony because of his motivation to avert conviction. Hines, however, had no present connection with defendant and had not even seen defendant for over seven years. Ms. Hines had no motivation to lie. Thus, her testimony would not only have corroborated defendant's testimony but itself would have presented the jury with an alternative to the State's theory of prosecution.

Where the court refused to allow defendant to present Hines' testimony concerning the fist fights and resulting blood, defendant was denied his right to a fair trial. Reviewing this issue on a de novo basis as there is no factual question in dispute, People v. Foskey, 136 Ill. 2d 66, 554 N.E.2d 192 (1980), Mr. Kaczmarek must be given a new trial.

IV.    **Defendant's Constitutional Right to a Speedy Trial Was Denied Where Over Three and One Half Years Elapsed Between Reversal of Defendant's Murder Conviction and His Second Trial and Where He Was Not Responsible for a Bulk of the Delay.**

This Court reversed defendant's murder conviction and remanded the case for a new trial on March 31, 1993. People v. Kaczmarek, 243 Ill. App. 3d 1067, 613 N.E.2d 1253 (1st Dist. 1993). The State did not bring defendant to trial until November, 1996, over three and one half years after the reversal of his conviction. Defendant filed a written motion to dismiss raised on a violation of his constitutional right to a speedy trial which the trial court denied in November of 1996. (C. 203-291) The trial court erred in denying the motion. Since the issue presented is entirely a question of law, this Court should review the issue de novo. People v. Garriott, 253 Ill. App. 3d 1048, 625 N.E.2d 780, 783 (4th Dist. 1993). The lengthy delay in the instant case resulted in a violation of defendant's constitutional right to a speedy trial, and thus defendant's conviction must be reversed.

Both the Federal and Illinois Constitutions guarantee a right to a speedy trial. U.S. Const., amends. VI, XIV; Ill. Const., art. I, sec. 8; People v. Singleton, 278 Ill. App. 3d 296, 662 N.E.2d 580, 582 (1st Dist. 1996). Illinois' Speedy Trial Act implements the constitutional right to a speedy trial, but is not coextensive with it. People v. Bazzell, 68 Ill. 2d 177, 369 N.E.2d 48, 49 (1977). There are four factors that courts should assess in determining whether a defendant has been deprived of his constitutional right to a speedy trial: 1) length of delay; 2) reasons for the delay; 3) defendant's assertion of his right; and 4) prejudice to defendant. Barker v. Wingo, 407 U.S. 514, 530-532 (1972); Bazzell, 369 N.E.2d at 50. In the instant case, each of the four

factors weighs in defendant's favor.

The threshold question in a <u>Barker</u> analysis is whether the delay is presumptively prejudicial. If a delay is presumptively prejudicial, then the court should go on to balance the remaining three factors. <u>People v. Belcher</u>, 186 Ill. App. 3d 202, 542 N.E.2d 419, 422 (2d Dist. 1989). The entire length of the delay between reversal of defendant's conviction and his second trial was about three and one half years. One year is the generally recognized dividing point between ordinary and presumptively prejudicial delay. <u>Doggett v. United States</u>, 505 U.S. 647, 652, fn 1, (1992); <u>Singleton</u>, 662 N.E.2d at 582. Thus, the delay in this case was presumptively prejudicial.

The second <u>Barker</u> factor is reason for the delay. The reason for a bulk of the delay in the case at bar must be weighed against the State. For two years the State was trying to get additional evidence for the retrial of defendant. In November of 1993, the State advised the court that it was seeking a blood splatter expert. (S.R. 49, 54) In February, 1994, the State informed the court that it was still trying to get an expert for retrial. (S.R. 64) In June, 1994, the State requested a continuance to conduct D.N.A. testing. (C. 248) The State told the court that it would have the results in August or September. (C. 250) In September, October, November, and December of 1994, the State averred that it was still waiting on the D.N.A. testing. (C. 257, 261, 277, 283) In May of 1995, the State advised the court that the Chicago Crime Lab was "in the middle" of the D.N.A. testing. (S.R. 93) In October of 1995, the State asserted that it still did not have the D.N.A. results. (C. 128) At defendant's November, 1996, trial, Serologist Pam Fish testified that the results of her D.N.A. tests on defendant's jacket were inconclusive and the sample from defendant's pants was too small and degraded to test. (R. J163)

-46-

The ultimate responsibility for promptly bringing the defendant to trial rests with the government rather than the defendant.  Barker v. Wingo, 407 U.S. at 531; Singleton, 662 N.E.2d at 583.  In his motion for discharge, defendant noted that Section 103-5(c) allows the court to grant the State an additional 120 days or four months to obtain D.N.A. evidence after a showing of due diligence.  Here, without a showing of due diligence, the State asked for, and was granted, more than 16 additional months to obtain D.N.A. testing.  Here, the minimal two-year-long delay in the State's effort to procure more evidence against defendant was not due to defendant; thus, the lengthy delay must be weighed heavily against the State.

The third Barker factor, defendant's assertion of his right, must also weigh in defendant's favor.  The Appellate Court issued its opinion on March 31, 1993, and its mandate on July 15, 1993.  The court appointed the Office of the Public Defender.  Defendant demanded a speedy trial on July 21, 1993.  (C. 229)  Defendant advised the court that he would wait and the cause was continued.  In October, November, and December of 1994, defendant moved for discharge on the basis of a speedy trial violation.  (C. 261, 277, 283)  Defendant told the court that his counsel would not present his motion for discharge and asked for a bar association attorney.  The court denied defendant's motion for other counsel.  In November of 1996, while represented by private counsel, defense counsel filed a motion to dismiss based upon a violation of defendant's right to a speedy trial.  The court denied the motion and subsequently denied defendant's post-trial motion which included a speedy trial violation claim.  Here, Mr. Kaczmarek asserted his right to a speedy trial.  Defendant, however, had no duty to bring himself to trial, rather, the State had that duty.  Barker v. Wingo, 407 U.S. at 527.  This third Barker factor weighs against the State and in defendant's favor.

The fourth and final factor, prejudice to defendant, also weighs in his favor. Prejudice is assessed in light of the interests of defendants that the speedy trial right was designed to protect. The Court has identified three such interests: 1) to prevent oppressive pretrial incarceration; 2) to minimize anxiety and concern of the accused; and 3) to limit the possibility that the defense will be impaired by diminishing memories and loss of exculpatory evidence. Barker v. Wingo, 407 U.S. at 532; Doggett v. United States, 505 U.S. at 654.

In this case, defendant's anxiety was reflected in the record and noted by the court. In February of 1994, the judge affirmed that defendant was anxious to be tried. (S.R. II 68) Subsequently, in June and August of 1995, the judge stated that defendant was anxious to go to trial. (S.R. II 113, 121) In defendant's motion for discharge, defendant asserted that defendant had "been subjected to unwarranted, lengthy pretrial detention; dilatory tactics have maximized his anxiety, and his defense has been impaired by the 44 months that have passed since the appellate court's remand." Defendant emphasized in his motion for discharge that the State had once already prepared its case as it had taken the cause to trial on a previous occasion. (C. 214)

When all four factors are weighed, it becomes apparent that defendant's constitutional right to a speedy trial was denied. Consequently, this Court should reverse Henry Kaczmarek's murder conviction.

# CONCLUSION

For the foregoing reasons, Henry Kaczmarek, Defendant-Appellant, respectfully requests that this Court reverse his murder conviction or in the alternative remand for a new trial.

Respectfully submitted,

MICHAEL J. PELLETIER
Deputy Defender

DEBRA R. SALINGER
Assistant Appellate Defender
Office of the State Appellate Defender
James R. Thompson Center
100 West Randolph Street - Suite 5-500
Chicago, Illinois  60601
(312) 814-5472

COUNSEL FOR DEFENDANT-APPELLANT

**APPENDIX TO THE BRIEF**

Index to the Record . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A

Sentencing Order . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . B

Notice of Appeal . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . C

# INDEX TO THE RECORD

Report of Proceedings ("R.")                                              Page

Jury Selection                                                           H32-146

Opening Statements:
    State                                                              I9
    Defendant                                                          I21

| State's Witnesses: | Direct | Cross | Redir. | Recr. |
|---|---|---|---|---|
| Officer Marsala | I32 | I51 | | |
| Ronald Larry | I60 | I85 | I101 | |
| Michael Chambliss | I103 | I147 | I155 | I156 |
| Margaret Fisher | I176 | I194 | I203 | |
| John Fisher | I204 | I211 | | |
| Mary Ann Furlong | I213 | I229 | | |
| Robert Baike | J3 | J20 | | |
| Jerome Bogucki | J27 | J61 | | |
| Robert Davie | J70 | J86 | | |
| Fern Briggs | J95 | | | |
| Barbara Briggs | J103 | | | |
| Theatrice Patterson | J110 | J121 | J123 | |
| Pam Fish | J127 | J164 | J170 | |
| Mitch Rea | K6,k26 | K21, K40 | K43 | |
| Rod Englert | K47, K66 | K64, K121 | K146 | K147 |

| Defense Witnesses: | | | | |
|---|---|---|---|---|
| Pam Hines | K151 | K157 | | |
| Henry Kaczmarek | K172 | K213 | K258 | |
| Elizabeth Finuchi (stipulation) | | | | K163 |
| Dr. Kenneth Siegesmund | L3 | L9 | L35 | |

Defense Rests                                                           L42

State's Rebuttal:

| | | | | |
|---|---|---|---|---|
| Det. Bogucki | L42 | L46 | L52 | L54 |
| Richard Stevens | L56 | L61 | L64 | |

A1

<u>Closing Argument</u>:
   State                                                          L74
   Defendant                                         L88
   State                                                          L106

Verdict                                                 L133

Motion for New Trial                             N3

Sentencing                                       N13

<u>Common Law Record</u> ("C.")

Memorandum of Orders . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1-33

Indictment (5/18/87) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34-51

Appellate Court's Opinion (3/31/93) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52-78

Motion to Reduce Bail (9/30/93) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 79-81

<u>Pro Se</u> Motion For Appointment of Other Counsel (1/31/94) . . . . . . . . . . . . . . . . . . . . . . . 82-85

<u>Pro Se</u> Motion to Secure Expert Witness (1/31/94) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 86-89

Motion for Bond Reduction (2/23/94) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 90

Motion for Judgment Notwithstanding the Verdict (9/13/94) . . . . . . . . . . . . . . . . . . . . . . . 91-92

Motion to Dismiss based upon Speedy Trial Violation (11/18/94) . . . . . . . . . . . . . . . . . 93-103

State's Motion to Compel Discovery (1/27/95) . . . . . . . . . . . . . . . . . . . . . . . . . 104-106, 116-120

Order (4/6/89) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 107-108

Documents Tendered by the State (6/27/95) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 109-110

State's Supplemental Answer to Discovery (1/27/95) . . . . . . . . . . . . . . . . . . . . . . . . . . 111-115

Certificate Adjudging Named Person to be Material Witness (8/8/95) . . . . . . . . . . . . . . 121-125

Report of Proceedings (10/11/95) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 126-134

Bond . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 135-144

Renewed Motion to Revoke or Increase Defendant's Bond . . . . . . . . . . . . . . . . . . . . . . 147-149

Jury Instructions and Verdicts (11/22/96) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 152-193

Motion in Limine (11/18/96) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 195-198

Motion to Dismiss with Exhibits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 199-200, 203-292

A3

Motion to Grant Bond Pending Appeal . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 201-202

Order of Sentence and Commitment (5/7/97) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 293

Motion for New Trial (1/17/97) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 294-295

Notice of Appeal (5/7/97) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 296-298

Certification . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 299

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

_____ DEPARTMENT _Crim_ _____
(County)              (Municipal)              (Division)              (District)

**People of the State of Illinois**

v.

_Henry Kazmarek_
        **Defendant**

}

NO. _87CR 6131 01_

I. R. # _291616_

S. I. D. # _____

## ORDER OF SENTENCE AND COMMITMENT TO
## ILLINOIS DEPARTMENT OF CORRECTIONS

The defendant having been adjudged guilty of committing the offense(s) enumerated below,

IT IS ORDERED that the defendant _____ _Henry Kazmarek_ _____ be and is hereby

...ed to the ILLINOIS DEPARTMENT OF CORRECTIONS AS FOLLOWS:

_On 5/7/97 Judge Brody sentenced the defendant_
_Natl Life I.D.O.C. (NATURAL LIFE)_
_Credit 0 days_
_Mitt issue 5-12-97_

_____

_____

|   |   | Statutory Citation |   |   |   |
|---|---|---|---|---|---|
| _Murder_ | 38 | ILCS | 9-1 | 1 | A-1 |
|  |  | ILCS | / |  |  |
|  |  | ILCS | / - |  |  |
|  |  | ILCS | / |  |  |

IT IS FURTHER ORDERED that the Clerk of the Court shall deliver a copy of this order to the Sheriff of Cook County

IT IS FURTHER ORDERED that the Sheriff of Cook County shall take the defendant into custody and deliver him/her to the Department of Corrections.

IT IS FURTHER ORDERED that the Illinois Department of Corrections shall take the defendant into custody and confine him in the manner provided by law until the above sentence is fulfilled.

...RED BY

_____
...Y CLERK

_502_     _5/7/97_
...H COURT     / DATE

ENTER: _____
        JUDGE            _1502_
                       JUDGE'S NO.

**IN THE CIRCUIT COURT OF COOK COUNTY**
**CRIMINAL DIVISION**

PLE OF THE STATE OF ILLINOIS

V S

HENRY KACZMAREK

| | |
|---|---|
| Ind. No. | 87 CR 6131 |
| Trial Judge | JOHN BRADY |
| Court Reporter | |
| Attorney | CHUCK MURPHY |
| Appeal Check Date | |
| Appeal Bond | None |

**NOTICE OF APPEAL**

FILED

MAY - 7 1997

AURELIA PUCINSKI
CLERK OF THE CIRCUIT COURT
CRIMINAL DIVISION

appeal is taken from the order or judgment described below:

ellant's Name: HENRY KACZMAREK

ellant's Address: I.D.O.C.

ellant's Attorney: STATE APPELLATE DEFENDER

ress: 100 W. RANDOLPH ST. - CHGO IL 60601

nse: MURDER 1ST DEGREE

gment: Guilty of MURDER 1ST DEGREE

on a VERDICT

c:

ence: NATURAL LIFE

Notice Filed: 5/7/97

X Henry Kaczmarek
by CGM ........ Appellant

**VERIFIED PETITION FOR REPORT OF PROCEEDINGS AND COMMON LAW RECORD**

er Supreme Court Rules 605-608 appellant ask the Court to order; (1) the Official Court Reporter to scribe an original and the copy of the proceedings, file the original with the Clerk and deliver a copy to the ellant, or upon appellant's written request to the appellant's attorney of record, and (2) the Clerk to prepare Record on Appeal.

Appellant, being duly sworn, says that at the time of his conviction he was and he now is unable to pay he Record or an appeal lawyer.

Henry Kaczmarek
by CGM ........ Appellant

ISCRIBED and SWORN TO before me this .......... day of ......................, 19 ....

......................... Notary public

**ORDER**

S ORDERED; 1. COOK COUNTY PUBLIC DEFENDER

ointed as counsel on appeal, and 2. the record and Report of Proceedings be furnished appellant free.

| | | |
|---|---|---|
| ................, 19 .... | ................, 19 .... | ................, 19 .... |
| ................, 19 .... | ................, 19 .... | ................, 19 .... |
| ................, 19 .... | ................, 19 .... | ................, 19 .... |

ENTER: ........................ JUDGE

TE: ..............................

knowledge receipt: ........................ Court Reporter

-C-    C296