NO. 97-2557

IN THE

APPELLATE COURT OF ILLINOIS

FIRST JUDICIAL DISTRICT

---

PEOPLE OF THE STATE OF ILLINOIS,

Plaintiff-Appellee,

vs.

HENRY KACZMAREK,

Defendant-Appellant.

---

Appeal from the Circuit Court of Cook County, Criminal Division.
Honorable **JOHN D. BRADY**, Judge Presiding.

BRIEF AND ARGUMENT FOR
PLAINTIFF-APPELLEE

———

RICHARD A. DEVINE,
State's Attorney,
County of Cook,
Room 309 - Richard J. Daley Center,
Chicago, Illinois 60602

<u>Attorney for Plaintiff-Appellee</u>

RENEE GOLDFARB,
ALAN J. SPELLBERG,
CHRISTINE COOK,
Assistant State's Attorneys,
   <u>Of Counsel</u>.

EXHIBIT P              ISP@439

IN THE

APPELLATE COURT OF ILLINOIS

FIRST JUDICIAL DISTRICT

---

PEOPLE OF THE STATE OF ILLINOIS

Plaintiff-Appellee

vs.

HENRY KACZMAREK,

Defendant-Appellant.

---

## POINTS AND AUTHORITIES

### I.

THE TRIAL COURT DID NOT ABUSE ITS DISCRETION BY DETERMINING WHICH WITNESSES HAD AND LACKED SUFFICIENT TRAINING AND BACKGROUND TO TESTIFY AS EXPERTS........................................ 25
(Response To Defendant's Arguments I and II)

People v. Ayala, 208 Ill. App. 3d 586,
567 N.E.2d 450 (1st Dist. 1990)......................... 25, 26

People v. Jackson, 145 Ill. App. 3d 626,
495 N.E.2d 1207 (1st Dist. 1986)......................... 25

In re V.Z., 287 Ill. App. 3d 552,
678 N.E.2d 1070 (1st Dist. 1997)......................... 25

Thurmond v. Monroe, 235 Ill. App. 3d 281,
601 N.E.2d 1048 (1st Dist. 1992)......................... 26

1

## A.

The Trial Court Properly Refused To Qualify Dr. Siegusmund As An Expert In The Area of Blood Spatter and Luminol Interpretation Where His Opinions Did Not Have Sufficient Basis To Be Of Assistance To The Trier Of Fact.................. 26

People v. Novak, 163 Ill. 2d 93,
 643 N.E.2ds 762 (1994)(distinguished).................... 32-33

Thurmond v. Monroe, 235 Ill. App. 3d 281,
 601 N.E.2d 1048 (1st Dist. 1992)......................... 33

Hubbard v. Sherman Hospital, 292 Ill. App. 3d 148,
 685 N.E.2d 648 (2nd Dist. 1997)......................... 33

People v. Jordan, 103 Ill. 2d 192,
 469 N.E.2d 569 (1984)(distinguished)..................... 35

People v. Knox, 121 Ill. App. 3d 579,
 459 N.E.2d 1077 (3rd Dist. 1984)......................... 35

People v. Smith, 241 Ill. App. 3d 446,
 608 N.E.2d 1259 (2nd Dist. 1993)......................... 36

People v. Linscott, 142 Ill. 2d 22,
 566 N.E.2d 1355 (1991).................................... 36

Dean v. Watson, 1996 U.S. Dist. LEXIS 2243 (1996)............. 36

Aguilar v. Dixon, 1995 U.S. Dist. LEXIS 7195 (1995)........... 36

## B.

The Trial Court Properly Allowed Mitch Rea To Testify As An Expert In The Field Of Luminol Testing Where Rea's Extensive Training And Experience Aided The Trier Of Fact................ 37

People v. Enoch, 122 Ill. 2d 176,
 522 N.E.2d 1124 (1988)................................. 37-38

Kravis v. Smith Marine, 60 Ill. 2d 141,
 324 N.E.2d 417, 420 (1975)............................... 38

Lee v. Chicago Transit Authority, 152 Ill. 2d 432,
 605 N.E.2d 493 (1992).................................... 39

## II.

THE TRIAL COURT DID NOT ABUSE ITS DISCRETION
WHEN IT PRECLUDED EVIDENCE THAT WAS SPECULATIVE AND
REMOTE........................................... 40
(Response to Defendant's Argument III)

Chambers v. Mississippi, 410 U.S. 284,
     93 S.Ct. 1038 (1973)......................................... 40

People v. Childress, 158 Ill. 2d 275,
     633 N.E.2d 635 (1994)........................................ 40, 41

Crane v. Kentucky, 476 U.S. 683,
     106 S.Ct. 2142 (1986)........................................ 40

People v. Carini, 151 Ill. App. 3d 264,
     502 N.E.2d 1206 (1st Dist. 1986)............................. 40

People v. Reid, 179 Ill. 2d 297,
     688 N.E.2d 1156 (1997)....................................... 41

People v. Illgen, 145 Ill. 2d 353,
     583 N.E.2d 515 (1991)........................................ 41

People v. Sims, 167 Ill. 2d 483,
     658 N.E.2d 413 (1995)........................................ 41

## III.

THE TRIAL COURT DID NOT ABUSE ITS DISCRETION
BY    DENYING    DEFENDANT'S    CLAIM    THAT    HIS
CONSTITUTIONAL RIGHT TO A SPEEDY TRIAL WAS VIOLATED
WHERE THE RECORD READILY ESTABLISHES THAT DEFENDANT
AGREED TO EVERY COURT CONTINUANCE IN AN EFFORT TO
PRESENT A VALID DEFENSE AT TRIAL.................. 47
(Response to Defendant's Argument IV)

People v. Jackson, 162 Ill. App. 3d 476,
     515 N.E.2d 390 (4th Dist. 1987).............................. 47,48,56

Barker v. Wingo, 407 U.S. 514,
     92 S.Ct. 2182 (1972)......................................... passim

People v. Lock, 266 Ill. App. 3d 185,
     640 N.E.2d 334 (2nd Dist. 1994).............................. 47

People v. Fly, 249 Ill. App. 3d 730,
     619 N.E.2d 821 (4th Dist. 1993).............................. 48

People v. Bowman, 138 Ill. 2d 131,
        561 N.E.2d 633 (1990)........................... 48

People v. Williams, 272 Ill. App. 3d 868,
        651 N.E.2d 532 (1st Dist. 1995)............. 48

People v. Garriot, 253 Ill. App. 3d 1048,
        625 N.E.2d 780 (4th Dist. 1993)(distinguished)........... 48

People v. Mitchell, 95 Ill. App. 3d 779,
        420 N.E.2d 415 (1st Dist. 1981)............ 52

People v. Prince, 242 Ill. App. 3d 1003,
        611 N.E.2d 105 (1st Dist. 1993)............ 52

People v. Smith, 251 Ill. App. 3d 839,
        623 N.E.2d 857 (2nd Dist. 1993)............ 53

People v. Crane, 1999 Ill. App. LEXIS 660...................... 53

People v. Keys, 195 Ill. App. 3d 370,
        552 N.E.2d 285 (4th Dist. 1990)............ 55

People v. Carr, 9 Ill. App. 3d 382,
        292 N.E.2d 492 (1st Dist. 1972)............ 55

People v. Ford, 34 Ill. App. 3d 79,
        339 N.E.2d 293 (1st Dist. 1975)............ 55

Smith v. Hooey, 393 U.S. 374,
        89 S.Ct. 575 (1969)........................... 56

United States v. Loud Hawk, 474 U.S. 302,
        106 S.Ct. 648 (1986)........................... 56

United States v. Askew, 584 F.2d 960 (10th Cir. 1978).......... 57

U.S. Const., amend. VI........................................ 47

Ill. Const. 1970, art. I, sec. 8............................. 47

4

## ISSUES PRESENTED FOR REVIEW

Whether the trial judge abused his discretion by ruling whether witnesses tendered as experts possessed sufficient knowledge to testify.

Whether the trial judge abused his discretion by precluding speculative and remote evidence from being presented to the jury.

Whether the trial judge abused his discretion when it denied defendant's Motion to Dismiss based upon a constitutional Speedy Trial violation.

## STATEMENT OF FACTS

Defendant was charged and convicted of the 1987 stabbing murder of 86 year-old Millie Nielson. (R.C. Vol. I C35)  On direct appeal, this Court reversed and remanded this cause for a new trial. People v. Kaczmarek, 243 Ill. App. 3d 1067, 613 N.E.2d 1252 (1st Dist. 1993).  On remand, defendant was again convicted by a jury of first degree murder and was sentenced to natural life imprisonment. (R.C. Vol. II C152, C293)

Margaret Fisher lived above the victim, Millie Nielson at the time of the murder.  Ms. Fisher lived on the second floor with her son, John Fisher and her former husband, Dan Lary. (Vol. II I177-178)  Defendant, Henry Kaczmarek was temporarily living at that location with the Larys for about one month prior to Millie Nielson's murder. (Vol. II I179)  The victim was the landlady who lived on the first floor.

On Friday, April 24, 1987, Margaret came home from work around 5:15 p.m.  She stopped downstairs and gave the victim some apples and asked the victim if she needed anything from the store.  Margaret went upstairs to her

5

apartment and found her then husband Dan Lary and defendant. Margaret and her son John left the apartment around 6:15 p.m. to go bowling. (Vol. II I181, I207) When they returned home at around 10:30 p.m., Dan and defendant were still there, watching television. (Vol. II I181-182) Margaret and John both noticed that defendant was wearing light colored jeans and a quilted work jacket.

Margaret got ready for bed and asked defendant to help her put her husband (who was intoxicated) to bed. Defendant had no trouble helping Margaret. Margaret then went to bed. John went to his room to listen to the radio. John saw defendant leave the apartment around 11:30 p.m. and return around midnight. When defendant returned, he asked John if Dan was awake. When John told defendant that Dan was sleeping, defendant left, saying he had to go find his car. (Vol. II I210)

Around 11:30 p.m., the doorbell rang, but Margaret did not answer it. Around 12:15 p.m. the doorbell rang again. When Margaret answered the door, her brother-in-law, Ron Lary, was standing outside. Margaret went upstairs and returned to bed. At 2:00 a.m. the doorbell rang a third time. Defendant asked Margaret if Ron was there. When defendant learned that Ron was not inside, he asked Margaret if Dan was awake. When Margaret told defendant that Dan was sleeping, defendant left. (Vol. II I189)

Ron Lary regularly visited Patty's Lounge, a bar across the street from his brother's apartment. (Vol. II I63) Ron had a retail theft conviction, a burglary conviction, an auto theft conviction, and a contempt of court conviction. (Vol. II I61-62) Although Ron was not allowed into his brother's apartment, he occasionally slept on the Larys' back porch. (Vol. II I64, I86) On Friday, April 24th, Ron finished his job and went to Patty's Lounge for

6

several hours. He shot pool, drank 8-10 beers and around midnight, went to a restaurant to get something to eat. (Vol. II I67) Ron then went to Dan's house and walked up the back stairs to the second floor. Ron found some padding and tried to fall asleep on the porch. He felt sick, however, got up and vomited over the railing. (Vol. II I70) Ron tried to fall asleep again when he heard the alarm system at Patty's Lounge go off. The bartender checked the security system at closing which was at 2:00 a.m. (Vol. II I71)

Shortly afterwards, Ron saw defendant crossing the back yard. Ron noticed that defendant was wearing dark jeans and a dark jacket. Defendant was carrying a bag through the yard and into the alley. Ron watched as defendant put the bag into the trunk of his car. (Vol. II I75) Defendant then drove his car east. Ron fell asleep and woke up around 7:00 a.m. He left the porch, went out and had coffee and worked all day.

Margaret awoke around 7:15 a.m. (Vol. II I190) Defendant was asleep on the couch. Margaret noticed that defendant was wearing a clean pair of dark colored jeans and a light dress shirt. It was a different outfit than the one defendant wore the previous night. (Vol. II I190) Margaret made coffee and defendant woke up a short time later. When Margaret asked defendant if he wanted any coffee she noticed he was fidgety which was unusual. (Vol. II I191)

Ron Sadlowski knew Millie Nielson for 30 years. He lived down the street and ran errands for her. (Vol. II I161) On Saturday, April 24th, Ron was on his way to the store when he noticed that the victim's gates in her backyard were open. That was unusual, so Ron went in to close the gates when he noticed that the storm door was open and the back door was slightly ajar. Ron also noticed some broken glass leaning against the window that came from the pantry. (Vol. II I163) Ron then discovered that the victim's car was still

7

in the garage.    Knowing that the victim had a standing beauty parlor appointment every Saturday morning, Ron became alarmed and immediately called the police. (Vol. II I164)

Officer Ross Marsala was dispatched to the victim's apartment around 10:00 a.m. on Saturday, April 25th. (Vol. II I36)  Upon his arrival, Officer Marsala spoke to Ron Sadlowski, then Marsala and his partner went to the victim's back porch and saw several large pieces of glass from a broken window that were leaning up against the wall. (Vol. II I37)  Officer Marsala noticed that the screen door was held open and the rear door although shut, was unlocked.  Officer Marsala also noticed some corn kernels which could have been vomit, on the outside stairway. (Vol. II I54)  Marsala went inside and saw keys inside the lock of the door.

Marsala entered the kitchen.  There, he saw blood spots on the floor leading into a bedroom. (Vol. II I40)  In the ransacked back bedroom, Marsala found the 86 year-old victim lying face up on the bed in a pool of blood. (Vol. II I39)  Millie Nielson was dead.  Marsala noticed blood spots on the floor and walls.

Marsala called for detectives and the crime lab to be sent to the crime scene.  When he left the back bedroom, he noticed blood spots on the door frame leading into the back bedroom. (Vol. II I41)  Next to the bedroom was a small table with a knife that appeared to be bloodstained. (Vol. II I42)  Marsala walked through the apartment and into a second bedroom.  That room too was ransacked.  Dresser drawers were pulled out, papers were scattered and the dust ruffle on the bed had a blood stain. (Vol. II I42)

A cabinet toward the front of the apartment had been opened.  Marsala found the front door to be locked and secured.  He found no sign of forced

8

entry. (Vol. II I43)   The broken window that Marsala first noticed while outside was from a small pantry off the kitchen.  There was no broken glass on the inside of the pantry. (Vol. II I44)

Robert Baike, a Forensic Investigator with the Chicago Police Department was dispatched to the homicide scene around 11:00 a.m. (Vol. III J5) When Baike entered the rear bedroom he saw the elderly victim on the bed in blood soaked sheets. (Vol. III J6)  Baike found a steak knife on a cabinet just outside the bedroom where the victim was found.  The blade was about 8 inches in length.  Baike took that knife into custody and submitted it for testing. (Vol. III J7)

Baike then photographed the crime scene and began to collect evidence. He took a blood sample from the kitchen floor, dusted for fingerprints, picked up boxes and papers from the front bedroom and submitted them for fingerprint analysis. (Vol. III J8)  Baike did not find any fingerprints which was not unusual, especially in the home of an elderly person. (Vol. III J10)  Baike did find a cloth impression on the broken glass and wood frame outside the broken pantry window which indicated that someone touched it with a cloth or gloves. (Vol. III J9)  The cloth impression appeared to be a finger of a glove. (Vol. III J9)  No bloody footprints were visible. (Vol. III J20)

Ron Lary returned to Patty's Lounge after he finished working that evening.  It was at Patty's that Ron learned of Millie Nielson's murder. (Vol. II I82)  Ron left the bar and saw police officers across the street at his brother's house.  Ron approached Detective Bogucki and related that he saw defendant carrying a bag to his car the previous evening. (Vol. III J30)  Ron left with the officers in an effort to help them find defendant. (Vol. II I84, Vol. III J31)

9

On the corner of Wrightwood and Altgeld, Ron Lary saw defendant's car and pointed it out to the police officers. Another squad car came to pick up Ron and returned him back home. Bogucki and his partner watched defendant's car and waited. (Vol. III J32) Around 1:00 a.m., Bogucki saw movement inside the car. The detectives approached and saw defendant sleeping on the front seat. Bogucki knocked on the window and asked defendant to step outside. When defendant got out of the car Bogucki noticed blood stains on the right and left sleeves of defendant's quilted jacket. (Vol. III J34)

Defendant was placed under arrest, was read his constitutional rights and was transported to Area 5. Defendant did not appear to be under the influence of alcohol. (Vol. III J37) The detectives put defendant into an interview room. Around 1:30 a.m. defendant signed a consent to search his car. Defendant's quilted jacket was also taken and put into an evidence bag. When Bogucki opened the trunk of defendant's car he saw many jewelry boxes, jewelry, serving plates and platters and a bag. Bogucki also saw blood stained blue jeans, a claw hammer, a screwdriver, glass cutter and other tools. (Vol. III J42) Bogucki closed the trunk and called for an evidence technician.

Officer Davie, the evidence technician, arrived and photographed the car and recovered property. (Vol. III J43, J73) When the trunk was first opened, Davie saw stained jeans on top of bags. (Vol. III J74) Some of the contents were taken inside Area 5 where they were photographed and dusted for ridge impressions. Davie also examined paper boxes, household utensils, platters, jewelry and a clock. (Vol. III J75) Davie lifted one print from a serving bowl, however, it was not suitable for comparison. (Vol. III J76) There were a few boxes that had blood stains on them which were sent to the serology unit for further testing. (Vol. III J78-79)

10

Bogucki contacted the victim's family to see if they could identify any of the items found in defendant's trunk.  The blood stained jeans and jacket were submitted to the police crime lab for testing. (Vol. III J53)  Bogucki also checked defendant's leather work boots, but did not see any evidence of blood.  The pants defendant was wearing did not appear to have any blood on them. (Vol. III J53)

The victim's family came to Area 5 and identified the recovered property as belonging to Millie Nielson. (Vol. III J57)  Fern  Briggs,  the victim's niece went to Area 5 on Sunday, April 26th and identified many items as belonging to the victim.  Specifically, Miss Briggs identified a flag pin that Miss Briggs had purchased for the victim, a monogrammed pin belonging to Millie Nielson, a necklace, a box from a store in Aurora and several serving dishes that the victim used during Thanksgiving. (Vol. III J100-102)  Barbara Briggs, the victim's great-niece identified the remaining items of jewelry, boxes and household items that belonged to Millie Nielson. (Vol. III J106-110)

Bogucki called the crime lab to see how the blood tests were going. He was told that the lab needed a sample of defendant's blood.  Defendant was taken to St. Anne's Hospital where his blood sample was voluntarily drawn. (Vol. III J59)  Bogucki took defendant's blood sample and turned it over to Pam Fish, an expert in the field of electrophoresis, serology and DNA testing who worked for the Chicago Police Department microanalysis unit. (Vol. III J60, J132)

Fish ran several tests on the items she received as it related to the Millie Nielson Homicide investigation.  Fish had three vials of the victim's blood, and defendant's blood.  Fish determined that Millie Nielson had type A blood, defendant had type B blood.  Fish performed an electrophoresis test upon

11

the stained jeans found in defendant's trunk. (Vol. III J139)  The stains were type A human blood. (Vol. III J141)  The stains on both the right and left sleeves of defendant's quilted jacket was also type A human blood. (Vol. III J143-144)  Fish also tested a swab taken from the kitchen floor of the victim's apartment.  Although it was type A human blood, no electrophoresis test was performed due to the insufficient amount.  The knife found inside the kitchen contained human blood, but due to the insufficient quantity, no further blood tests could be performed. (Vol. III J146)

Fish then began to test the other materials submitted to her.  On two of the jewelry boxes, Fish saw some stains that were human blood, but due to the insufficient amount of blood, no further testing could be completed. Another box was stained with blood, but Fish could not even determine whether the blood was human.  Fish then performed electrophoresis test on the victim and defendant's known blood samples.  That test involved looking at components of blood to separate them and look for genetic markers in order to make an identification. (Vol. III J130)  Fish explained that the blood on the jacket and jeans was not defendant's blood, but was consistent with that of the victim. (Vol. III J154)   In fact, Fish explained that the enzymes from defendant's pants and quilted jacket were consistent in all nine categories as with the victim. (Vol. III J155, J170)  Years later, Fish attempted to perform DNA testing on the samples but due to the insufficient amount of the victim's known blood standard, she was unable to do so. (Vol. III J161)

Dr. Michael Chambliss performed the autopsy upon Millie Nielson. (Vol. II I112)  The victim weighed 117 pounds and was 5 feet tall. (Vol. II I115) Upon examining the victim, Dr. Chambliss noted the following external injuries to the victim's head area: large contusions around the upper and lower eyes,

12

mouth, lower lip, front chin and left cheek; linear abrasions on right cheek just below the eye; bruising on front and sides of neck and shoulder areas; bruising on right jaw behind and below the ear down the neck and mouth. (Vol. II I123-125)

The external exam also revealed large areas of bruising over the tip of the victim's right hand, right forearm and mid-back; stab wound on the victim's left thigh, multiple bruises on the front left forearm and hand, a stab wound on the top of the right forearm, smaller bruises on the elbow and right arm, left arm, wrist and top of the left hand and elbow in addition to a stab wound toward the left of the victim's groin. (Vol. II I131-133)  The victim's right hand and wrist were lacerated in addition to being bruised.  Dr. Chambliss found an incised wound over the top of the victim's left thumb. (Vol. II I134)  An incised wound below the knee and toward the ankle of the left leg was also found. (Vol. II I134)  An incised wound was also discovered on the tip of the victim's right thumb. (Vol. II I138)

Dr. Chambliss' internal examination revealed hemorrhages on the victim's adam's apple and on the right front of her neck, hemorrhaging on the right side of the bottom of her tongue and small hemorrhages in the esophagus which is common in strangulation cases. (Vol. II I126)  When Dr. Chambliss cut into the victim's esophagus, he found a fracture on the left side of her thyroid cartridge of the larynx as well as hemorrhaging on the back of the thyroid gland and the larynx itself. (Vol. II I127)  An examination of the victim's skull revealed hemorrhaging of the thin clear membrane over both brain portions. (Vol. II I129)

Dr. Chambliss did not find any evidence of fibers or hair upon the victim, her nightgown or underneath her fingernails. (Vol. II I143)  It was the

13

opinion of Dr. Chambliss that Millie Nielson died between 11:30 p.m. on April 24th and 2:30 a.m. on April 25th. (Vol. II I144)  The victim sustained several defense wounds on her thumbs, the stab wound to her right forearm and the left front leg. (Vol. II I145)  The blunt trauma to the victim's head could have been caused by a fist or hand.  Dr. Chambliss testified that the attacker could have been wearing gloves because there were abrasions in the same area as the bruising. (Vol. II I146)  Although the victim could have died from the blunt force injuries she received, Dr. Chambliss determined that the cause of death was manual strangulation. (Vol. II I146)  Her manner of death was ruled a homicide. (Vol. II I147)

Mary Ann Furlong, a fingerprint analyst for the Chicago Police Crime Lab and expert in the field of latent fingerprint development, examined several items involving the victim's murder investigation. (Vol. II I214-218)  She examined the knife found in the victim's kitchen, but after several tests, was unable to find any prints or ridge impressions. (Vol. II I220-221)  Furlong also examined various greeting cards, boxes and other papers located in the ransacked front bedroom.  Out of the 100 pieces of paper, she found only 1 ridge impression, however it was not suitable for comparison. (Vol. II I223-224)  The Marshall Field's shopping bag recovered from defendant's trunk had 15 spots where ridge impressions developed.  In five spots, Furlong saw impressions.  Those were deemed suitable for comparison. (Vol. II I228)

Theatrice Patterson, an expert in the field of fingerprint identification, compared defendant's inked impressions with several latent prints taken from the Marshall Field's Shopping bag.  Patterson found 10 points of comparison from the defendant's inked print to the palm impression on the Field's bag.  Patterson also found four other negatives from the impressions

14

taken from that bag and determined that all of the latent prints from the Field's bag were made by the left palm of defendant. (Vol. III J120-121)

Mitch Rea was qualified as an expert in the field of luminol and luminol testing over defendant's objection. (Vol. III J24)  In the spring of 1994, Rea performed luminol testing of defendant's quilted jacket. (Vol. IV K26-27)  Rea spread the jacket out on a flat surface and applied luminol, a mixture of chemicals that results in a glowing effect when it comes into contact with blood. (Vol. IV K11)  Rea sectioned off the jacket and applied the luminol.  Rea sprayed the right sleeve which resulted in a bright luminance in spots.  Rea photographed the result which showed very small dots on the right side which was consistent to a reaction with blood. (Vol. IV K35)  Rea found a large glowing portion next to the zipper on the right side of the jacket, but he did not interpret that glow to be blood. (Vol. IV K36)  When Rea sectioned off and sprayed the right front sleeve, he found a glow on the cuff and higher up from the sleeve.  Sections of the jacket had cut outs (from Pam Fish's tests years earlier).  Rea noticed luminance surrounding the cut outs as well as significant reaction to blood on the fabric cuff. (Vol. IV K37)  The elbow area and the back of the left sleeve also reacted to being sprayed with luminol, consistent with blood. (Vol. IV K39)

In 1994, Rod Englert, an expert in crime scene reconstruction and blood spatter, reviewed the police files, reports and Medical Examiner's protocol involving the Millie Nielson murder. (Vol. IV K66)  Englert also reviewed the luminol photos taken by Mitch Rea as well as conducting his own experiments and viewing the physical evidence including defendant's blood stained pants and jacket.

Englert explained the three types of blood stain spatters: low velocity, medium and high velocity. Low velocity stains are drops that fall straight down. Medium velocity is caused from blunt trauma. In medium velocity stain spatters, it is possible to tell where the origin of a beating took place and the position of the victim when injured. (Vol. IV K71) Englert testified that blood does not spatter on the first blow and that regardless of the severity of the beating, very little blood gets on the attacker. (Vol. IV K72) High velocity blood spatters results from gun shot wounds.

Englert was involved in a reconstruction in Arizona previously which involved two victims who had been hacked to death by a knife that was 12-16 inches long. The victims had been hacked about 30 times a piece. Witnesses saw the offender leaving the crime scene, without any blood stains apparent on his person. Englert reconstructed the scene using a prosecutor as the offender. Englert discovered that when the experiment was over, the prosecutor, who was dressed in full protective gear, had less than 10 drops of blood on his clothing. No bloody footprints were evident. (Vol. IV K84-85)

In another case, Englert testified that a smoke alarm had gone off in an apartment building. An officer responded to the scene and stopped the offender who was fleeing the building. Upon entering the building, the officer found an elderly lady on the floor in a bloody scene. Blood was all over the wall. The victim was beaten to death with a board. The offender had 3 drops of blood on his face, 4 drops on his jacket, and his shorts had 1-2 drops. The offender's shoes had some drops as well as the area around his hands. Englert explained that the force is always directed away from the offender which is why so little blood would be found upon an attacker. (Vol. IV K86)

16

Englert also explained how blood transfer stains happened. Pools of blood coagulate, although blood is very sticky. Englert testified that if he had blood all over him and bear hugged a juror, the juror would have a very light pattern of blood on his clothes. Because of this misconception, transfer stains are easily overlooked by untrained police officers. (Vol. IV K88)

The victim's apartment appeared to have been ransacked. The crime scene photos also showed blood stain transfers. The floor in the kitchen next to the back bedroom had smears of blood, indicating that a struggle transpired at that location and someone on the floor was bleeding. (Vol. IV K91) There was also evidence of a wiping motion. It was not surprising to Englert that no bloody footprints were found because blood dries so quickly. (Vol. IV K91) Englert opined that the victim received numerous blows while on the floor outside the bedroom due to the blood spatter fanning out and becoming less dense. (Vol. IV K92) Englert further opined that the offender picked up the victim and threw her on the bed. Because of the spatter on the wall and the circle of blood around the victim's body, Englert determined that the attacker was close to the wall and continued to hit the victim while she was on the bed. (Vol. IV K94)

Englert then examined defendant's blood stained jeans and quilted jacket. According to Englert, the knees of defendant's pants showed a blood transfer stain, not a spatter. The left and right knees were consistent with coming into contact with the pool of blood surrounding the victim. (Vol. IV K94) It was Englert's opinion that the blood stained knees were either involved with the striking of the victim upon the bed, or very close to that action. (Vol. IV K94) The bottom of defendant's pants were consistent with someone moving or coming into contact with the victim since there were numerous

17

little specs of blood, consistent with medium velocity spatters. (Vol. IV K96)
The lower left leg of defendant's pants had very fine droplets of blood that
were airborne and projected on to the lower left leg, consistent with being in
close proximity to the beating of Millie Nielson. (Vol. IV K98)  The splatters
and transfers were not consistent with defendant picking up a bag that was
stained with blood.  If defendant had picked up a blood stained bag, it would
have had to literally been dripping blood, and the pattern would have been
different, as opposed to the medium velocity stains that did appear. (Vol. IV
K100)  The stains that appeared on defendant's jeans had tiny droplets which
would not happen in a dripping situation.  Neither were the stains consistent
with defendant kneeing someone else in the nose. (Vol. IV K102)  In that
scenario, the blood droplets would have tails on them which were not present
on defendant's pants.

Englert recommended that luminol be applied to defendant's jacket since
it was so dark in color.  Englert examined the photos taken by Mitch Rea
depicting the glowing effect from the luminol test. (Vol. IV K107) When Englert
examined the photos of the right front sleeve, he saw spatters on the cuff up
to the elbow.  He counted 15-20 medium velocity spatters.  The left cuff also
luminated.  The front sleeves came into contact with something bloody and had
also been involved where energy was impacted upon blood. (Vol. IV K109)
Although there were some blood stains on the back of the sleeves, they were
transfer stains.  Projected blood was on the front of the jacket. (Vol. IV
K110)  Englert also saw a transfer stain on the right pocket of the quilted
jacket which indicated that a hand disappeared into the pocket. (Vol. IV K113)
The blood on defendant's jacket did not appear from picking up a paper bag.
(Vol. IV K113)

Englert believed that the victim was first attacked in the kitchen close to the entry of the back bedroom. Based on the blood stains, Englert stated that the victim received many blows while on the floor in the kitchen. Englert opined that the blood spatters at the bottom of defendant's pants happened at this time. (Vol. IV K117) The victim struggled, was taken into the bedroom and thrown on the bed where she was attacked again. The stains on defendant's pants and quilted jacket fit every piece of the physical evidence examined by Englert and were consistent with the person causing the death of Millie Nielson. (Vol. IV K120)

On cross-examination, Englert testified that most of the blood upon which the victim was found happened after the attack and probably after she was dead. (Vol. IV K134) Englert also presumed that the blood found on the jeans and jacket belonged to Millie Nielson.

## The Defense

Pamela Hines, defendant's former live-in girlfriend, identified defendant's quilted coat as the jacket he wore everyday. (Vol. V K153) When defendant and Hines lived together, defendant helped to maintain the building. Hines testified that shortly before the murder of Millie Nielson, defendant moved out of their apartment and used a Marshall Field's shopping bag as a suitcase for his clothes. (Vol. V K156) Hines remembered having a Field's bag because she bought a lady across the street something at Old Orchard.

On Saturday, April 25th, Elizabeth Finuchi was out drinking with Dan Funkhauser. Around 2:30 a.m., they went "Our Place" on Belmont. (Vol. V K164) Finuchi saw defendant, they greeted each other and defendant sent her a drink. Finuchi, Funkhauser and defendant left the bar around 4 a.m. Defendant gave

19

the two a ride home. Finuchi did not notice anything unusual about defendant, he was not upset, nor did she notice any blood on his clothing. (Vol. V K166)

Defendant testified that he was born in Poland and arrived in the United States when he was five. He finished 9th grade before going on to mechanic's school. Defendant suffered a head injury when he was hit with a pole. That accident resulted in a speech problem and effected his thinking. (Vol. V K173) Defendant was a seasonal construction worker at the time of Millie Nielson's murder.

About one month prior to the murder, defendant moved out of the apartment he shared with his former girlfriend, Pam Hines. When defendant left Hines' apartment, he packed all of his belongings in a Marshall Field's shopping bag. (Vol. V K182) He also took his hammer, screwdriver, channel locks and a glass cutter. Defendant temporarily moved in with his friend Dan Lary. Dan's wife Margaret and her son John also lived with Dan. (Vol. V K176) Defendant was not working at the time but received public aid as well as money from his mother.

The week before the murder, defendant and Dan spent most of the week drinking, since Dan had a toothache. (Vol. V K178) Defendant was also involved in several fist fights that week. The first fight involved his friend, Tom Szeszol. Defendant had two gashes in his knuckle area, Szeszol was bleeding from his mouth and nose. The second fight, with his friend Bill Henderson involved defendant hitting Henderson who also bled from the mouth. (Vol. V K180-181) The Wednesday preceding Millie Nielson's murder, defendant was in a fight with a stranger who was "messing" with defendant's car. (Vol. V K181) The two fought, and defendant forced his knee into the stranger's face. The stranger bled. (Vol. V K181-182)

20

On Friday, April 24th, defendant and Dan were drinking at Dan's house until the afternoon when defendant left to go to Tom Szeszol's house. Defendant went to Szeszol's house to take a shower and wash his clothes. Defendant was not able to wash his blood stained jeans because he wanted to soak them first, but defendant had to leave because Szeszol's mother was returning. (Vol. V K185)  Defendant threw the rest of his clothes that he was able to wash, into the trunk of his car.  Defendant went to a tavern on Wrightwood where he stayed until about 6:30 p.m.  Defendant then returned to Dan Lary's house with a case of beer.  Dan and defendant drank the case of beer.  Defendant left the Lary's at 11:45 p.m. and went to another bar down the street, had 2 drinks then went to "Our Place" till about 2:00 a.m.  (Vol. V K190)  At that time, defendant returned to the Lary's to see if Dan wanted to go out and drink in Cicero.

Defendant drove his car into the alley behind the Larys' apartment. When he got out of the car, he heard a noise, like that of a door closing, but did not see anyone.  Defendant then approached the building and urinated close to the house.  He noticed a bag on the side of the house.  When he looked inside, he saw a box which contained a spoon and fork.  Defendant picked up the bag and put it in the trunk of his car. (Vol. V K195)  Defendant drove the car to the front of Lary's and went upstairs to ring the bell.  When Margaret told defendant that Dan was sleeping, defendant returned to "Our Place" where he saw Liz Finuchi.  Defendant stayed at "Our Place" until 4 a.m. when he dropped Liz and her friend Dan off at two different locations.  Defendant returned to the Lary home, and fell asleep in his clothes until about 8:00 a.m. (Vol. V K198)

That morning, defendant and Dan drove out to Melrose Park to see defendant's friend, Bill, who owned a tavern.  Bill was not there, so defendant

21

and Dan stayed and drank till about 1:00 p.m. (Vol. V K202) They went across the street to Bill's house. It was at this time that defendant opened up his trunk to find out what was in the bag he found earlier that morning. Defendant removed everything and put it on a bench, and things were all bloody. The brown bag was bloody as was a pillow case, so defendant threw those items into a dumpster. (Vol. V K203-4) Defendant separated the good "stuff" from the bad. Dan left to purchase a six-pack. Defendant found a lot of costume jewelry which he threw in the dumpster.

Defendant showed Bill the items he kept. Bill purchased those items for $60. Defendant returned to the tavern. (Vol. V K205) Later, he drove Dan home and went to another tavern named Frank's, where he fought with a man previously. Defendant drank some more and called Dan who informed defendant that the police were at his home because the lady who lived downstairs had been killed. (Vol. V K206) Defendant told Dan he would be right over, but defendant stayed at the bar and drank two more beers.

Defendant went over to the Lary home, but when he arrived, nobody was there. Defendant went across the street to the laundromat and called, but nobody answered. Defendant was returning to the bar when he became sleepy and fell asleep in his car. (Vol. V K207) Defendant woke up to the police banging on his window telling him to get out of the car. Defendant was searched and cuffed. Defendant denied killing the victim. He explained that he had the quilted coat for more than a year and had a lot of fights in that coat. (Vol. V K211)

On cross-examination, defendant said that when he was washing his clothes at Tom Szeszol's house, he was able to wash everything except his quilted jacket and his blood stained jeans. (Vol. V K224) Defendant denied

that he helped Margaret put Dan to bed.  Defendant also denied changing his clothes when he returned to "Our Place." (Vol. V K232)   Defendant noticed that the bag he had picked up had blood on it and he also threw that item in the dumpster. (Vol. V K236)  Defendant stated that neither the jewelry boxes nor the serving pieces were in his trunk, and did not know how the police found them there. (Vol. V K239, K245)   Defendant did not remember telling an Assistant State's Attorney that he could have killed Millie Nielson but did not remember. (Vol. V K257)

## Rebuttal

When Detective Bogucki spoke to defendant in an interview room on April 26th at 3:15 a.m., Bogucki told defendant that he had a witness that saw defendant picking up a bag at 2:30 a.m. and putting it in the trunk of his car. Defendant told Bogucki that he drove his car behind the Lary's because he had to urinate. (Vol. VI L44)  Defendant said he walked through the backyard and noticed a bag when he was urinating.  Defendant saw the jewelry and plates inside and picked up the bag and put it into the trunk of his car.  Defendant told Bogucki that he walked to the front of the Lary's, rang the doorbell and asked if Dan was awake. (Vol. VI L45)  Defendant left.  When asked if he murdered Millie Nielson, defendant responded that he could have but did not remember. (Vol. VI L45)  Defendant never told Bogucki that he heard a noise, never said he picked up a bloody bag or that he threw away property as well as a bloody pillow case. (Vol. VI L46)

At 9:00 a.m on April 26th, defendant spoke to Assistant State's Attorney Richard Stevens.  Defendant also told ASA Stevens that he drove his car into the alley behind the Lary's, urinated in the gangway and found a bag

which he placed in the trunk of his car. (Vol. VI L59-60)  Defendant said he went to the front of the building, rang the bell and was let in and fell asleep.   Defendant also told ASA Stevens that he could have been in the victim's apartment that morning and could have killed Millie Nielson but did not remember. (Vol. VI L60)  When asked about the blood stains on his clothing, defendant told ASA Stevens that he had a lot of fights.   Defendant never mentioned a bloody bag or a bloody pillow case, nor did he mention disposing of property in Melrose Park. (Vol. VI L61)

ARGUMENT

I.

### THE TRIAL COURT DID NOT ABUSE ITS DISCRETION BY DETERMINING WHICH WITNESSES HAD AND LACKED SUFFICIENT TRAINING AND BACKGROUND TO TESTIFY AS EXPERTS.
(Response To Defendant's Arguments I and II)

Defendant claims that he is entitled to a third trial because the trial court improperly refused to qualify one of his witnesses as an expert and improperly qualified one of the State's witnesses an expert in the same field. The record and the law, however, easily contradict defendant's baseless claims.

The complaint at issue involves the expertise and lack thereof of two witnesses. First, during the prosecution's case-in-chief, Mitch Rea was qualified as an expert in the field of Luminol and Luminol testing over defendant's objection. (Vol. IV K20) Defendant called and tendered Dr. Siegusmund as an expert in the field of blood spatters, luminol application and interpretation. (Vol. VI L8) The trial judge refused to qualify Dr. Siegusmund as an expert in blood spatters and luminol interpretation but allowed his testimony regarding luminol processing. (Vol. IV L40)

A witness will qualify as an expert if "because of his skill, training, or experience, he is better able to form a more accurate opinion as to the matter under consideration than is an ordinary person." People v. Ayala, 208 Ill. App. 3d 586, 593, 567 N.E.2d 450 (1st Dist. 1990), citing, People v. Jackson, 145 Ill. App. 3d 626, 633-634 (1986), "The test for competency of an expert is whether or not the witness exhibits **sufficient** knowledge on the subject matter." In re V.Z., 287 Ill. App. 3d 552, 564, 678 N.E.2d 1070 (1st Dist. 1997)(emphasis added). It is the burden of the proponent of the testimony to establish the qualifications of a person to testify as an expert

25

witness on a particular subject. <u>Thurmond v. Monroe</u>, 235 Ill. App. 3d 281, 289-290, 601 N.E.2d 1048 (1st Dist. 1992). A reversal of this ruling is not warranted absent an abuse of discretion. <u>Ayala</u>, 208 Ill. App. 3d at 594.

### A.

#### The Trial Court Properly Refused To Qualify Dr. Siegusmund As An Expert In The Area of Blood Spatter and Luminol Interpretation Where His Opinions Did Not Have Sufficient Basis To Be Of Assistance To The Trier Of Fact.

Prior to trial, the prosecutor noted that the curriculum vitae of Dr. Siegusmund did not mention blood spatter and interpretation. Defense counsel stated:

> Judge, regarding his qualifications, that is a hurdle I have got to overcome. It's not appropriate I present him as an expert witness. (Vol. I H27)

Defendant called and tendered Dr. Siegusmund as an expert in the field of blood spatter interpretation as well as luminol testing and interpretation. On direct examination, Dr. Siegusmund testified regarding his "expertise" of blood spatter:

> Q: Are you familiar with a forensic field of study called blood splatter?
> A: Yes.
> Q: Have you ever had an occasion prior to today to be qualified as an expert to testify regarding blood splatter issues?
> A: Yes.
> Q: How many different occasions have you been so qualified and thus given testimony?
> A: Just on blood splatter probably about 20 times. (Vol. VI L8)

On cross-examination, however, it was revealed:

26

Q: You also indicated that you consider yourself expert in blood splatter, is that correct?
A: Yes.
Q: Have you ever received any formal training from the State Police Crime Lab in blood splatter?
A: No.
Q: Have you ever received any training from the FBI in blood splatter?
A: No.
Q: The training that you say you received was by attending these lectures at the American Academy of Forensic Sciences and you read about them?
A: And the test books, yes.
Q: Have you ever worked in a crime lab doing experiments?
A: No.
Q: Have you ever written any articles on blood splatter?
A: No.
Q: Have you ever written any articles on blood splatter analysis?
A: No.
Q: Have you ever performed any experiments in blood splatter?
A: Yes.
Q: How many?
A: Dozens.
Q: Dozens where?
A: Part of my teaching course in forensic science. I will demonstrate blood splatter to the sheriffs in the police department they are attending.
Q: But you have never received any training in how to conduct those experiments for any formal course taught by law enforcement agencies?
A: I'm teaching. I don't take courses from them.
Q: Would it make sense to learn how to do it before you taught a subject?
[Defense Counsel]: Overruled.
A: I believe that I can do it properly. I'm a scientist.
Q: Just by reading about it and hearing about it, is that correct?
A: Yes. (Vol. VI L27-29)

*        *        *

Q: Do you belong to any group of individuals that is involved in the reconstruction of blood pattern analysis?
A: No. (Vol. VI L30)

Dr. Siegusmund's qualifications regarding luminol testing and interpretation consisted of the following:

> Q: Sir, have you ever performed luminol testing?
> A: I have performed luminol testing many times.
> Q: Can you give an approximation or estimation how many times you have performed luminol tests?
> A: Well over a hundred. (Vol. VI L5)

There was no testimony offered regarding luminol interpretation.

The prosecutor, however, revealed that Dr. Siegusmund had no training in luminol:

> Q: Are you a member of the National Association of Luminol--
> A: No.
> Q: You just said that you consider--you consider yourself an expert in luminol?
> A: Yes.
> Q: Have you received any training for luminol from the FBI?
> A: No.
> Q: Have you taken any courses on how to luminol an object at a crime scene?
> A: No.
> Q: Have you ever done luminol at a crime scene?
> A: No.
> Q: Have you ever been present at a crime scene when somebody else used luminol?
> A: No.
> Q: Have you ever asked a law enforcement officer if you could be present the next time they used luminol at a crime scene?
> A: No. (Vol. VI L26-27)

Dr. Siegusmund also testified that he had been qualified as an expert in "related fields" in forensic science about 250 times. (Vol. VI L8)

On cross-examination, however, Dr. Siegusmund's credibility was completely destroyed:

28

Q: You've just testified that you have been qualified as an expert 250 times?
A: Yes.
Q: Is that in forensics or in other areas also?
A: That's in forensics.
Q: Do you have a list of cases with you documenting those 250 cases?
A: No. I don't. (Vol. VI L10)

&ast; &ast; &ast;

Q: How many times have you testified as a forensic expert in Cook County?
A: I have no idea.  My estimate would be anywhere from 20 to 40.
Q: Has a court in Cook County found that you were not qualified to testify as an expert?
A: I don't believe so.  There may have been a case where I wasn't qualified in a certain area but not with respect to the entire testimony that I gave. I don't recall.
Q: Sir, do you remember testifying on June 6, 1996 before Judge Paul Nealis in the case of People versus Bobby Murphy?
A: The name is familiar.  I don't recall the specifics.
Q: You recall being hired by the defense in the case of the People versus Bobby Murphy?
A: I'm usually hired by defense, yes.
Q: Did you appear in Judge Nealis' courtroom on June 6, 1996 and were you offered as an expert in crime scene reconstruction? (Vol. VI L10-11)

&ast; &ast; &ast;

Q: Now do you remember telling the judge that day that you testified 200 times in the area of shooting reconstruction?
A: Yes.
Q: And you remember telling him that you had written 130 or 140 articles but that none had dealt with shooting reconstruction?
A: Yes.
Q: Can you name as you sit there today another case that you testified as an expert in Cook County?
A: No, I can't. (Vol. VI L12)

&ast; &ast; &ast;

Q: Now when you testified before Judge Nealis on June 6, you testified that you had not taken any courses in crime scene reconstruction, is that correct?
A: Correct.
Q: Have you taken any courses in crime scene reconstruction since June of 1996?
A: No.

29

> [Defense Counsel]: I object. This witness is not
> being offered as a crime scene reconstruction
> expert at this trial.
> The Court: What is he being offered for?
> [Defense Counsel]: Luminol, serological testing as
> well as the study of blood splatter.
> The Court: That's crime scene reconstruction. (Vol.
> VI L13)

The cross-examination went on to reveal that Judge Nealis refused to qualify

Dr. Siegusmund as an expert. (Vol. VI L14)  Although Dr. Siegusmund claimed

that was the "only case" in which he was not found to be qualified as an

expert, the prosecutor revealed another untruth and professional embarrassment.

Dr. Siegusmund admitted to not being qualified in a Michigan case because it

was "too medically oriented." (Vol. VI L15)  Dr. Siegusmund could not remember

that he was not qualified as a ballistics expert in a federal case in

Indianapolis. (Vol. VI L16)  Despite the fact that his expertise had been

denied in several cases, Dr. Siegusmund considered himself an expert in the

following  fields:  shooting  reconstruction,  blood  splatter,  blood

identification, accident reconstruction, head injuries, forensic pathology,

luminol testing, lung disease, tool marks, hair comparisons and gun shot

residue. (Vol. VI L17-19)  The cross-examination went on to reveal:

> Q: So the totality of your training in forensics,
> if I can get this right, is you sometimes go to an
> annual meeting of the Academy of Forensic Science
> and you read, is that correct?
> A: Also background.  I have taken courses on hair
> and blood as part of my training in biology and
> immunology.
> Q: How long ago were those courses?
> A: 1960.
> Q: Now the American Academy of Forensic Sciences
> which sector do you belong to?
> A: General section.
> Q: Are there any sub-divisions?
> A: There are sub-divisions.

30

Q: And is there a subdivision in crime scene
reconstruction?
A: Yes.
Q: Do you belong to that subdivision?
A: No.
Q: Is there a subdivision on blood splatter?
A: I really don't know.
Q: Is there a subdivision in luminol testing?
A: No.
Q: It's on your curriculum vitae in front of you,
is that correct?
A: Yes.
Q: It was dated April 1996, is that correct?
A: Yes.
Q: Does the word luminol appear in your curriculum
vitae?
A: No.
Q: Does the words (sic) blood splatter appear in
that curriculum vitae?
A: No.
Q: Are you accredited by the American Society of
Crime Laboratory Directors?
A: No.  (Vol. VI L24-26

After cross-examination when it was abundantly clear that Dr.
Siegusmund had absolutely no training in the areas in which he was being
offered, the prosecutor argued:

Judge, I'm asking that this man not be allowed
to testify regarding luminol testing or blood
splatter or qualified as any kind of crime scene
reconstruction expert.  The only thing he has done
in his whole life regarding forensics is go to a
yearly seminar every now and then and read about
it.  He's received no training whatsoever in these
fields that would make him qualified as an expert
either to give testimony or conduct tests of any
type.  His qualifications are devoid.  When it
comes down to what's behind his so called forensic
credentials, he teaches courses without ever having
received any formal training.  This man has never
been to a crime scene in his life.  How can a man
who has never been to a crime scene in his life be
put on the stand to testify in a criminal case
regarding blood splatter interpretation at a crime
scene or luminol testing done regarding an item of
evidence that relates to a crime scene?  We are

31

asking that he not be allowed to testify as an
expert in those areas. (Vol. VI L 37-38)

Defendant argued that since Dr. Siegusmund had knowledge that the laypersons
of the jury did not possess, that he was an expert. (Vol. VI L 39-40)   The
trial judge properly ruled:

> The fact that someone has some knowledge that
> someone in the public sector may not have doesn't
> make somebody an expert.  I don't see that there is
> anyway I can say this man is an expert in blood
> splatter  testimony.    Even  his  manner  while
> testifying seemed disingenuous at times.  That's
> not a way to instill some confidence that someone
> is an expert in some kind of field.  He appears to
> be a jack of all trades and master of none.  This
> Court will not recognize this man as an expert in
> the field of blood splatter testimony. (Vol. VI L
> 40)

The trial court also limited the doctor's testimony regarding luminol
on how luminol processing was done, but not interpretation:

> I don't believe he's an expert or that he
> might be an expert on how the luminol testing is
> done and know something about it.   There was
> nothing that came forward from this witness stand
> to indicate he knew anything about the luminol.
> (Vol. VI L40-41)

On appeal, defendant operates under the incorrect presumption that
because his witness had some knowledge and education beyond that of a
layperson, that he was presumptively entitled to be qualified as an expert.
(Def's Br. p. 28-29), citing, People v. Novak, 163 Ill. 2d 93, 643 N.E.2d 762
(1994). The issue in Novak was whether the testimony of lay witnesses was
improper where it was beyond their personal knowledge.  The Novak court found
that the witnesses in question improperly testified as lay witnesses, but due

32

to their experiences and qualifications, their testimony was properly admitted as expert testimony. <u>Novak</u>, 163 Ill. 2d at 103-104.  The <u>Novak</u> decision does not hold that mere knowledge beyond that of a lay person equates into expertise.

In the instant case, the trial court properly ruled that Dr. Siegusmund did not possess the requisite expertise in the field for which he was tendered. Mere training and experience in a field outside the realm of knowledge of a layperson does not always qualify one as an expert.

In <u>Thurmond v. Monroe</u>, 235 Ill. App. 3d 281, 601 N.E.2d 1048 (1st Dist. 1992), the defendants complained that the trial judge committed error when he refused to qualify a police officer as an expert regarding the point of impact collision and reconstruction testimony.  This Court affirmed the trial court's ruling despite the fact that the officer had one year of experience on the police force and had investigated 15 accident scenes. <u>Thurmond</u>, 235 Ill. App. 3d at 289.

Consistently, in <u>Hubbard v. Sherman Hospital</u>, 292 Ill. App. 3d 148, 153-154, 685 N.E.2d 648 (2nd Dist. 1997), it was held that the trial judge did not abuse discretion by refusing to qualify a doctor as an expert in a field of appendectomy procedure and diagnostic testing due to doctor's "little experience in the emergency room" and no actual experience regarding the matter for which he was tendered.

Although Dr. Siegusmund had extensive academic training and experience in very specialized fields, none of those areas had anything to do with the areas for which he was being tendered.  Taking defendant's argument to its logical conclusion, any person with a science degree who attended a conference

once a year would have been deemed an expert in these very specialized fields. Such a conclusion is ludicrous.

As for Dr. Siegusmund's "experience" in the Glendale Crime Lab, it was revealed:

> Q: Have you ever worked in a crime lab?
> A: The Glendale Crime Lab.
> Q: When is the last time that crime lab was open?
> A: I'm sorry. What?
> Q: When was the last time the Glendale Crime Lab was open?
> A: Open?
> Q: Yes.
> A: It's still open as far as I know.
> Q: Is it correct that the crime lab has not done any forensic work for ten years?
> A: That's incorrect.
> Q: Did you ever testify that it hasn't done any forensic work for ten years?
> A: If I did I was in error.
> Q: People versus Michael Tillman. Do you remember testifying in People v. Michael Tillman trial?
> A: No.
> Q: That was in this building. You remember testifying in this building on February 5, 1996? Do you remember testifying in People versus Michael Tillman on February 5, 1996?
> A: I don't recall, no.
> Q: Page 128. Do you remember being asked this question and giving this answer?
> Q: Isn't it true that the Glendale Crime Lab has not done any forensic work for 20 years? And your answer?
> A: I'm not sure that's true. We haven't done anything for 10 years. (Vol. VI L22-23)

Defendant's argument on appeal suffers from the same infirmity as it did at trial. In spite of Dr. Siegusmund's academic background and work experience, defendant has failed to show that Siegusmund had sufficient knowledge or training in the fields for which he was being tendered.

Defendant relies on several cases to support his argument that Dr. Siegusmund should have been qualified to testify as an expert. None of those

cases, however, have any relevance to the issue at bar. In <u>People v. Jordan</u>, 103 Ill. 2d 192, 469 N.E.2d 569 (1984), the issue was not whether one was qualified to testify as an expert. Rather, in <u>Jordan</u>, the defendant complained that the "trial court erred in allowing forensic odontologists to testify regarding the cause of death" because the relied upon theory had not gained general acceptance in the dental community. <u>Jordan</u>, 103 Ill. 2d at 207-8. <u>Jordan</u> had no relevance to the facts at issue.

Defendant's citation to <u>People v. Knox</u>, 121 Ill. App. 3d 579, 459 N.E.2d 1077 (3rd Dist. 1984), shows exactly why the trial court in the instant case was correct in rejecting the alleged expertise of Dr. Siegusmund. In <u>Knox</u>, the defendant alleged that a witness who testified regarding blood stain evidence was not properly qualified as an expert. The appellate court noted that the witness in question had been a police officer for 12 years, investigated crime scenes for 10 years, had formal training in the field of blood characteristics, read literature in the filed, observed bloodstain evidence at crime scenes for over 10 years and had previously been deemed an expert in this very field. <u>Knox</u>, 121 Ill. App. 3d at 584. The <u>Knox</u> court held that "[t]he degree and manner of knowledge and experience required of an alleged expert is directly related to the complexity of the subject matter." <u>Knox</u>, at 584.

Compared to the <u>Knox</u> witness, Dr. Siegusmund did not have the requisite knowledge nor did he have any experience as it related to the issues for which he was tendered. The cross-examination revealed that Dr. Siegusmund had never been trained nor had any experience in these fields. A biology professor does not a blood spatter expert make.

35

Last, defendant has furnished this Court with two cases in which Dr. Siegusmund was allowed to testify as an expert. In <u>People v. Smith</u>, 241 Ill. App. 3d 446, 608 N.E.2d 1259 (2nd Dist. 1993), Dr. Siegusmund testified at the defendant's sentencing hearing in mitigation regarding how much acid an infant ingested which ultimately resulted in the baby's death. <u>Smith</u>, 241 Ill. App. 3d at 447. Dr. Siegusmund was allowed to testify as an expert in hair comparison in <u>People v. Linscott</u>, 142 Ill. 2d 22, 30, 566 N.E.2d 1355 (1991). The People fail to see the relationship between Siegusmund's expertise in chemical substances and hair analysis to that of blood spatter and luminol testing. In fact, defendant's references to these cases supports the trial court's statement that Siegusmund was a "jack of all trades and master of none." (Vol. VI L40)

This Court should be aware of other cases involving Siegusmund's alleged expertise. <u>See</u>, <u>Dean v. Watson</u>, 1996 U.S. Dist. LEXIS 2243 (1996), Siegusmund to be used as an expert regarding bullet trajectory; <u>Aguilar v. Dixon</u>, 1995 U.S. Dist. LEXIS 7195 (1995), Siegusmund allowed to testify as an expert regarding ballistics marking on bullets and due to his position as an anatomy professor, he was allowed to testify to injuries and timing and process of bruising, but precluded from testifying to bullet trajectory and patterns of shell casings since "Dr. Siegusmund's opinions on these matters do not appear to have sufficient scientific support to be of assistance to the trier of fact." <u>Id</u>. at p. 23.

The only basis for submitting Siegusmund as an expert on blood spatter was that he had allegedly been qualified about 20 times in that field. (Vol. VI L8) When it was quickly established that Siegusmund had never received any training in blood spatter, had never conducted any experiments in blood spatter

36

in a crime lab nor had he ever written any articles regarding blood spatter. the trial judge properly determined that Siegusmund's expertise was lacking.

Additionally, the trial court properly limited Siegusmund's luminol testimony to application only since there was no basis that Siegusmund had ever interpreted luminol. The cross-examination was a complete obliteration of Siegusmund's credibility and revealed his actual lies regarding his history as an alleged expert witness.

Defendant failed in the trial court, and again fails on appeal, in showing what experience, training or knowledge Dr. Siegusmund possessed that would have allowed him to be qualified as an expert in the fields of blood spatter and luminol interpretation. The trial judge did not abuse his discretion by precluding such a farce from being presented to the jury. This Court should affirm that ruling.

### B.

**The Trial Court Properly Allowed Mitch Rea To Testify As An Expert In The Field Of Luminol Testing Where Rea's Extensive Training And Experience Aided The Trier Of Fact.**

Inconsistent with his entire defense at trial, defendant now complains that Mitch Rea should not have been able to testify as to his luminol experiment with defendant's clothing because he never conducted a follow up test to determine whether the glow that emitted from defendant's pants and jacket were in fact, blood. (Def's Br. p. 38)

Initially, this Court should not address this issue, as it is waived. It has long been established that "[b]oth a trial objection _and_ a written post-trial motion raising the issue are required for alleged errors that could have

37

been raised during trial." <u>People v. Enoch</u>, 122 Ill. 2d 176, 186, 522 N.E.2d 1124 (1988). Since defendant failed to raise this issue in his post-trial motion, this Court should not address the substance of the claim. (R.C. Vol. II C294-295)

Assuming <u>arguendo</u> that this issue has been properly preserved, defendant's claim fails nonetheless. First, it should be noted that defendant's complaint on appeal is inconsistent with his defense at trial. During the trial, defendant conceded that his quilted jacket and his stained pants were human blood. In fact, defendant went to great lengths to present testimony to that fact. Defendant informed the jury several times that the human blood that was on his jacket and pants were the result of numerous fights that resulted in his opponents bleeding from their noses and mouths. (Vol. V K180-181, K186) Defendant went so far as to concede that some of the blood on his clothes could have been the victim's because he picked up a wet bag containing her belongings. (Vol. V K220) During closing arguments, defense counsel noted that the stains on the jacket and jeans were transfer stains, and alluded to the fact that the clothing could have been stained with the victim's blood when he picked up the bloody bag in the gang way. (Vol. VI L95-96, L106) Now, on appeal, defendant is improperly changing his entire theory of defense. A defendant cannot change the theory upon which his case was tried. <u>Kravis v. Smith Marine</u>, 60 Ill. 2d 141, 324 N.E.2d 417, 420 (1975). Defendant's argument is waived since it has never been raised prior to appeal.

Assuming <u>arguendo</u> that this Court addresses the merits of defendant's argument, no reversal is required. The remaining contentions concerning Mitch Rea are that he did not take any college level chemistry courses. "Formal academic training or specific degrees are not required to qualify a person as

an expert; practical experience in a field may serve just as well to qualify him." <u>Lee v. Chicago Transit Authority</u>, 152 Ill. 2d 432, 459, 605 N.E.2d 493 (1992).    Rea's testimony shows the extensive work experience which well qualified him as an expert in the field of luminol.

Defendant has failed to provide this Court with a logical or legal basis to reverse his murder conviction.    Defendant's argument should be rejected, as it lacks merit.

II.

THE TRIAL COURT DID NOT ABUSE ITS DISCRETION
WHEN IT PRECLUDED EVIDENCE THAT WAS SPECULATIVE AND
REMOTE.
(Response to Defendant's Argument III)

There is no dispute that a criminal defendant is constitutionally guaranteed the right to present a defense. Chambers v. Mississippi, 410 U.S. 284, 93 S.Ct. 1038 (1973). The trial court, however, has the discretion to refuse evidence that is not relevant. "Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence more probable or less probable than it would be without the evidence." People v. Childress, 158 Ill. 2d 275, 295, 633 N.E.2d 635 (1994). The trial court can rejected proffered evidence on the grounds of irrelevancy if it has little probative value due to its remoteness, uncertainty or unfair prejudicial nature. Childress, 158 Ill. 2d at 295-296.

These same rules apply even if the proffered evidence goes to the defendant's theory of the case, because the constitutional right to present a defense has not altered "the power of States to exclude evidence through the application of evidentiary rules that themselves serve the interests of fairness and reliability--even if the defendant would prefer to see that evidence admitted." Crane v. Kentucky, 476 U.S. 683, 690, 106 S.Ct. 2142 (1986); also see, People v. Carini, 151 Ill. App. 3d 264, 281-282, 502 N.E.2d 1206 (1st Dist. 1986), (holding that the defendant was not deprived of his right to present a defense when the trial court ruled that certain evidence was irrelevant).

The Childress Court held that an evidentiary issue should not be reviewed de novo. Rather, an abuse of discretion standard of review must be

40

employed since the "decision to admit evidence cannot be made in isolation. The trial judge must consider a number of circumstances that bear on that issue, including questions of remoteness and prejudice." <u>Childress</u>, at 296; also <u>see</u>, <u>People v. Reid</u>, 179 Ill. 2d 297, 313, 688 N.E.2d 1156 (1997). "[A]n abuse of discretion will be found only where the trial court's decision is 'arbitrary, fanciful or unreasonable' or 'where no reasonable man would take the view adopted by the trial court.'" <u>People v. Illgen</u>, 145 Ill. 2d 353, 364, 583 N.E.2d 515 (1991)(cites omitted). "[T]he erroneous exclusion of evidence is ground for a new proceeding where it can be said that the excluded evidence, if considered, would have altered the outcome of the proceeding." <u>People v. Sims</u>, 167 Ill. 2d 483, 516, 658 N.E.2d 413 (1995).

In the case at bar, the trial judge properly precluded the testimony that defendant had been involved in fights at least one month prior to the murder of Millie Nielson. Pamela Hines, defendant's former live-in girlfriend testified at trial that defendant had moved out of her apartment "quite a few months" prior to defendant's arrest. (Vol. V K152) Defense counsel then asked Hines the following questions:

> Q: Were you ever with Henry when he got into a fight?
> [The Prosecutor]: Objection.
> The Court: Sustained.
> A: Yeah.
> [Defense Counsel]: May I be heard?
> The Witness: Do I answer?
> The Court: No. Ask the next question.
> Q: Were you ever with Henry when he got into a fist fight with another person?
> [The Prosecutor]: Objection.
> The Court: Sustained.
> Q: Were you ever with Henry when he was wearing People's Number 45 in evidence, that quilted coat, when he got into a fist fight with another person?
> [The Prosecutor]: Objection.
> The Court: Sustained.

41

[Defense Counsel]: I would ask to be heard at a sidebar, Judge.
The Court: Ask the next question.
Q: Were you ever with Henry when he was wearing People's Number 45 in evidence, that quilted coat, when either he or someone else that he was with was bleeding?
[The Prosecutor]: Objection.
The Court: Sustained. (Vol. V K154-155)

At a sidebar, defendant made the following offer of proof:

Judge, with regard to the testimony of Ms. Hines, by way of an offer of proof, if she were permitted to answer additional questions along the line of, I was beginning to inquire of her about what she would say; that she was with Henry on, I think, it was seven or eight possibly different occasions. When he got in fist fights and punches were thrown and people were bleeding. And she would testify that the quilted coat which is in evidence was the jacket that he had on each and every one of these occasions that she saw him in fist fights. (Vol. V K168-169)

*      *      *

If the jurors were permitted to hear the testimony of Ms. Hines, they would have an alternative to the assumptions he has made in formulating his conclusions and hypothesis.
The alternative that would be available to them would be that some of the blood, not all of the blood, the spattered blood that's on that quilted coat, was not the blood of Millie Nielson. That's the reason that I would seek to introduce her testimony along those lines. (Vol. V K169-170)

The trial judge responded:

She said the last time she saw him was about six months before this thing happened. It's not probable.
[The Prosecutor]: For clarification she lived with him about six months before. She didn't see him

about a month before.[1]  But still it would be our
position at that point there is no indicia.
The Court: There was no question asked about when.
[The Prosecutor]: Right.
The Court: Or what time the supposed fights were,
and it's just too remote.
[Defense Counsel]: Judge, if I could respond?  In
regard to how far I got in my questioning, indeed,
I understand I have got to lay a foundation, but I
wasn't permitted to ask the first question about
whether or not she was ever with him when he got in
a fight.  That's where I was headed, in terms of
laying a foundation.  But I wasn't given the
opportunity to lay a foundation. (Vol. V 170-171)

The trial court properly precluded Pam Hines from testifying regarding
these alleged fights.  Nowhere in the offer of proof is there any indication
of when these fights took place.  Hines could have seen defendant in a fight
months or even years before the murder.  Furthermore, there is no indication
as to who was involved in the fights, whose blood was shed, or whether
defendant's jacket would have been stained as a result, thus making her
testimony speculative.  Also, since Hines had not seen defendant for quite a
period of time, defendant could have washed his jacket, thus making her
testimony irrelevant.

This Court should be mindful of the fact that defendant did not possess
a large quantity of clothing.  When he moved out of Hines' apartment, he packed
all of his things in a Marshall Field's shopping bag. (Vol. V K156)  According
to defendant's own testimony, the day before the murder, he wanted to soak his
blood stained jeans at the home of Tom Szeszol. (Vol. V K185)  Defendant never
mentioned needing to soak a blood stained jacket.  Defendant apparently did not
want to wear dirty clothing.  If his jacket was truly blood-stained from

---

[1] When asked on cross-examination the last time she had seen defendant prior
to the murder, Hines responded that it was at least a month, but she didn't
really remember. (Vol. V K161-162)

43

previous fights, it is logical to assume that he would have washed when the opportunity arose.    Furthermore, when defendant was arrested at 1:00 a.m., Detective Bogucki noticed the stains on the jacket. (Vol. III J34)  Hours prior to the brutal murder of Millie Nielson, defendant was wearing that same jacket, yet nobody noticed any stains. (Vol. II I182, I209, K166)

Assuming _arguendo_ that this Court deems the trial court's ruling to be error, no reversal is required notwithstanding.   Defendant himself presented other testimony regarding more recent altercations:

> [Defense Counsel]: Calling your attention to the period of time shortly before April 24th of 1987, had you had any fist fights with any individuals?
> [Defendant]: Yes.
> Q: Can you remember approximately how many fights you had during the week before April 24th of 1987?
> A: I think three.
> Q: Do you remember who the individuals who you had these fist fights with?
> A: Tom Szeszol and Bill Henderson.
> Q: What was your relationship with Tom Szeszol at that time?
> A: Friend of mine.
> Q: Did you at times go drinking with Mr. Szeszol in bars?
> A: Yes.
> Q: Did you know Mr. Henderson personally at that time?
> A: Yeah.
> Q: When you said that you had a fight with Mr. Henderson and Mr. Szeszol, were these separate fist fights?
> A: Both of them were.
> Q: They were both there at the time?
> A: Yes.
> Q: So at the time you had the fist fight with these two individuals, who was present?
> A: Just Tom and Bob.   But Julie and Danny were upstairs in the house.[2]
> Q: Where did this fist fight with these two individuals occur?

---

[2] Since Pamela Hines was not present for these fights, her testimony regarding them would have been inadmissible hearsay.

44

A: In the alley.
Q: In the alley where, what location?
A: Behind the house.
Q: Behind which house?
A: The 3507.
Q: During that fist fight, were you injured?
A: Yeah.
Q: Can you describe your injuries?
A: I had two gashes in my knuckle area here.
Q: Was Tom Szeszol injured?
A: Yes.
Q: Do you remember the nature of his injury?
A: Bleeding from his mouth and nose.
Q: Was Mr. Henderson injured?
A: Some blood from his mouth, I think.
Q: Now you indicated there was another fist fight
that you had the week before April 24, 1987. Do
you remember who that was with?
A: That was some guy trying to mess with my car.
Q: Do you remember when that occurred?
A: Wednesday, I think
Q: Wednesday?
A: About 6:30, something like that.
Q: Where did that fist fight occur on Wednesday?
A: Outside. Around the corner from the bar.
Q: From which bar?
A: On Wrightwood and Central Park.
Q: Can you tell the jury what happened in that fist
fight?
A: Well, this guy tried to mess with--I'd seen him
messing with my car handles, so I hit him with my
left three or four times. We were going around.
I kicked him I guess a few times with my knee, I
guess. We were rolling around and that's it.
Q: Were either of you bleeding at that time?
A: He was. He was.
Q: Do you remember where he was bleeding from on
his body?
A: His face over here. (Vol. V K 179-182)

Contrary to the protestations of defendant, the jury was presented with

evidence that the blood found on defendant's jacket belonged to someone other

than Millie Nielson. In fact, during closing arguments, the defense attorney

argued:

No one told you that it was Millie Nielson's blood.
The testimony that you heard from the serologist
about splatter was human blood, that it's human

45

blood. Whose? Who knows? He's a fighter. He gets in fights. (Vol. VI L96)

\* \* \*

That's pretty nonscientific. Particularly in view of the fact that my client is a guy that gets in fights. If you hit people, other men you get in fights with, they hit you, your blood, his blood can get on the garment. (Vol. VI L103)

Furthermore, defendant consistently relied upon a fall back position in that he conceded that some of the blood on his jacket was probably that of Millie Nielson, but that it stained his clothes from picking up the bag in the gangway. During closing arguments, defense counsel stated:

He picked up someone else's proceeds and he walked away and he got blood on him. But the blood that he (sic) was on him is not consistent with the blood that was deposited on his clothes in a fit or someone fighting for their life. (Vol. VI L106)

The trial court's ruling did not preclude defendant from presenting his defense. His murder conviction should be upheld.

46

III.

THE TRIAL COURT DID NOT ABUSE ITS DISCRETION BY DENYING DEFENDANT'S CLAIM THAT HIS CONSTITUTIONAL RIGHT TO A SPEEDY TRIAL WAS VIOLATED WHERE THE RECORD READILY ESTABLISHES THAT DEFENDANT AGREED TO EVERY COURT CONTINUANCE IN AN EFFORT TO PRESENT A VALID DEFENSE AT TRIAL.
(Response to Defendant's Argument IV)

Defendant alleges that his constitutional right to a speedy trial was violated, and that as a result, his conviction should be reversed. (Def's Br. p. 28)  The record and law, however, establish that the trial court did not abuse its discretion when it determined that defendant was tried within the Speedy Trial mandate.

Initially, it should be noted that this issue is waived.  Defendant alleged at the trial level that his statutory right to a speedy trial was violated. (R.C. Vol. I R. C93-98)  At no time was the constitutional issue of a speedy trial raised.[3]  On appeal, however, defendant has raised this issue for the first time.  This issue is waived. <u>People v. Jackson</u>, 162 Ill. App. 3d 476, 478, 515 N.E.2d 390 (4th Dist. 1987).

Assuming <u>arguendo</u> a substantive review, defendant is still not entitled to relief.  The right to a speedy trial is guaranteed by the United States Constitution (U.S. Const., amend. VI) and the Illinois Constitution (Ill. Const. 1970, art. I, sec. 8).  In determining whether the constitutional right to a speedy trial has been violated, no specific time period is used. <u>Barker v. Wingo</u>, 407 U.S. 514, 523, 92 S.Ct. 2182 (1972), <u>People v. Lock</u>, 266 Ill. App. 3d 185, 187, 640 N.E.2d 334 (2nd Dist. 1994).  The <u>Barker</u> Court identified

---

[3] Defendant filed a <u>pro-se</u> request for a Speedy Trial Dismissal. (R.C. Vol. I C30, C93)  The Common Law Record contains a Motion to Dismiss and Memorandum in Support Based also on a speedy trial claim. (R.C. Vol. II C199-215)  Neither document, however, is filed stamped, nor is there any record of such document being filed, in the half-sheets. (R.C. Vol. II C27-33)

four factors to determine whether a defendant's right to a speedy trial is violated: (1) the length of the delay; (2) the reason for the delay; (3) the defendant's assertion of his right to a speedy trial; and (4) the prejudice to the defendant. Barker, 407 U.S. at 518.

This four part test weighs the conduct for both the prosecution as well as the defense. People v. Jackson, 162 Ill. App. 3d 476, 478, 515 N.E.2d 390 (4th Dist. 1987). "No one of these factors singly is necessary or sufficient to support a finding that the right to a speedy trial has been violated. Rather, these factors have no talismanic qualities; court must still engage in a difficult and sensitive balancing process." People v. Fly, 249 Ill. App. 3d 730, 733, 619 N.E.2d 821 (4th Dist. 1993). A trial court's ruling on the speedy trial issue will not be reversed absent an abuse of discretion. People v. Bowman, 138 Ill. 2d 131, 137, 561 N.E.2d 633 (1990), People v. Williams, 272 Ill. App. 3d 868, 877, 651 N.E.2d 532 (1st Dist. 1995).

Defendant improperly claims that this Court should apply a de novo standard of review, citing People v. Garriot, 253 Ill. App. 3d 1048, 625 N.E.2d 780 (4th Dist. 1993), as support. The Garriot decision, however, does not apply to this issue. In fact, the only issue in appeal in Garriot involved whether the refusal to take a breathalyzer test following a DUI arrest on private property was admissible at trial. Garriot, 253 Ill. App. 3d at 1049. The Garriot decision never addressed constitutional speedy trial violations.

A cursory review of the history of this case is required before applying the four-part test to the facts in this case. The record clearly shows that defense counsels were not in a trial posture at the time defendant was making his demands for a speedy trial. In fact, defendant's attorney refused to file such a motion. On July 21, 1993, five months after defendant's

48

case was reversed and remanded, all parties were in court.  Defense counsel
informed the trial judge that he was in the process of tracking down the
original trial transcripts and needed to conduct his own investigation into the
case. (Vol. II R.C. C232)  The following transpired:

> [Defense Counsel]: [Defendant] indicated to me that
> on his own motion, he's demanding a speedy trial.
> I don't know if he's still standing by that motion.
> I certainly would not be ready at this point
> professionally.
> The Court: [Defense Counsel], if [defendant] wants
> a speedy trial, I may be able to accommodate him
> and give him a very speedy trial.   It's the
> equivalent of somebody committing suicide, but if
> that's what he wants to do.
> You see, what your lawyer is trying to tell
> you, [defendant], is the state already had their
> case.  They've got a blueprint of the case.  This
> man doesn't know anything about your case and has
> to learn.
> Now, if you want a lawyer who is going to be
> able to give you the best possible defense, you'd
> better listen to him.  If you want to just rush
> through and go right back in as much of a hurry as
> you can with a very lengthy negative outcome for
> your case, well, then I'll set a date for you next
> week.
> Now, what will it be?
> [Defendant]: I'll wait.
> The Court: Are you going to listen to your lawyer?
> [Defendant]: Mm-humm.
> The Court: Okay.  We'll agree to a continuance; is
> that right?
> [Defendant]: Yes. (Vol. II R.C. C233-234)

Defense counsel did not obtain a complete set of transcripts until
November 15, 1993, eight months after defendant's case was reversed and
remanded. (S.R. Vol. I R 55)  In February 1994, the prosecution indicated that
an expert would be utilized in the case.  Defendant wanted to wait to see what
the expert would say before possibly engaging his own expert on blood splatter.
(S.R. Vol. I R 65-66)  By June 1994, tests had been completed by some experts
and it was expected that DNA testing would be complete by September 1994. (S.R.

49

Vol. I R 77)   In September, it was revealed that Pam Fish was performing additional blood tests.  Defense counsel did not want to set a trial date until he saw that report. (Vol. II R.C. C259)

In October 1994, the court was informed that the DNA tests were not complete and another status date was held.  Defendant made another oral request to dismiss his charges pursuant to the Speedy Trial Act. (Vol. II R.C. C262) Defendant told the trial court that his attorney refused to file the motion. (Vol. II R.C. C262)   Defendant was told that his motion had to be in writing. While waiting for DNA results to come back, defendant took several dates in order to argue his Speedy Trial motion. (Vol. I R.C. C11, Vol. II R.C. C262)

In January 1995, a second assistant public defender appeared on defendant's case. (Vol. II R.C. C289)  In March 1995, the prosecutor filed a Motion to Produce involving DNA testing that was done prior to defendant's first trial. (Vol. I S.R. 84)  The DNA tests were still not complete at that time.  In May 1995, the prosecutor still had not received the written findings from the DNA tests performed prior to defendant's first trial.  Defense counsel indicated that there were no written findings, but notes existed. (Vol. I S.R. 91)   The prosection informed the court that the DNA tests could not be completed until the results from defendant's DNA testing were revealed. (Vol. I S.R. 92)   Defense counsel was finally ordered to turn over the notes regarding the first DNA testing. (Vol. I S.R. 94)

Later that month, the prosecution was still asking for DNA test results from the first trial.  It was also learned that the second attorney was moving out of state and would not be trying defendant's case. (Vol. I S.R. 104)  In June 1995, a third attorney filed an appearance on defendant's behalf. (Vol. I S.R. 113)  By August of 1995, the prosecution finally received the missing

50

discovery as it related to the DNA testing. (Vol. I S.R. 120) By October 1995, the defense attorney asked for another status date as she had outstanding subpoenas and was not "in a position to set this matter for trial." (Vol. I S.R. 136) In December 1995, the public defender was granted leave to withdraw and a fourth attorney filed his appearance. (Vol. I S.R. 140)    The fourth attorney withdrew, and attorney number five filed an appearance in January 1996. (Vol. I S.R. 163) Trial counsel, defendant's sixth attorney, filed his appearance in March 1996. (Vol. I S.R. 171) A few months later, trial counsel had gone through the discovery and both sides indicated they would be ready for trial in August. (Vol. I S.R. 181) In July, it was indicated that defendant might hire an expert, which would set the date back. (Vol. I S.R. 184) The next transcript shows the scheduling for the November 1996 trial. Out of the 47 times this case appeared before the trial judge, there were 39 by agreement continuances, 3 continuances by order of court, 3 continuances at defendant's request.[4] There is not one single "motion state" date in the record. (Vol. I R.C. C1-15)

Due to this very significant fact and the history of proceedings, defendant claims that his constitutional right to a Speedy Trial was violated. An application of the facts above to the four-part test completely undermines defendant's baseless claim.

### The Length of the Delay

The length of delay is a triggering mechanism to the operation of the test. <u>Barker v. Wingo</u>, 407 U.S. at 530. When examining the length of the

---

[4] The court half-sheets for two dates, December 7, 1995 and January 11, 1996 do not indicate the type of continuance taken.

delay, it is important not to view this span "as a single block of time." People v. Mitchell, 95 Ill. App. 3d 779, 788, 420 N.E.2d 415 (1st Dist. 1981). "Rather, the particular context of that period must be examined." Mitchell, 95 Ill. App. 3d at 788.

In Mitchell, the defendant claimed that his constitutional right to a speedy trial was violated, as the length of time between his indictment and trial date spanned nearly six years. This Court rejected the defendant's claim that his constitutional right to a speedy trial had been violated. In that case, the defendant filed a Motion to Quash, and either requested continuances, or agreed to the continuances, therefore, those time periods could not be attributed to the prosecution. Mitchell, 95 Ill. App. 3d at 789. This Court held that "[t]he remaining period of time prior to trial involved delays caused as much by defendant as the State. No violation of rights is assignable to this time frame." Mitchell, at 789. Although this Court found that "the amount of time involved in this case" to be "unfortunate," there was no constitutional Speedy Trial violation. Id. at 789-790.

In the case at bar, the record shows that the series of defense counsels were not prepared for trial until the DNA tests were finished. It was not until the prosecution's DNA tests were completed that the defense hired their own expert. The rationale is evident. It was not until the blood tests had been completed that defense counsel knew what to rebut and if an expert was needed for the defense. In order for this factor to be considered against the prosecution, the defendant needs to establish that the delay was not attributable to his actions. People v. Prince, 242 Ill. App. 3d 1003, 1008, 611 N.E.2d 105 (1st Dist. 1993).

52

The record is uncontradicted that defense counsel agreed to every continuance at issue.  "[E]ven express consent to or acquiescence in a continuance constitutes delay attributable to defendant." People v. Smith, 251 Ill. App. 3d 839, 843, 623 N.E.2d 857 (2nd Dist. 1993).  Since the length of time between the trial and the issue of the mandate were attributable to defendant, the delay was not presumptively prejudicial.

The People are aware of this Court's recent opinion in People v. Crane, 1999 Ill. App. LEXIS 660, which reversed the defendant's murder conviction and dismissed his indictment due to a Constitutional Speedy Trial violation.  The Crane decision, however, is not applicable to this case.  In Crane, the trial court did not receive the reissued mandate until eleven months later.  This Court found that since the prosecution could not explain this lapse and there was no justification for the delay in bringing the defendant to trial, that dismissal was warranted. Crane, at p. 4.

In the case at issue, however, there are no unexplained absences.  In fact, all of the continuances were at defense counsel's informed consent or at defendant's request.  Crane is not applicable.


## The Reason for the Delay

If this Court finds that the delay was prejudicial and proceeds to the other three factors set forth in Barker, a review of the facts show that no violation of a constitutional speedy trial was denied.  The second Barker factor to consider is the reason for the delay.

The record establishes that DNA testing was the cause for the delay. The rationale for that cause, and its consequences, however, are critical. Defense counsels needed to know the results of the DNA tests in order to

53

prepare their defense. That is precisely the reason why so many by agreement dates were made. Had the DNA results indicated that the blood found on defendant's clothing was not that of Millie Nielson, an acquittal was a probability. That was the rationale for the defense. This Court should also be mindful of the fact that defendant went through six attorneys and that the prosecution's DNA tests would have been more prompt had the defense complied with the court's order to turn over the results of the DNA tests from the first trial.

In his brief, defendant wholly ignores the fact that he went through six attorneys prior to trial. Additionally, defendant naively presumes that his attorneys would have been prepared for trial, absent the DNA conclusions. Defendant's arguments belie logic and competent trial preparation and should be rejected.


### Defendant's Assertion of His Right to a Speedy Trial

The third factor to consider in assessing whether defendant was denied his constitutional right to a speedy trial was his assertion of that right. It has been held that "[t]he defendant's assertion of his speedy trial right, then, is entitled to strong evidentiary weight in determining whether the defendant is being deprived of the right. We emphasize that failure to assert the right will make it difficult for a defendant to prove that he was denied a speedy trial." Barker v. Wingo, 407 U.S. 514, 531-532, 92 S.Ct. 2181 (1972).

In the case at issue, defendant was asserting his statutory right in direct conflict to the needs of his series of attorneys. The law is clear that the decision to file a demand for a speedy trial is a strategic matter left for

counsel. <u>People v. Keys</u>, 195 Ill. App. 3d 370, 373, 552 N.E.2d 285 (4th Dist. 1990):

> Furthermore, Illinois Courts have recognized that the decision to demand a speedy trial may be determined by counsel over defendant's objections. (<u>People v. Carr</u>, 9 Ill. App. 3d 382, 292 N.E.2d 492.) In <u>Carr</u>, the trial court granted defense counsel a continuance over the strenuous objection of defendant, who demanded a speedy trial. The court allowed defense counsel to make the decision, even though, in doing so, defendant relinquished the statutory right to be tried within 120 days of his arrest. See also <u>People v. Ford</u> (1975), 34 Ill. App. 3d 79, 339 N.E.2d 293. <u>Keys</u>, 195 Ill. App. 3d at 375.

It has been recognized that a delay in trial is not an uncommon defense tactic, as witnesses may become unavailable or their memories become less reliable which would weaken the prosecution's case. <u>Keys</u>, 195 Ill. App. 3d at 374-375.

Defendant withdrew his first statutory assertion when it was explained to him that his first attorney was not prepared for trial. (Vol. II R.C. C234) Defendant made a second statutory assertion but told the court that he was unprepared to argue it until he received transcripts. (Vol. II R.C. C278-281) Defense counsel specifically told the court that defendant was angry because defense counsel "won't file" the Speedy Trial Motion. (Vol. II R.C. C280)

Then, on the eve of trial, defendant submitted a Motion to Dismiss based upon his claim that his right to a speedy trial was denied. The trial court rejected the motion stating:

> Very well. I have read the Motion and the memorandum. I had the opportunity to look at the transcripts that were attached. The Motion speaks for itself.
> Although [defendant] at times asked for a trial to start right away, in almost every

```
instance, he then asked for a continuance because
either in opposition of what his lawyer wanted to
do or he wanted to argue the motion himself, which
I have him opportunity (sic) to do on several
occasions.
     So, the Motion to Dismiss will be denied.
(Vol. I H4)
```

Defendant alleges that this factor should weigh in his favor because he made statutory assertions. Defendant's argument, however, ignores the simple facts and well established law regarding this issue. The record is replete with the fact that defense counsel after defense counsel refused to submit a Speedy Trial Motion due to the fact that they needed the DNA tests to prepare for trial. Defendant's assertions were based on a misunderstanding of the law and what was required for his attorneys to proceed to trial.

### Prejudice to Defendant

The last factor to consider is the prejudice to defendant. The United States Supreme Court has found that the prejudice factor should be assessed in the light of three interests of a defendant: to prevent oppressive pretrial incarceration, to minimize anxiety and concern of the accused and to limit the possibility that the defense will be impaired. Smith v. Hooey, 393 U.S. 374, 89 S.Ct. 575 (1969). Although the Supreme Court has held that the Speedy Trial Clause's "core concern" is impairment of liberty, it does not shield a defendant from every expense or inconvenience associated with criminal defense. United States v. Loud Hawk, 474 U.S. 302, 312, 106 S.Ct. 648 (1986).

"It has been stated the anxiety factor will count substantially in defendant's favor only if it is shown there was a rather special situation giving rise to an inordinate amount of anxiety." People v. Jackson, 162 Ill.

App. 3d 476, 481, 515 N.E.2d 390 (4th Dist. 1987), citing, United States v. Askew, 584 F.2d 960 (10th Cir. 1978).

Defendant asks this Court to weigh this issue in his favor because he was "anxious" to get to trial. Presumably, every defendant is "anxious" to get to trial. Other than unsubstantiated speculative claims, defendant has failed to show why this factor should be resolved in his favor. The record establishes that the delay in bringing defendant to trial was in no way intended to establish oppressive incarceration. When this case was reversed and remanded, the prosecution made every attempt to get defendant's case to trial as soon as it was possible. The fact that new evidence (DNA testing and blood spatter testimony) became available was an important factor for both the prosecution and defense. It should also be noted that defendant was out on bond for a short period of time prior to trial. (Vol. I S.R. 143) Additionally, the delay in bringing defendant to trial in no way impaired the defense from going to trial and presenting evidence. It was the defendant's advantage to wait to see what the DNA tests proved, since they could have been wholly exculpatory.

Regarding the anxiety factor, it is significant to note that defendant had already withstood trial and had already been proven guilty. Defendant was given a second chance to go to trial. The "anxiety" factor was different for defendant who was being retried.

Defendant has failed to establish that he was in any way prejudiced. This Court should reject his baseless allegations and affirm his conviction for the brutal death of Millie Nielson.

CONCLUSION

The People of the State of Illinois respectfully request that this Honorable Court affirm defendant's conviction for the murder of Millie Nielson.

Pursuant to People v. Nicholls, 71 Ill. 2d 166, 374 N.E.2d 194 (1978) and relevant statutory provisions 725 ILCS 5/110-7(h)(1992); 725 ILCS 130/13 (1992); 55 ILCS 5/4-2002.1 (1992), the People of the State of Illinois respectfully request that this Court grant the People costs and incorporate as part of its judgment and mandate a fee of $100.00 for defending this appeal. In addition, pursuant to People v. Agnew, 105 Ill. 2d 275, 473 N.E.2d 1319 (1985) and 55 ILCS 5/4-2002.1 (1992), the People respectfully request that this Court also grant the People an additional fee of $50.00 in the event oral argument is held in this case.

Respectfully Submitted,

RICHARD A. DEVINE,
State's Attorney,
County of Cook,
Room 309 - Richard J. Daley Center,
Chicago, Illinois 60602

Attorney for Plaintiff-Appellee

RENEE GOLDFARB,
ALAN J. SPELLBERG,
CHRISTINE COOK,
Assistant State's Attorneys,
    Of Counsel.

58