No. 97-2557

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | |
|---|---|
| **PEOPLE OF THE STATE OF ILLINOIS,** ) | Appeal from the Circuit Court |
| ) | of Cook County, Illinois. |
| Plaintiff-Appellee, ) | |
| ) | |
| -vs- ) | Indictment No. 87-6131. |
| ) | |
| **HENRY KACZMAREK,** ) | Honorable |
| ) | John D. Brady, |
| Defendant-Appellant. ) | Judge Presiding. |

**REPLY BRIEF AND ARGUMENT FOR DEFENDANT-APPELLANT**

MICHAEL J. PELLETIER
Deputy Defender

DEBRA R. SALINGER
Assistant Appellate Defender
Office of the State Appellate Defender
James R. Thompson Center
100 West Randolph Street - Suite 5-500
Chicago, Illinois 60601
(312) 814-5472

COUNSEL FOR DEFENDANT-APPELLANT

RECEIVED
CRIMINAL APPEALS
DEC 16 1999
309 RICHARD J. DALEY CENTER
RICHARD A. DEVINE
STATE'S ATTORNEY'S OFFICE

EXHIBIT Q

No. 97-2557

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| **PEOPLE OF THE STATE OF ILLINOIS,** | ) | Appeal from the Circuit Court |
| | ) | of Cook County, Illinois. |
| Plaintiff-Appellee, | ) | |
| | ) | |
| -vs- | ) | Indictment No. 87-6131. |
| | ) | |
| **HENRY KACZMAREK,** | ) | Honorable |
| | ) | John D. Brady, |
| Defendant-Appellant. | ) | Judge Presiding. |

**REPLY BRIEF AND ARGUMENT FOR DEFENDANT-APPELLANT**

**ARGUMENT**

I.  The State Presented The Testimony of Two Former Police Officers as Experts in Luminol Testing and Blood Splatter. Defendant Sought to Rebut the State's Witnesses with the Testimony of Dr. Siegesmund Who Himself Gave Training Seminars to Police Officers in Blood Splatter and Had Done Luminol Testing. Where the State's Case Turned on the Location and Quantity of Blood Found on Defendant's Clothes, the Judge Erred in Prohibiting Dr. Siegesmund from Testifying for the Defense.

-1-

The judge precluded defendant from presenting the testimony of Dr. Kenneth Siegesmund to rebut the State's expert witnesses, Mitch Rea and Rod Englert. Henry Kaczmarek was denied a fair trial. Consequently, this Court must remand the cause for a new trial.

### Dr. Siegesmund Was Qualified to Testify About Luminol Testing And Blood Splatter

The State argues that Dr. Siegesmund had extensive academic training and experience but "none of those areas had anything to do with the areas for which he was being tendered." (St. Br. 31) The State in fact asserts that Dr. Siegesmund had no training in luminol testing. (St. Br. 28) The State's position is rebutted by the record. Dr. Siegesmund stated that he had performed luminol testing well over a hundred times with the last time he conducted luminol testing three weeks before. (R. L5, L27) Dr. Siegesmund further averred that he had performed dozens of experiments in blood splatter and that he had been qualified to testify as an expert in the area of blood splatter 20 to 30 times. (R. L28, L37)

The State bases its argument concerning that Dr. Siegesmund had "absolutely no training" in the areas in which he was being tendered as an expert on the fact that Dr. Siegesmund did not receive training from the F.B.I. or the police. (St. Br. 31) Contrary to the State's position, being deemed an expert, does not require that one was trained by the police crime lab or F.B.I. Significantly, Dr. Siegesmund gave courses to sheriffs in the police department which included teaching about blood splatter. (R. L29) When asked whether he attended any formal course taught by law enforcement agencies, Siegesmund stated "I'm teaching. I don't take courses from them." (R. L29) Dr. Siegesmund, by virtue of his education

-2-

and experience, was an expert in the fields of luminol testing and blood splatter and trained others.

As emphasized in defendant's opening brief, but not addressed by the State, the fact that Dr. Siegesmund had never been to a crime scene had no impact upon his qualifications to testify as an expert witness. (Def. Br. 32-33) Dr. Siegesmund explained that he had never gone to a crime scene because by the time he is consulted the crime scene is gone. (R. L18, L20) Notably, examination of a crime scene is not a prerequisite to applying scientific principles concerning blood and how it splattered.

The State argues that Dr. Siegesmund's credibility was "completely destroyed" on cross-examination. (St. Br. 28) Not having a list of cases in which Dr. Siegesmund testified as an expert does not destroy credibility. When asked if a court had ever found him not qualified as an expert in Cook County, Dr. Siegesmund stated that he did not believe so explaining that there may have been a case where he was not qualified in a certain area but that he did not recall not being qualified in respect to entire testimony. (R. L10) At issue was not whether Dr. Siegesmund was an expert in lung disease, tool marks, hair comparisons, or gunshot residue, (St. Br. 30), rather whether the court should have permitted Dr. Siegesmund to testify as an expert in blood splatter and luminol testing.

Citing the report of proceedings, the State intimates that even defense counsel thought it was inappropriate to present the doctor as an expert witness. (St. Br. 26) The transcription in the report of proceedings must not be credited as it is illogical. (R. H27) The report of proceedings attribute to defense counsel the statement that "It's not appropriate I present him as an expert witness." (R. H27) Defense counsel tendered Dr. Siegesmund as an expert witness. It would

-3-

have been senseless for counsel to state that Dr. Siegesmund was not an expert and then fight for defendant's right to present him as an expert witness.

The State contends that "a biology professor does not a blood spatter expert make." (St. Br. 35) In this case, where "the biology professor" has conducted experiments and had practical experience in luminol testing and blood splatter, the "professor" had knowledge beyond that of a layperson, and must be deemed an expert in the areas of luminol testing and blood splatter. Notably, the State does not address Ralston v. Plogger, 132 Ill. App. 3d 90, 476 N.E.2d 1378, 1383 (4th Dist. 1985) which held that practical experience can make an individual an expert. (Def. Br. 33) Here, based upon scientific principles and experimentation, Dr. Siegesmund had knowledge beyond that of a lay person and should have been deemed an expert witness.

Contrary to the State's assertion, defendant is not arguing that "any person with a science degree who attended a conference once a year would have been deemed an expert in these very specialized fields." (St. Br. 33-34) In addition to his scientific training, Dr. Siegesmund had practical experience in the fields of luminol testing and blood splatter. Dr. Siegesmund testified that he had performed luminol testing well over a hundred times and blood splatter testing a dozen times. (R. L28, L37)

The State's reliance on Thurmond v. Monroe, 235 Ill. App. 3d 281, 601 N.E.2d 1048 (1st Dist. 1992) and Hubbard v. Sherman Hospital, 292 Ill. App. 3d 148, 685 N.E.2d 648 (2nd Dist. 1997), to argue that Dr. Siegesmund was not an expert, is misplaced. (St. Br. 33) In Thurmond, the court found that a police officer who had been with the department only one year; had investigated only 15 accident cases; and whose training consisted only of taking measurements and collecting evidences at an accident scene, could not be deemed an expert in accident

-4-

reconstruction. In Hubbard, the court found that a doctor who had only spent one month in the emergency room as an intern could not be deemed an expert in emergency room practice. In contrast, Dr. Siegesmund's had years of education and had practical experience.

### The Judge Below Was Acting Under A Misapprehension of Law Concerning Experts

The State asserts that People v. Novak, 163 Ill. 2d 93, 643 N.E.2d 762, 768 (1994), does not hold that "mere knowledge beyond that of a lay person equates into expertise." (St. Br. 33) Novak and its progeny have held that an expert need only have knowledge and experience beyond that of the average citizen. Novak, 643 N.E.2d at 768; People v. Steffens, 208 Ill. App. 3d 252, 566 N.E.2d 985, 991 (4th Dist. 1991)("expert has knowledge and experience beyond the average citizen which would assist the jury in evaluating the evidence.");People v. Rozo, 303 Ill. App. 3d 787, 708 N.E.2d 1229, 1233 (2nd Dist. 1999).

Although the State cites to Thurmond v. Monroe, 235 Ill. App. 3d 281, 601 N.E.2d 1048 (1st Dist. 1992), to argue that Dr. Siegesmund should not have been deemed an expert witness, the Hubbard Court reaffirmed that "an expert witness is a person who possesses knowledge beyond the ordinary understanding of the jury as a result of his or her education, training, or experience." Hubbard, 685 N.E.2d at 651. Likewise, Hubbard v. Sherman Hospital, 292 Ill. App. 3d 148, 685 N.E.2d 648 (2nd Dist. 1997), cited by the State as well, stressed that "an expert is one who, because of his education, training or experience, possesses knowledge and skill of a specialized nature which is beyond the knowledge of the average person." Thurmond, 601 N.E.2d at 1053. (St. Br. 33)

The State cites to In re V.Z., 287 Ill. App. 3d 552, 678 N.E.2d 1070 (1st Dist. 1997), to argue that "the test for competency of an expert is whether or not the witness exhibits sufficient knowledge of the subject matter." (St. Br. 25) The court's comments concerning sufficiency of a witness' knowledge necessary to render them an expert was made in the context of whether experience can serve as a basis for qualification of an expert. Notably, in V.Z., the court had no need to discuss whether a certain witness was in fact an expert as the appellee did not dispute that the witness was not qualified to testify as an expert. V.Z., 678 N.E.2d at 1078.

The defect in the instant State's argument is the same as the flaw in the judge's ruling below. (R. L40) The State asserts that defendant has failed to show that Siegesmund "had sufficient knowledge or training in the fields for which he was being tendered." (St. Br. 34) The courts have repeatedly reaffirmed that an expert is a person who has knowledge beyond that of an average person. Here, the record reflects that Dr. Siegesmund had knowledge beyond that of an average person in the fields of luminol testing and blood splatter and should have been permitted to testify as an expert witness.

### Not Allowing Dr. Siegesmund to Testify Denied Defendant a Fair Trial

The State does not address this portion of defendant's argument. Where the judge precluded defendant from rebutting the State's expert witnesses, the instant error was not harmless beyond a reasonable doubt and thus the cause must be remanded for a new trial.

**II.     The Court Erred in Allowing Mitch Rea to Testify as an Expert for the State in Luminol Testing Where Rea Had Never Taken a College Level Chemistry Course, Did Not Know How to Perform a Confirmatory Test to Determine Whether the Substance That Luminesced Was in Fact Blood, and Did Not Make the Chemical Luminol Mixture Himself but Obtained Pre-Packaged Chemicals from a Private Chemist.**

The State has two responses to defendant's argument: 1] defendant cannot raise a complaint on appeal that is inconsistent with his defense at trial; and 2] practical experience qualified Mitch Rea as an expert. The State's argument fails on both accounts.

Defendant's theory of defense was not inconsistent. The defense agreed that there was blood on defendant's jacket and on the knee area of defendant's pants. The defense argued that the blood on the jacket and the blood on defendant's knee were transfer stains. (R. L95-L96, L103) In contrast to the defendant's theory, the State contended that the blood stains on defendant's clothing were the result of an attack on decedent. (R. L95-L96)

The State asserts that defendant is improperly changing his entire theory of defense on appeal. (St. Br. 38) A pivotal issue for the jury to resolve was whether that was "splatter" on the pants found in defendant's trunk and on defendant's jacket. When the court ruled that Dr. Siegesmund could not testify in opposition to State's witness Englert on the subject of "splatter," defendant subsequently was forced to argue that any blood splatter found on defendant's jacket and on the pants found in the trunk of defendant's car were a result of fistfights and not from any attack on decedent. (R. L96) Further, even if defendant had inconsistent theories of defense, a

defendant is permitted to present alternative theories of defense. See People v. Jersky, 377 Ill. 261, 36 N.E.2d 347, 350 (1941) (in finding no error in submitting jury instructions on inconsistent defenses, court ruled that defendant "had a right, of course, to present as many defenses as he had.")

Addressing the merits of defendant's argument, the State, in three sentences, contend that Rea's "extensive work experience qualified him as an expert in the field of luminol." (St. Br. 39) The State fails to address the fact that since the luminol chemical is not completely specific for blood, confirmatory testing is required and that Rea conceded that he did not know how to perform any confirmatory testing. (R. K24; K40) Rea, who was not a serologist, had only taken a "very basic" biology class "long ago" but no a chemistry course. (R. K21) Experience with applying luminol is of little worth when there is no assurance that the luminating substance is in fact blood. To determine whether an area that luminesces is blood or another substance, further testing is required. Lytle, "Chemiluminescense in the Visualization of Forensic Bloodstains," 23 Journal of Forensic Sciences 550, 554 (July 1978); (Def. Br. 39). Rea had no knowledge of how to perform any confirmatory tests.

The State alternatively alleges that defendant has waived the issue. (St. Br. 37) Defendant objected at trial. (R. K26) Although the error was not included in defendant's post-trial motion, due to the gravity of the error, this Court can review the error under the plain error doctrine. Supreme Court Rule 615. (Def. Br. 39)

Rea's testimony was pivotal to the State's case. Without Rea's testimony, Englert would have had no basis for his testimony. The foundation of Englert's testimony was that the areas that glowed were blood. (R. K122) The State commented extensively in closing argument about

defendant's pants and jacket and the testing that was performed on the clothing. (R.L84, L112-114) Where the substance that luminated on defendant's clothing formed the cornerstone of the State's theory of prosecution, the error in allowing Mitch Rea to testify as an expert denied defendant a fair trial. Consequently, the cause must be remanded for a new trial.

**III. Where the Crux of Defendant's Case Was That Any "Blood Splatter" Was a Result of Defendant Having Been in Fist Fights Rather than by Any Alleged Attack on Decedent, the Judge Erred in Not Allowing Defendant to Present Evidence That Defendant's Girlfriend Had Been with Defendant on Several Occasions When Defendant Had Being Wearing His Quilted Coat While Fighting and the Other Person Had Bled.**

The State asserts that Pam Hines' testimony was speculative as it was not known who was involved in the fights, whose blood was shed, when the fights were, or whether defendant's jacket was stained as a result of the fights. (St. Br. 43) Defense counsel was precluded from establishing the groundwork for Hines' testimony. Responding to the court's comment that the fights were "too remote," defense counsel stated that he could not get past the first question to lay a foundation. (R. K154-155, K168-169) Knowing who besides defendant was involved in the fights and whose blood was shed, was not necessary. Defendant was attempting to establish that any blood that had been splattered on defendant's jacket was a result of having been engaged in fist fights where someone bled, and not because of any attack on decedent.

The State contends that since defendant did not possess a large quantity of clothing, and that defendant "apparently did not want to wear dirty clothing," defendant would have washed the jacket when the opportunity arose. (St. Br. 43-44) The evidence establishes that defendant had more than one pair of pants. (R. K260) There is nothing in the record to establish that defendant had more than one jacket to wear if the quilted jacket was been laundered. In fact, the evidence all pointed to the fact that defendant had only one jacket in his self-styled "dress code."

The State argues that the error was harmless since defendant himself presented testimony of other more recent altercations. Defendant, in the jury's eyes, had a motivation to lie in order to avoid conviction. In fact, the prosecution in closing argument, contended that defendant was a liar and his testimony was untruthful. (R. L112) The prosecutor argued: "That's what he did and you saw him lying right before you on the witness stand." (R. L112) Hines, however, had no current connection with defendant and had not even seen defendant for over seven years. The jury would have more likely credited Ms. Hines' testimony as she had no motivation to lie. Her testimony, thus, would not only have corroborated defendant's testimony but itself would have presented the jury with an alternative to the State's theory of prosecution. The error was not harmless beyond a reasonable doubt and defendant must be given a new trial.

Pam Hines' testimony was critical to rebut the State's theory that the blood on defendant's coat was a result of defendant having attacked and killed decedent. Defendant attempted to establish that any blood that had been splattered on defendant's coat was a result of having been engaged in fist fights where blood was present, and not because of any attack on decedent. There was justification for precluding defendant from exercising his constitutional right to present a his defense. Where the court refused to allow defendant to present Hines' testimony concerning the fist fights and resulting blood, defendant was denied his right to a fair trial.

IV.     **Defendant's Constitutional Right to a Speedy Trial Was Denied Where Over Three and One Half Years Elapsed Between Reversal of Defendant's Murder Conviction and His Second Trial and Where He Was Not Responsible for a Bulk of the Delay.**

The State argues that defendant for the first time on appeal is raising the issue of a constitutional speedy trial violation. (St. Br. 47) The State's position is erroneous. In November of 1994, defendant filed a pro se motion to dismiss charges based upon constitutional and statutory speedy trial violations. (C. 271-276) In November of 1996, defense counsel moved to dismiss charges based upon the violation of his constitutional right to a speedy trial. (C. 199-215) The State asserts that the copy of the motion to dismiss and memorandum of law contained within the common-law record are not file-stamped. (St. Br. 47) The report of proceedings reflect that defense counsel filed the motion and the court ruled on it. (R. H4)[1] The State, in its argument, accepts that in November of 1996, "defendant submitted a Motion to Dismiss based upon his claim that his right to a speedy trial was denied." (St. Br. 55) Defendant also included the denial of his constitutional right to a speedy trial in his motion for new trial. (C. 294) Defendant has not waived the issue. (St. Br. 47)

The State argues that the error should not be reviewed de novo but the State does suggest what the appropriate standard should be. (St. Br. 48) Where there are no factual issues in dispute, and only issues of law need be addressed, de novo review is warranted. See People v. Williams, ___Ill. 2d ___, ___N.E.2d ___, No. 86710 (Nov. 18, 1999) (in discussing standard review

---

[1] Appellate counsel has obtained a filed-stamped copy of defendant's "Memorandum in Support of Defendant's Motion to Dismiss," (filed November 18, 1996), and will move to have it be made a supplemental record on appeal.

-12-

for reviewing motion in limine ruling, Court holds that "where the question presented is one of law, a reviewing court determines it independently of the trial court's judgment.")

The State contends that defense counsel was not in a trial posture at the time defendant made his claims for a speedy trial. (St. Br. 48) Defense counsel had to wait eight months from the time defendant's case was reversed and remanded to obtain the trial transcripts. From November of 1993, until, at least, October, 1995, the State was in the process of procuring expert testimony and having DNA testing done. The minimal two-year-long delay in the State's effort to procure more evidence against defendant was not due to defendant; thus, the lengthy delay must be weighed heavily against the State.

The State's citation to People v. Mitchell, 95 Ill. App. 3d 779, 420 N.E.2d 415 (1st Dist. 1981), is misplaced. In Mitchell, the court held that based on "the peculiar facts of the case, including the out-of-State conviction of defendant, the lengthy interlocutory appeal, and defendant's own dilatory actions preclude a finding of a violation of the constitutional speedy-trial protection." Mitchell, 420 N.E.2d 423. In the case at bar, it was the State who was not ready to proceed and who was delaying trial to obtain additional evidence against defendant.

The State concedes that "the record establishes that DNA testing was the cause for the delay." (St. Br. 53) Further, the State acknowledges that defense counsel could not prepare for trial until obtaining the DNA results. (St. Br. 50) The flaw in the State's argument is that it was not the defendant who was seeking to have DNA testing done but the State. The State was the party who was continuing the cause, month after month, to have the DNA testing done. As the State concedes, defense counsel could not know what needed to be rebutted or how to prepare its defense until after the State completed its testing. (St. Br. 52, 53-54)

-13-

Defendant was merely reacting to the State's prosecutorial tact of attempting to obtain additional evidence against defendant. Had the State not had DNA testing done, defendant would have had nothing to have to rebut and would have been ready for trial. The complexion of the trial clearly changes if, and when, the State obtains new evidence against defendant. The State cannot blame defendant for not being prepared when the State was the reason for defendant's inability to complete its preparations for trial.

The State argues that the prosecution's DNA tests would have been more prompt had the defense complied with the court's order to turn over the results of DNA tests from the first trial. (St. Br. 54) In November of 1993, the State began asking for continuances in order to secure additional evidence against defendant. In March of 1995, the State filed a written motion asking that defendant produce DNA documentation done at the time of defendant's first trial. (S.R. 84) The defendant's DNA laboratory, Cellmark, did not document any results. (S.R. 400) The State could have simply had DNA testing done without defendant. Defense counsel advised the court that "there's no reason why [the State] shouldn't be able to do the testing and [obtain] their own results." (S.R. 102)

The State argues that it was to defendant's advantage to wait and see what the DNA tests proved. (St. Br. 57) The State's position is without support. At defendant's first trial, defendant had already testified that he picked up a bag found in decedent's yard and carried it to his trunk, thus, explaining how he could have come to have gotten decedent's blood on his clothing. Additionally, it should be noted that defense counsel from defendant's first trial contacted Cellmark for DNA testing and no conclusive findings were made. (S.R. 91) Notably, on retrial, defendant was not the party asking that the cause be continued in order to conduct DNA testing.

Defendant was tried once without DNA evidence. In fact, DNA evidence was not introduced at defendant's second trial. Serologist Pam Fish testified that the results of her D.N.A. tests on defendant's jacket were inconclusive and the sample from defendant's pants was too small and degraded to test. (R. J163) Contrary to the State's position on appeal, obtaining DNA results worked to the prosecutions's advantage not defendant's.

Further, it must be stressed that the State was not merely asking for more time to obtain DNA testing but also to secure a blood splatter expert. Rodney Englert examined the physical evidence in March of 1994. (R. K68) Mitchell Rea examined the physical evidence in May of 1994. (R. K26) There would be no tactical advantage for defense counsel to elect to wait in order to obtain blood splatter results. Blood splatter evidence, rather than transfer stains, would not likely benefit defendant.

The State asserts that there is not "one single 'motion state' date in the record." (St. Br. 51) The fact that "defense counsel agreed to every continuance" is of no consequence. (St. Br. 53) Defendant is raising a constitutional speedy trial violation. The lengthy delay in the instant case resulted in a violation of defendant's constitutional right to a speedy trial.

The State contends that People v. Crane, __ Ill. App. 3d __, 719 N.E.2d 138 (1st Dist. 1999), is inapposite to the case at bar. (St. Br. 53) Although Crane involved delay in issuing a mandate for retrial, the Crane Court reaffirmed that the "State's Attorney is responsible for bringing a defendant to retrial," and that "the courts must retry withing a reasonable time any defendant subject to a second trial for an offense." Crane, 719 N.E.2d at 141.

The State contends that "since the length of time between the trial and the issue of the mandate were attributable to defendant, the delay was not presumptively prejudicial." (St. Br.

-15-

53) The delay was not attributable to defendant but to the prosecution and their attempt to secure additional evidence to be used against defendant at retrial. In Crane, the court found that prejudice can be presumed from a 26 month time period. The Crane Court also emphasized that because defendant remained incarcerated throughout the delay, defendant suffered substantial prejudice. Crane, 719 N.E.2d at 142. Likewise, here two defendant was prejudiced.

Asserting that defendant "went through six attorneys prior to trial," the State contends that defense counsel would not have been prepared for trial regardless of the DNA results. (St. Br. 54) The number of attorneys during the 44 month delay between reversal and retrial is of no consequence. A number of the attorneys would have been ready for trial, but for the State not having completed discovery with the DNA tests. (C. 259, 284) A reason in part why defendant "went through" more than one attorney was simply due to attrition from the public defender's office based upon the lengthy time lapse. (C. 289) Further, preparing for retrial would not be as difficult as preparing for a new trial since defense counsel would have the testimony of the witnesses from the first trial and the rulings made on pre-trial motions.

Arguing that "delay in trial" is a common defense tactic, the State intimates that defendant was in no hurry to go to trial. (St. Br. 55) The State's contention is refuted by the record. Defendant told the court on several occasions that he desired trial and the court noted that defendant was anxious to get the trial underway. (S.R. II 68) The State insists that "defense counsel after defense counsel" did not file "a motion to dismiss due to the fact that they needed the DNA tests to prepare for trial." (St. Br. 56) Defense counsel did not need "DNA tests" to prepare for trial, defense counsel needed completed discovery, which included the State's DNA results since the State was going ahead with DNA testing, to conclude their trial preparations.

-16-

The State contends that "the anxiety factor" is less significant and therefore less prejudicial because defendant was being retried. In <u>Crane</u>, the court noted that defendant suffered substantial prejudice because he remained incarcerated throughout the delay. <u>Crane</u>, 719 N.E.2d at 742. Here, defendant was out on bond for only a very brief period. Defendant's incarceration for the majority of the 44 month period resulted in substantial prejudice.

The lengthy delay in the instant case resulted in a violation of defendant's constitutional right to a speedy trial, and thus defendant's conviction must be reversed.

## CONCLUSION

For the foregoing reasons, Henry Kaczmarek, Defendant-Appellant, respectfully requests that this Court reverse his murder conviction or in the alternative remand for a new trial.

Respectfully submitted,

MICHAEL J. PELLETIER
Deputy Defender

DEBRA R. SALINGER
Assistant Appellate Defender
Office of the State Appellate Defender
James R. Thompson Center
100 West Randolph Street - Suite 5-500
Chicago, Illinois  60601
(312) 814-5472

COUNSEL FOR DEFENDANT-APPELLANT