IN THE
UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

KC FILED
JAN 18 2008
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA<br>ex rel. HENRY KACZMAREK, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | No. 07 C 6126 |
| | ) | |
| DONALD HULICK, Warden,<br>Menard Correctional Center, | ) | |
| | ) | The Honorable |
| | ) | Wayne R. Andersen, |
| Respondent. | ) | Judge Presiding. |

## TO THE CLERK OF THE UNITED STATES DISTRICT COURT

Pursuant to Rule 5 of the Rules Governing Section 2254 Cases in the United States District Courts, the attached Exhibits to respondent's Answer to the above-captioned Petition for Writ of Habeas Corpus are hereby filed with this Court:

Exhibit A:   *People v. Kaczmarek*, No. 1-97-2557, 741 N.E.2d 1131 (2000);

Exhibit B:   State's Brief, *People v. Kaczmarek*, No. 90865;

Exhibit C:   Petitioner's Response and Cross-Brief, *People v. Kaczmarek*, No. 90865;

Exhibit D:   State's Reply Brief and Cross-Response, *People v. Kaczmarek*, No. 90865;

Exhibit E:    Petitioner's Cross-Reply Brief, *People v. Kaczmarek*, No. 90865;

Exhibit F:    *People v. Kaczmarek*, 798 N.E.2d 713 (Ill. 2003);

Exhibit G:    *Kaczmarek v. Illinois*, 540 U.S. 1199 (2004);

Exhibit H:    Postconviction petition, *People v. Kaczmarek*, No. 87 CR 6131, Circuit Court of Cook County;

Exhibit I:    Petitioner's Brief, *People v. Kaczmarek*, No. 1-04-2401;

Exhibit J:    State's Brief, *People v. Kaczmarek*, No. 1-04-2401;

Exhibit K:    Petitioner's Reply, *People v. Kaczmarek*, No. 1-04-2401;

Exhibit L    Rule 23 Order, *People v. Kaczmarek*, No. 1-04-2401 (Ill.App. 2006);

Exhibit M:    PLA, *People v. Kaczmarek*, No. 104184;

Exhibit N:    Order Denying PLA, *People v. Kaczmarek*, No. 104184;

Exhibit O:    Petitioner's Brief, *People v. Kaczmarek*, No. 97-2557;

Exhibit P:    State's Brief, *People v. Kaczmarek*, No. 97-2557; and

Exhibit Q:    Petitioner's Reply Brief, *People v. Kaczmarek*, No. 97-2557.

January 18, 2008                           Respectfully submitted,

                                           LISA MADIGAN
                                           Attorney General of Illinois

                                By:        _____
                                           ERIC W. TRUETT, Bar # 6291213
                                           Assistant Attorney General
                                           100 W. Randolph Street, 12th Floor
                                           Chicago, Illinois 60601-3218
                                           PHONE: (312) 814-4684
                                           FAX: (312) 814-2253
                                           E-MAIL: etruett@atg.state.il.us

Westlaw.

318 Ill.App.3d 340, 741 N.E.2d 1131, 251 Ill.Dec. 953
**(Cite as: 318 Ill.App.3d 340, 741 N.E.2d 1131)**

►
People v. Kaczmarek
Ill.App. 1 Dist.,2000.

Appellate Court of Illinois,First District, Third
Division.
The PEOPLE of the State of Illinois,
Plaintiff-Appellee,
v.
HenryKACZMAREK, Defendant-Appellant.
No. 1-97-2557.

Dec. 27, 2000.

Defendant was convicted in the Circuit Court, Cook
County, Michael B. Getty, J., of murder, residential
burglary, home invasion, and armed robbery, and he
appealed. The Appellate Court, Cerda, J., 243
Ill.App.3d 1067, 184 Ill.Dec. 661, 613 N.E.2d 1253,
reversed and remanded. Prior to retrial, defendant
moved to dismiss charges on speedy trial grounds.
After denying defendant's motion, the Circuit Court,
Cook County, John Brady, J., again convicted him
of murder and sentenced him to natural life
imprisonment, based upon finding that murder was
exceptionally brutal or heinous. Defendant
appealed. The Appellate Court, Cerda, J., held that:
(1) defendant did not waive appellate review of his
challenge to constitutionality of sentencing statute
by failing to raise such challenge in his original
appeal; (2) the United States Supreme Court
decision in *Apprendi v. New Jersey* applied
retroactively to defendant's appeal; (3) sentencing
statute whereby defendant's sentence was subject to
enhancement effectively created separate,
aggravated offense of murder; and (4) enhancement
of defendant's sentence based upon finding by trial
court violated defendant's constitutional right to
have aggravating factor treated as element of
underlying offense and presented to jury.

Affirmed in part, reversed in part, and remanded
with directions.
West Headnotes

**[1] Indictment and Information 210 ⬚113**

210 Indictment and Information
　　210V Requisites and Sufficiency of Accusation
　　　　210k113　k.　Matter　of　Aggravation　in
General. Most Cited Cases

**Jury 230 ⬚34(6)**

230 Jury
　　230II Right to Trial by Jury
　　　　230k30 Denial or Infringement of Right
　　　　　　230k34　Restriction　or　Invasion　of
Functions of Jury
　　　　　　230k34(5) Sentencing Matters
　　　　　　　　230k34(6)　k.　In　General.　Most
Cited Cases
　　(Formerly 230k24)
Accused criminal has the constitutional right to
have any statutory enhancement fact that, if found,
increases the penalty for a crime beyond the
prescribed maximum to be treated as an element of
the underlying offense, that is, charged in the
indictment and tried to the jury. U.S.C.A.
Const.Amends. 5, 6, 14.

**[2] Criminal Law 110 ⬚632(3.1)**

110 Criminal Law
　　110XX Trial
　　　　110XX(A) Preliminary Proceedings
　　　　　　110k632 Dockets and Pretrial Procedure
　　　　　　　　110k632(3) Motions
　　　　　　　　　　110k632(3.1)　k.　In　General.　Most
Cited Cases
As a general rule, parties may not argue new points
in a petition for rehearing.

**[3] Criminal Law 110 ⬚632(3.1)**

110 Criminal Law
　　110XX Trial
　　　　110XX(A) Preliminary Proceedings
　　　　　　110k632 Dockets and Pretrial Procedure

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

EXHIBIT A

741 N.E.2d 1131                                                                              Page 2

318 Ill.App.3d 340, 741 N.E.2d 1131, 251 Ill.Dec. 953
**(Cite as: 318 Ill.App.3d 340, 741 N.E.2d 1131)**

110k632(3) Motions
110k632(3.1) k. In General. Most Cited Cases
Exception to the general rule that parties may not argue new points in a petition for rehearing exists where the new matter raised attacks the constitutionality of a criminal statute; such challenges may be raised at any time, because it would be fundamentally unfair to uphold a criminal conviction pursuant to an unconstitutional statute.

**[4] Criminal Law 110 ⟜1180**

110 Criminal Law
110XXIV Review
110XXIV(T) Subsequent Appeals
110k1180 k. In General. Most Cited Cases
Murder defendant did not waive appellate review of his challenge to constitutionality of sentencing statute, pursuant to which he received enhanced natural life sentence based on a finding by the trial court, by failing to raise such challenge in his original appeal, where United States Supreme Court case on which defendant's challenge was based had not been released at time of defendant's original appeal and was not merely restatement of that Court's prior holdings. S.H.A. 730 ILCS 5/5-8-1.

**[5] Sentencing and Punishment 350H ⟜2275**

350H Sentencing and Punishment
350HXII Reconsideration and Modification of Sentence
350HXII(C) Proceedings
350HXII(C)1 In General
350Hk2274 Motion or Application
350Hk2275 k. In General. Most Cited Cases
Exception to the general rule that parties may not argue new points in a petition for rehearing for new matter attacking the constitutionality of a criminal statute applies to cases where a defendant attacks his sentence on the basis that it was imposed pursuant to an unconstitutional sentencing procedure.

**[6] Courts 106 ⟜100(1)**

106 Courts

106II Establishment, Organization, and Procedure
106II(H) Effect of Reversal or Overruling
106k100 In General
106k100(1) k. In General; Retroactive or Prospective Operation. Most Cited Cases
Judicial decision announcing a new constitutional rule applicable to criminal cases is to be applied retroactively to all cases pending on direct review at the time the new constitutional rule is declared.

**[7] Courts 106 ⟜100(1)**

106 Courts.
106II Establishment, Organization, and Procedure
106II(H) Effect of Reversal or Overruling
106k100 In General
106k100(1) k. In General; Retroactive or Prospective Operation. Most Cited Cases
For retroactivity of a judicial decision announcing a new constitutional rule applicable to criminal cases to be triggered, two factors must be present: (1) the case to which the new rule is to be applied was pending on direct review or was otherwise not final when the rule was declared; and (2) the rule to be applied retroactively is of constitutional dimension.

**[8] Courts 106 ⟜100(1)**

106 Courts
106II Establishment, Organization, and Procedure
106II(H) Effect of Reversal or Overruling
106k100 In General
106k100(1) k. In General; Retroactive or Prospective Operation. Most Cited Cases
The United States Supreme Court decision in Apprendi v. New Jersey, in which the Court held that an accused criminal has constitutional right to have any statutory enhancement fact that, if found, increases the penalty for crime beyond prescribed maximum to be charged in the indictment and tried to the jury, applied retroactively to defendant's appeal from murder conviction with respect to which he received, on rehearing, enhanced natural life sentence based upon trial court's finding that murder had been exceptionally brutal or heinous; defendant raised Apprendi challenge in timely filed

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

741 N.E.2d 1131                                                           Page 3

318 Ill.App.3d 340, 741 N.E.2d 1131, 251 Ill.Dec. 953
**(Cite as: 318 Ill.App.3d 340, 741 N.E.2d 1131)**

rehearing petition and at earliest possible opportunity, and rule announced in *Apprendi* was of constitutional dimension. S.H.A. 730 ILCS 5/5-8-1.

**[9] Courts 106 ⟜100(1)**

106 Courts
   106II Establishment, Organization, and Procedure
      106II(H) Effect of Reversal or Overruling
         106k100 In General
            106k100(1) k. In General; Retroactive or Prospective Operation. Most Cited Cases
Rule announced by the United States Supreme Court in *Apprendi v. New Jersey,* providing that an accused criminal has constitutional right to have any statutory enhancement fact that, if found, increases penalty for crime beyond prescribed maximum to be treated as element of underlying offense, that is, charged in the indictment and tried to the jury, was of constitutional dimensions, for purposes of determining whether the *Apprendi* decision was subject to retroactive application; decision itself stated that rule was grounded in the Fifth, Sixth and Fourteenth Amendments, and all discussion and analysis pertained to federal Constitutional issues rather than interpretation of state statute at issue or facts of case. U.S.C.A. Const.Amends. 5, 6, 14.

**[10] Homicide 203 ⟜1562**

203 Homicide
   203XIV Sentence and Punishment
      203k1561 Constitutional and Statutory Provisions
         203k1562 k. In General. Most Cited Cases
      (Formerly 203k358(3), 203k354(1))

**Indictment and Information 210 ⟜113**

210 Indictment and Information
   210V Requisites and Sufficiency of Accusation
      210k113 k. Matter of Aggravation in General. Most Cited Cases
Statutory sentencing range for first-degree murder was 20 to 40 years' imprisonment, as provided in first-degree murder statute in effect at time of defendant's conviction, rather than 20 years to life imprisonment or death, for purposes of determining whether separate sentencing statute whereby defendant's sentence was subject to enhancement to natural life imprisonment upon finding of aggravating factor effectively created separate, aggravated offense of murder; enhancement of sentence beyond 20- to 40-year range required finding of additional aggravating factors not contained in first-degree murder statute itself. S.H.A. 730 ILCS 5/5-8-1(a)(1)(a, b).

**[11] Indictment and Information 210 ⟜113**

210 Indictment and Information
   210V Requisites and Sufficiency of Accusation
      210k113 k. Matter of Aggravation in General. Most Cited Cases

**Jury 230 ⟜34(6)**

230 Jury
   230II Right to Trial by Jury
      230k30 Denial or Infringement of Right
         230k34 Restriction or Invasion of Functions of Jury
            230k34(5) Sentencing Matters
               230k34(6) k. In General. Most Cited Cases
      (Formerly 230k24)
Constitutional principle that an accused criminal has the right to have any statutory enhancement fact that, if found, increases the penalty for a crime beyond the prescribed maximum to be charged in the indictment and tried to the jury is limited to noncapital cases. U.S.C.A. Const.Amends. 5, 6, 14.

**[12] Indictment and Information 210 ⟜113**

210 Indictment and Information
   210V Requisites and Sufficiency of Accusation
      210k113 k. Matter of Aggravation in General. Most Cited Cases

**Jury 230 ⟜34(7)**

230 Jury
   230II Right to Trial by Jury
      230k30 Denial or Infringement of Right
         230k34 Restriction or Invasion of Functions of Jury

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

741 N.E.2d 1131    Page 4

318 Ill.App.3d 340, 741 N.E.2d 1131, 251 Ill.Dec. 953
**(Cite as: 318 Ill.App.3d 340, 741 N.E.2d 1131)**

230k34(5) Sentencing Matters
230k34(7) k. Particular Cases in General. Most Cited Cases
(Formerly 230k24)

Highest theoretical punishment for first-degree murder, death or life imprisonment, was not the " statutory maximum" for purposes of rule entitling defendant to have statutory enhancement fact, effect of which was to increase penalty for first-degree murder beyond statutory maximum, charged in the indictment and tried to the jury. S.H.A. 730 ILCS 5/5-8-1(a)(1)(b).

**[13] Criminal Law 110 ☞796**

110 Criminal Law
110XX Trial
110XX(G) Instructions: Necessity, Requisites, and Sufficiency
110k796 k. Punishment. Most Cited Cases
(Formerly 203k311)

**Indictment and Information 210 ☞113**

210 Indictment and Information
210V Requisites and Sufficiency of Accusation
210k113 k. Matter of Aggravation in General. Most Cited Cases

**Jury 230 ☞34(7)**

230 Jury
230II Right to Trial by Jury
230k30 Denial or Infringement of Right
230k34 Restriction or Invasion of Functions of Jury
230k34(5) Sentencing Matters
230k34(7) k. Particular Cases in General. Most Cited Cases
(Formerly 230k24)

Sentencing statute whereby defendant's sentence for first-degree murder was subject to enhancement to natural life imprisonment upon finding that murder was accompanied by "exceptionally brutal or heinous behavior indicative of wanton cruelty" required additional factual determination, effectively creating separate, aggravated offense of murder, and entitling defendant to have aggravating factor presented to and found by a jury. S.H.A. 730

ILCS 5/5-8-1(a)(1)(b).

**[14] Homicide 203 ☞540**

203 Homicide
203II Murder
203k539 First Degree, Capital, or Aggravated Murder
203k540 k. In General. Most Cited Cases
(Formerly 203k22(1))

"Exceptionally brutal or heinous" aggravating circumstance applicable to first-degree murder charge is most accurately characterized for constitutional purposes as an element of a greater crime, rather than a mere factor to be considered at sentencing. S.H.A. 730 ILCS 5/5-8-1(a)(1)(b).

**[15] Indictment and Information 210 ☞113**

210 Indictment and Information
210V Requisites and Sufficiency of Accusation
210k113 k. Matter of Aggravation in General. Most Cited Cases

**Sentencing and Punishment 350H ☞322**

350H Sentencing and Punishment
350HIII Sentencing Proceedings in General
350HIII(F) Evidence
350Hk322 k. Degree of Proof. Most Cited Cases

If the state wishes to seek an enhanced sentence for murder on the grounds that the offense was " exceptionally brutal or heinous," it must allege that factual circumstance in the relevant charging instrument and prove it to a jury beyond a reasonable doubt. S.H.A. 730 ILCS 5/5-8-1(a)(1)(b).

**[16] Indictment and Information 210 ☞113**

210 Indictment and Information
210V Requisites and Sufficiency of Accusation
210k113 k. Matter of Aggravation in General. Most Cited Cases

**Jury 230 ☞31.3(1)**

230 Jury

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

741 N.E.2d 1131                                                                                                    Page 5

318 Ill.App.3d 340, 741 N.E.2d 1131, 251 Ill.Dec. 953
**(Cite as: 318 Ill.App.3d 340, 741 N.E.2d 1131)**

230II Right to Trial by Jury
    230k30 Denial or Infringement of Right
      230k31.3 Practice and Procedure in
Criminal Cases
        230k31.3(1) k. In General. Most Cited
Cases
Enhancement of defendant's sentence for
first-degree murder to natural life imprisonment
upon finding by trial court that murder was
accompanied by "exceptionally brutal or heinous
behavior indicative of wanton cruelty" violated
defendant's constitutional right to have aggravating
factor treated as element of underlying offense,
charged in indictment and presented to jury, where
jury had not been required to find, and did not
specifically find, that defendant's conduct
accompanying victim's murder was exceptionally
brutal or heinous. U.S.C.A. Const.Amends. 5, 6, 14
; S.H.A. 730 ILCS 5/5-8-1(a)(1)(b).
West     CodenotesHeld     Unconstitutional
Ill.Rev.Stat.1985, ch. 38, par. 1005-8-1(a)(1)(b)

**\*\*1134 \*\*\*956 \*340** Michael J. Pelletier, Deputy
Defender, Debra R. Salinger, Assistant Appellate
Defender, Chicago, for Appellant.
\*341 Richard A. Devine, State's Attorney, Chicago (
Renee Goldfarb; Alan J. Spellberg and Christine
Cook, of counsel), for Appellee.

### OPINION ON DENIAL OF REHEARING
Justice CERDA delivered the opinion of the court:
Following a jury trial in July 1989, defendant,
**Henry Kaczmarek**, was convicted of murder,
residential burglary, home invasion, and armed
robbery and was sentenced to a term of natural life
imprisonment on the murder conviction.
Defendant appealed, and on March 31, 1993, this
court reversed the murder conviction and remanded
for a new trial.[FN1] *People v. Kaczmarek*, 243
Ill.App.3d 1067, 1082, 184 Ill.Dec. 661, 613
N.E.2d 1253, 1264 (1993)(*Kaczmarek I*).

> FN1. Defendant also challenged his
> convictions for burglary, home invasion
> and armed robbery on the basis of
> insufficient evidence. Because no
> sentence was imposed on these verdicts,
> this court dismissed defendant's appeals for

want of finality. *Kaczmarek I,* 243
Ill.App.3d at 1082, 184 Ill.Dec. 661, 613
N.E.2d at 1264.

Prior to the start of his second trial in November
1996, defendant unsuccessfully moved to dismiss
the State's charges on the grounds that his
constitutional and statutory rights to a speedy trial
had been violated. Following a retrial by jury,
defendant was again found guilty of murder and,
following a finding by the sentencing judge that the
victim's murder was "exceptionally brutal or
heinous," defendant received an enhanced term of
natural life in prison under section 5-8-1(a)(1)(b) of
the Unified Code of Corrections (Corrections Code)
(Ill.Rev.Stat.1985, ch. 38, par. 1005-8-1(a)(1)(b)).

Defendant appeals, arguing (1) the trial court erred
in denying his motion for speedy-trial dismissal of
the State's charges, and (2) he was denied a fair trial
when the court (a) accepted a State witness as an
expert in the area of chemical luminol testing and
interpretation; (b) refused to accept a defense
witness as an expert in the fields of luminol
interpretation and blood splatter analysis; and (c)
precluded the testimony of a defense witness
concerning certain physical altercations defendant
had been involved in with other individuals prior to
the victim's murder. Defendant additionally
challenges the validity of this life sentence, claiming
the penalty enhancing scheme provided by section
5-8-1(a)(1)(b) of the Corrections Code is
constitutionally infirm in light of in light of the
United States Supreme Court's recent decision in
**\*\*1135\*\*\*957***Apprendi v. New Jersey*, 530 U.S.
466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000).

For the following reasons, we reject, in an
unpublished portion of this opinion, defendant's
speedy trial and trial error claims and affirm
defendant's conviction for murder. However,
because the penalty **\*342** scheme set forth in
section 5-8-1(a)(1)(b) of the Corrections Code
offends the constitutional principles announced in
*Apprendi*, we vacate defendant's life sentence and
remand for resentencing.

**(The following material is nonpublishable under
Supreme Court Rule 23)**

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

741 N.E.2d 1131                                                    Page 6

318 Ill.App.3d 340, 741 N.E.2d 1131, 251 Ill.Dec. 953
**(Cite as: 318 Ill.App.3d 340, 741 N.E.2d 1131)**

## BACKGROUND

The relevant evidence presented at defendant's retrial establishes that in April 1987, the victim, 86-year old Millie Nielsen, lived on the first floor of a two-flat apartment building located at 3507 West Diversey Avenue in Chicago. Dan Lary, together with his then wife Margaret Fisher and Margaret's 19-year-old son John Fisher, lived on the second floor. Defendant had been living with the Larys for about a month after moving out of the house of his former girlfriend, Pamela Hines.

At about 10:30 p.m. on April 24, 1987, Margaret and John returned home after a night of bowling. At the time, Dan was passed out intoxicated on a living room couch while defendant was watching television. Margaret stated that defendant was wearing light-colored jeans, a flannel shirt, a blue quilted work jacket and construction boots. Margaret assisted Dan to bed, and then went to bed herself at about 11 p.m. Defendant continued to watch television in the living room.

According to John, defendant left the apartment at about 11:30 p.m. and returned at about midnight. Upon returning, defendant asked John if Dan was awake. John replied that Dan was sleeping, and defendant left, stating he had to go find his car.

At about 12:15 a.m. on April 25, the Larys' front doorbell rang. Margaret answered the door and discovered Dan's brother, Ron Lary, who asked if Dan was home. Because she did not want Ron in her apartment, Margaret responded no and went back to bed.

Margaret was again awakened by the front doorbell at about 2:00 a.m. When she answered the door, Margaret saw defendant who asked if Dan was available. Margaret told defendant that Dan was asleep, and defendant left.

From time to time, Ron slept on the back porch of his brother's apartment. In the early morning hours

of April 25, 1987, Ron went to Dan's back porch to sleep after a night of drinking at Patty's Lounge, a nearby bar. Shortly after 2:00 a.m., Ron observed defendant carrying a bag through the back yard toward his car, which was parked in the alley. According to Ron, defendant was wearing dark jeans and a dark jacket. Defendant placed the bag in the car's trunk and drove east down the alley.

Margaret awoke the morning of April 25 at about 7:00 a.m. and saw defendant sleeping on the living room couch. According to Margaret, defendant was wearing a clean pair of dark-colored jeans and a light-colored dress shirt. After making coffee, Margaret left for work at about 9:00 a.m.

At about 9:45 a.m., Ronald Sadlowski, a neighbor who helped Ms. Nielsen with errands and maintenance work around the building, noticed that the back porch door of Ms. Nielsen's kitchen was open and that the window of her kitchen pantry was broken. Sadlowski further discovered that Ms. Nielsen's car was still parked in the garage although she had a beauty appointment scheduled early that morning. Concerned about Ms. Nielsen's well-being, Sadlowski called the police.

In response to Sadlowski's call, Ross Marsala, an officer with the Chicago Police Department, and his partner arrived at Ms. Nielsen's apartment at about 10 a.m. After speaking briefly to Sadlowski, Officer Marsala proceeded to the back porch of the apartment and noticed several pieces of glass that had been broken from the pantry window. Officer Marsala entered the kitchen and observed spots of blood on the kitchen floor leading to a nearby bedroom. Officer Marsala further noticed blood spots on the bedroom door frame, and found a kitchen knife, which was bloodstained, on a small table immediately outside the bedroom.

Inside the bedroom, Officer Marsala found Ms. Nielsen lying in bed, face up in a pool of blood. Officer Marsala observed blood on the floor and walls near the bed. The bedroom, including the rest of the apartment, had been ransacked, and no signs of forced entry were readily apparent.

Robert Baike, a forensic investigator who processed

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

741 N.E.2d 1131 Page 7

318 Ill.App.3d 340, 741 N.E.2d 1131, 251 Ill.Dec. 953
**(Cite as: 318 Ill.App.3d 340, 741 N.E.2d 1131)**

the crime scene, obtained several blood samples from the kitchen floor. Baike did not observe any bloody footprints in the apartment.

After working for the day, Ron returned to Dan's apartment and spoke with the police, describing for them defendant's activity in the back of the house earlier that morning. Chicago police detectives, accompanied by Ron, then left the apartment in search of defendant.

The detectives found defendant early the next morning asleep in his car. Chicago Police Detective Jerome Bogucki approached the vehicle and requested defendant to exit. As defendant exited, Detective Bogucki observed blood stains on the right and left sleeves of defendant's quilted jacket. The detectives placed defendant under arrest and, upon obtaining defendant's written consent, they searched the trunk of the vehicle. In the trunk, the detectives found jewelry boxes, which appeared to be stained with blood, jewelry, serving plates and platters. The detectives also discovered a pair of blood-stained jeans and several tools, including a glass cutter.

Detective Bogucki submitted the jeans and jacket to the crime lab for testing. Bogucki further checked defendant's work boots but did not observe any appearance of blood. The other items found in the trunk were taken to Area 5 headquarters, where they were later identified by Ms. Nielsen's family members as belonging to the victim.

A subsequent medical examination of Ms. Nielsen's body by Dr. Michael Chambliss disclosed numerous external and internal injuries. An external exam revealed several abrasions, incises and bruises about Ms. Nielsen's upper body, including her head, chest and arms. Stab wounds were also found on Ms. Nielsen's left thigh, the left part of her groin, and right forearm. An internal exam revealed injuries indicative of manual strangulation, including hemorrhages of the larynx, tongue and esophagus, hemorrhaging of the membrane of the brain and a fractured larynx.

Due to the condition of the body, Dr. Chambliss opined Ms. Nielsen died between 11:30 p.m. on

April 24, 1987 and 2:30 a.m. on April 25, 1987. Dr. Chambliss concluded that Ms. Nielsen died as a result of manual strangulation with the contributing factors of blunt force injuries and stab wounds. Dr. Chambliss also stated that Ms. Nielsen could have died from the blunt force injuries.

Pamela Fish, an expert in electrophoresis, serology and DNA testing with the microanalysis unit of the Chicago Police Department, detailed the results of her examination conducted of the physical evidence back in 1987. Fish examined blood samples obtained from defendant, Ms. Nielsen, Ms. Nielsen's kitchen floor, and the knife found in the apartment. Fish also inspected the substances resembling blood found on defendant's jacket and jeans, and the jewelry boxes recovered from the trunk of defendant's vehicle. Fish determined that Ms. Nielsen had Type A blood and that defendant had Type B blood. Fish further determined that the substances taken from defendant's jeans and quilted jacket were human blood possessing Type A characteristics.

Fish additionally examined the blood samples to ascertain their particular genetic markers for purposes of making an identification. Fish testified that the blood found on the jeans and quilted jacket was consistent with Ms. Nielsen's blood and could not have come from defendant. In fact, according to Fish, all the enzymes from the blood taken from defendant's clothing was consistent with those found in Ms. Nielsen's blood.

With respect to the substances found on the kitchen floor, the knife and the jewelry box, Fish was able to determine that the substances were human blood, but due to the small quantity provided, she was unable to ascertain the particular blood type. Fish explained she attempted to perform DNA testing on the blood samples provided years after her 1987 testing, but that their small size and degraded nature made testing ineffective.

Mitch Rea was called by the State as an expert in luminol testing and interpretation. During *voir dire* examination of his qualifications, Rea stated he is an insurance fraud investigator who had previously worked over 26 years as a police officer with the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

741 N.E.2d 1131

318 Ill.App.3d 340, 741 N.E.2d 1131, 251 Ill.Dec. 953
**(Cite as: 318 Ill.App.3d 340, 741 N.E.2d 1131)**

Phoenix Police Department in Arizona. Of his time at the department, Rea spent ten years working as a detective in the homicide unit where he processed over an estimated 350 murder crime scenes. Rea has received training in crime scene investigation and specialized training in chemical blood detection involving luminol.

Rea has additionally attended and participated in numerous seminars dealing with luminol and luminol testing, has taught and trained other law enforcement officers in these fields, has conducted hundreds of experiments involving luminol, has participated in several workshops covering luminol testing, and has previously testified in court as a luminol expert.

Rea detailed the application and use of the luminol chemical as a detecting agent, and described its glowing effect when it reacts with particular substances, including blood. Rea acknowledged that luminol is not specific to blood and that it reacts with other substances, such as metals and cleansers.

Upon questioning by defense counsel, Rea acknowledged never being educated or trained in the field of chemistry. Rea further admitted that he does not perform any additional testing, like DNA analysis, to ensure the accuracy of results indicating the presence of blood.

Over defendant's objection, Rea was accepted by the court as an expert and testified that he performed luminol tests on defendant's quilted jacket in early 1994. Rea explained that an application of luminol to the right front panel of the jacket produced a bright luminance of several small spots. According to Rea, these luminances indicated the presence of blood. Rea further observed luminances about sections of the jacket which had been previously removed for Fish's examination, the right sleeve and cuff, and both the elbow region and back portion of the left sleeve. Rea stated that each of the foregoing luminances were consistent with the presence of blood. On cross-examination, Rea explained he did not perform any additional tests to confirm that the luminol reactions he observed were in fact reactions

to blood.

Rod Englert, an expert in crime scene reconstruction and blood splatter, described three different categories of blood splatter: low velocity splatter which result from drops of blood falling straight down; medium velocity splatter which results from blunt force trauma; and high velocity splatter which results from gunfire. With respect to medium velocity splatter, Englert explained that blood does not splatter on the first blow of force, and that regardless of the severity of the beating, very little blood gets on the offender although the scene may be terribly bloody. Englert explained that a minimal amount of blood would be found on the offender in such cases because the force is always directed away at the victim. Englert additionally discussed blood transfer stains, and explained that they occur when blood is swiped against someone or something.

Englert examined the physical evidence and photographs in the case and concluded that the blood on Ms. Nielsen's kitchen floor appeared smeared, indicative of a struggle in which someone bled. Englert stated that the absence of bloody shoe prints was not unusual given how quickly blood dries. Englert noted the blood on the kitchen wall immediately outside the bedroom represented classic medium velocity splatter suggestive of blunt force being inflicted upon the victim. Given the low angle of projection, Englert opined that Ms. Nielsen received numerous blows while on the kitchen floor.

Upon reviewing photos of defendant's jeans, Englert stated the blood on the left and right knee areas represented transfer stains, and not splatter. According to Englert, these stains were consistent with defendant coming into contact with the pool of blood surrounding the victim. As for the bottom of the pants, Englert observed several small specs of blood which in his opinion were consistent with medium velocity splatter. Englert specifically stated the transfer and splatter stains were not consistent with defendant picking up a bag having blood on it or with such a bag being placed on top of the clothing. Englert further stated the stains were not consistent with defendant kneeing another

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

318 Ill.App.3d 340, 741 N.E.2d 1131, 251 Ill.Dec. 953
**(Cite as: 318 Ill.App.3d 340, 741 N.E.2d 1131)**

person in the nose.

In examining photographs of the luminol testing performed on defendant's jacket by Rea, Englert stated the stains on the right and left sleeves and on the front of the jacket represented medium velocity splatter. Englert also observed transfer stains on the back of the sleeves and on the right front pocket.

In Englert's opinion, Ms. Nielsen was first attacked in the kitchen, near the entry of the bedroom, where she received numerous blows while on the floor. Englert believed the blood splatters on the bottom of defendant's pants occurred at this time. Ms. Nielsen, struggling to break free, was then taken to the bedroom and thrown on the bed where she was attacked again and ultimately killed. According to Englert, the bleeding represented by the amount of blood found in the bed would have occurred after Ms. Nielsen had died. Englert opined the physical evidence he examined was consistent with the person causing the death of the victim.

On cross-examination, Englert knew during his examination of defendant's pants and jacket that the substance present on the clothing has human blood, but presumed that the blood was that of Ms. Nielsen. Englert acknowledged that medium velocity splatter could very possibly occur during a fist fight, but explained that the medium splatter found in the case was consistent with Ms. Nielsen's attack. Englert additionally stated that, in attacks similar to that on Ms. Nielsen, blood may or may not get on the attacker's shoes.

After the State rested, defendant testified that in April 1987 he was unemployed and temporarily living with the Larys after moving out of his ex-girlfriend's house about a month earlier. Defendant stated he had been involved in three fights on the Wednesday prior to Ms. Nielsen's murder. Two of these fights involved friends Tom Szeszol and Bill Henderson, while the other involved an unidentified man who was attempting to break into defendant's car. In the former fight, defendant stated he sustained two cuts to his hand which bled, that Szeszol bled from his mouth and nose, and that Henderson also bled from his mouth. In the latter fight, defendant stated he hit the man

three or four times in the face and kneed him in the nose, causing the man to bleed. Defendant intimated that in all three fights he was wearing his blue quilted jacket; indeed, according to defendant, he had been in several fights while wearing his jacket.

In the afternoon of April 24, 1987, defendant and Dan, after spending the morning drinking, went to Szeszol's apartment to clean laundry, including defendant's jeans which had blood on them. Defendant was able to wash every article of clothing except his jeans before leaving. Defendant explained he wanted to soak his jeans before washing them, but was directed by Szeszol to leave the apartment before he had the opportunity to do so. Defendant was further unable to wash his quilted jacket. Upon leaving, defendant threw his clothing, including the jeans, into the trunk of his car. Defendant drove Dan to his apartment and then went to a nearby tavern to drink.

Defendant left the bar about 6:30 p.m. and, after buying a case of beer, went to Dan's apartment. Defendant and Dan drank together until about 11:45 p.m. when defendant left and went to a bar down the street. After having a couple of drinks, defendant went to another bar, Our Place. At about 2:00 a.m., defendant left and went to the Lary's apartment to see if Dan wanted to get some drinks.

Upon returning to the Larys, defendant parked his car in the alley behind the building to urinate. When he exited the vehicle, defendant heard a noise, like that of a door closing. Henry approached the house, but saw no one. As he urinated, defendant noticed a bag on the side of the house. Defendant looked inside and found a box of silverware. Defendant picked up the bag and carried it to his car where he placed it in the trunk. Defendant drove his car to the front of the house and went to see if Dan was awake.

After being told by Margaret that Dan was sleeping, defendant left and returned to the Our Place tavern. Defendant drank at the bar until about 4:00 a.m., and after dropping off two friends, he returned to the Lary's apartment and fell asleep on the living room couch.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

741 N.E.2d 1131　　　　　　　　　　　　　　　　　　　　　　　　　　　　Page 10

318 Ill.App.3d 340, 741 N.E.2d 1131, 251 Ill.Dec. 953
**(Cite as: 318 Ill.App.3d 340, 741 N.E.2d 1131)**

Defendant awoke at about 8:00 a.m. on April 25, and later that morning he and Dan drove to the house of a friend, Bill Brown, in Melrose Park. Before entering Brown's house, defendant decided to look in the bag he had discovered earlier that morning. Defendant removed the bag's contents and noticed that some of the items were bloody. Defendant kept some items and disposed of others, including a bloody pillow case, in a dumpster. Defendant sold the items he kept to Brown for $60, and then drove Dan back to his apartment.

Defendant was ultimately arrested by the police early the next morning as he slept in his car. Defendant maintained his innocence and denied any responsibility in both the break-in of the Ms. Nielsen's apartment and in the victim's death.

Hines, defendant's former girlfriend, testified that defendant moved out of her apartment about a month before Ms. Nielsen's murder, and she acknowledged not seeing defendant during that period. Hines identified the quilted jacket recovered by police as belonging to defendant, and indicated that defendant wore the jacket every day.

During direct examination, defense counsel attempted to elicit testimony that Hines had witnessed defendant's involvement in numerous fights in which he was wearing his quilted jacket and where one of the participants had bled. However, the State successfully moved the court to bar this testimony.

In an offer of proof, defense counsel stated Hines would have testified that she was present with defendant on about seven or eight occasions when defendant was involved in a physical altercation with others; that defendant was wearing his quilted jacket on each of these occasions; and that one or more of the participants involved had bled. In response to counsel's offer, the court noted that Hines was never asked when these alleged fights occurred and, on that basis, concluded her testimony was too remote to be relevant.

To rebut the testimonies of Rea and Englert, the defense offered Dr. Kenneth Siegusmund as an expert in the fields of luminol processing and blood

splatter analysis. During *voir dire*, Dr. Siegusmund testified he holds a Ph.D. and B.S. in biology and an undergraduate minor in chemistry. As his primary employ, Dr. Siegesmund works in the Department of Anatomy at the Medical College of Wisconsin developing a scientific instrument used in the field of immunology. The doctor admitted that this work is unrelated to the forensic science field. Previously, Dr. Siegesmund worked in the Department of Biology at Marquette University in Milwaukee. Dr. Siegesmund additionally teaches a general forensic sciences course at a local university, and has given lectures in the field to law enforcement personnel. Dr. Siegesmund holds memberships in the American Academy of Forensic Scientists, the Midwest American Association of Anatomy, the Neuroloectic Society of America, and the American Association for the Advancement of Science.

Dr. Siegesmund has performed luminol testing well over a hundred times, and was "familiar" with the study of blood splatter. Dr. Siegesmund indicated that he had been qualified in court as an expert in forensic sciences about 250 times, and specifically as a blood splatter expert about 20 times. Dr. Siegesmund did not indicate whether he had ever been previously accepted as an expert in luminol application or testing.

On cross-examination, the State initially went to great lengths to undermine Dr. Siegesmund's credibility. When asked whether any court in Cook County had found him unqualified as an expert in any field, Dr. Siegesmund replied "I don't believe so," that "[t]here may have been a case where I wasn't qualified in a certain area but not with respect to the entire testimony that I gave." The prosecutor then demonstrated that the doctor could not remember being disqualified as a crime reconstruction expert in an unrelated criminal trial and as a ballistics expert in a federal civil case. The prosecutor further elicited testimony from the doctor that he could not remember giving certain testimony in those proceedings.

Dr. Siegesmund described himself as an expert in, among other areas, crime scene reconstruction, blood splatter, blood identification and luminol

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

741 N.E.2d 1131　　　　　　　　　　　　　　　　　　　　　　　　　　　Page 11

318 Ill.App.3d 340, 741 N.E.2d 1131, 251 Ill.Dec. 953
**(Cite as: 318 Ill.App.3d 340, 741 N.E.2d 1131)**

testing. The doctor has never taken a course in crime scene reconstruction and has never been to a crime scene under investigation. Dr. Siegesmund has never had any formal training in crime scene processing or in techniques of physical evidence collection. His only exposure in this area has been through yearly, one-week seminars held by the American Academy of Forensic Scientists. Dr. Siegesmund believed he last attended such a conference in 1994, but was not sure. The prosecutor questioned Dr. Siegesmund further in this regard, noting for the doctor that he had previously testified in a 1996 criminal case indicating that he did not attend an Academy conference in 1994. The doctor could not recall making that statement.

Dr. Siegesmund stated he had conducted work at the Glendale Crime Lab in Wisconsin. Dr. Siegesmund denied that the Glendale Lab had not performed forensic work for ten years, and believed that the lab was still operating. The prosecutor then confronted Dr. Siegesmund with testimony he had given earlier that year in an unrelated criminal prosecution where he had stated that the Glendale Lab had not conducted forensic work since 1986. Dr. Siegesmund could not recall making that statement.

Dr. Siegesmund has not received any formal forensic training. Dr. Siegesmund explained his training in the area comes from attending the yearly conferences held by the Academy and from reading a monthly Academy publication and text books on the subject.

With respect to luminol processing, Dr. Siegesmund has never received any training from the police or FBI, has never taken any course teaching luminol application at a crime scene, and has never performed any luminol testing for a crime lab. Dr. Siegesmund stated he last performed an experiment using luminol sometime in late October 1996, about three weeks prior to the start of defendant's retrial.

Dr. Siegesmund has never received any formal training in blood splatter analysis, has never performed such work in a crime lab, and has not written any articles on the subject. His knowledge

of blood splatter comes from attending the Academy conferences and through reading text books. The doctor has performed numerous experiments involving blood splatter in connection with his forensic science lectures given to law enforcement officers. When asked by the prosecutor if he had ever received any training on how to conduct such experiments, Dr. Siegesmund indicated no, responding he was the teacher and that he did not take courses from the officers. Further, when asked if it was sensible to learn how to conduct the experiments before he taught them, the doctor replied that he is a scientist and that he " believed" he could perform the work properly on the basis of the information he had learned from the conferences and written materials.

Responding to the defense's tender of Dr. Siegesmund as an expert, the court remarked that the doctor "appears to be a jack of all trades and [a] master of none." The court specifically commented on Dr. Siegesmund's credibility, stating that "his manner while testifying seemed disingenuous at times" undermining any attempt "to instill some confidence that someone is an expert in some kind of field." Finding the doctor's qualifications lacking, the court refused to accept Dr. Siegesmund as an expert in blood splatter analysis and luminol interpretation. The court, however, allowed Dr. Siegesmund to testify about the manner in which luminol testing is conducted.

Defense counsel did not proceed with Dr. Siegesmund as a witness, but instead made an offer of proof. Counsel explained Dr. Siegesmund would have testified that confirmatory testing is necessary when using luminol as a detecting agent for blood. In this regard, Dr. Siegesmund would have opined that Rea should have performed additional tests to confirm that the areas of luminance on defendant's jacket were in fact indicative of blood and, if so, a test to determine whether that blood was that of defendant. Dr. Siegesmund would have further refuted Englert's conclusions that the blood found on defendant's jacket represented splatter, and would have stated that the blood stains about the knee areas of defendant's jeans were indicative of lateral activity. The doctor would have also stated, contrary to

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

741 N.E.2d 1131

318 Ill.App.3d 340, 741 N.E.2d 1131, 251 Ill.Dec. 953
**(Cite as: 318 Ill.App.3d 340, 741 N.E.2d 1131)**

Englert's opinion, that a majority of Ms. Nielsen's blood loss would have occurred prior to her death. On this basis, Dr. Siegesmund would have explained that the offender would have been covered in blood and, thus, would have likely left bloody shoe prints in the victim's apartment.

Following the presentation of rebuttal evidence by the State and the jury's deliberations, defendant was found guilty of murder and sentenced to a term of natural life imprisonment.

## ANALYSIS

### I

Defendant initially contends that the trial court erred in denying his motion to dismiss the State's charges due to alleged speedy-trial violations. Although defendant asserts violations of both his constitutional and statutory rights to a speedy trial in his motion, he challenges only the denial of his constitutional claim on appeal.[FN2] Accordingly, we will limit our review to this issue.

> FN2. The State asserts defendant never raised his constitutional speedy-trial claim before the trial court, and maintains that this issue is thus waived for our review. The State, however, ignores defendant's speedy-trial motion, filed November 18, 1996, which specifically contains a claim based on the constitutional speedy-trial clause.

According to defendant, the State deprived him of his constitutional right to a speedy trial by waiting more than 43 months after the reversal of his original murder conviction in March 1993 to bring him to retrial. The right to a speedy criminal prosecution is guaranteed a defendant under both the United States (U.S. Const., amend.VI) and Illinois constitutions (Ill. Const.1970., art. I, § 8). The issue presented by defendant's constitutional speedy-trial claim here is whether the State made a diligent good-faith effort in bringing the matter to

retrial without unreasonable and unnecessary delay. See *People v. Williams,* 299 Ill.App.3d 143, 147, 233 Ill.Dec. 225, 700 N.E.2d 753, 756 (1998). When a defendant's original case is reversed on appeal and the matter is remanded for a new trial, like here, the speedy-trial clause requires the State to retry the defendant within a reasonable time following the date of the reviewing court's decision. See *People v. Crane,* 307 Ill.App.3d 816, 818, 241 Ill.Dec. 277, 719 N.E.2d 138, 140 (1999).

Analysis of defendant's claim is conducted under the four-part balancing test set forth by the United States Supreme Court in *Barker v. Wingo,* 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972), in which the conduct of both the prosecution and the accused are considered and weighed. In particular, we examine (1) the length of the pretrial delay and whether that delay was uncommonly long; (2) the reasons for the delay and to which party the delay is more attributable; (3) whether the defendant asserted his right to a speedy trial in due course; and (4) the prejudice, if any, suffered by the defendant as a result of the delay. *Doggett v. United States,* 505 U.S. 647, 651, 112 S.Ct. 2686, 2690, 120 L.Ed.2d 520 (1992); *Barker,* 407 U.S. at 530, 92 S.Ct. at 2192; *People v. Norris,* 303 Ill.App.3d 163, 175, 236 Ill.Dec. 501, 707 N.E.2d 628, 637 (1999).

No one of the foregoing elements is dispositive. Instead, each factor must be weighed and considered in light of the circumstances of the case as reflected by an examination of the entire record. *People v. Rievia,* 307 Ill.App.3d 846, 853, 241 Ill.Dec. 674, 719 N.E.2d 1077, 1082 (1999); *People v. Wills,* 153 Ill.App.3d 328, 336, 106 Ill.Dec. 207, 505 N.E.2d 754, 759 (1987). The consideration of the *Barker* factors and the determination of whether the accused's constitutional right to a speedy trial was violated are matters left to the sound discretion of the trial court. *United States v. Anderson,* 902 F.2d 1105, 1110 (2nd Cir.1990); see also *People v. Belcher,* 186 Ill.App.3d 202, 208, 134 Ill.Dec. 240, 542 N.E.2d 419, 422 (1989) (applying abuse-of-discretion standard in reviewing accused's claimed deprivation of constitutional speedy-trial right).

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

318 Ill.App.3d 340, 741 N.E.2d 1131, 251 Ill.Dec. 953
**(Cite as: 318 Ill.App.3d 340, 741 N.E.2d 1131)**

The first factor presents the threshold inquiry of whether the amount of delay should be deemed presumptively prejudicial to the defendant. *Barker*, 407 U.S. at 530-31, 92 S.Ct. at 2192; *Williams*, 299 Ill.App.3d at 147, 233 Ill.Dec. 225, 700 N.E.2d at 756. The term "presumptively prejudicial" simply marks the point at which the law deems the time between the resolution of the defendant's original appeal and the commencement of the second trial to be unreasonably long enough so as to trigger consideration of the remaining three factors. See *Williams*, 299 Ill.App.3d at 147, 233 Ill.Dec. 225, 700 N.E.2d at 756.

As a threshold, the courts of this state presume prejudice where the pretrial delay equals or exceeds a period of one year. *Crane*, 307 Ill.App.3d at 818, 241 Ill.Dec. 277, 719 N.E.2d at 141; *Williams*, 299 Ill.App.3d at 148, 233 Ill.Dec. 225, 700 N.E.2d at 756; *People v. Lock*, 266 Ill.App.3d 185, 191, 203 Ill.Dec. 675, 640 N.E.2d 334, 338 (1994). Given this temporal benchmark, we find that the more than three and one-half year delay between our decision in *Kaczmarek I* and the commencement of the State's retrial was presumptively prejudicial to defendant. Accordingly, we will assess the remaining factors of the *Barker* enquiry to determine whether defendant was denied his constitutional right to a speedy trial in this case.

In considering the second factor, the reason for the delay, the State bears the burden of providing a justifiable explanation for the period of postponement, and the defendant need only show that the delay was not attributable to his actions. *Crane*, 307 Ill.App.3d at 818, 241 Ill.Dec. 277, 719 N.E.2d at 141; *People v. Prince*, 242 Ill.App.3d 1003, 1008-09, 183 Ill.Dec. 252, 611 N.E.2d 105, 109 (1993). Delay will be attributed to the defense where the defendant's actions in fact caused or contributed to the postponement of the trial. See *People v. Kliner*, 185 Ill.2d 81, 114, 235 Ill.Dec. 667, 705 N.E.2d 850, 868 (1998). In this regard, the accused is bound by the acts or omissions of his defense counsel (*People v. Brimmer*, 60 Ill.App.3d 214, 219, 17 Ill.Dec. 338, 376 N.E.2d 337, 341 (1978); see also *Kliner*, 185 Ill.2d at 114, 235 Ill.Dec. 667, 705 N.E.2d at 870; *People v. Staten*, 159 Ill.2d 419, 433, 203 Ill.Dec. 230, 639 N.E.2d

550, 557 (1994)), since an attorney in criminal proceedings is authorized to act on behalf of his client and to determine for him procedural matters and decisions involving trial strategy and tactics. See *People v. Bowman*, 138 Ill.2d 131-141, 149 Ill.Dec. 263, 561 N.E.2d 633, 638 (1990); see also *People v. Steiger*, 208 Ill.App.3d 979, 981, 153 Ill.Dec. 702, 567 N.E.2d 660, 662 (1991) (criminal defendant "speaks and acts through his attorney"). Accordingly, the affirmative acts of defense counsel cannot be separated from the defendant's own actions. See *Bowman*, 138 Ill.2d at 141, 149 Ill.Dec. 263, 561 N.E.2d at 638.

In the present matter, the record clearly establishes that the defense either caused or contributed to nearly all the pretrial delay at issue. Indeed, the only time period not attributable to defendant was a 26-day period occurring between June 3, 1993, the date the Illinois Supreme Court denied the State's appeal from *Kaczmarek I*, and June 29, 1993, the date of the trial court's first status hearing.[FN3] From the court's June 29 hearing up until the start of trial in November 1996, the case was delayed because of the defense's explicit requests for a continuance or express agreement with the prosecution thereto. Delay resulting from such requests and agreements are generally chargeable to the defendant. See *People v. Beard*, 271 Ill.App.3d 320, 328, 207 Ill.Dec. 655, 648 N.E.2d 111, 116 (1995) (delay caused by continuances either requested or agreed to by defense is attributable to defendant); *People v. Moore*, 263 Ill.App.3d 1, 8, 200 Ill.Dec. 168, 635 N.E.2d 507, 513 (1994) (same); *People v. Nolan*, 102 Ill.App.3d 895, 898-99, 58 Ill.Dec. 403, 430 N.E.2d 345, 349 (1981) (same); see also *Kliner*, 185 Ill.2d at 114, 235 Ill.Dec. 667, 705 N.E.2d at 869. Notably, the defense changed attorneys no less than six times during the postponement period, necessitating additional time being granted to new counsel so he or she could review discovery and familiarize himself or herself with the case. See *Norris*, 303 Ill.App.3d at 176, 236 Ill.Dec. at 510, 707 N.E.2d at 637 (delay resulting from time new counsel needed to become familiar with the accused's case was attributable to defense). As a further note, the case was continued on at least four occasions because of defense counsel's failure to

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

741 N.E.2d 1131

318 Ill.App.3d 340, 741 N.E.2d 1131, 251 Ill.Dec. 953
**(Cite as: 318 Ill.App.3d 340, 741 N.E.2d 1131)**

appear at scheduled court hearings. See *United States v. Brock,* 782 F.2d 1442, 1447 (7th Cir.1986) (charging defendant with delay resulting from defense counsel's absence from court); see also *Kliner,* 185 Ill.2d at 117, 235 Ill.Dec. 667, 705 N.E.2d at 870.

> FN3. The time in which the State's appeal was under consideration by the supreme court fully justifies the first two months of delay. See *Crane,* 307 Ill.App.3d at 818, 241 Ill.Dec. 277, 719 N.E.2d at 141.

Defendant accurately notes that the prosecution used the pretrial period to gather expert evidence regarding DNA testing and blood splatter analysis, and that it requested additional time from the court many times to secure these materials. On several of those occasions, however, defendant's attorneys explicitly agreed to the State's request. Indeed, defense counsels never objected to the State's attempt to secure its additional evidence. Rather, the record shows that the defense welcomed the State's blood evidence because of its possible exculpatory effect. The defense obviously viewed the State's evidence as possibly beneficial to its case and, for this reason, agreed to many of the continuances sought by the State. With respect to the remaining instances where the State requested additional time, defense counsel specifically sought continuances for his own reasons.

Turning to the third factor, the assertion of the accused's speedy-trial right, we note defendant made a *pro se* demand for a speedy trial at a hearing held July 21, 1993, a few months after reversal. Defendant's attorney at the time told the court that he was not making the demand on defendant's behalf and that defendant was acting in his own capacity in seeking a speedy trial. Counsel further informed the court that he was not ready to proceed with trial. The trial judge explained to defendant that his defense could be compromised if he proceeded to trial with counsel who was not adequately prepared. In light of the court's advisement, defendant stated he would wait for his attorney to become prepared and explicitly agreed to a continuance.

The record shows that defendant never made another demand for a speedy trial. Rather, defendant followed by moving *pro se* to dismiss the State's charges in November 1994 on the ground that his statutory speedy-trial right, implemented in this state's Speedy Trial Act (725 ILCS 5/103-5 (West 1994)), had been violated.[FN4] The Supreme Court has indicated that the filing of a motion for speedy-trial dismissal without making a prior demand does not alone establish that the accused has appropriately asserted his rights. *United States v. Loud Hawk,* 474 U.S. 302, 314, 106 S.Ct. 648, 655, 88 L.Ed.2d 640 (1986). While such assertions by the accused are entitled to strong evidentiary weight, these assertions must be viewed in light of the accused's other conduct. *Loud Hawk,* 474 U.S. at 314, 106 S.Ct. at 656.

> FN4. The trial court should not have permitted defendant to file his *pro se* motion because defendant was represented by counsel at the time. The law is clear that a criminal defendant has no right to both self-representation and the assistance of counsel (*People v. Williams,* 97 Ill.2d 252, 267, 73 Ill.Dec. 360, 454 N.E.2d 220, 227 (1983)), and thus has no right to some sort of hybrid representation, whereby he is allowed to accept his attorney's services and still be permitted to file *pro se* motions. *People v. Handy,* 278 Ill.App.3d 829, 836, 216 Ill.Dec. 114, 664 N.E.2d 1042, 1046 (1996).

Following the filing of defendant's motion, the defense either requested or agreed to continue the case until the matter was ultimately brought to trial in November 1996. Defendant's claim here that he had an actual interest in receiving a prompt and speedy resolution of the State's charges is undermined by his conduct proceeding his motion's filing. See *Loud Hawk,* 474 U.S. at 315-16, 106 S.Ct. at 656 (finding third factor weighed against the defense where the defendants filed a number of frivolous petitions and motions, which caused delay, at the same time they moved to dismiss the government's charges on speedy-trial grounds); *Beard,* 271 Ill.App.3d at 329, 207 Ill.Dec. 655, 648

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

318 Ill.App.3d 340, 741 N.E.2d 1131, 251 Ill.Dec. 953
**(Cite as: 318 Ill.App.3d 340, 741 N.E.2d 1131)**

N.E.2d at 116 (same where, although the defendant continued to demand a speedy trial, he agreed to a number of continuances).

Defendant attempts to distance himself from the conduct of his attorneys by stressing that, notwithstanding the their decisions, he wanted a speedy trial. Because he wanted a speedy trial, defendant argues this factor should weigh heavily in his favor. We disagree. Generally, the decision to demand a speedy trial and to seek dismissal of the State's charges on such grounds are matters left to the sound strategic decision of counsel. See *People v. Ramey,* 151 Ill.2d 498, 523-24, 177 Ill.Dec. 449, 603 N.E.2d 519, 529 (1992); *People v. Keys,* 195 Ill.App.3d 370, 373, 141 Ill.Dec. 917, 552 N.E.2d 285, 287 (1990). Further, as previously discussed, defendant spoke and acted through his attorneys and was bound by their conduct during the pretrial proceedings. Importantly, defendant never sought the discharge of his attorneys to pursue his speedy-trial claims on his own. Indeed, the record unequivocally shows that defendant wanted the assistance of counsel in preparing his defense for trial.

Finally, in assessing the fourth factor, the prejudice to the accused, we consider the interests sought to be protected by the speedy-trial right, namely: (1) the prevention of lengthy and oppressive pretrial incarceration; (2) the minimization of anxiety and concern on the part of the accused; and (3) the limitation of the possibility that the accused's defense will be impaired. *Barker,* 407 U.S. at 532, 92 S.Ct. at 2193; *Moore,* 263 Ill.App.3d at 9, 200 Ill.Dec. 168, 635 N.E.2d at 513. The latter interest has been recognized by the Supreme Court as the most serious "because the inability of a defendant adequately to prepare his case skews the fairness of the entire system." *Doggett,* 505 U.S. at 654, 112 S.Ct. at 2692, quoting *Barker,* 407 U.S. at 532, 92 S.Ct. at 2193.

Except for certain instances where the presumption of prejudice remains due to some form of unjustifiable conduct on the part of the State, causing excessive delay which presumptively compromises the reliability of the trial proceedings, (see *Doggett,* 505 U.S. at 655-58, 112 S.Ct. at

2692-94; *Prince,* 242 Ill.App.3d at 1010, 183 Ill.Dec. 252, 611 N.E.2d at 110), a showing of prejudice is required to establish a violation of the defendant's constitutional speedy-trial right. *Reed v. Farley,* 512 U.S. 339, 353, 114 S.Ct. 2291, 2299, 129 L.Ed.2d 277 (1994); *Beard,* 271 Ill.App.3d at 328, 207 Ill.Dec. 655, 648 N.E.2d at 116.

We are mindful that defendant was in custody for almost the entire time between remand and the commencement of his second trial, and we understand that such lengthy periods of pretrial incarceration may have adverse effects on an accused. See *Crane,* 307 Ill.App.3d at 819-20, 241 Ill.Dec. 277, 719 N.E.2d at 142. This fact alone, however, is insufficient to establish prejudice and must be viewed in light of the other relevant considerations.

Defendant stresses he experienced a great deal of anxiety while incarcerated awaiting trial. Anxiety on the part of the accused, as one court has explained, is "present to some extent in every case and absent some unusual showing, this inconvenience alone is of slight import." *Wills,* 153 Ill.App.3d at 337, 106 Ill.Dec. 207, 505 N.E.2d at 760. This factor will weigh in the defendant's favor "only if it is shown there was a rather special situation giving rise to an inordinate amount of anxiety." *People v. Jackson,* 162 Ill.App.3d 476, 481, 113 Ill.Dec. 581, 515 N.E.2d 390, 394 (1987). The record fails to reveal such a situation in this case.

Significantly, defendant never claims his ability to prepare and present a defense was in any way impaired by the delay. The defense was wholly or partially responsible for the delays experienced in bringing the matter to trial, and nothing in the record indicates that the delay was intentionally contrived by the prosecution for purposes of impairing the defense. Moreover, it was in the best interests of the defense to wait until the State obtained the results of its blood testing since the findings could have excluded defendant as the offender.

Under the circumstances presented, we find no error in the trial court's determination that defendant was

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

741 N.E.2d 1131                                                                    Page 16

318 Ill.App.3d 340, 741 N.E.2d 1131, 251 Ill.Dec. 953
**(Cite as: 318 Ill.App.3d 340, 741 N.E.2d 1131)**

not denied his constitutional right to a speedy retrial.


## II.

Defendant next asserts error in the rulings of the trial court regarding (1) the presentation of expert testimony by a witness offered by the State and (2) the nonacceptance of his tendered expert, Dr. Siegesmund.

An individual will be allowed to testify as an expert if his experience and qualifications afford him knowledge beyond that of the average person, and where his testimony will aid, and not invade, the province of the trier of fact in reaching its conclusions. *People v. Miller,* 173 Ill.2d 167, 186, 219 Ill.Dec. 43, 670 N.E.2d 721, 730 (1996); *People v. Sargeant,* 292 Ill.App.3d 508, 511, 226 Ill.Dec. 501, 685 N.E.2d 956, 958 (1997). The degree and manner of knowledge and experience required of the alleged expert is directly related to the complexity of the subject matter and the corresponding likelihood of error by one insufficiently familiar with the field. *People v. Huddleston,* 176 Ill.App.3d 18, 32, 125 Ill.Dec. 606, 530 N.E.2d 1015, 1024 (1988).

The courts do not employ any predetermined formula for how an expert acquires specialized skill or knowledge, and the indicia of expertise is not an assigned level of academic training. *People v. Novak,* 163 Ill.2d 93, 104, 205 Ill.Dec. 471, 643 N.E.2d 762, 768 (1994). An expert may acquire his expertise from a variety of outlets, including practical experience, scientific study, education, training and/or research. *Miller,* 173 Ill.2d at 186, 219 Ill.Dec. 43, 670 N.E.2d at 730. Regardless of how such knowledge is acquired, the witness should be allowed to testify where the subject matter of his testimony exceeds the knowledge of an average person and where the testimony would assist the trier of fact in evaluating the evidence. *Novak,* 163 Ill.2d at 104, 205 Ill.Dec. 471, 643 N.E.2d at 768; *People v. Shaw,* 278 Ill.App.3d 939, 948, 215 Ill.Dec. 700, 664 N.E.2d 97, 103 (1996).

The burden of establishing the qualifications of a witness as an expert is on the proponent of the

witnesses's testimony. *Novak,* 163 Ill.2d at 104, 205 Ill.Dec. 471, 643 N.E.2d at 768. Determinations regarding the adequacy of a witness's qualifications to testify as an expert is a matter reserved to the sound discretion of the trial court. (*Novak,* 163 Ill.2d at 104, 205 Ill.Dec. 471, 643 N.E.2d at 768), which will not be disturbed on review absent a clear abuse of discretion resulting in manifest prejudice to the accused. *People v. Petitt,* 245 Ill.App.3d 132, 145, 184 Ill.Dec. 766, 613 N.E.2d 1358, 1369 (1993); *Huddleston,* 176 Ill.App.3d at 32, 125 Ill.Dec. 606, 530 N.E.2d at 1024.


## A.

Defendant first challenges Rea's acceptance as an expert. We find this issue waived. The law is well settled that both a trial objection and a post-trial motion raising the alleged trial error is required to preserve the matter for review. *People v. Thomas,* 178 Ill.2d 215, 234, 227 Ill.Dec. 410, 687 N.E.2d 892, 900 (1997); *People v. Enoch,* 122 Ill.2d 176, 186, 119 Ill.Dec. 265, 522 N.E.2d 1124, 1129-30 (1988). Errors objected to at trial but not raised in a post-trial motion or before the court at a post-trial hearing are deemed waived. *Thomas,* 178 Ill.2d at 234, 227 Ill.Dec. 410, 687 N.E.2d at 900. Although defendant voiced an objection to Rea's acceptance as an luminol expert, he did not raise this point in his post-trial motion.

Wavier aside, we find no error in the trial court's decision. Based on his extensive work experience, training and independent study, Rea possessed knowledge not commonly known to the average person that would have assisted the jury in making its determinations concerning defendant's guilt. Although Rea has never taken a college-level chemistry course as defendant correctly observes, the law is clear that an expert is not required to have any particular level of academic training, and that the witness may acquire his particular expertise and training through other means. Notably, defendant fails to explain the importance a general chemistry class would serve in understanding and performing testing with luminol.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

741 N.E.2d 1131                                                                    Page 17

318 Ill.App.3d 340, 741 N.E.2d 1131, 251 Ill.Dec. 953
**(Cite as: 318 Ill.App.3d 340, 741 N.E.2d 1131)**

Defendant additionally notes that Rea never performs follow-up tests to confirm his findings. Defendant's claim is misplaced because it does not reflect upon Rea's qualifications to testify as an expert, but rather concerns the reliability of the specific testing procedures used by him. As such, defendant's argument goes to the weight of the evidence and not to the degree of knowledge and expertise held by Rea. Importantly, defense counsel extensively cross-examined Rea concerning his limited knowledge on how to perform confirmatory testing and his practice of not conducting such tests on defendant's clothing in the instant case.

Defendant's claim hints that the testing procedure is unreliable and consequently fails to satisfy the federal *Frye* standard adopted by this state's courts in determining whether a scientific principle, technique or test is sufficiently reliable and generally accepted by the relevant scientific community to be admitted. See *People v. Eyler*, 133 Ill.2d 173, 139 Ill.Dec. 756, 549 N.E.2d 268 (1989). To the extent defendant makes this argument, we find it waived. Defendant merely objected at trial to Rea's expert qualifications and did not raise the matter of testing reliability to the court. Defendant further has provided no argument in support of this argument in his opening brief.

### B.

Defendant additionally challenges the court's ruling finding Dr. Siegesmund unqualified to testify as an expert in luminol interpretation and blood splatter analysis.

A review of the record shows that Dr. Siegesmund simply possesses a general knowledge of forensic studies, and does not hold any specialized understanding of luminol interpretation and blood splatter analysis. Indeed, the doctor never stated he knew how to interpret particular luminol reactions, and merely explained that he has conducted numerous luminol testing without indicating whether he ever interpreted the results. Although not determinative, Dr. Siegesmund additionally has received no training in luminol application and interpretation and has never performed such work in

any crime lab.

With respect to blood splatter analysis, Dr. Siegesmund merely stated he was "familiar" with the subject. He has neither received training in the field nor performed such work in a crime lab setting. Dr. Siegesmund explained that his knowledge and self-described expertise in the subject comes from, among other things, yearly, one-week seminars held by the Academy of Forensic Scientists. Yet, the doctor conceded he had not been to an Academy conference for at least six years. Although he has conducted dozens of experiments in blood splatter, Dr. Siegesmund has received no training on how to conduct such experiments and "believed" his simulations were accurate based on information he has read in journals and text books.

An obvious import of the trial judge's comments is that he had serious concerns as to Dr. Siegesmund's credibility. The court's observations were well-founded, amply supported by the record. In particular, Dr. Siegesmund's inability to remember when he last attended an Academy conference, where the doctor explained that these conferences are the primary source of the knowledge for which he was being tendered, and the doctor's misstatements regarding the operations of the Glendale Crime Lab, directly reflect upon the doctor's credentials as an expert witness.

We find no error in the trial court's determination that, based on the testimony presented, Dr. Siegesmund did not possess a sufficient level of knowledge and expertise to testify as an expert in the fields of luminol interpretation and blood splatter analysis.

### III.

Defendant further argues that the trial court erred in precluding Hines from testifying about fights involving defendant that had occurred before Ms. Nielsen's murder. According to defendant, this evidence was relevant to rebut the State's theory that the blood found on the jacket was the blood of Ms. Nielsen and to raise the possibility that the blood

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

318 Ill.App.3d 340, 741 N.E.2d 1131, 251 Ill.Dec. 953
**(Cite as: 318 Ill.App.3d 340, 741 N.E.2d 1131)**

came from someone with whom he had fought previously.

A criminal defendant has the right to present a defense, present witnesses to establish his theory of the case, and present his version of the events to the trier of fact. *People v. Wright,* 218 Ill.App.3d 764, 771, 161 Ill.Dec. 444, 578 N.E.2d 1090, 1095 (1991). This right, however, is not unqualified, and the trial court may properly limit the presentation of evidence on grounds of relevancy. *People v. Turner,* 179 Ill.App.3d 510, 521, 128 Ill.Dec. 159, 534 N.E.2d 179, 186 (1989). Evidence is relevant if it tends to prove or disprove a disputed fact material to the case or render the matter in issue more or less probable. *People v. Childress,* 158 Ill.2d 275, 295, 198 Ill.Dec. 794, 633 N.E.2d 635, 643 (1994); *People v. Agee,* 307 Ill.App.3d 902, 904, 241 Ill.Dec. 390, 719 N.E.2d 251, 253 (1999). Contrary to defendant's contention that this issue should be reviewed *de novo,* the law is well established that evidentiary rulings are within the sound discretion of the trial court which will not be reversed absent a clear abuse of discretion resulting in manifest prejudice to the accused. *People v. Reid,* 179 Ill.2d 297, 313, 228 Ill.Dec. 179, 688 N.E.2d 1156, 1164 (1997); *People v. Dow,* 240 Ill.App.3d 392, 400-01, 181 Ill.Dec. 186, 608 N.E.2d 259, 266 (1992); *Wright,* 218 Ill.App.3d at 771, 161 Ill.Dec. 444, 578 N.E.2d at 1096.

Contrary to the trial court's determination, defendant's proffered evidence was not irrelevant due to remoteness. Given the ability of a blood stain to persist over time, especially on clothing that goes untreated, the blood from the alleged altercations could have remained on defendant's jacket until a time well after Ms. Nielsen's death. We find it difficult to understand how the trial court could have found this evidence too remote where defense counsel was not even allowed to ask Hines when the alleged altercations occurred.

Notwithstanding, we find the court's error harmless. In determining whether an accused has been prejudiced by the rejection or exclusion of certain evidence, so as to require a new trial, we review the entire record of proceedings to determine whether

the rejected evidence could have reasonably affected the jury's verdict. *People v. Montes,* 263 Ill.App.3d 680, 691, 200 Ill.Dec. 571, 635 N.E.2d 910, 917 (1994). Reversal is not warranted where the accused's guilt is shown beyond of reasonable doubt or where, based upon the evidence, a different result could not have been reached. *Montes,* 263 Ill.App.3d at 691, 200 Ill.Dec. 571, 635 N.E.2d at 917. In other words, "the erroneous exclusion of evidence is ground for a new proceeding where it can be said that the excluded evidence, if considered, would have altered the outcome of the proceeding." *People v. Sims,* 167 Ill.2d 483, 516, 212 Ill.Dec. 931, 658 N.E.2d 413, 428 (1995); see also *People v. Amos,* 204 Ill.App.3d 75, 81-82, 149 Ill.Dec. 411, 561 N.E.2d 1107, 1113 (1990).

Here, the State's evidence, specifically the testimony of Fish, established that blood extracted from defendant's clothing was consistent in blood type and various genetic markers with the blood of the victim. Hines' precluded testimony would have merely raised the possibility that some other person's blood may have been on defendant's clothing, and it would have done nothing to refute the State's evidence linking defendant to Ms. Nielsen's murder. Given this fact, and in light of the evidence contained in the record, we conclude the erroneously excluded testimony of Hines would not have altered the outcome of the case and, therefore, did not manifestly prejudice defendant.

IV.

**(The preceding material is nonpublishable under Supreme Court Rule 23)**

The primary issue presented by defendant's appeal is whether the sentencing scheme set forth in section 5-1-8(a)(1)(b) of Corrections Code, which allows for an enhanced sentence for first degree murder under certain court-determined circumstances, offends the constitutional mandates announced by the Supreme Court in *Apprendi v. New Jersey,* 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000).

At sentencing in May 1997, the State urged the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

318 Ill.App.3d 340, 741 N.E.2d 1131, 251 Ill.Dec. 953
**(Cite as: 318 Ill.App.3d 340, 741 N.E.2d 1131)**

court to impose a life sentence based on its contention that the victim's murder was " exceptionally brutal" and "heinous" within the meaning of section 5-8-1(a)(1)(b) contained in the 1985 version of the Corrections Code. That version of section 5-8-1 generally enumerates the imprisonment terms for felony offenses and specifically sets forth a sentence of "not less than 20 years and not more than 40 years" in prison for the offense of first degree murder. Ill.Rev.Stat.1985 ch. 38, par. 1005-8-1(a)(1)(a).[FN5] Under paragraph (1)(b) of this provision, a sentence of natural life is authorized where the sentencing judge finds that "the murder was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty." Ill.Rev.Stat.1985 ch. 38, par. 1005-8-1(a)(1)(b).

> FN5. In its response brief, the State indicates that defendant is subject to a prison sentence of between 20 and 60 years. The murder of the victim in the instant matter occurred in April 1997. At that time, section 5-8-1 provided a sentencing range for first degree murder of 20 to 40 years. By amendment effective January 1, 1988, this sentencing range was increased to the current term of 60 years. Contrary to the State's suggestion, the amended version of section 5-8-1 that became effective in January 1988, or the current version of that provision, cannot be retroactively applied to defendant's case because such an application would be violative of the *ex post facto* clauses of the United States and Illinois Constitutions ( U.S. Const., art. I, § 9, cl. 3; Ill. Const.1970, art. I, § 16). See *Fletcher v. Williams,* 179 Ill.2d 225, 233, 227 Ill.Dec. 942, 688 N.E.2d 635, 640 (1997) (any statute that, *inter alia,* makes more burdensome the punishment for a crime after its commission is prohibited as *ex post facto*).

The sentencing judge in the instant case agreed with the State's characterization of the crime and, specifically drawing upon his recollection of the

evidentiary proofs adduced at trial, he found the conduct of defendant accompanying the murder of Ms. Nielsen to be brutal and heinous as contemplated by the Corrections Code. Based on its finding, the court sentenced defendant to life in prison.

*343 In *Apprendi,* the accused, Charles Apprendi, pled guilty to, among other offenses, two counts of second degree possession of a firearm for an unlawful purpose. Under New Jersey's sentencing scheme, a second-degree offense carried a penalty range of 5 to 10 years in prison. As part of the plea agreement, the prosecution reserved the right, however, to seek a greater sentence on one of the two firearm possession counts under a hate crime statute that allowed for an enhanced sentence where the offense was committed with a biased purpose. For a second-degree offense, the hate crime law provided for a prison term of between 10 and 20 years.

Following a hearing, the sentencing court found, by a preponderance of the evidence, that the firearm possession offense**1136 ***958 committed by Apprendi was motivated by a racial bias. Relying on the hate crime enhancement provision, the court sentenced Apprendi to a term of 12 years, two years beyond the statutory maximum penalty for such an offense.

Apprendi challenged the validity of his sentence to the state appellate and supreme courts, arguing that the sentencing scheme provided in the hate crime law was unconstitutional. The state courts disagreed and upheld Apprendi's sentence. The Supreme Court reversed, finding that New Jersey's sentencing scheme infringed upon the due process and notice and right to jury clauses of the Constitution by impermissibly allowing the sentencing judge, rather than the jury, to determine, under a relaxed evidentiary standard, a fact which is most appropriately characterized as an element of the underlying offense.

After discussing at length the constitutional rights of every defendant in a criminal case to a trial by jury in which the State is required to prove every element of the offense charged beyond a reasonable

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

741 N.E.2d 1131　　　　　　　　　　　　　　　　　　　　　　　　　　Page 20

318 Ill.App.3d 340, 741 N.E.2d 1131, 251 Ill.Dec. 953
**(Cite as: 318 Ill.App.3d 340, 741 N.E.2d 1131)**

doubt (U.S. Const. amends. V, VI, XIV; *Apprendi,* 530 U.S. at ----, 120 S.Ct. at 2355-56, 147 L.Ed.2d at 446-48), the Court examined the term " sentencing factor," a term it first coined in *McMillan v. Pennsylvania,* 477 U.S. 79, 106 S.Ct. 2411, 91 L.Ed.2d 67 (1986), in light of the novelty of legislative schemes, referred to as "sentence enhancements," that remove from the jury the determination of a fact that, if found, exposes a defendant to a penalty exceeding the maximum he would receive if punished according to the facts reflected by the jury verdict alone. *Apprendi,* 530 U.S. at ----, 120 S.Ct. at 2356-60, 147 L.Ed.2d at 448-52. According to the Court, a "sentencing factor" is "a circumstance, which may be either aggravating or mitigating in character, that supports a specific sentence within a range authorized by the jury's finding that the defendant is guilty of a particular offense." (Emphasis omitted.) 530 U.S. at ---- n. 19, 120 S.Ct. at 2365 n. 19, 147 L.Ed.2d at 457 n. 19. A "sentence enhancement," on the other *344 hand, refers to a factual determination that results in "an increase beyond the maximum authorized statutory sentence." *Apprendi,* 530 U.S. at ---- n. 19, 120 S.Ct. at 2365, n. 19, 147 L.Ed.2d at 457, n. 19.

The Court explicitly recognized that the effect of sentence enhancement legislation on a defendant's punishment raises serious constitutional concerns in light of its prior precedent in the area and the history upon which those decisions rely. *Apprendi,* 530 U.S. at ----, 120 S.Ct. at 2360, 147 L.Ed.2d at 452. For the first time, the Court squarely confronted the issue of whether such enhancement schemes run afoul of well-established constitutional principles. Traditionally, according to the Court, any circumstance that exposed an accused to a higher degree of punishment had to be pled in the charging instrument and presented and proven to the jury beyond a reasonable doubt. *Apprendi,* 530 U.S. at ----, 120 S.Ct. at 2357, 147 L.Ed.2d at 449. Further, the fact that judges have historically enjoyed the discretion of fixing a punishment within a prescribed statutory range (*Apprendi,* 530 U.S. at ----, 120 S.Ct. at 2358, 147 L.Ed.2d at 449-50) demonstrated that their role in sentencing was " constrained at its outer limits by the facts alleged in the indictment and found by the jury. * * * [F]acts

that expose a defendant to a punishment greater than that otherwise legally prescribed were by definition 'elements' of a separate legal offense." *Apprendi,* 530 U.S. at ---- n. 10, 120 S.Ct. at 2359 n. 10, 147 L.Ed.2d at 451 n. 10. The Court explained:
"If a defendant faces punishment beyond that provided by statute when an offense is committed under certain circumstances but not others, it is obvious that both the loss of liberty and the stigma attaching to the offense [and suffered by the defendant] are heightened; it necessarily follows that the defendant should not-at the moment the State is put to proof of those circumstances-be **1137 ***959 deprived of protections that have, until that point, unquestionably attached." *Apprendi,* 530 U.S. at ----, 120 S.Ct. at 2359, 147 L.Ed.2d at 451.

Relying on the principles established by its prior decisions, the Court concluded the Constitution forbids " 'a legislature [from] remov[ing] from the jury the assessment of facts that increase the prescribed range of penalties to which a criminal defendant is exposed.' " *Apprendi,* 530 U.S. at ----, 120 S.Ct. at 2363, 147 L.Ed.2d at 455, quoting *Jones v. United States,* 526 U.S. 227, 252, 119 S.Ct. 1215, 1228, 143 L.Ed.2d 311, 332 (1999). (Stevens, J. concurring). According to the Court, the Constitution mandates that " 'such facts * * * be established by proof beyond a reasonable doubt.' " *Apprendi,* 530 U.S. at ----, 120 S.Ct. at 2363, 147 L.Ed.2d at 455, quoting *Jones,* 526 U.S. at 253, 119 S.Ct. at 1229, 143 L.Ed.2d at 332. (Stevens, J., concurring). The *345 Court held that "any fact [other than the fact of a prior conviction] that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." [FN6]
*Apprendi,* 530 U.S. at ----, 120 S.Ct. at 2362-63, 147 L.Ed.2d at 455.[FN7]

　　　　FN6. The Court's holding finally
　　　　established the constitutional principle it
　　　　suggested, but had avoided to pronounce,
　　　　in its earlier decision of *Jones v. United
　　　　States,* 526 U.S. 227, 243 n. 6, 119 S.Ct.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

741 N.E.2d 1131                                                                                           Page 21

318 Ill.App.3d 340, 741 N.E.2d 1131, 251 Ill.Dec. 953
**(Cite as: 318 Ill.App.3d 340, 741 N.E.2d 1131)**

1215, 1224 n. 6, 143 L.Ed.2d 311, 326 n. 6 (1999), where in *dictum* the Court stated:

"under the Due Process Clause of the Fifth Amendment and the notice and jury trial guarantees of the Sixth Amendment, any fact (other than prior conviction) that increases the maximum penalty for a crime must be charged in an indictment, submitted to a jury, and proven beyond a reasonable doubt."

FN7. It must be noted that the rule announced by *Apprendi* makes no mention of any obligation on the part of the prosecution to allege the enhancing factor in the indictment. The Court's holding only provides that any fact other than a prior conviction that increases the punishment for a crime beyond the statutory maximum must be presented to the jury and proved beyond a reasonable doubt. The Court never expressly indicated that such a fact need also be alleged in the indictment. Nonetheless, when the Court's ruling is viewed as a whole, and when it is specifically considered together with the Court's statement in *Jones,* it becomes clear that facts that expose a defendant to a penalty beyond the maximum must also be pled in the indictment. Indeed, several federal courts have read *Apprendi* this way. See *United States v. Meshack,* 225 F.3d 556, 575 n. 15 (5th Cir.2000); *United States v. Aguayo-Delgado,* 220 F.3d 926, 933 (8th Cir.2000); *United States v. Murphy,* 109 F .Supp.2d 1059, 1062 (D.Minn.2000); *United States v. Henderson,* 105 F.Supp.2d 523, 535 (S.D.W.Va.2000).

In applying its ruling, the Court explained the relevant inquiry does not depend on the formal structure of the statute at issue, but of the statute's effect on the defendant's sentence-that is, "does the required finding expose the defendant to a greater punishment than that authorized by the jury's guilty verdict?" *Apprendi,* 530 U.S. at ----, 120 S.Ct. at 2365, 147 L.Ed.2d at 457. If so, then the fact upon which the enhancement is based must be alleged in

the charging instrument and proven before the jury beyond a reasonable doubt. In such cases, the enhancement factor is the "functional equivalent of an element of a greater offense than the one covered by the jury's verdict" (*Apprendi,* 530 U.S. at ---- n. 19, 120 S.Ct. at 2365 n. 19, 147 L.Ed.2d at 457 n. 19), and as such becomes the " 'tail which wags the dog of the substantive offense.' " *Apprendi,* 530 U.S. at ----, 120 S.Ct. at 2365, 147 L.Ed.2d at 458, quoting *McMillan,* 477 U.S. at 88, 106 S.Ct. at 2417, 91 L.Ed.2d at 77. Conversely, since *Apprendi's* holding is expressly limited to instances where the enhancing factor has the effect*346 of increasing the penalty beyond the prescribed statutory maximum set, a court-determined fact may permissibly alter a defendant's sentence within the range provided for by the applicable statute.

[1] The *Apprendi* ruling marks a stark departure from the approach the Court has traditionally employed in differentiating between an element of an offense and a sentencing factor. The *Apprendi* Court **1138 ***960 explicitly recognized for the first time that an accused criminal has the constitutional right to have any statutory enhancement fact that, if found, increases the penalty for a crime beyond the prescribed maximum to be treated as an element of the underlying offense. In previous decisions, the Court did not concern itself with the constitutional implications of sentencing enhancement schemes but, rather, resorted to principles of statutory interpretation. In those cases, the Court undertook a microanalysis of the relevant statute's language, structure and history in an effort to determine whether it defined a distinct offense or whether it merely set forth a factor that could be properly considered in imposing an enhanced punishment. Within its analysis, the Court also frequently considered the related matter of whether the particular enhancement factor at issue was traditionally or typically considered by the courts as a sentencing factor. See *Castillo v. United States,* 530 U.S. 120, ----, 120 S.Ct. 2090, 2092-96, 147 L.Ed.2d 94, 98-103 (2000) (in a case decided three weeks before *Apprendi* was issued, the Court, in determining whether a federal statute which dramatically increased the penalty for the use or possession of a firearm when the weapon at issue is

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

741 N.E.2d 1131                                                      Page 22

318 Ill.App.3d 340, 741 N.E.2d 1131, 251 Ill.Dec. 953
**(Cite as: 318 Ill.App.3d 340, 741 N.E.2d 1131)**

a "machinegun" constituted a separate offense, concerned itself primarily with the intent of Congress, examining the literal language the statute and the statute's legislative history; the Court also considered whether the type of firearm in question had been typically or traditionally viewed as a sentencing factor); *Jones,* 526 U.S. at 232-40, 251-52, 119 S.Ct. at 1219-22, 1228, 143 L.Ed.2d at 319-24, 331 (in determining whether the federal carjacking statute, which increased the maximum punishment of 15 years where either "serious bodily injury" or "death" resulted from the offense, constituted a single offense or three distinct crimes, the Court turned to statutory interpretation to ascertain Congress' intent and specifically relied on the statutory construction principle of constitutional doubt to construe the statute as establishing three separate offenses, the Court further considered whether the facts of "serious bodily injury" and "death" had been traditionally considered sentencing factors); *Almendarez-Torres v. United States,* 523 U.S. 224, 229-35, 118 S.Ct. 1219, 1224-26, 140 L.Ed.2d 350, 359-63 (1998) (the Court resorted to principles of statutory interpretation,*347 and specifically looked to the statute's language, structure, subject matter, context, and history, to determine whether Congress intended a federal law, which elevated the maximum penalty for a deported alien reentering the country beyond a two-year prison term if the alien's initial deportation resulted from an aggravated felony conviction, to define a separate crime or simply an enhanced penalty; the Court also examined whether recidivism was a typical sentencing factor).

[2][3] Turning to the case at hand, we initially consider the State's argument that defendant has waived the matter of his sentence's validity for our review. As the State notes, defendant did not raise his *Apprendi* challenge in his original appeal and raised that matter for the first time in his timely filed rehearing petition. As a general rule, parties may not argue new points in a petition for rehearing. *People v. Wright,* 194 Ill.2d 1, 22-23, 251 Ill.Dec. 469, 740 N.E.2d 755 (2000). In *Wright,* the supreme court has recognized an exception to this rule where the new matter raised attacks the constitutionality of a criminal statute. *Wright,* 194 Ill.2d at 22-23, 251 Ill.Dec. 469, 740

N.E.2d 755. According to the court, such challenges may be raised at any time because it would be fundamentally unfair to uphold a criminal conviction pursuant to an unconstitutional statute. *Wright,* 194 Ill.2d at 22-23, 251 Ill.Dec. 469, 740 N.E.2d 755.

[4][5] We believe *Wright,* while involving a challenge to the validity of a criminal statute, equally applies to cases, like the instant matter, where a defendant attacks his sentence on the basis that it was imposed pursuant to an unconstitutional sentencing**1139 ***961 procedure set forth in the Corrections Code. The fundamental unfairness to a defendant explicitly recognized by *Wright* would similarly be present in such instances. This court, in fact, has recently declined to find waiver of a defendant's *Apprendi* challenge to his sentence imposed pursuant to the mandatory Class X sentencing scheme found in section 5-5-3(c)(8) of the Corrections Code despite that challenge being raised for the first by defendant in his rehearing petition. *People v. Lathon,* 317 Ill.App.3d 573, 578-79, 251 Ill.Dec. 296, 740 N.E.2d 377 (2000); see also *People v. Wooters,* 188 Ill.2d 500, 510, 243 Ill.Dec. 33, 722 N.E.2d 1102, 1108 (1999) (permitting defendant's challenge on appeal to validity of section 5-8-1(a)(1)(c)(ii) of the Corrections Code where that attack, asserted for the first time on appeal, warranted consideration given its constitutional dimension).

We further note *Apprendi* had yet to be released when we issued our original decision in the matter. Defendant thus did not have the benefit of *Apprendi* during the original portion of his appeal. Notwithstanding, the State argues the ruling in *Apprendi* is nothing new but, rather, is a restatement of the holdings announced earlier by the Court in *Jones* and *Almendarez-Torres.* The State unsuccessfully asserted the same argument before this court in *348*Lathon,* 317 Ill.App.3d at 578, 251 Ill.Dec. 296, 740 N.E.2d 377 (noting *Jones* and *Almendarez-Torres* were each decided as a matter of statutory interpretation of federal sentencing guidelines, where *Apprendi* applied the principles established by those cases for the first time to state prosecutions), and more recently in *People v. Sutherland,* 317 Ill.App.3d 1117, 1128-29, 252

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

741 N.E.2d 1131

318 Ill.App.3d 340, 741 N.E.2d 1131, 251 Ill.Dec. 953
**(Cite as: 318 Ill.App.3d 340, 741 N.E.2d 1131)**

Ill.Dec. 851, 743 N.E.2d 1007 (2000). We likewise reject the State's argument here, and declining to apply waiver, we will address the merits of defendant's challenge to his sentence.

[6][7] We must next resolve the question of *Apprendi's* applicability to defendant's case. The law provides that a judicial decision announcing a new constitutional rule applicable to criminal cases is to be applied retroactively to all cases pending on direct review at the time the new constitutional rule is declared. *People v. Erickson*, 117 Ill.2d 271, 288, 111 Ill.Dec. 924, 513 N.E.2d 367, 374 (1987), citing *Griffith v. Kentucky*, 479 U.S. 314, 328, 107 S.Ct. 708, 716, 93 L.Ed.2d 649, 661 (1987). In particular, for retroactivity to be triggered, two factors must be present: (1) the case to which the new rule is to be applied was pending on direct review or was otherwise not final when the rule was declared and (2) the rule to be applied retroactively is of constitutional dimension. *People v. Dean*, 175 Ill.2d 244, 253, 222 Ill.Dec. 413, 677 N.E.2d 947, 951 (1997); *Erickson*, 117 Ill.2d at 289, 111 Ill.Dec. 924, 513 N.E.2d at 374.

[8] We find both factors present in the instant case. Defendant's case was still pending on direct review and was not yet final when *Apprendi* was decided. The term "final" has been defined in the retroactivity context as " 'a case in which a judgment of conviction has been rendered, the availability of appeal exhausted, and the time for a petition for certiorari elapsed or a petition for certiorari finally denied.' " *People v. Holman*, 132 Ill.2d 128, 141, 138 Ill.Dec. 155, 547 N.E.2d 124, 128 (1989), quoting *Griffith*, 479 U.S. at 321 n. 6, 107 S.Ct. at 712 n. 6, 93 L.Ed.2d at 657 n. 6. Defendant raised his *Apprendi* challenge in a timely filed rehearing petition and at the earliest possible opportunity. Defendant's case, while at the rehearing stage, nonetheless remains before this court on direct review.

[9] Secondly, the Supreme Court's ruling clearly announced a new rule of constitutional dimensions. Such a finding is readily apparent from the *Apprendi* opinion itself, as well as from the Court's break from its past method of resolving the proper characterization of a particular penalty enhancement

statute. The *Apprendi* **\*\*1140 \*\*\*962** Court expressly predicated its holding . on the Constitution's due process clauses of the fifth and fourteenth amendments and the notice and jury trial guarantees of the sixth amendment. The right of a criminal defendant to have all facts, except the fact of a prior conviction, that increase the statutory maximum penalty for an offense pled in the indictment and proved to a jury beyond a reasonable doubt is, according to the Court, deeply rooted in the Constitution and its jurisprudence.

**\*349** Furthermore, in determining the validity of the New Jersey sentencing scheme under which Apprendi was punished, the Court did not seek to ascertain the state legislature's intent in enacting the statute by examining its language, structure, subject matter, context, and history. Neither did the Court place any weight on whether the enhancement fact at issue, *i.e.*, a biased purpose on the part of the offender, has been traditionally or typically viewed as a sentencing factor. Rather, the Court concerned itself solely with the principles that have developed in light of the rights guaranteed by the fifth and sixth amendments and the limits those constitutional provisions place on a legislature's ability to remove the determination of certain facts from the province of the jury which, if found, would elevate the penalty for a particular offense above its statutorily prescribed maximum.[FN8]

> FN8. Several federal courts have held that *Apprendi's* holding represents a new rule of constitutional law. See *United States v. Aguayo-Delgado*, 220 F.3d 926, 931-32 (8th Cir., 2000) ("[i]n *Apprendi*, the Supreme Court made it clear that the principle discussed in *Jones* is a rule of constitutional law"); *Sustache-Rivera v. United States*, 221 F.3d 8, 15 (1st Cir.2000) (recognizing same); *United States v. Murphy*, 109 F.Supp.2d 1059, 1062 (D.Minn.2000) (recognizing same); *United States v. Kelly*, 105 F.Supp.2d 1107, 1112 (S.D.Cal.2000) (recognizing same); *United States v. Rogers*, 228 F.3d 1318, 1325-26 (11th Cir.2000) (recognizing same); *United States v.*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

741 N.E.2d 1131                                                                    Page 24

318 Ill.App.3d 340, 741 N.E.2d 1131, 251 Ill.Dec. 953
**(Cite as: 318 Ill.App.3d 340, 741 N.E.2d 1131)**

*Nordby,* 225 F.3d 1053, 1059 (9th Cir.2000) (indicating that *Apprendi* established a new constitutional rule and applying the decision retroactively pursuant to *Griffith*).

Because defendant's case remains pending, and since *Apprendi* reflects the establishment of a new constitutional principle, we find *Apprendi* applicable to the instant matter. *Lathon,* 317 Ill.App.3d at 578-79, 251 Ill.Dec. 296, 740 N.E.2d 377 (applying *Apprendi* retroactively where defendant raised issue in petition for rehearing); *People v. Clifton,* Nos. 1-98-2126, 1-98-2384 cons., slip op. at 51 n. 6, --- Ill.App.3d ----, ----, ---Ill.Dec. ----, ---N.E.2d ---- (September 29, 2000) (applying *Apprendi* retroactively to case pending on review).

Pursuant to *Apprendi,* the question presented here is whether section 5-8-1(a)(1)(b) defines a separate, aggravated offense of murder or whether that provision merely represents a factor that a court may properly consider in imposing a sentence. In resolving this question, our duty is to ascertain the effect section 5-8-1(a)(1)(b) has on the statutory prescribed maximum imposed for a murder offense as set forth in paragraph (a)(1)(a) of that provision.

[10]   The State makes several attempts to demonstrate that the instant case is not covered by *Apprendi.* Each of the State's claims is based on the contention that defendant's life sentence is not beyond, but rather falls within, the prescribed statutory maximum for first degree murder. The State first contends that section 5-8-1(a)(1)(a) *350 simply provides the "typical" sentencing range for murder, and that the statutory maximum is actually life imprisonment or the death penalty as provided in section 9-1(b) of the Criminal Code of 1963 (Criminal Code) (Ill.Rev.Stat.1985 ch. 38, par. 9-1(b)). Based on its reading of the Corrections Code, the State asserts the applicable sentencing range should be referred to as 20 years in prison up to and including the death penalty.

The position posited by the State has been recently rejected by this court in *People v. Beachem,* 317 Ill.App.3d 693, 708, 251 Ill.Dec. 308, 740 N.E.2d 389 ***963 (2000). **1141 There, the defendant,

who was convicted of first degree murder, argued that her extended-term sentence of 90 years' imprisonment imposed under section 5-8-2(a) of the Corrections Code (730 ILCS 5/5-8-2(a) (West 1996)) ran afoul of the mandates of *Apprendi.* In asserting *Apprendi's* inapplicability, the State claimed, like here, that the defendant's 90-year sentence did not exceed the maximum penalty for first degree murder, which, according to the State, was life or the death penalty.

This court rejected the State's reading of the Corrections Code, finding the current version of section 5-8-1(a)(1)(a), which provides a sentencing range of 20 to 60 years, reflects the prescribed statutory maximum penalty for a first degree murder offense. *Beachem,* 317 Ill.App.3d at 706-707, 251 Ill.Dec. 308, 740 N.E.2d 389. The court noted that for any punishment exceeding 60 years, including either a term of life or the death penalty, to be imposed, additional aggravating factors must be found to exist. *Beachem,* 317 Ill.App.3d at 307, 251 Ill.Dec. 308, 740 N.E.2d 389. The court's conclusion was further buttressed by the specific language of the extended-term provision, which explicitly provides that " 'a judge shall not sentence an offender to a term of imprisonment *in excess of the maximum sentence authorized by Section 5-8-1'* " unless certain aggravating factors are present. (Emphasis in original.) *Beachem,* 317 Ill.App.3d at 706-707, 251 Ill.Dec. 308, 740 N.E.2d 389, quoting 730 ILCS 5/5-8-2(a)(1) (West 1996).

*Beachem* commands rejection of the State's contention in the present case. The predecessor version of section 5-1-8(a)(1), which is at issue here, expressly provides for a prison term of 20 to 40 years' imprisonment for first degree murder. Like the statutory schemes examined in *Beachem,* the 1985 version of the sentencing laws similarly authorizes a sentence in excess of 40 years only upon additional findings. See Ill.Rev.Stat.1985 ch. 38, par. 1005-8-1(a)(1)(b) (term of life imprisonment permitted if offense was "exceptionally brutal or heinous," or where any aggravating factors specified in section 9-1 of the Criminal Code, which lists the eligibility factors for a penalty of death, are present); Ill.Rev.Stat.1985 ch. 38, par. 1005-8-1(a)(1)(c) (term of life

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

318 Ill.App.3d 340, 741 N.E.2d 1131, 251 Ill.Dec. 953
**(Cite as: 318 Ill.App.3d 340, 741 N.E.2d 1131)**

authorized where defendant **\*351** has previously been convicted of murder or where he was found guilty of murdering more than one victim); Ill.Rev.Stat.1985 ch. 38, par. 1005-8-2(a)(1) (extended term of 40 to 80 years' imprisonment allowed where aggravating factors set forth in section 5-5-3.2 of Corrections Code are found to be present); Ill.Rev.Stat.1985 ch. 38, par. 9-1(b) (death penalty warranted where defendant has been convicted of murder while 18 years of age or older and where certain statutory aggravating factors are found). Additionally, the 1985 version of the extended-term provision found in section 5-8-2(a) sets forth verbatim the sentencing limitation found in the current legislation and discussed by the *Beachem* court. See Ill.Rev.Stat.1985 ch. 38, par. 1005-8-2(a) (expressly referring to section 5-8-1 as setting forth the maximum punishment for first degree murder).

The State alternatively contends that *Apprendi* stands for the proposition that the prescribed statutory maximum for first degree murder, from a constitutional standpoint, and seemingly notwithstanding the express language of the enhanced penalty provision at issue in the case, must be viewed in all instances as the imposition of the death penalty. In this regard, the State argues " as the elements of first degree murder are the same regardless of whether a defendant is facing the death penalty * * *, it would be absurd to find that a murder defendant facing the death penalty has no sixth amendment right to have a jury find the statutory aggravating eligibility factors, while all other murder defendants have the constitutional right to have a jury * * * find the statutory factors **\*\*1142 \*\*\*964** authorizing an extended term sentence or natural life imprisonment."

[11] The State essentially maintains that the dictates of *Apprendi* must apply equally to capital and noncapital defendants. The Supreme Court, however, specifically limited its holding in *Apprendi* to noncapital cases and was careful to note that its decision does not disturb its earlier ruling in *Walton v. Arizona,* 497 U.S. 639, 639-40, 110 S.Ct. 3047, 3049-50, 111 L.Ed.2d 511, 519-20 (1990), where the Court rejected the argument that the Constitution mandated that judge-authorized

findings of aggravating factors necessary for the imposition of the death penalty be made by a jury, and further dismissed the contention that those factors were "elements" of the underlying offense, which, according to the Court, merely represented standards to guide the decision of choosing between verdicts of death or another lesser form of punishment. *Apprendi,* 530 U.S. at ----, 120 S.Ct. at 2366, 147 L.Ed.2d at 459. Thus, while it appears *Apprendi* extends greater constitutional protections to noncapital, rather than capital, defendants,**\*352** the Court has endorsed this precise principle, and we are in no position to secondguess that decision here.[FN9]

> FN9. Notably, the Illinois death penalty statute expressly provides that the eligibility factors for such a punishment must be proved by the State beyond a reasonable doubt. Ill.Rev.Stat.1985 ch. 38, par. 9-1(f). In this regard, the death penalty statute conforms to the rule in *Apprendi.* The statute, however, does not require the State to give a defendant pretrial notice of the eligibility factors sought to be established. Our supreme court has specifically held that no constitutional right exists entitling a criminal defendant to such notification. *People v. Jones,* 123 Ill.2d 387, 426, 123 Ill.Dec. 944, 528 N.E.2d 648, 666 (1988); *People v. Crews,* 122 Ill.2d 266, 293, 119 Ill.Dec. 308, 522 N.E.2d 1167, 1180 (1988).

[12] In a final attempt to show that the statutory maximum was not exceeded in this case, the State relies on the Seventh Circuit's recent decision in *United States v. Smith,* 223 F.3d 554 (7th Cir .2000) , for the proposition that the theoretical possibility of a certain statutory penalty of a given offense represents that offense's maximum punishment. Because a conviction of first degree murder carries the theoretical possibility of either a sentence of death or life in prison under Illinois law, the State maintains that death or life is the maximum penalty for murder.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

741 N.E.2d 1131

318 Ill.App.3d 340, 741 N.E.2d 1131, 251 Ill.Dec. 953
**(Cite as: 318 Ill.App.3d 340, 741 N.E.2d 1131)**

We do not share the State's reading of *Smith.* Contrary to the State's contention, nothing in *Smith* suggests that the highest theoretical punishment for a particular crime constitutes the statutory maximum for purposes of applying *Apprendi.* Moreover, the sentencing statute in *Smith* concerned the imposition of a mandatory minimum under certain circumstances. See *Smith,* 223 F.3d at 562-63 (statute authorized range of 30 years' imprisonment to life upon a finding that the defendant participated in a continuing criminal enterprise, but set forth a mandatory minimum sentence of life for any defendant who, *inter alia,* was a principal or otherwise was a leader in such enterprise). The *Smith* court specifically indicated that *Apprendi* did not apply, and noted that the Supreme Court, in *McMillan,* expressly upheld the validity of such mandatory minimum sentencing legislation. *Smith,* 223 F.3d at 565-66. The sentencing scheme in this case does not involve the imposition of a mandatory minimum punishment but, rather, authorizes an enhanced penalty upon the finding of certain specified factual circumstances.

[13] We must now decide whether that enhancement procedure is constitutional under *Apprendi* and must specifically consider whether the sentencing factor reflected in section 5-8-1(a)(1)(b), *i.e.,* whether the murder was accompanied by "exceptionally brutal or heinous behavior indicative of wanton cruelty," represents a factual determination, and, if so, whether that determination*353 increases the maximum penalty for murder.

**\*\*1143 \*\*\*965** [14][15] Certainly, the question of whether a particular murder was accompanied by " exceptionally brutal or heinous behavior" necessarily involves an examination of, and is based upon, the factual circumstances presented by the evidentiary proofs. Further, a court's finding that a murder was accompanied by such behavior significantly increases the statutory maximum penalty from a term of 40 years' imprisonment to a term of natural life. Based on the foregoing, the " exceptionally brutal or heinous" inquiry presented by section 5-8-1(a)(1)(b) is most accurately characterized for constitutional purposes as an element of a greater crime, rather than a mere factor

to be considered at sentencing. Accordingly, if the State wishes to seek an enhanced sentence for murder on the grounds that the offense was " exceptionally brutal or heinous," it must allege that factual circumstance in the relevant charging instrument and prove it to a jury beyond a reasonable doubt.[FN10] We note that a different division of this court in *People v. Lee,* 318 Ill.App.3d 417, 422, 252 Ill.Dec. 863, 743 N.E.2d 1019 (2000), and the Second District Appellate Court in *People v. Joyner,* 317 Ill.App.3d 93, 110, 250 Ill.Dec. 831, 739 N.E.2d 594 (2000), have recently determined that section 5-8-1(a)(1)(b) is constitutionally infirm under *Apprendi.*

> FN10. We make no comment on whether such a procedure is properly available to the State under current Illinois law.

[16] Considering the merits of defendant's challenge, the crime of murder as defined in section 9-1 of the Criminal Code did not require a finding by the jury that defendant's conduct accompanying the victim's murder was "exceptionally brutal or heinous." It is of no surprise then that the State's charging instruments make no mention of such circumstances. Further, the record is clear that defendant's jury made no finding concerning the nature of the victim's murder and specifically reveals that the jurors never considered and passed on the question of whether defendant acted brutally or heinously.

The highest punishment defendant could receive based solely on the facts reflected by the jury's verdict was the maximum term of 40 years' imprisonment. The jury's verdict authorized no greater penalty. Only when the sentencing judge, proceeding under a relaxed evidentiary standard, found an additional factual circumstance related to the crime did defendant become subject to a prison term well in excess of the maximum. That procedure, as *Apprendi* dictates, offends constitutional principles and is invalid as applied to defendant in this case. See *Beachem,* 317 Ill.App.3d at 708, 251 Ill.Dec. 308, 740 N.E.2d 389 (noting the *Apprendi* Court never declared the New Jersey statute void on its face but, rather, referred to

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

741 N.E.2d 1131                                                                            Page 27

318 Ill.App.3d 340, 741 N.E.2d 1131, 251 Ill.Dec. 953
**(Cite as: 318 Ill.App.3d 340, 741 N.E.2d 1131)**

it as creating an unconstitutional procedure).

**\*354** Since the State never alleged and proved to
the jury beyond a reasonable doubt that defendant
acted in an "exceptionally brutal or heinous"
fashion when he murdered the victim, we vacate
defendant's life sentence and remand for a sentence
that is consistent with this opinion.

### CONCLUSION

We affirm defendant's conviction for murder based
on the reasons expressed in the unpublished portion
of this opinion. We further vacate defendant's
sentence of life and remand for the imposition of a
new prison term that is consistent with this opinion.

Affirmed in part and reversed in part; cause
remanded with directions.

CAHILL, P.J., and WOLFSON, J., concur.
Ill.App. 1 Dist.,2000.
People v. Kaczmarek
318 Ill.App.3d 340, 741 N.E.2d 1131, 251 Ill.Dec.
953

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

NO. _____

IN THE

SUPREME COURT OF ILLINOIS

|  |  |
|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, )<br><br>Plaintiff-Appellant, )<br><br>vs. )<br><br>HENRY KACZMAREK, )<br><br>Defendant-Appellee. ) | Appeal from the<br>Appellate Court<br>of Illinois,<br>First District,<br>Third Division,<br>Appellate Court No. 97-2557<br><br>———<br><br>There Heard on Appeal<br>from the Circuit Court<br>of Cook County,<br>Criminal Division.<br><br>———<br><br>Honorable<br>John Brady,<br>Judge Presiding. |

## PETITION FOR APPEAL AS A MATTER OF RIGHT
## OR IN THE ALTERNATIVE, PETITION FOR LEAVE TO APPEAL

> JAMES E. RYAN,
>   Attorney General
>   State of Illinois
> WILLIAM L. BROWERS,
>   Assistant Attorney General
>   100 West Randolph Street, Suite 1200
>   Chicago, Illinois 60601
>
> Attorneys for Plaintiff-Appellant.

RICHARD A. DEVINE,
  State's Attorney
  County of Cook
  309 Richard J. Daley Center
  Chicago, Illinois 60602
RENEE G. GOLDFARB,
WILLIAM D. CARROLL,
ALAN J. SPELLBERG,
  Assistant State's Attorneys,
    Of Counsel.

EXHIBIT B

IN THE

SUPREME COURT OF ILLINOIS

| | |
|---|---|
| | ) Appeal from the |
| | ) Appellate Court |
| PEOPLE OF THE STATE OF ILLINOIS, | ) of Illinois, |
| | ) First District, |
| | ) Third Division, |
| Plaintiff-Appellant, | ) Appellate Court No. 97-2557 |
| | ) |
| | ) |
| vs. | ) There Heard on Appeal |
| | ) from the Circuit Court |
| | ) of Cook County, |
| HENRY KACZMAREK, | ) Criminal Division. |
| | ) |
| | ) |
| Defendant-Appellee. | ) Honorable |
| | ) John Brady, |
| | ) Judge Presiding. |

## I.

## BASIS OF APPEAL AS A MATTER OF RIGHT

Pursuant to the provisions of Supreme Court Rules 315 and 317, the People of the State

of Illinois respectfully appeal to this Honorable Court as a matter of right, or in the alternative, ask

for leave to appeal from the judgment entered in the above-entitled cause by the Appellate Court,

First District, Third Division.

The instant appeal should be accepted as a matter of right because the Appellate Court

held that section 5-8-1(a)(1)(b) of the Unified Code of Corrections is unconstitutional pursuant to

the recent United States Supreme Court decision of Apprendi v. New Jersey, 530 U.S. 466, 120

S. Ct. 2348 (2000). See People v. Kaczmarek, ___ Ill. App.3d ___ (No. 1-97-2557 December 27,

1

2000). Specifically, the Appellate Court held that section 5-8-1(a)(1)(b) is unconstitutional because a finding by the trial court that defendant committed the instant murder in an exceptionally brutal or heinous manner indicative of wanton cruelty authorized a sentence for first degree murder beyond the 40 year maximum provided for in section 5-8-1(a)(1)(a). Slip op. at 59-61. Because the determination that section 5-8-1(a)(1)(b) was unconstitutional arose for the first time and as a result of the Appellate Court's ruling, the People maintain that appeal as a matter of right is appropriate in the instant case. Supreme Court Rule 317. (134 Ill. 2d R. 317).

Furthermore, this Honorable Court should reverse the lower court's ruling that section 5-8-1(a)(1)(b) is unconstitutional in light of Apprendi because that conclusion is inconsistent with Apprendi and other rulings by the United States Supreme Court and other courts recognizing that the "prescribed statutory maximum" for first degree murder is the death penalty and that judicial fact-finding at sentencing is constitutionally permissible, even if those facts tend to lengthen the actual time of imprisonment, provided the sentence imposed is within the "prescribed statutory maximum." See Apprendi, 120 S.Ct. at 2361, 2365; See also Walton v. Arizona, 479 U.S. 639, 110 S.Ct. 3047 (1990); McMillan v. Pennsylvania, 477 U.S. 79, 106 S.Ct. 2411 (1986); United States v. Dunigan, 507 U.S. 87, 113 S.Ct. 1111 (1993); Edwards v. United States, 523 U.S. 511, 118 S.Ct. 1475 (1998); United States v. Watts, 519 U.S. 148, 117 S.Ct. 633 (1997); Hernandez v. United States, 226 F.3d 839 (7th Cir. 2000); United States v. Smith, et al., 223 F. 3d 554 (7th Cir. 2000); State v. Conley, ___ Kan. ___, 2000 Kan. LEXIS 810 (No. 82,380 October 27, 2000); and State v. Grooms, ___ S.C. ___, 2000 S.C. LEXIS 218, at *8-9 (No. 25211 November 7, 2000).

In the alternative, the People respectfully request this Honorable Court to grant leave to appeal in order to provide guidance to Illinois courts and litigants as to the proper interpretation

of the United States Supreme Court's opinion in <u>Apprendi</u>.    Moreover, as the Appellate Court's ruling may be inconsistent with this Court's forthcoming resolution of the issue in <u>People v. Eric Ford</u>, case no. 90083 (petition for leave to appeal granted November 29, 2000), the People respectfully request this Honorable Court to hold the instant matter until <u>Ford</u> is resolved.

## II.

## HISTORY IN THE APPELLATE COURT

On June 28, 2000, the Appellate Court, First District, Third Division, affirmed defendant's conviction and his sentence of natural life imprisonment for first degree murder in a unpublished order pursuant to Supreme Court rule 23. Thereafter on July 18, 2000, defendant filed a petition for rehearing and supplemental brief alleging that his natural life sentence imposed under section 5-8-1(b) of the Unified Code of Corrections (730 ILCS 5/5-8-1(b)) is unconstitutional pursuant to Apprendi v. New Jersey, 530 U.S. 466, 120 S. Ct. 2348 (2000). After hearing additional oral argument, on December 27, 2000, the Appellate Court withdrew its earlier unpublished order and issued a published opinion affirming defendant's conviction but vacating his natural life sentence and remanding the matter for resentencing. See People v. Kaczmarek, ____ Ill. App.3d ___ (No. 1-97-2557 December 27, 2000), Slip op. at 59-61. On January 17, 2001, an affidavit stating the People's intention to seek an appeal as a matter of right, or in the alternative leave to appeal, to this Honorable Court was filed with the Appellate Court, First District, Third Division, pursuant to Supreme Court Rule 368(b).

4

## III.

## POINTS RELIED UPON FOR REVERSAL

The Appellate Court, First District, Third Division held section 5-8-1(b) of the Unified Code of Corrections (730 ILCS 5/5-8-1(b)) unconstitutional pursuant to the recent United States Supreme Court decision of <u>Apprendi v. New Jersey</u>, 530 U.S. 466, 120 S. Ct. 2348 (2000). This conclusion is inconsistent with the <u>Apprendi</u> opinion itself as well as other rulings by the United States Supreme Court and other courts recognizing that the "prescribed statutory maximum" for first degree murder is the death penalty and that judicial fact-finding at sentencing is constitutionally permissible, even if those facts tend to lengthen the actual time of imprisonment, provided the sentence imposed is within the "prescribed statutory maximum."

## IV.

## STATEMENT OF FACTS

Defendant Henry Kaczmarek Defendant was charged and convicted of the 1987 stabbing murder of 86 year-old Millie Nielson. (R.C. Vol. I C35)  On direct appeal, the Illinois Appellate Court reversed and remanded this cause for a new trial. People v. Kaczmarek, 243 Ill. App. 3d 1067, 613 N.E.2d 1252 (1st Dist. 1993).  On remand, defendant was again convicted by a jury of first degree murder and was sentenced to natural life imprisonment. (R.C. Vol. II C152, C293)

Then, on December 27, 2000, the Appellate Court, First District, Third Division affirmed defendant's conviction for first degree murder, but vacated his natural life sentence and remanded for resentencing. People v. Kaczmarek, ____ Ill. App.3d ____ (No. 1-97-2557 December 27, 2000), Slip op. at 59-61.. This appeal followed.

## V.

## ARGUMENT

**THIS HONORABLE COURT SHOULD EXERCISE ITS JURISDICTION OVER THE INSTANT APPEAL BECAUSE THE APPELLATE COURT'S HOLDING THAT SECTION 5-8-1(a)(1)(b) OF THE UNIFIED CODE OF CORRECTIONS IS UNCONSTITUTIONAL IN LIGHT OF APPRENDI IS INCONSISTENT WITH APPRENDI AND OTHER RULINGS BY THE UNITED STATES SUPREME COURT.**

This Honorable Court should exercise its jurisdiction over the instant appeal either pursuant to Supreme Court Rule 317 or Supreme Court Rule 315 because the Appellate Court's conclusion that section 5-8-1(a)(1)(b) is unconstitutional in light of Apprendi is inconsistent with the Apprendi decision itself and other rulings by the United States Supreme Court recognizing the legitimacy of judicial fact-finding at sentencing, even if those facts tend to lengthen the actual time of imprisonment, provided the sentence imposed is within the "prescribed statutory maximum."

In Apprendi, the defendant pled guilty to the second degree offense of unlawful firearm possession, but because the trial judge at the sentencing hearing made the factual finding that the defendant had committed the crime with a biased purpose, the court imposed a sentence based on an extended range of 10-20 years rather than the 5-10 year range generally applicable to the second degree offenses. Apprendi v. New Jersey, 530 U.S. ___, 120 S. Ct. 2348 (2000). After the defendant's appeals were rejected by the New Jersey state courts, the United States Supreme Court reversed, holding that the Constitution requires that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury and proved beyond a reasonable doubt." Id., 120 S.Ct. at 2362-63.

7

In reliance on this holding, the Appellate Court in the instant case held that section 5-8-1(a)(1)(b) is unconstitutional because a finding by the trial court that the defendant committed the murder in an exceptionally brutal or heinous manner indicative of wanton cruelty permitted the court to impose a sentence for first degree murder beyond 40 years imprisonment. People v. Kaczmarek, ___ Ill. App.3d ___ (No. 1-97-2557  December 27, 2000), Slip op. at 59-61. The People maintain that the Appellate Court's holding is inconsistent with the Apprendi decision itself and other rulings by the United States Supreme Court recognizing that the "prescribed statutory maximum" for first degree murder is the death penalty and that judicial fact-finding at sentencing is constitutionally permissible, even if those facts tend to lengthen the actual time of imprisonment, provided the sentence imposed is within the "prescribed statutory maximum."[1]  As such, application of Apprendi to Illinois first degree murder provision is both unnecessary and incorrect.

It is true that the Apprendi majority held that the United States Constitution requires that any fact that increases the penalty for a crime beyond the prescribed statutory maximum, other than the fact of a prior conviction, must be submitted to a jury and proved beyond a reasonable doubt. Id., 120 S.Ct. at 2362-63. However, the People maintain that in imposing a sentence of natural life imprisonment because the murder was accompanied by brutal and heinous behavior indicative of

---

[1]The People also maintain that defendant has waived this issue because he never challenged the constitutionality of his sentence. See 730 ILCS 5-8-1 (c) (1994); People v. Reed, 177 Ill.2d 389, 686 N.E.2d 584 (1997). Accordingly, the People maintain that defendant's challenge to his sentence is waived and should be summarily rejected.  Similarly, in regard to any claim that the charging instrument was deficient, the People point out that a failure to challenge a charging instrument prior to the conclusion of the trial will result in waiver of the issue unless the defendant can prove that he was prejudiced by the deficiency. See People v. Thingvold, 145 Ill. 2d 441, 448, 584 N.E.2d 89 (1991); People v. Gilmore, 63 Ill. 2d 23, 29, 344 N.E.2d 456 (1976). Because defendant has never even alleged that he was prejudiced by the alleged deficiency in the indictment, all of defendant's arguments should be deemed waived.

8

wanton cruelty, the trial court **did not** impose a sentence which was "beyond the prescribed statutory maximum."

First, unlike all the other offenses listed in the Criminal Code of 1961, first degree murder is **not** part of a particular class of felony such as Class X or Class 1. Rather, it is by definition a "separate class of felony." 730 ILCS 5/5-5-1(b)(1). Therefore, first degree murder is unique and must be treated as such. Thus, while section 5-8-1(a)(1) of the Unified Code of Corrections (730 ILCS 5/5-8-1(a)(1)) delineates the statutory maximum sentences for all the other classes of felonies, section 5-8-1(a)(1)(a) simply provides the typical sentencing range for first degree murder. This is true because the legislature has clearly stated that the maximum sentence available for the offense of first degree murder is the death penalty. See 720 ILCS 5/9-1(b), 730 ILCS 5/5-8-1(a)(1)(c). Similarly, the legislature has clearly stated that defendants convicted of first degree murder may be sentenced to a term of natural life imprisonment in certain types of cases. See 730 ILCS 5/5-8-1(a)(1)(b),(c). Thus, the range of sentencing for first degree murder should more appropriately be referred to as 20 years of imprisonment up to and including the death penalty.

Furthermore, the Apprendi decision itself indicates that from a constitutional standpoint, the "prescribed statutory maximum" for first degree murder is the imposition of the death penalty. In response to the dissent's assertion that the Apprendi holding was in direct conflict with the Court's earlier decision in Walton v. Arizona, 479 U.S. 639, 110 S.Ct. 3047 (1990) (where the Court approved an Arizona statutory scheme authorizing the trial judge rather than the jury to find the existence of the requisite aggravating factor in order to find the defendant eligible for the death penalty), the Apprendi majority explained:

9

"Neither the cases cited, nor any other case, permits a judge to determine the existence of a factor which makes a crime a capital offense. What the cited cases hold is that, once a <u>jury</u> has found the defendant <u>guilty</u> of <u>all the elements</u> of an offense which carries as its maximum penalty the sentence of death, it may be left to the judge to decide whether that maximum penalty, rather than a lesser one, ought to be imposed . . . . The person who is charged with actions that expose him to the death penalty has an absolute entitlement to jury trial on <u>all the elements</u> of the charge."

<u>Apprendi</u>, 120 S.Ct. at 2366 (quoting <u>Almendarez-Torres v. United States</u>, 523 U.S. 224, 257 n.2, 118 S. Ct. 1219, 1237 n.2 (1998) (Scalia, J., dissenting)) (emphasis in <u>Almendarez-Torres</u>).

Thus, by its own terms, the holding of <u>Apprendi</u> does not apply to Illinois' first degree murder statute because once a defendant has been found guilty of that offense, the only remaining question is what sentence should be imposed, be it the death penalty or a lesser sentence such as life imprisonment or a term of years. As the elements of first degree murder are the same regardless of whether a defendant is facing the death penalty (see 720 ILCS 5/9-1(a)), it would be absurd to find that a murder defendant facing the death penalty has no sixth amendment right to have the jury[2] find the statutory aggravating eligibility factors, while all other murder defendants have the constitutional right to have a jury find the statutory factors authorizing an extended term sentence or natural life imprisonment. Certainly, nothing in the <u>Apprendi</u> opinion or the rest of the Supreme

---

[2] In Illinois, the right to have a jury determine a defendant's eligibility for the death penalty is one of statutory creation and not constitutionally based. See <u>People v. Ramey</u>, 152 Ill. 2d 41, 65, 604 N.E.2d 275, 286 (1992)

Court's jurisprudence indicates that capital defendants are entitled to **fewer** constitutional protections than non-capital defendants.

Moreover, despite the oft-cited holding, it is clear that the Apprendi decision does **not** prohibit all judicial fact-finding at sentencing, even if those facts tend to lengthen the actual time of imprisonment. Rather, the Apprendi court expressly stated that the constitution permits such sentencing determinations as long as the sentence imposed is within the prescribed statutory range. See Id.,120 S.Ct. at 2365 (citing McMillan v. Pennsylvania, 477 U.S. 79, 106 S.Ct. 2411 (1986)).

In McMillan, the Court held that a defendant's constitutional rights are not infringed by a legislative enactment calling for a mandatory minimum sentence whenever the sentencing judge found a specific fact to be in existence. The Court stated that even though the defendant would be subject to a higher minimum sentence (and therefore serve a longer period of imprisonment) than he would have been without the judge's finding, the constitutional requirements that each element of the offense be proven beyond a reasonable doubt and found by a jury did not apply because the legislature had merely identified a particular "sentencing factor" and provided the appropriate weight to be given to that factor. Id. at 86-88, 106 S.Ct. at 2416-17. The McMillan court qualified its holding, however, by pointing out that the statute did not "expose [defendants] to greater or additional punishment" by "alter[ing] the maximum penalty for the crime committed." Id. at 87-88, 106 S.Ct. at 2417 (emphasis added).

The majority opinion in Apprendi specifically refers to this qualification of the holding in McMillan and points out that it is not overruling McMillan, but "limit[ing] its holding to cases that do not involve the imposition of a sentence more severe than the statutory maximum for the offense established by the jury's verdict -- a limitation identified in the McMillan opinion itself."

11

Apprendi, 530 U.S. at ___, 120 S.Ct. at 2361, n.13. Thus, it is clear that the Apprendi decision by its own terms permits judicial fact-finding at sentencing even if those facts have the effect of lengthening the actual time of imprisonment served by the defendant.

Consistent with this interpretation, the Seventh Circuit has held that as long as a sentence is theoretically possible under the statute, McMillan rather than Apprendi controls. Hernandez v. United States, 226 F.3d 839 (7th Cir. 2000); United States v. Smith, 223 F. 3d 554 (7th Cir. 2000). In Hernandez, the defendant argued that his enhanced sentence for kidnaping was unconstitutional under Apprendi because the additional facts that supported the upward adjustments under the Federal Sentencing Guidelines "were facts that should have been charged in the indictment, submitted to the jury and proven beyond a reasonable doubt." Hernandez, 226 F.3d at 841. In rejecting that argument, the Seventh Circuit pointed out that the defendant had "overlook[ed] the distinction between the prescribed statutory maximum and the various levels of punishment authorized by the Sentencing Guidelines." Id. The court then held that because the prescribed statutory maximum under the kidnaping statute is life imprisonment, "[t]he fact that different levels under the statutory maximum depend on proof of various aggravating facts is not enough to make those facts 'elements of the offense' rather than 'sentencing factors.'" Id.

Similarly, in rejecting the defendants' arguments that their life sentences for continuing criminal enterprise convictions violated the rule in Apprendi, the Seventh Circuit stated in Smith:

> [W]e must decide whether § 848(b) has the kind of "increased punishment"
> effect that triggers the Apprendi rule. This is a difficult inquiry. On the one
> hand, § 848(a) authorizes a range of imprisonment of 30 years to life, and §
> 848(b) simply eliminates anything in that range below a life sentence for the
> principal administrator, organizer or leader when the required quantities or

value of drugs are involved. Thus, at the time the Governor defendants went to trial, they knew that they faced the risk of a life sentence.    On the other hand, as Justice Thomas wrote in his concurring opinion in Apprendi, at a certain level of generality one can surely say that a fact that increases the prosecution's entitlement is an element, not a sentencing factor. Ex ante, the expected punishment the defendant will receive is necessarily greater if the range has been shrunk from 30 years to life, to mandatory life: "The mandatory minimum entitles the government to more than it would otherwise be entitled (5 to 10 years, rather than 0 to 10 and the risk of a sentence below 5). Thus, the fact triggering the mandatory minimum is part of the punishment sought to be inflicted."

We must decide, therefore, whether the literal fact that these defendants faced at least a risk of a life term is enough to make § 848(b) a sentencing statute under Apprendi. Such a decision would, of course, amount to a rejection of the theory of increased expected punishment articulated by Justices Thomas and Scalia in Apprendi -- a theory that the other three justices in the majority had no occasion to discuss, given the nature of the New Jersey law actually before them. In the end, however, it is our best guess that the rest of the majority would not have gone this far (and it seems clear that the four dissenters would have no trouble finding a sentencing factor under the circumstances now before us). The language of the principal opinion refers not to the defendant's expected punishment, but to the "prescribed statutory maximum." That sounds to us like a reference to the text of the statute, and there is no doubt here that a life sentence was possible under § 848(a), even if it was not a certainty.

We agree entirely with Justice Thomas's observation that the predicted sentence would often be lower, if the judge knew she could select a sentence below life. Indeed, we have often remanded cases for resentencing if a district court makes an error in calculating either offense level or criminal history

13

under the Sentencing Guidelines, and (for example) that error has the effect

of moving the defendant from level 43 (mandatory life) to level 42 at any

criminal history category (360 months to life). The defendant is entitled in

those cases to a chance to persuade the judge to select something less than

life, even though the risk of a new life sentence remains. Nevertheless, the

Court has reiterated several times that it has not overruled McMillan, and it

seems to us that the rationale of McMillan applies with equal force to § 848:

"[The statute] operates to divest the judge of discretion to impose any

sentence of less than [life] for the underlying felony; it does not authorize a

sentence in excess of that otherwise allowed for that offense." See *477 U.S.

at 81-82.* We therefore reject the Governor defendants' argument that the

indictment should have charged that they satisfied the criteria of § 848(b) and

that the jury should have found those facts beyond a reasonable doubt.

Smith, 223 F.3d at 565-66 (emphasis added) (citations omitted).

Similarly, in State v. Conley, ___ Kan. ___, 11 P.3d 1147 (No. 82,380 October 27,

2000), the Kansas Supreme Court rejected the defendant's arguments that his "hard 40" sentence

for first degree premeditated murder (meaning that he would not be eligible for parole for 40 years

rather than the typical 25) violated Apprendi because it was based upon a finding by the trial judge

of certain statutory aggravating factors, including that "'the defendant committed the offense in an

especially heinous, atrocious or cruel manner'" (Id., 11 P.3d at 1155 (quoting K.S.A. 21-436(f)).

The Conley court explained that the defendant's constitutional rights were not violated even though

the judge's finding resulted in an extra 15 years of imprisonment because it did not increase the

maximum penalty. Id. 11 P.3d at 1158-59 (citing McMillan). See also State v. Grooms, ___ S.C.

___, 2000 S.C. LEXIS 218, at *8-9 (No. 25211 November 7, 2000) (holding that McMillan rather

than Apprendi applies to determinations as to whether or not the evidence warranted the

14

defendant's eligibility for early parole "[b]ecause the maximum penalty for voluntary manslaughter is not increased by [the early release provision]").

Moreover, numerous other cases recently decided by the United States Supreme Court demonstrate that the constitution is not violated when trial courts make factual findings at sentencing which serve to lengthen the defendant's sentence, provided the sentence imposed is within the prescribed statutory maximum. For example, in Edwards v. United States, 523 U.S. 511, 514-16, 118 S.Ct. 1475, 1477-78 (1998), the Court unanimously held that a sentencing judge could legally make the determination as to whether a defendant had been convicted of conspiracy to possess powder cocaine or crack cocaine even though the jury did not make such a distinction and the minimum sentence for crack cocaine was higher than that for powder cocaine. The Court pointed out, however, that the defendants' "constitutional claims would make a difference if it were possible to argue . . . that the sentences imposed exceeded the maximum that the statutes permit for cocaine-only conspiracy." Id. at 515, 118 S.Ct. at 1477 (emphasis added).[3]

Similarly, in United States v. Dunigan, 507 U.S. 87, 97-98, 113 S.Ct. 1111, 1118-19 (1993), the Court unanimously held that a defendant's constitutional rights are not violated when a federal court imposes a mandatory enhancement to a sentence - but still within the statutory range - based on the finding that the defendant perjured himself at trial even though the defendant had never been charged with perjury and the jury was never instructed to make a finding that the defendant had perjured himself.

---

[3] The Apprendi majority specifically referred to the Court's unanimous ruling in Edwards to indicate that Federal Sentencing Guidelines do not violate the holding of Apprendi as long as the sentence imposed does not exceed the statutory maximum. See Apprendi, 120 S.Ct. at 2366, n. 21.

15

Finally, in <u>United States v. Watts</u>, 519 U.S. 148, 156-57, 117 S.Ct. 633, 637 (1997), the Court relied upon <u>McMillan</u> when it held that the constitution does not prohibit sentencing courts from imposing lengthier sentences based on a finding that the defendant had committed additional criminal conduct <u>even though the defendant had previously been acquitted for those offenses</u>.

Thus, it is clear that <u>Apprendi</u> does not in any way prohibit judicial fact-finding at sentencing, even if the result is a longer period of imprisonment for the defendant. The <u>only</u> restriction is that specifically identified by <u>Apprendi</u> and <u>McMillan</u>: that a court may not impose a sentence beyond the prescribed statutory maximum. However, because the Illinois legislature has authorized the imposition of the death penalty and natural life imprisonment for the offense of first degree murder, the mere fact that the extended term sentencing and life imprisonment provisions call for the trial judge rather than a jury to make the requisite findings is meaningless.

Moreover, because the <u>Apprendi</u> majority specifically noted that state legislatures may set a high maximum penalty and then give the trial judges "guided discretion as to a few specially selected factors within that range" (<u>Id.</u>, 120 S.Ct. at 2363, n.16), the People maintain Illinois' statutory scheme authorizing several ranges of sentencing for first degree murder <u>within</u> the boundaries of 20 years' imprisonment up to and including the death penalty wholly comports with the constitution. Thus, as with the federal statutes at issue in <u>Hernandez</u> and <u>Smith</u> or the Kansas provision at issue in <u>Conley</u>, every first degree murder case in Illinois carries the theoretical possibility of either the death penalty or life imprisonment being imposed. Accordingly, it cannot be said that a sentence has exceeded the "prescribed statutory maximum" when a sentencing judge imposes a sentence longer than 60 years' imprisonment for first degree murder.

16

The People acknowledge that the Appellate Court has rejected similar arguments in People v. Beachem, ___ Ill. App. 3d ___, 2000 Ill. App. LEXIS 868 (No. 1-99-0852 Nov. 8, 2000) (holding that the defendant's 90 year sentence violated Apprendi) and People v. Joyner, ___ Ill. App. 3d ___, 2000 Ill. App. LEXIS 885 (No. 2-99-0433 Nov. 8, 2000) (holding that the defendant's sentence of natural life imprisonment was unconstitutional). However, neither the Beachem nor the Joyner opinion, nor the Appellate Court's ruling in the instant case provide any explanation as to how their holdings were consistent with the Apprendi court's clear statement that both Walton and McMillan are still good law. Rather, the courts blindly applied the general holding of Apprendi without any reference to the clear distinctions made by the Apprendi Court itself. By doing so, the Appellate Court in the instant case as well as in Beachem and Joyner has disregarded the carefully balanced approach adopted by the Supreme Court; that Apprendi's holding should be construed in conjunction with Walton and McMillan rather than in contravention to them. Similarly, the Appellate Court has ignored the clear guidance offered by both the Seventh Circuit in Hernandez and Smith and the Kansas Supreme Court in Conley as to how Apprendi should be interpreted consistently with the Supreme Court's previous decisions.

Furthermore, the Appellate Court's opinion in People v. Clifton, ___ Ill. App. 3d ___, 2000 Ill. App. LEXIS 804 (1st Dist. Nos. 1-98-2126 & 1-98-2384 (cons.) September 29, 2000) (holding that the consecutive sentencing provision of the Unified Code of Corrections (730 ILCS 5/5-8-4(a)) violates Apprendi), has also misinterpreted the holding of Apprendi. While it is true that Apprendi states that "the relevant inquiry is not one of form, but of effect"(120 S.Ct. at 2365), Clifton's reliance on this reference to support the conclusion that any factual finding which results in a longer term of imprisonment violates Apprendi (Id. 2000 Ill. App. LEXIS 804 at *70) is

inappropriate. When viewed in context, the Apprendi court was merely stating that it is irrelevant as to whether or not a factor which increases the sentencing range beyond the prescribed statutory maximum is referred to as an "element" or a "sentencing factor" because it must nevertheless comport with the requirements imposed by the Due Process Clause and the Sixth Amendment. However, nowhere in the opinion does the Supreme Court hold that the "effect" of permitting a longer period of imprisonment within the prescribed statutory maximum based on judicial fact finding would violate the constitutional mandate. Rather, the Court expressly rejected such a proposition when it reaffirmed McMillan.

Moreover, although the Clifton court referred to the "stigma and loss of liberty attached to [the imposition of consecutive sentences]" (Clifton, 2000 Ill. App. LEXIS 804 at *70-71 (citing Apprendi, 120 S.Ct. at 2359)), the People maintain that such a consideration is relevant only in situations where the sentence imposed is beyond the prescribed statutory range. To apply it in other circumstances would mean that trial courts should never make any factual findings at sentencing, even if only deciding what sentence to impose within a particular range, because those facts would have resulted in an improper stigma and loss of liberty. Thus, taken to its logical extreme, the Clifton rationale would effectively prevent sentencing judges from considering any facts or arguments in aggravation which would support a lengthier sentence, thereby negating the judges' broad discretion to impose the appropriate sentence. Certainly, such a result would be absurd and wholly contradicts Apprendi's clear statement that judges retain their discretion to impose sentences within the statutory range (Apprendi, 120 S.Ct. at 2358) as well as the Court's express reliance upon both McMillan and Edwards.

Accordingly, for all the foregoing reasons, the People respectfully request that this Honorable Court accept the instant appeal as a matter of right. In the alternative, the People request this Honorable Court to grant leave to appeal in order to provide guidance to Illinois courts and litigants as to the proper interpretation of the United States Supreme Court's opinion in Apprendi. Moreover, as the Appellate Court's ruling may be inconsistent with this Court's forthcoming resolution of the issue in People v. Eric Ford, case no. 90083 (petition for leave to appeal accepted November 29, 2000), the People respectfully request this Honorable Court to hold the instant matter until Ford is resolved.

19

## CONCLUSION

The People of the State of Illinois respectfully request this Honorable Court accept the instant appeal as a matter of right, or in the alternative, grant leave to appeal.

Respectfully submitted,

JAMES E. RYAN,
  Attorney General
  State of Illinois
WILLIAM L. BROWERS,
  Assistant Attorney General
  100 West Randolph Street, Suite 1200
  Chicago, Illinois 60601

Attorneys for Plaintiff-Appellant.

RICHARD A. DEVINE,
  State's Attorney
  County of Cook
  309 Richard J. Daley Center
  Chicago, Illinois 60602
RENEE G. GOLDFARB,
WILLIAM D. CARROLL,
ALAN J. SPELLBERG,
  Assistant State's Attorneys,
    Of Counsel.

20

**THIRD DIVISION**
**DECEMBER 27, 2000**

**NOTICE**

The text of this opinion may be changed or corrected prior to the time for filing of a Petition for Rehearing or the disposition of the same.

No. 1-97-2557

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County |
| | ) | |
| v. | ) | |
| | ) | |
| HENRY KACZMAREK, | ) | Honorable |
| | ) | John Brady, |
| Defendant-Appellant. | ) | Judge Presiding. |

## OPINION ON DENIAL OF REHEARING

JUSTICE CERDA delivered the opinion of the court:

Following a jury trial in July 1989, defendant, Henry Kaczmarek, was convicted of murder, residential burglary, home invasion, and armed robbery and was sentenced to a term of natural life imprisonment on the murder conviction. Defendant appealed, and on March 31, 1993, this court reversed the murder conviction and remanded for a new trial.[1] People v. Kaczmarek, 243 Ill. App. 3d 1067, 1082, 613 N.E.2d 1253, 1264 (1993) (Kaczmarek I).

Prior to the start of his second trial in November 1996, defendant unsuccessfully moved to dismiss the State's charges on

---

[1]    Defendant also challenged his convictions for burglary, home invasion and armed robbery on the basis of insufficient evidence. Because no sentence was imposed on these verdicts, this court dismissed defendant's appeals for want of finality. Kaczmarek I, 243 Ill. App. 3d at 1082, 613 N.E.2d at 1264.

1-97-2557

the grounds that his constitutional and statutory rights to a
speedy trial had been violated.  Following a retrial by jury,
defendant was again found guilty of murder and, following a
finding by the sentencing judge that the victim's murder was
"exceptionally brutal or heinous," defendant received an enhanced
term of natural life in prison under section 5-8-1(a)(1)(b) of
the Unified Code of Corrections (Corrections Code) (Ill. Rev.
Stat. 1985, ch. 38, par. 1005-8-1(a)(1)(b)).

Defendant appeals, arguing (1) the trial court erred in
denying his motion for speedy-trial dismissal of the State's
charges, and (2) he was denied a fair trial when the court (a)
accepted a State witness as an expert in the area of chemical
luminol testing and interpretation; (b) refused to accept a
defense witness as an expert in the fields of luminol
interpretation and blood splatter analysis; and (c) precluded the
testimony of a defense witness concerning certain physical
altercations defendant had been involved in with other
individuals prior to the victim's murder.  Defendant additionally
challenges the validity of this life sentence, claiming the
penalty enhancing scheme provided by section 5-8-1(a)(1)(b) of
the Corrections Code is constitutionally infirm in light of in
light of the United States Supreme Court's recent decision in
Apprendi v. New Jersey, 530 U.S. __, 147 L. Ed. 2d 435, 120 S.
Ct. 2348 (2000).

For the following reasons, we reject, in an unpublished

2

1-97-2557

portion of this opinion, defendant's speedy trial and trial error
claims and affirm defendant's conviction for murder.  However,
because the penalty scheme set forth in section 5-8-1(a)(1)(b) of
the Corrections Code offends the constitutional principles
announced in Apprendi, we vacate defendant's life sentence and
remand for resentencing.

(The following material is nonpublishable under Supreme Court
Rule 23)

### BACKGROUND

The relevant evidence presented at defendant's retrial
establishes that in April 1987, the victim, 86-year old Millie
Nielsen, lived on the first floor of a two-flat apartment
building located at 3507 West Diversey Avenue in Chicago.  Dan
Lary, together with his then wife Margaret Fisher and Margaret's
19-year-old son John Fisher, lived on the second floor.
Defendant had been living with the Larys for about a month after
moving out of the house of his former girlfriend, Pamela Hines.

At about 10:30 p.m. on April 24, 1987, Margaret and John
returned home after a night of bowling.  At the time, Dan was
passed out intoxicated on a living room couch while defendant was
watching television.  Margaret stated that defendant was wearing
light-colored jeans, a flannel shirt, a blue quilted work jacket
and construction boots.  Margaret assisted Dan to bed, and then
went to bed herself at about 11 p.m.  Defendant continued to
watch television in the living room.

3

1-97-2557

According to John, defendant left the apartment at about
11:30 p.m. and returned at about midnight. Upon returning,
defendant asked John if Dan was awake. John replied that Dan was
sleeping, and defendant left, stating he had to go find his car.

At about 12:15 a.m. on April 25, the Larys' front doorbell
rang. Margaret answered the door and discovered Dan's brother,
Ron Lary, who asked if Dan was home. Because she did not want
Ron in her apartment, Margaret responded no and went back to bed.

Margaret was again awakened by the front doorbell at about
2:00 a.m. When she answered the door, Margaret saw defendant who
asked if Dan was available. Margaret told defendant that Dan was
asleep, and defendant left.

From time to time, Ron slept on the back porch of his
brother's apartment. In the early morning hours of April 25,
1987, Ron went to Dan's back porch to sleep after a night of
drinking at Patty's Lounge, a nearby bar. Shortly after 2:00
a.m., Ron observed defendant carrying a bag through the back yard
toward his car, which was parked in the alley. According to Ron,
defendant was wearing dark jeans and a dark jacket. Defendant
placed the bag in the car's trunk and drove east down the alley.

Margaret awoke the morning of April 25 at about 7:00 a.m.
and saw defendant sleeping on the living room couch. According
to Margaret, defendant was wearing a clean pair of dark-colored
jeans and a light-colored dress shirt. After making coffee,
Margaret left for work at about 9:00 a.m.

4

1-97-2557

At about 9:45 a.m., Ronald Sadlowski, a neighbor who helped
Ms. Nielsen with errands and maintenance work around the
building, noticed that the back porch door of Ms. Nielsen's
kitchen was open and that the window of her kitchen pantry was
broken.  Sadlowski further discovered that Ms. Nielsen's car was
still parked in the garage although she had a beauty appointment
scheduled early that morning.  Concerned about Ms. Nielsen's
well-being, Sadlowski called the police.

In response to Sadlowski's call, Ross Marsala, an officer
with the Chicago Police Department, and his partner arrived at
Ms. Nielsen's apartment at about 10 a.m.  After speaking briefly
to Sadlowski, Officer Marsala proceeded to the back porch of the
apartment and noticed several pieces of glass that had been
broken from the pantry window.  Officer Marsala entered the
kitchen and observed spots of blood on the kitchen floor leading
to a nearby bedroom.  Officer Marsala further noticed blood spots
on the bedroom door frame, and found a kitchen knife, which was
bloodstained, on a small table immediately outside the bedroom.

Inside the bedroom, Officer Marsala found Ms. Nielsen lying
in bed, face up in a pool of blood.  Officer Marsala observed
blood on the floor and walls near the bed.  The bedroom,
including the rest of the apartment, had been ransacked, and no
signs of forced entry were readily apparent.

Robert Baike, a forensic investigator who processed the
crime scene, obtained several blood samples from the kitchen

5

1-97-2557

floor.  Baike did not observe any bloody footprints in the
apartment.

    After working for the day, Ron returned to Dan's apartment
and spoke with the police, describing for them defendant's
activity in the back of the house earlier that morning.  Chicago
police detectives, accompanied by Ron, then left the apartment in
search of defendant.

    The detectives found defendant early the next morning asleep
in his car.  Chicago Police Detective Jerome Bogucki approached
the vehicle and requested defendant to exit.  As defendant
exited, Detective Bogucki observed blood stains on the right and
left sleeves of defendant's quilted jacket.  The detectives
placed defendant under arrest and, upon obtaining defendant's
written consent, they searched the trunk of the vehicle.  In the
trunk, the detectives found jewelry boxes, which appeared to be
stained with blood, jewelry, serving plates and platters.  The
detectives also discovered a pair of blood-stained jeans and
several tools, including a glass cutter.

    Detective Bogucki submitted the jeans and jacket to the
crime lab for testing.  Bogucki further checked defendant's work
boots but did not observe any appearance of blood.  The other
items found in the trunk were taken to Area 5 headquarters, where
they were later identified by Ms. Nielsen's family members as
belonging to the victim.

    A subsequent medical examination of Ms. Nielsen's body by

6

1-97-2557

Dr. Michael Chambliss disclosed numerous external and internal injuries. An external exam revealed several abrasions, incises and bruises about Ms. Nielsen's upper body, including her head, chest and arms. Stab wounds were also found on Ms. Nielsen's left thigh, the left part of her groin, and right forearm. An internal exam revealed injuries indicative of manual strangulation, including hemorrhages of the larynx, tongue and esophagus, hemorrhaging of the membrane of the brain and a fractured larynx.

Due to the condition of the body, Dr. Chambliss opined Ms. Nielsen died between 11:30 p.m. on April 24, 1987 and 2:30 a.m. on April 25, 1987. Dr. Chambliss concluded that Ms. Nielsen died as a result of manual strangulation with the contributing factors of blunt force injuries and stab wounds. Dr. Chambliss also stated that Ms. Nielsen could have died from the blunt force injuries.

Pamela Fish, an expert in electrophoresis, serology and DNA testing with the microanalysis unit of the Chicago Police Department, detailed the results of her examination conducted of the physical evidence back in 1987. Fish examined blood samples obtained from defendant, Ms. Nielsen, Ms. Nielsen's kitchen floor, and the knife found in the apartment. Fish also inspected the substances resembling blood found on defendant's jacket and jeans, and the jewelry boxes recovered from the trunk of defendant's vehicle. Fish determined that Ms. Nielsen had Type A

7

1-97-2557

blood and that defendant had Type B blood.  Fish further
determined that the substances taken from defendant's jeans and
quilted jacket were human blood possessing Type A
characteristics.

Fish additionally examined the blood samples to ascertain
their particular genetic markers for purposes of making an
identification.  Fish testified that the blood found on the jeans
and quilted jacket was consistent with Ms. Nielsen's blood and
could not have come from defendant.  In fact, according to Fish,
all the enzymes from the blood taken from defendant's clothing
was consistent with those found in Ms. Nielsen's blood.

With respect to the substances found on the kitchen floor,
the knife and the jewelry box, Fish was able to determine that
the substances were human blood, but due to the small quantity
provided, she was unable to ascertain the particular blood type.
Fish explained she attempted to perform DNA testing on the blood
samples provided years after her 1987 testing, but that their
small size and degraded nature made testing ineffective.

Mitch Rea was called by the State as an expert in luminol
testing and interpretation.  During voir dire examination of his
qualifications, Rea stated he is an insurance fraud investigator
who had previously worked over 26 years as a police officer with
the Phoenix Police Department in Arizona.  Of his time at the
department, Rea spent ten years working as a detective in the
homicide unit where he processed over an estimated 350 murder

8

1-97-2557

crime scenes.  Rea has received training in crime scene
investigation and specialized training in chemical blood
detection involving luminol.

Rea has additionally attended and participated in numerous
seminars dealing with luminol and luminol testing, has taught and
trained other law enforcement officers in these fields, has
conducted hundreds of experiments involving luminol, has
participated in several workshops covering luminol testing, and
has previously testified in court as a luminol expert.

Rea detailed the application and use of the luminol chemical
as a detecting agent, and described its glowing effect when it
reacts with particular substances, including blood.  Rea
acknowledged that luminol is not specific to blood and that it
reacts with other substances, such as metals and cleansers.

Upon questioning by defense counsel, Rea acknowledged never
being educated or trained in the field of chemistry.  Rea further
admitted that he does not perform any additional testing, like
DNA analysis, to ensure the accuracy of results indicating the
presence of blood.

Over defendant's objection, Rea was accepted by the court as
an expert and testified that he performed luminol tests on
defendant's quilted jacket in early 1994.  Rea explained that an
application of luminol to the right front panel of the jacket
produced a bright luminance of several small spots.  According to
Rea, these luminances indicated the presence of blood.  Rea

9

1-97-2557

further observed luminances about sections of the jacket which had been previously removed for Fish's examination, the right sleeve and cuff, and both the elbow region and back portion of the left sleeve. Rea stated that each of the foregoing luminances were consistent with the presence of blood. On cross-examination, Rea explained he did not perform any additional tests to confirm that the luminol reactions he observed were in fact reactions to blood.

Rod Englert, an expert in crime scene reconstruction and blood splatter, described three different categories of blood splatter: low velocity splatter which result from drops of blood falling straight down; medium velocity splatter which results from blunt force trauma; and high velocity splatter which results from gunfire. With respect to medium velocity splatter, Englert explained that blood does not splatter on the first blow of force, and that regardless of the severity of the beating, very little blood gets on the offender although the scene may be terribly bloody. Englert explained that a minimal amount of blood would be found on the offender in such cases because the force is always directed away at the victim. Englert additionally discussed blood transfer stains, and explained that they occur when blood is swiped against someone or something.

Englert examined the physical evidence and photographs in the case and concluded that the blood on Ms. Nielsen's kitchen floor appeared smeared, indicative of a struggle in which someone

10

1-97-2557

bled.　Englert stated that the absence of bloody shoe prints was not unusual given how quickly blood dries.　Englert noted the blood on the kitchen wall immediately outside the bedroom represented classic medium velocity splatter suggestive of blunt force being inflicted upon the victim.　Given the low angle of projection, Englert opined that Ms. Nielsen received numerous blows while on the kitchen floor.

Upon reviewing photos of defendant's jeans, Englert stated the blood on the left and right knee areas represented transfer stains, and not splatter.　According to Englert, these stains were consistent with defendant coming into contact with the pool of blood surrounding the victim.　As for the bottom of the pants, Englert observed several small specs of blood which in his opinion were consistent with medium velocity splatter.　Englert specifically stated the transfer and splatter stains were not consistent with defendant picking up a bag having blood on it or with such a bag being placed on top of the clothing.　Englert further stated the stains were not consistent with defendant kneeing another person in the nose.

In examining photographs of the luminol testing performed on defendant's jacket by Rea, Englert stated the stains on the right and left sleeves and on the front of the jacket represented medium velocity splatter.　Englert also observed transfer stains on the back of the sleeves and on the right front pocket.

In Englert's opinion, Ms. Nielsen was first attacked in the

11

1-97-2557

kitchen, near the entry of the bedroom, where she received
numerous blows while on the floor. Englert believed the blood
splatters on the bottom of defendant's pants occurred at this
time. Ms. Nielsen, struggling to break free, was then taken to
the bedroom and thrown on the bed where she was attacked again
and ultimately killed. According to Englert, the bleeding
represented by the amount of blood found in the bed would have
occurred after Ms. Nielsen had died. Englert opined the physical
evidence he examined was consistent with the person causing the
death of the victim.

On cross-examination, Englert knew during his examination of
defendant's pants and jacket that the substance present on the
clothing has human blood, but presumed that the blood was that of
Ms. Nielsen. Englert acknowledged that medium velocity splatter
could very possibly occur during a fist fight, but explained that
the medium splatter found in the case was consistent with Ms.
Nielsen's attack. Englert additionally stated that, in attacks
similar to that on Ms. Nielsen, blood may or may not get on the
attacker's shoes.

After the State rested, defendant testified that in April
1987 he was unemployed and temporarily living with the Larys
after moving out of his ex-girlfriend's house about a month
earlier. Defendant stated he had been involved in three fights
on the Wednesday prior to Ms. Nielsen's murder. Two of these
fights involved friends Tom Szeszol and Bill Henderson, while the

12

1-97-2557

other involved an unidentified man who was attempting to break
into defendant's car.  In the former fight, defendant stated he
sustained two cuts to his hand which bled, that Szeszol bled from
his mouth and nose, and that Henderson also bled from his mouth.
In the latter fight, defendant stated he hit the man three or
four times in the face and kneed him in the nose, causing the man
to bleed.  Defendant intimated that in all three fights he was
wearing his blue quilted jacket; indeed, according to defendant,
he had been in several fights while wearing his jacket.

In the afternoon of April 24, 1987, defendant and Dan, after
spending the morning drinking, went to Szeszol's apartment to
clean laundry, including defendant's jeans which had blood on
them.  Defendant was able to wash every article of clothing
except his jeans before leaving.  Defendant explained he wanted
to soak his jeans before washing them, but was directed by
Szeszol to leave the apartment before he had the opportunity to
do so.  Defendant was further unable to wash his quilted jacket.
Upon leaving, defendant threw his clothing, including the jeans,
into the trunk of his car.  Defendant drove Dan to his apartment
and then went to a nearby tavern to drink.

Defendant left the bar about 6:30 p.m. and, after buying a
case of beer, went to Dan's apartment.  Defendant and Dan drank
together until about 11:45 p.m. when defendant left and went to a
bar down the street.  After having a couple of drinks, defendant
went to another bar, Our Place.  At about 2:00 a.m., defendant

13

1-97-2557

left and went to the Lary's apartment to see if Dan wanted to get some drinks.

Upon returning to the Larys, defendant parked his car in the alley behind the building to urinate. When he exited the vehicle, defendant heard a noise, like that of a door closing. Henry approached the house, but saw no one. As he urinated, defendant noticed a bag on the side of the house. Defendant looked inside and found a box of silverware. Defendant picked up the bag and carried it to his car where he placed it in the trunk. Defendant drove his car to the front of the house and went to see if Dan was awake.

After being told by Margaret that Dan was sleeping, defendant left and returned to the Our Place tavern. Defendant drank at the bar until about 4:00 a.m., and after dropping off two friends, he returned to the Lary's apartment and fell asleep on the living room couch.

Defendant awoke at about 8:00 a.m. on April 25, and later that morning he and Dan drove to the house of a friend, Bill Brown, in Melrose Park. Before entering Brown's house, defendant decided to look in the bag he had discovered earlier that morning. Defendant removed the bag's contents and noticed that some of the items were bloody. Defendant kept some items and disposed of others, including a bloody pillow case, in a dumpster. Defendant sold the items he kept to Brown for $60, and then drove Dan back to his apartment.

14

1-97-2557

Defendant was ultimately arrested by the police early the next morning as he slept in his car. Defendant maintained his innocence and denied any responsibility in both the break-in of the Ms. Nielsen's apartment and in the victim's death.

Hines, defendant's former girlfriend, testified that defendant moved out of her apartment about a month before Ms. Nielsen's murder, and she acknowledged not seeing defendant during that period. Hines identified the quilted jacket recovered by police as belonging to defendant, and indicated that defendant wore the jacket every day.

During direct examination, defense counsel attempted to elicit testimony that Hines had witnessed defendant's involvement in numerous fights in which he was wearing his quilted jacket and where one of the participants had bled. However, the State successfully moved the court to bar this testimony.

In an offer of proof, defense counsel stated Hines would have testified that she was present with defendant on about seven or eight occasions when defendant was involved in a physical altercation with others; that defendant was wearing his quilted jacket on each of these occasions; and that one or more of the participants involved had bled. In response to counsel's offer, the court noted that Hines was never asked when these alleged fights occurred and, on that basis, concluded her testimony was too remote to be relevant.

To rebut the testimonies of Rea and Englert, the defense

15

1-97-2557

offered Dr. Kenneth Siegusmund as an expert in the fields of
luminol processing and blood splatter analysis. During voir
dire, Dr. Siegusmund testified he holds a Ph.D. and B.S. in
biology and an undergraduate minor in chemistry. As his primary
employ, Dr. Siegesmund works in the Department of Anatomy at the
Medical College of Wisconsin developing a scientific instrument
used in the field of immunology. The doctor admitted that this
work is unrelated to the forensic science field. Previously, Dr.
Siegesmund worked in the Department of Biology at Marquette
University in Milwaukee. Dr. Siegesmund additionally teaches a
general forensic sciences course at a local university, and has
given lectures in the field to law enforcement personnel. Dr.
Siegesmund holds memberships in the American Academy of Forensic
Scientists, the Midwest American Association of Anatomy, the
Neuroloectic Society of America, and the American Association for
the Advancement of Science.

Dr. Siegesmund has performed luminol testing well over a
hundred times, and was "familiar" with the study of blood
splatter. Dr. Siegesmund indicated that he had been qualified in
court as an expert in forensic sciences about 250 times, and
specifically as a blood splatter expert about 20 times. Dr.
Siegesmund did not indicate whether he had ever been previously
accepted as an expert in luminol application or testing.

On cross-examination, the State initially went to great
lengths to undermine Dr. Siegesmund's credibility. When asked

16

1-97-2557

whether any court in Cook County had found him unqualified as an
expert in any field, Dr. Siegesmund replied "I don't believe so,"
that "[t]here may have been a case where I wasn't qualified in a
certain area but not with respect to the entire testimony that I
gave." The prosecutor then demonstrated that the doctor could
not remember being disqualified as a crime reconstruction expert
in an unrelated criminal trial and as a ballistics expert in a
federal civil case. The prosecutor further elicited testimony
from the doctor that he could not remember giving certain
testimony in those proceedings.

Dr. Siegesmund described himself as an expert in, among
other areas, crime scene reconstruction, blood splatter, blood
identification and luminol testing. The doctor has never taken a
course in crime scene reconstruction and has never been to a
crime scene under investigation. Dr. Siegesmund has never had
any formal training in crime scene processing or in techniques of
physical evidence collection. His only exposure in this area has
been through yearly, one-week seminars held by the American
Academy of Forensic Scientists. Dr. Siegesmund believed he last
attended such a conference in 1994, but was not sure. The
prosecutor questioned Dr. Siegesmund further in this regard,
noting for the doctor that he had previously testified in a 1996
criminal case indicating that he did not attend an Academy
conference in 1994. The doctor could not recall making that
statement.

17

1-97-2557

Dr. Siegesmund stated he had conducted work at the Glendale Crime Lab in Wisconsin.  Dr. Siegesmund denied that the Glendale Lab had not performed forensic work for ten years, and believed that the lab was still operating.  The prosecutor then confronted Dr. Siegesmund with testimony he had given earlier that year in an unrelated criminal prosecution where he had stated that the Glendale Lab had not conducted forensic work since 1986.  Dr. Siegesmund could not recall making that statement.

Dr. Siegesmund has not received any formal forensic training.  Dr. Siegesmund explained his training in the area comes from attending the yearly conferences held by the Academy and from reading a monthly Academy publication and text books on the subject.

With respect to luminol processing, Dr. Siegesmund has never received any training from the police or FBI, has never taken any course teaching luminol application at a crime scene, and has never performed any luminol testing for a crime lab.  Dr. Siegesmund stated he last performed an experiment using luminol sometime in late October 1996, about three weeks prior to the start of defendant's retrial.

Dr. Siegesmund has never received any formal training in blood splatter analysis, has never performed such work in a crime lab, and has not written any articles on the subject.  His knowledge of blood splatter comes from attending the Academy conferences and through reading text books.  The doctor has

18

1-97-2557

performed numerous experiments involving blood splatter in
connection with his forensic science lectures given to law
enforcement officers.  When asked by the prosecutor if he had
ever received any training on how to conduct such experiments,
Dr. Siegesmund indicated no, responding he was the teacher and
that he did not take courses from the officers.  Further, when
asked if it was sensible to learn how to conduct the experiments
before he taught them, the doctor replied that he is a scientist
and that he "believed" he could perform the work properly on the
basis of the information he had learned from the conferences and
written materials.

Responding to the defense's tender of Dr. Siegesmund as an
expert, the court remarked that the doctor "appears to be a jack
of all trades and [a] master of none."  The court specifically
commented on Dr. Siegesmund's credibility, stating that "his
manner while testifying seemed disingenuous at times" undermining
any attempt "to instill some confidence that someone is an expert
in some kind of field."  Finding the doctor's qualifications
lacking, the court refused to accept Dr. Siegesmund as an expert
in blood splatter analysis and luminol interpretation.  The
court, however, allowed Dr. Siegesmund to testify about the
manner in which luminol testing is conducted.

Defense counsel did not proceed with Dr. Siegesmund as a
witness, but instead made an offer of proof.  Counsel explained
Dr. Siegesmund would have testified that confirmatory testing is

19

1-97-2557

necessary when using luminol as a detecting agent for blood.  In

this regard, Dr. Siegesmund would have opined that Rea should

have performed additional tests to confirm that the areas of

luminance on defendant's jacket were in fact indicative of blood

and, if so, a test to determine whether that blood was that of

defendant.  Dr. Siegesmund would have further refuted Englert's

conclusions that the blood found on defendant's jacket

represented splatter, and would have stated that the blood stains

about the knee areas of defendant's jeans were indicative of

lateral activity.  The doctor would have also stated, contrary to

Englert's opinion, that a majority of Ms. Nielsen's blood loss

would have occurred prior to her death.  On this basis, Dr.

Siegesmund would have explained that the offender would have been

covered in blood and, thus, would have likely left bloody shoe

prints in the victim's apartment.

     Following the presentation of rebuttal evidence by the State

and the jury's deliberations, defendant was found guilty of

murder and sentenced to a term of natural life imprisonment.

ANALYSIS

I

     Defendant initially contends that the trial court erred in

denying his motion to dismiss the State's charges due to alleged

speedy-trial violations.  Although defendant asserts violations

of both his constitutional and statutory rights to a speedy trial

in his motion, he challenges only the denial of his

20

1-97-2557

constitutional claim on appeal.[2]  Accordingly, we will limit our
review to this issue.

According to defendant, the State deprived him of his
constitutional right to a speedy trial by waiting more than 43
months after the reversal of his original murder conviction in
March 1993 to bring him to retrial.  The right to a speedy
criminal prosecution is guaranteed a defendant under both the
United States (U.S. Const., amend. VI) and Illinois constitutions
(Ill. Const.1970., art. I, § 8).  The issue presented by
defendant's constitutional speedy-trial claim here is whether the
State made a diligent good-faith effort in bringing the matter to
retrial without unreasonable and unnecessary delay.  See People
v. Williams, 299 Ill. App. 3d 143, 147, 700 N.E.2d 753, 756
(1998).  When a defendant's original case is reversed on appeal
and the matter is remanded for a new trial, like here, the
speedy-trial clause requires the State to retry the defendant
within a reasonable time following the date of the reviewing
court's decision.  See People v. Crane, 307 Ill. App. 3d 816,
818, 719 N.E.2d 138, 140 (1999).

Analysis of defendant's claim is conducted under the four-
part balancing test set forth by the United States Supreme Court

---

[2]    The State asserts defendant never raised his
constitutional speedy-trial claim before the trial court, and
maintains that this issue is thus waived for our review.  The
State, however, ignores defendant's speedy-trial motion, filed
November 18, 1996, which specifically contains a claim based on
the constitutional speedy-trial clause.

1-97-2557

in <u>Barker v. Wingo</u>, 407 U.S. 514, 92 S. Ct. 2182, 33 L. Ed. 2d

101 (1972), in which the conduct of both the prosecution and the

accused are considered and weighed. In particular, we examine

(1) the length of the pretrial delay and whether that delay was

uncommonly long; (2) the reasons for the delay and to which party

the delay is more attributable; (3) whether the defendant

asserted his right to a speedy trial in due course; and (4) the

prejudice, if any, suffered by the defendant as a result of the

delay. <u>Doggett v. United States</u>, 505 U.S. 647, 651, 112 S. Ct.

2686, 2690, 120 L. Ed. 2d 520 (1992); <u>Barker</u>, 407 U.S. at 530, 92

S. Ct. at 2192; <u>People v. Norris</u>, 303 Ill. App. 3d 163, 175, 707

N.E.2d 628, 637 (1999).

No one of the foregoing elements is dispositive. Instead,

each factor must be weighed and considered in light of the

circumstances of the case as reflected by an examination of the

entire record. <u>People v. Rievia</u>, 307 Ill. App. 3d 846, 853, 719

N.E.2d 1077, 1082 (1999); <u>People v. Wills</u>, 153 Ill. App. 3d 328,

336, 505 N.E.2d 754, 759 (1987). The consideration of the <u>Barker</u>

factors and the determination of whether the accused's

constitutional right to a speedy trial was violated are matters

left to the sound discretion of the trial court. <u>United States

v. Anderson</u>, 902 F. 2d 1105, 1110 (2nd Cir. 1990); see also

<u>People v. Belcher</u>, 186 Ill. App. 3d 202, 208, 542 N.E.2d 419, 422

(1989) (applying abuse-of-discretion standard in reviewing

accused's claimed deprivation of constitutional speedy-trial

22

1-97-2557

right).

The first factor presents the threshold inquiry of whether the amount of delay should be deemed presumptively prejudicial to the defendant. Barker, 407 U.S. at 530-31, 92 S. Ct. at 2192; Williams, 299 Ill. App. 3d at 147, 700 N.E.2d at 756. The term "presumptively prejudicial" simply marks the point at which the law deems the time between the resolution of the defendant's original appeal and the commencement of the second trial to be unreasonably long enough so as to trigger consideration of the remaining three factors. See Williams, 299 Ill. App. 3d at 147, 700 N.E.2d at 756.

As a threshold, the courts of this state presume prejudice where the pretrial delay equals or exceeds a period of one year. Crane, 307 Ill. App. 3d at 818, 719 N.E.2d at 141; Williams, 299 Ill. App. 3d at 148, 700 N.E.2d at 756; People v. Lock, 266 Ill. App. 3d 185, 191, 640 N.E.2d 334, 338 (1994). Given this temporal benchmark, we find that the more than three and one-half year delay between our decision in Kaczmarek I and the commencement of the State's retrial was presumptively prejudicial to defendant. Accordingly, we will assess the remaining factors of the Barker enquiry to determine whether defendant was denied his constitutional right to a speedy trial in this case.

In considering the second factor, the reason for the delay, the State bears the burden of providing a justifiable explanation for the period of postponement, and the defendant need only show

23

1-97-2557

that the delay was not attributable to his actions.  Crane, 307

Ill. App. 3d at 818, 719 N.E.2d at 141; People v. Prince, 242

Ill. App. 3d 1003, 1008-09, 611 N.E.2d 105, 109 (1993).  Delay

will be attributed to the defense where the defendant's actions

in fact caused or contributed to the postponement of the trial.

See People v. Kliner, 185 Ill. 2d 81, 114, 705 N.E.2d 850, 868

(1998).  In this regard, the accused is bound by the acts or

omissions of his defense counsel (People v. Brimmer, 60 Ill. App.

3d 214, 219, 376 N.E.2d 337, 341 (1978); see also Kliner, 185

Ill. 2d at 114, 705 N.E.2d at 870; People v. Staten, 159 Ill. 2d

419, 433, 639 N.E.2d 550, 557 (1994)), since an attorney in

criminal proceedings is authorized to act on behalf of his client

and to determine for him procedural matters and decisions

involving trial strategy and tactics.  See People v. Bowman, 138

Ill. 2d 131 141, 561 N.E.2d 633, 638 (1990); see also People v.

Steiger, 208 Ill. App. 3d 979, 981, 567 N.E.2d 660, 662 (1991)

(criminal defendant "speaks and acts through his attorney").

Accordingly, the affirmative acts of defense counsel cannot be

separated from the defendant's own actions.  See Bowman, 138 Ill.

2d at 141, 561 N.E.2d at 638.

In the present matter, the record clearly establishes that

the defense either caused or contributed to nearly all the

pretrial delay at issue.  Indeed, the only time period not

attributable to defendant was a 26-day period occurring between

June 3, 1993, the date the Illinois Supreme Court denied the

24

1-97-2557

State's appeal from Kaczmarek I, and June 29, 1993, the date of
the trial court's first status hearing.[3]  From the court's June
29 hearing up until the start of trial in November 1996, the case
was delayed because of the defense's explicit requests for a
continuance or express agreement with the prosecution thereto.
Delay resulting from such requests and agreements are generally
chargeable to the defendant.  See People v. Beard, 271 Ill. App.
3d 320, 328, 648 N.E.2d 111, 116 (1995) (delay caused by
continuances either requested or agreed to by defense is
attributable to defendant); People v. Moore, 263 Ill. App. 3d 1,
8, 635 N.E.2d 507, 513 (1994) (same); People v. Nolan, 102 Ill.
App. 3d 895, 898-99, 430 N.E.2d 345, 349 (1981) (same); see also
Kliner, 185 Ill. 2d at 114, 705 N.E.2d at 869.  Notably, the
defense changed attorneys no less than six times during the
postponement period, necessitating additional time being granted
to new counsel so he or she could review discovery and
familiarize himself or herself with the case.  See Norris, 303
Ill. App. 3d at 176, 707 N.E.2d at 510 (delay resulting from time
new counsel needed to become familiar with the accused's case was
attributable to defense).  As a further note, the case was
continued on at least four occasions because of defense counsel's
failure to appear at scheduled court hearings.  See United States

---

[3]     The time in which the State's appeal was under
consideration by the supreme court fully justifies the first two
months of delay.  See Crane, 307 Ill. App. 3d at 818, 719 N.E.2d
at 141.

1-97-2557

v. Brock, 782 F. 2d 1442, 1447 (7th Cir. 1986) (charging
defendant with delay resulting from defense counsel's absence
from court); see also Kliner, 185 Ill. 2d at 117, 705 N.E.2d at
870.

Defendant accurately notes that the prosecution used the
pretrial period to gather expert evidence regarding DNA testing
and blood splatter analysis, and that it requested additional
time from the court many times to secure these materials. On
several of those occasions, however, defendant's attorneys
explicitly agreed to the State's request. Indeed, defense
counsels never objected to the State's attempt to secure its
additional evidence. Rather, the record shows that the defense
welcomed the State's blood evidence because of its possible
exculpatory effect. The defense obviously viewed the State's
evidence as possibly beneficial to its case and, for this reason,
agreed to many of the continuances sought by the State. With
respect to the remaining instances where the State requested
additional time, defense counsel specifically sought continuances
for his own reasons.

Turning to the third factor, the assertion of the accused's
speedy-trial right, we note defendant made a pro se demand for a
speedy trial at a hearing held July 21, 1993, a few months after
reversal. Defendant's attorney at the time told the court that
he was not making the demand on defendant's behalf and that
defendant was acting in his own capacity in seeking a speedy

26

1-97-2557

trial. Counsel further informed the court that he was not ready to proceed with trial. The trial judge explained to defendant that his defense could be compromised if he proceeded to trial with counsel who was not adequately prepared. In light of the court's advisement, defendant stated he would wait for his attorney to become prepared and explicitly agreed to a continuance.

The record shows that defendant never made another demand for a speedy trial. Rather, defendant followed by moving pro se to dismiss the State's charges in November 1994 on the ground that his statutory speedy-trial right, implemented in this state's Speedy Trial Act (725 ILCS 5/103-5 (West 1994)), had been violated.[4]  The Supreme Court has indicated that the filing of a motion for speedy-trial dismissal without making a prior demand does not alone establish that the accused has appropriately asserted his rights.  United States v. Loud Hawk, 474 U.S. 302, 314, 106 S. Ct. 648, 655, 88 L. Ed. 2d 640 (1986).  While such assertions by the accused are entitled to strong evidentiary weight, these assertions must be viewed in light of the accused's

---

[4]    The trial court should not have permitted defendant to file his pro se motion because defendant was represented by counsel at the time.  The law is clear that a criminal defendant has no right to both self-representation and the assistance of counsel (People v. Williams, 97 Ill. 2d 252, 267, 454 N.E.2d 220, 227 (1983)), and thus has no right to some sort of hybrid representation, whereby he is allowed to accept his attorney's services and still be permitted to file pro se motions.  People v. Handy, 278 Ill. App. 3d 829, 836, 664 N.E.2d 1042, 1046 (1996).

1-97-2557

other conduct.  <u>Loud Hawk</u>, 474 U.S. at 314, 106 S. Ct. at 656.

Following the filing of defendant's motion, the defense either requested or agreed to continue the case until the matter was ultimately brought to trial in November 1996.  Defendant's claim here that he had an actual interest in receiving a prompt and speedy resolution of the State's charges is undermined by his conduct proceeding his motion's filing.  See <u>Loud Hawk</u>, 474 U.S. at 315-16, 106 S. Ct. at 656 (finding third factor weighed against the defense where the defendants filed a number of frivolous petitions and motions, which caused delay, at the same time they moved to dismiss the government's charges on speedy-trial grounds); <u>Beard</u>, 271 Ill. App. 3d at 329, 648 N.E.2d at 116 (same where, although the defendant continued to demand a speedy trial, he agreed to a number of continuances).

Defendant attempts to distance himself from the conduct of his attorneys by stressing that, notwithstanding the their decisions, he wanted a speedy trial.  Because he wanted a speedy trial, defendant argues this factor should weigh heavily in his favor.  We disagree.  Generally, the decision to demand a speedy trial and to seek dismissal of the State's charges on such grounds are matters left to the sound strategic decision of counsel.  See <u>People v. Ramey</u>, 151 Ill. 2d 498, 523-24, 603 N.E.2d 519, 529 (1992); <u>People v. Keys</u>, 195 Ill. App. 3d 370, 373, 552 N.E.2d 285, 287 (1990).  Further, as previously discussed, defendant spoke and acted through his attorneys and

28

1-97-2557

was bound by their conduct during the pretrial proceedings. Importantly, defendant never sought the discharge of his attorneys to pursue his speedy-trial claims on his own.   Indeed, the record unequivocally shows that defendant wanted the assistance of counsel in preparing his defense for trial.

Finally, in assessing the fourth factor, the prejudice to the accused, we consider the interests sought to be protected by the speedy-trial right, namely: (1) the prevention of lengthy and oppressive pretrial incarceration; (2) the minimization of anxiety and concern on the part of the accused; and (3) the limitation of the possibility that the accused's defense will be impaired.   Barker, 407 U.S. at 532, 92 S. Ct. at 2193; Moore, 263 Ill. App. 3d at 9, 635 N.E.2d at 513.   The latter interest has been recognized by the Supreme Court as the most serious "because the inability of a defendant adequately to prepare his case skews the fairness of the entire system."   Doggett, 505 U.S. at 654, 112 S. Ct. at 2692, quoting Barker, 407 U.S. at 532, 92 S. Ct. at 2193.

Except for certain instances where the presumption of prejudice remains due to some form of unjustifiable conduct on the part of the State, causing excessive delay which presumptively compromises the reliability of the trial proceedings, (see Doggett, 505 U.S. at 655-58, 112 S. Ct. at 2692-94; Prince, 242 Ill. App. 3d at 1010, 611 N.E.2d at 110), a showing of prejudice is required to establish a violation of the

29

1-97-2557

defendant's constitutional speedy-trial right.  Reed v. Farley,
512 U.S. 339, 353, 114 S. Ct. 2291, 2299, 129 L. Ed. 2d 277
(1994); Beard, 271 Ill. App. 3d at 328, 648 N.E.2d at 116.

    We are mindful that defendant was in custody for almost the
entire time between remand and the commencement of his second
trial, and we understand that such lengthy periods of pretrial
incarceration may have adverse effects on an accused.  See Crane,
307 Ill. App. 3d at 819-20, 719 N.E.2d at 142.  This fact alone,
however, is insufficient to establish prejudice and must be
viewed in light of the other relevant considerations.

    Defendant stresses he experienced a great deal of anxiety
while incarcerated awaiting trial.  Anxiety on the part of the
accused, as one court has explained, is "present to some extent
in every case and absent some unusual showing, this inconvenience
alone is of slight import."  Wills, 153 Ill. App. 3d at 337, 505
N.E.2d at 760.  This factor will weigh in the defendant's favor
"only if it is shown there was a rather special situation giving
rise to an inordinate amount of anxiety."  People v. Jackson, 162
Ill. App. 3d 476, 481, 515 N.E.2d 390, 394 (1987).  The record
fails to reveal such a situation in this case.

    Significantly, defendant never claims his ability to prepare
and present a defense was in any way impaired by the delay.  The
defense was wholly or partially responsible for the delays
experienced in bringing the matter to trial, and nothing in the
record indicates that the delay was intentionally contrived by

                              30

1-97-2557

the prosecution for purposes of impairing the defense. Moreover, it was in the best interests of the defense to wait until the State obtained the results of its blood testing since the findings could have excluded defendant as the offender.

Under the circumstances presented, we find no error in the trial court's determination that defendant was not denied his constitutional right to a speedy retrial.

II.

Defendant next asserts error in the rulings of the trial court regarding (1) the presentation of expert testimony by a witness offered by the State and (2) the nonacceptance of his tendered expert, Dr. Siegesmund.

An individual will be allowed to testify as an expert if his experience and qualifications afford him knowledge beyond that of the average person, and where his testimony will aid, and not invade, the province of the trier of fact in reaching its conclusions. People v. Miller, 173 Ill. 2d 167, 186, 670 N.E.2d 721, 730 (1996); People v. Sargent, 292 Ill. App. 3d 508, 511, 685 N.E.2d 956, 958 (1997). The degree and manner of knowledge and experience required of the alleged expert is directly related to the complexity of the subject matter and the corresponding likelihood of error by one insufficiently familiar with the field. People v. Huddleston, 176 Ill. App. 3d 18, 32, 530 N.E.2d 1015, 1024 (1988).

The courts do not employ any predetermined formula for how

31

1-97-2557

an expert acquires specialized skill or knowledge, and the
indicia of expertise is not an assigned level of academic
training. People v. Novak, 163 Ill. 2d 93, 104, 643 N.E.2d 762,
768 (1994). An expert may acquire his expertise from a variety
of outlets, including practical experience, scientific study,
education, training and/or research. Miller, 173 Ill. 2d at 186,
670 N.E.2d at 730. Regardless of how such knowledge is acquired,
the witness should be allowed to testify where the subject matter
of his testimony exceeds the knowledge of an average person and
where the testimony would assist the trier of fact in evaluating
the evidence. Novak, 163 Ill. 2d at 104, 643 N.E.2d at 768;
People v. Shaw, 278 Ill. App. 3d 939, 948, 664 N.E.2d 97, 103
(1996).

The burden of establishing the qualifications of a witness
as an expert is on the proponent of the witnesses's testimony.
Novak, 163 Ill. 2d at 104, 643 N.E.2d at 768. Determinations
regarding the adequacy of a witness's qualifications to testify
as an expert is a matter reserved to the sound discretion of the
trial court. (Novak, 163 Ill. 2d at 104, 643 N.E.2d at 768),
which will not be disturbed on review absent a clear abuse of
discretion resulting in manifest prejudice to the accused.
People v. Petitt, 245 Ill. App. 3d 132, 145, 613 N.E.2d 1358,
1369 (1993); Huddleston, 176 Ill. App. 3d at 32, 530 N.E.2d at
1024.

A.

32

1-97-2557

Defendant first challenges Rea's acceptance as an expert.
We find this issue waived.  The law is well settled that both a
trial objection and a post-trial motion raising the alleged trial
error is required to preserve the matter for review.  People v.
Thomas, 178 Ill. 2d 215, 234, 687 N.E.2d 892, 900 (1997); People
v. Enoch, 122 Ill. 2d 176, 186, 522 N.E.2d 1124, 1129-30 (1988).
Errors objected to at trial but not raised in a post-trial motion
or before the court at a post-trial hearing are deemed waived.
Thomas, 178 Ill. 2d at 234, 687 N.E.2d at 900.  Although
defendant voiced on objection to Rea's acceptance as an luminol
expert, he did not raise this point in his post-trial motion.

Wavier aside, we find no error in the trial court's
decision.  Based on his extensive work experience, training and
independent study, Rea possessed knowledge not commonly known to
the average person that would have assisted the jury in making
its determinations concerning defendant's guilt.  Although Rea
has never taken a college-level chemistry course as defendant
correctly observes, the law is clear that an expert is not
required to have any particular level of academic training, and
that the witness may acquire his particular expertise and
training through other means.  Notably, defendant fails to
explain the importance a general chemistry class would serve in
understanding and performing testing with luminol.

Defendant additionally notes that Rea never performs follow-
up tests to confirm his findings.  Defendant's claim is misplaced

33

1-97-2557

because it does not reflect upon Rea's qualifications to testify
as an expert, but rather concerns the reliability of the specific
testing procedures used by him.  As such, defendant's argument
goes to the weight of the evidence and not to the degree of
knowledge and expertise held by Rea.  Importantly, defense
counsel extensively cross-examined Rea concerning his limited
knowledge on how to perform confirmatory testing and his practice
of not conducting such tests on defendant's clothing in the
instant case.

Defendant's claim hints that the testing procedure is
unreliable and consequently fails to satisfy the federal Fyre
standard adopted by this state's courts in determining whether a
scientific principle, technique or test is sufficiently reliable
and generally accepted by the relevant scientific community to be
admitted.  See People v. Eyler, 133 Ill. 2d 173, 549 N.E.2d 268
(1989).  To the extent defendant makes this argument, we find it
waived.  Defendant merely objected at trial to Rea's expert
qualifications and did not raise the matter of testing
reliability to the court.  Defendant further has provided no
argument in support of this argument in his opening brief.

B.

Defendant additionally challenges the court's ruling finding
Dr. Siegesmund unqualified to testify as an expert in luminol
interpretation and blood splatter analysis.

A review of the record shows that Dr. Siegesmund simply

34

1-97-2557

possesses a general knowledge of forensic studies, and does not hold any specialized understanding of luminol interpretation and blood splatter analysis. Indeed, the doctor never stated he knew how to interpret particular luminol reactions, and merely explained that he has conducted numerous luminol testing without indicating whether he ever interpreted the results. Although not determinative, Dr. Siegesmund additionally has received no training in luminol application and interpretation and has never performed such work in any crime lab.

With respect to blood splatter analysis, Dr. Siegesmund merely stated he was "familiar" with the subject. He has neither received training in the field nor performed such work in a crime lab setting. Dr. Siegesmund explained that his knowledge and self-described expertise in the subject comes from, among other things, yearly, one-week seminars held by the Academy of Forensic Scientists. Yet, the doctor conceded he had not been to an Academy conference for at least six years. Although he has conducted dozens of experiments in blood splatter, Dr. Siegesmund has received no training on how to conduct such experiments and "believed" his simulations were accurate based on information he has read in journals and text books.

An obvious import of the trial judge's comments is that he had serious concerns as to Dr. Siegesmund's credibility. The court's observations were well-founded, amply supported by the record. In particular, Dr. Siegesmund's inability to remember

35

1-97-2557

when he last attended an Academy conference, where the doctor
explained that these conferences are the primary source of the
knowledge for which he was being tendered, and the doctor's
misstatements regarding the operations of the Glendale Crime Lab,
directly reflect upon the doctor's credentials as an expert
witness.

We find no error in the trial court's determination that,
based on the testimony presented, Dr. Siegesmund did not possess
a sufficient level of knowledge and expertise to testify as an
expert in the fields of luminol interpretation and blood splatter
analysis.

III.

Defendant further argues that the trial court erred in
precluding Hines from testifying about fights involving defendant
that had occurred before Ms. Nielsen's murder. According to
defendant, this evidence was relevant to rebut the State's theory
that the blood found on the jacket was the blood of Ms. Nielsen
and to raise the possibility that the blood came from someone
with whom he had fought previously.

A criminal defendant has the right to present a defense,
present witnesses to establish his theory of the case, and
present his version of the events to the trier of fact. People
v. Wright, 218 Ill. App. 3d 764, 771, 578 N.E.2d 1090, 1095
(1991). This right, however, is not unqualified, and the trial
court may properly limit the presentation of evidence on grounds

36

1-97-2557

of relevancy. <u>People v. Turner</u>, 179 Ill. App. 3d 510, 521, 534
N.E.2d 179, 186 (1989). Evidence is relevant if it tends to
prove or disprove a disputed fact material to the case or render
the matter in issue more or less probable. <u>People v. Childress</u>,
158 Ill. 2d 275, 295, 633 N.E.2d 635, 643 (1994); <u>People v. Agee</u>,
307 Ill. App. 3d 902, 904, 719 N.E.2d 251, 253 (1999). Contrary
to defendant's contention that this issue should be reviewed <u>de</u>
<u>novo</u>, the law is well established that evidentiary rulings are
within the sound discretion of the trial court which will not be
reversed absent a clear abuse of discretion resulting in manifest
prejudice to the accused. <u>People v. Reid</u>, 179 Ill. 2d. 297, 313,
688 N.E.2d 1156, 1164 (1997); <u>People v. Dow</u>, 240 Ill. App. 3d
392, 400-01, 608 N.E.2d 259, 266 (1992); <u>Wright</u>, 218 Ill. App. 3d
at 771, 578 N.E.2d at 1096.

Contrary to the trial court's determination, defendant's
proffered evidence was not irrelevant due to remoteness. Given
the ability of a blood stain to persist over time, especially on
clothing that goes untreated, the blood from the alleged
altercations could have remained on defendant's jacket until a
time well after Ms. Nielsen's death. We find it difficult to
understand how the trial court could have found this evidence too
remote where defense counsel was not even allowed to ask Hines
when the alleged altercations occurred.

Notwithstanding, we find the court's error harmless. In
determining whether an accused has been prejudiced by the

37

1-97-2557

rejection or exclusion of certain evidence, so as to require a
new trial, we review the entire record of proceedings to
determine whether the rejected evidence could have reasonably
affected the jury's verdict. People v. Montes, 263 Ill. App. 3d
680, 691, 635 N.E.2d 910, 917 (1994). Reversal is not warranted
where the accused's guilt is shown beyond of reasonable doubt or
where, based upon the evidence, a different result could not have
been reached. Montes, 263 Ill. App. 3d at 691, 635 N.E.2d 917.
In other words, "the erroneous exclusion of evidence is ground
for a new proceeding where it can be said that the excluded
evidence, if considered, would have altered the outcome of the
proceeding." People v. Sims, 167 Ill. 2d 483, 516, 658 N.E.2d
413, 428 (1995); see also People v. Amos, 204 Ill. App. 3d 75,
81-82, 561 N.E.2d 1107, 1113 (1990).

    Here, the State's evidence, specifically the testimony of
Fish, established that blood extracted from defendant's clothing
was consistent in blood type and various genetic markers with the
blood of the victim. Hines' precluded testimony would have
merely raised the possibility that some other person's blood may
have been on defendant's clothing, and it would have done nothing
to refute the State's evidence linking defendant to Ms. Nielsen's
murder. Given this fact, and in light of the evidence contained
in the record, we conclude the erroneously excluded testimony of
Hines would not have altered the outcome of the case and,
therefore, did not manifestly prejudice defendant.

1-97-2557

IV.

(The preceding material is nonpublishable under Supreme Court
Rule 23)

The primary issue presented by defendant's appeal is whether
the sentencing scheme set forth in section 5-1-8(a)(1)(b) of
Corrections Code, which allows for an enhanced sentence for first
degree murder under certain court-determined circumstances,
offends the constitutional mandates announced by the Supreme
Court in Apprendi v. New Jersey, 530 U.S. __, 147 L. Ed. 2d 435,
120 S. Ct. 2348 (2000).

At sentencing in May 1997, the State urged the court to
impose a life sentence based on its contention that the victim's
murder was "exceptionally brutal" and "heinous" within the
meaning of section 5-8-1(a)(1)(b) contained in the 1985 version
of the Corrections Code. That version of section 5-8-1 generally
enumerates the imprisonment terms for felony offenses and
specifically sets forth a sentence of "not less than 20 years and
not more than 40 years" in prison for the offense of first degree
murder. Ill. Rev. Stat. 1985 ch. 38, par. 1005-8-1(a))(1)(a).[5]

_____

[5]    In its response brief, the State indicates that
defendant is subject to a prison sentence of between 20 and 60
years. The murder of the victim in the instant matter occurred
in April 1997. At that time, section 5-8-1 provided a sentencing
range for first degree murder of 20 to 40 years. By amendment
effective January 1, 1988, this sentencing range was increased to
the current term of 60 years.
    Contrary to the State's suggestion, the amended version of
section 5-8-1 that became effective in January 1988, or the
current version of that provision, cannot be retroactively
applied to defendant's case because such an application would be

39

1-97-2557

Under paragraph (1)(b) of this provision, a sentence of natural
life is authorized where the sentencing judge finds that "the
murder was accompanied by exceptionally brutal or heinous
behavior indicative of wanton cruelty." Ill. Rev. Stat. 1985 ch.
38, par. 1005-8-1(a)(1)(b).

The sentencing judge in the instant case agreed with the
State's characterization of the crime and, specifically drawing
upon his recollection of the evidentiary proofs adduced at trial,
he found the conduct of defendant accompanying the murder of Ms.
Nielsen to be brutal and heinous as contemplated by the
Corrections Code. Based on its finding, the court sentenced
defendant to life in prison.

In Apprendi, the accused, Charles Apprendi, pled guilty to,
among other offenses, two counts of second degree possession of a
firearm for an unlawful purpose. Under New Jersey's sentencing
scheme, a second-degree offense carried a penalty range of 5 to
10 years in prison. As part of the plea agreement, the
prosecution reserved the right, however, to seek a greater
sentence on one of the two firearm possession counts under a hate
crime statute that allowed for an enhanced sentence where the
offense was committed with a biased purpose. For a second-degree

---

violative of the ex post facto clauses of the United States and
Illinois Constitutions (U.S. Const., art. I, § 9, cl. 3; Ill.
Const.1970, art. I, § 16). See Fletcher v. Williams, 179 Ill. 2d
225, 233, 688 N.E.2d 635, 640 (1997) (any statute that, inter
alia, makes more burdensome the punishment for a crime after its
commission is prohibited as ex post facto).

1-97-2557

offense, the hate crime law provided for a prison term of between 10 and 20 years.

Following a hearing, the sentencing court found, by a preponderance of the evidence, that the firearm possession offense committed by Apprendi was motivated by a racial bias. Relying on the hate crime enhancement provision, the court sentenced Apprendi to a term of 12 years, two years beyond the statutory maximum penalty for such an offense.

Apprendi challenged the validity of his sentence to the state appellate and supreme courts, arguing that the sentencing scheme provided in the hate crime law was unconstitutional. The state courts disagreed and upheld Apprendi's sentence. The Supreme Court reversed, finding that New Jersey's sentencing scheme infringed upon the due process and notice and right to jury clauses of the Constitution by impermissibly allowing the sentencing judge, rather than the jury, to determine, under a relaxed evidentiary standard, a fact which is most appropriately characterized as an element of the underlying offense.

After discussing at length the constitutional rights of every defendant in a criminal case to a trial by jury in which the State is required to prove every element of the offense charged beyond a reasonable doubt (U.S. Const. amends. V, VI, XIV; Apprendi, 530 U.S. at __, 147 L. Ed. 2d at 446-48, 120 S. Ct. at 2355-56), the Court examined the term "sentencing factor," a term it first coined in McMillan v. Pennsylvania, 477 U.S. 79,

41

1-97-2557

91 L. Ed. 2d 67, 106 S. Ct. 2411 (1986), in light of the novelty
of legislative schemes, referred to as "sentence enhancements,"
that remove from the jury the determination of a fact that, if
found, exposes a defendant to a penalty exceeding the maximum he
would receive if punished according to the facts reflected by the
jury verdict alone. Apprendi, 530 U.S. at __, 147 L. Ed. 2d at
448-52, 120 S. Ct. at 2356-60. According to the Court, a
"sentencing factor" is "a circumstance, which may be either
aggravating or mitigating in character, that supports a specific
sentence within a range authorized by the jury's finding that the
defendant is guilty of a particular offense." (Emphasis
omitted.) 530 U.S. at __ n.19, 147 L. Ed. 2d at 457 n.19, 120 S.
Ct. at 2365 n.19. A "sentence enhancement," on the other hand,
refers to a factual determination that results in "an increase
beyond the maximum authorized statutory sentence." Apprendi, 530
U.S. at __ n.19, 147 L. Ed. 2d at 457, n.19, 120 S. Ct. at 2365,
n.19.

The Court explicitly recognized that the effect of sentence
enhancement legislation on a defendant's punishment raises
serious constitutional concerns in light of its prior precedent
in the area and the history upon which those decisions rely.
Apprendi, 530 U.S. at __, 147 L. Ed. 2d at 452, 120 S. Ct. at
2360. For the first time, the Court squarely confronted the
issue of whether such enhancement schemes run afoul of well-
established constitutional principles. Traditionally, according

42

1-97-2557

to the Court, any circumstance that exposed an accused to a
higher degree of punishment had to be pled in the charging
instrument and presented and proven to the jury beyond a
reasonable doubt. Apprendi, 530 U.S. at __, 147 L. Ed. 2d at
449, 120 S. Ct. at 2357. Further, the fact that judges have
historically enjoyed the discretion of fixing a punishment within
a prescribed statutory range (Apprendi, 530 U.S. at __, 147 L.
Ed. 2d at 449-50, 120 S. Ct. at 2358) demonstrated that their
role in sentencing was "constrained at its outer limits by the
facts alleged in the indictment and found by the jury. ***
[F]acts that expose a defendant to a punishment greater than that
otherwise legally prescribed were by definition 'elements' of a
separate legal offense." Apprendi, 530 U.S. at __ n.10, 147 L.
Ed. 2d at 451 n.10, 120 S. Ct. at 2359 n.10. The Court
explained:

> "If a defendant faces punishment beyond that
> provided by statute when an offense is
> committed under certain circumstances but not
> others, it is obvious that both the loss of
> liberty and the stigma attaching to the
> offense [and suffered by the defendant] are
> heightened; it necessarily follows that the
> defendant should not - at the moment the
> State is put to proof of those circumstances
> - be deprived of protections that have, until

43

1-97-2557

that point, unquestionably attached."

Apprendi, 530 U.S. at __, 147 L. Ed. 2d at

451, 120 S. Ct. at 2359.

Relying on the principles established by its prior
decisions, the Court concluded the Constitution forbids "'a
legislature [from] remov[ing] from the jury the assessment of
facts that increase the prescribed range of penalties to which a
criminal defendant is exposed.'" Apprendi, 530 U.S. at __, 147
L. Ed. 2d at 455, 120 S. Ct. at 2363, quoting Jones v. United
States, 526 U.S. 227, 252, 143 L. Ed. 2d 311, 332, 119 S. Ct.
1215, 1228 (1999). (Stevens, J. concurring). According to the
Court, the Constitution mandates that "'such facts *** be
established by proof beyond a reasonable doubt.'" Apprendi, 530
U.S. at __, 147 L. Ed. 2d at 455, 120 S. Ct. at 2363, quoting
Jones, 526 U.S. at 253, 143 L. Ed. 2d at 332, 119 S. Ct. at 1229.
(Stevens, J., concurring). The Court held that "any fact [other
than the fact of a prior conviction] that increases the penalty
for a crime beyond the prescribed statutory maximum must be
submitted to a jury, and proved beyond a reasonable doubt."[6]

---

[6]    The Court's holding finally established the
constitutional principle it suggested, but had avoided to
pronounce, in its earlier decision of Jones v. United States, 526
U.S. 227, 243 n.6, 119 S. Ct. 1215, 1224 n.6, 143 L. Ed. 2d 311,
326 n.6 (1999), where in dictum the Court stated: "under the Due
Process Clause of the Fifth Amendment and the notice and jury
trial guarantees of the Sixth Amendment, any fact (other than
prior conviction) that increases the maximum penalty for a crime
must be charged in an indictment, submitted to a jury, and proven
beyond a reasonable doubt."

44

1-97-2557

Apprendi, 530 U.S. at __, 147 L. Ed. 2d at 455, 120 S. Ct. at
2362-63.[7]

In applying its ruling, the Court explained the relevant
inquiry does not depend on the formal structure of the statute at
issue, but of the statute's effect on the defendant's sentence -
that is, "does the required finding expose the defendant to a
greater punishment than that authorized by the jury's guilty
verdict?" Apprendi, 530 U.S. at __, 147 L. Ed. 2d at 457, 120 S.
Ct. at 2365.  If so, then the fact upon which the enhancement is
based must be alleged in the charging instrument and proven
before the jury beyond a reasonable doubt.  In such cases, the
enhancement factor is the "functional equivalent of an element of
a greater offense than the one covered by the jury's verdict"
(Apprendi, 530 U.S. at __ n.19, 147 L. Ed. 2d at 457 n.19, 120 S.
Ct. at 2365 n.19), and as such becomes the "'tail which wags the

--------------------

[7]        It must be noted that the rule announced by Apprendi
makes no mention of any obligation on the part of the prosecution
to allege the enhancing factor in the indictment.  The Court's
holding only provides that any fact other than a prior conviction
that increases the punishment for a crime beyond the statutory
maximum must be presented to the jury and proved beyond a
reasonable doubt.  The Court never expressly indicated that such
a fact need also be alleged in the indictment.  Nonetheless, when
the Court's ruling is viewed as a whole, and when it is
specifically considered together with the Court's statement in
Jones, it becomes clear that facts that expose a defendant to a
penalty beyond the maximum must also be pled in the indictment.
Indeed, several federal courts have read Apprendi this way.  See
United States v. Meshack, 225 F.3d 556, 575 n.15 (5th Cir. 2000);
United States v. Aquayo-Delgado, 220 F.3d 926, 933 (8th Cir.
2000); United States v. Murphy, 109 F. Supp. 2d 1059, 1062 (D.
Minn. 2000); United States v. Henderson, 105 F. Supp. 2d 523, 535
(S.D. W. Va. 2000).

1-97-2557

dog of the substantive offense.'" Apprendi, 530 U.S. at __, 147
L. Ed. 2d at 458, 120 S. Ct. at 2365, quoting McMillan, 477 U.S.
at 88, 91 L. Ed. 2d at 77, 106 S. Ct. at 2417. Conversely, since
Apprendi's holding is expressly limited to instances where the
enhancing factor has the effect of increasing the penalty beyond
the prescribed statutory maximum set, a court-determined fact may
permissibly alter a defendant's sentence within the range
provided for by the applicable statute.

The Apprendi ruling marks a stark departure from the
approach the Court has traditionally employed in differentiating
between an element of an offense and a sentencing factor. The
Apprendi Court explicitly recognized for the first time that an
accused criminal has the constitutional right to have any
statutory enhancement fact that, if found, increases the penalty
for a crime beyond the prescribed maximum to be treated as an
element of the underlying offense. In previous decisions, the
Court did not concern itself with the constitutional implications
of sentencing enhancement schemes but, rather, resorted to
principles of statutory interpretation. In those cases, the
Court undertook a microanalysis of the relevant statute's
language, structure and history in an effort to determine whether
it defined a distinct offense or whether it merely set forth a
factor that could be properly considered in imposing an enhanced
punishment. Within its analysis, the Court also frequently
considered the related matter of whether the particular

46

1-97-2557

enhancement factor at issue was traditionally or typically

considered by the courts as a sentencing factor. See <u>Castillo v.</u>

<u>United States</u>, 530 U.S. __, __, 147 L. Ed. 2d 94, 98-103, 120 S.

Ct. 2090, 2092-96 (2000) (in a case decided three weeks before

<u>Apprendi</u> was issued, the Court, in determining whether a federal

statute which dramatically increased the penalty for the use or

possession of a firearm when the weapon at issue is a

"machinegun" constituted a separate offense, concerned itself

primarily with the intent of Congress, examining the literal

language the statute and the statute's legislative history; the

Court also considered whether the type of firearm in question had

been typically or traditionally viewed as a sentencing factor);

<u>Jones</u>, 526 U.S. at 232-40, 251-52, 143 L. Ed. at 319-24, 331, 119

S. Ct. at 1219-22, 1228 (in determining whether the federal

carjacking statute, which increased the maximum punishment of 15

years where either "serious bodily injury" or "death" resulted

from the offense, constituted a single offense or three distinct

crimes, the Court turned to statutory interpretation to ascertain

Congress' intent and specifically relied on the statutory

construction principle of constitutional doubt to construe the

statute as establishing three separate offenses; the Court

further considered whether the facts of "serious bodily injury"

and "death" had been traditionally considered sentencing

factors); <u>Almendarez-Torres v. United States</u>, 523 U.S. 224, 229-

35, 140 L. Ed. 2d 350, 359-63, 118 S. Ct. 1219, 1224-26 (1998)

1-97-2557

(the Court resorted to principles of statutory interpretation, and specifically looked to the statute's language, structure, subject matter, context, and history, to determine whether Congress intended a federal law, which elevated the maximum penalty for a deported alien reentering the country beyond a two-year prison term if the alien's initial deportation resulted from an aggravated felony conviction, to define a separate crime or simply an enhanced penalty; the Court also examined whether recidivism was a typical sentencing factor).

Turning to the case at hand, we initially consider the State's argument that defendant has waived the matter of his sentence's validity for our review. As the State notes, defendant did not raise his Apprendi challenge in his original appeal and raised that matter for the first time in his timely filed rehearing petition. As a general rule, parties may not argue new points in a petition for rehearing. People v. Wright, No. 8711, slip op. at 17 (February 17, 2000). In Wright, the supreme court has recognized an exception to this rule where the new matter raised attacks the constitutionality of a criminal statute. Wright, slip op. at 17. According to the court, such challenges may be raised at any time because it would be fundamentally unfair to uphold a criminal conviction pursuant to an unconstitutional statute. Wright, Slip Op. at 17.

We believe Wright, while involving a challenge to the validity of a criminal statute, equally applies to cases, like

48

1-97-2557

the instant matter, where a defendant attacks his sentence on the
basis that it was imposed pursuant to an unconstitutional
sentencing procedure set forth in the Corrections Code.  The
fundamental unfairness to a defendant explicitly recognized by
Wright would similarly be present in such instances.  This court,
in fact, has recently declined to find waiver of a defendant's
Apprendi challenge to his sentence imposed pursuant to the
mandatory Class X sentencing scheme found in section 5-5-3(c)(8)
of the Corrections Code despite that challenge being raised for
the first by defendant in his rehearing petition.  People v.
Lathon, 1-99-0261, slip op. at 5 (November. 6, 2000); see also
People v. Wooters, 188 Ill. 2d 500, 510, 722 N.E.2d 1102, 1108
(1999) (permitting defendant's challenge on appeal to validity of
section 5-8-1(a)(1)(c)(ii) of the Corrections Code where that
attack, asserted for the first time on appeal, warranted
consideration given its constitutional dimension).

We further note Apprendi had yet to be released when we
issued our original decision in the matter.  Defendant thus did
not have the benefit of Apprendi during the original portion of
his appeal.  Notwithstanding, the State argues the ruling in
Apprendi is nothing new but, rather, is a restatement of the
holdings announced earlier by the Court in Jones and Almendarez-
Torres.  The State unsuccessfully asserted the same argument
before this court in Lathon, slip op. at 5 (noting Jones and
Almendarez-Torres were each decided as a matter of statutory

49

1-97-2557

interpretation of federal sentencing guidelines, where <u>Apprendi</u>
applied the principles established by those cases for the first
time to state prosecutions), and more recently in <u>People v.</u>
<u>Sutherland</u>, 1-98-3802, slip op. at 15 (December. 1, 2000).  We
likewise reject the State's argument here, and declining to apply
waiver, we will address the merits of defendant's challenge to
his sentence.

We must next resolve the question of <u>Apprendi</u>'s
applicability to defendant's case.  The law provides that a
judicial decision announcing a new constitutional rule applicable
to criminal cases is to be applied retroactively to all cases
pending on direct review at the time the new constitutional rule
is declared.  <u>People v. Erickson</u>, 117 Ill. 2d 271, 288, 513
N.E.2d 267, 374 (1987), citing <u>Griffith v. Kentucky</u>, 479 U.S.
314, 328, 93 L. Ed. 2d 649, 661, 107 S. Ct. 708, 716 (1987).  In
particular, for retroactivity to be triggered, two factors must
be present: (1) the case to which the new rule is to be applied
was pending on direct review or was otherwise not final when the
rule was declared and (2) the rule to be applied retroactively is
of constitutional dimension.  <u>People v. Dean</u>, 175 Ill. 2d 244,
253, 677 N.E.2d 947, 951 (1997); <u>Erickson</u>, 117 Ill. 2d at 289,
513 N.E.2d at 374.

We find both factors present in the instant case.
Defendant's case was still pending on direct review and was not
yet final when <u>Apprendi</u> was decided.  The term "final" has been

50

1-97-2557

defined in the retroactivity context as "'a case in which a
judgment of conviction has been rendered, the availability of
appeal exhausted, and the time for a petition for certiorari
elapsed or a petition for certiorari finally denied.'" People v.
Holman, 132 Ill. 2d 128, 141, 547 N.E.2d 124, 128 (1989), quoting
Griffith, 479 U.S. at 321 n.6, 93 L. Ed. 2d at 657 n.6, 107 S.
Ct. at 712 n.6. Defendant raised his Apprendi challenge in a
timely filed rehearing petition and at the earliest possible
opportunity. Defendant's case, while at the rehearing stage,
nonetheless remains before this court on direct review.

Secondly, the Supreme Court's ruling clearly announced a new
rule of constitutional dimensions. Such a finding is readily
apparent from the Apprendi opinion itself, as well as from the
Court's break from its past method of resolving the proper
characterization of a particular penalty enhancement statute.
The Apprendi Court expressly predicated its holding on the
Constitution's due process clauses of the fifth and fourteenth
amendments and the notice and jury trial guarantees of the sixth
amendment. The right of a criminal defendant to have all facts,
except the fact of a prior conviction, that increase the
statutory maximum penalty for an offense pled in the indictment
and proved to a jury beyond a reasonable doubt is, according to
the Court, deeply rooted in the Constitution and its
jurisprudence.

Furthermore, in determining the validity of the New Jersey

51

1-97-2557

sentencing scheme under which Apprendi was punished, the Court
did not seek to ascertain the state legislature's intent in
enacting the statute by examining its language, structure,
subject matter, context, and history. Neither did the Court
place any weight on whether the enhancement fact at issue, _i.e._,
a biased purpose on the part of the offender, has been
traditionally or typically viewed as a sentencing factor.
Rather, the Court concerned itself solely with the principles
that have developed in light of the rights guaranteed by the
fifth and sixth amendments and the limits those constitutional
provisions place on a legislature's ability to remove the
determination of certain facts from the province of the jury
which, if found, would elevate the penalty for a particular
offense above its statutorily prescribed maximum.[8]

Because defendant's case remains pending, and since Apprendi
reflects the establishment of a new constitutional principle, we
find Apprendi applicable to the instant matter. Lathon, slip op.

---

[8]     Several federal courts have held that Apprendi's
holding represents a new rule of constitutional law. See United
States v. Aguayo-Delgado, 220 F.3d 926, 931-32 (8th Cir. 2000)
("[i]n Apprendi, the Supreme Court made it clear that the
principle discussed in Jones is a rule of constitutional law");
Sustache-Rivera v. United States, 221 F.3d 8, 15 (1st Cir. 2000)
(recognizing same); United States v. Murphy, 109 F. Supp. 2d
1059, 1062 (D. Minn. 2000) (recognizing same); United States v.
Kelly, 105 F. Supp. 2d 1107, 1112 (S.D. Cal. 2000) (recognizing
same); United States v. Rogers, 228 F.3d 1318, 1325-26 (11th Cir.
2000) (recognizing same); United States v. Nordby, 225 F.3d 1053,
1059 (9th Cir. 2000) (indicating that Apprendi established a new
constitutional rule and applying the decision retroactively
pursuant to Griffith).

1-97-2557

at 5 (applying <u>Apprendi</u> retroactively where defendant raised
issue in petition for rehearing); <u>People v. Clifton</u>, Nos. 1-98-
2126, 1-98-2384 cons., slip op. at 51 n.6 (September 29, 2000)
(applying <u>Apprendi</u> retroactively to case pending on review).

Pursuant to <u>Apprendi</u>, the question presented here is whether
section 5-8-1(a)(1)(b) defines a separate, aggravated offense of
murder or whether that provision merely represents a factor that
a court may properly consider in imposing a sentence.   In
resolving this question, our duty is to ascertain the effect
section 5-8-1(a)(1)(b) has on the statutory prescribed maximum
imposed for a murder offense as set forth in paragraph (a)(1)(a)
of that provision.

The State makes several attempts to demonstrate that the
instant case is not covered by <u>Apprendi</u>.   Each of the State's
claims is based on the contention that defendant's life sentence
is not beyond, but rather falls within, the prescribed statutory
maximum for first degree murder.   The State first contends that
section 5-8-1(a)(1)(a) simply provides the "typical" sentencing
range for murder, and that the statutory maximum is actually life
imprisonment or the death penalty as provided in section 9-1(b)
of the Criminal Code of 1963 (Criminal Code) (Ill. Rev. Stat.
1985 ch. 38, par. 9-1(b)).   Based on its reading of the
Corrections Code, the State asserts the applicable sentencing
range should be referred to as 20 years in prison up to and
including the death penalty.

1-97-2557

The position posited by the State has been recently rejected by this court in <u>People v. Beachem</u>, No. 1-99-0852, slip op. at 21 (November. 8, 2000). There, the defendant, who was convicted of first degree murder, argued that her extended-term sentence of 90 years' imprisonment imposed under section 5-8-2(a) of the Corrections Code (730 ILCS 5/5-8-2(a) (West 1996)) ran afoul of the mandates of <u>Apprendi</u>. In asserting <u>Apprendi</u>'s inapplicability, the State claimed, like here, that the defendant's 90-year sentence did not exceed the maximum penalty for first degree murder, which, according to the State, was life or the death penalty.

This court rejected the State's reading of the Corrections Code, finding the current version of section 5-8-1(a)(1)(a), which provides a sentencing range of 20 to 60 years, reflects the prescribed statutory maximum penalty for a first degree murder offense. <u>Beachem</u>, slip op. at 23-24. The court noted that for any punishment exceeding 60 years, including either a term of life or the death penalty, to be imposed, additional aggravating factors must be found to exist. <u>Beachem</u>, slip op. at 21-22. The court's conclusion was further buttressed by the specific language of the extended-term provision, which explicitly provides that "'a judge shall not sentence an offender to a term of imprisonment <u>in excess of the maximum sentence authorized by Section 5-8-1</u>'" unless certain aggravating factors are present. (Emphasis in original.) <u>Beachem</u>, slip op. at 22, quoting 730

54

1-97-2557

ILCS 5/5-8-2(a)(1) (West 1996).

Beachem commands rejection of the State's contention in the
present case.  The predecessor version of section 5-1-8(a)(1),
which is at issue here, expressly provides for a prison term of
20 to 40 years' imprisonment for first degree murder.  Like the
statutory schemes examined in Beachem, the 1985 version of the
sentencing laws similarly authorizes a sentence in excess of 40
years only upon additional findings.  See Ill Rev. Stat. 1985 ch.
38, par. 1005-8-1(a)(1)(b) (term of life imprisonment permitted
if offense was "exceptionally brutal or heinous," or where any
aggravating factors specified in section 9-1 of the Criminal
Code, which lists the eligibility factors for a penalty of death,
are present); Ill. Rev. Stat. 1985 ch. 38, par. 1005-8-1(a)(1)(c)
(term of life authorized where defendant has previously been
convicted of murder or where he was found guilty of murdering
more than one victim); Ill. Rev. Stat. 1985 ch. 38, par. 1005-8-
2(a)(1) (extended term of 40 to 80 years' imprisonment allowed
where aggravating factors set forth in section 5-5-3.2 of
Corrections Code are found to be present); Ill. Rev. Stat. 1985
ch. 38, par. 9-1(b) (death penalty warranted where defendant has
been convicted of murder while 18 years of age or older and where
certain statutory aggravating factors are found).  Additionally,
the 1985 version of the extended-term provision found in section
5-8-2(a) sets forth verbatim the sentencing limitation found in
the current legislation and discussed by the Beachem court.  See

1-97-2557

Ill. Rev. Stat. 1985 ch. 38, par. 1005-8-2(a) (expressly
referring to section 5-8-1 as setting forth the maximum
punishment for first degree murder).

The State alternatively contends that Apprendi stands for
the proposition that the prescribed statutory maximum for first
degree murder, from a constitutional standpoint, and seemingly
notwithstanding the express language of the enhanced penalty
provision at issue in the case, must be viewed in all instances
as the imposition of the death penalty. In this regard, the
State argues "as the elements of first degree murder are the same
regardless of whether a defendant is facing the death penalty
***, it would be absurd to find that a murder defendant facing
the death penalty has no sixth amendment right to have a jury
find the statutory aggravating eligibility factors, while all
other murder defendants have the constitutional right to have a
jury *** find the statutory factors authorizing an extended term
sentence or natural life imprisonment."

The State essentially maintains that the dictates of
Apprendi must apply equally to capital and noncapital defendants.
The Supreme Court, however, specifically limited its holding in
Apprendi to noncapital cases and was careful to note that its
decision does not disturb its earlier ruling in Walton v.
Arizona, 497 U.S. 639, 639-40, 111 L. Ed. 2d 511, 519-20, 110 S.
Ct. 3047, 3049-50 (1990), where the Court rejected the argument
that the Constitution mandated that judge-authorized findings of

56

Case 1:07-cv-06126    Document 16    Filed 01/18/2008    Page 108 of 112

1-97-2557

aggravating factors necessary for the imposition of the death

penalty be made by a jury, and further dismissed the contention

that those factors were "elements" of the underlying offense,

which, according to the Court, merely represented standards to

guide the decision of choosing between verdicts of death or

another lesser form of punishment.  Apprendi, 530 U.S. at __, 147

L. Ed. 2d at 459, 120 S. Ct. at 2366.  Thus, while it appears

Apprendi extends greater constitutional protections to

noncapital, rather than capital, defendants, the Court has

endorsed this precise principle, and we are in no position to

secondguess that decision here.[9]

In a final attempt to show that the statutory maximum was

not exceeded in this case, the State relies on the Seventh

Circuit's recent decision in United States v. Smith, 223 F.3d 554

(7th Cir. 2000), for the proposition that the theoretical

possibility of a certain statutory penalty of a given offense

represents that offense's maximum punishment.  Because a

conviction of first degree murder carries the theoretical

---

[9]    Notably, the Illinois death penalty statute expressly
provides that the eligibility factors for such a punishment must
be proved by the State beyond a reasonable doubt.  Ill. Rev.
Stat. 1985 ch. 38, par. 9-1(f).  In this regard, the death
penalty statute conforms to the rule in Apprendi.  The statute,
however, does not require the State to give a defendant pretrial
notice of the eligibility factors sought to be established.  Our
supreme court has specifically held that no constitutional right
exists entitling a criminal defendant to such notification.
People v. Jones, 123 Ill. 2d 387, 426, 528 N.E.2d 648, 666
(1988); People v. Crews, 122 Ill. 2d 266, 293, 522 N.E.2d 1167,
1180 (1988).

1-97-2557

possibility of either a sentence of death or life in prison under
Illinois law, the State maintains that death or life is the
maximum penalty for murder.

We do not share the State's reading of _Smith_.  Contrary to
the State's contention, nothing in _Smith_ suggests that the
highest theoretical punishment for a particular crime constitutes
the statutory maximum for purposes of applying _Apprendi_.
Moreover, the sentencing statute in _Smith_ concerned the
imposition of a mandatory minimum under certain circumstances.
See _Smith_, 223 F.3d at 562-63 (statute authorized range of 30
years' imprisonment to life upon a finding that the defendant
participated in a continuing criminal enterprise, but set forth a
mandatory minimum sentence of life for any defendant who, _inter
alia_, was a principal or otherwise was a leader in such
enterprise).  The _Smith_ court specifically indicated that
_Apprendi_ did not apply, and noted that the Supreme Court, in
_McMillan_, expressly upheld the validity of such mandatory minimum
sentencing legislation.  _Smith_, 223 F.3d at 565-66.  The
sentencing scheme in this case does not involve the imposition of
a mandatory minimum punishment but, rather, authorizes an
enhanced penalty upon the finding of certain specified factual
circumstances.

We must now decide whether that enhancement procedure is
constitutional under _Apprendi_ and must specifically consider
whether the sentencing factor reflected in section 5-8-

58

1-97-2557

1(a)(1)(b), i.e., whether the murder was accompanied by
"exceptionally brutal or heinous behavior indicative of wanton
cruelty," represents a factual determination, and, if so, whether
that determination increases the maximum penalty for murder.

Certainly, the question of whether a particular murder was
accompanied by "exceptionally brutal or heinous behavior"
necessarily involves an examination of, and is based upon, the
factual circumstances presented by the evidentiary proofs.
Further, a court's finding that a murder was accompanied by such
behavior significantly increases the statutory maximum penalty
from a term of 40 years' imprisonment to a term of natural life.
Based on the foregoing, the "exceptionally brutal or heinous"
inquiry presented by section 5-8-1(a)(1)(b) is most accurately
characterized for constitutional purposes as an element of a
greater crime, rather than a mere factor to be considered at
sentencing.  Accordingly, if the State wishes to seek an enhanced
sentence for murder on the grounds that the offense was
"exceptionally brutal or heinous," it must allege that factual
circumstance in the relevant charging instrument and prove it to
a jury beyond a reasonable doubt.[10]  We note that a different
division of this court in People v. Lee, Nos. 1-98-3631, 1-99-
2203 cons., slip op. at 9 (December. 14, 2000), and the Second
District Appellate Court in People v. Joyner, No. 2-99-0433, slip

---

[10]     We make no comment on whether such a procedure is
properly available to the State under current Illinois law.

1-97-2557

op. at 22 (November. 8, 2000), have recently determined that section 5-8-1(a)(1)(b) is constitutionally infirm under Apprendi.

Considering the merits of defendant's challenge, the crime of murder as defined in section 9-1 of the Criminal Code did not require a finding by the jury that defendant's conduct accompanying the victim's murder was "exceptionally brutal or heinous." It is of no surprise then that the State's charging instruments make no mention of such circumstances. Further, the record is clear that defendant's jury made no finding concerning the nature of the victim's murder and specifically reveals that the jurors never considered and passed on the question of whether defendant acted brutally or heinously.

The highest punishment defendant could receive based solely on the facts reflected by the jury's verdict was the maximum term of 40 years' imprisonment. The jury's verdict authorized no greater penalty. Only when the sentencing judge, proceeding under a relaxed evidentiary standard, found an additional factual circumstance related to the crime did defendant become subject to a prison term well in excess of the maximum. That procedure, as Apprendi dictates, offends constitutional principles and is invalid as applied to defendant in this case. See Beachem, slip op. at 25 (noting the Apprendi Court never declared the New Jersey statute void on its face but, rather, referred to it as creating an unconstitutional procedure).

Since the State never alleged and proved to the jury beyond

60

1-97-2557

a reasonable doubt that defendant acted in an "exceptionally brutal or heinous" fashion when he murdered the victim, we vacate defendant's life sentence and remand for a sentence that is consistent with this opinion.

CONCLUSION

We affirm defendant's conviction for murder based on the reasons expressed in the unpublished portion of this opinion. We further vacate defendant's sentence of life and remand for the imposition of a new prison term that is consistent with this opinion.

Affirmed in part and reversed in part; cause remanded with directions.

CAHILL, P.J., and WOLFSON, J., concur.

61