CASE NO. 07CV 6126

ATTACHMENT NO. 1

EXHIBIT C - E

TAB (DESCRIPTION)

No. 90865

IN THE

SUPREME COURT OF ILLINOIS

| | | |
|---|---|---|
| **PEOPLE OF THE STATE OF ILLINOIS,** | ) | Appeal from the Appellate Court of Illinois, First District, No. 97-2557 |
| Plaintiff-Appellant, | ) | |
| | ) | There heard on Appeal from the Circuit Court of Cook County, Illinois, No. 87 CR 6131. |
| -vs- | ) | |
| **HENRY KACZMAREK,** | ) | Honorable John Brady, Judge Presiding. |
| Defendant-Appellee. | ) | |

## BRIEF FOR DEFENDANT-APPELLEE – CROSS RELIEF REQUESTED

MICHAEL J. PELLETIER
Deputy Defender

DEBRA R. SALINGER
Assistant Appellate Defender
Office of the State Appellate Defender
203 North LaSalle Street - 24th Floor
Chicago, Illinois 60601
(312) 814-5472

COUNSEL FOR DEFENDANT-APPELLEE

**ORAL ARGUMENT REQUESTED**

EXHIBIT C

## POINTS AND AUTHORITIES                                    Page

**I.**   **The Greatest Penalty Authorized By The Jury's Verdict Was 40 Years.**
**Kaczmarek's Natural-Life Sentence For Murder Based On A Judicial Finding of**
**Brutal And Heinous Must Be Vacated Where The Facts That Increased the**
**Prescribed Range of Penalties Were Not Charged, Submitted To The Jury, Or**
**Proved Beyond a Reasonable Doubt** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Ill. Rev. Stat., ch. 38, sec. 9-1 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Ill. Rev. Stat., ch. 38, sec. 1005-8-1(a)(1)(a)(1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Ill. Rev. Stat., ch. 38, sec. 1005-8-1(a)(1)(b)(1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

U.S. Const. Amends. VI, XIV . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Apprendi v. New Jersey*, 530 U.S. 466 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Ring v. Arizona*, 536 U.S. __, 122 S. Ct. 2428, 153 L.Ed 2d 556 (2002) . . . . . . . . . . . . . . 21, 22

*People v. Kaczmarek*, 318 Ill. App. 340, 741 N.E.2d 1131 (1st Dist. 2000) . . . . . . . . . . . . . . 21

*People v. Swift*, No. 91840, 2002 Ill. LEXIS 954 (Nov. 21, 2002) . . . . . . . . . . . . . . . . . . . . . 22

**1.**   ***Pursuant to Statute, 40 Years Was The Maximum Statutory Penalty***
***For Murder*** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Ill. Rev. Stat., ch. 38, sec. 1005-8-1(a)(1)(1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*People v. Swift*, No. 91840, 2002 Ill. LEXIS 954 (Nov. 21, 2002) . . . . . . . . . . . . . . . . . . . . 22, 23

*People v. Brownell*, 79 Ill. 2d 508, 404 N.E.2d 181 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*People v. Davis*, No. 89704, 2002 Ill. LEXIS 286 (Feb. 22, 2002) . . . . . . . . . . . . . . . . . . . . . . 23

2.      *This Case Does Not Fall Within the Ambit of Ford* . . . . . . . . . . . . . . . . . 24

Ill. Rev. Stat., ch. 38, sec. 9-1(b)(1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Ill. Rev. Stat., ch. 38, sec. 9-1(d)(1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*People v. Ford*, 198 Ill. 2d 68, 761 N.E.2d 735 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*People v. Hopkins*, 201 Ill. 2d 76, 773 N.E.2d 633 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

A.      *Jury's General Verdict Of Guilty of Murder Did Not Authorize Death* . . . . . . 25

*People v. Mack*, 167 Ill. 2d 525, 658 N.E.2d 437 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*People v. Ramey*, 151 Ill. 2d 598, 603 N.E.2d 519 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*People v. Williams*, 193 Ill. 2d 1, 737 N.E.2d 230 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*People v. Crite*, 261 Ill. App. 3d 1041, 634 N.E.2d 487 (2nd Dist. 1994) . . . . . . . . . . . . . . . 26

*People v. Rivera*, __ Ill. App. 3d __, 777 N.E.2d 360 (2nd Dist. 2001) . . . . . . . . . . . . . . . . 26-27

B.      *Section 9-1(a)(3) Is Not Equivalent to Section 9-1(b)(6)* . . . . . . . . . . . . . . . . . . 27

Ill. Rev. Stat., ch. 38, sec. 9-1(a)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

Ill. Rev. Stat., ch. 38, sec. 9-1(b)(6) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*People v. Fuller*, No. 89220, 2002 Ill. LEXIS 287 (Feb., 22, 2002) . . . . . . . . . . . . . . . . . . . . . . 29

I.P.I. Criminal 7B.07 (3rd Ed. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

C.      *Residential Burglary Cannot Serve As A Basis for a Section 9-1(b)(6)*
        *Finding* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

Ill. Rev. Stat., ch. 38, sec. 9-1(b)(6)(c)(1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Schad v. Arizona*, 501 U.S. 624 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Stromberg v. California*, 283 U.S. 359 (1931) .................................................... 30

*People v. Simms*, 143 Ill. 2d 154, 572 N.E.2d 947 (1991) ................................. 29

*In re Brown*, 71 Ill. 2d 151, 374 N.E.2d 209 (1978) ....................................... 32

*People v. Kazcmarek*, 243 Ill. App. 3d 1067, 613 N.E.2d 1253 (1st Dist. 1993) ............ 31

*People v. Alexander*, 40 Ill. App. 3d 457, 352 N.E.2d 247 (1st Dist. 19976) ............... 32

### 3. *Kaczmarek Was Not Given Notice of The Element Used to Enhance His Sentence* ............................................... *32*

725 ILCS 5/111-3 (2001) ....................................................... 35

*United States v. Cotton*, 535 U.S. ___, 122 S. Ct 1781 (2002) ........................... 34

*People v. Brownell*, 79 Ill. 2d 508, 4040 N.E.2d 181 (1980) ............................. 33

*People v. Davis*, No. 89704, 2002 Ill. LEXIS 286 (Feb. 22, 2002) ....................... 33

*People v. Holloway*, 177 Ill. 2d 1, 682 N.E.2d 59 (1997) ............................. 35

*People v. Thingvold*, 145 Ill. 2d 441, 584 N.E.2d 89 (1991) ........................... 33

*People v. Lucas*, 353 N.C. 568, 548 S.E.2d 712 (2001) ............................... 34

*People v. Martinez*, 32 P.3d 520 (Col. App. 2001) ................................... 34

*State v. Ouellette*, 145 N.H.489, 764 A.2d 914 (2000) ............................... 34

*State v. Seilert*, 28 P.3d 445 (Kan.App. 2001) ....................................... 34

### 4. *The Element of Brutal and Heinous Was Not Charged, Submitted to a Jury, Nor Proven Beyond a Reasonable Doubt* ..................... *35*

Ill. Rev. Stat., ch. 38, sec. 10050801(1)(a)(1)(b) (1987) ............................... 36

*Apprendi v. New Jersey*, 530 U.S. 466 (2000) ....................................... 36

*People v. Swift*, No. 91840, 2002 Ill. LEXIS 954 (Nov. 21, 2002) ....................... 36

5. *The Failure to Find an Element of the Offense Cannot Constitute Harmless Error* .................................................. 36

*Arizona v. Fulminante*, 499 U.S. 279 (1991) ........................................ 38

*Neder v. United States*, 527 U.S. 1 (1999) ..................................... 37-38

*Sullivan v. Louisiana*, 508 U.S. 275 (1993) ........................................ 38

*People v. Armstrong*, 183 Ill. 2d 130, 700 N.E.2d 960 (1998) .......................... 39

*People v. Jones*, 81 Ill. 2d 1, 405 N.E.2d 343 (1979) ................................. 39

*People v. Leger*, 149 Ill. 2d 355, 597 N.E.2d 586 (1992) .............................. 39

*People v. O'Neal*, 104 Ill. 2d 399, 472 N.E.2d 471 (1984) ............................ 36

*People v. Blackwell*, 325 Ill. App. 3d 354, 757 N.E.2d 589 (1st Dist. 2001) ............... 41

*People v. Bryant*, 325 Ill. App. 3d 448, 758 N.E.2d 430 (1st Dist. 2002) ................. 40

*People v. Carter*, 332 Ill. App. 3d 576, 773 N.E.2d 1140 (1st Dist. 2002) .......... 39, 40, 41

*People v. Gholston*, 332 Ill. App. 3d 179, 772 N.E.2d 880 (1st Dist. 2002) ............... 40

*People v. Peacock*, 324 Ill. App. 3d 749, 756 N.E.2d 261 (1st Dist. 2001) ............... 41

*People v. Pearson*, 324 Ill. App. 3d 622, 756 N.E.2d 438 (4th Dist. 2001) ............... 41

*U.S. v. Anderson*, 236 F.3d 427 (8th Cir. 2001) .................................... 40

*U.S. v. Nance*, 236 F.3d 820 (7th Cir. 2000) ...................................... 40

*U.S. v. Terry*, 240 F.3d 65 (1st Cir. 2001) ........................................ 40

II. **Defendant's Constitutional Right to a Speedy Trial Was Denied Where Three and One Half Years Elapsed Between Reversal of Defendant's Murder Conviction and His Second Trial and Where Defendant Was Not Responsible for a Bulk of the Delay** .......................................................... 42

U.S. Const., amends. VI, XIV . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

Ill. Const., art. I, sec. 8 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

725 ILCS 5/103-5(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

*Barker v. Wingo*, 407 U.S. 514 (1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Doggett v. U.S.*, 505 U.S. 647 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43, 50

*People v. Bazzell*, 68 Ill. 2d 177, 369 N.E.2d 48 (1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . 42, 43

*People v. Crane*, 195 Ill. 2d 42, 743 N.E.2d 555 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . 43, 51-52

*People v. Kliner*, 185 Ill. 2d 81, 705 N.E.2d 850 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

*People v. Staten*, 159 Ill. 2d 419, 639 N.E.2d 550 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

*People v. Kaczmarek*, 243 Ill. App. 3d 1067, 613 N.E.2d 1253 (1st Dist. 1993) . . . . . . . . . . . . 42

*People v. Kaczmarek*, 318 Ill. App. 3d 340, 741 N.E.2d 1131 (1st Dist. 2000) . . . . . . . . . *passim*

*People v. Singleton*, 278 Ill. App. 3d 296, 662 N.E.2d 580 (1st Dist. 1996) . . . . . . . . . . . . . . . 42

*People v. Williams*, 299 Ill. App. 3d 143, 700 N.E.2d 753 (1st Dist. 1998) . . . . . . . . . . . . . . . . 42

*People v. Belcher*, 186 Ill. App. 3d 202, 542 N.E.2d 419 (2d Dist. 1989) . . . . . . . . . . . . . . . . . 43

*People v. Battles*, 311 Ill. App. 3d 911, 724 N.E.2d 997 (5th Dist. 2000) . . . . . . . . . . . . . . . . . 45

*People v. Brimmer*, 60 Ill. App. 3d 214, 376 N.E.2d 337 (1st Dist. 1978) . . . . . . . . . . . . . . . . . 47

*People v. Prince*, 242 Ill. App. 3d 1003, 611 N.E.2d 105 (3rd Dist. 1993) . . . . . . . . . . . . . . . . 47

*Nickerson v. State* (Ala. App.), 629 So. 2d 60 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

## NATURE OF THE CASE

In 1989, Henry Kaczmarek was convicted of first-degree murder after a jury trial and was sentenced to natural-life in prison. Defendant appealed and on March 31, 1993, the appellate court reversed defendant's murder conviction and remanded for a new trial. *People v. Kaczmarek*, 243 Ill. App. 3d 1067, 613 N.E.2d 1253 (1st Dist. 1993). Following a second jury trial in November of 1996, defendant was found guilty of murder. Defendant appealed and on December 27, 2000, the appellate court vacated defendant's natural-life sentence and remanded the cause for resentencing. *People v. Kaczmarek*, 318 Ill. App. 3d 340, 741 N.E.2d 1131 (1st Dist. 2000)(portions of the opinion were ordered to be unpublished pursuant to Supreme Court Rule 23). On May 30, 2002, this Court allowed the State's petition for leave to appeal.

An issue is raised concerning the challenging instrument. Cross-relief is being requested.

-1-

## STATUTES INVOLVED

Ill. Rev. Stat., ch. 38, sec. 9-1 (now codified as 720 ILCS 5/9-1).
**First degree murder -Death penalties -Exceptions -Separate hearings – Proof - Findings - Appellate procedures -Reversals**

(a)  A person who kills an individual without lawful justifications commits first degree murder, if, in performing the acts which cause the death:

(1) He either intends to kill or do great harm ... or knows that such acts will cause death to that individual . . . or . . .

(2)  He knows that such acts create a strong probability of death or great bodily harm to that individual or another or

(3) He is attempting or committing a forcible felony other than second degree murder.

(b) Aggravating factors:
A defendant who at the age of the commission of the offense who has attained the age 18 or more and who has been found guilty of first degree murder may be sentenced to death if:

*          *          *

(6) the murdered individual was killed in the course of another felony if:
    (a) the murdered individual:
        (i) was actually killed by the defendant, or
        (ii) received physical injuries inflicted by the defendant
        substantially contemporaneously with physical injuries caused by one or
        more persons for whose the conduct the defendant is legally accountable
        caused the death ... or
    (b) in performing the act which caused the death of the murdered individual...
    (c) the other felony was one of the following:  armed robbery, robbery,
aggravated criminal sexual assault, aggravated kidnaping, forcible detention, arson, aggravated arson, burglary, home invasion, or the attempt to commit any of the felonies listed in this subsection (c).

(c) consideration of factors in aggravation and mitigation.

*          *          *

(d) Separate sentencing hearing

Where requested by the State, the court shall conduct a separate sentencing proceeding  to

-2-

determine the existence of factors set forth in subsection (b) and to consider any aggravating or mitigating factors as indicated in subsection (c). The proceedings shall be conducted:

> (1) before the jury that determined the defendant's guilt; or
>
> (2) before a jury impaneled for the purpose of the proceeding . . .

**(f) Proof**

The burden of proof of establishing the existence of any of the factors set forth in subsection (b) is on the State and shall not be satisfied unless established by proof beyond a reasonable doubt.

**(g) Procedure- Jury**

If at the separate sentencing proceeding the jury finds that none of the factors found in subsection (b) exists, the court shall sentence the defendant to a term of imprisonment under Chapter V of the Unified Code of Corrections. If there is a unanimous finding by the jury that one or more of the factors set forth in subsection (b) exist, the jury shall consider aggravating and mitigating factors as instructed by the court and shall determine whether the sentence of death shall be imposed. If the jury determines unanimously that there are no mitigating factors sufficient to preclude the imposition of the death sentence, the court shall sentence the defendant to death.

Unless the jury unanimously finds that there are no mitigating factors sufficient to preclude imposition of the death sentence, the court shall sentence the defendant to a term of imprisonment under Chapter V of the Code of Corrections.

**(h) Procedure - No Jury**

In a proceeding before the court alone, if the court finds that none of the factors found in subsection (b) exists, the court shall sentence the defendant to a term of imprisonment under Chapter V of the Unified Code of Corrections.

If the court determines that one or more of the factors set forth in subsection (b) exists, the court shall consider any aggravating and mitigation factors ... If the court determines that there are no mitigating factors sufficient to preclude the imposition of the death penalty, the Court shall sentence the defendant to death.

Unless the court finds that there are no mitigating factors sufficient to preclude the imposition of the sentence of death, the court shall sentence the defendant to a term of imprisonment under Chapter V of the Code of Corrections.

## Code of Corrections - Chapter V.  Sentencing

Ill. Rev. Stat., ch. 38, sec. 1005-8-1 (now codified as 730 ILCS 5/5-8-1)
**Sentence of Imprisonment for Felony**

     (**a**) Except as otherwise provided in the statute defining the offense, a sentence of imprisonment for a felony shall be a determinate sentence set by the court under this Section, according to the following limitations:

     (1) for first degree murder,

     (a) a term shall not be less than 20 years and not more than 40 years, or

     (b) if the court finds that the murder was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty, or, except as set forth in subsection (a)(1)(c) of this Section, that any of the aggravating factors listed in subsection (b) of Section 9-1 of the Criminal Code of 1961 are present, the court may sentence the defendant to a term of natural life imprisonment ***

## ISSUES PRESENTED FOR REVIEW

1.     Whether pursuant to *Apprendi v. New Jersey*, Mr. Kaczmarek's natural-life sentence for first-degree murder based on a judicial finding of brutal and heinous must be vacated where the jury's verdict authorized a maximum penalty of forty years and where the facts that increased the prescribed range of penalties were not charged, submitted to the jury, or proved beyond a reasonable doubt?

2.     Whether Mr. Kaczmarek's constitutional right to a speedy trial was denied where over three and one half years elapsed between reversal of defendant's murder conviction and his second trial and where defendant was not responsible for a bulk of the delay?

## STATEMENT OF FACTS

In the early morning hours of April 25, 1987, Millie Nielsen was killed in her apartment. Police arrested Henry Kaczmarek and he was subsequently charged with Ms. Nielsen's murder as well as with residential burglary, home invasion, and armed robbery. (C. 34-51) Following a jury trial in 1989, defendant was found guilty of all charges. (C. 54) Judge Michael Getty sentenced defendant to a term of natural life on the murder conviction. (C. 54) Defendant appealed.

On March 31, 1993, the appellate court reversed defendant's murder conviction and remanded for a new trial. *People v. Kaczmarek*, 243 Ill. App. 3d 1067, 613 N.E.2d 1253 (1st Dist. 1993)(C. 54-78). Following the denial of defendant's motion for discharge based on a speedy trial violation, the State, in November of 1996, retried defendant on five counts of murder. Judge John Brady presided over the second jury trial. The jury found defendant guilty of murder and the court sentenced defendant to natural-life imprisonment. (C. 152, 293) Defendant appealed. On December 27, 2000, the appellate court vacated defendant's sentence and remanded for resentencing. *People v. Kaczmarek*, 318 Ill. App. 3d 340, 741 N.E.2d 1131 (1st Dist. 2000)(2000 Ill. App. LEXIS 999). Four of the issues raised on appeal were addressed in unpublished portions of the opinion while the fifth issue concerning the application of *Apprendi v. New Jersey* was addressed in the published opinion.

### Evidence At Trial

Millie Nielsen lived on the first floor of a two-flat apartment building while Dan Larry,

-6-

his wife Margaret, and Margaret's then 19-year-old son, John Fisher, lived on the second floor. (R. I179)  The 86-year-old Nielsen was the Larrys' landlady.  (R. I177-I179)

On April 24, 1987, a Friday, Margaret Larry saw Ms. Nielsen at around 5:00 or 5:30 p.m. (R. I180)  At 6:15 p.m., Margaret went bowling with her son John.  (R. I181, I207)  Margaret and John returned home at about 10:30 p.m.  (R. I181)  In the apartment, Margaret's husband was passed out on the couch.  (R. I181)  Also in the apartment was Henry Kaczmarek, who was on the couch watching television.  (R. I181, I207)  Henry was wearing light-colored jeans and a blue, quilted work jacket, and construction boots.  (R. I179, I207, I211)  Henry had been living with the Larrys for about a month after previously having lived at his girlfriend, Pam Hines' house.  (R. K182)  At 11:00 p.m., Henry helped Margaret bring Dan to bed.  (R. I184, I209) Margaret went to sleep and Henry left.

Margaret woke up that morning at around 7:00 or 7:30 a.m.  (R. I190)  Margaret saw Henry sleeping on the couch.  (R. I190)  Shortly after, Henry woke up.  (R. I190)  Margaret stated that Henry looked "kind of" nervous until he got his coffee after which he sat down and relaxed. (R. I192)  Margaret stated that Henry was wearing a clean pair of dark-colored jeans and a light dress shirt.  (R. I190)  Margaret did not pay attention to whether there were any stains on Henry's clothing.  (R. I199)  Margaret admitted that the first time she told police about what Henry was wearing on Saturday morning was two years after Millie's murder.  (R. I202)

At around 9:45 a.m., Ms. Nielsen's helper, Ronald Sadlowski, noticed that the back pantry window of Millie's apartment had been broken and the back storm door was fully open. (R. I163)  Ronald called the police.  (R. I164)  Police found Ms. Nielsen in the bedroom of her apartment having been stabbed multiple times, strangled, and having sustained blunt force

-7-

injuries. (R. I119-121, I147) Officer Marsala observed bloodspots on the floor and walls above the bed where Ms. Nielsen was found, blood on the kitchen floor leading to the bedroom, and bloodspots on the dust ruffle of the bed in the second bedroom.. (R. I40-42, I51-53) Marsala found no signs of forced entry and no broken glass inside. (R. I43-44)

John woke up at 10:00 a.m. on Saturday morning when police came to question him. (R. I210) Detective Bogucki and partner Raymond Schalk conducted a follow-up investigation regarding the murder of Millie Nielsen. (R. J29) The detectives interviewed Dan and Margaret Larry. (R. J29) Ron Larry approached the detectives and talked to them. (R. J30)

In 1987, Ron Larry lived with his mother but would sleep on the back porch of Margaret and Dan Larrys' apartment. (R. I64) Ron Larry admitted being convicted of theft in February of 1980 and being placed on probation. (R. I61) In April of 1980, Ron was convicted of burglary and was sentenced to four years probation with a condition of probation being that he spend the first four months in jail and pay $300 restitution. (R. I61) Three years later, Ron was arrested for theft and charged with violating his probation. Ron was sentenced to three years in prison for violating his probation and two years incarceration for felony theft. (R. I61-62)

On April 24th, Ron went to work and then went drinking at Patty's Lounge. Ron left the lounge at midnight or 1:00 a.m. (R. I68) After getting something to eat, Ron went to his brother's house and laid down on some padding on the second floor back porch to sleep. (R. I68) At trial, Margaret testified that Ron had no permission to sleep on the Larrys' back porch. (R. I196) Ron did not see any bags or property in the gangway and did not pay attention to the first floor door or windows. (R. I69) Ron stated that when he was on the porch, the temperature was in the 50's. (R. I96) Ron admitted that he previously testified that it had been in the 60's. (R.

-8-

196) The parties subsequently stipulated that the temperature at 3:00 a.m. was 37 degrees. (R. J126)

At 2:00 a.m., while on the porch, Ron heard the alarm from Patty's Lounge indicating its closing. (R. H72) Ron claimed that twenty to thirty minutes later, he saw Henry in the back yard of the building carrying a bag. (R. H64) He had known Henry for five or six years. (R. H64) Ron testified that Henry, who was wearing jeans and a dark jacket, was walking across the yard. (R. H73) Ron stated that Henry was carrying the bag with his arms out at a 90 degree angle. (R. H100) The bag, which looked like a garbage bag, did not have handles on it. (R. H100)

Ron went to sleep, waking up around 7:00 a.m. (R. H76) Ron used the back stairs and noticed nothing unusual. (R. H77) After going to work for a full day on Saturday April 25th, Ron went to Patty's Lounge for a few beers. (R. H82) At Patty's, Ron learned that Ms. Nielsen had been murdered. (R. H82) After Patty's, Ron went to the Larrys' where Ron spoke to police. (R. H83) Ron told the police about Henry and he went with police to find Henry. (R. H83, J31)

Police arrested Henry in his car on April 26th. (R. J33-J36) Henry was wearing a plaid shirt and blue jeans and had on leather work boots. (R. J36, J62) Police noted blood stains on the right and the left sleeve of Henry's coat. (R. J34) Henry signed a written consent form to search his car. (R. J40) In the trunk of Henry's car, police found jewelry boxes, plates and platters, a Marshall Fields bag, a pair of blue jeans with blood stains, and tools. (R. J42) Police did not find any gloves in the trunk or car and no other shoes. (R. J43)

Ms. Nielsen's niece Fern Briggs and great niece Barbara Tucker viewed the property taken from the trunk of Henry's car. (R. J57, J95, J105) Briggs and Tucker identified pieces of jewelry and serving dishes as their Aunt Millie Nielsen's. (R. J95-101, J105-108) Officer

-9-

Patterson, an expert in fingerprint identification, averred that a hand print taken from the bag found in the trunk of defendant's car was a print from defendant. (R. J121)

Henry gave his consent to have police take a blood sample from him. (R. J58) Defendant's blood sample was transferred to serologist Pam Fish. (R. J126) During Nielsen's autopsy, medical examiner Michael Chambliss took blood from decedent, also transferring it to serologist Pam Fish. (R. J126) Officer Kenneth Martin fingerprinted defendant. (J124)

Forensic investigator Robert Baike testified that he went to Nielsen's apartment on April 25th and observed blood splatters above the decedent on the wall by the bed and noted that the room had been ransacked. (R. J6) Baike photographed the area and collected evidence. (R. J8) Baike was unable to find any fingerprints. (R. J9) Baike did not see any bloody footprints. (R. J19)

Police checked Henry's shoes. (R. J53) Police did not notice any blood or brown or reddish stains on Henry's boots. (R. J53, J63) Officer Bogucki averred that no other clothing had blood on it. (R. J53)

Pam Fish, a serologist, testified that in 1987, Chicago was not doing DNA testing but was doing electrophoresis serology. (R. J155) Ms. Fish stated that she received from police investigating the Nielsen murder a jacket, a pair of jeans, jewelry boxes, and a knife. (R. J139) Based on blood standards she received from Henry and decedent, Ms. Fish determined that all the blood on defendant's jeans and jacket was consistent with Ms. Nielsen's blood and could not have come from defendant. (R. J153) In 1994, Chicago discontinued electrophoresis serology and began DNA typing. (R. J129) Ms. Fish tried to do DNA testing on the samples received in 1987 but the samples were too small or too degraded and results were inconclusive. (R. J161-

-10-

163) Ms. Fish did not do luminol testing. (R. J163)

Arizona insurance fraud investigator Mitch Rea testified that he was contacted by the Cook County State's attorney's office in Spring of 1994 to perform luminol testing in conjunction with the Nielsen murder. (R. K7, K26) Over objection, the court accepted Rea as an expert in the field of luminol testing. (R. K25-26) In May of 1994, Rea received a sealed box containing a dark-colored quilted jacket. (R. K26-27) After spraying segments of the jacket with the luminol chemicals and turning off the lights, Rea observed luminance in various sections of the jacket. (R. K32-K37) Rea took photographs of the jacket. (R. K39)

The State called Rod Englert to testify concerning blood splatter. Over objection, the court ruled that Englert was an expert in the field of crime scene reconstruction and blood splatter. (R. K66) Upon request from the Cook County State's Attorney, Englert reviewed the photographs of the Nielsen crime scene, the statements of witnesses, the luminol testing photographs prepared by Mitch Rea, and the physical evidence recovered. (R. K66-69)

Concerning Ms. Nielsen's apartment, Englert noted that there was blood on the floor of the kitchen leading into Ms. Nielsen's bedroom. (R. K91) Englert also observed that "on the floor are smears of blood, as though a struggle took place, and one of the individuals on the floor was bleeding." (R. K91) When asked whether it was unusual not to have any footprints in the blood, Englert stated that it would not be unusual because blood dries very fast. (R. K86-91)

Englert stated that the left and right knee areas of the pants contained a transfer stain and not splatter. (R. K94) The transfer does not involve energy but just a transfer of something that was bloody that touched against the pants. (R. K95) As for the bottom of the pants, Englert opined that there were numerous specks of blood consistent with medium velocity splatter. (R.

-11-

K96) Englert stated that the blood on defendant's pants would not be consistent with a person picking up a bloody bag in a gangway. (R. K100) Further, Englert opined that the blood on the jeans would not be consistent with the wearer of the jeans "kneeing" someone in the nose. (R. K102)

In examining the luminol photographs of defendant's jacket, Englert stated that the stains on the right and left arms contained splatter. (R. K109) Englert stated that over the front of the jacket were little specks of projected blood. (R. K111) On the right pocket was a very light transfer stain. (R. K111) Englert opined that the jewelry boxes had transfer stains that were consistent with ransacking. (R. K114)

Englert asserted that the manner of Nielsen's death was that she was attacked first in the kitchen where she received many blows while on the floor, and that she, while still alive, was taken into the bedroom and thrown on the bed. (R. K117) Englert acknowledged that there was a great deal of blood in Ms. Nielsen's bed. (R. K134)

Englert admitted that he was assuming that the blood splatter on defendant's jeans was Nielsen's blood. (R. K123) Englert conceded that no report stated that the splatter on the lower left leg was Nielsen's blood and that if it were someone else's blood he would have to reevaluate his position. (R. K122-123) Englert testified that it was "very, very possible" to get medium velocity splatter from a fight. (R. K125)

Following Englert's testimony, the State rested. (R. J150) The court denied defendant's motion for a directed finding. (R. J149)

To rebut the testimony of State's witnesses Englert and Rea, defendant called Dr. Kenneth Siegesmund on defendant's behalf. Outside the presence of the jury, the parties

-12-

inquired into Dr. Siegesmund's qualifications. Dr. Siegesmund testified that he had a Ph.D. in biology and that his undergraduate major was biology with a minor in chemistry. (R. L3) Dr. Siegesmund stated that he had performed luminol testing well over a hundred times and had lectured in forensic science. (R. L5) Dr. Siegesmund stated that he had been qualified to testify as an expert in the area of blood splatter 20 to 30 times. (R. L37) Following argument on Dr. Siegesmund's credentials, the court ruled that he would not recognize Siegesmund as an expert in the field of blood splatter and could not testify as to the interpretation of luminol testing. (R. L40)

Defense counsel made an offer of proof averring that Dr. Siegesmund would testify that in his opinion there was almost no indication of blood splatter on the jacket and that the blue jeans contained smears in the knee area indicative of lateral activity. (R. L72) Dr. Siegesmund would have testified that the majority of decedent's blood would have been deposited on the bed prior to, and not after, her death. (R. L72) Dr. Siegesmund would have further stated that in his opinion, the offender in the instant case would have been dramatically covered with blood based on the particular type of attack. (R. L72)

In defendant's case, Henry testified that in April 1987, he had been living with the Larry family. (R. K176) Before living with the Larrys, Henry had lived with his girlfriend, Pam Hines. (R. K182) When Henry left Pam's house, Henry took all his belongings including his clothes, flashlight, and work tools. (R. K182) Henry's work tools included a hammer, screwdrivers, channel locks, and a glass cutter. (R. K183) Henry's clothes included six pairs of jeans and eight or nine flannel shirts. (R. K260) Henry used a Marshall Fields bag for luggage. (R. K182) Henry had been living at the Larrys' for between two weeks and a month prior to decedent's

-13-

murder. (R. K182, K214)

The week decedent was killed, Dan Larry had been suffering from a toothache for most of that week. (R. K178) Henry and Dan went to bars and drank for most of that week. (R. K178) Henry had been laid off and was scheduled to begin work for Lee Willis the Monday following Nielsen's death. (R. K177) Henry got into three fights on the Wednesday before April 24th. (R. K179, K251) In each of these fights, someone bled. (R. K180-K181) Henry asserted that he had owned his jacket for a year or more and that he had been in a lot of fights while wearing the jacket. (R. K210) Henry related that he "went to a lot of bars" and "had a lot of fights in that coat." (R. K211)

On the morning of April 24th, Henry began drinking with Dan. (R. K183) In the afternoon, Henry and Dan went to Tom Szeszol's house where Henry took a shower and did laundry. (R. K184) Henry did not wash his stained jeans there because Henry wanted to soak them and Tom's mother was coming and wanted everyone out. (R. K184, K224) When Henry was told to leave, he tossed all his clothes back into the trunk of the car. (R. K185) Henry threw the jeans which he was going to soak but did not, on the floor of the trunk. (R. K185) All of Henry's clothes got washed except for his jacket and the pair of jeans that he was going to soak. (R. K224-225)

After Szeszol's house, Henry dropped Dan off and went to Mike's Tavern on Wrightwood. (R. K187) Henry stayed there until 6:30 p.m. drinking. (R. K188) After Mike's Tavern, Henry went to the Larrys' house. (R. K188) When Henry got to the Larrys' house, Dan was the only person there. (R. K188) Henry and Dan drank a case of beer together. (R. K188) Henry left the Larrys' at 11:45 p.m. and went to another bar. (R. K188-189) When Henry left

-14-

the Larrys', Margaret and John were in the house. (R. K189, K225)

After drinking two beers, Henry went to a bar called "Our Place" until 2:00 a.m. (R. K190) Henry estimated that there were 50 people at the bar. (R. K227) When asked to describe anyone at the bar, Henry stated that it was ten years before and that he would be lying if he had to describe anyone at the bar. (R. K227-228) At around 2:00 a.m., Henry went back to Dan's house to see if Dan wanted to drink some more. (R. K190) Although Henry had a key to Dan's house, Henry had to "pee" and parked in the alley behind Dan's house to urinate. (R. K191, K214)

After parking in the alley, Henry opened the car door, got out of the car, and heard a noise. (R. K191) The noise sounded like a door closing. (R. K229) Henry closed the car door and walked towards the house. (R. K191) Henry looked up thinking that the noise might have been Dan upstairs. (R. K191) After seeing no one up there, Henry kept walking towards the house and urinated close to the house. (R. K191) While urinating, Henry saw a bag on the side of the house. (R. K192) Henry looked inside the bag and saw a little box containing silverware. (R. K194-195, K216) Henry picked up the bag and carried the bag to his car where he threw it into the trunk of his car. (R. K195) When Henry picked up the bag it was damp or wet. (R. K219-210) Henry got into his car and drove around to the front of Dan's house. (R. K195)

Henry went upstairs and rang the Larrys' doorbell. (R. K196) Margaret told Henry that Dan was not awake and Henry left and went to "Our Place" bar. (R. K196) At the bar, Henry saw Liz and Dan Funkhauser. (R. K197) Henry stayed until closing at 4:00 a.m., and gave rides home to Liz and Dan. (R. K197) After parking his car across the street from the Larrys' apartment, Henry went upstairs and went to sleep on the Larrys' couch. (R. K197-198, K234)

Defendant went to sleep around 5:00 a.m. and woke up around 8:00 a.m. (R. K198) Henry slept in his clothes: jeans, flannel shirt, boots, and coat. (R. K198, K234) Henry had one pair of shoes which were boots. (R. K237)

On Saturday morning, Henry and Dan drove to Melrose Park to see Bill Brown. (R. K202) Henry wanted to show Bill his car and Henry owed Bill some money. (R. K202) At Brown's house, Henry opened the car trunk to see what was in the bag he found that morning. (R. K203) Dan was with Henry. (R. K203) Henry took everything out and put it on a bench. (R. 203) Henry stated that "it was all bloody." (R. K203) The bag and a pillow case was all bloody with dried blood. (R. K204). Henry separated the good things from the bad, throwing the bag, a pillow case, and some other things in a dumpster next door to Brown's house. (R. K204, K236) Henry did not throw into the dumpster any work gloves, clothes, or boots. (R. K236-237) Henry kept about four or five pieces and put the things back into the trunk. (R. K205, K238)

Henry showed Brown the silverware. (R. K205, 245) Brown gave Henry $30 for some coins Henry had and $30 for the silverware. (R. K205) Henry and Dan left and Henry dropped Dan off at home. (R. K206) Henry went to Frank's Tavern where Henry had a couple of beers. (R. K206) Henry left. He got sleepy, so he pulled his car over and went to sleep in his car. (R. K207)

The next thing Henry remembered was police banging on his car window. (R. K208) Henry got out of the car, at which time police patted Henry down and handcuffed him. (R. K208) Police took Henry to the station and talked to Henry at 3:15 a.m. (R. K218) Henry did not remember telling police that when he found the bag he saw jewelry and plates inside the bag. (R. K218) Henry stated that he did not tell police about hearing a noise in the backyard because

-16-

they did not ask. (R. K229)

Henry talked to an assistant State's attorney at 9:00 a.m. (R. K218) Henry did not recall telling the State's attorney that when Henry put the bag in the car that he knew that it contained jewelry. (R. K219) Henry did not remember telling Assistant State's Attorney Stevens that after ringing the Larrys' doorbell, he went upstairs to go to sleep. (R. K232) Henry did not recall telling police at 3:15 a.m or State's Attorney Stevens at 9:00 or 9:30 a.m. that he "could have killed the woman but that [he] didn't remember." (R. K256-257)

Henry stated that he had never been in Ms. Nielsen's apartment. (R. K209) Henry testified that he had seen the decedent one time when Henry had been watching television, and decedent was on the back porch talking to Margaret. (R. K208) Henry stated that that was the only time he had ever seen Ms. Nielsen. (R. K209) Henry knew that Ms. Nielsen was an older woman but did not know that she lived alone. (R. K220)

Henry denied killing Ms. Nielsen. (R. K209) Henry denied using a glass cutter to cut the window on the back of decedent's house. (R. K254) Henry denied beating, stabbing or strangling decedent. (R. K255)

Pam Hines testified that she had formerly been Henry's girlfriend. (R. K152) Hines was not living with Henry at the time of Henry's arrest. (R. K152) Pam identified Henry's jacket in court and stated that the whole time Pam knew Henry he had that jacket. (R. K153) Pam stated that Henry would dress the same every day and that daily dress would include a flannel shirt, jeans, the jacket, and boots. (R. K154)

Pam stated that Henry was a construction worker and that when they lived together Henry helped with the upkeep of the building. (R. K154) Henry had an assortment of tools to fix

things including hammers, screwdrivers, wrenches, glass cutters, and pliers. (R. K154) Hines

stated that Henry was familiar with how to cut glass. (R. K158) Pam Hines identified the

Marshall Fields bag found in the trunk of Henry's car as looking like the bag that Henry put his

clothes and personal items in when he left the apartment they were sharing. (R. K156, K159)

In lieu of Elizabeth Finuchi's live testimony, the parties stipulated that if Elizabeth

Finuchi were called to testify she would state that she knew Henry and that on April 15, 1987, at

around 2:00 to 2:30 a.m., she and Daniel Funkhauser were drinking at a bar called "Our Place,"

where she saw Henry. (R. K164-165) At 4:00 a.m., Henry gave Elizabeth and Dan a ride home.

(R. K165) Elizabeth did not notice anything unusual about Henry or his clothes. (R. K166)

In rebuttal, Officer Bogucki testified that he talked to defendant at 2:15 a.m. on April 26,

1987 and that Henry said that he had been in the alley behind the Larrys' apartment to urinate

when he walked through the back yard and noticed a bag. (R. L44) Seeing that the bag had

jewelry and plates inside, Henry picked up the bag and put it in the trunk of his car. (R. L45)

Henry then walked back to the front, rang the doorbell and spoke to Margaret. (R. L45) When

Margaret told Henry that Dan was asleep, Henry went back to the car and left. (R. L45) Bogucki

stated that when he asked Henry about the crime, Henry stated that may have done it, but did not

remember. (R. L45) Bogucki asserted that Henry never said that he heard a noise or that the bag

was bloody, or that there was a bloody pillow case inside the bag. (R. L45) Bogucki further

averred that Henry never mentioned anything about Melrose Park or throwing the bag and case in

a dumpster. (R. L46)

Bogucki conceded that there was no written statement of the April 26th, 3:15 a.m.

conversation. (R. L47) When asked about the handwriting and signature on the police general

-18-

progress report concerning the conversation with defendant, Bogucki stated that Detective Mook wrote the report and that Bogucki signed Detective Schalk's name to the report. (R. L50) Bogucki admitted that Mook was not present at the time Bogucki interviewed Henry. (R. L50)

Assistant State's Attorney Stevens testified in rebuttal that on April 26th at 9:00 a..m, he talked with Henry and that Henry told him that during the morning of April 25th he drove his car into the alley behind 3507 Diversey to "take a leak," and that he found a bag in the gangway, took it to his car, and dumped it out in the trunk of his car. (R. L59-60) Stevens said that Henry related that he discovered that the bag contained jewelry. (R. L60) Henry went to the front of the building, rang the bell, went up to the second floor, and spent the night. (R. L60) Henry told Stevens that the blood stains on his clothing may have been the result of getting into a lot of fights. (R. L60) According to Stevens, Henry said that he could have killed the woman, but he did not remember. (R. L60) Stevens stated that Henry never said he heard a noise, that the bag was bloody, that he later found a bloody pillow case, or that he later threw the bag, the pillow case and the other items in a dumpster in Melrose Park. (R. L60) Stevens admitted that he took no notes of his conversation with Henry. (R. L61) When asked whether he had any difficulty understanding Henry, Stevens admitted that Henry spoke slowly. (R. L64)

Following a jury instruction conference, the parties presented closing arguments. (R. L66-L120) The judge instructed the jury on the three theories of murder and presented the jury with a general verdict form for murder. The jury subsequently returned a guilty murder verdict. (R. L133)

The judge denied defendant's motion for a new trial. (R. N3) At sentencing, the State urged that the court impose a natural-life sentence due to the brutal and heinous nature of the

offense. Following argument, the judge imposed a sentence of natural life. (R. N13)

Henry Kaczmarek appealed his murder conviction and sentence. On December 27, 2000, the appellate court affirmed his conviction but vacated his natural-life sentence. On May 30, 2002, this Court granted the State's petition for leave to appeal.

## ARGUMENT

I.    **The Greatest Penalty Authorized By The Jury's Verdict Was 40 Years.**
**Kaczmarek's Natural-Life Sentence For Murder Based On A Judicial Finding of**
**Brutal And Heinous Must Be Vacated Where The Facts That Increased the**
**Prescribed Range of Penalties Were Not Charged, Submitted To The Jury, Or**
**Proved Beyond a Reasonable Doubt.**

Pursuant to first-degree murder charges, a jury by general verdict found Mr. Kaczmarek
guilty of murder. (S. R. L133); Ill. Rev. Stat., ch. 38, sec. 9-1 (1987).  At the time of the offense,
Illinois provided that an offender could be sentenced for first-degree murder to a term of
imprisonment of not less than 20 years and not more than 40 years. Ill. Rev. Stat., ch. 38, sec.
1005-8-1(a)(1)(a)(1987).  The jury's verdict only authorized a maximum penalty of 40 years.
Based upon a belief that the murder was brutal and heinous, the trial judge, however, sentenced
Kaczmarek to a term of natural-life imprisonment. (R. N13); Ill. Rev. Stat., ch. 38, sec. 1005-8-
1(a)(1)(b).  Because the aggravating factor used to impose a natural-life sentence was never
charged, submitted to the jury, and proved beyond a reasonable doubt, Henry Kaczmarek was
denied his right to due process, his right to notice, and his right to trial by jury.  U.S. Const.
Amends. VI, XIV; *Apprendi v. New Jersey*, 530 U.S. 466 (2000) and *Ring v. Arizona*, 536 U.S.
__, 122 S. Ct. 2428, 153 L.Ed 2d 556 (2002).

In accord with the appellate court's decision, Mr. Kaczmarek's sentence must be reduced
to a sentence within the statutory range of 20 to 40 years. *People v. Kaczmarek*, 318 Ill. App.

-21-

340, 741 N.E.2d 1131 (1st Dist. 2000). On matters of statutory interpretation, the standard of review is *de novo*. *People v. Swift*, No. 91840, 2002 Ill. LEXIS 954, at *10 (Nov. 21, 2002).

## 1. *Pursuant to Statute, 40 Years Was The Maximum Statutory Penalty For Murder*

The State argues that defendant's natural-life sentence did not exceed the statutory maximum because in Illinois there is but one form of murder for which the maximum punishment is death. (St. Br. 30-32) The United States Supreme Court rejected this precise argument in *Ring v. Arizona*. *Ring*, 122 S.Ct at 2440. Likewise, this Court rejected this argument in *People v. Swift*, No. 91840, 2002 Ill. LEXIS 954, at *15-16 (Nov. 21, 2002); slip op. at 8-9. *Ring* and *Swift* firmly established that where the jury does not make a finding of fact of an aggravating factor beyond a reasonable doubt, it is a constitutional violation for the trial judge to increase a defendant's sentence on the basis of that aggravating factor. 122 S. Ct. at 2443; *Swift*, 2002 Ill. LEXIS 954, at *8-9; slip op. at 4.

In *Ring*, the defendant was convicted of armed robbery and felony murder. 122 S.Ct at 2433. In order for the defendant to receive a death sentence, the trial judge had to make a finding that one of a series of enumerated statutory factors existed. *Id.* at 2434-2435. The trial judge in *Ring* found two such factors: a) the crime was committed for pecuniary value, and b) the crime was committed in a heinous, cruel and depraved manner, and sentenced defendant to death. *Id.* at 2435. On appeal, the government argued that under Arizona law, the statutory maximum for murder was death or life imprisonment and therefore Ring's death sentence was within the statutory range for first-degree murder. The United States Supreme Court rejected the government's argument, holding that Arizona's first-degree murder statute authorized a

-22-

"maximum penalty of death only in a formal sense." 122 S.Ct at 2440. Reiterating that the

inquiry is "not one of form but effect," the Supreme Court held that "a defendant may not be

'exposed...to a penalty *exceeding* the maximum he would receive if punished according to the

facts reflected in the jury verdict alone.'" 122 S.Ct. at 2439. Hence, where the findings of fact

used to enhance defendant's sentence were not made by the jury beyond a reasonable doubt, but

by the trial judge after the jury had entered its verdict, the defendant's sentence was

unconstitutional. *Id.* at 2443.[1]

In the instant case, in "addressing" *Ring*, the State, after discussing *People v. Brownell*,

79 Ill. 2d 508, 404 N.E.2d 181 (1980) and the cases applying *Brownell*, merely states "But see

*Ring v. Arizona*." (St. Br. 32) The State offers no explanation as to why *Brownell* and its

progeny survive *Ring*. To the extent that this Court in *People v. Davis*, No. 89704, 2002 Ill.

LEXIS 286 (Feb. 22, 2002), cited approvingly to *Brownell*, that portion of *Davis* is no longer

valid in light of *Ring*.

In 1987, "the sentencing range" for a non-extended term of imprisonment for first-degree

murder was 20 to 40 years. *Swift*, 2002 Ill. LEXIS 954, at *22; slip op. at 11; Ill. Rev. Stat., ch.

38, sec. 1005-8-1(a)(1)(1987). Pursuant to *Swift*, "this is the only range of sentence permissible

based on an ordinary jury verdict of guilt." *Swift*, 2002 Ill. LEXIS 954, at *22-23; slip op. at 11.

An increased penalty of natural-life imprisonment may only be imposed upon a finding of a

qualifying fact in addition to the elements of first-degree murder. Ill. Rev. Stat., ch. 38, sections

1005-8-1(a)(1); 1005-8-2(a)(1)(1987). Contrary to the holdings in *Swift* and *Ring*, here the trial

---

[1] The appellate court below forecasted the decision in *Ring*, noting the difficulties in
reconciling *Walton* with *Apprendi*. *Kaczmarek*, 318 Ill. App. 3d at 351-352. *Ring*, citing
*Kazcmarek*, 122 S.Ct at 2436.

judge, not the jury, made the finding that the killing was brutal and heinous. Hence, where the instant jury did not make specific findings of fact as to the aggravating factor beyond a reasonable doubt, the sentence imposed by the trial court violated Kaczmarek's right to trial by jury and due process of law.

## 2.    This Case Does Not Fall Within the Ambit of Ford

In *People v. Ford*, 198 Ill. 2d 68, 761 N.E.2d 735 (2001), this Court held that when a defendant is found eligible for the death penalty by proof beyond a reasonable doubt, by a jury or after a jury waiver, the court's imposition of a sentence of any term of years is not beyond the statutory maximum for the offense. Specifically, after the defendant waived a jury for both phases of the capital sentencing hearing and the trial court found beyond a reasonable doubt that defendant was eligible for the death, "defendant faced a prescribed statutory maximum sentence of death." *Ford*, 198 Ill. 2d at 74. The *Ford* Court concluded that the judge's subsequent finding that the murder "was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty" did nothing to increase the penalty that defendant faced. *See* also *People v. Hopkins*, 201 Ill. 2d 76, 773 N.E.2d 633 (2002)(where one extended-term factor was an element of crime which was proven beyond a reasonable doubt and on which jury returned a verdict, any other extended-term factors did not increase the maximum authorized sentence.)

In the instant case, as the State concedes, the prosecution did not, and could not seek the death penalty. (St. Br. 44, note 5) After Kaczmarek was convicted on retrial, no death penalty proceedings were conducted. Unlike *Ford*, here death could never be the prescribed statutory maximum. The instant case was not a capital case. Ill. Rev. Stat., ch. 38, sec. 9-1(b); 9-

-24-



1(d)(1987). Thus, the maximum sentence authorized by the jury's verdict was 40 years.

### A.     Jury's General Verdict Of Guilty of Murder Did Not Authorize Death

The State asks this Court to apply *Ford* to this case even though the jury made no finding

that the State proved a death-eligibility factor beyond a reasonable doubt. (St. Br. 34) The jury

returned only a general verdict finding Kaczmarek guilty of murder after being instructed that it

could convict defendant of murder on one of three theories: intentional, knowing, or felony

murder. (C. 152) The State argues that this general verdict can be construed as a finding of a

death-eligibility factor authorizing imposition of a natural-life sentence. (St. Br. 34) No specific

finding, however, can be deduced from the general jury verdict. Such a construction would

violate this Court's directive in *People v. Ramey*, 151 Ill. 2d 598, 545, 603 N.E.2d 519 (1992),

where the Court held that when the sentencing jury's verdict omitted a requisite mental state, the

general jury's verdict for murder could not act as a substitute, and the error could not be

considered harmless.

In *Ramey*, defendant was charged with alternative types of first-degree murder as well as

with home invasion, aggravated unlawful restraint, and possession of a motor vehicle. The jury

returned a general verdict of guilty of murder and a guilty verdict as to the other felonies. The

jury subsequently found defendant death eligible and found no factors to preclude the imposition

of the death penalty. On appeal, defendant argued that the jury's verdict at the capital sentencing

hearing was legally insufficient because it omitted a necessary mental state. The State argued

that the jury's general guilty verdict of murder at the guilt phase supported the imposition of the

death penalty. *Ramey*, 151 Ill. 2d at 545. In rejecting the State's argument, the *Ramey* Court

held that the general verdict could not cure the defective sentencing verdict. Further, the Court rejected the State's argument that defendant's intent could be found from the evidence. *Ramey*, 151 Ill. 2d at 545.

Likewise, in *People v. Mack*, 167 Ill. 2d 525, 658 N.E.2d 437 (1995), this Court found that where the jury's verdict at sentencing omitted a necessary mental state, a guilty determination at trial could not act as a substitute. The *Mack* Court stressed that because the jury never expressed a conclusion as to whether defendant possessed the required mental state, the eligibility verdict was legally insufficient. The court emphasized that the process of interpreting a jury's verdict "should not become a speculative attempt to reconstruct the jury's deliberation and divine its unexpressed conclusions." *Mack*, 167 Ill. 2d at 536. *See People v. Crite*, 261 Ill. App. 3d 1041, 1046, 634 N.E.2d 487, 490 (2nd Dist. 1994) ("It was not the trial court's function, nor is it ours to speculate on the jury's verdict.") *See* also *People v. Williams*, 193 Ill. 2d 1, 42-43, 737 N.E.2d 230 (2000)(Court recognized that although a general guilty verdict is sufficient to sustain a conviction as charged in the indictment, where a sentencing jury's verdict omits a requisite element such as mental state, the verdict is insufficient and the error not harmless.)

In the instant case, the State prosecuted Kaczmarek on murder only. The jury was given one jury verdict: guilty or not guilty of murder. (C. 155-156) The court did not give the jury specific verdicts for each theory of murder. Further, the State did not prosecute any of the underlying felonies nor was the jury given verdicts for any underlying felonies. The jury signed only one jury verdict: guilty of murder. (C. 152) Contrary to the State's argument, no specific finding of a death-eligibility factor can be deduced from a jury's general verdict of guilty at trial.

The State relies on *People v. Rivera*, ___ Ill. App. 3d ___, 777 N.E.2d 360 (2nd Dist. 2001),

to argue that in the instant case the jury found all the relevant facts necessary to authorize a death sentence. (St. Br. 32-33) To the extent that it can be argued that *Rivera* survives *Ring* and *Swift*, *Rivera* is inapposite to the case at bar. In *Rivera*, defendant was charged with murder under three different theories: intentional, knowing, and felony murder. At trial, the court instructed the jury as to each theory. Critically, the jury was provided with separate sets of jury verdicts allowing the jury to find defendant guilty or not guilty of each type of murder. The *Rivera* jury specifically returned a verdict as to guilty of felony murder. *Rivera*, 777 N.E.2d at 368. The court imposed a natural-life sentence based upon the victim being under age 12 and the offense being brutal and heinous. Although the State did not seek the death penalty, the *Rivera* Court held that the jury's felony-murder finding authorized a sentence up to natural-life imprisonment.

In contrast to *Rivera*, in the case at bar, the jury made no specific findings on the murder charges. The jury did not make a separate finding on felony murder or the underlying felonies. Nothing can be deduced from the jury's general verdict of guilty of murder. *Ramey*; *Mack*. Thus, the State's reliance on *Rivera* fails.

### B.    *Section 9-1(a)(3) Is Not Equivalent to Section 9-1(b)(6)*

*Rivera* was wrong to equate the section 9-1(a)(3) felony-murder provision with the section 9-1(b)(6) felony-murder finding necessary for death eligibility. *Rivera*, 777 N.E.2d at 368-369; Ill. Rev. Stat., ch. 38, sec. 9-1(a)(3); 9-1(b)(6)(1987). To make a finding of death eligibility based on felony murder, the trier of fact must find, in relevant part:

- that the murdered individual was killed in the course of another felony;

- the murdered individual was actually killed by the defendant or received physical injuries

-27-

personally inflicted by the defendant;

● defendant acted with the intent to kill the murdered individual or with the knowledge that his acts created a strong probability of death;

● defendant was over age 18; and

● the decedent was killed in one of the enumerated felonies.

Ill. Rev. Stat., ch. 38, sec. 9-1(b)(6) (1987). The Illinois pattern instructions specifically set forth what the jury must find to return a verdict that a defendant is death eligible. For death eligibility based on felony murder, the I.P.I. issues instruction reads:

> 7B.07   Issues Concerning Eligibility
>
> Before the defendant may be found eligible for a death sentence under the law, the State must prove the following propositions:
>
> First Proposition: That the defendant was 18 years old or older at the time of the commission of the murder of which he was found guilty at the trial of this case; and
>
> Second Proposition: That [the following statutory] aggravating factor exists:
>
> *                    *                    *
>
> [6] The murdered person was killed in the course of another felony if
>
> [a] the murdered person was actually killed by the defendant; and
>
> *                    *                    *
>
> [c] in performing the acts which caused the death of the murdered person, the defendant acted with the intent to kill the murdered person or with the knowledge that his acts created a strong probability of death or great bodily harm to the murdered person; and
>
> *                    *                    *
>
> [e] the other felony [was one or more of the following:] .... (armed robbery)(home invasion). I.P.I. Criminal 7B.07 (3rd Ed. 1992)

A section 9-1(b)(6) finding, thus, requires not only that the defendant commit a felony murder but also requires that defendant must meet an age requirement, that defendant personally inflict the injuries and not merely be accountable for someone else's acts, and that decedent be killed knowingly or intentionally.

-28-

Here, the jury never made a finding that defendant was over the age of 18, that the defendant committed the murder in the course of another felony or that decedent was killed knowingly or intentionally. A section 9-1(a)(3) finding is not equivalent to a finding of death eligibility under 9-1(b)(6). Clearly, the jury's verdict at trial cannot substitute for the requisite findings of death eligibility.

Further, the criminal code requires that statutory aggravating factors be proven beyond a reasonable doubt at a separate sentencing hearing. Ill. Rev. Stat., ch. 38, sec. 9-1(d). When the State seeks the death penalty, a separate sentencing hearing is required. *Swift*, 2002 Ill. LEXIS 954, at *13; slip op. at 7. It is only at this hearing that the fact-finder determines whether defendant is death eligible. The State is "yoked anew with the burden" of establishing death eligibility. *People v. Fuller*, No. 89220, 2002 Ill. LEXIS 287, at *58 (Feb. 22, 2002). In the case at bar, death was not sought and a separate section 9-1(d) hearing was not held. Thus, the State's argument that the range of sentence was 20 to death is untenable.

## C. *Residential Burglary Cannot Serve As A Basis For A Section 9-1(b)(6) Finding*

In the instant case, the jury made no specific factual findings. Further, even had the jury entered a specific finding as to felony murder, one of the grounds for felony murder that the jury was instructed on, was residential burglary. At the time of the offense, residential burglary was not a permissible basis for the death penalty. *People v. Simms*, 143 Ill. 2d 154, 572 N.E.2d 947 (1991) (defendant's death sentence vacated, where the jury could have found defendant death eligible based on residential burglary which was not a permissible basis at the time for the death penalty.)

-29-

In *Simms*, the jury was instructed that defendant was eligible for death if he committed a murder in the course of a residential burglary, as well as in the course of a home invasion, armed robbery, and aggravated criminal sexual assault. The jury returned a general verdict finding defendant eligible for the death penalty. At the time of defendant's sentencing hearing, residential burglary did not support death eligibility. Recognizing that the jury's death-eligible verdict may have been based on the fact that the murder occurred in the course of a residential burglary, the Court vacated defendant's death sentence. *Simms*, 143 Ill 2d at 169. *See also Stromberg v. California*, 283 U.S. 359, 361 (1931) (where defendant was found guilty upon a statute later held unconstitutional in part, the Court ruled that defendant's conviction based on a general guilty verdict could not stand because it was impossible to determine under which clause of the statute the conviction was obtained, and it could not be assumed that the defendant was found guilty under the constitutional clause.); *Schad v. Arizona*, 501 U.S. 624 (1991) (in discussing what constitutes an "unanimous verdict," Court recognized that a jury may convict a defendant of first-degree murder without agreeing on whether the defendant was guilty of premeditated murder or felony murder.)

In the case at bar, in addition to the jury being instructed on felony murder based upon the underlying felonies of home invasion and armed robbery, the jury was instructed that they could find defendant guilty of murder based upon residential burglary. (C. 167-168) In 1987, residential burglary was not an enumerated offense under the statutory aggravating factors. Ill. Rev. Stat., ch. 38, sec. 9-1(b)(6)(c)(1987). As the State concedes, defendant could not be found death eligible based upon murder in the course of a residential burglary. (St. Br. 44, n. 5) Thus, because the jury was instructed on residential burglary, even a specific finding as to felony

murder would have been insufficient to authorize a sentence greater than 40 years under *Simms* and *Stromberg*. Certainly, where a specific finding would not suffice, necessarily, then, a general verdict cannot suffice.

The State asserts that "at defendant's first trial, the jury expressly found defendant guilty of armed robbery and home invasion in addition to the murder." (St. Br. 33) Defendant strenuously objects to any reference to findings made by the jury at defendant's first trial. This Court should disregard all references made by the State to defendant's "initial trial." (St. Br. 32, 33-34, 44) The appellate court vacated that conviction and remanded for a new trial. *People v. Kazcmarek*, 243 Ill. App. 3d 1067, 613 N.E.2d 1253 (1st Dist. 1993). Thus, any determination made by the first jury is nonexistent. *See Simms*, 143 Ill. 2d at 173 (where court rejected State's suggestion to use findings made at prior proceeding which had been previously vacated by the court.)

The State misleadingly asserts that "the jury in defendant's second trial was not asked to find defendant guilty of armed robbery and home invasion since the appellate court had not ordered a new trial on those counts," and thus the jury on retrial was instructed only on intentional, knowing, and felony murder. (St. Br. 34) The appellate court did not order a new trial on the offenses of armed robbery, home invasion, and residential burglary, because no sentence had been entered and thus there was no final judgment being appealed on those counts. *Kazcmarek*, 243 Ill. App. 3d at 1082.[2] The State did not appeal the appellate court's decision

_____

[2] Notably, in defendant's appeal following the first trial, defendant challenged defendant's home invasion, armed robbery, and residential burglary convictions on grounds of insufficiency of evidence. The appellate court found the evidence insufficient and reversed those convictions. (*see* discussion at C. 129-131) The appellate court subsequently, *sua sponte*, withdrew its opinion and its finding concerning the insufficiency of the evidence on the felonies,

-31-

concerning the underlying felonies and no sentence was ever entered. At defendant's second

trial, the only charge the State pursued was murder. The State did not seek convictions for any

underlying felonies. When the appellate court remanded the cause for a new trial, all findings

made by the first jury were of no consequence.

The jury's general guilty verdict for murder authorized a maximum sentence of 40 years.

Unlike *Ford*, the range of sentence here was not 20 to natural life or death, but 20 to 40 years.

Mr. Kaczmarek's natural-life sentence exceeded the bounds of the jury's verdict.

### 3. *Kaczmarek Was Not Given Notice of The Element Used to Enhance His Sentence*

The State concedes that under the Sixth Amendment, a defendant is entitled to

"reasonable notice of a charge." (St. Br. 35) The State argues that the defendant here received

"adequate notice in the indictment that he could potentially receive the death penalty." (St. Br.

37) Specifically, the State contends that the indictment "gave sufficient notice that defendant

was facing the death penalty based on the murder in the course of another felony aggravating

factor." (St. Br. 34-39) The State cites to defendant's "initial trial" in 1989 where the State

sought the death penalty to conclude that it "cannot be said that defendant was hindered in

preparing his defense." (St. Br. 38-39)

The flaw in the State's argument is that at defendant's 1996 trial, defendant was not

preparing for a range of sentence of 20 years to death – death was not a possibility. The State

---

ruling that since no sentences had been entered on the home invasion, armed robbery and
residential burglary convictions, there was no final appealable order. *Kazcmarek*, 243 Ill. App.
3d at 1082. This Court can take judicial notice of these court records. *People v. Alexander*, 40
Ill. App. 3d 457, 352 N.E.2d 245, 247 (1st Dist. 1976); *In re Brown*, 71 Ill. 2d 151, 155, 374
N.E.2d 209 (1978).

could not seek the death penalty at defendant's second trial due to a double jeopardy bar. (St. Br. at 44, n. 5) The State, hence, cannot simultaneously allege both that "defendant received adequate notice in the indictment that he could potentially receive the death penalty," while also conceding that death was not an option. (St. Br. 37; 44, n. 5)

The charging instrument never put Kaczmarek on notice that he needed to defend against a finding of section 9-1(b)(6) aggravating factors. The State proceeded only on the charge of murder. The State's reliance on *People v. Brownell*, 79 Ill. 2d 508, 4040 N.E.2d 181 (1980), to argue that an indictment charging murder put defendant on notice that the State could seek the death penalty, is misplaced. (St. Br. 37) In *Brownell*, the Court held that the indictment need not include death-eligibility factors when a defendant is charged with murdering a decedent in the course of certain other felonies. The State, in *Brownell*, however, proceeded on the underlying felonies of aggravated kidnaping and rape as well as murder. In the case at bar, the State did not proceed on the underlying felonies. Further, although this Court in *People v. Davis*, No. 89704, 2002 Ill. LEXIS 286 (Feb. 22, 2002), cited approvingly to *Brownell*, unlike *Brownell* and *Davis*, here, defendant was only tried on murder. Therefore, the maximum prescribed sentence could under no circumstances have been death.

The State argues that defendant was not prejudiced by any defect in the indictment and that he has waived any challenge to the sufficiency of the charging instrument. (St. Br. 38). The State's citation to *People v. Thingvold*, 145 Ill. 2d 441, 584 N.E.2d 89 (1991), supports defendant's position. The *Thingvold* Court affirmed that the indictment or information "apprise[] the accused of the precise offense charged with sufficient specificity to prepare his defense..." *Thingvold*, 145 Ill. 2d at 148. Here, the indictment made no mention that defendant would have

-33-

to convince the jury that he was not death eligible.

Kaczmarek prepared a defense to murder. He had no notice that he would also be required to defend against death eligibility. Lacking knowledge of the precise offense with which he or she is charged, a defendant cannot make intelligent decisions on such critical matters as trial strategy, what defense to put on, what witnesses to call, what facts to concede, or what cross-examination to conduct. Additionally, a lack of information as to the charge a defendant is facing adversely affects decisions on whether to engage in plea-negotiations or not.

The United States Supreme Court's decision in *United States v. Cotton*, 535 U.S. ___, 122 S. Ct 1781 (2002), in which the Court held that a defendant is entitled to notice of sentencing enhancers, is instructive. Contrary to the State's contention, *Cotton's* holding on notice is not merely applicable to federal courts but also state courts as illustrated by the state courts which, following *Apprendi*, require that defendant be given notice of additional sentencing enhancers. (St. Br. 35) *See State v. Seilert*, 29 Kan. App. 2d 489, 490, 28 P.3d 445 (2001) ("notice and jury trial guarantees of the Sixth amendment" must be satisfied); *People v. Martinez*, 32 P. 3d 520, 530 (Col. App. 2001) (no *Apprendi* violation where, *inter alia*, there was "proper notice to defendant"); *State v. Ouellette*, 145 N.H. 489, 491, 764 A.2d 914 (2000) (State failed to satisfy "*Apprendi's* indictment requirement"); *People v. Lucas*, 353 N.C. 568, 598, 548 S.E.2d 712 (2001) (statutory factors supporting an enhanced sentence must be charged in the indictment).

Should this Court accept the position that sentencing enhancers need not be charged, defendant would have to prepare for, submit evidence concerning, and argue at trial that unknown sentencing enhancers were not applicable, "just in case," he or she would have to later defend against such an allegation. Notably, since *Apprendi*, the Illinois general assembly has

-34-

amended the criminal code to specifically require that a defendant be given notice of the element which is used to enhance a defendant's sentence. *See People v. Holloway*, 177 Ill. 2d 1, 11, 682 N.E.2d 59 (1997) (Court recognized that legislature's attempt to amend a statute could be viewed as an attempt by the legislature to change the law in response to the court's decisions).

In 2001, the general assembly passed legislation amending the criminal code to provide the constitutional protections required by *Apprendi*. The legislature enacted Public Act 91-953 which requires that any alleged fact used to increase the range of penalties beyond the statutory maximum "must be included in the charging instrument or otherwise provided to the defendant through a written notification before trial, submitted to a trier of fact as an aggravating factor, and proved beyond a reasonable doubt." 725 ILCS 5/111-3 (2001). By enacting P.A. 91-953 on the heels of *Apprendi*, the legislature recognized the constitutional infirmities in Illinois' criminal code and the need to rectify the statutory structural defects.

Because death eligibility was never charged, submitted to the jury, and proved beyond a reasonable doubt, Henry Kaczmarek's natural-life sentence must be vacated

## 4. *The Element of Brutal and Heinous Was Not Charged, Submitted to A Jury, Nor Proven Beyond a Reasonable Doubt.*

At sentencing, the State argued that defendant should be given a natural-life sentence based upon the offense being brutal and heinous. Following the State's argument, the judge imposed a natural-life sentence. (R. N13) In its brief, the State asserts that defendant's natural-life sentence was proper based on an extension of *Ford*. (St. Br. 32) Because the State only advances arguments concerning death eligibility, the State implicitly concedes that a brutal and

-35-

heinous determination in the instant case could not serve as grounds for a natural-life sentence.

When a defendant is found guilty of "exceptionally brutal or heinous behavior" and "wanton cruelty," this adds additional "elements of the offense" transforming the ordinary offense into a greater offense with a more culpable *mens rea* and *actus reus* than the ordinary offense. Pursuant to *Swift* and *Apprendi*, a brutal and heinous determination is a factual finding which takes the sentence above the sentencing range and which must be proven to a jury beyond a reasonable doubt. *Swift*, 2002 Ill. LEXIS 954, at *23; slip op. at 12; *Apprendi*, 530 U.S. at 494.

Based upon a belief that the murder was brutal and heinous, the trial judge sentenced Kaczmarek to a term of natural-life imprisonment. (R. N13); Ill. Rev. Stat., ch. 38, sec. 1005-8-1(1)(a)(1)(b)(1987). Where the question of whether the offense was "exceptionally brutal or heinous indicative of wanton cruelty" was never charged, submitted to the jury and proved beyond a reasonable doubt, Henry Kaczmarek was denied his right to due process, his right to notice, and his right to trial by jury. Accordingly, defendant's sentence must be reduced to a sentence within the statutory range of 20 to 40 years.

## 5. *The Failure to Find an Element of the Offense Cannot Constitute Harmless Error*

The State alternatively argues that any error was harmless and that a "constitutional error does not automatically require reversal." (St. Br. 39) Initially, it should be noted that the State failed to make this argument in the appellate court and, thus, the argument is waived. *People v. O'Neal*, 104 Ill. 2d 399, 407, 472 N.E.2d 471 (1984) (principle of waiver applies to the State as well as defendant). Even were the issue not waived, the State's waiver argument is without basis.

-36-

The State contends that the record "clearly reflects" that defendant murdered decedent in a "brutal or heinous fashion indicative of wanton cruelty." (St. Br. 44) The State further avers that "any rational trier of fact would have found that at least one of the death penalty eligibility factors were present in the instant case." (St. Br. 44) The State, thus, concludes that any *Apprendi* violation was harmless because "one of the requisite factors" necessary to impose a natural-life sentence was established beyond a reasonable doubt. (St. Br. 45)

The flaw in the State's argument is its characterization of the jury's failure to make requisite factual findings as trial error, rather than structural error, and therefore, subject to a harmless error analysis. (St. Br. 40-45) The State relies on *Neder v. United States*, 527 U.S. 1 (1999) and cases applying *Neder* to argue that the instant error was harmless. (St. Br. 40-42) *Neder*, however, is inapplicable to the case at bar.

In *Neder*, the United States Supreme Court held that the judge's failure to instruct the jury on the "materiality" element of false statements by the defendant to lenders and tax authorities was harmless because the evidence supporting that element was overwhelming and defendant did not contest the issue. The Court held that if the missing element was uncontested, and supported by overwhelming evidence, a harmless error analysis would apply. *Neder*, 527 U.S. at 17.

*Neder* is altogether different from the instant case. In *Neder*, the parties proceeded as if the element missing from the instructions was an essential part of the State's case. The defendant had notice of the "materiality" element in the charging instrument, put on a defense that did not revolve around that element, and did not contest that element. Conversely, in the case at bar, defendant did not proceed as if the cause was a capital case. At the time the defendant was tried and sentenced, according to statute, the aggravating factors were not

-37-

elements of the offense. Unlike the circumstances in *Neder*, Kaczmarek had no reason to mount a defense against those factors, nor make a strategic decision as in *Neder* to not contest the materiality element.

The entire statutory scheme at issue produces "structural" rather than mere "trial" error. A mere "trial error" occurs during the presentation of the case to the jury and may be quantitatively assessed in the context of the evidence presented to determine if the error is harmless. *Arizona v. Fulminante*, 499 U.S. 279, 308 (1991). On the other hand, a "structural error" occurs when "the entire conduct of the trial from beginning to end is obviously affected" and the "criminal trial cannot reliably serve its function as a vehicle for determination of guilt or innocence, and no criminal punishment may be regarded as fundamentally fair." *Arizona v. Fulminante*, 499 U.S. at 309-310. Such errors violate a "basic protection whose precise effects are unmeasurable, but without which a criminal trial cannot reliably serve its function." *Sullivan v. Louisiana*, 508 U.S. 275, 281 (1993).

Where a defendant is charged and tried for one offense, only to be later found guilty of a greater offense by a preponderance of evidence, without a jury adjudication, this is a "structural error" infecting the entire trial process from beginning to end. One cannot know, from the evidence presented, what outcome would have occurred if the defense had pursued different strategies, introduced different evidence, engaged in differing cross-examination, and the like. The results of such misinformation are "unmeasurable," and so skew the entire trial process that the trial "cannot reliably serve its function," and is "fundamentally unfair." *See Arizona v. Fulminante*, 499 U.S. at 309.

The State argues that "at its core," the instant deprivation is the same as "a failure to

-38-

instruct the jury on all elements of an offense." (St. Br. 40)  The State's argument is flawed. When an error is confined to the jury instructions, the reviewing court can look at the evidence presented to determine whether a jury, if properly instructed, could have reached a different determination.  In contrast, the error here was so global that a reviewing court cannot assess from the evidence whether the error was harmless because the parties had no reason to proceed as if the omitted elements were at issue.  Consequently, there is no way of knowing if the outcome of the proceedings would have been the same because defendant did not know he also had to defend against a brutal and heinous determination and death-eligibility determination in addition to defending against the charges set forth in the indictment.

The State's reliance on harmless error cases in which the jury was not correctly instructed is misplaced.  (St. Br. 40-41, 43, citing *People v. Jones*, 81 Ill. 2d 1, 405 N.E.2d 343 (1979); *People v. Leger*, 149 Ill. 2d 355, 597 N.E.2d 586 (1992); *People v. Armstrong*, 183 Ill. 2d 130, 700 N.E.2d 960 (1998)).  *Jones*, *Leger* and *Armstrong*, were all jury instruction cases where the failure to submit the intent element of the offenses to the jury was deemed harmless.  In those cases, all of which pre-date *Apprendi*, the reviewing courts were able to determine from the evidence adduced whether the error was harmless beyond a reasonable doubt.  *See People v. Carter*, 332 Ill. App. 3d 576, 582, 773 N.E.2d 1140 (1st Dist. 2002) (in finding *Apprendi* violation not harmless, court distinguishes *Jones*, *Leger* and *Armstrong*).  In the instant case, defendant had no reason to defend at trial against a determination that the offense was exceptionally brutal or heinous indicative of wanton cruelty or death eligibility.

In the cases relied on by the State, defendant's sentence was enhanced by a factor that was easily discernible at trial, such as the age of the victim, or the quantity of drugs in

-39-

defendant's possession. (St. Br. 42-43)  Here, the offense was enhanced based on the trial

court's determination that the crime was exceptionally brutal and heinous.  A finding that the

crime was exceptionally brutal and heinous indicative of wanton cruelty is a factual question

which involves weighing of the evidence at trial. *Carter*, 332 Ill. App. 3d at 581.  "While one

rational jury could find that an offense was exceptionally brutal and heinous, another could find

the opposite based on the same evidence." *People v. Bryant*, 325 Ill. App. 3d 448, 457-458, 758

N.E.2d 430 (1st Dist. 2002).  The terms "brutal" and "heinous" are subject to "various

interpretations" and "reasonable juries could disagree." *Carter*, 332 Ill. App. 3d at 581; *Bryant*,

325 Ill. App. 3d at 458.  Thus, a harmless error analysis is inapplicable.

The State's reliance on *People v. Gholston*, 332 Ill. App. 3d 179, 772 N.E.2d 880 (1st

Dist. 2002), which discussed whether the failure to allow a jury to make a "brutal and heinous"

determination could be harmless, is misplaced. (St. Br. 43)  The *Gholston* Court, although

declaring that no reasonable and rational jury would have found the crimes not to be brutal and

heinous, was evaluating whether *Apprendi* should be applied retroactively on post-conviction

appeal. *Gholston* was not deciding the merits of whether the safeguards in *Apprendi* were

violated when defendant was sentenced to a greater sentence based upon the judge's finding of

brutal and heinous.  Notably, this Court in *Swift,* after finding that the judge's brutal and heinous

determination exceeded the factual finding made at trial and thus violated *Apprendi*, remanded

the cause for resentencing without a discussion of harmless error.

The State's reliance on the federal cases of *U.S. v. Nance*, 236 F.3d 820 (7th Cir. 2000),

*U.S. v. Anderson*, 236 F.3d 427 (8th Cir. 2001), and *U.S. v. Terry*, 240 F.3d 65 (1st Cir. 2001), is

likewise misplaced. (St. Br. 42-43)  Those cases involved specific quantities of drugs in which

-40-

the reviewing courts held the error harmless. As held in *Carter*, unlike "an amount of narcotics,

where there can be specific evidence presented at trial indicating the exact quantity of narcotics

involved, a finding that the crime was exceptionally brutal and heinous indicative of wanton

cruelty is a factual question involving weighing evidence." *Carter*, 332 Ill. App. 3d at 581.

Likewise, *People v. Peacock*, 324 Ill. App. 3d, 756 N.E.2d 261 (1st Dist. 2001), *People v.*

*Blackwell*, 325 Ill. App. 3d 354, 757 N.E.2d 589 (1st Dist. 2001), and *People v. Pearson*, 324 Ill.

App. 3d 622, 756 N.E.2d 438 (4th Dist. 2001), all involved the age of the victim, another easily

ascertainable fact. (St. Br. 43) Notably, the *Peacock* Court contrasted the nature of a brutal-

heinous determination with an age finding. *Peacock*, 324 Ill. App. 3d at 761.

The *Apprendi* violation in the instant case cannot be deemed harmless beyond a

reasonable doubt. The error was a structural error that went to the foundation of defendant's

fundamental rights. Here, where Kaczmarek did not know he had to defend against an

aggravating factor used to impose a natural-life sentence, the error cannot be deemed harmless.

## Conclusion

The highest punishment Henry Kaczmarek could have received based solely on the facts

reflected by the jury's verdict was 40 years' imprisonment. The jury's verdict authorized no

greater penalty. *Kazcmarek*, 318 Ill. App. 3d at 353. The appellate court correctly held that

defendant's constitutional rights were violated and that defendant's natural-life sentence must be

vacated. Where Mr. Kaczmarek was denied his constitutional right to have all elements which

increased his sentence submitted to a jury, proven beyond a reasonable doubt, and charged, Mr.

Kaczmarek's sentence must be reduced to a sentence within the range of 20 to 40 years.

II.    **Defendant's Constitutional Right to a Speedy Trial Was Denied Where Three and One Half Years Elapsed Between The Reversal of Defendant's Murder Conviction and His Second Trial and Where Defendant Was Not Responsible for a Bulk of the Delay.**

On March 31, 1993, the appellate court reversed defendant's murder conviction and remanded the case for a new trial. *People v. Kaczmarek*, 243 Ill. App. 3d 1067, 613 N.E.2d 1253 (1st Dist. 1993). The State did not bring defendant to trial until November, 1996, over three and one half years after the reversal of his conviction. The State must make "a diligent good-faith effort in bringing the matter to retrial without unreasonable and unnecessary delay." *People v. Williams*, 299 Ill. App. 3d 143, 147, 700 N.E.2d 753, 756 (1st Dist. 1998). The criteria for evaluating a constitutional speedy trial violation was set out in *Barker v. Wingo*, 407 U.S. 514, 519 (1972). Pursuant to *Barker v. Wingo*, the lengthy delay in the instant case resulted in a violation of defendant's constitutional right to a speedy trial, and thus defendant's conviction must be reversed.

Both the Federal and Illinois Constitutions guarantee a right to a speedy trial. U.S. Const., amends. VI, XIV; Ill. Const., art. I, sec. 8; *People v. Singleton*, 278 Ill. App. 3d 296, 662 N.E.2d 580, 582 (1st Dist. 1996). Illinois' Speedy Trial Act implements the constitutional right to a speedy trial, but is not coextensive with it. *People v. Bazzell*, 68 Ill. 2d 177, 369 N.E.2d 48, 49 (1977). The speedy-trial right is "generically different" from other constitutionally guaranteed protections because "there is a societal interest in providing a speedy trial which exists separate from, and at times in opposition to, the interests of the accused." *Barker*, 407 U.S. at 519;

-42-

*People v. Crane*, 195 Ill. 2d 42, 47, 743 N.E.2d 555 (2001). Society's interests are not served "when delay in prosecution contributes to court backlog, allows defendants released on bail an opportunity to commit more crimes, prevents defendants from receiving rehabilitation, and lengthens pretrial detention, which causes overcrowding in jails and is costly." *Crane*, 195 Ill. 2d at 47, citing *Barker*, 407 U.S. at 520.

The four factors that courts should assess in determining whether a defendant has been deprived of his constitutional right to a speedy trial are: 1) length of delay; 2) reasons for the delay; 3) defendant's assertion of his right; and 4) prejudice to defendant. *Barker v. Wingo*, 407 U.S. at 530-532; *Bazzell*, 369 N.E.2d at 50. In the instant case, each of the four factors weighs in defendant's favor.

## FACTOR #1

The threshold question in a *Barker* analysis is whether the delay is presumptively prejudicial. If a delay is presumptively prejudicial, then the court should go on to balance the remaining three factors. *People v. Belcher*, 186 Ill. App. 3d 202, 542 N.E.2d 419, 422 (2d Dist. 1989). In the case at bar, the entire length of the delay between reversal of defendant's conviction and his second trial was about three and one half years. (C. 8; H32) One year is the generally recognized dividing point between ordinary and presumptively prejudicial delay. *Doggett v. United States*, 505 U.S. 647, 652, fn 1, (1992); *Singleton*, 662 N.E.2d at 582. The delay in this case was presumptively prejudicial. In evaluating the four *Barker* criteria, the appellate court correctly found the first factor presumptively prejudicial to the defendant. *People*

*v. Kaczmarek,* 2000 Ill. App. LEXIS 999, at *29.[3]

**FACTOR #2**

The second *Barker* factor is reason for the delay. The basis for the bulk of the delay in the case at bar must be weighed against the State. For two years, the State was trying to get additional evidence to retry defendant. In its brief in the appellate court, the State conceded that "the record establishes that DNA testing was the cause for the delay." (St. Br. 53; app. no. 97-2557)

In November of 1993, the State advised the court that it was seeking a blood splatter expert. (S.R. 49, 54) In February, 1994, the State informed the court that it was still trying to get an expert for retrial. (S.R. 64) In June, 1994, the State requested a continuance to conduct DNA testing. (C. 248) The State told the court that it would have the results in August or September. (C. 250) In September, October, November, and December of 1994, the State averred that it was still waiting on the DNA testing. (C. 257, 261, 277, 283)

In January of 1995, the State filed a motion to compel defendant to tender previous written DNA findings to the State. (C. 106) In March of 1995, the State asserted that it needed more time because defendant had failed to turn over defense DNA test results done at the time of defendant's first trial. (S.R. 84) Defendant had in fact tendered the results of the DNA testing from the first trial in November of 1989. (S.R. III 34)

In May of 1995, the State advised the court that the Chicago Crime Lab was "in the

_____

[3]The appellate court's discussion of the constitutional speedy trial violation was addressed in the unpublished portion of the opinion.

-44-

middle" of the DNA testing. (S.R. 93) The prosecutor asserted that the State had "been waiting for [defendant's DNA] results for 6 years, I mean it is time they tendered them to me." (S.R. 93) In October of 1995, the State asserted that it still did not have the DNA results but had "expected to have them done by this week." (C. 128) At defendant's November, 1996 trial, Serologist Pam Fish testified that the results of her DNA tests on defendant's jacket were inconclusive and the sample from defendant's pants was too small and degraded to test. (R. J163)

In *People v. Battles*, 311 Ill. App. 3d 911,724 N.E.2d 997 (5th Dist. 2000), the court expressed its disapproval of delay caused by efforts to obtain DNA results. In discussing Section 103-5(c) which permits an additional 120-day continuance to obtain DNA results upon a showing of due diligence, the *Battles* Court emphasized that Section 103-5(c) did not provide a "refuge ... for cases where the need for additional time to conduct testing stemmed from the State's neglect or lack of effort." *Battles*, 724 N.E.2d at 999; 725 ILCS 5/103-5(c). Concerning the length of time necessary to conduct DNA testing, the court observed that the **"actual testing took less than 22 days**." *Battles*, 724 N.E.2d at 1005 (emphasis added).

In accord with *Battles* where the actual testing took less than 22 days, here the State pronounced that Serologist Fish's tests would only take "a few weeks." (S.R. 100) In fact, the State, at a very minimum, took 1 ½ years to obtain DNA results. Contrary to the appellate court's statements that defendant below either caused or contributed to nearly all the pre-trial delay, it is clear that the delay was caused by DNA testing ordered at the State's behest. Although *Battles* involved Section 103-5(c) and the instant case did not, the *Battles* Court expressed its disapproval of the State's lack of effort in obtaining DNA results in a timely fashion. Further, the State's claim in March, 1995, that delay was required because of

-45-

defendant's failure to tender DNA material was disingenuous as defendant had tendered DNA results six years earlier in 1989. (S.R. III 34) By delaying trial for an unacceptable length of time under the posture of attempting to obtain DNA evidence, the State abrogated Mr. Kaczmarek's constitutional right to a speedy trial.

Additionally, it must be recognized that the State was not merely asking for more time to obtain DNA testing but also to secure a blood splatter expert. State witnesses Rodney Englert and Mitchell Rea examined the physical evidence in the Spring of 1994. (R. K26, K68) Defendant was tried in November of 1996. There would have been no tactical advantage for defense counsel to elect to wait for blood splatter results. Blood splatter evidence, rather than transfer stains, would not likely benefit defendant.

The appellate court's intimation that it was to defendant's advantage to wait and see what the DNA tests proved is without support. *Kaczmarek*, 2000 Ill. App. LEXIS 999, at \*33. At defendant's first trial, defendant had already testified that he picked up a bag found in decedent's yard and carried it to his car trunk, thus explaining how he could have come to have gotten decedent's blood on his clothing. (S.R. 1153, 1185-1186) Additionally, at the time of defendant's first trial, defense counsel had already had DNA testing done and Cellmark found that no conclusive findings could be made. (S.R. 91)

Defendant was tried once without DNA evidence. DNA evidence was not introduced at defendant's second trial. Serologist Pam Fish testified that the results of her DNA tests on defendant's jacket were inconclusive and the sample from defendant's pants was too small and degraded to test. (R. J163) On retrial, defendant was not the party asking that the cause be continued in order to conduct DNA testing. Contrary to the appellate court's conclusion,

-46-

obtaining DNA results worked to the prosecution's advantage not defendant's.

In evaluating the second *Barker* factor, the appellate court confused statutory delay with constitutional delay. *Kaczmarek*, 2000 Ill. App. LEXIS 999, at *32. Defense counsel's acquiescence to continuances and those continuances being charged to defendant are factors in statutory speedy trial analysis – not in constitutional speedy trial analysis. Notably, the cases relied on by the appellate court, *People v. Kliner*, 185 Ill. 2d 81, 113,705 N.E.2d 850 (1998), *People v. Prince*, 242 Ill. App. 3d 1003, 1007, 611 N.E.2d 105 (3rd Dist. 1993), *People v. Brimmer*, 60 Ill. App. 3d 214, 376 N.E.2d 337 (1st Dist. 1978), and *People v. Staten*, 159 Ill. 2d 419, 639 N.E.2d 550, 557 (1994), all involved statutory speedy trial claims, rather than constitutional speedy trial allegations. *Kaczmarek*, 2000 Ill. App. LEXIS 999, at *32.

The appellate court's reliance on defendant having "no less than 6 attorneys" during the 3 ½ year delay as grounds for attributing delay to defendant is without foundation. *Kaczmarek*, 2000 Ill. App. LEXIS 999, at *32. The number of attorneys defendant had during the 44-month delay between reversal and retrial is of no consequence. A number of the attorneys would have been ready for trial, but for the State not having completed discovery with the DNA tests. (C. 259, 284) In part, defendant "went through" more than one attorney simply due to attrition from the public defender's office based upon the lengthy time lapse. (C. 289) Defendant himself, in his *pro se* motion for appointment of other counsel, commented on the lack of continuity among the assistant public defenders. (C. 82) Further, although defendant did ultimately hire and change private attorneys, the change occurred within one four-month period, from December, 1995, when the public defender was permitted to withdraw, to March, 1996, when Attorney Charles Murphy appeared and took the case to trial in November of 1996.

Notably, preparing for retrial would not have been as difficult as preparing for a new trial since defense counsel would have had the testimony of the witnesses from the first trial and the rulings made on pre-trial motions. In *Nickerson v. State (Ala. App.)*, 629 So.2d 60 (1993), the court recognized that ordinarily retrial does not require extra time to prepare. In ordering defendant's release based upon a constitutional speedy trial violation, the *Nickerson* Court noted that the state "had previously been prepared to go to trial in this case and was thus familiar with the appellant's case." *Nickerson*, 629 So.2d at 64.

The appellate court further contended that defendant was the basis for the delay because he either explicitly requested continuances or expressly agreed with the prosecution's request for delay. *Kaczmarek*, 2000 Ill. App. LEXIS 999, at *31-32. On several dates, defendant himself objected to the State's delay. (C. 262, 278, 284) At other times, the State represented to the court that the tests would be concluded within a specific time period. (S.R. 128: "have them done by this week"; S.R. 77: "have the results in August or in September"; S.R. 130: "be done by October 11th"). Based on the State's declarations to the court, defendant would not have a basis for disagreeing.

The ultimate responsibility for promptly bringing the defendant to trial rests with the government rather than the defendant. *Barker v. Wingo*, 407 U.S. at 531; *Singleton*, 662 N.E.2d at 583. In his motion for discharge, defendant noted that Section 103-5(c) allows the court to grant the State an additional 120 days or four months to obtain DNA evidence after a showing of due diligence. (C. 214) Here, without a showing of due diligence, the State asked for, and was granted, more than 16 additional months to obtain DNA testing. The approximate two-year-long delay in the State's effort to procure more evidence against defendant was not attributable to

-48-

defendant; thus, the lengthy delay must be weighed heavily against the State.

## FACTOR #3

The third *Barker* factor, defendant's assertion of his right, must also weigh in defendant's favor. The appellate court issued its opinion on March 31, 1993, and its mandate on July 15, 1993. The court appointed the Office of the Public Defender. Defendant demanded a speedy trial on July 21, 1993. (C. 229) Defendant advised the court that he would wait and the cause was continued. In October, November, and December of 1994, defendant moved for discharge on the basis of a speedy trial violation. (C. 261, 277, 283) Defendant told the court that his counsel would not present his motion for discharge and asked for a bar association attorney. The court denied defendant's motion for other counsel. In November of 1996, while represented by private counsel, defense counsel filed a motion to dismiss based upon a violation of defendant's right to a speedy trial. (C. 199-291) The court denied the motion and subsequently denied defendant's post-trial motion which included a speedy trial violation claim. (C. 294) Where Mr. Kaczmarek asserted his right to a speedy trial, this third *Barker* factor weighs against the State and in defendant's favor.

The appellate court's claim that defendant never sought discharge of his own attorneys in order to pursue his speedy trial claims ignores the fact that defendant asked the court to appoint other counsel. (C. 240, 265, 287) The trial court below would not appoint other counsel and forced defendant to present his own *pro se* motions for discharge. (C. 279-281, 284-286) Without *Faretta* admonishments on proceeding *pro se*, defendant, short of discharging counsel altogether, did all he could to assert his right to a speedy trial. Defendant had no obligation to

-49-

bring himself to trial, rather, the State had that duty. *Barker*, 407 U.S. at 527.

**FACTOR #4**

The fourth and final factor, prejudice to defendant, also weighs in his favor. Prejudice is assessed in light of the interests of defendants that the speedy trial right was designed to protect. The United States Supreme Court has identified three such interests: 1) to prevent oppressive pretrial incarceration; 2) to minimize anxiety and concern of the accused; and 3) to limit the possibility that the defense will be impaired by diminishing memories and loss of exculpatory evidence. *Barker v. Wingo*, 407 U.S. at 532; *Doggett v. United States*, 505 U.S. at 654.

In this case, defendant's anxiety was reflected in the record and noted by the court. In February of 1994, the judge affirmed that defendant was anxious to be tried. (S.R. II 68) Subsequently, in June and August of 1995, the judge again noted that defendant was anxious to go to trial. (S.R. 113, 121) In defendant's motion for discharge, defendant asserted that defendant had "been subjected to unwarranted, lengthy pretrial detention; dilatory tactics have maximized his anxiety, and his defense has been impaired by the 44 months that have passed since the appellate court's remand." (C. 214)

The appellate court's declaration that the delay was in defendant's "best interests" was baseless. *Kaczmarek*, 2000 Ill. App. LEXIS 999, at *39. According to the lower court, defendant would want to wait until the State obtained the results of its blood testing since the findings could have excluded defendant as the offender. Contrary to the appellate court's opinion, defendant would have had no such desire. Defendant had already explained at his first trial how he could have come to have gotten decedent's blood on his clothing by picking up a bag

found in decedent's yard and carrying it to his car. DNA evidence was not introduced at either defendant's first or second trial. This not a situation of delaying trial in hopes of witnesses becoming available. Defendant had already been tried once. Testimony from unavailable witnesses would have been already memorialized. (*See i.e.* Finuchi's testimony, S.R. K163-168) Defendant had nothing to gain by waiting, as waiting merely allowed the State to attempt to accumulate more evidence.

Each of the four *Barker* factors weighs in defendant's favor. The duration of the delay was lengthy; the reason for the delay was due to the State's unpreparedness; the right to a speedy trial was asserted; and prejudice to the defendant ensued. Thus, using the framework set forth in *Barker v. Wingo*, the conclusion must be that defendant's constitutional right to a speedy trial was violated.

## STANDARD OF REVIEW

In analyzing Mr. Kaczmarek's constitutional speedy trial deprivation, the appellate court utilized an incorrect standard of review. *Kaczmarek*, 2000 Ill. App. LEXIS 999, at *28-29. The court below held that the determination of whether defendant's right to a speedy trial was violated was better left "to the sound discretion of the trial court." *Kaczmarek*, 2000 Ill. App. LEXIS 999, at *28-29. In using an abuse of discretion standard to review defendant's claimed deprivation of his constitutional speedy trial right, the appellate court found that the trial court did not err in determining that defendant was not denied his right to a speedy trial. *Kaczmarek*, 2000 Ill. App. LEXIS 999, at *28-29.

In *People v. Crane*, 195 Ill. 2d 42, 743 N.E.2d 555 (2001), issued subsequent to the

-51-

decision in *Kaczmarek*, this Court discussed the appropriate standard of review for evaluating constitutional speedy trial violation claims. When resolving a constitutional speedy-trial claim, any factual determinations made by the trial court, which are contained in the record, shall be upheld on review unless they are against the manifest weight of the evidence. *Crane*, 195 Ill. 2d at 51. However, when performing the *Barker* balancing test, the *Crane* Court stressed that the trial court is in no better position than the reviewing court to balance the competing concerns. The *Crane* Court held that the ultimate determination of whether a defendant's constitutional speedy-trial right has been violated is subject to *de novo* review. *Crane*, 195 Ill. 2d at 51-52.

In the instant case, Mr. Kaczmarek's constitutional right to a speedy trial was denied where approximately 3 ½ years elapsed between reversal of defendant's murder conviction and his second trial due to delay caused by the State. When all four *Barker* factors are weighed, it becomes apparent that defendant's constitutional right to a speedy trial was denied. Consequently, this Court should reverse Henry Kaczmarek's murder conviction.

## CONCLUSION

For the foregoing reasons, Henry Kaczmarek, Defendant-Appellee, respectfully requests that this Court reverse his murder conviction and order his release. Alternatively, defendant asks that his sentence be reduced to a sentence within the non-extended range of 20 to 40 years.

Respectfully submitted,

MICHAEL J. PELLETIER
Deputy Defender

DEBRA R. SALINGER
Assistant Appellate Defender
Office of the State Appellate Defender
203 North LaSalle Street - 24th Floor
Chicago, Illinois 60601
(312) 814-5472

COUNSEL FOR DEFENDANT-APPELLEE

-53-

NO. 90865

IN THE

SUPREME COURT OF ILLINOIS

| | | |
|---|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) ) ) | Appeal from the Appellate Court of Illinois, First District, Third Division, Appellate Court No. 97-2557 |
| Plaintiff-Appellant/Cross-Appellee, | ) ) ) | |
| vs. | ) ) ) | There Heard on Appeal from the Circuit Court of Cook County, Criminal Division. |
| HENRY KACZMAREK, | ) ) ) | |
| Defendant-Appellee/Cross-Appellant. | ) ) ) ) | Honorable John D. Brady, Judge Presiding. |

## REPLY BRIEF AND ARGUMENT FOR
## PLAINTIFF-APPELLANT/CROSS-APPELLEE

LISA MADIGAN,
  Attorney General
  State of Illinois
LISA HOFFMAN,
  Assistant Attorney General
  100 West Randolph Street, Suite 1200
  Chicago, Illinois 60601

Attorneys for Plaintiff-Appellant/Cross-Appellee.

RICHARD A. DEVINE,
  State's Attorney
  County of Cook
  309 Richard J. Daley Center
  Chicago, Illinois 60602
RENEE G. GOLDFARB,
CHRISTINE COOK,
WILLIAM D. CARROLL,
ALAN J. SPELLBERG,
  Assistant State's Attorneys,
  Of Counsel.

EXHIBIT D

IN THE

SUPREME COURT OF ILLINOIS

|  |  |
|---|---|
| PEOPLE OF THE STATE OF ILLINOIS,<br><br>Plaintiff-Appellant/Cross-Appellee,<br><br>vs.<br><br>HENRY KACZMAREK,<br><br>Defendant-Appellee/Cross-Appellant. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |

Appeal from the
Appellate Court
of Illinois,
First District,
Third Division,
Appellate Court No. 97-2557

_____

There Heard on Appeal
from the Circuit Court
of Cook County,
Criminal Division.

_____

Honorable
John D. Brady,
Judge Presiding.

**I.**

**THE APPELLATE COURT ERRED IN FINDING THAT DEFENDANT'S NATURAL LIFE SENTENCE VIOLATED <u>APPRENDI V. NEW JERSEY</u> BECAUSE SUCH A SENTENCE DOES NOT EXCEED THE MAXIMUM PUNISHMENT AUTHORIZED BY EITHER THE LEGISLATURE OR THE EXPRESS FINDINGS OF THE TRIER OF FACT.**

At the outset, the People acknowledge that due to an oversight, they neglected to include

in the opening brief a statement of the applicable standard of review as required by Supreme Court

Rule 341(e)(3). The People apologize for the failure, but point out that this Honorable Court has

already made clear that claims pursuant to <u>Apprendi v. New Jersey</u>, 530 U.S. 466, 120 S. Ct. 2348

1

(2000) will be reviewed <u>de novo</u>. See e.g. <u>People v. Hopkins</u>, 201 Ill. 2d 26, 36, 773 N.E.2d 633 (2002).

In his brief, defendant asserts in his brief that the Appellate Court properly held that under <u>Apprendi</u>, his natural life sentence for murder is unconstitutional because the trial court imposed such a sentence after finding that the murder of Millie Nielsen was committed in a brutal and heinous manner indicative of wanton cruelty. He first contends that the Appellate Court's decision was correct because pursuant to this Court's decision in <u>People v. Swift</u>, 202 Ill. 2d 378, 781 N.E.2d 292 (2002), the maximum penalty he was subject to based upon the jury's verdict was 40 years. The People acknowledge that under <u>Swift</u>, any sentence longer than 40 years would violate <u>Apprendi</u> unless it was authorized by facts as found by the trier of fact beyond a reasonable doubt. <u>Id.</u> at 388.[1] As a result, the People hereby withdraw any assertion that the imposition of a sentence based on facts other than the basic elements for murder does not implicate <u>Apprendi</u>.

However, the People do not concede in any way that defendant's natural life sentence is unconstitutional. In <u>Swift</u>, this Honorable Court stated that <u>Apprendi</u> simply "requires that all facts necessary to establish the <u>statutory sentencing range</u> within which the defendant's sentence falls must be proven to a jury beyond a reasonable doubt." <u>Id.</u> at 383 (emphasis added). As a result, "[a] defendant's due process rights are violated by a sentence <u>which exceeds the maximum sentence authorized by the facts found by the jury</u>, whether imposition of the invalid sentence is

---

[1]As a result of this Court's decision in <u>Swift</u>, two of the cases relied upon by the People in their opening brief are no longer valid. See <u>People v. Vida</u>, 323 Ill. App. 3d 554, 752 N.E.2d 614 (1st Dist. 2001), vacated and remanded No. 92311 (Feb. 5, 2003), <u>People v. Simmons</u>, 331 Ill. App. 3d 416, 770 N.E.2d 1271 (2nd Dist. 2002), vacated and remanded No. 94345 (Feb. 5, 2003), (cited at pp. 31-32 of the People's opening brief). Accordingly, the People respectfully request that this Honorable Court ignore the citation of these decisions.

2

mandatory or discretionary with the judge." Id. (emphasis added). In other words, an extended sentence imposed by the trial court based upon a finding of brutal and heinous behavior "cannot stand unless [the defendant] was eligible for such a sentence *without* such a finding–*i.e.*, based solely on the facts found by the jury beyond a reasonable doubt." Id. at 384 (underlined emphasis added, italicized emphasis in original). See also People v. Hopkins, 201 Ill. 2d 26, 40, 773 N.E.2d 633 (2002) (expressly holding that once the rule of Apprendi has been satisfied, trial courts remain free to exercise their discretion to consider additional factors "when creating an appropriate sentence based on the facts of the crime"); People v. Ford, 198 Ill. 2d 68, 74, 761 N.E.2d 735 (2001) (holding that the fact that the brutal and heinous nature of the defendant's crime was not proved beyond a reasonable doubt was immaterial where the defendant had been proven eligible for the death penalty); Harris v. United States, 536 U.S. 545, 122 S. Ct. 2406, 2414 (2002) ("Apprendi said that any fact extending the defendant's sentence beyond the maximum authorized by the jury's verdict would have been considered an element of an aggravated crime -- and thus the domain of the jury -- by those who framed the Bill of Rights.") (plurality opinion) (emphasis added)); Ring v Arizona, 536 U.S. 584, 122 S. Ct. 2428, 2440 (2002) (reversing Walton v. Arizona because the required finding of a death penalty aggravating factor "exposed [the defendant] to a greater punishment than that authorized by the jury's guilty verdict.").

It is for this reason that Swift does not control the instant case. Unlike defendant here, the defendant in Swift was charged only with first degree murder and was found guilty of just that offense. Swift, 202 Ill.2d at 380. Therefore, the jury in Swift necessarily made no "additional fact findings" which would permit a sentence beyond 60 years. In the instant case, however, defendant was charged with two counts of home invasion, one count of armed robbery, five counts of

3

residential burglary, one count of aggravated unlawful restraint and three counts of armed violence *in addition to* six counts of murder (C. 35-51; S.R.1-89-3182 13-30) and was found guilty by the triers of fact of not only murder, but also residential burglary, home invasion and armed robbery. (R. L133; C. 152-53; S.R. 1-89-3182 1384)

As a result of all of these findings, defendant was necessarily eligible for a natural life sentence under section 5-8-1(a)(1)(b) of the Unified Code of Corrections because one "of the aggravating factors listed in subsection (b) of section 9-1 of the Criminal Code of 1961 [is] present."(Ill. Rev. Stat. 1985, ch. 38, par. 1005-8-1(a)(1)(b)). The juries' findings demonstrated beyond any doubt that defendant intentionally murdered the 86 year old victim while in the course of committing other felonies, specifically armed robbery and home invasion. In fact, since defendant does not contest the sufficiency of the evidence supporting the juries' findings, it is clear that he agrees that the People have satisfied their burden of proving these facts beyond a reasonable doubt.[2] Accordingly, the instant case is more similar to Ford and Hopkins than it is to Swift in that there were findings by a trier of fact in addition to the basic elements of the crime of murder.

---

[2] Defendant asserts that the People's reliance upon the findings of guilt for home invasion and armed robbery by the jury at his initial trial is improper. (Deft. Br. at 31) However, the record reveals that defendant had previously recognized that the jury's verdicts were "left undisturbed" by the Appellate Court's ruling since prior to commencing the second trial he expressly sought to preclude the trial court from entering sentence upon those findings. (R. H30-32)   Moreover, defendant now recognizes that the Appellate Court expressly refused to address the validity of those findings and chastises the People for failing to seek further review of that ruling. (Deft. Br. at 31-32) However, as demonstrated by the current litigation, it was defendant and not the People who had an interest in reversing the Appellate Court's decision on this point. However, defendant never sought any further review and a party seeking to avoid a decision of the appellate court has only two avenues for relief: either file a petition for rehearing and/or seek leave to appeal to this Honorable Court. Harris Trust & Savings v. Otis Elevator Co., 297 Ill. App. 3d 383, 388, 696 N.E.2d 697 (1st Dist. 1998). Since defendant never exercised either of these options, he is bound by the Appellate Court's express ruling that it was not vacating the findings of guilt for residential burglary, home invasion and armed robbery.

4

Nevertheless, defendant asserts that <u>Ford</u> is inapplicable to the instant case because in <u>Ford</u> the defendant was found eligible for the death penalty by the trial court prior to being sentenced to 100 years imprisonment, and that therefore the prescribed statutory maximum in that case was the death penalty. (Deft. Br. at 24)  Defendant then posits that since the People could not seek the death penalty at his second trial, the maximum penalty he faced was 40 years imprisonment. (Deft. Br. at 24-25)  The People point out that such a limited understanding of the holding in <u>Ford</u> is unwarranted in that it places undue emphasis on the particular procedures involved as opposed to the determinative factor in that case; that a sentence greater than 60 years was authorized by factual findings by the trier of fact *in addition to* the basic elements of first degree murder.  By doing so, defendant has failed to heed the admonition in <u>Apprendi</u> that "the relevant inquiry is one not of form, but of effect." See <u>Apprendi</u>, 530 U.S. at 494, 120 S. Ct. at 2365.  See also <u>Swift</u>, 202 Ill. 2d at 391 (quoting <u>Ring</u>, 122 S. Ct. at 2440); <u>People v. Wagener</u>, 196 Ill. 2d 269, 286-87, 752 N.E.2d 430 (2001).  Moreover, defendant's attempted explanation of <u>Ford</u> is wholly inconsistent with <u>Hopkins</u>, wherein this Honorable Court held that <u>Apprendi</u> permits extended term sentences if particular elements of other offenses found by the trier of fact beyond a reasonable doubt constitute factors which would have authorized such a sentence. See <u>Hopkins</u> 201 Ill. 2d at 39-40 (holding that the defendant was necessarily eligible for an extended term sentence for murder because the jury also found him guilty of aggravated battery of a person over 60 years of age). Accordingly, it is clear that under <u>Apprendi</u>, courts must consider <u>all</u> the factual findings made by the trier of fact when determining if a defendant was eligible for an extended term sentence.

5

Due to this relationship between the trier of fact's findings for all the offenses and the defendant's eligibility for an extended sentence, it becomes clear that the Second District Appellate Court's decision in People v. Rivera, 333 Ill. App. 3d 1092, 777 N.E.2d 360 (2nd Dist. 2001) is wholly consistent with Swift. The Rivera court held that the defendant's natural life sentence comported with Apprendi even though the prosecution did not seek the death penalty, because the jury had found beyond a reasonable doubt that the defendant intentionally and knowingly murdered the victim and that he had committed the murder in the course of another felony, aggravated criminal sexual assault. Id. at 1103. Given these findings by the jury, the Rivera court held that "based exclusively upon the evidence presented to the jury," the defendant was eligible for a natural life sentence. Id. (citing 730 ILCS 5/5-8-1(b), 720 ILCS 5/9-1(b)(6)).

Defendant attempts to discount Rivera by claiming that it was "wrong to equate" felony murder under section 9-1(a)(3) (720 ILCS 5/9-1(a)(3)) with the death penalty eligibility factor of murder in the course of a felony under section 9-1(b)(6) (720 ILCS 5/9-1(b)(6)). (Deft. Br. at 27-29) The People agree with defendant that findings under 9-1(a)(3) and 9-1(b)(6) are not co-extensive. However, nowhere in Rivera (or in the People's opening brief) is such a comparison ever made.[3] Rather, the court in Rivera expressly stated that it was relying upon the jury's verdict of felony murder based on aggravated criminal sexual assault *in conjunction with* the jury's other verdicts that the defendant intentionally and knowingly murdered the victim when it held that the

---

[3] In fact, given his extensive discussion as to why the jury's general verdict could not support a finding of death penalty eligibility since the jury was also instructed on residential burglary as a predicate felony for felony murder (Deft. Br. at 29-31), it appears that defendant has improperly equated sections 9-1(a)(3) and 9-1(b)(6). However, defendant's entire analysis on this point is irrelevant because, as stated below, the general verdict for murder must be viewed as a finding of intentional murder rather than felony murder.

jury's findings necessarily encompassed the requisite facts to authorize a natural life sentence. Rivera, 333 Ill. App. 3d at 1103-04. As this is precisely the same analysis conducted by this Honorable Court in Hopkins, it is clear that the Rivera court properly rejected that defendant's Apprendi challenge to his natural life sentence.

Defendant further asserts that Rivera is inapplicable because unlike the jury in Rivera, the jury in the instant case returned a general verdict and did not specifically indicate that defendant intentionally or knowingly murdered the victim, a factor necessary under section 9-1(b)(6) (Deft. Br. at 27, 29) While it is true that the jury in the instant case returned a general verdict, defendant is in error when he asserts that the jury never made the requisite findings regarding his mental state when he murdered 86 year old Millie Nielsen after breaking into her apartment.

Illinois law is well established that when a jury is instructed on intentional, knowing and felony murder and returns a general verdict, it is presumed that jury found that defendant intentionally murdered the victim. People v. Cardona, 158 Ill. 2d 403, 411-12, 634 N.E.2d 720 (1994); People v. Scott, 148 Ill. 2d 479, 555 (1992); People v. Thompkins, 121 Ill. 2d 401, 456, 521 N.E.2d 38 (1988). Moreover, this Honorable Court has repeatedly held that such a general verdict is sufficient to support a finding of eligibility section 9-1(b)(6).

In People v. Smith, 176 Ill. 2d 217, 229-30, 680 N.E.2d 291 (1997), this Court affirmed the defendant's eligibility finding on remand even though no evidence was presented regarding his mental state, because the trial court took judicial notice of the jury's earlier general verdict of guilty of first degree murder, which included the necessary finding of intent.[4]

---

[4]This is precisely what occurred at the eligibility phase of defendant's initial trial. S.R.1-89-3182 1443-44.

7

Similarly, in People v. Shatner, 174 Ill. 2d 133, 673 N.E.2d 258 (1996), this Court stated that where the jury's general verdict at the guilt phase "encompassed the necessary finding of intent" and the trial court took judicial notice of that verdict, the trial court's conclusion that the defendant acted with the requisite intent for eligibility "cannot be assailed." Id. at 150-51. See also People v. Johnson, 149 Ill. 2d 118, 156-57, 594 N.E.2d 253 (1992) (same).

Finally, in People v Johnson, 159 Ill. 2d 97, 636 N.E.2d 485 (1994), this Court held that the People sustained their burden at the eligibility phase of the defendant's trial because defendant entered a general plea of guilt to a three-part indictment for first degree murder and therefore was considered to have pled guilty to intentional and knowing murder. Id. at 129-30.

Therefore, it is clear that defendant is wrong when he asserts that the jury never found that he intentionally murdered the victim. Furthermore, the record contains overwhelming evidence that defendant intentionally killed the 86-year old victim when he repeatedly beat, stabbed and strangled her after breaking into her apartment. Since it was established beyond any doubt that defendant "acted with the intent to kill the murdered individual or with the knowledge that his acts created a strong probability of death or great bodily harm to the murdered individual or another" (Ill. Rev. Stat. 1985, ch. 38, par. 9-1(b)(6)(b)), this Court should reject defendant's arguments that the jury did not find that he acted with the requisite mental state. Moreover, this finding, when considered in conjunction with the earlier verdicts as to home invasion and armed robbery, makes it clear that one "of the aggravating factors listed in subsection of section 9-1 of the Criminal Code of 1961 [is] present." Ill. Rev. Stat. 1985, ch. 38, par. 1005-8-1(a)(1)(b). As this is precisely the

8

same analysis engaged in by this Court in <u>Hopkins</u> and the Appellate Court in <u>Rivera</u>, the People maintain that defendant's natural life sentence comports with <u>Apprendi</u>.[5]

Although defendant relies extensively upon <u>People v. Ramey</u>, 151 Ill. 2d 498, 603 N.E.2d 519 (1992) (Deft. Br. at 25-26) to support the proposition that a general verdict at the guilt phase cannot be used to rectify an erroneous instruction at the death penalty eligibility phase, it is clear that <u>Ramey</u> has absolutely no application to the instant case. In <u>Ramey</u>, this Court ruled that the defendant was entitled to a new sentencing hearing because the trial court failed to properly instruct the jury as to the requisite mental state for eligibility even though the defendant repeatedly asserted that such an instruction was required. Moreover, because <u>Ramey</u> involved questions of the defendant's accountability for a co-defendant's actions, it was not possible to rely upon the general verdict from the guilt phase because by failing to include the requisite mental state in the instructions, the jury may have believed that the defendant could be eligible for the death penalty simply because he was accountable for the actions of another even if he himself never intended to kill.

---

[5]Defendant further asserts that in order to be found eligible for the death penalty, it must also be proven that the defendant was at least 18 years old at the time of the offense. (Deft. Br. at 29) The People do not disute that death eligibility requires proof of the defendant's age (see 720 ILCS 5/9-1(b)), but point out that eligiblity for a life sentence under section 5-8-1(a)(1)(b) is not identical to death penalty eligibility even though they are based upon the same factors. See <u>People v. Whitehead</u>, 116 Ill. 2d 425, 465, 508 N.E.2d 687 (1987). Section 5-8-1(a)(1)(b) does not state that a defendant must be found eligible for the death penalty before a court may impose a life sentence. Rather, it merely requires that one of the factors listed in section 9-1(b) be "present" and makes no mention of the additional requirement for death penalty eligibility that the defendant be over 18 years old. Thus, under the plain language of the statute, a defendant could be sentenced to life imprisonment even if he were only 17 years old. Because "a statute is to be interpreted and applied in the manner in which it is written . . . and is not to be rewritten by a court in an effort to render it consistent with the court's view of sound public policy" (<u>People v. Lewis</u>, 158 Ill. 2d 386, 391, 634 N.E.2d 717 (1994)), the People respectfully request that this Court reject defendant's implicit request to rewrite the statutory provision.

In contrast to Ramey, this Court in People v. Armstrong, 183 Ill. 2d 130, 150-52, 700 N.E.2d 960 (1998) held that where a defendant fails to object to the erroneous instruction, a general verdict from the guilt phase may be considered to determine if the requisite mental state was proven.

In the instant case, the record is clear that defendant never objected to the use of a general verdict form at his trial. Moreover, it cannot be questioned that defendant was found guilty based exclusively on his own actions and not those of an accomplice. Accordingly, Ramey is inapposite to the instant case.

Similarly, defendant's reliance upon People v. Mack, 167 Ill. 2d 525, 538, 658 N.E.2d 437 (1995) (Deft. Br. at 26) is misplaced because by its own terms Mack only applies where the parties attempt to use a special verdict form but fail to include all the elements of the offense. In contrast, Mack does not apply to situations involving general verdicts such as the one at issue in the instant case. Accordingly, Mack is also inapposite to the instant case.

Finally, it is irrelevant that the jury at the defendant's retrial was not asked to determine defendant's eligibility for the death penalty. Apprendi simply requires "that all facts necessary to establish the statutory sentencing range within which the defendant's sentence falls must be proven to a jury beyond a reasonable doubt." Swift, 202 Ill. 2d at 383 (citing People v. Jackson, 199 Ill. 2d 286, 296, 769 N.E.2d 21 (2002); Ford, 198 Ill. 2d at 73). Because the juries had already found beyond a reasonable doubt that he intentionally and knowingly murdered Millie Nielsen and that he committed the offenses of home invasion and armed robbery, the requisite facts to authorize a natural life sentence had already been established. Accordingly, defendant's natural life sentence was properly imposed and should be affirmed.

Defendant further argues that the indictment was deficient because it failed to give adequate notice of the possibility of a natural life sentence. (Deft. Br. at 32-35) However, as stated in the People's opening brief, this Honorable Court expressly rejected an identical claim in Ford. See People's Br. at 34-35 (quoting Ford, 198 Ill. 2d at 72 n.1 (citing Apprendi, 530 U.S. at 477 n.3, 120 S. Ct. at 2355 n.3)). Similarly, in People v. Thurow, ____ Ill. 2d ____, 2003 Ill. LEXIS 20 (No. 90911 February 6, 2003) this Court reiterated its holding in Ford, stating:

> With regard to defendant's "notice" argument, the Supreme Court in Apprendi specifically declined to address the indictment question. The Court noted that the defendant, Charles Apprendi, did not assert a constitutional claim based upon the indictment's failure to charge the sentence-enhancement factors. Instead, the defendant relied upon the due process clause of the fourteenth amendment, which the Court stated has never been construed to make the fifth amendment right to "presentment or indictment of a Grand Jury" applicable to the states. Indeed, Apprendi's central holding makes no mention of any indictment right. Instead, as previously noted, it focuses upon the rights to trial by jury and proof beyond a reasonable doubt. We therefore reject defendant's argument that Apprendi requires "notice of the sentence-enhancing facts."

Thurow, 2003 Ill. LEXIS 20 at * 21-22 (citations omitted).

Thus, contrary to defendant's assertion, it is clear that neither the United States Supreme Court nor this Honorable Court have ever held that sentencing factors must appear in the indictment. See also Ring, 122 S. Ct. at 2437 n.4 (noting that the petitioner did not contend that the indictment was constitutionally defective and pointing out that the fifth amendment indictment clause has not been construed against the states); People v. Davis, ____ Ill. 2d ____, 2002 Ill. LEXIS 286 at *47 (No. 89704 February 22, 2002) (holding that Apprendi does not require that the death penalty eligibility factors appear in the indictment).

11

Moreover, even if <u>Apprendi</u> did require sentencing factors to be pled in the indictment, the People point out that defendant does not dispute that he received adequate notice from the indictment that he could potentially receive the death sentence. (Deft. Br. at 33)  Instead, he argues that he was unaware that he might face life imprisonment at his second trial since the People were only proceeding on the murder charges.  Of course, defendant neglects to mention that he had been sentenced to natural life for murder following the initial trial and was aware that even though the People were precluded from seeking the death penalty under double jeopardy principles, the People still believed that the horrific offense required a significant sentence.  Moreover, as in <u>Ford</u>, where this Honorable Court held that <u>Apprendi</u> is not implicated where a defendant is sentenced to a lesser sentence than what he is legally eligible for, a defendant should not be heard to complain that he received notice that he could potentially be sentenced to a greater penalty than he ultimately is.

Also, the record is clear that defendant never once objected to the sufficiency of the indictment until after he was convicted at the second trial and the <u>Apprendi</u> decision was released while his appeal was pending in the Appellate Court. Defendant implicitly acknowledges this procedural default by speculating as to how defendants may be prejudiced in preparing their defense (Deft. Br. at 33-34), but makes no claim that he would have prepared for trial differently or that he suffered actual prejudice in any manner due to the alleged deficiency. See <u>Davis</u>, 2002 Ill. LEXIS 286 at *42; <u>People v. Thingvold</u>, 145 Ill. 2d 441, 448, 584 N.E.2d 89 (1991);  <u>People v. Gilmore</u>, 63 Ill. 2d 23, 29, 344 N.E.2d 456 (1976).

Finally, defendant challenges the People's alternative argument that if defendant's sentence violates <u>Apprendi</u> any error was harmless beyond a reasonable doubt. Defendant claims that <u>Apprendi</u> errors are necessarily structural in nature and that as a result, can never be considered

12

harmless. (Deft. Br. at 36-41)[6] However, as this Honorable Court recently held in Thurow, an Apprendi violation must be considered a trial error rather than a structural one. The Thurow court explained that under Neder v. United States, 527 U.S. 1, 119 S.Ct. 1827 (1999) and United States v. Cotton, 535 U.S. 625, 122 S. Ct. 1781 (2002), Apprendi errors are subject to harmless error analysis because "'[u]nlike such defects as the complete deprivation of counsel or trial before a biased judge, an instruction that omits an element of the offense does not necessarily render a criminal trial fundamentally unfair or an unreliable vehicle for determining guilt or innocence.'" Thurow, 2003 Ill. LEXIS 20 at *18 (quoting Neder, 527 U.S. at 9, 119 S. Ct. at 1833) (emphasis in Neder). Accordingly, the Thurow court stated that it was "compelled by Neder to conclude that the Apprendi violation in the case at bar is subject to harmless-error review." Id., 2003 Ill. LEXIS 20 at *25 (emphasis added)

In the instant case, since it is clear that Apprendi is subject to harmless error review, the only question remaining (assuming arguendo that defendant's sentence violates Apprendi), is

---

[6]Defendant further asserts that the People have waived their harmless error argument by failing to make such a claim in the Appellate Court. (Deft. Br. at 36) However, because the People were the appellee in the Appellate Court and did not define the issues in that court, the typical rule that arguments must first be raised in the lower court does not apply. People v. Schott, 145 Ill. 2d 188, 201, 582 N.E.2d 690 (1991). As this Court explained, "'[w]here the trial court is reversed by the Appellate Court and the appellee in that court brings the case here for further review, he may raise any question properly by the record to sustain the judgment of the trial court, even though those questions were not raised or argued in the Appellate Court.'" Id. (quoting Mueller v. Elm Park Hotel Co., 391 Ill. 391, 399, 63 N.E.2d 365 (1945)) (emphasis added). Therefore, waiver cannot apply in the instant case. Moreover, the People point out that the instant case represents one of the first cases to address Apprendi in the Appellate Court and that because the law under Apprendi was developing throughout the entire country, a continuous re-evaluation of appropriate responses and arguments was required. Accordingly, assuming the People's harmless error argument had been waived, the People respectfully request this Honorable Court to consider this portion of the People's argument (if it is necessary) in order to provide a complete adjudication of the issues. See Schatz v. Abbott Laboratories, 51 Ill. 2d 143, 145, 281 N.E.2d 323 (1972) (ignoring waiver where it was "desirable to make a complete adjudication of the issues").

whether such error was harmless. Id. The People point out, however, that defendant does not challenge the substance of the People's arguments as to why the alleged error was harmless beyond a reasonable doubt and instead relies exclusively upon his erroneous claim that Apprendi errors are structural in nature.

Nevertheless, the People reiterate that the record clearly reflects that defendant murdered 86 year old Millie Nielsen "in a brutal or heinous fashion indicative of wanton cruelty" when he repeatedly beat, stabbed and strangled her after breaking into her apartment. Moreover, because it cannot be disputed that defendant committed the murder in the course of other felonies, specifically armed robbery and home invasion, the People maintain that any rational trier of fact would have found that at least one of the death penalty eligibility factors was present in the instant case. Accordingly, as in Thurow, the People maintain that any rational trier of fact would have found beyond a reasonable doubt one of the requisite factors to impose a natural life sentence for murder.

For all the foregoing reasons, the People respectfully request that this Honorable Court reverse the Appellate Court's ruling and reinstate defendant's natural life sentence.

14

## II.

**THE APPELLATE COURT PROPERLY FOUND THAT DEFENDANT WAS NOT DENIED HIS CONSTITUTIONAL RIGHT TO A SPEEDY TRIAL WHERE THE RECORD IS CLEAR THAT DEFENSE COUNSEL AGREED TO THE DELAY OF TRIAL IN ORDER TO PREPARE THE DEFENSE.**

In his cross-appeal, defendant claims that his constitutional right to a speedy trial was denied because it was 43 months from the date of the reversal of his first murder conviction to the date of his retrial. (Deft Br. 42) The facts as applied to the law, however, show that the decision rendered by the Appellate Court, finding that there was no constitutional violation, was proper, as defendant's attorneys expressly sought the additional time in order to await potentially exculpatory DNA testing which would allow them to prepare the defense.[7]

The right to a speedy trial is guaranteed by the United States Constitution. (U.S. Const., amend. VI) and the Illinois Constitution (Ill. Const. 1970, art. I, sec. 8) Since defendant's original conviction was reversed on appeal and his cause remanded for a new trial, the speedy trial clause requires the People to retry defendant within a reasonable period of time following the date of the denial of the People's Petition for Leave to Appeal. Since the right to a speedy trial "cannot be defined in terms of an absolute or precise standard of time" this Court must analyze the "record in its totality" to determine whether the right to a speedy trial has been denied. People v. Crane, 195 Ill. 2d 42, 47-48, 743 N.E.2d 555 (2001).

This analysis is conducted under the four-part test set forth in Barker v. Wingo, 407 U.S. 514, 92 S.Ct. 2182 (1972). The Barker Court identified four factors in determining whether the

---

[7] The speedy trial issue was rendered in the unpublished portion of the Appellate Court's decision (Slip op. at 20-31).

constitutional right to a speedy trial is violated: (1) the length of the delay; (2) the reason for the delay; (3) the defendant's assertion of his right to a speedy trial; and (4) the prejudice to the defendant. Barker, 407 U.S. at 530, 92 S.Ct. at 2192. The People maintain that the record in the instant case shows that the Appellate Court properly applied the four-part test set forth in Barker to the facts at issue and determined that defendant was not denied his constitutional right to a speedy trial.

Although defendant complains that the Appellate Court utilized the incorrect standard of review when this case was decided in 2000, this Court found in People v. Crane, 195 Ill. 2d 42, 50, 743 N.E.2d 555 (2001), that there was previously, "no definitive answer on this issue." This Court ultimately found that "when a trial court performs the Barker balancing test" by weighing the interests of the People against the interest of the defendant, the standard of review is de novo. Id. at 52.

### The Length of Delay

When balancing the Barker factors, no one factor is dispositive or sufficient to determine if the constitutional right to a speedy trial was violated. Barker, 407 U.S. at 533, 92 S.Ct. at 2193. In determining the length of the delay, the United States Supreme Court has held one year to be "presumptively prejudicial" such that it triggers the Barker inquiry. Doggett v. United States, 505 U.S. 647, 652 n.1, 112 S.Ct. 2686, 2691 n.1 (1992); Barker, 407 U.S. at 530-531, 92 S.Ct. at 2192.

In the instant case, the Appellate Court found that the length of the delay triggered the Barker inquiry regarding the last three prongs of the test. Although the delay triggers the analysis, it does not, however, imply that the delay actually prejudiced defendant. It "simply marks the point

16

at which courts deem the delay unreasonable enough to trigger the <u>Barker</u> enquiry." <u>Doggett</u>, 505 U.S. at 652 n.1, 112 S.Ct. at 2691 n.1.

## The Reason for Delay

The next inquiry for this Court to make is the reason for the delay. The People bear the burden of providing justification for any delay which has occurred, however, defendant needs to show that the delay was not attributable to his actions. <u>Crane</u>, 195 Ill. 2d at 53.

The Appellate Court properly determined that in this case, the "defense either caused or contributed to nearly all the pretrial delay at issue." Slip op. at 24. The record establishes that the Appellate Court's decision was correct, as it was based on the facts unfolding after remand and the denial of the People's Petition for Leave to Appeal.

After the Appellate Court reversed defendant's murder conviction and remanded the matter for a new trial on the murder charges, the People sought leave to appeal in this Honorable Court. This Court denied the People's Petition for Leave to Appeal on June 3, 1993.[8] The first status date following the denial of the PLA was June 29, 1993. This 26-day period was the only period that the Appellate Court found was "not attributable to defendant." Slip op. at 24-25. (However the June 29th date was set at an earlier a status hearing on May 28, 1993 where the court denied defendant's requested six week continuance and instead entered an agreed 30 day

---

[8] Defendant continues to use the date the Appellate Decision was issued, however, the date the People's PLA was denied is the proper time since the People's attempt to seek review of a lower court's decision has been held to be "fully justified" reason for delay in bringing a defendant to trial. <u>Crane</u>, 195 Ill. 2d at 54; <u>United States v. Loud Hawk</u>, 474 U.S. 302, 315, 106 S.Ct. 648, 656 (1986).

continuance even though this Court had not yet ruled on the PLA. (C. 216-21)).  As to the remaining time, the Appellate Court found that it was attributable to defendant.

> From the court's June 29 hearing up until the start of trial in November 1996, the case was delayed because of the defense's explicit requests for a continuance or express agreement with the prosecution thereto.  Delay resulting from such requests and agreements are generally chargeable to the defendant. See, People v. Beard, 271 Ill. App. 3d 320, 328, 648 N.E.2d 111, 116 (1st Dist. 1995)(delay caused by continuances either requested or agreed to by defense is attributable to defendant); People v. Moore, 263 Ill. App. 3d 1, 8, 635 N.E.2d 507, 513 (1st Dist.1994) (same); People v. Nolan, 102 Ill. App. 3d 895, 898-99, 430 N.E.2d 345, 349 (1st Dist. 1981) (same).

Slip op. at 25.

DNA testing was the cause for the delay in bringing defendant to retrial.  The rationale for that cause, and its consequences, however, are critical.  Defense counsels needed to know the results of the DNA tests in order to prepare the defense.  That is precisely the reason why so many "by agreement" dates were made.  Had the DNA results indicated that the blood found on defendant's clothing was not that of Millie Nielsen, an acquittal was practically guaranteed. The defense was, after all, that defendant's blood soaked clothes became stained as a result of several fights he had with different men that week, not as a result of brutally beating, stabbing and strangling 86-year old Millie Nielsen to death in her own home. (R. K180-182)

This Court, as was the Appellate Court, should be mindful of the fact that defendant went through six attorneys and that the prosecution's DNA tests would have been more prompt had the defense complied with the trial court's order to turn over results of the DNA tests that were requested by defendant from his first trial.

The record shows that after the matter was remanded to the Circuit Court of Cook County, defense counsel #1 (an assistant public defender) needed to obtain the transcripts from the

18

first trial in order to prepare the defense. (C. 232) He also indicated to the court that defendant wished to make a pro se motion for a speedy trial. (C. 2330 After the court informed defendant that his lawyer was not yet ready to proceed to trial and explained the risks of going to trial with an unprepared attorney, defendant stated that he would wait until his lawyer is ready and agree to the requested continuance. (C. 233-34)

The record further indicates that defense counsel did not obtain a complete set of transcripts until November 15, 1993, five months after the People's PLA was denied. (Vol. 3 S.R55)[9] In February 1994, the prosecutor indicated that an expert would be utilized in the case. Defense counsel wanted to wait to see what the expert would say before engaging his own expert on blood splatter. (Vol. 3 S.R.65-66) By June 30, 1994, one year after the first status date, the tests of some experts were complete and it was expected that DNA testing would be complete by September 1994. (Vol. 3 S.R. 77) In September, it was revealed that an expert was performing additional serology tests. Defense counsel specifically stated that he did not want to set a trial date until he saw that report. (C. 259)

In October 1994, the trial court was informed that DNA tests were not complete and another status date was held. (C. 262) Defendant made another pro-se oral request to dismiss his charges pursuant to the Speedy Trial Act. (C. 262) After being told that the motion had to be in writing (C. 262), defendant filed a written "Motion to Dismiss Charges [-] Violation of the Speedy Trial Act" (C265-70) asked for several continuances to obtain documents so he could argue his speedy trial motion. (C. 279-81, 284-85)

---

[9]"Vol. 3 S.R." refers to the third volume of supplemental record identified in the Appendix to the People's opening brief at page A66.

In January 1995, attorney #2 (an assistant public defender) was assigned to defendant's case. (C. 289) In March 1995, the People filed a Motion to Produce involving DNA testing that was done prior to defendant's first trial. (Vol. 3 S.R. 84) The DNA tests were still not complete at that time. In May 1995, the prosecutor still had not received the written findings from the DNA tests performed prior to defendant's first trial. Defense counsel #2 indicated that there were no written findings, but notes existed. (Vol. 3 S.R. 91) The prosecution informed the court that the DNA tests could not be completed until the results from defendant's DNA tests were revealed. (Vol. 3 S.R. 91-93) The trial court then ordered defense counsel to turn over the notes regarding the first DNA testing. (Vol. 3 S.R. 94)

Later that month, the prosecution was still asking for the DNA test results from the first trial. (Vol. 3 S.R. 99) It was also revealed that attorney #2 was moving out of state and would not try the case. (Vol. 3 S.R. 101) In June 1995, two years after the People's PLA was denied, defense attorney #3 (an assistant public defender) filed an appearance on defendant's behalf and stated that because defendant was "anxious to go to trial" she would review the materials as "quickly as possible." (Vol. 3 S.R. 113) By August of 1995, the prosecution finally received the missing discovery relating to defendant's DNA testing from his first trial. (Vol. 3 S.R. 120)

By October 1995, defense attorney #3 asked for another status date as she had outstanding subpoenas and was not "in a position to set this matter for trial." (Vol. 3 S.R. 136)

In December 1995, attorney #3 was granted leave to withdraw and defense attorney #4 (a private defense attorney) filed an appearance. (Vol. 3 S.R. 140) Attorney #5 (a private defense attorney) filed her appearance in January 1996 and attorney #4 was given leave to withdraw (Vol. 3 S.R. 163-64) In March 1996, attorney #6 (a private defense attorney) filed his appearance, and

20

subsequently obtained three continuances. (Vol. 3 S.R. 171, 175, 178) (Attorneys #6 continued to

represent defendant through trial and sentencing with the assistance of Attorney #5.)

        In June 1996, both sides indicated they would be ready for trial in August. (Vol. 3 S.R.

181) In July, it was indicated that the defense might hire an expert, which would set the trial date

back. (Vol. 3 S.R. 184) Then, in August 1996, the prosecutor informed the court that defense

counsel would be unable to appear that day because he had to attend a funeral. (Vol. 3 S.R. 188)

The matter was continued until November 18, 1996, when defense counsel filed and argued a

motion to dismiss the indictment based on a violation of defendant's constitutional right to a speedy

trial. (Vol. 3 S.R. 188; C. 199-215; R. H4) The court denied the motion, stating that "[a]lthough

[defendant] at times asked for a trial to start right away, in almost every instance, he then asked for

a continuance because either in oppostion of what his lawyer wanted to do or he wanted to argue

the motion himself, which I gave him opportunity to do on several occasions." (R. H4) The court

then heard other pre-trial motions and commenced jury selection. (R. H1)

        Therefore, the record reveals that out of the 47 times this case appeared before the trial

judge, there were 39 by agreement continuances, 3 continuances by order of court and 3

continuances at defendant's request.[10] There is not one "motion state" date in the record. (C. 1-15)

Accordingly, the Appellate Court properly reviewed the record as a whole and held that defendant

was responsible for the delay for retrial. The court stated:

> Notably, the defense changed attorneys not less than six times during the
> postponement period, necessitating additional time being granted to new
> counsel so he or she could review discovery and familiarize himself or herself
> with the case. As a further note, the case was continued on at least four

---

    [10] The court half-sheets for two dates, December 7, 1995 and January 11, 1996, do
not indicate the types of continuances taken.

21

occasions because of defense counsel's failure to appear at scheduled court hearings.

Defendant accurately notes that the prosecution used the pretrial period to gather expert evidence regarding DNA testing and blood splatter analysis, and that it requested additional time from the court many times to secure these materials. On several of those occasions, however, defendant's attorneys explicitly agreed to the State's request. Indeed, defense counsels never objected to the State's attempt to secure its additional evidence. Rather, the record shows that the defense welcomed the State's blood evidence because of its possible exculpatory effect. The defense obviously viewed the State's evidence as possibly beneficial to its case and, for this reason, agreed to many of the continuances sought by the State. With respect to the remaining instances where the State requested additional time, defense counsel specifically sought continuances for his own reasons.

Slip op. at 25-26 (citations omitted).

Defendant fails to apprise this Court of the significant facts in this case which established why defense counsels agreed to the continuance dates regarding the DNA testing. Rather, in his brief, defendant alleges that it was the People who sought the DNA test which was "ordered at the State's behest." (Deft. Br. 45) As the Appellate Court recognized, defendant had as much of a stake in the DNA tests as the prosecution. Had those tests revealed that the blood found on defendant's clothing did not belong to Millie Nielsen, defendant's acquittal was assured.

In this regard, the instant case is strikingly similar to Barker, because in that case the defense attorneys stated that they agreed to the more than four years of delay because they were "gambling on [a co-defendant's] acquittal." Barker, 407 U.S. at 535, 92 S.Ct. at 2194. The Court explained that "[t]he evidence was not very strong against [the co-defendant], as the reversals and hung juries suggest, and Barker undoubtedly thought that if [the co-defendant] were acquitted, he would never be tried." Id. The Court found this to be a legitimate reason even though in "hindsight"

22

it would have been a wiser course of action to demand an immediate trial. Id. at 535 n.39, 92 S.Ct. at 2194 n.39.

Defendant also asks this Court to find it persuasive that no DNA evidence was actually introduced into the second trial. (Deft. Br. 46)  Defendant's argument intimates that the People stalled the retrial for no legitimate reason.  The fact that the samples were too small and degraded does not undermine the legitimacy in making the request.

Defendant also claims that the Appellate Court's opinion that it was to his advantage to wait and see what the DNA tests proved was without support since defendant testified at his first trial that he could have gotten Millie Nielsen's blood on his clothing when he picked up a bag in her yard which was already blood soaked at the time. (Deft Br. 46)   The fact that defendant provided an explanation for having Millie Nielsen's blood on his clothing at his first trial has no relevance to preparing for the retrial.  First, the People had to prove defendant guilty beyond a reasonable doubt.  DNA evidence would go a long way in establishing that burden.  Second, the prosecutors could not have known in advance of trial if defendant would testify at his retrial. Presuming that defendant would repeat this testimony, or testify at all at retrial would have required the prosecutors to be clairvoyant.  Regarding the prior disclosure of the DNA testing at the first trial, the issue on remand was that the prosecutors repeatedly asked for the written results of the DNA tests as it was imperative to the scientists to see written results as opposed to verbal claims made by defense attorneys.

Dfendant further claims that the Appellate Court "confused statutory delay with constitutional delay." (Deft Br. 47)   He asserts that "[d]efense counsel's acquiescence to continuances and those continuances being charged to defendant are factors in statutory speedy trial

23

analysis-not in constitutional speedy trial analysis." (Deft. Br. 47) Defendant fails to provide this

Court with any case law supporting this claim. Moreover, <u>Barker</u> expressly refutes such a claim.

In <u>Barker</u>, the Court placed significant weight on the fact that the defendant had not

objected to the numerous continuances. The Court stated:

> Counsel was appointed for Barker immediately after his indictment and
> represented him throughout the period. No question is raised as to the
> competency of such counsel. Despite the fact that counsel had notice of the
> motions for continuances, the record shows no action whatever taken
> between October 21, 1958, and February 12, 1962, that could be construed
> as the assertion of the speedy trial right. On the latter date, in response to
> another motion for continuance, Barker moved to dismiss the indictment. The
> record does not show on what ground this motion was based, although it is
> clear that no alternative motion was made for an immediate trial. <u>Instead the
> record strongly suggests that while he hoped to take advantage of the delay
> in which he had acquiesced, and thereby obtain a dismissal of the charges, he
> definitely did not want to be tried.</u>

407 U.S. at 535-35, 92 S.Ct. at 2194 (emphasis added) (footnotes omitted). The Court then

explained:

> We do not hold that there may never be a situation in which an indictment
> may be dismissed on speedy trial grounds where the defendant has failed to
> object to continuances. There may be a situation in which the defendant was
> represented by incompetent counsel, was severely prejudiced, or even cases
> in which the continuances were granted *ex parte*. <u>But barring extraordinary
> circumstances, we would be reluctant indeed to rule that a defendant was
> denied this constitutional right on a record that strongly indicates, as does this
> one, that the defendant did not want a speedy trial.</u>

<u>Id.</u> at 536, 92 S.Ct. at 2195 (emphasis added). Thus, it is clear that defendant's assertion that his

acquiescence is irrelevant is wholly without merit. Moreover, as defendant does not make any

allegation of ineffective assistance of counsel (nor could he) based on his attorneys' agreement to

the continuances, he must share responsibility for the delay in bringing the matter to trial.

24

Defendant also finds it insignificant that he went through six attorneys, arguing that this fact "is of no consequence." (Deft. Br. 47)  The record and common sense however, contradicts his claims.  Defendant's attorneys specifically requested continuances so that they would be able to digest the complex history of the case and pending discovery. (C. 233-34; Vol. 3 S.R. 65-66, 136)  The People take issue with defendant's claim that "[a] number of the attorneys would have been ready for trial, but for the State not having completed discovery with the DNA tests. (Deft Br. 47)  Defendant's claim is hardly a candid assessment of the facts.

The first defense attorney needed a continuance to obtain transcripts from the first trial. (C. 232)  When the prosecutor stated that an expert might be utilized in this case, defense counsel #1 wanted to wait and see the results of the People's expert before possibly engaging his own expert in blood splatter. (Vol. 3 S.R.65-66) Defense counsel did not want to set a trial date until he saw the additional blood tests. (C. 259)  In March 1995, the prosecutors filed a Motion to Produce relating to the DNA tests allegedly performed at defendant's first trial. (Vol. 3 S.R. 84)  Defense counsels #2 and 3 did not comply with that order until August 1995. (Vol. 3 S.R. 120)  Attorney #3 asked for continuances as she had outstanding subpoenas and was not "in a position to set this matter for trial." (Vol. 3 S.R. 136) Attorney #4 filed an appearance in December 1995 and withdrew when #5 filed an appearance in January 1996. (Vol. 3 S.R. 163-64)  Trial counsel, attorney #6, filed his appearance in March 1996. (Vol. 3 S.R. 171)  It took counsel #6 several months to go through discovery.  Both sides indicated they would be ready for trial in August, but then, in July 1996, defense counsel stated he might hire an expert which set the trial date back. (Vol. 3 S.R. 184)  Defendant's claim that this revolving door of attorneys would have been ready for trial is refuted by the record and common sense.

25

According to defendant, "preparing for retrial would not have been as difficult as preparing for a new trial since defense counsel would have had the testimony of the witnesses from the first trial and the rulings made on pre-trial motions." (Deft. Br. 48)  The People fail to appreciate how appellate counsel's claim of defense ease established that his constitutional right to a speedy trial was violated.  Further, defense counsel on retrial was limited by what defendant claimed at his first trial.  Defense attorneys had to then investigate and find witnesses or experts that would have supported defendant's theory.  Since DNA evidence could have exonerated defendant, the testing was obviously seen as significant by all six defense attorneys representing defendant during this time.  Furthermore, the fact that DNA evidence was admissible on retrial does not make the testing procedure any less difficult or time consuming.

Defendant perverts the record by claiming that although the Appellate Court found that he "explicitly requested continuances or expressly agreed with the prosecution's request for delay" he himself objected to the delay on several dates. (Deft. Br. 48)  The record also shows, however, that when asked by the trial court, defendant himself sought additional time to prepare and argue his pro se motion (C. 279, 284-85, 289) and then apparently abandoned his pro se demand for a speedy trial because he never once raised the matter again before the trial court.  Accordingly, defendant's argument is disingenuous.

Moreover, Illinois law is clear that when a defendant is represented by counsel, he may not also attempt to proceed pro se; he must make an election between the two rights. People v. Williams, 97 Il. 2d 252, 267, 454 N.E.2d 220 (1983) (citing People v. Ephraim, 411 Ill. 118, 122, 103 N.E.2d 363 (1952). While defendant here did make pro se requests for a speedy trial, he also clearly indicated that he wanted to be represented by counsel. As this Honorable Court recently

held in <u>People v. Mayo</u>, 198 Ill. 2d 530, 764 N.E.2d 525 (2002), a defendant will be bound by his attorney's request for a continuance unless he clearly and convincingly indicates that he wants to assert his right to discharge his attorney and proceed to an immediate trial. The rationale underlying this rule is the recognition that very few decisions regarding the course of a criminal trial belong to the defendant himself: what plea to enter (and whether to tender a lesser included offense instruction); whether to waive a jury trial; whether to testify on his own behalf; whether to seek an appeal. <u>People v. Brocksmith</u>, 162 Ill. 2d 224, 227, 642 N.E.2d 1230 (1994); <u>People v. Ramey</u>, 152 Ill. 2d 41, 54, 604 N.E.2d 275 (1992)). "'[B]eyond these four decisions, however, trial counsel has the right to make the ultimate decision with respect to matters of tactics and strategy after consulting with his client.'" <u>Brocksmith</u>, 162 Ill. 2d at 228 (quoting <u>Ramey</u>, 152 Ill. 2d at 54). Because the decision of whether or not to demand an immediate trial is inextricably intertwined with the attorney's responsibility to formulate trial strategy, it is clear that defendant's <u>pro se</u> objections were ineffectual.

Based on the facts of the case, the Appellate Court's ruling was proper. This Court should affirm the ruling made by the Appellate Court as it was based on the well established law.

## Defendant's Assertion Of His Right For A Speedy Trial

The third factor to consider in assessing whether defendant was denied his constitutional right to a speedy trial was his assertion of that right. It has been held that "[t]he defendant's assertion of his speedy trial right, then, is entitled to strong evidentiary weight in determining whether the defendant is being deprived of the right." <u>Barker</u>, 407 U.S. at 531-532, 92 S.Ct. at 2192-93. While such assertions are entitled to strong evidentiary weight, they must be viewed in

27

light of the defendant's other conduct. <u>United States v. Loud Hawk</u>, 474 U.S. 302, 314, 106 S.Ct. 648, 656 (1986).

In the instant case, defendant made an oral assertion of his right to a speedy trial and then filed a <u>pro-se</u> Motion to Dismiss Charges on the same ground. The record shows and the Appellate Court found, however, that those assertions were made <u>pro-se</u> and that defendant's attorneys expressly refused to file such a motion as they were not in a trial posture.

On July 21, 1993, about six weeks after the People's PLA was denied, all parties were in court. Defense counsel #1 informed the trial judge that he was tracking down the original trial transcripts and needed time to conduct his own investigation into the case. (C. 232)

> **[Defense Counsel]:** [Defendant] indicated to me that on his own motion, he's demanding a speedy trial. I don't know if he's still standing by that motion. I certainly would not be ready at this point professionally.
> **The Court:** [Defense counsel], if [defendant] wants a speedy trial, I may be able to accommodate him and give him a very speedy trial. It's the equivalent of somebody committing suicide, but if that's what he wants to do.
> You see, what your lawyer is trying to tell you, [defendant], is the state already had their case. They've got a blueprint of the case. This man doesn't know anything about your case and has to learn.
> Now, if you want a lawyer who is going to be able to give you the best possible defense, you'd better listen to him. If you want to just rush through and go right back in as much of a hurry as you can with a very lengthy negative outcome for your case, well, then I'll set a date for you next week.
> Now, what will it be?
> **[Defendant]:** I'll wait.
> **The Court:** Are you going to listen to your lawyer?
> **[Defendant]:** Mm-humm.
> **The Court:** Okay. We'll agree to a continuance; is that right?
> **[Defendant]:** Yes. (C. 233-34)

In October-November 1994, the court was informed that DNA tests were not complete and another status date was held. Defendant made an oral request to dismiss his charges pursuant

to the Speedy Trial Act. (C. 262)  Defendant told the trial court that his attorney refused to file the

motion. (C. 262)  After he filed a written pro se motion at the court's direction, defendant stated

that he was unable to argue the motion until he received the transcripts. (C. 278-81)  Defense

counsel specifically told the court that defendant was angry because defense counsel "won't file"

the Speedy Trial Motion. (C. 280)

Then, on the eve of trial, defense counsel submitted a motion to dismiss based upon

defendant's right to a speedy trial.  The trial court denied the motion, noting that the earlier pro-se

requests were "in opposition to what his lawyer wanted." (Vol. I H4)

The Appellate Court properly found that this factor could not be decided in defendant's

favor due to the facts presented:

> Generally, the decision to demand a speedy trial and to seek dismissal of the
> State's charges on such ground are matters left to the sound strategic decision
> of counsel. See People v. Ramey, 151 Ill. 2d 498, 523-524, 603 N.E.2d 519
> (1992); People v. Keys, 195 Ill. App. 3d 370, 373, 552 N.E.2d 285 (1990).
> Further, as previously discussed, defendant spoke and acted through his
> attorneys and was bound by their conduct during the pretrial proceedings.
> Importantly, defendant never sought the discharge of his attorneys to pursue
> his speedy-trial claims on his own.  Indeed, the record unequivocally shows
> that defendant wanted the assistance of counsel in preparing his defense for
> trial.

Slip op. at 28-29.

Although the record is clear that defendant asserted, then abandoned his pro se motion

to dismiss based on a violation of his right to a speedy trial, it is also abundantly clear that none

of defendant's six attorneys were ready to proceed to trial when defendant was making those

assertions. This is a crucial issue which defendant continues to ignore. See People v. Mayo, 198

Ill. 2d 530, 539-40, 764 N.E.2d 525 (2002). The record also establishes that the series of attorneys



needed DNA analysis to be completed and the final results of experts to be rendered before they could be prepared for trial. In light of these facts, the People maintain that the Appellate Court properly found that this factor weighed against defendant.

### Prejudice to Defendant

The last factor to consider is the prejudice suffered by defendant. The United States Supreme Court has found that the prejudice factor should be assessed in light of three interests of a defendant: (1) to prevent oppressive pretrial incarceration; (2) to minimize anxiety and concern of the accused and; (3) to limit the possibility that the defense will be impaired. Barker, 407 U.S. at 532, 92 S.Ct. at 2193. The most serious consideration is the last as "the inability of a defendant adequately to prepare his case skews the fairness of the entire system." Id.; Doggett, 505 U.S. at 654, 112 S.Ct. at 2692. Except for certain instances where the presumption of prejudice remains due to some form of unjustifiable conduct on the part of the prosecution, causing excessive delay which presumptively compromises the reliability of the trial proceedings a showing of prejudice is required to establish a violation of a defendant's constitutional right to a speedy trial. Doggett, 505 U.S. at 655-58, 112 S. Ct. at 2692-94; Reed v. Farley, 512 U.S. 339, 353, 114 S.Ct. 2291, 2299 (1994).

The Appellate Court addressed all three prongs of the prejudice analysis to defendant's case. The Court found that although defendant was in custody "for almost the entire time between remand and the commencement of his second trial," this fact alone was insufficient to establish prejudice and must be viewed with the other relevant considerations. Slip op. at 30.

Regarding the second factor, defendant claims that his "anxiety was reflected in the record and noted by the court." (Deft. Br. 50) However, in addressing this precise claim, the Appellate Court found that anxiety is "present to some extent in every case and absent some unusual showing, this inconvenience alone is of slight import." Slip op. at 30 (citing People v. Wills, 153 Ill. App. 3d 328, 337, 505 N.E.2d 754 (2nd Dist. 1987)). The Appellate Court further noted that this factor weighs in defendant's favor "only if it is shown there was a rather special situation giving rise to an inordinate amount of anxiety." Slip op. at 30 (citing People v. Jackson, 162 Ill. App. 3d 476, 481, 515 N.E.2d 390 (4th Dist. 1987)).

The People maintain that the Appellate Court properly rejected defendant's claims on this point. Obviously defendant was stressed—any incarcerated inmate would be. However, anxiety is not tantamount to prejudice, and as the Appellate Court properly noted, this record fails to reveal prejudice.

The Appellate Court also found that the delay never impaired the defense. In fact, the defense had as much of a stake in the DNA results as the prosecution. The Appellate Court, in finding that the prejudice factor did not weigh in defendant's favor, stated:

> Significantly, defendant never claims his ability to prepare and present a defense was in any way impaired by the delay. The defense was wholly or partially responsible for the delays experienced in bringing the matter to trial, and nothing in the record indicates that the delay was intentionally contrived by the prosecution for purposes of impairing the defense. Moreover, it was in the best interests of the defense to wait until the State obtained the results of its blood testing since the findings could have excluded defendant as the offender.

Slip op. at 30-31.

31

Defendant challenges this conclusion as "baseless" because "defendant would have had no such desire" to wait for the DNA results because he had already explained at the first trial how the victim's blood ended up on his clothing. (Deft. Br. at 50) However, defendant is either naïve in thinking that he did not have as much of a stake in the results of the blood test, or his argument is one of pure semantics. The defense theory was that the blood on his clothes was the result of having several fights with different people the week Millie Nielsen was beaten and brutally murdered. Accordingly, all six defense attorneys acquiesced in the delay for this very reason, because the defense theory would become stronger if the tests revealed that the blood was not the victim's. While it is true that defendant also had an alternative explanation just in case the blood was truly that of the victim's, such a fact does not negate the reality that defendant's attorneys were attempting to secure evidence which would enhance the likelihood of acquittal. The fact that defendant himself did not want to wait for the blood results indicates that he himself failed to understand its vital role in his defense and does not negate its significance.

The decision of the Appellate Court should be affirmed. The application of the specific facts of this case to the well established law demonstrates that there was no error in finding that defendant's constitutional right to a speedy trial was never jeopardized.

32

## CONCLUSION

The People of the State of Illinois respectfully request this Honorable Court reverse the Appellate Court's ruling vacating defendant's natural life sentence and affirm defendant's convictions and sentence as imposed by the Circuit Court of Cook County.


Respectfully submitted,


LISA MADIGAN,
  Attorney General
  State of Illinois
LISA HOFFMAN,
  Assistant Attorney General
  100 West Randolph Street, Suite 1200
  Chicago, Illinois 60601

Attorneys for Plaintiff-Appellant/Cross-Appellee.


RICHARD A. DEVINE,
  State's Attorney
  County of Cook
  309 Richard J. Daley Center
  Chicago, Illinois 60602
RENEE G. GOLDFARB,
CHRISTINE COOK,
WILLIAM D. CARROLL,
ALAN J. SPELLBERG,
  Assistant State's Attorneys,
      Of Counsel.

33

EXHIBIT E

No. 90865

IN THE

SUPREME COURT OF ILLINOIS

| | | |
|---|---|---|
| **PEOPLE OF THE STATE OF ILLINOIS,** | ) | Appeal from the Appellate Court of |
| | ) | Illinois, First District, No. 97-2557 |
| Plaintiff-Appellant, | ) | |
| | ) | |
| | ) | There heard on Appeal from the Circuit |
| -vs- | ) | Court of Cook County, Illinois, |
| | ) | No. 87 CR 6131. |
| | ) | |
| **HENRY KACZMAREK,** | ) | Honorable |
| | ) | John Brady, |
| Defendant-Appellee. | ) | Judge Presiding. |

## CROSS-REPLY BRIEF FOR DEFENDANT-APPELLEE

### ARGUMENT

II.    **Defendant's Constitutional Right to a Speedy Trial Was Denied Where Three and One Half Years Elapsed Between The Reversal of Defendant's Murder Conviction and His Second Trial and Where Defendant Was Not Responsible for a Bulk of the Delay.**

The State agrees that the four factors that courts should assess in determining whether a defendant has been deprived of his constitutional right to a speedy trial are: 1) length of delay; 2) reasons for the delay; 3) defendant's assertion of his right; and 4) prejudice to defendant. *Barker v. Wingo*, 407 U.S. 514, 530-532 (1972). (St. Rep. 15-16) Contrary to the State's contention, in the instant case, each of the four factors weighs in defendant's favor.

-1-

## FACTOR #1 – LENGTH OF DELAY

The State does not dispute that the length of delay was "presumptively prejudicial." (St. Rep. 16) Thus, no further comments are necessary.


## FACTOR #2 – THE REASON FOR THE DELAY

The State acknowledges that "DNA testing was the cause for the delay in bringing defendant to retrial." (St. Rep. 18) The State, however, argues that defendant "either caused or contributed to nearly all the pretrial delay" because "defense counsels needed to know the results of the DNA tests in order to prepare the defense." (St. Rep. 17-18) The State is proposing a "chicken and egg" argument. Defendant could not be prepared without the State's DNA results, however, had the State not sought DNA testing defendant would have been prepared.

The State asserts that "defense counsel specifically stated that he did not want to set a trial date until he saw that report." (St. Rep. 19) Counsel in fact indicated that since the State was doing additional testing, he had to wait for the results of the State's tests. (C. 259) Specifically, counsel stated that he had been told by the assistant state's attorney that Serologist Fish was "supposed to be doing additional test[s]. She is doing additional blood training [sic]; she didn't have a report, so I don't think it is set for trial until I get a report." (C. 259) Counsel, thus, explained that he would not be prepared for trial until he saw the State's evidence which included the serology report.

The State is essentially asking defendant to choose between two constitutional rights: defendant's constitutional right to discovery and to a speedy trial. A defendant cannot be forced to elect between his right to a speedy trial and his right to pretrial discovery. *People v. Nunnery*, 54 Ill. 2d 372, 297 N.E.2d 129 (1973). In *Nunnery*, in discussing defendant's right to a speedy

-2-

trial, this Court affirmed that a defendant is "clearly entitled to discovery." *Nunnery*, 54 Ill. 2d at 377. *Nunnery* stands for the proposition that a defendant cannot be forced to elect between his right to a speedy trial and his right to pretrial discovery. *See also People v. Moore*, 26 Ill. App. 3d 282, 325 N.E.2d 33 (4th Dist. 1975) (where court found that defendant did not occasion delay when he agreed to a date for preliminary hearing because defendant had not sought a continuance, but merely requested the hearing in which he was constitutionally entitled).

The State perpetrates the misconception that the State's DNA tests would have been "more prompt had the defense complied with the trial court's order to turn over results of the DNA tests that were requested by defendant from his first trial." (St. Rep. 18) The State claims that in August of 1995, "the prosecution finally received the missing discovery relating to defendant's DNA testing from his first trial." (St. Rep. 20) As the record bears out, the State had those reports since 1989. (S.R. III 34)[1] Conspicuously absent from the State's reply is any reference to the November 9, 1989 date. The State does not mention what it identifies as Vol. 2, S.R., containing the November, 1989 transcript, in its response.

On November 9, 1989, in response to defendant's previous request for appointment of a forensic serologist, the prosecutor admitted obtaining the results from Cellmark. (S.R. III 34-35) The prosecutor stated:

---

[1] In his brief, defendant referred to the three supplemental volumes in the same manner as in the appellate court and as indicated on the front cover of the volumes. The State reordered the designations in its brief.

| Description | Defendant's designation | State's designation |
|---|---|---|
| Numerous pre-trial dates | S.R. | Vol. 3, S.R. |
| Def.'s motion to dismiss | S.R. II | Vol. 1, S.R. |
| November 9, 1989 proceeding | S.R. III | Vol. 2, S.R. |

-3-

[PROSECUTOR]: [W]e would just ask that the record note that the defendant did have this evidence to Cell Mar [sic] for DNA testing; that initially the defendant initially refused to turn over any result to the People; that upon the court issuing an order, Cell Mar did turn over those results to us, which indicated that five bands matched but they could not be conclusive because –

[DEFENSE COUNSEL]: Object to that, your Honor. That is some testimony he is trying to present now.

[PROSECUTOR]: There is information that came to me from Cell Mar [sic] which was withheld by [defense counsel]. (S.R. III 34-35)

In accord, the common-law record from defendant's first trial contains the April, 1989 court order compelling Cellmark to turn over results to the State. (1989 Trial, S.C. 119-120)

In response to the defendant's contention that the State had the defense DNA reports since the first trial, the State concedes that there was "prior disclosure of the DNA testing at the first trial." (St. Rep. 23) The State, however, avers that "it was imperative to the scientists to see written results as opposed to verbal claims made by defense attorneys." (St. Rep. 23) The State's claim that defendant only made verbal claims and had not tendered written results is not only without support but is rebutted by the record. (S.R. III 34-35)

The State argues that "had the DNA results indicated that the blood found on defendant's clothing was not that of Millie Nielsen, an acquittal was practically guaranteed." (St. Rep. 18) Defendant, however, already knew the ABO blood tests results from the first trial. Serologist Fish testified that decedent had type "A" blood with "BA" enzymes. (1989 trial, S. R. 867-872) Fish had testified that the percentage of the population having the same blood type and enzymes as decedent was "eight in a thousand people." (1989 trial, S.R. 913) The blood-typing evidence from the first trial, without DNA testing, was already to defendant's detriment. Having more sophisticated blood examination, such as DNA testing, could not benefit defendant.

Although defendant had already offered an explanation as to how decedent's blood may

-4-

have gotten on his clothes when he picked up the blood-stained bag in the yard, the State contends that it was to defendant's advantage to wait and see what the DNA tests proved on retrial. (St. Rep. 23) The State's two-fold response is without basis. The State first asserts that although defendant provided an explanation at the first trial as to how he could have gotten decedent's blood on his clothing, defendant's explanation had no relevance to preparing for retrial because the State had to prove defendant guilty beyond a reasonable doubt. (St. Rep. 23) By claiming that "DNA evidence would go a long way in establishing that burden," the State exposes itself as the reason for the DNA testing and the true cause of the delay.

Second, the State contends that the prosecution needed the DNA evidence because the prosecution did not know whether defendant would be testifying at retrial. Whether defendant testified or not would not impact on the State's preparation or its duty to bring defendant to trial in a timely fashion. If defendant were going to testify at retrial, the State would already know the substance of defendant's testimony from the first trial and would be able to impeach him if there were any inconsistencies. If defendant did not testify, then the State's burden would be reduced as it would not have to counter defendant's explanation concerning finding the bag in the yard. In reality, the only party who would be advantaged by the DNA testing was the State.

The State cites to the fact that defendant had six attorneys while the case languished on remand. (St. Rep. 18-21) As cited in defendant's brief, a number of the attorneys would have been ready for trial, but for the State not having completed discovery with the DNA and blood splatter tests. (Def. Br. 47) Notably, the State does not address *People v. Battles*, 311 Ill. App. 3d 911, 724 N.E.2d 997 (5th Dist. 2000), where the court observed that the "actual [DNA] testing took less than 22 days." (Def. Br. 47)

In arguing that it was to defendant's advantage to wait for the State's DNA testing, the

-5-

State declares that "the instant case is strikingly similar to *Barker*." (St. Rep. 22) In fact, *Barker* highlights why there was a constitutional speedy trial violation in the instant case. In *Barker*, defendant did not want to be tried. Defendant, in *Barker*, was charged along with a co-defendant. The evidence against the co-defendant was not as strong as established by the reversals and hung juries obtained by the co-defendant. *Barker*, 407 U.S. 535. The defendant was gambling on his co-defendant's acquittal. The United States Supreme Court stated that defendant "undoubtedly thought" that if co-defendant were acquitted, "he [Barker] would never be tried." The *Barker* Court observed that defendant "definitely did not want to be tried" and that "counsel conceded as much at oral argument." *Barker*, 407 U.S. at 535. In contrast to *Barker* where defendant had a tactical reason for delaying trial, here, there was no advantage to defendant's waiting for DNA testing and blood splatter analysis by the State. (Def. Br. 46)

The State argues that of the 47 times the case was called prior to trial, "there is not one 'motion state' date in the record." (St. Rep. 21) "Motion State" is only relevant for statutory speedy trial analysis. (Def. Br. 47) Here, the entire reason the cause was delayed was due to the State's seeking additional evidence against defendant.

## FACTOR #3 – Defendant's Assertion of His Right

The State concedes that defendant had asserted his right to a speedy trial. (St. Rep. 29) The State, however argues that it is "abundantly clear that none of defendant's six attorneys were ready to proceed to trial when defendant was making those assertions." (St. Rep. 29) Relying on *People v. Mayo*, 198 Ill. 2d 530, 764 N.E.2d 525 (2002), the State asserts that "this is a crucial issue which defendant continues to ignore." (St. Rep. 29) *Mayo* is inapposite as defendant in *Mayo* alleged a statutory speedy trial violation; not a constitutional speedy trial violation.

-6-

Further, the issue in *Mayo* concerned whether defendant wished to represent himself or be represented by an attorney. Here, at differing times, both defendant *pro se*, and defense counsel, asserted defendant's right to a speedy trial. (C. 240, 265, 287; C. 199-291)

The State cites to the Appellate Court's statement that defendant was "bound" by his attorney's conduct and that defendant "never sought discharge of his attorneys to pursue his speedy-trial claims on his own." (St. Rep. 29) In fact, defendant asked the court to appoint other counsel. (C. 240, 265, 287) Although the Appellate Court determined that defendant was bound by his counsel's conduct, defendant had the constitutional right to demand a timely trial. The circuit court would not appoint other counsel and forced defendant to present his own *pro se* motions for discharge. (C. 279-281, 284-286) The trial judge never gave defendant *Faretta* admonishments in order to proceed *pro se*. Thus, short of discharging counsel altogether, defendant did all he could to assert his right to a speedy trial.

The State again relies on the tautological argument that defendant's attorneys "needed DNA analysis to be completed and the final results of experts to be rendered before they could be prepared for trial." (St. Rep. 30) Had the State not sought additional discovery which delayed defendant's trial, the "series of attorneys" would have been ready for trial. In contrast to *Barker v. Wingo* where the United States Supreme Court found that there was no assertion of the right to a speedy trial since the defendant in *Barker* was gambling on his co-defendant's acquittal, here defendant asserted his right to a speedy trial.

### FACTOR #4 – Prejudice to Defendant

In *Barker*, the Court found that the prejudice was minimal as defendant had been released on bond for the majority of the time pending trial. In contrast to *Barker*, defendant in the instant

case was incarcerated for the majority of the 3 ½ years from reversal to retrial.[2] The State cites to *People v. Wills*, 153 Ill. App. 3d 328, 505 N.E.2d 754 (2nd Dist. 1987), in an effort to downplay the prejudice by contending that anxiety is present "to some extent" in every case. (St. Rep. 31) In *Wills*, however, the court found no prejudice because defendant was "free on bond during the entire proceeding." *Wills*, 153 Ill. App. 3d at 337. Likewise, the State's reliance on *People v. Jackson*, 162 Ill. App. 3d 476, 515 N.E.2d 390 (4th Dist. 1987), and the need to show an "inordinate amount of anxiety," is misplaced. (St. Rep. 31) In *Jackson*, the court noted that "defendant's liberty was already impaired because of the separate offense for which he was incarcerated." *Jackson*, 162 Ill. App. 3d at 480.

Although the State contends that "anxiety is not tantamount to prejudice," the *Barker* Court specifically declared that prejudice should be assessed in the light of the interest of defendants which the speedy trial right was designed to protect. *Barker*, 407 U.S. at 532. Among those interests, the *Barker* Court specifically included the anxiety and concerns of the defendant. *Barker*, 407 U.S. at 532. Here, the judge explicitly noted for the record that defendant was anxious to be tried. (S.R. 68, 113, 121) Specifically, the judge stated that defendant was "anxious to go to trial" (S.R. 113); that he knew "that you're anxious to get this case off of your call. I think Mr. Kaczmarek is too" (S.R. 121); and that "Mr. Kazcmarek I think is probably [ ] anxious for trial." (S.R. 68) (*see* also defendant's motion for discharge, C. 214)

The State asserts that the delay never impaired the defense and that defendant "had as much of a stake in the DNA results as the prosecution." (St. Rep. 31) The State's position is

---

[2] Excluding the approximate two-month period, from the March 31, 1993 reversal to the June 3, 1993 denial of the State's petition for leave to appeal, 42 months remain, or approximately 3 ½ years, between reversal and the November, 1996 retrial. (*See* St. Rep. 17)

-8-

without support. Delay to obtain DNA results worked to the prosecution's advantage, not defendant's. Defendant had already explained at his first trial how he could have come to have gotten decedent's blood on his clothing by picking up a bag found in the yard and carrying it to trunk of his car. The State's response that "all six defense attorneys acquiesced in the delay because the defense theory would become stronger if the tests revealed that the blood was not the victim's" obfuscates the fact that the State needed the delay to try to accumulate additional evidence against defendant. (St. Rep. 32)

The State concedes that "defendant himself did not want to wait for the blood results," but argues that defendant merely did not "understand its vital role." (St. Rep. 32) There was no question that defendant handled the decedent's belongings. At defendant's first trial, defendant admitted to finding the bag in the yard and then selling items contained within it to Bill Brown. (1989 Trial, S.R. 1153, 1185, 1164) Defendant explained how decedent's blood could have gotten on him without his being in decedent's apartment. Contrary to the State's theory, whether the blood on defendant was the decedent's or not, an acquittal was not assured. In closing argument, counsel posited that defendant had "picked up a bag that had objects in it, all the property that was inside that bag was the property of Millie Nielsen and had been taken from her home by Ron Larry." (R. L94) Delaying the trial to obtain DNA results worked to the prosecutions's advantage, not defendant's.

In the instant case, Mr. Kaczmarek's constitutional right to a speedy trial was denied where approximately 3 ½ years elapsed between reversal of defendant's murder conviction and his second trial due to delay caused by the State. When all four *Barker* factors are weighed, it becomes apparent that defendant's constitutional right to a speedy trial was denied. This Court should reverse Henry Kaczmarek's murder conviction.

## CONCLUSION

For the foregoing reasons, Henry Kaczmarek, Defendant-Appellee, respectfully requests that this Court reverse his murder conviction and order his release.  Alternatively, defendant asks that his sentence be reduced to a sentence within the non-extended range of 20 to 40 years.

Respectfully submitted,

MICHAEL J. PELLETIER
Deputy Defender

DEBRA R. SALINGER
Assistant Appellate Defender
Office of the State Appellate Defender
203 North LaSalle Street - 24th Floor
Chicago, Illinois  60601
(312) 814-5472

COUNSEL FOR DEFENDANT-APPELLEE

-10-