CASE NO. ___07cv 626___

ATTACHMENT NO. ___2___

EXHIBIT ___F - I___

TAB (DESCRIPTION) _____



798 N.E.2d 713

Page 1

207 Ill.2d 288, 798 N.E.2d 713, 278 Ill.Dec. 329
**(Cite as: 207 Ill.2d 288, 798 N.E.2d 713)**

**H**
People v. Kaczmarek
Ill.,2003.

Supreme Court of Illinois.
The PEOPLE of the State of Illinois, Appellant and
Cross-Appellee,
v.
Henry KACZMAREK, Appellee and
Cross-Appellant.
No. 90865.

Oct. 2, 2003.

Defendant was convicted in the Circuit Court, Cook County, Michael B. Getty, J., of murder, residential burglary, home invasion, and armed robbery, and he appealed. The Appellate Court, Cerda, J., 243 Ill.App.3d 1067, 184 Ill.Dec. 661, 613 N.E.2d 1253, reversed and remanded. Prior to retrial, defendant moved to dismiss charges on speedy trial grounds. After denying defendant's motion, the Circuit Court, Cook County, John D. Brady, J., again convicted him of murder and sentenced him to natural life imprisonment, based upon finding that murder was exceptionally brutal or heinous. Defendant appealed. The Appellate Court, Cerda, J., 318 Ill.App.3d 340, 251 Ill.Dec. 953, 741 N.E.2d 1131, affirmed in part, reversed in part, and remanded. Appeal and cross-appeal were taken. The Supreme Court, Rarick, J., held that: (1) delay of more than three years between remand and retrial did not violate constitutional right to a speedy trial, and (2) violation of *Apprendi* by sentencing defendant to an enhanced term of natural life based upon judge's finding that the murder was committed in a brutal and heinous manner indicative of wanton cruelty was not plain error.

Appellate Court judgment affirmed in part and reversed in part; circuit court judgment affirmed.

Kilbride, J., specially concurred and filed opinion.
West Headnotes

**[1] Criminal Law 110 ⊄577.10(1)**

110 Criminal Law
  110XVIII Time of Trial
    110XVIII(B) Decisions Subsequent to 1966
      110k577.10 Factors Affecting Application of Requirements in General
        110k577.10(1)   k.   In   General; Balancing Test. Most Cited Cases
A court needs to consider four factors when analyzing alleged violation of constitutional right to a speedy trial: the length of the delay; the reasons for the delay; defendant's assertion of his right; and the prejudice, if any, to the defendant, and no one factor is dispositive. U.S.C.A. Const.Amend. 6; S.H.A. Const. Art. 1, § 8.

**[2] Criminal Law 110 ⊄1139**

110 Criminal Law
  110XXIV Review
    110XXIV(L) Scope of Review in General
      110k1139 k. Additional Proofs and Trial De Novo. Most Cited Cases
The ultimate determination of whether a defendant's constitutional speedy-trial right has been violated is subject to de novo review. U.S.C.A. Const.Amend. 6; S.H.A. Const. Art. 1, § 8.

**[3] Criminal Law 110 ⊄577.10(8)**

110 Criminal Law
  110XVIII Time of Trial
    110XVIII(B) Decisions Subsequent to 1966
      110k577.10 Factors Affecting Application of Requirements in General
        110k577.10(8)   k.   Delay   Caused   by Accused. Most Cited Cases

**Criminal Law 110 ⊄577.14**

110 Criminal Law
  110XVIII Time of Trial
    110XVIII(B) Decisions Subsequent to 1966

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

798 N.E.2d 713

207 Ill.2d 288, 798 N.E.2d 713, 278 Ill.Dec. 329
**(Cite as: 207 Ill.2d 288, 798 N.E.2d 713)**

110k577.14 k. Refiling Charge; Second Trial. Most Cited Cases
Delay of more than three years between remand and retrial did not violate constitutional right to a speedy trial in murder prosecution; defendant was represented by six different attorneys, no more than three months of delay could be attributed to causes independent of the actions of defendant's attorneys, defendant attempted to assert his right against the wishes of his attorneys who were not prepared or inclined to proceed, he never attempted to discharge attorneys and proceed to immediate trial, and the evidence was substantially the same in each trial with the exception of state's additional blood-splatter evidence in second trial. U.S.C.A. Const.Amend. 6; S.H.A. Const. Art. 1, § 8.

**[4] Criminal Law 110 ⟜577.16(8)**

110 Criminal Law
    110XVIII Time of Trial
        110XVIII(B) Decisions Subsequent to 1966
            110k577.16 Relief; Dismissal or Discharge
                110k577.16(5) Proceedings
                    110k577.16(8) k. Presumptions and Burden of Proof. Most Cited Cases.
A finding of presumptive prejudice from delay in speedy trial does not imply that the delay will be found to have actually prejudiced the defendant; rather, it simply marks the point at which courts deem the delay unreasonable enough to trigger the full *Barker* inquiry into the reasons for the delay, the defendant's assertion of his right, and prejudice. U.S.C.A. Const.Amend. 6; S.H.A. Const. Art. 1, § 8.

**[5] Criminal Law 110 ⟜577.10(8)**

110 Criminal Law
    110XVIII Time of Trial
        110XVIII(B) Decisions Subsequent to 1966
            110k577.10 Factors Affecting Application of Requirements in General
                110k577.10(8) k. Delay Caused by Accused. Most Cited Cases
A delay is occasioned by the defendant for speedy trial purposes when the defendant's acts caused or contributed to the delay. U.S.C.A. Const.Amend. 6; S.H.A. Const. Art. 1, § 8.

**[6] Criminal Law 110 ⟜577.10(8)**

110 Criminal Law
    110XVIII Time of Trial
        110XVIII(B) Decisions Subsequent to 1966
            110k577.10 Factors Affecting Application of Requirements in General
                110k577.10(8) k. Delay Caused by Accused. Most Cited Cases
When a defense attorney requests a continuance on behalf of a defendant, any delay caused by that continuance will obviously be attributed to the defendant for speedy trial purposes. U.S.C.A. Const.Amend. 6; S.H.A. Const. Art. 1, § 8.

**[7] Criminal Law 110 ⟜577.10(8)**

110 Criminal Law
    110XVIII Time of Trial
        110XVIII(B) Decisions Subsequent to 1966
            110k577.10 Factors Affecting Application of Requirements in General
                110k577.10(8) k. Delay Caused by Accused. Most Cited Cases
An agreement to continue the case is properly chargeable to defendant for speedy trial purposes. U.S.C.A. Const.Amend. 6; S.H.A. Const. Art. 1, § 8.

**[8] Criminal Law 110 ⟜577.10(8)**

110 Criminal Law
    110XVIII Time of Trial
        110XVIII(B) Decisions Subsequent to 1966
            110k577.10 Factors Affecting Application of Requirements in General
                110k577.10(8) k. Delay Caused by Accused. Most Cited Cases
When a defendant's attorney fails to appear in court at the appointed time, his absence causes a delay attributable to the defendant for speedy trial purposes. U.S.C.A. Const.Amend. 6; S.H.A. Const. Art. 1, § 8.

**[9] Criminal Law 110 ⟜577.10(10)**

110 Criminal Law
    110XVIII Time of Trial
        110XVIII(B) Decisions Subsequent to 1966
            110k577.10 Factors Affecting Application

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

798 N.E.2d 713

Page 3

207 Ill.2d 288, 798 N.E.2d 713, 278 Ill.Dec. 329
**(Cite as: 207 Ill.2d 288, 798 N.E.2d 713)**

of Requirements in General
110k577.10(10) k. Demand for Trial.
Most Cited Cases
With respect to the factor concerning the
defendant's assertion of his speedy-trial right, a
defendant is bound by the actions of his attorney,
unless the defendant clearly and convincingly
asserts his right to discharge his attorney. U.S.C.A.
Const.Amend. 6; S.H.A. Const. Art. 1, § 8.

**[10] Attorney and Client 45 ☞88**

45 Attorney and Client
45II Retainer and Authority
45k87 Commencement and Conduct of
Litigation
45k88 k. In General. Most Cited Cases

**Attorney and Client 45 ☞92**

45 Attorney and Client
45II Retainer and Authority
45k87 Commencement and Conduct of
Litigation
45k92 k. Conduct of Trial. Most Cited
Cases
In criminal proceedings, an attorney is authorized to
act for his client and determine for him procedural
matters and decisions involving trial strategy and
tactics; thus, the affirmative acts of a defendant's
counsel cannot be separated from the defendant's
own acts.

**[11] Criminal Law 110 ☞641.13(2.1)**

110 Criminal Law
110XX Trial
110XX(B) Course and Conduct of Trial in
General
110k641 Counsel for Accused
110k641.13 Adequacy of
Representation
110k641.13(2) Particular Cases and
Problems
110k641.13(2.1) k. In General.
Most Cited Cases
Generally, the decision to demand a speedy trial and
to seek dismissal of the state's charges on such
grounds are matters left to the sound strategic

decision of counsel. U.S.C.A. Const.Amend. 6;
S.H.A. Const. Art. 1, § 8.

**[12] Criminal Law 110 ☞577.16(4)**

110 Criminal Law
110XVIII Time of Trial
110XVIII(B) Decisions Subsequent to 1966
110k577.16 Relief; Dismissal or
Discharge
110k577.16(4) k. Prejudice or Absence
of Prejudice. Most Cited Cases
Prejudice must be assessed in the light of the
interests of defendants which the speedy-trial right
was designed to protect: (1) the prevention of
oppressive pretrial incarceration, (2) the
minimization of defendant's anxiety and concern
about the pending charge, and (3) the limitation of
the possibility that the defense will be impaired by
the delay. U.S.C.A. Const.Amend. 6; S.H.A. Const.
Art. 1, § 8.

**[13] Criminal Law 110 ☞577.10(1)**

110 Criminal Law
110XVIII Time of Trial
110XVIII(B) Decisions Subsequent to 1966
110k577.10 Factors Affecting Application
of Requirements in General
110k577.10(1) k. In General;
Balancing Test. Most Cited Cases
Inconvenience alone is of slight import to
constitutional speedy trial claim. U.S.C.A.
Const.Amend. 6; S.H.A. Const. Art. 1, § 8.

**[14] Criminal Law 110 ☞1035(1)**

110 Criminal Law
110XXIV Review
110XXIV(E) Presentation and Reservation in
Lower Court of Grounds of Review
110XXIV(E)1 In General
110k1035 Proceedings at Trial in
General
110k1035(1) k. In General. Most
Cited Cases
Violation of *Apprendi* by sentencing defendant to
an enhanced term of natural life based upon judge's
finding that the murder was committed in a brutal

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

798 N.E.2d 713

207 Ill.2d 288, 798 N.E.2d 713, 278 Ill.Dec. 329
**(Cite as: 207 Ill.2d 288, 798 N.E.2d 713)**

Page 4

and heinous manner indicative of wanton cruelty was not plain error; defendant was not prejudiced since his conduct was exceptionally brutal and heinous behavior indicative of wanton cruelty under any definition. U.S.C.A. Const.Amend. 6; S.H.A. 730 ILCS 5/5-8-1(a)(1)(b).

**[15] Homicide 203 ☞1572**

203 Homicide
   203XIV Sentence and Punishment
      203k1570 Life Sentence
         203k1572 k. Murder. Most Cited Cases

**Sentencing and Punishment 350H ☞82**

350H Sentencing and Punishment
   350HI Punishment in General
      350HI(D) Factors Related to Offense
         350Hk82 k. Brutality or Cruelty in Commission of Offense. Most Cited Cases
Murder of 86-year-old woman during robbery was committed in a brutal and heinous manner indicative of wanton cruelty and justified enhanced prison term of natural life; the victim suffered multiple abrasions, bruises, and cuts on upper body, including head, chest, and arms, stab wounds to leg and forearm, injuries from manual strangulation, including hemorrhages of the larynx, tongue, and esophagus, and numerous blunt trauma injuries, including hemorrhaging of the membrane of the brain and a fractured larynx. S.H.A. 730 ILCS 5/5-8-1(a)(1)(b).

**[16] Homicide 203 ☞1572**

203 Homicide
   203XIV Sentence and Punishment
      203k1570 Life Sentence
         203k1572 k. Murder. Most Cited Cases

**Sentencing and Punishment 350H ☞82**

350H Sentencing and Punishment
   350HI Punishment in General
      350HI(D) Factors Related to Offense
         350Hk82 k. Brutality or Cruelty in Commission of Offense. Most Cited Cases
"Heinous behavior" supporting enhanced prison

term of natural life for murder is behavior that is hatefully or shockingly evil, grossly bad, or enormously and flagrantly criminal. S.H.A. 730 ILCS 5/5-8-1(a)(1)(b).

**[17] Homicide 203 ☞1572**

203 Homicide
   203XIV Sentence and Punishment
      203k1570 Life Sentence
         203k1572 k. Murder. Most Cited Cases

**Sentencing and Punishment 350H ☞82**

350H Sentencing and Punishment
   350HI Punishment in General
      350HI(D) Factors Related to Offense
         350Hk82 k. Brutality or Cruelty in Commission of Offense. Most Cited Cases
"Brutal behavior" supporting enhanced prison term of natural life for murder is behavior that is grossly ruthless, devoid of mercy or compassion, or cruel and cold-blooded. S.H.A. 730 ILCS 5/5-8-1(a)(1)(b).

**[18] Homicide 203 ☞1572**

203 Homicide
   203XIV Sentence and Punishment
      203k1570 Life Sentence
         203k1572 k. Murder. Most Cited Cases

**Sentencing and Punishment 350H ☞82**

350H Sentencing and Punishment
   350HI Punishment in General
      350HI(D) Factors Related to Offense
         350Hk82 k. Brutality or Cruelty in Commission of Offense. Most Cited Cases
"Wanton cruelty" supporting enhanced prison term of natural life for murder requires proof that the defendant consciously sought to inflict pain and suffering on the victim of the offense. S.H.A. 730 ILCS 5/5-8-1(a)(1)(b).

**\*\*715** James E. Ryan and Lisa Madigan, Attorneys General, Springfield, and Richard A. Devine, State's Attorney, Chicago (William L. Browers and Lisa

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

798 N.E.2d 713

207 Ill.2d 288, 798 N.E.2d 713, 278 Ill.Dec. 329
**(Cite as: 207 Ill.2d 288, 798 N.E.2d 713)**

Hoffman, Assistant Attorneys General, Chicago, and Rence G. Goldfarb, William D. Carroll, Alan J. Spellberg and Christine Cook, Assistant State's Attorneys, of counsel), for the People.

Michael J. Pelletier, Deputy Defender, and Debra R. Salinger, Assistant Appellate Defender, of the Office of the State Appellate Defender, Chicago, for appellee.

Justice RARICK delivered the opinion of the court:

*289 Following a jury trial in the circuit court of Cook County, defendant, **HenryKaczmarek**, was convicted of murder, residential burglary, home invasion, and armed robbery. Defendant was sentenced to a term of natural *290 life imprisonment on the murder conviction, but no sentences were imposed on the other convictions. Defendant appealed. On March 31, 1993, the appellate court filed an opinion in which it declined to review defendant's convictions for residential burglary, home invasion, and armed robbery, due to lack of finality, but reversed the murder conviction and remanded for a new trial. *People v. Kaczmarek* , 243 Ill.App.3d 1067, 184 Ill.Dec. 661, 613 N.E.2d 1253 (1993). We denied leave to appeal. *People v. Kaczmarek*, 151 Ill.2d 571, 186 Ill.Dec. 389, 616 N.E.2d 342 (1993).

Prior to the commencement of his second trial in November of 1996, defendant unsuccessfully moved to dismiss the State's charges on the grounds that his constitutional and statutory rights to a speedy trial had been violated. Following a retrial by jury, defendant was again found guilty of murder, and, based upon a trial court finding that the victim's murder was exceptionally brutal and heinous, defendant**716 again received an enhanced term of natural life in prison pursuant to section 5-8-1(a)(1)(b) of the Unified Code of Corrections (Unified Code) (Ill.Rev.Stat.1985, ch. 38, par. 1005-8-1(a)(1)(b)).

Defendant appealed, arguing, *inter alia,* that he had been denied his constitutional right to a speedy trial, and challenging the validity of his life sentence, claiming the penalty enhancement scheme provided by section 5-8-1(a)(1)(b) of the Unified Code is constitutionally infirm in light of the United States Supreme Court's decision in *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d

435 (2000). The appellate court rejected defendant's speedy-trial claim, but vacated defendant's life sentence and remanded for resentencing, concluding that "the penalty scheme set forth in section 5-8-1(a)(1)(b) of the Corrections Code offends the constitutional principles announced in *Apprendi*." 318 Ill.App.3d 340, 341-42, 251 Ill.Dec. 953, 741 N.E.2d 1131. We allowed the State's petition for leave to appeal (177 Ill.2d R. 315).

*291 The State argues that the defendant's sentence does not violate principles of *Apprendi* or, in the alternative, a violation of *Apprendi* does not warrant resentencing given the reasoning of this court's recent opinions in *People v. Thurow*, 203 Ill.2d 352, 272 Ill.Dec. 185, 786 N.E.2d 1019 (2003) (applying harmless error analysis to *Apprendi* violations), and *People v. Crespo*, 203 Ill.2d 335, 273 Ill.Dec. 241, 788 N.E.2d 1117 (2001) (applying plain error analysis). By way of cross-appeal, the defendant reiterates his appellate contention that his constitutional right to a speedy trial has been violated. For the reasons that follow, we affirm in part and reverse in part.

A comprehensive and detailed recitation of the procedural history of this case and the evidence adduced at defendant's trial and sentencing hearing is not necessary for our analysis. The pertinent facts are those which bear upon the parties' speedy-trial and sentencing issues. Hence, we will at this juncture summarize the relevant evidence presented at defendant's retrial, in order to provide a general overview, and more fully treat facts specifically relating to the speedy-trial and sentencing issues in our discussion of those issues.

Defendant was tried for the murder of 86-year-old Millie Nielsen. The evidence indicated that defendant broke into Nielsen's apartment where he stabbed, beat, and strangled her in the course of an attack that apparently started in Nielsen's kitchen and concluded in her bedroom. Defendant took items of minimal value from Nielsen's residence and was later apprehended in possession of some of her bloodstained personal belongings. When he was arrested, officers observed bloodstains on the quilted shirt defendant was wearing, and

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

798 N.E.2d 713                                                                Page 6

207 Ill.2d 288, 798 N.E.2d 713, 278 Ill.Dec. 329
**(Cite as: 207 Ill.2d 288, 798 N.E.2d 713)**

bloodstained jeans were recovered from the trunk of his car. A witness testified that he had seen defendant in the backyard of Nielsen's apartment building on the night of the murder. The witness saw defendant carry a bag through the backyard, place it in the trunk of his car, and drive away.

*292 Dr. Michael Chambliss performed the medical examination of Nielsen's body and testified to her extensive injuries. Dr. Chambliss concluded that Nielsen died as a result of manual strangulation with the contributing factors of blunt force injuries and stab wounds. Dr. Chambliss stated that Nielsen could have died from the blunt force injuries alone.

Pamela Fish, an expert in electrophoresis, serology, and DNA analysis, testified to the results of her 1987 examination of the physical evidence. At that time, she determined the blood found on defendant's jacket and jeans was consistent with Nielsen's blood type and could not have come from defendant. Fish determined that the **717 substance on other evidentiary items was human blood, but due to the small quantity provided, she was unable to identify a particular blood type. Prior to defendant's second trial, Fish attempted to perform DNA testing on blood samples collected in this case; however, their small size and degraded condition made testing ineffective.

Rod Englert, an expert in crime scene reconstruction and blood splatter, examined the physical evidence and photographs in the case. Englert stated that the blood on Nielsen's kitchen floor appeared smeared, indicative of a struggle in which someone bled. Englert noted that the blood on the kitchen wall immediately outside the bedroom represented classic medium velocity splatter, suggestive of blunt force being inflicted upon the victim. Given the low angle of projection, Englert believed that Nielsen had received numerous blows while on the kitchen floor. Englert concluded that the blood on the knees of defendant's jeans, and the back of his shirtsleeves, represented transfer stains-blood swiped against something or someone. The blood on the front of defendant's shirtsleeves represented medium velocity splatter. The blood at the bottom

of defendant's jeans was also consistent with medium velocity splatter. Englert*293 testified that these stains were not consistent with defendant having picked up a bag with blood on it or with such a bag having been placed on top of clothing. Englert further stated the stains were not consistent with defendant having kneed another person in the nose.

Defendant testified, offering an explanation for the blood on his clothes and his possession of Nielsen's belongings. Defendant claimed he had been involved in three fights prior to the night of Nielsen's murder, and he intimated that the blood on his clothing had been deposited there during one or more of those altercations. Defendant claimed two of the fights were with his friends, Tom Szeszol and Bill Henderson, while a third fight involved an unidentified man who was attempting to break into defendant's car. In the latter fight, defendant stated, he hit the man three or four times in the face and kneed him in the nose. According to defendant, everyone involved in the fights bled.

As for his possession of Nielsen's bloodstained property, defendant stated he had noticed a bag on the side of Nielsen's apartment building. He looked inside the bag and discovered therein a box of silverware. He picked up the bag, carried it to his car, and placed it in the trunk. Later that morning, defendant decided to look into the bag and removed the bag's contents, some or which were bloody. Defendant kept some items and disposed of others, including a bloody pillowcase, in a Dumpster. Defendant sold some of the items for $60.

Given this evidence, the jury found that defendant had committed the murder of Millie Nielsen. We turn our attention to a discussion of the law governing the constitutional right to speedy trial, followed by a recitation of the circumstances preceding defendant's retrial and the facts pertinent to defendant's speedy-trial issue.

### SPEEDY TRIAL

Both the United States Constitution and the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

798 N.E.2d 713 Page 7

207 Ill.2d 288, 798 N.E.2d 713, 278 Ill.Dec. 329
**(Cite as: 207 Ill.2d 288, 798 N.E.2d 713)**

Constitution*294 of Illinois guarantee an accused the right to a speedy trial. U.S. Const., amend. VI; Ill. Const.1970, art. I, § 8. In *Barker v. Wingo,* 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972), the United States Supreme Court addressed the nature of the constitutional right to a speedy trial and recognized the need to set out "criteria by which [a constitutional] speedy trial right is to be judged." **\*718***Barker,* 407 U.S. at 516, 92 S.Ct. at 2185, 33 L.Ed. 2d at 109. This court has acknowledged the competing interests recognized in *Barker's* discussion of the constitutional right to speedy trial, and we consider in our own analysis the "four factors" identified in that case " together with such other circumstances as may be relevant." *Barker,* 407 U.S. at 533, 92 S.Ct. at 2193, 33 L.Ed.2d at 118; *People v. Crane,* 195 Ill.2d 42, 46-48, 252 Ill.Dec. 687, 743 N.E.2d 555 (2001).

As we observed in *Crane:*
"[T]he right to a speedy trial is 'a more vague concept than other procedural rules,' which makes it 'impossible to determine with precision when the right has been denied.' *Barker,* 407 U.S. at 521, 92 S.Ct. at 2187, 33 L.Ed.2d at 112. Instead, determining whether an accused's constitutional right to a speedy trial has been violated ' necessitates a functional analysis of the right in the particular context of the case.' *Barker,* 407 U.S. at 522, 92 S.Ct. at 2188, 33 L.Ed.2d at 112. Because of the seriousness of the remedy-'a defendant who may be guilty of a serious crime will go free, without having been tried'-the right to a speedy trial should always be in balance, and not inconsistent, with the rights of public justice. *Barker,* 407 U.S. at 522, 92 S.Ct. at 2188, 33 L.Ed.2d at 112." *Crane,* 195 Ill.2d at 47, 252 Ill.Dec. 687, 743 N.E.2d 555.

[1][2][3] In order to strike a proper analytical balance between society's interests and those of an accused, the Supreme Court in *Barker* identified four factors to be considered: the length of the delay; the reasons for the delay; defendant's assertion of his right; and the prejudice, if any, to the defendant. *\*295Barker,* 407 U.S. at 530, 92 S.Ct. at 2192, 33 L.Ed.2d at 116-17. No one factor is dispositive. *Barker,* 407 U.S. at 530-33,

92 S.Ct. at 2192-93, 33 L.Ed.2d at 116-19; *Crane,* 195 Ill.2d at 52, 252 Ill.Dec. 687, 743 N.E.2d 555. The ultimate determination of whether a defendant's constitutional speedy-trial right has been violated is subject to *de novo* review. *Crane,* 195 Ill.2d at 52, 252 Ill.Dec. 687, 743 N.E.2d 555. Applying the *Barker* factors to the facts of this case, it is clear that defendant's constitutional right to a speedy trial has not been violated.

On March 31, 1993, the appellate court filed an opinion in which it reversed the defendant's murder conviction and remanded for a new trial. The appellate court's mandate was filed in the circuit court on July 19, 1993. Defendant's retrial commenced on November 18, 1996.

[4] When assessing a constitutional speedy-trial claim, the first consideration is the length of the delay. In general, courts have recognized a delay approaching one year to be "presumptively prejudicial." *Barker,* 407 U.S. at 530-31, 93 S.Ct. at 2192, 33 L.Ed.2d at 117; *Crane,* 195 Ill.2d at 52-53, 252 Ill.Dec. 687, 743 N.E.2d 555. Obviously, the delay in this case qualifies as presumptively prejudicial. A finding of " presumptive prejudice," however, does not imply that the delay will be found to have actually prejudiced the defendant. Rather, it simply marks the point at which courts deem the delay unreasonable enough to trigger the full *Barker* inquiry. *Doggett v. United States,* 505 U.S. 647, 656, 112 S.Ct. 2686, 2693, 120 L.Ed.2d 520, 531 (1992); *Crane,* 195 Ill.2d at 53, 252 Ill.Dec. 687, 743 N.E.2d 555. Therefore, we next address the second *Barker* factor, the reason for the delay.

During the period beginning on May 28, 1993, and ending November 18, 1996, the common law record evinces 39 continuances by agreement of the parties, 3 by order of the court, and 3 granted on motion of defendant. The case was continued four times because defense counsel failed to appear. During this period of \*296 time, **\*719 defendant was represented by six different attorneys-three with the Cook County public defender's office and three private attorneys-all of whom required time to familiarize themselves with, what one described as, "two to three feet" of discovery and the voluminous

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

207 Ill.2d 288, 798 N.E.2d 713, 278 Ill.Dec. 329
**(Cite as: 207 Ill.2d 288, 798 N.E.2d 713)**

record after they assumed responsibility for defendant's representation. Although the common law record is not a model of clarity, we have considered it, together with the transcripts contained in the record on appeal, so that we may do justice to both the State and the defendant. See *People v. Mayo,* 198 Ill.2d 530, 536, 261 Ill.Dec. 910, 764 N.E.2d 525 (2002). It would needlessly lengthen this opinion if we were to *specifically* address the circumstances of each continuance in this case; however, we *have* reviewed individually the circumstances of each delay, and we conclude that no more than three months of delay can be attributed to causes independent of the actions of defendant's attorneys.

[5][6][7][8] A delay is considered to have been occasioned by the defendant when the defendant's acts caused or contributed to the delay. *Mayo,* 198 Ill.2d at 537, 261 Ill.Dec. 910, 764 N.E.2d 525. When a defense attorney requests a continuance on behalf of a defendant, any delay caused by that continuance will obviously be attributed to the defendant. *Mayo,* 198 Ill.2d at 537, 261 Ill.Dec. 910, 764 N.E.2d 525. Moreover, an agreement to continue the case is properly chargeable to defendant. *People v. Kliner,* 185 Ill.2d 81, 115, 121, 235 Ill.Dec. 667, 705 N.E.2d 850 (1998); see *People v. Plair,* 292 Ill.App.3d 396, 398, 400, 226 Ill.Dec. 679, 686 N.E.2d 28 (1997). Further, when a defendant's attorney fails to appear in court at the appointed time, his absence causes a delay attributable to the defendant. *Kliner,* 185 Ill.2d at 117, 235 Ill.Dec. 667, 705 N.E.2d 850. Applying the foregoing principles to the facts of this case, we find that the defendant caused or contributed to nearly all the pretrial delay at issue.

Defendant's suggestion that the lengthy delay between remand and retrial was the result of the State's failure to timely disclose material in discovery is belied *297 by those transcripts that have been made a part of the record on appeal which reveal no pertinent objections or complaints by defendant's attorneys with respect to the State's disclosure of materials. This observation also applies to defendant's contention that the protracted delay resulted solely from the State's efforts to obtain additional testing of bloodstained evidentiary

items. Until defendant's final attorney filed a motion for discharge on speedy-trial grounds just before trial, defendant's preceding attorneys seemed perfectly content to continue the case by agreement or on defense motion, either because they were unprepared to proceed, or because they wanted to see if blood testing would corroborate defendant's testimony from his first trial, which suggested that the blood on his clothing had come from a source other than Nielsen. While it is true that the State used the period between remand and retrial to pursue further testing, defendant cannot escape the consequences of his attorneys' conduct which caused or contributed to most of the delay.

[9][10] With respect to the third *Barker* factor, the defendant's assertion of his speedy-trial right, we note that a defendant is bound by the actions of his attorney, unless the defendant clearly and convincingly asserts his right to discharge his attorney. *Mayo,* 198 Ill.2d at 537, 261 Ill.Dec. 910, 764 N.E.2d 525; *Kliner,* 185 Ill.2d at 118, 235 Ill.Dec. 667, 705 N.E.2d 850. As this court observed in *People v. Bowman,* 138 Ill.2d 131, 141, 149 Ill.Dec. 263, 561 N.E.2d 633 (1990): "In criminal **720 proceedings, an attorney is authorized to act for his client and determine for him procedural matters and decisions involving trial strategy and tactics. [Citations.] Thus, the affirmative acts of a defendant's counsel cannot be separated from the defendant's own acts." Defendant in this case was at all pertinent times represented by counsel.

[11] Defendant at various times attempted to assert his right to a speedy trial; however, until shortly before *298 retrial, he did so against the wishes of his attorneys, who were not prepared or inclined to proceed. Generally, the decision to demand a speedy trial and to seek dismissal of the State's charges on such grounds are matters left to the sound strategic decision of counsel. See *People v. Ramey,* 151 Ill.2d 498, 523-24, 177 Ill.Dec. 449, 603 N.E.2d 519 (1992). As this court observed in *Bowman,* "[d]efendant cannot contend that it was unfair to force him to choose between a speedy trial and effective assistance of counsel. Defendant may have a right, even of constitutional dimensions, to pursue whichever course he chooses, but the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

798 N.E.2d 713                                                                                            Page 9

207 Ill.2d 288, 798 N.E.2d 713, 278 Ill.Dec. 329
**(Cite as: 207 Ill.2d 288, 798 N.E.2d 713)**

Constitution does not forbid requiring him to choose nonetheless." *Bowman,* 138 Ill.2d at 148, 149 Ill.Dec. 263, 561 N.E.2d 633. Defendant made his choice in this matter.

Defendant first "asserted" his right to a speedy trial on July 21, 1993, when appointed counsel informed the court that defendant, "on his own motion," was demanding a speedy trial. Counsel told the court, " I certainly would not be ready at this point professionally." The court warned the defendant of the dangers of proceeding with an attorney who was not prepared. Defendant responded, "I'll wait." He explicitly agreed to a continuance.

On October 12, 1994, defendant made an oral, *pro se* motion for discharge on statutory speedy-trial grounds. The circuit court advised defendant to put his motion in writing. Defendant subsequently filed a written, *pro se* motion on November 18, 1994, claiming a violation of "the speedy trial act." Defendant, acting in a *pro se* capacity, announced he was ready for trial on that date. He was given the opportunity to argue his *pro se* motion, but admitted he was not ready to do so and requested a continuance. The court denied defendant's request for a "bar association lawyer." Defendant did not ask to discharge appointed counsel and proceed *pro se.*

Hearing on defendant's *pro se* motion was later \*299 continued again because defendant was not prepared to proceed. We find nothing in the record which would indicate that defendant's motion was ever argued or that the court rendered a ruling thereon. The same is true with respect to a second *pro se* motion for appointment of a "bar association attorney." Defendant never attempted to assert his right to discharge his attorney and proceed to an immediate trial. The record unequivocally shows that defendant wanted the assistance of counsel in preparing his defense for trial. Thus, defendant is bound by the actions of his attorneys. See *Mayo,* 198 Ill.2d at 537, 261 Ill.Dec. 910, 764 N.E.2d 525.

[12] The fourth and final consideration in the *Barker* analysis is prejudice to the defendant. Prejudice must be assessed in the light of the interests of defendants which the speedy-trial right was designed to protect. *Barker,* 407 U.S. at 532, 92 S.Ct. at 2193, 33 L.Ed.2d at 118. Those interests are (1) the prevention of oppressive pretrial incarceration, (2) the minimization of defendant's anxiety and concern about the pending charge, and (3) the limitation of the possibility that the defense will be impaired by the delay. \*\*721*Barker,* 407 U.S. at 532, 92 S.Ct. at 2193, 33 L.Ed.2d at 118; *Crane,* 195 Ill.2d at 59, 252 Ill.Dec. 687, 743 N.E.2d 555. The third factor has been recognized by the Supreme Court as the most serious " ' because the inability of a defendant adequately to prepare his case skews the fairness of the entire system.' " *Doggett,* 505 U.S. at 654, 112 S.Ct. at 2692, 120 L.Ed.2d at 530, quoting *Barker,* 407 U.S. at 532, 92 S.Ct. at 2193, 33 L.Ed.2d at 118.

In this case, defendant has not specified how his ability to prepare his defense was impaired or adversely affected by the delay in retrying the murder charge. If witnesses die or disappear during a delay, prejudice is obvious. Clearly, there is also prejudice if defense witnesses are unable to recall accurately events of the distant past. See \*300*Barker,* 407 U.S. at 532, 92 S.Ct. at 2193, 33 L.Ed.2d at 118. We see no evidence of such prejudice in this case. With the exception of additional blood-splatter evidence in defendant's second trial, the evidence adduced by both sides at defendant's second trial was substantially the same as the evidence properly presented at his first trial. The State's use of blood-splatter evidence at the second trial does not qualify as *impairment* of defendant's ability to present *his* defense.

[13] Defendant also claims that he experienced anxiety while awaiting retrial. We note that this factor is present to some extent in every case and absent some unusual showing, this inconvenience alone is of slight import. *People v. Wills,* 153 Ill.App.3d 328, 337, 106 Ill.Dec. 207, 505 N.E.2d 754 (1987); 2 W. LaFave & J. Israel, Criminal Procedure § 18.2, at 410 (1984). No doubt much of the anxiety defendant experienced was the result of having been already once tried by a jury, having been found guilty of Nielsen's murder, and having been sentenced to a term of natural life imprisonment. We are of the opinion that the weight to be accorded the first two components of

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

798 N.E.2d 713

Page 10

207 Ill.2d 288, 798 N.E.2d 713, 278 Ill.Dec. 329
**(Cite as: 207 Ill.2d 288, 798 N.E.2d 713)**

the fourth *Barker* factor is minimal under the circumstances of this case.

The balancing that we are required to perform must take into account the rights of the defendant, but does not preclude the rights of public justice. *Crane,* 195 Ill.2d at 62, 252 Ill.Dec. 687, 743 N.E.2d 555. Although the delay between remand and retrial was indeed lengthy, and the State admittedly used that time to its advantage, the defendant cannot escape responsibility for causing or contributing to most of the delay. Considering that fact, together with lack of any showing that the delay impaired the presentation of a defense, we conclude that defendant's constitutional right to a speedy trial was not violated. We therefore affirm the judgment of the appellate court in this respect.

### *APPRENDI* ISSUE

The State's *Apprendi* argument in this case has changed with our evolving *Apprendi* jurisprudence. The *301 State's original brief was filed prior to our decisions in *People v. Swift,* 202 Ill.2d 378, 269 Ill.Dec. 495, 781 N.E.2d 292 (2002), *People v. Thurow,* 203 Ill.2d 352, 272 Ill.Dec. 185, 786 N.E.2d 1019 (2003), and *People v. Crespo,* 203 Ill.2d 335, 273 Ill.Dec. 241, 788 N.E.2d 1117 (2001).

Relying upon our decisions in *People v. Ford,* 198 Ill.2d 68, 260 Ill.Dec. 552, 761 N.E.2d 735 (2001), and *People v. Hopkins,* 201 Ill.2d 26, 40, 265 Ill.Dec. 869, 773 N.E.2d 633 (2002) ("when any statutory enhancing aggravating factor is proved to exist beyond a reasonable doubt, * * * the original sentencing range increases according to the statutory scheme"), the State initially argues that the jury's findings of guilt on charges of residential burglary, home invasion, and armed robbery at defendant's first trial were sufficient to expand the sentencing range in this case and **722 thus satisfy the requirements of *Apprendi* as interpreted by this court in *Ford* and *Hopkins.* The State reasons that the first jury's findings were the equivalent of finding that defendant committed the murder in the course of another felony, an aggravating factor that would have made the defendant eligible for the

death penalty. See Ill.Rev.Stat.1985, ch. 38, par. 9-1(b)(6). Pursuant to this court's decisions in *Ford* and *Hopkins,* a sentence of natural life would thus have been within the allowable sentencing range, and a finding that defendant had engaged in brutal and heinous behavior indicative of wanton cruelty could have been used to set the specific sentence within the allowable range. Alternatively, in its original brief, citing, *inter alia, Neder v. United States,* 527 U.S. 1, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999), the State argued that any *Apprendi* error in this case could be considered harmless because "the record clearly reflects that defendant murdered 86-year-old Millie Nielsen 'in a brutal or heinous fashion indicative of wanton cruelty' when he repeatedly beat, stabbed and strangled her after breaking into her apartment."

In its reply brief, the State acknowledged this court's holding in *Swift*-defendant's 80-year sentence violated *302 *Apprendi* because it was based on the *trial judge's* factual finding that the behavior was exceptionally brutal or heinous-but bolstered its position by reference to this court's decision in *Thurow,* wherein this court, for the first time, held that an *Apprendi* error could be deemed harmless. See *Thurow,* 203 Ill.2d at 369-71, 272 Ill.Dec. 185, 786 N.E.2d 1019. The State later obtained leave to cite this court's decision in *Crespo* as additional authority. In *Crespo,* this court held that the virtually identical *Apprendi* error, that had warranted reversal in *Swift,* was not plain error that would warrant reversal. The court reasoned:
"On the basis of this overwhelming evidence that the crime was brutal and heinous, there is no basis for concluding that the *Apprendi* violation ' seriously affected the fairness, integrity or public reputation of judicial proceedings.' We have no doubt that a jury, presented with these facts, would have found that the crime was committed in a brutal and heinous manner, indicative of wanton cruelty. Accordingly, defendant has failed to show that the error was prejudicial." *Crespo,* 203 Ill.2d at 348-49, 273 Ill.Dec. 241, 788 N.E.2d 1117.

[14][15] Clearly, after *Swift* there can be no doubt that the sentencing judge in this case violated principles of *Apprendi* when he sentenced

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Washington
v.
McvInco

207 Ill.2d 288, 798 N.E.2d 713, 278 Ill.Dec. 329
**(Cite as: 207 Ill.2d 288, 798 N.E.2d 713)**

defendant to an enhanced term of natural life based upon *his* finding that the murder was committed in a brutal and heinous manner indicative of wanton cruelty. However, it is equally clear, after *Thurow* and *Crespo,* that an *Apprendi* violation of this kind will not warrant resentencing where there is overwhelming evidence that the crime was committed in a brutal and heinous manner indicative of wanton cruelty. The conduct of the defendant in this instance qualifies as exceptionally brutal and heinous behavior indicative of wanton cruelty under *any* definition. Thus, defendant-who failed to object at trial-cannot demonstrate prejudice for purposes of plain error analysis.

The medical examination of Nielsen's body by Dr. Chambliss revealed extensive external and internal injuries. In the course of his external examination, Chambliss*303 found multiple abrasions, bruises and incises about Nielsen's upper body, including her head, chest and arms. Stab wounds were also found on her left thigh, the left part of her groin, and right forearm. Two additional incise wounds were noted on her left leg. An internal exam **723 revealed injuries indicative of manual strangulation, including hemorrhages of the larynx, tongue and esophagus, as well as numerous blunt trauma injuries, including hemorrhaging of the membrane of the brain and a fractured larynx. Although Chambliss concluded that Nielsen died as a result of manual strangulation, with contributing factors of blunt force injuries and stab wounds, he believed the blunt force injuries were so severe that she could have died from them alone. From Chambliss' testimony, it is clear that Nielsen's body was literally covered with bruises. Physical evidence in this case suggests an intense and prolonged struggle that began in Nielsen's kitchen and ended in her bedroom.

[16][17][18] This court defines "heinous" behavior as behavior that is hatefully or shockingly evil; grossly bad; enormously and flagrantly criminal. *People v. Nielson,* 187 Ill.2d 271, 299, 240 Ill.Dec. 650, 718 N.E.2d 131 (1999); *People v. Lucas,* 132 Ill.2d 399, 445, 139 Ill.Dec. 447, 548 N.E.2d 1003 (1989); *People v. La Pointe,* 88 Ill.2d 482, 501, 59 Ill.Dec. 59, 431 N.E.2d 344 (1981). "Brutal" behavior is behavior that is grossly ruthless, devoid

of mercy or compassion; cruel and cold-blooded. *Nielson,* 187 Ill.2d at 299, 240 Ill.Dec. 650, 718 N.E.2d 131; *Lucas,* 132 Ill.2d at 445, 139 Ill.Dec. 447, 548 N.E.2d 1003; *La Pointe,* 88 Ill.2d at 501, 59 Ill.Dec. 59, 431 N.E.2d 344. Finally, "wanton cruelty" requires proof that the defendant consciously sought to inflict pain and suffering on the victim of the offense. *Nielson,* 187 Ill.2d at 299, 240 Ill.Dec. 650, 718 N.E.2d 131; *People v. Pastewski,* 164 Ill.2d 189, 194, 207 Ill.Dec. 316, 647 N.E.2d 278 (1995).

The senseless, vicious murder of this elderly woman, effected by means of beating, stabbing and strangling, in order to perpetrate a robbery that could have been easily accomplished without killing her, undoubtedly qualifies as exceptionally brutal and heinous behavior. The manner*304 of the murder clearly indicates that the defendant consciously inflicted unnecessary mental and physical suffering on his victim, indicative of wanton cruelty. We have no doubt that a jury, presented with these facts, would have found that the crime was committed in a brutal and heinous manner, indicative of wanton cruelty. Accordingly, we find that the failure to comply with the dictates of *Apprendi* does not require resentencing. In this respect, the judgment of the appellate court is reversed, the remainder of the appellate court's judgment is affirmed, and the judgment of the circuit court is affirmed.

*Appellate court judgment affirmed in part and reversed in part; circuit court judgment affirmed.*
Justice KILBRIDE, specially concurring:
Today's decision follows *People v. Swift,* 202 Ill.2d 378, 269 Ill.Dec. 495, 781 N.E.2d 292 (2002), *People v. Thurow,* 203 Ill.2d 352, 272 Ill.Dec. 185, 786 N.E.2d 1019 (2003), and *People v. Crespo,* 203 Ill.2d 335, 273 Ill.Dec. 241, 788 N.E.2d 1117 (2001). I dissented from the majority in *Thurow* and *Crespo* because I believed, and continue to believe, that an *Apprendi* violation can never be subject to a harmless error review. Nonetheless, having voiced my disagreement previously, I reluctantly concur in today's opinion only because the doctrine of *stare decisis* requires that we adhere to established precedent, even if certain members of the court disagree. *People v. Mitchell,* 189 Ill.2d

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

798 N.E.2d 713          Page 12

207 Ill.2d 288, 798 N.E.2d 713, 278 Ill.Dec. 329
**(Cite as: 207 Ill.2d 288, 798 N.E.2d 713)**

312, 338, 245 Ill.Dec. 1, 727 N.E.2d 254 (2000).

Ill.,2003.
People v. Kaczmarek
207 Ill.2d 288, 798 N.E.2d 713, 278 Ill.Dec. 329

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

124 S.Ct. 1459                                                      Page 1

540 U.S. 1199, 124 S.Ct. 1459, 158 L.Ed.2d 115, 72 USLW 3537
**(Cite as: 540 U.S. 1199, 124 S.Ct. 1459)**

**H**
Kaczmarek v. Illinois
U.S.,2004

> Supreme Court of the United States
> **HenryKACZMAREK**, petitioner,
> v.
> ILLINOIS.
> **No. 03-8091.**

Feb. 23, 2004.

Case below, 207 Ill.2d 288, 278 Ill.Dec. 329, 798
N.E.2d 713.

Petition for writ of certiorari to the Supreme Court
of Illinois denied.

U.S.,2004
Kaczmarek v. Illinois
540 U.S. 1199, 124 S.Ct. 1459, 158 L.Ed.2d 115,
72 USLW 3537

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

No. 1-04-2401

IN THE

APPELLATE COURT OF ILLINOIS

FIRST JUDICIAL DISTRICT

RECEIVED
CRIMINAL APPEALS

OCT 2 0 2005

309 RICHARD J. DALEY CENTER
RICHARD A. DEVINE
STATE'S ATTORNEY'S OFFICE

PEOPLE OF THE STATE OF ILLINOIS,

       Respondent-Appellee,

-vs-

HENRY KACZMAREK,

       Petitioner-Appellant.

---

Appeal from the Circuit Court of Cook County, Illinois
Criminal Division
The Honorable Lon William Shultz, Judge Presiding.

---

**PRO SE SUPPLEMENTAL BRIEF AND ARGUMENT FOR DEFENDANT-APPELLANT**

---

**ORAL ARGUMENT REQUESTED**

EXHIBIT H

No. 1-04-2401

IN THE

APPELLATE COURT OF ILLINOIS

FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the Circuit Court of Cook County |
| Respondent-Appellee, | ) | |
| -vs- | ) | No. 87 CR 6131 |
| HENRY KACZMAREK, | ) | Honorable Lon William Shultz, |
| Petitioner-Appellant. | ) | Presiding Judge. |

## PRO SE SUPPLEMENTAL BRIEF AND ARGUMENT FOR DEFENDANT-APPELLANT

### POINTS AND AUTHORITIES

#### I.

THE STATES ATTORNEY OFFICE/AND OR ONE OF THEIR AGENTS COMMITTED PROSECUTORIAL MISCONDUCT BY WILLINGFULLY WITHHOLDING KEY EXCULPATORY EVIDENCE IN VIOLATION OF SUPREME COURT RULES 412 (c) IN DOING SO DENYING DEFENDANT HIS BASIC CONSTITUTIONAL GUARANTEES UNDER DUE PROCESS AND FUNDAMENTAL FAIRNESS OF LAW

**Brady v. Maryland**, 373 U.S. 83 (1963)............................ p.3, 4

**Kyles v. Whitley**, 514 U.S. 419 (1995)........................... p.3

**United States v. Bagley**, 473 U.S. 667, 676..................... p.3

**United States v. Agurs**, 96 S.Ct. 2392 (1976).................. p.3

**People v. Washington**, 171 Ill. 2d 475, 489-90
      665 N.E. 2d 1330 (1996)................................ p.5

**People v. Burrows**, 172 Ill. 2d 169, 180
      665 N.E. 2d 1319 (1996).............................p.5

**People v. Olinger**, 176 Ill. 2d 326, 345, 223 Ill. Dec
      588, 680 N.E. 2d 321 (1997).........................p.6

**United States v. Marrero**, 516 F.2d 12 (1975)...............p.6

## PRO SE SUPPLEMENTAL ISSUE PRESENTED FOR REVIEW

THE STATES ATTORNEY OFFICE/AND OR ONE OF THEIR AGENTS COMMITTED

PROSECUTORIAL MISCONDUCT BY WILLINGFULLY WITHHOLDING KEY

EXCULPATORY EVIDENCE IN VIOLATION OF SUPREME COURT RULES 412 (c)

IN DOING SO DENYING PETITIONER HIS BASIC CONSTITUTIONAL

GUARANTEES UNDER DUE PROCESS AND FUNDAMENTAL FAIRNESS OF LAW

## PRO SE SUPPLEMENTAL ARGUMENT

I.  **THE STATES ATTORNEY OFFICE/AND OR ONE OF THEIR AGENTS COMMITTED PROSECUTORIAL MISCONDUCT BY WILLINGFULLY WITHHOLDING KEY EXCULPATORY EVIDENCE IN VIOLATION OF SUPREME COURT RULES 412 (c) IN DOING SO DENYING DEFENDANT HIS BASIC CONSTITUTIONAL GUARANTEES UNDER DUE PROCESS AND FUNDAMENTAL FAIRNESS OF LAW**

Henry Kaczmarek was convicted of first degree murder based on the testimony of state criminalist Pamela Fish who testified as a forensic expert in the field of serology.

According to her testimony she and her lab conducted numerous test on blood droplets that were recovered from defendants clothing, while giving testimony Ms. Fish testified that a match was found and consistent to that of the decedent, she further goes on to explain the process in which her conclusion were reached.

It was later discovered that the results were in fact erroneous and misleading (See appendix -B) because the fact of the matter was that when defendant finally received the actual results results from the Chicago crime lab which was some 6 years later from the time  the Court had conducted a hearing ordering that the state release all DNA evidence in connection to the instant case.

Defendant assert that because the state failed to disclose these documents they denied him a right to a fair trial where if these documents would have been disclosed the defendants chance of acquittal were highly likely because the testimony in which the state elicted from its expert witness could have easily been refuted and discredited by the fact that her entire testimony in defendants 1st. and 2nd. trial was in fact a lie where the

2.

official results essentially states that blood standards were taken and identified for comparisons and DNA was isolated and amplified by polymerase chain reaction, the results were inconclusive and unequivocally no matches were made. Defendant argues that by the failure of the state to disclose these results as a matter of a rule to discovery it violated his 14th. Amendment right of the United State Constitutional right where it is well known that the due process clause of the Fourteenth Amendment requires the prosecution to disclose material evidence that is favorable to the accused. **Brady v. Maryland**, 373 U.S. 83, 87 (1963); **Kyles v. Whitley**, 514 U.S. 419, 432-33 (1995).

The prosecutions duty to disclose emcopasses impeachment evidence **United States v. Bagley**, 473 U.S. 667, 676 (1985). Such evidence is considered "evidence favorable to the accused" because, if disclosed and used effectively, it may make the difference between conviction and acquittal **Bagley**, 473 U.S. at 676 citing **Brady**, 373 U.S. at 87. also **United States v. Agurs**, cite as 96 S.Ct. 2392 (1976) where it states:

> there are situations in which evidence is obviously of such substantial value to the defense that the prosecution disclose it to the defense even without spefic request U.S.C. A. Const. Amend. 5, 14.

Defendant realleges that as a rule to discovery the state clearly abused their office by failing to disclose this information it clearly denied him a basic guarantee thats afforded to every citizen,

the disclosure rules dictate that as a matter of fairness each
criminal defendant shall be entitled to a fair and impartial trial
and all evidence shall be given in the hopes that fairness could
be reached and according to Supreme Court Rules 412 (c) it states:

> any material or information within
> its possession or control which
> tends to negate the guilt of
> the accused as to the offense
> charged or would tend to reduce
> his punishment therefor

> (i)s included to comply with
> the constitution requirements
> that the prosecution disclose,
> ***where the evidence is material
> to guilt or the punishment "
> **Brady v. Maryland**, 373 U.S. 83
> at p. 87, 83, S.Ct. 1194at 1196⌐
> 97 (1963).

Defendant ascertain that as a rule of discovery pursuant
to Supreme Court Rules 412 (c) the state failed to meet their
burden where they continued to withhold evidence within its process
that could have very well proved the innocence of the defendant.

First by the failing to disclose the results of the initial
testing by stating " that the amount recovered was not sufficient
enough to be tested and what was recovered was to degraded to
make a comparison ".  Secondly failing to disclose evidence again
in the May 9, 1995 hearing conducted some 8 years later during
a pre-trial hearing to defendants second trial, where the trial
judge ordered the then assistant states attorney to furnish whatever
results he had concerning the DNA evidence and/or any results

to the instanter, the ackownledged that the results were middle
way through finishing and their office would be providing the
results at the closing of that day (see appendix for exhibit
marked--A).

It is defendants contention that if the rule of discovery
had been followed the states case could not have held "muster"
where the jury would have been placed in a position to review
the facts and all relevant evidence related to trhe case not partial
pieces that the state chose to display ultimately off-setting
the balance of fairness denying defendants right to a fair and
impartial trial trial.

The Illinois Supreme Court has held that a free-standing
claim of innocence based on newly-discovered evidence is a
constitutional issue under the due process clause of the Illinois
Constitution and is therefore cognizable under the Post-Conviction
Hearing Act. **People v. Washington**, 171 Ill. 2d 475, 489-90, 665
N.E.2d 1330 (1996); Ill. Const., art. I, sec. 2. Newly discovered
evidence is evidence which was unavailable at trial and which
could not have been discovered sooner through due diligence.

**People v. Burrows**, 172 Ill. 2d 169, 180, 665 N.E. 2d 1319
(1996). In order to obtain relief when raising a claim of actual
innocence, the supporting evidence must be material, non-cumulative,
and of such a conclusive character that it would "probably change
the result on retrial." **Washington**, 171 Ill. 2d at 489.

5.

In conclusion, defendant has made a substantial showing of actual innocence, where if the state would have disclosed this key evidence it could have reasonably affected the jury's verdict, instead of doing so they presented and solicited false testimony from a so called expert witness whose credentials are now under attack and considered to be suspect, even if the prosecution did not solicit false testimony, but allowed it to go uncorrected when it appeared due process is violated. **People v. Olinger**, 176 Ill. 2d 326, 345, 223 Ill. Dec. 588, 680 N.E. 2d 321 (1997); also **United States v. Marrero**, 516 F.2d 12 (1975)(where the state is obligated to protect the rights of the defendant as vigorously as the rights of the victim in a criminal prosecution and the defendant enjoys the rights to due process and equal protection of law, where a conviction cannot stand where the prosecution knowingly use false and misleading testimony.

Unlike the first and second trial where key evidence was not available  defendant argues that the trial court should have not dismissed his post-conviction petition without at least an evidentiary hearing to determine the relevance of the evidence presented.

6.

## CONCLUSION

For the foregoing reasons, Henry Kaczmarek, Petitioner-Appellant, pro se, respectfully requests that this Honorable Court reverse the dismissal of his petition and remand for further proceedings under the Post-Conviction Hearing Act.

Respectfully Sumitted,

*Henry Kaczmarek*

### CERTIFICATE OF VERIFICATION

Under the penalty of perjury as provided by law pursuant to section 5/1-109 of the Illinois Code of Civil Procedure, the undersigned certifies that the statements set forth in these documents are both true and correct.

*Henry Kaczmarek*

Henry Kaczmarek
Register No. N-95790
P.O. Box 711
Menard, Illinois 62259

## APPENDIX TO THE BRIEF

Report of Proceeding...................................... A

Laboratory Report......................................... B

STATE OF ILLINOIS    )
                     )   SS:
COUNTY OF C O O K     )

### IN THE CIRCUIT COURT OF COOK COUNTY
### COUNTY DEPARTMENT–CRIMINAL DIVISION

THE PEOPLE OF THE      )
STATE OF ILLINOIS,     )
                       )        Criminal
        Plaintiff,     )
                       )        No. 87-6131
    vs.                )
                       )        Charge:  Murder, etc.
HENRY KACZMAREK,       )
                       )
        Defendant.     )

REPORT OF PROCEEDINGS had of the hearing
in the above entitled cause, before the Honorable
JOHN D. BRADY, Judge of said court, on the 9th
day of May, 1995.

APPEARANCES:

       HONORABLE JACK O'MALLEY,
           State's Attorney of Cook County, by:
       MR. NEAL GOODFRIEND,
           Assistant State's Attorney,
           for the People of the State of Illinois;

       MS. RITA A. FRY,
           Public Defender of Cook County, by:
       MR. PYIUSH CHANDRA,
           Assistant Public Defender,
           for the defendant.

J. D. Williams, CSR
Official Court Reporter
2650 S. California Ave.-4C02
Chicago, Illinois  60608

1      THE CLERK:  People of the State versus

2   Henry Kaczmarek.

3      THE COURT:  This is the matter of Mr. Kaczmarek.

4      THE DEFENDANT:  Pardon me?

5      THE COURT:  I just said this is the case that was

6   called.

7      MR. GOODFRIEND:  Judge, years ago the defense had

8   been ordered to turn over certain results of D.N.A.

9   testing done by their expert and I renew that motion

10  because I hadn't gotten the results, I'm still waiting

11  for certain documents that have been tendered by

12  Selmar to the defense, I think it is Selmar, and we

13  were trying to finish up our D.N.A. testing but I'm

14  waiting for these results, I haven't received them.  I

15  know the defense has them.

16     MR. CHANDRA:  Judge, what we received years ago

17  when Mr. Cooley originally represented Mr. Kaczmarek

18  he had ordered some testing done, he never requested

19  any findings be produced by the agency that did the

20  testing so there are no findings.  All I have now are

21  notes from them that are not conclusive finding.

22        We are happy to comply with any order,

23  however when I spoke with Mr. -- with the state's

24  attorney previously he indicated to me that his

1     results that are his results of the Chicago crime labs

2     analyses of the D.N.A. cannot be made available to us

3     until they see what we've got.

4           Since the burden of proof is on them I

5     believe they have to reach their own conclusions and

6     they cannot use our evidence to help reach conclusions

7     for their case.

8           What we would ask is that they simply provide

9     us with their findings at this point and we'll be

10    happy to provide them with the notes that we have but

11    we don't believe that we have to supply them with our

12    notes to help them reach their conclusions.

13       MR. GOODFRIEND:  This is ridiculous, Judge.

14    Number one is back in 1987 we had serology done at the

15    Chicago Police Department crime lab and as soon as our

16    test results were done we tendered them to the defense

17    as required by the rules of discovery.  The Chicago

18    Police Department was not doing D.N.A. at the time.

19           We supplied samples to Mr. Cooley and he sent

20    them to the other lab in their sample supply by the

21    Chicago Police Department and then when he got his

22    results back he would not give them to us.  Judge

23    Getty at that time ordered him to do so.  Then he

24    eventually we got an answer over the phone, we never

1   got any documents.

2            So now that the case has come back for

3   retrial and the Chicago Police Department has started

4   some of their D.N.A. testing it would be fruitless for

5   them to retest possibly something that has already

6   been tested by some other laboratory, they might not

7   want to go into that.  But why should we wait for

8   their results, we have been waiting for their results

9   for six years, I mean it is time that they tendered

10  them to me.  If they want to cross examine Pam Fish

11  and say that she only came up with the results after

12  looking at somebody else's results that is up to

13  cross-examination.

14       THE COURT:  You tendered the defense all the

15  results from the Chicago Police Department?

16       MR. GOODFRIEND:  They are in the middle of their

17  D.N.A. testing.

18       THE COURT:  Have you tendered all of the results

19  from your testing?

20       MR. CHANDRA:  As I said --

21       THE COURT:  According to the order of Judge Getty.

22       MR. CHANDRA:  There were no results made.

23       MR. GOODFRIEND:  He's got notes.  He's got notes.

24  I haven't seen the notes.

1      THE COURT:  Tender the notes.

2      MR. GOODFRIEND:  Thank you, Judge.

3      MR. CHANDRA:  Judge, I would ask to tender them at

4   the same time they tender the results of their

5   examinations of the D.N.A.  We should not be --

6      THE COURT:  I am not going to play this game.

7   Tender the notes, period.  When your testing is done

8   tender the results, period.  Okay.  Now, do we

9   understand each other?

10      MR. GOODFRIEND:  Absolutely, Judge.

11      THE COURT:  When they're done I want them tendered

12   to both sides.  This is not going to be any of this

13   piecemeal discovery, I want it done.

14      MR. GOODFRIEND:  Okay.

15          Mr. Chandra, when can I have your notes?  Do

16   you have them today?

17      MR. CHANDRA:  Yeah, I can get them to you today.

18      THE COURT:  I mean let's get it finished, let's

19   not play games, okay.

20          What date do we need on this?

21      MR. CHANDRA:  Judge, we would ask also as to a

22   different matter, there are a number of photographs

23   apparently taken in this case and we would like an

24   opportunity to review the photographs and all

1  negatives that were taken by the Chicago Police

2  Department in this case.

3      MR. GOODFRIEND:  No problem.

4      THE COURT:  Okay, get them to him.  Maybe you can

5  get him a set of photographs.

6      MR. GOODFRIEND:  Sure, Judge.

7      THE COURT:  That shouldn't be too difficult to do.

8      MR. GOODFRIEND:  No.

9      MR. CHANDRA:  We would like to review the

10  negatives, Judge.

11      THE COURT:  I'm sure you can review the negatives

12  at the Chicago Police Department, I can't imagine them

13  turning any negatives over to anybody.

14      MR. GOODFRIEND:  They won't turn them over to me.

15      THE COURT:  I didn't think they would that's why I

16  told him he had to go down to do it.

17      MR. GOODFRIEND:  If we could have a status date of

18  May the 22nd I'll know on that date when the Chicago

19  Police Department --

20      THE COURT:  How is that for you?

21      MR. CHANDRA:  May the 22nd?

22      MR. GOODFRIEND:  Yes.  Or even next Monday May the

23  15th I'll know, well actually the week of the 22nd

24  sometime then I should know.

1          MR. CHANDRA:  May the 22nd is fine.

2          THE COURT:  May the 22nd, okay.

3                          (The case was continued to

4                          May 22, 1995.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

1    STATE OF ILLINOIS    )
                          )   SS:
2    COUNTY OF C O O K    )

3

4

5              I, Jewel Williams, an  Official

6    Court Reporter for the Circuit Court of Cook County,

7    County Department-Criminal Division, do hereby certify

8    that I reported in shorthand the proceedings had in

9    the above entitled cause, that I thereafter caused the

10   foregoing to be transcribed into typewriting, which I

11   hereby certify to be a true and accurate transcript of

12   the proceedings had before the Honorable

13   JOHN D. BRADY, Judge of said court.

14

15

16   _____
                    Official Court Reporter

17

18

19

20

21

22

23

24

M-9

EXHIBIT
A
Pg. 1

### CHICAGO POLICE DEPARTMENT
### CRIME LABORATORY DIVISION
1121 SOUTH STATE STREET, CHICAGO, ILLINOIS 60605

# LABORATORY REPORT

J170913
Millie Nielsen
HOMICIDE
SUPPLEMENTARY REPORT I
(see original report dated 7 May 1987)

22 October 1995

The evidence listed below was subjected to DNA analysis.

**EXHIBIT**          **DESCRIPTION**

K-1          Blood standard: Millie Nielsen

Q-1          Blood standard: Henry Kaczmarek

The evidence listed below was received from Investigator J. Lewandowski on 12 May 1994 for DNA analysis.

**EXHIBIT**          **DESCRIPTION**

Q-2          Blue jeans identified as the property of Henry Kaczmarek.

Q-3          Quilted jacket identified as the property of Henry Kaczmarek.

**FINDINGS**

K-1          Submitted as a standard for comparison.
             DNA isolated.

Q-1          Submitted as a standard for comparison.
             DNA isolated.

Q-2          Blood identified.  DNA isolated.

Q-3          Blood identified. DNA isolated.

**RESULTS**

DNA isolated from each exhibit was amplified by the Polymerase Chain Reaction (PCR) at the following loci: HLA DQ-alpha, LDLR, GYPA, HBGG, D7S8 and GC.

No DNA profile was obtained from the blue jeans. Inconclusive results were obtained from the jacket.

CHICAGO POLICE DEPARTMENT
CRIME LABORATORY DIVISION
1121 SOUTH STATE STREET, CHICAGO, ILLINOIS 60605

*EXHIBIT*
*B*
*Pg.2*

# LABORATORY REPORT

J170913
Millie Nielsen
Homicide
page 2

CONCLUSIONS
No DNA comparisons were made.

EVIDENCE DISPOSITION
DNA evidence will remain in the laboratory.

*Pamela Fish*

Pamela Fish
Supervising Criminalist

## AFFIDAVIT

I, Henry Kaczmarek, deposes and state that as to the documents herein, is the defendant in the above entitled cause; that I have read the aforegoing documents, and by my signature I state that the statements contained are true in substance and in fact.

Respectfully Submitted,

_Henry Kaczmarek_

Henry Kaczmarek

## CERTIFICATE OF VERIFICATION

Under the penalty of perjury as provided by law pursuant to section 5/1-109 of the Code of Civil procedure, the undersigned certifies that the statements set forth in these documents are both true and correct.

_Henry Kaczmarek_

Henry Kaczmarek
Register No. N-95790
P.O. Box 711
Menard, Illinois 66259

No. 1-04-2401

## IN THE

## APPELLATE COURT OF ILLINOIS

## FIRST DISTRICT

| | | |
|---|---|---|
| **PEOPLE OF THE STATE OF ILLINOIS,** | ) | Appeal from the Circuit Court |
| | ) | of Cook County, Illinois. |
| Respondent-Appellee, | ) | |
| | ) | |
| -vs- | ) | No. 87 CR 6131. |
| | ) | |
| **HENRY KACZMAREK,** | ) | Honorable |
| | ) | Lon William Shultz, |
| Petitioner-Appellant. | ) | Judge Presiding. |

## BRIEF AND ARGUMENT FOR PETITIONER-APPELLANT

MICHAEL J. PELLETIER
Deputy Defender

SARAH CURRY
Assistant Appellate Defender
Office of the State Appellate Defender
203 North LaSalle Street - 24th Floor
Chicago, Illinois 60601
(312) 814-5472

COUNSEL FOR PETITIONER-APPELLANT

## ORAL ARGUMENT REQUESTED



RECEIVED
CRIMINAL APPEALS

NOV - 9 2005

308 RICHARD J. DALEY CENTER
RICHARD A. DEVINE
STATE'S ATTORNEY'S OFFICE

EXHIBIT I

## POINTS AND AUTHORITIES **Page**

I. **HENRY KACZMAREK'S *PRO SE* POST-CONVICTION PETITION PRESENTED THE GIST OF A CONSTITUTIONAL CLAIM THAT THE STATE PRESENTED THE PERJURED TESTIMONY OF CRIMINALIST PAMELA FISH IN ORDER TO SECURE HIS CONVICTION FOR FIRST DEGREE MURDER. KACZMAREK'S PETITION THEREBY WARRANTS FURTHER PROCEEDINGS UNDER THE POST-CONVICTION HEARING ACT. ....... 20**

*People v. Morgan*, 187 Ill.2d 500, 719 N.E.2d 681 (1999) ............................. 21

*People v. Johnson*, 191 Ill.2d 257, 730 N.E.2d 1107 (2000) ........................... 21

*People v. Gaultney*, 174 Ill. 2d 410, 675 N.E.2d 102 (1996) ........................... 21

*People v. Boclair*, 202 Ill.2d 89, 789 N.E.2d 734 (2002) ............................. 21

*People v. Edwards*, 197 Ill.2d 239, 757 N.E.2d 442 (2001) ........................... 21

*People v. Towns*, 182 Ill.2d 491, 503, 696 N.E.2d 1128 (1998) ......................... 21

*People v. Coleman*, 183 Ill.2d 366, 387-88, 701 N.E.2d 1063 (1998) ................... 21

*People v. Olinger*, 176 Ill.2d 326, 680 N.E.2d 321 (1997) ........................... 22

*People v. Smith*, 352 Ill.App.3d 1095, 817 N.E.2d 982 (1st Dist. 2004) ............. *in passim*

725 ILCS 5/122-1 (2004) ................................................. 21

725 ILCS 5/122-2.1 (2004) ................................................. 21

Nicole Ziegler Dizon, *Crime Lab Supervisor Transferred*, The State Journal Register, August 16, 2001 .................................................................. 26,27

Robert C. Herguth, *Report Slams '80s Police Lab*, Chicago Suntimes, January 14, 2001 ..... 27

Maurice Possley and Steve Mills, *Disorganization Typified Crime Lab, Report Says*, Chicago Tribune, January 15, 2001 ................................................. 27

Steve Mills and Maurice Possley, *State Crime Lab Fraud Charged*, Chicago Tribune, January 14, 2001 ................................................................. 28



RECEIVED
CRIMINAL APPEALS

NOV - 9 2005

305 RICHARD J. DALEY CENTER
CHICAGO IL 60602
STATE APPELLATE'S OFFICE

**II.    HENRY KACZMAREK'S *PRO SE* POST-CONVICTION PETITION
PRESENTED THE GIST OF A CONSTITUTIONAL CLAIM OF INEFFECTIVE
ASSISTANCE OF TRIAL AND APPELLATE COUNSELS FOR FAILING TO
CHALLENGE THE ADMISSIBILITY OF THE STATE'S EXPERT WITNESSES'
TESTIMONY REGARDING LUMINOL TESTING AND BLOOD SPLATTER
EVIDENCE UNDER *FRYE V. UNITED STATES*.  KACZMAREK'S PETITION
THEREBY WARRANTS FURTHER PROCEEDINGS UNDER THE POST-
CONVICTION HEARING ACT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33**

U.S. Const. Amends. VI, XIV . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

Ill. Const., Art. I, sec.8 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*People v. Morgan,* 187 Ill.2d 500, 719 N.E.2d 681 (1999) . . . . . . . . . . . . . . . . . . . . . . . . 33

*People v. Johnson,* 191 Ill.2d 257, 730 N.E.2d 1107 (2000) . . . . . . . . . . . . . . . . . . . . . . . 33

*People v. Gaultney,* 174 Ill. 2d 410, 675 N.E.2d 102 (1996) . . . . . . . . . . . . . . . . . . . . . . . 33

*People v. Boclair,* 202 Ill.2d 89, 789 N.E.2d 734 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . 34

*People v. Edwards,* 197 Ill.2d 239, 757 N.E.2d 442 (2001) . . . . . . . . . . . . . . . . . . . . . . . 34

*People v. Towns,* 182 Ill.2d 491, 696 N.E.2d 1128 (1998) . . . . . . . . . . . . . . . . . . . . . . . . 34

*People v. Coleman,* 183 Ill.2d 366, 701 N.E.2d 1063 (1998) . . . . . . . . . . . . . . . . . . . . . . 34

*Strickland v. Washington,* 466 U.S. 688, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) . . . . . . . . . . 37

*People v. Albanese,* 104 Ill.2d 504, 473 N.E.2d 1246 (1984) . . . . . . . . . . . . . . . . . . . . . . 37

*People v. Steidl,* 177 Ill.2d 239, 685 N.E.2d 1335 (1997) . . . . . . . . . . . . . . . . . . . . . . . . 37

*People v. West,* 187 Ill.2d 418, 719 N.E.2d 664 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*People v. Coleman,* 168 Ill.2d 509, 660 N.E.2d 919 (1995) . . . . . . . . . . . . . . . . . . . . . . . 37

*Frye v. United States,* 293 F. 1013 (D.C. Cir. 1923) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37,38

*Donaldson v. Central Ill. Pub. Serv. Co.,* 199 Ill.2d 63, 767 N.E.2d 314 (2002) . . . . . . . . . 37,38

*People v. Henne,* 165 Ill.App.3d 315, 518 N.E.2d 1276 (4th Dist. 1988) . . . . . . . . . . . . . . . 38

*People v. Hendricks*, 145 Ill.App.3d 71, 495 N.E.2d 85 (4th Dist. 1986) . . . . . . . . . . . . . . . . . 39

*People v. Wheeler*, 777 N.E.2d 961 (3rd Dist. 2001), *supplemental opinion at People v. Wheeler*, 334 Ill.App.3d 273, 777 N.E.2d 961 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*People v. Owens*, 155 Ill.App.3d 990, 508 N.E.2d 1088 (4th Dist. 1987) . . . . . . . . . . . . . . . . . 39

*People v. Knox*, 121 Ill.App.3d 579, 459 N.E.2d 1077 (3rd Dist. 1984) . . . . . . . . . . . . . . . . . . 39

725 ILCS 5/122-1(2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

725 ILCS 5/122-2.1 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

## NATURE OF THE CASE

Henry Kaczmarek, Petitioner-Appellant, appeals from a judgment dismissing his petition for post-conviction relief.

No issue is raised concerning the charging instrument.  However, an issue is raised concerning the sufficiency of the post-conviction pleadings.

## ISSUES PRESENTED FOR REVIEW

1.      Whether Henry Kaczmarek's *pro se* post-conviction petition presented the gist of a constitutional claim that the State presented the perjured testimony of criminalist Pamela Fish in order to secure his conviction for first degree murder.

2.      Whether Henry Kaczmarek's *pro se* post-conviction petition presented the gist of a constitutional claim of ineffective assistance of trial and appellate counsels for failing to challenge the admissibility of the State's expert witnesses' testimony regarding luminol testing and blood splatter evidence under *Frye v. United States*.

## JURISDICTION

Henry Kaczmarek, Petitioner-Appellant, appeals the dismissal of his post-conviction petition. The judgment being appealed was entered on June 14, 2004. (C. 106, 107) Notice of appeal was timely filed on July 13, 2004. (C. 114) Jurisdiction therefore lies in this Court pursuant to Article VI, Section 6, of the Illinois Constitution, and Supreme Court Rule 651 (a).

## STATEMENT OF FACTS

In the early morning hours of April 25, 1987, Millie Nielsen was killed in her apartment. Police arrested Henry Kaczmarek and he was subsequently charged with Ms. Nielsen's murder. (Second Trial C. 34-51)[1] Following a jury trial in 1989, defendant was found guilty of murder. (Second Trial C. 54) Judge Michael Getty sentenced defendant to a term of natural life. (Second Trial C. 54) Defendant appealed.

On March 31, 1993, the appellate court reversed defendant's murder conviction and remanded for a new trial. *People v. Kaczmarek*, 243 Ill. App. 3d 1067, 613 N.E.2d 1253 (1st Dist. 1993). Following the denial of defendant's motion for discharge based on a speedy trial violation, the State, in November of 1996, retried defendant on five counts of murder. Judge John Brady presided over the second jury trial. The jury found defendant guilty of murder and the court sentenced defendant to natural-life imprisonment. (C. 152, 293) Defendant appealed. On December 27, 2000, the appellate court vacated defendant's sentence and remanded for resentencing. *People v. Kaczmarek,* 318 Ill. App. 3d 340, 741 N.E.2d 1131 (1st Dist. 2000). The Illinois Supreme Court reversed the Appellate Court's decision regarding defendant's sentence, and affirmed the judgment of the trial court. *People v. Kaczmarek*, 207 Ill.2d 288, 798 N.E.2d 713 (2003).

On March 24, 2004, Henry filed a *pro se* petition for post-conviction relief. (C. 76) Henry's petition was summarily dismissed on June 14, 2004. (R. B11)

---

[1]The common law record containing Henry Kaczmarek's post-conviction petition and the report of proceedings pertaining thereto will be cited as (C. __) and (R. __). The record from Henry's first trial, Appellate Court No. 89-3182, will be cited to as (First Trial C. __) and (First Trial R. __). The record from Henry's second trial, Appellate Court No. 97-2557, will be cited to as (Second Trial C. __) and (Second Trial R. __).

**Evidence At Trial**

Millie Nielsen lived on the first floor of a two-flat apartment building while Dan Larry, his wife Margaret, and Margaret's then 19-year-old son, John Fisher, lived on the second floor. (Second Trial R. I179) The 86-year-old Nielsen was the Larrys' landlady. (Second Trial R. I177-I179)

On April 24, 1987, a Friday, Margaret Larry saw Ms. Nielsen at around 5:00 or 5:30 p.m. (Second Trial R. I180) At 6:15 p.m., Margaret went bowling with her son John. (Second Trial R. I181, I207) Margaret and John returned home at about 10:30 p.m. (Second Trial R. I181) In the apartment, Margaret's husband was passed out on the couch. (Second Trial R. I181) Also in the apartment was Henry Kaczmarck, who was on the couch watching television. (Second Trial R. I181, I207) Henry was wearing light-colored jeans and a blue, quilted work jacket, and construction boots. (Second Trial R. I179, I207, I211) Henry had been living with the Larrys for about a month after previously having lived at his girlfriend, Pam Hines' house. (Second Trial R. K182) At 11:00 p.m., Henry helped Margaret bring Dan to bed. (Second Trial R. I184, I209) Margaret went to sleep and Henry left. (Second Trial R. I184, I209)

Margaret woke up that morning at around 7:00 or 7:30 a.m. (Second Trial R. I190) Margaret saw Henry sleeping on the couch. (Second Trial R. I190) Shortly after, Henry woke up. (Second Trial R. I190) Margaret stated that Henry looked "kind of" nervous until he got his coffee after which he sat down and relaxed. (Second Trial R. I192) Margaret stated that Henry was wearing a clean pair of dark-colored jeans and a light dress shirt. (Second Trial R. I190) Margaret did not pay attention to whether there were any stains on Henry's clothing. (Second Trial R. I199) Margaret admitted that the first time she told police about what Henry was

wearing on Saturday morning was two years after Millie's murder. (Second Trial R. I202)

At around 9:45 a.m., Ms. Nielsen's helper, Ronald Sadlowski, noticed that the back pantry window of Millie's apartment had been broken and the back storm door was fully open. (Second Trial R. I163) Ronald called the police. (Second Trial R. I164) Police found Ms. Nielsen in the bedroom of her apartment having been stabbed multiple times, strangled, and having sustained blunt force injuries. (Second Trial R. 1119-121, 1147) Officer Marsala observed bloodspots on the floor and walls above the bed where Ms. Nielsen was found, blood on the kitchen floor leading to the bedroom, and bloodspots on the dust ruffle of the bed in the second bedroom. (Second Trial R. I40-42, I51-53) Marsala found no signs of forced entry and no broken glass inside. (Second Trial R. I43-44)

John woke up at 10:00 a.m. on Saturday morning when police came to question him. (Second Trial R. I210) Detective Bogucki and partner Raymond Schalk conducted a follow-up investigation regarding the murder of Millie Nielsen. (Second Trial R. J29) The detectives interviewed Dan and Margaret Larry. (Second Trial R. J29) Ron Larry approached the detectives and talked to them. (Second Trial R. J30)

In 1987, Ron Larry lived with his mother but would sleep on the back porch of Margaret and Dan Larry's apartment. (Second Trial R. I64) Ron Larry admitted being convicted of theft in February of 1980 and being placed on probation. (Second Trial R. I61) In April of 1980, Ron was convicted of burglary and was sentenced to four years probation with a condition of probation being that he spend the first four months in jail and pay $300 restitution. (Second Trial R. I61) Three years later, Ron was arrested for theft and charged with violating his probation. Ron was sentenced to three years in prison for violating his probation and two years incarceration

-6-

for felony theft.  (Second Trial R. I61-62)

On April 24th, Ron went to work and then went drinking at Patty's Lounge.  Ron left the lounge at midnight or 1:00 a.m.  (Second Trial R. I68)  After getting something to eat, Ron went to his brother's house and laid down on some padding on the second floor back porch to sleep. (Second Trial R. I68)  At trial, Margaret testified that Ron had no permission to sleep on the Larrys' back porch.  (Second Trial R. I196)  Ron did not see any bags or property in the gangway and did not pay attention to the first floor door or windows.  (Second Trial R. I69)  Ron stated that when he was on the porch, the temperature was in the 50's.  (Second Trial R. I96)  Ron admitted that he previously testified that it had been in the 60's.  (Second Trial R. I96)  The parties subsequently stipulated that the temperature at 3:00 a.m. was 37 degrees.  (Second Trial R. J126)

At 2:00 a.m., while on the porch, Ron heard the alarm from Patty's Lounge indicating its closing.  (Second Trial R. H72)  Ron claimed that twenty to thirty minutes later, he saw Henry in the back yard of the building carrying a bag.  (Second Trial R. H64)  He had known Henry for five or six years.  (Second Trial R. H64)  Ron testified that Henry, who was wearing jeans and a dark jacket, was walking across the yard. (Second Trial R. H73)  Ron stated that Henry was carrying the bag with his arms out at a 90 degree angle.  (Second Trial R. H100)  The bag, which looked like a garbage bag, did not have handles on it.  (Second Trial R. H100)

Ron went to sleep, waking up around 7:00 a.m.  (Second Trial R. H76)  Ron used the back stairs and noticed nothing unusual.  (Second Trial R. H77)  After going to work for a full day on Saturday April 25th, Ron went to Patty's Lounge for a few beers.  (Second Trial R. H82) At Patty's, Ron learned that Ms. Nielsen had been murdered.  (Second Trial R. H82)  After

Patty's, Ron went to the Larrys' where Ron spoke to police. (Second Trial R. H83) Ron told the police about Henry and he went with police to find Henry. (Second Trial R. H83, J31)

Bogucki and Schalk arrested Henry in his car on April 26th. (Second Trial R. J33-J36) Henry was wearing a plaid shirt and blue jeans and had on leather work boots. (Second Trial R. J36, J62) Police noted blood stains on the right and the left sleeve of Henry's coat. (Second Trial R. J34) Henry signed a written consent form to search his car. (Second Trial R. J40) In the trunk of Henry's car, police found jewelry boxes, plates and platters, a Marshall Fields bag, a pair of blue jeans with blood stains, and tools. (Second Trial R. J42) Police did not find any gloves in the trunk or car and no other shoes. (Second Trial R. J43)

Ms. Nielsen's niece Fem Briggs and great niece Barbara Tucker viewed the property taken from the trunk of Henry's car. (Second Trial R. J57, J95, J105) Briggs and Tucker identified pieces of jewelry and serving dishes as their Aunt Millie Nielsen's. (Second Trial R. J95-101, J105-108) Officer Patterson, an expert in fingerprint identification, averred that a hand print taken from the bag found in the trunk of defendant's car was a print from defendant. (Second Trial R. J121)

Henry gave his consent to have police take a blood sample from him. (Second Trial R. J58) Defendant's blood sample was transferred to serologist Pam Fish. (Second Trial R. J126) During Nielsen's autopsy, medical examiner Michael Chambliss took blood from decedent, also transferring it to serologist Pam Fish. (Second Trial R. J126) Officer Kenneth Martin fingerprinted defendant. (J124)

Forensic investigator Robert Baike testified that he went to Nielsen's apartment on April 25th and observed blood splatters above the decedent on the wall by the bed and noted that the

-8-

room had been ransacked. (Second Trial R. J6) Baike photographed the area and collected evidence. (Second Trial R. J8) Baike was unable to find any fingerprints. (Second Trial R. J9) Baike did not see any bloody footprints. (Second Trial R. J19)

Police checked Henry's shoes. (Second Trial R. J53) Police did not notice any blood or brown or reddish stains on Henry's boots. (Second Trial R. J53, J63) Officer Bogucki averred that no other clothing had blood on it. (Second Trial R. J53)

Pam Fish, a serologist, testified that in 1987, Chicago was not doing DNA testing but was doing electrophoresis serology. (Second Trial R. J155) Ms. Fish stated that she received from police investigating the Nielsen murder a jacket, a pair of jeans, jewelry boxes, and a knife. (Second Trial R. J139) Based on blood standards she received from Henry and decedent, Ms. Fish determined that all the blood on defendant's jeans and jacket was consistent with Ms. Nielsen's blood and could not have come from defendant. (Second Trial R. J153) In 1994, Chicago discontinued electrophoresis serology and began DNA typing. (Second Trial R. J129) Ms. Fish tried to do DNA testing on the samples received in 1987 but the samples were too small or too degraded and results were inconclusive. (Second Trial R. J161-163) Ms. Fish did not do luminol testing. (Second Trial R. J163)

Arizona insurance fraud investigator Mitch Rea testified that he was contacted by the Cook County State's Attorney's Office in Spring of 1994 to perform luminol testing in conjunction with the Nielsen murder. (Second Trial R. K7, K26) Over objection, the court accepted Rea as an expert in the field of luminol testing. (Second Trial R. K25-26) In May of 1994, Rea received a sealed box containing a dark-colored quilted jacket. (Second Trial R. K26-27) After spraying segments of the jacket with the luminol chemicals and turning off the lights,

Rea observed luminance in various sections of the jacket. (Second Trial R. K32-K37) Rea took photographs of the jacket. (Second Trial R. K39)

The State called Rod Englert to testify concerning blood splatter. Over objection, the court ruled that Englert was an expert in the field of crime scene reconstruction and blood splatter. (Second Trial R. K66) Upon request from the Cook County State's Attorney, Englert reviewed the photographs of the Nielsen crime scene, the statements of witnesses, the luminol testing photographs prepared by Mitch Rea, and the physical evidence recovered. (Second Trial R. K66-69)

Concerning Ms. Nielsen's apartment, Englert noted that there was blood on the floor of the kitchen leading into Ms. Nielsen's bedroom. (Second Trial R. K91) Englert also observed that "on the floor are smears of blood, as though a struggle took place, and one of the individuals on the floor was bleeding." (Second Trial R. K91) When asked whether it was unusual not to have any footprints in the blood, Englert stated that it would not be unusual because blood dries very fast. (Second Trial R. K86-91)

Englert stated that the left and right knee areas of the pants contained a transfer stain and not splatter. (Second Trial R. K94) The transfer does not involve energy but just a transfer of something that was bloody that touched against the pants. (Second Trial R. K95) As for the bottom of the pants, Englert opined that there were numerous specks of blood consistent with medium velocity splatter. (Second Trial R. K96) Englert stated that the blood on defendant's pants would not be consistent with a person picking up a bloody bag in a gangway. (Second Trial R. K100) Further, Englert opined that the blood on the jeans would not be consistent with the wearer of the jeans "kneeing" someone in the nose. (Second Trial R. K102)

-10-

In examining the luminol photographs of defendant's jacket, Englert stated that the stains on the right and left arms contained splatter. (Second Trial R. K109) Englert stated that over the front of the jacket were little specks of projected blood. (Second Trial R. K111) On the right pocket was a very light transfer stain. (Second Trial R. K111) Englert opined that the jewelry boxes had transfer stains that were consistent with ransacking. (Second Trial R. K114)

Englert asserted that the manner of Nielsen's death was that she was attacked first in the kitchen where she received many blows while on the floor, and that she, while still alive, was taken into the bedroom and thrown on the bed. (Second Trial R. K117) Englert acknowledged that there was a great deal of blood in Ms. Nielsen's bed. (Second Trial R. K134)

Englert admitted that he was assuming that the blood splatter on defendant's jeans was Nielsen's blood. (Second Trial R. K123) Englert conceded that no report stated that the splatter on the lower left leg was Nielsen's blood and that if it were someone else's blood he would have to reevaluate his position. (Second Trial R. K122-123) Englert testified that it was "very, very possible" to get medium velocity splatter from a fight. (Second Trial R. K125)

Following Englert's testimony, the State rested. (Second Trial R. J150) The court denied defendant's motion for a directed finding. (Second Trial R. J149)

To rebut the testimony of State's witnesses Englert and Rea, defendant called Dr. Kenneth Siegesmund on defendant's behalf. Outside the presence of the jury, the parties inquired into Dr. Siegesmund's qualifications. Dr. Siegesmund testified that he had a Ph.D. in biology and that his undergraduate major was biology with a minor in chemistry. (Second Trial R. L3) Dr. Siegesmund stated that he had performed luminol testing well over a hundred times and had lectured in forensic science. (Second Trial R. L5) Dr. Siegesmund stated that he had

-11-

been qualified to testify as an expert in the area of blood splatter 20 to 30 times. (Second Trial R. L37) Following argument on Dr. Siegesmund's credentials, the court ruled that he would not recognize Siegesmund as an expert in the field of blood splatter and could not testify as to the interpretation of luminol testing. (Second Trial R. L40)

Defense counsel made an offer of proof averring that Dr. Siegesmund would testify that in his opinion there was almost no indication of blood splatter on the jacket and that the blue jeans contained smears in the knee area indicative of lateral activity. (Second Trial R. L72) Dr. Siegesmund would have testified that the majority of decedent's blood would have been deposited on the bed prior to, and not after, her death. (Second Trial R. L72) Dr. Siegesmund would have further stated that in his opinion, the offender in the instant case would have been dramatically covered with blood based on the particular type of attack. (Second Trial R. L72)

In defendant's case, Henry testified that in April 1987, he had been living with the Larry family. (Second Trial R. K176) Before living with the Larrys, Henry had lived with his girlfriend, Pam Hines. (Second Trial R. K182) When Henry left Pam's house, Henry took all his belongings including his clothes, flashlight, and work tools. (Second Trial R. K182) Henry's work tools included a hammer, screwdrivers, channel locks, and a glass cutter. (Second Trial R. K183) Henry's clothes included six pairs of jeans and eight or nine flannel shirts. (Second Trial R. K260) Henry used a Marshall Fields bag for luggage. (Second Trial R. K182) Henry had been living at the Larrys' for between two weeks and a month prior to decedent's murder. (Second Trial R. K182, K214)

The week decedent was killed, Dan Larry had been suffering from a toothache for most of that week. (Second Trial R. K178) Henry and Dan went to bars and drank for most of that week.

-12-

(Second Trial R. K178) Henry had been laid off and was scheduled to begin work for Lee Willis the Monday following Nielsen's death. (Second Trial R. K177) Henry got into three fights on the Wednesday before April 24th. (Second Trial R. K179, K251) In each of these fights, someone bled. (Second Trial R. K180-K181) Henry asserted that he had owned his jacket for a year or more and that he had been in a lot of fights while wearing the jacket. (Second Trial R. K210) Henry related that he "went to a lot of bars" and "had a lot of fights in that coat." (Second Trial R. K211)

On the morning of April 24th, Henry began drinking with Dan. (Second Trial R. K183) In the afternoon, Henry and Dan went to Tom Szeszol's house where Henry took a shower and did laundry. (Second Trial R. K184) Henry did not wash his stained jeans there because Henry wanted to soak them and Tom's mother was coming and wanted everyone out. (Second Trial R. K184, K224) When Henry was told to leave, he tossed all his clothes back into the trunk of the car. (Second Trial R. K185) Henry threw the jeans which he was going to soak but did not, on the floor of the trunk. (Second Trial R. K185) All of Henry's clothes got washed except for his jacket and the pair of jeans that he was going to soak. (Second Trial R. K224-225)

After Szeszol's house, Henry dropped Dan off and went to Mike's Tavern on Wrightwood. (Second Trial R. K187) Henry stayed there until 6:30 p.m. drinking. (Second Trial R. K188) After Mike's Tavern, Henry went to the Larrys' house. (Second Trial R. K188) When Henry got to the Larrys' house, Dan was the only person there. (Second Trial R. K188) Henry and Dan drank a case of beer together. (Second Trial R. K188) Henry left the Larrys' at 11:45 p.m. and went to another bar. (Second Trial R. K188-189) When Henry left the Larrys', Margaret and John were in the house. (Second Trial R. K189, K225)

-13-

After drinking two beers, Henry went to a bar called "Our Place" until 2:00 a.m. (Second Trial R. K190) Henry estimated that there were 50 people at the bar. (Second Trial R. K227) When asked to describe anyone at the bar, Henry stated that it was ten years before and that he would be lying if he had to describe anyone at the bar. (Second Trial R. K227-228) At around 2:00 a.m., Henry went back to Dan's house to see if Dan wanted to drink some more. (Second Trial R. K190) Although Henry had a key to Dan's house, Henry had to "pee"and parked in the alley behind Dan's house to urinate. (Second Trial R. K191, K214)

After parking in the alley, Henry opened the car door, got out of the car, and heard a noise. (Second Trial R. K191) The noise sounded like a door closing. (Second Trial R. K229) Henry closed the car door and walked towards the house. (Second Trial R. K191) Henry looked up thinking that the noise might have been Dan upstairs. (Second Trial R. K191) After seeing no one up there, Henry kept walking towards the house and urinated close to the house. (Second Trial R. K191) While urinating, Henry saw a bag on the side of the house. (Second Trial R. K192) Henry looked inside the bag and saw a little box containing silverware. (Second Trial R. K194-195, K216) Henry picked up the bag and carried the bag to his car where he threw it into the trunk of his car. (Second Trial R. K195) When Henry picked up the bag it was damp or wet. (Second Trial R. K219-210) Henry got into his car and drove around to the front of Dan's house. (Second Trial R. K195)

Henry went upstairs and rang the Larrys' doorbell. (Second Trial R. K196) Margaret told Henry that Dan was not awake and Henry left and went to "Our Place" bar. (Second Trial R. K196) At the bar, Henry saw Liz and Dan Funkhauser. (Second Trial R. K197) Henry stayed until closing at 4:00 a.m., and gave rides home to Liz and Dan. (Second Trial R. K197) After

-14-

parking his car across the street from the Larrys' apartment, Henry went upstairs and went to sleep on the Larrys' couch. (Second Trial R. K197-198, K234) Defendant went to sleep around 5:00 a.m. and woke up around 8:00 a.m. (Second Trial R. K198) Henry slept in his clothes: jeans, flannel shirt, boots, and coat. (Second Trial R. K198, K234) Henry had one pair of shoes which were boots. (Second Trial R. K237)

On Saturday morning, Henry and Dan drove to Melrose Park to see Bill Brown. (Second Trial R. K202) Henry wanted to show Bill his car and Henry owed Bill some money. (Second Trial R. K202) At Brown's house, Henry opened the car trunk to see what was in the bag he found that morning. (Second Trial R. K203) Dan was with Henry. (Second Trial R. K203) Henry took everything out and put it on a bench. (Second Trial R. 203) Henry stated that "it was all bloody." (Second Trial R. K203) The bag and a pillow case were all bloody with dried blood. (Second Trial R. K204) Henry separated the good things from the bad, throwing the bag, a pillow case, and some other things in a dumpster next door to Brown's house. (Second Trial R. K204, K236) Henry did not throw into the dumpster any work gloves, clothes, or boots. (Second Trial R. K236-237) Henry kept about four or five pieces and put the things back into the trunk. (Second Trial R. K205, K238)

Henry showed Brown the silverware. (Second Trial R. K205, 245) Brown gave Henry $30 for some coins Henry had and $30 for the silverware. (Second Trial R. K205) Henry and Dan left and Henry dropped Dan off at home. (Second Trial R. K206) Henry went to Frank's Tavern where Henry had a couple of beers. (Second Trial R. K206) Henry left. He got sleepy, so he pulled his car over and went to sleep in his car. (Second Trial R. K207)

The next thing Henry remembered was police banging on his car window. (Second Trial

-15-

R. K208)  Henry got out of the car, at which time police patted Henry down and handcuffed him. (Second Trial R. K208)  Police took Henry to the station and talked to Henry at 3:15 a.m. (Second Trial R. K218)  Henry did not remember telling police that when he found the bag he saw jewelry and plates inside the bag.  (Second Trial R. K218)  Henry stated that he did not tell police about hearing a noise in the backyard because they did not ask.  (Second Trial R. K229)

Henry talked to an assistant State's attorney at 9:00 a.m.  (Second Trial R. K218)  Henry did not recall telling the State's attorney that when Henry put the bag in the car he knew that it contained jewelry.  (Second Trial R. K219)  Henry did not remember telling Assistant State's Attorney Stevens that after ringing the Larrys' doorbell, he went upstairs to go to sleep.  (Second Trial R. K232)  Henry did not recall telling police at 3:15 a.m or State's Attorney Stevens at 9:00 or 9:30 a.m. that he "could have killed the woman but that [he] didn't remember."  (Second Trial R. K256-257)

Henry stated that he had never been in Ms. Nielsen's apartment.  (Second Trial R. K209) Henry testified that he had seen the decedent one time when Henry had been watching television, and decedent was on the back porch talking to Margaret.  (Second Trial R. K208)  Henry stated that that was the only time he had ever seen Ms. Nielsen.  (Second Trial R. K209)  Henry knew that Ms. Nielsen was an older woman but did not know that she lived alone.  (Second Trial R. K220)

Henry denied killing Ms. Nielsen.  (Second Trial R. K209)  Henry denied using a glass cutter to cut the window on the back of decedent's house.  (Second Trial R. K254)  Henry denied beating, stabbing or strangling decedent.  (Second Trial R. K255)

Pam Hines testified that she had formerly been Henry's girlfriend.  (Second Trial R.

-16-

K152) Hines was not living with Henry at the time of Henry's arrest. (Second Trial R. K152) Pam identified Henry's jacket in court and stated that the whole time Pam knew Henry he had that jacket. (Second Trial R. K153) Pam stated that Henry would dress the same every day and that daily dress would include a flannel shirt, jeans, the jacket, and boots. (Second Trial R. K154)

Pam stated that Henry was a construction worker and that when they lived together Henry helped with the upkeep of the building. (Second Trial R. K154) Henry had an assortment of tools to fix things including hammers, screwdrivers, wrenches, glass cutters, and pliers. (Second Trial R. K154) Hines stated that Henry was familiar with how to cut glass. (Second Trial R. K158) Pam Hines identified the Marshall Fields bag found in the trunk of Henry's car as looking like the bag that Henry put his clothes and personal items in when he left the apartment they were sharing. (Second Trial R. K156, K159)

In lieu of Elizabeth Finuchi's live testimony, the parties stipulated that if Elizabeth Finuchi were called to testify she would state that she knew Henry and that on April 15, 1987, at around 2:00 to 2:30 a.m., she and Daniel Funkhauser were drinking at a bar called "Our Place," where she saw Henry. (Second Trial R. K164-165) At 4:00 a.m., Henry gave Elizabeth and Dan a ride home. (Second Trial R. K165) Elizabeth did not notice anything unusual about Henry or his clothes. (Second Trial R. K166)

In rebuttal, Officer Bogucki testified that he talked to defendant at 2:15 a.m. on April 26, 1987, and that Henry said that he had been in the alley behind the Larrys' apartment to urinate when he walked through the back yard and noticed a bag. (Second Trial R. L44) Seeing that the bag had jewelry and plates inside, Henry picked up the bag and put it in the trunk of his car.

-17-

(Second Trial R. L45)  Henry then walked back to the front, rang the doorbell and spoke to

Margaret.  (Second Trial R. L45)  When Margaret told Henry that Dan was asleep, Henry went

back to the car and left.  (Second Trial R. L45)  Bogucki stated that when he asked Henry about

the crime, Henry stated that he may have done it, but did not remember.  (Second Trial R. L45)

Bogucki asserted that Henry never said that he heard a noise or that the bag was bloody, or that

there was a bloody pillow case inside the bag.  (Second Trial R. L45)  Bogucki further averred

that Henry never mentioned anything about Melrose Park or throwing the bag and case in a

dumpster.  (Second Trial R. L46)

Bogucki conceded that there was no written statement of the April 26th, 3:15 a.m.

conversation.  (Second Trial R. L47)  When asked about the handwriting and signature on the

police general progress report concerning the conversation with defendant, Bogucki stated that

Detective Mook wrote the report and that Bogucki signed Detective Schalk's name to the report.

(Second Trial R. L50)  Bogucki admitted that Mook was not present at the time Bogucki

interviewed Henry.  (Second Trial R. L50)    Assistant State's Attorney Stevens testified in

rebuttal that on April 26th at 9:00 a..m, he talked with Henry and that Henry told him that during

the morning of April 25th he drove his car into the alley behind 3507 Diversey to "take a leak,"

and that he found a bag in the gangway, took it to his car, and dumped it out in the trunk of his

car.  (Second Trial R. L59-60)  Stevens said that Henry related that he discovered that the bag

contained jewelry.  (Second Trial R. L60)  Henry went to the front of the building, rang the bell,

went up to the second floor, and spent the night.  (Second Trial R. L60)  Henry told Stevens that

the blood stains on his clothing may have been the result of getting into a lot of fights.  (Second

Trial R. L60)  According to Stevens, Henry said that he could have killed the woman, but he did

-18-

not remember. (Second Trial R. L60) Stevens stated that Henry never said he heard a noise, that the bag was bloody, that he later found a bloody pillow case, or that he later threw the bag, the pillow case and the other items in a dumpster in Melrose Park. (Second Trial R. L60) Stevens admitted that he took no notes of his conversation with Henry. (Second Trial R. L61) When asked whether he had any difficulty understanding Henry, Stevens admitted that Henry spoke slowly. (Second Trial R. L64)

Following a jury instruction conference, the parties presented closing arguments. (Second Trial R. L66-L120) The judge instructed the jury on the three theories of murder and presented the jury with a general verdict form for murder. The jury subsequently found Henry guilty of murder. (Second Trial R. L133)

The judge denied defendant's motion for a new trial. (Second Trial R. N3) At sentencing, the State urged that the court impose a natural-life sentence due to the brutal and heinous nature of the offense. Following argument, the judge imposed a sentence of natural life. (Second Trial R. N13) Henry's conviction and sentence were ultimately affirmed on direct appeal. *People v. Kaczmarek*, 207 Ill.2d 288, 798 N.E.2d 713 (2003).

On March 24, 2004, Henry filed a *pro se* post-conviction petition. (C. 76-104) In his petition, among other things, Henry alleged that he was denied his right to due process where the State presented the perjured testimony of serologist Pamela Fish, and that he was denied his right to the effective assistance of trial and appellate counsels where his attorneys failed to challenge the admissibility of the State's experts' testimonies. (C. 76-104) Henry's petition was summarily dismissed by the circuit court as frivolous and patently without merit. (C. 106, 107-113; R. B11)

-19-

### ARGUMENT

I.    **HENRY KACZMAREK'S *PRO SE* POST-CONVICTION PETITION PRESENTED THE GIST OF A CONSTITUTIONAL CLAIM THAT THE STATE PRESENTED THE PERJURED TESTIMONY OF CRIMINALIST PAMELA FISH IN ORDER TO SECURE HIS CONVICTION FOR FIRST DEGREE MURDER. KACZMAREK'S PETITION THEREBY WARRANTS FURTHER PROCEEDINGS UNDER THE POST-CONVICTION HEARING ACT.**

In his *pro se* post-conviction petition, Henry Kaczmarek alleged that the State presented the perjured testimony of criminalist Pamela Fish in order to secure Henry's conviction for first degree murder. (C. 78-82) This error is cognizable under the Post-Conviction Hearing Act ("Act") because it amount to "a substantial denial" of Henry's constitutional rights as required by the Act. *See* 725 ILCS 5/122-1(a)(2004). However, the circuit court dismissed Henry's petition as frivolous and patently without merit. In so ruling, the trial court erred, because the petition alleged constitutional errors that were not substantively rebutted by the record. Therefore, this Court should reverse the circuit court's dismissal of the post-conviction petition, and remand this cause for second-stage proceedings pursuant to the Act.

Post-conviction petitions are governed by the Illinois Post-Conviction Hearing Act, 725 ILCS 5/122-1 *et seq.* (2004), which provides a remedy for criminal defendants who claim that a substantial violation of their constitutional rights occurred at the proceedings resulting in their convictions. *People v. Morgan*, 187 Ill.2d 500, 527 719 N.E.2d 681 (1999); *People v. Johnson*, 191 Ill.2d 257, 268, 730 N.E.2d 1107 (2000). The Act creates a three-tiered process for the adjudication of claims of constitutional deprivation. *People v. Gaultney*, 174 Ill. 2d 410, 417, 675 N.E.2d 102 (1996). At the first-stage of the process, when the defendant files a *pro se* post-conviction petition, the Act allows the trial court to review the pleading without input from the

State for a 90-day period to assess its adequacy. 725 ILCS 5/122-2.1(a). The trial court's review

is limited to a singular inquiry: is the pleading "frivolous and patently without merit?" 725 ILCS

5/122-2.1(a)(2); *People v. Boclair*, 202 Ill.2d 89, 789 N.E.2d 734 (2002); *People v. Edwards*,

197 Ill.2d 239, 757 N.E.2d 442 (2001). If it is, the court orders its dismissal; if not, counsel is

appointed, and the matter proceeds to the second-stage under the Act. 725 ILCS 5/122-2.1(b),

122-4 *et seq.*

The Illinois Supreme Court has held that a post-conviction petition is considered

frivolous or patently without merit only if the allegations in the petition, taken as true and

liberally construed, fail to present the "gist of a constitutional claim." *People v. Edwards*, 197

Ill.2d at 244. In adopting the more relaxed gist standard, the Court rejected the prior "sufficient

facts" test and stated that "requiring this type of full or complete pleading is contrary to this

court's holding that the *pro se* defendant need only present a limited amount of detail." *Id.* at

245. Hence, the "gist" standard is a low threshold, requiring only a limited amount of detail and

a claim need not be set forth in its entirety. *Id.* Additionally, all well-pleaded facts in the

petition are taken as true. *People v. Towns*, 182 Ill.2d 491, 503, 696 N.E.2d 1128 (1998).

The standard of review in an appeal from an order dismissing a post-conviction petition is

plenary or *de novo* review, because inquiry into the sufficiency of the allegations is legal in

nature. *People v. Coleman*, 183 Ill.2d 366, 387-88, 701 N.E.2d 1063 (1998).

In his petition, Henry alleged that his right to due process was violated when the State

presented the perjured testimony of criminalist Pam Fish in order to secure his conviction for first

degree murder. A conviction obtained by the knowing use of perjured testimony violates due

process and must be set aside if there is any reasonable likelihood that the false testimony could

-21-

have affected the jury's verdict. *People v. Olinger*, 176 Ill.2d 326, 345, 680 N.E.2d 321 (1997).

However, in order to establish a violation of due process, the prosecutor actually trying the case

need not have known that the testimony was false. *Olinger*, 176 Ill.2d at 348. Rather,

knowledge on the part of any representative or agent of the prosecution is enough. *Olinger*, 176

Ill.2d at 348. Therefore, if in fact the allegation of perjured testimony by Pam Fish (an employee

of the Crime Lab Division of the Chicago Police Department at the time of the first trial and an

employee of the Forensic Science Center run by the Illinois State Police at the time of the second

trial) affecting the jury's verdict is proven by Henry, whether known or unknown to the

prosecution, a due process violation occurred since the prosecution is charged with knowledge of

its agents, including the police. *See People v. Smith*, 352 Ill.App.3d 1095, 817 N.E.2d 982 (1st

Dist. 2004).

　　In this case, Pam Fish testified at both Henry's first and second trials. At the first trial,

Fish was qualified as an expert in the field of serology. (First Trial R. 855) In order to conduct

her testing, Fish received Henry's jacket, Henry's jeans, blood that was taken from Minnie

Nielsen's kitchen floor, a knife that was recovered from Nielsen's apartment, three jewelry boxes

recovered from Nielsen's apartment, and samples of both Henry's and Nielsen's blood. (First

Trial R. 859-862) Fish made two cuttings from the knees of the jeans and cuttings from each arm

panel of the jacket where she observed reddish-brown stains. (First Trial R. 856-858)

　　Fish testified that Nielsen's blood was Type A, and Henry's blood was Type B. (First

Trial R. 864) Fish determined that the blood on the kitchen floor was Type A human blood, the

blood on the knife was human blood, and the blood on the jewelry boxes was human blood.

(First Trial R. 867-869) Fish was unable to conduct any further testing on the blood samples

-22-

from the floor, knife and boxes. (First Trial R. 867-869)

Fish determined that the reddish brown stains that she found on Henry's jacket and pants were Type A human blood. (First Trial R. 864-865) Fish testified that she was also able to perform electrophoresis on the blood samples taken from Henry's jacket and pants, as well as on the known blood standards of Henry and Nielsen. (First Trial R. 870) Fish tested the samples for nine enzymes and hemoglobin. (First Trial R. 884) Fish was only able to get a reading on eight of the enzymes and hemoglobin. (First Trial R. 873) The samples from Henry's pants and jacket were too degraded to get a reading on the GLO enzyme. (First Trial R. 873) Of the enzymes she was able to test, the enzymes from the blood samples taken from Henry's pants and jacket matched the enzymes from Nielsen's blood. (First Trial R. 873-874) Also, of the enzymes she was able to test, all but one of the enzymes in Nielsen's and Henry's blood were identical. (First Trial R. 906)

Based on her testing, Fish concluded that the blood on Henry's jacket and pants was not his own blood. (First Trial R. 873) Fish testified that about eight in one thousand people would have the same blood type and enzyme types that Nielsen had. (First Trial R. 913)

At the second trial, Fish was qualified as an expert in the fields of electrophoresis, serology, and DNA testing. (Second Trial R. J133) Fish gave similar testimony at the second trial regarding her blood type testing and enzyme testing of the various samples that she received in this case. Her conclusions were the same as the conclusions that she presented at the first trial – that Henry could not have been the contributor of the blood found on his pants and jacket, but that the blood found on the jacket and pants was consistent with Nielsen's blood. (Second Trial R. J127-J154)

-23-

Fish testified that since Henry's first trial, the Chicago Police Department had converted to DNA testing. (Second trial J160) Fish attempted to conduct DNA testing on the remaining samples that she had in this case. (Second Trial R. J160) Fish made additional cuttings on the lower left leg of Henry's pants where she observed some very small stains. (Second Trial R. J162) Fish was able to extract a very small amount of human DNA from these samples, but was unable to conduct any further testing because the samples were too small and degraded, and because it is difficult to conduct DNA testing on samples taken from blue jeans. (Second trial R. J163) Fish tried to conduct DNA testing on the blood samples taken from Henry's jacket, but her results indicated a mixture of blood samples that were consistent and therefore uninterpretable. (Second Trial R. J163)

Pam Fish's testimony that the blood found on Henry's pants and jacket was consistent with Nielsen's blood was critical to the State's case against Henry because it was the only evidence placing Henry inside Nielsen's apartment. There were no fingerprints or shoeprints found in Nielsen's home connecting Henry to the murder. No one testified that they saw Henry entering or leaving Nielsen's apartment. The police did not recover a weapon from Henry connecting him to the murder.

Henry testified that he had never been in Nielsen's apartment and he denied killing her. (Second Trial. K209) Henry explained how he came into possession of Nielsen's things. Henry testified that around 2:00 a.m., on the night of the murder, he returned to Dan Larry's house from a bar because he had to go to the bathroom and he wanted to see if Dan wanted to go out drinking. (Second Trial R. K190, K227-228) Henry parked his car behind Dan's house and went to urinate on the side of the house. (Second Trial R. K191, K214) While urinating, Henry saw a

-24-

bag and looked inside. (Second trial R. K192, K194) Henry, seeing a box containing silverware

in the bag, picked up the bag and threw it into the trunk of his car. (Second Trial R. K195) He

did not look at the bag again until the next day when he sorted through it at his friend Bill

Brown's house. (Second Trial R. K203-205) With this plausible explanation for Henry's

possession of Nielsen's things, evidence that Nielsen's blood may have been present on Henry's

pants and jacket was a critical element of the State's case.

In fact, the State consistently argued the importance of Fish's testimony in both opening

statement and closing argument. The prosecutor concluded his opening statement at the second

trial with the following:

> On Sunday morning, you are going to hear about Pam Fish. She's a
> serologist who, at that time, worked for the Chicago Police Department, was
> called at home, called down specially to work on this case.
> Millie Nielsen is Type A blood. The defendant is Type B. The blood on
> the jacket was tested for blood. It was blood. It was Type A, just like Millie's.
> The blood on the jeans was Type A, just like Millie's, and you are going to hear
> from Miss Fish over the next two weeks that she performed a process called
> electrophoresis, which is the predecessor of the crime lab's DNA testing.
> But back in 1987, they were doing electrophoresis, and they test for
> enzymes in the blood, and Miss Fish was able to test for nine known enzymes in
> the victim, Millie Nielsen's blood.
> Wouldn't you know that the bloodstain on the defendant's right jacket
> sleeve, as I said, was A, and every enzyme matched that of the blood of Millie
> Nielsen.
> And the blood stain on his left jacket sleeve was A, and every enzyme,
> all nine enzymes, matched those of the blood of Millie Nielsen.
> And the stain on his right thigh area was A, just like Millie Nielsen, and
> all nine enzymes tested the same as enzymes of the known blood standard of Millie
> Nielsen and, once again, when they tested the left leg, they tested the enzyme activity,
> and all nine enzymes tested, tested and matched those of Millie Nielsen.
> (Second Trial R. 119-20)

During closing, the prosecutor argued:

> And later on, you heard that Pam Fish performed electrophoresis, the

process that was used at that time. If I can remember from her testimony the other day, from the items that she cut out the blood on the defendant's clothes was consistent in all 9 categories of enzyme activity with the victim Millie Nielsen's blood on his clothes cannot be his because it's type A, he's type B. He's immediately excluded. (Second Trial R. L83)

And circumstantially we can say well if the blood in that cut out on his right sleeve is consistent with all the enzymes of Millie Nielsen, blood that lights up right now next to that cut out, couldn't you infer that's also the blood of Millie Nielsen? Couldn't you also infer that the specks are the blood of Millie Nielsen. (Second Trial R. L84-85)

Now in [Nielsen's] struggle for life, she left you the clues to find him guilty. Because she left her blood on his jacket and on his pants. (Second Trial R. L88)

Clearly, the State relied heavily on Fish's testimony and expert opinions in its effort to connect

Henry to the crime.

In his post-conviction petition, Henry claimed that Pam Fish's testimony was perjured.

(C. 78-82)

The only evidence of any substance in this case is the testimony of Pam Fish, who[se] credibility is now called into question, not just in the present case, but in all cases that she testified on the State's behalf. It has now been proven that Ms. Fish has repeatedly lied to and mislead juries and courts to ensure convictions for the State. She is under investigation, she is being sued and all cases that Ms. Fish has testified in are being called into question. (C. 81)

In support of his allegation, Henry attached four newspaper articles to his petition. (C. 92-98)

The first article reports that Pam Fish had been transferred to an administrative job within the

Illinois State Police crime lab in research and development where she would review proposed

projects and help write grants. Nicole Ziegler Dizon, *Crime Lab Supervisor Transferred*, The

State Journal Register, August 16, 2001. Fish had been the supervisor of the biochemistry

division of the Illinois State Police crime lab which handled DNA and trace evidence. *Id.* The

article reported that this transfer came after Fish's work had been questioned in several high-

profile rape cases, and that several civil suits had been filed against Fish claiming that Fish

-26-

misled juries and ignored evidence that could have exonerated defendants. *Id.*

The second article describes a report[2], authored by Edward T. Blake and Alan Keel, which had been filed in federal court accusing Pam Fish of providing false testimony in nine cases, including one involving Billy Wardell and Donald Reynolds, who were wrongfully convicted of the 1986 rape of two University of Chicago students. Robert C. Herguth, *Report Slams '80s Police Lab*, Chicago Suntimes, January 14, 2001. The two men were later exonerated by DNA. *Id.* The report was filed as part of a civil lawsuit being brought by Wardell and Reynolds. *Id.* The report also stated that Fish gave contradictory and questionable testimony in the case of the four men convicted of the 1986 rape and murder of medical student Lori Roscetti on the West Side. *Id.* The article pointed out that Fish had first come under scrutiny when it was revealed that she failed to disclose that John Willis, who was wrongly convicted of rape, had a different blood type from the actual offender. *Id.*

The third article describes the report authored by Blake and Keel regarding Fish and another report authored by Dr. Howard Harris regarding the Chicago Police Department crime laboratory. Both of these reports were filed in federal court in connection with the civil suit filed by Billy Wardell and Donald Reynolds. Maurice Possley and Steve Mills, *Disorganization Typified Crime Lab, Report Says*, Chicago Tribune, January 15, 2001. The report pertaining to the Chicago Police Department crime lab concluded that the lab "'displayed serious deviations from established crime laboratory standards for care of crime laboratories in 1986.'" *Id.* The report pertaining to Fish alleged that she "falsely testified about the results of blood tests

---

[2]Appellant's Motion to Supplement the Record on Appeal with the Blake and Keel report was denied by this Court on September 30, 2005.

performed for the Reynolds and Wardell case, as well as the cases of seven other men." *Id*.

The final article also discusses the Blake and Keel report. Steve Mills and Maurice Possley, *State Crime Lab Fraud Charged*, Chicago Tribune, January 14, 2001. The article quotes the report as stating, "'In many of these cases, Ms. Fish misrepresented the scientific significance of her findings either directly or by omission. . . . The nature of these errors are such that a reasonable investigator, attorney or fact finder would be misled. . . . And always, she offered the opinion most damaging to the defendant.'" *Id*. According to the article, in the Willis case, Fish testified that her test results were inconclusive, but her lab notes later showed that the tests excluded Willis as a suspect. *Id*. In the cases of Larry and Calvin Ollins, who were accused of the rape and murder of Lori Roscetti, Fish's testimony helped to convict the brothers even though her tests ruled them out as having any link to the semen found in Roscetti, a fact that Fish failed to disclose to the jury. *Id*. In an interview, Blake told the Chicago Tribune that he was surprised that the disclosures in past cases had not generated investigation into all of Fish's cases. *Id*.

In *People v. Smith*, 352 Ill.App.3d 1095, 817 N.E.2d 982 (1st Dist. 2004), the defendant filed a post-conviction petition alleging that he had been denied his right to due process where the State presented the perjured testimony of Pamela Fish in order to secure his conviction for murder. The defendant's petition was dismissed at the second stage of post-conviction proceedings. *Smith*, 352 Ill.App.3d at 1098. On appeal, the defendant argued that the circuit court erred in dismissing his post-conviction petition. *Smith*, 352 Ill.App.3d at 1097. In response, the State first argued that the defendant had failed to show any constitutional violation because the testimony provided by Fish was not material at his trial. The court disagreed,

-28-

pointing out that Fish's testimony did connect the defendant to the crime, and the State relied on

Fish's testimony in both opening statement and closing argument to argue to the jury that Fish's

testimony connected the defendant to the crime. *Smith*, 352 Ill.App.3d at 1102-1105.

The State in *Smith* also argued that the defendant's petition was properly dismissed

because the defendant failed to provide documentation supporting his allegation of false or

perjured testimony. *Smith*, 352 Ill.App.3d at 1105. The appellate court disagreed with this

contention as well. The defendant attached to his petition the "Petition to Vacate Judgment"

from *People v. Willis*, No. 90 CR 23912. *Smith*, 352 Ill.App.3d at 1107. The court found that

the *Willis* petition demonstrated that Fish testified that the results of her tests in that case were

inconclusive, which was similar to the testimony she had given regarding her test results in

*Smith*. *Smith*, 352 Ill.App.3d at 1107-1108.

> It was not until April of 1998 that defense attorneys in the *Willis* case discovered, by reviewing Fish's notes of test results, that her testing did not produce inconclusive results, but actually exonerated Willis. . . . Pamela Fish incorrectly reported the results as 'inconclusive' and repeated this assertion at trial. The forensic results in fact excluded Willis, which defense counsel discovered after trial when given the opportunity to examine the notes of the test results.
>
> \*       \*       \*
>
> Without a hearing it cannot be determined whether Fish's testimony in the instant case regarding inconclusive test results was factually accurate or factually false as it was found to be in the *Willis* case. Without a hearing, it cannot be determined whether Fish's testimony that she was unable to type some of the blood samples in the instant case due to insufficient size was accurate or factually false.
>
> Fish also conducted an electrophoresis enzyme test on the blood found on Smith's underpants and on cross-examination she testified that for 6 of the 10 subcategories of enzymes she tested for she got no reaction. However, on re-direct she claimed that the enzymes she did recover from the defendant's underwear were consistent with the victim's blood. Fish's testimony that she got no reaction from the test is similar to her testimony in the *Willis* case where she reported her test results as inconclusive. As previously noted, the forensic results in fact were inaccurately reported by Fish as inconclusive and in fact excluded Willis. Without a hearing, it cannot be determined whether Fish's testimony in the instant case that she got no

reaction was factually accurate or factually false.

*  *  *

Fish further testified she did not conduct DNA testing of any of the blood samples because the blood sample was 'degraded.' Without a hearing, it cannot be determined whether Fish's inability to conduct DNA testing for the reason provided at trial was in fact accurate or, as alleged by defendant, factually false, as similar testimony was found to be in the *Willis* case. *Smith*, 352 Ill.App.3d at 1108.

The appellate court found that the defendant had made a substantial showing of a constitutional violation warranting an evidentiary hearing. *Smith*, 352 Ill.App.3d at 1112. The court remanded the case for an evidentiary hearing to determine whether or not the defendant had in fact been denied due process and unfairly convicted as the result of the perjured testimony provided by Pamela Fish. *Smith*, 352 Ill.App.3d at 1113.

The articles Henry attached to his petition and this Court's decision in *Smith* support Henry's allegation that Pam Fish testified falsely at his trial. These documents give numerous examples of cases where Fish either testified falsely or gave misleading testimony, always in support of the State's case against the defendants. The newspaper articles detail the many cases in which Fish's testimony aided in the conviction of certain defendants who were later exonerated of the crimes for which they were convicted. The articles also discuss how Fish was transferred to an administrative position within the crime lab after the allegations of her misconduct were revealed.

The report from Alan Keel and Edward Blake, as reported in the articles, concludes that in many of the cases in which Fish's testimony was critical to the State's case, she misrepresented the scientific significance of her findings either directly or by omission to such an extent that a reasonable investigator, attorney or fact finder would have been misled concerning the ability of her work to include or exclude relevant individuals as potential sources of

-30-

biological evidence.

Morever, the facts of *Smith*, and those of *Willis* as described in *Smith*, are strikingly similar to the facts in this case. First, as in *Smith* and *Willis*, part of Fish's test results in this case were inconclusive. Fish's results from the DNA testing that she did on Henry's jacket were inconclusive. Thus, like *Smith* and *Willis*, without a hearing, it cannot be determined whether Fish's testimony regarding inconclusive test results was factually accurate or factually false.

Second, as in *Smith* and *Willis*, Fish testified that she got "no reaction" for one out of the nine enzymes that she tested for on Henry's pants and jacket. Fish testified that she was not able to determined the type of GLO enzyme present in the samples taken from Henry's pants and jacket. Also, as in *Smith* and *Willis*, Fish testified that of the enzymes she was able to recover, they were all consistent with Nielsen's blood. Thus, like *Smith* and *Willis*, without a hearing, it cannot be determined whether Fish's testimony that she got no reaction was factually accurate or factually false.

Finally, as in *Smith* and *Willis*, Fish testified that she could not conduct DNA testing on many of the blood samples because the samples were "degraded." Fish testified that she was not able to obtain a DNA profile from the blood samples taken from Henry's pants because the samples were too small or degraded. Thus, like *Smith* and *Willis*, without a hearing, it cannot be determined whether Fish's inability to conduct DNA testing for the reason provided at trial was in fact accurate or was factually false.

While the issue before this Court in *Smith* and in this case is the same, it is important to note that the post-conviction petition in *Smith* had been dismissed at the second stage of post-conviction proceedings, while Henry's petition was dismissed at the first stage. Therefore, the

-31-

court in *Smith* had to determine whether the defendant had demonstrated a substantial showing of a constitutional violation warranting an evidentiary hearing, while in this case, this Court need only determine whether Henry has stated the gist of a constitutional violation. *See Smith*, 352 Ill.App.3d at 1099. Based on the similarities between the facts of this case and those of *Smith*, Henry has clearly satisfied this low standard.

As in *Smith*, this Court should reverse the dismissal of Henry's *pro se* post-conviction petition and remand for further post-conviction proceedings. Henry has alleged facts in his petition, unrebutted by the record and support by documentation, that Pamela Fish gave perjured testimony that led to his conviction for first degree murder. This perjury by an agent of the State constitutes a due process violation and is therefore cognizable under the Act. Therefore, this Court must reverse the dismissal of Henry Kaczmarek's post-conviction petition and remand for further proceedings under the Post-Conviction Hearing Act.

**II.    HENRY KACZMAREK'S *PRO SE* POST-CONVICTION PETITION PRESENTED THE GIST OF A CONSTITUTIONAL CLAIM OF INEFFECTIVE ASSISTANCE OF TRIAL AND APPELLATE COUNSELS FOR FAILING TO CHALLENGE THE ADMISSIBILITY OF THE STATE'S EXPERT WITNESSES' TESTIMONY REGARDING LUMINOL TESTING AND BLOOD SPLATTER EVIDENCE UNDER *FRYE V. UNITED STATES*. KACZMAREK'S PETITION THEREBY WARRANTS FURTHER PROCEEDINGS UNDER THE POST-CONVICTION HEARING ACT.**

In his *pro se* post-conviction petition, Henry Kaczmarek alleged that he received the ineffective assistance of counsel where his appellate and trial counsels failed to challenge the trial court's erroneous acquiescence to the expert testimonies of the State's witnesses Mitch Rea and Rod Englert.  (C. 84-85)  Where both trial and appellate counsel failed to challenge these witnesses' testimonies under *Frye v. United States*, Henry stated the gist of a constitutional claim cognizable under the Post-Conviction Hearing Act ("Act").  *See* 725 ILCS 5/122-1(a)(2004). However, the circuit court dismissed Henry's petition as frivolous and patently without merit.  In so ruling, the trial court erred, because the petition alleged constitutional errors that were not substantively rebutted by the record.  Therefore, this Court should reverse the circuit court's dismissal of the post-conviction petition, and remand this cause for second-stage proceedings pursuant to the Act.

Post-conviction petitions are governed by the Illinois Post-Conviction Hearing Act, 725 ILCS 5/122-1 *et seq.* (2004), which provides a remedy for criminal defendants who claim that a substantial violation of their constitutional rights occurred at the proceedings resulting in their convictions.  *People v. Morgan*, 187 Ill.2d 500, 527 719 N.E.2d 681 (1999); *People v. Johnson*, 191 Ill.2d 257, 268, 730 N.E.2d 1107 (2000).  The Act creates a three-tiered process for the adjudication of claims of constitutional deprivation.  *People v. Gaultney*, 174 Ill. 2d 410, 417,

-33-

675 N.E.2d 102 (1996). At the first-stage of the process, when the defendant files a *pro se* post-conviction petition, the Act allows the trial court to review the pleading without input from the State for a 90-day period to assess its adequacy. 725 ILCS 5/122-2.1(a). The trial court's review is limited to a singular inquiry: is the pleading "frivolous and patently without merit?" 725 ILCS 5/122-2.1(a)(2); *People v. Boclair*, 202 Ill.2d 89, 789 N.E.2d 734 (2002); *People v. Edwards*, 197 Ill.2d 239, 757 N.E.2d 442 (2001). If it is, the court orders its dismissal; if not, counsel is appointed, and the matter proceeds to the second-stage under the Act. 725 ILCS 5/122-2.1(b), 122-4 *et seq.*

The Illinois Supreme Court has held that a post-conviction petition is considered frivolous or patently without merit only if the allegations in the petition, taken as true and liberally construed, fail to present the "gist of a constitutional claim." *People v. Edwards*, 197 Ill.2d at 244. In adopting the more relaxed gist standard, the Court rejected the prior "sufficient facts" test and stated that "requiring this type of full or complete pleading is contrary to this court's holding that the *pro se* defendant need only present a limited amount of detail." *Id.* at 245. Hence, the "gist" standard is a low threshold, requiring only a limited amount of detail and a claim need not be set forth in its entirety. *Id.* Additionally, all well-pleaded facts in the petition are taken as true. *People v. Towns*, 182 Ill.2d 491, 503, 696 N.E.2d 1128 (1998).

The standard of review in an appeal from an order dismissing a post-conviction petition is plenary or *de novo* review, because inquiry into the sufficiency of the allegations is legal in nature. *People v. Coleman*, 183 Ill.2d 366, 387-88, 701 N.E.2d 1063 (1998).

In his *pro se* post-conviction petition, Henry alleged that the trial judge was biased against him as evidenced by the judge allowing the State's expert witnesses to testify as experts

-34-

despite their credentials suggesting that they were not in fact experts. (C. 84) Henry further alleged in his petition that his trial and appellate counsels were ineffective for failing to challenge these experts' testimonies at both the trial and appellate levels. (C. 84)

The two State expert witnesses at issue were Mitch Rea and Rod Englert. Mitch Rea, an Arizona fraud investigator, testified that he was contacted by the Cook County State's Attorney's Office in the Spring of 1994 to perform luminol testing in conjunction with the Nielsen murder. (Second Trial R. K7, K26) The trial court accepted Rea as an expert in the field of luminol testing. (Second Trial R. K25-26) Rea testified that luminol testing is a chemical test for the presence of blood. (Second Trial R. K9) In the forensic context, Rea testified, luminol testing is primarily used to find blood that you cannot see. (Second Trial R. K10-11) Rea described that when the test is conducted, the luminol will produce a fleeting luminance or glow where blood is present. (Second Trial R. K12) Rea admitted that luminol will react not only with human blood, but animal blood, certain metals, cleansers, common household agents, bleach, and some plant materials as well. (Second Trial R. K17)

Rea conducted luminol testing on Henry's jacket and he testified that he observed a luminance consistent with blood on the right front arm, right front panel, left front panel, and left front sleeve of Henry's jacket. (Second Trial R. K26-27, K32-37) Rea took photographs of the jacket and pants showing the locations of the glow. (Second Trial R. K39)

Rod Englert testified on behalf of the State regarding blood splatter evidence. The court ruled that Englert was an expert in the field of crime scene reconstruction and blood splatter. (Second Trial R. K66) Upon request from the Cook County State's Attorney, Englert reviewed the photographs of the Nielsen crime scene, the statements of witnesses, the luminol testing

-35-

photographs prepared by Mitch Rea, and the physical evidence recovered in the case. (Second Trial R. K66-69)

Concerning Ms. Nielsen's apartment, Englert noted that there was blood on the floor of the kitchen leading into Ms. Nielsen's bedroom. (Second Trial R. K91) Englert also observed that "on the floor are smears of blood, as though a struggle took place, and one of the individuals on the floor was bleeding." (Second Trial R. K91) When asked whether it was unusual not to have any footprints in the blood, Englert stated that it would not be unusual because blood dries very fast. (Second Trial R. K86-91)

Englert stated that the left and right knee areas of Henry's pants contained transfer stains and not splatter. (Second Trial R. K94) The transfer does not involve energy but just a transfer of something that was bloody that touched against the pants. (Second Trial R. K95) As for the bottom of the pants, Englert opined that there were numerous specks of blood consistent with medium velocity splatter. (Second Trial R. K96) Englert stated that the blood on defendant's pants would not be consistent with a person picking up a bloody bag in a gangway. (Second Trial R. K100) Further, Englert opined that the blood on the jeans would not be consistent with the wearer of the jeans "kneeing" someone in the nose. (Second Trial R. K102)

In examining the luminol photographs of Henry's jacket, Englert stated that the stains on the right and left arms contained splatter. (Second Trial R. K109) Englert stated that over the front of the jacket were little specks of projected blood. (Second Trial R. K111) On the right pocket was a very light transfer stain. (Second Trial R. K111)

Englert asserted that the manner of Nielsen's death was that she was attacked first in the kitchen where she received many blows while on the floor, and that she, while still alive, was

-36-

taken into the bedroom and thrown on the bed. (Second Trial R. K117) Englert acknowledged

that there was a great deal of blood in Ms. Nielsen's bed. (Second Trial R. K134)

Englert admitted that he was assuming that the blood splatter on Henry's jeans was

Nielsen's blood. (Second Trial R. K123) Englert conceded that no report stated that the splatter

on the lower left leg was Nielsen's blood and that if it were someone else's blood he would have

to reevaluate his position. (Second Trial R. K122-123) Englert testified that it was "very, very

possible" to get medium velocity splatter from a fight. (Second Trial R. K125)

While trial and appellate counsels challenged the expertise of Rea and Englert, trial

counsel did not request a *Frye* hearing to determine the admissibility of luminol testing and

blood splatter evidence, nor did appellate counsel raise this issue on appeal. It is well established

that the right to counsel guaranteed by both the United States and Illinois Constitutions includes

the right to the effective assistance of counsel. U.S. Const. Amends. VI, XIV; Ill. Const., Art. I,

sec.8; *Strickland v. Washington*, 466 U.S. 688, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *People v.

Albanese*, 104 Ill.2d 504, 473 N.E.2d 1246 (1984). Consequently, post-conviction relief may be

sought on the basis of ineffective assistance of trial counsel. *See People v. Steidl*, 177 Ill.2d 239,

685 N.E.2d 1335 (1997). Claims of ineffective assistance of appellate counsel are measured

against the same standard as those dealing with ineffective assistance of trial counsel. *People v.

West*, 187 Ill.2d 418, 435, 719 N.E.2d 664 (1999). A defendant who contends that appellate

counsel rendered ineffective assistance must show that the failure to raise the issue was

objectively unreasonable. *People v. Coleman*, 168 Ill.2d 509, 523, 660 N.E.2d 919 (1995).

In Illinois, the exclusive test for the admission of expert testimony is governed by *Frye v.

United States*, 293 F. 1013 (D.C. Cir. 1923). *Donaldson v. Central Ill. Pub. Serv. Co.*, 199 Ill.2d

63, 76-77, 767 N.E.2d 314 (2002). The *Frye* standard, commonly called the "general acceptance" test, provides that scientific evidence is only admissible at trial if the methodology or scientific principle upon which the opinion is based is "sufficiently established to have gained general acceptance in the particular field in which it belongs." *Donaldson*, 199 Ill.2d at 77, *quoting Frye*, 293 F. At 1014. In determining general acceptance, the focus is on the underlying methodology used to generate the conclusion, not the ultimate conclusion itself. *Donaldson*, 199 Ill.2d at 77. The initial inquiry focuses on *what* has been generally accepted by the relevant scientific community. *Donaldson*, 199 Ill.2d at 77-78. General acceptance does not require that the methodology be accepted by unanimity, consensus or even a majority of the experts. *Donaldson*, 199 Ill.2d at 78. "The *Frye* rule is meant to exclude methods new to science that undeservedly create a perception of certainty when the basis for the evidence or opinion is actually invalid." *Donaldson*, 199 Ill.2d at 78.

The *Frye* test is to be applied when the scientific principle, technique or test offered by the expert to support his or her conclusion is new or novel. *Donaldson*, 199 Ill.2d at 78-79. A scientific technique will be considered new or novel if is it original or striking or does not resemble something formerly known or used. *Donaldson*, 199 Ill.2d at 79. Once a principle, technique, or test has gained general acceptance in the particular scientific community, its general acceptance is presumed in subsequent litigation, and further *Frye* hearings will not be required. *Donaldson*, 199 Ill.2d at 79.

No reported cases in Illinois have addressed the admissibility of luminol testing. Two cases mention the use of luminol testing, but neither of these cases address the admissibility of the test results. *See People v. Henne*, 165 Ill.App.3d 315, 518 N.E.2d 1276 (4th Dist. 1988);

-38-

*People v. Hendricks*, 145 Ill.App.3d 71, 495 N.E.2d 85 (4th Dist. 1986). In *People v. Wheeler*, 777 N.E.2d 961 (3rd Dist. 2001), *supplemental opinion at People v. Wheeler*, 334 Ill.App.3d 273, 777 N.E.2d 961 (2002), a police technician testified regarding LMG (Leuco-Malachite Green) testing that he conducted on certain evidence in the case. LMG testing is a similar test to that of luminol testing in that it involves the spraying of a chemical mixture on a surface in order to detect latent blood. *Wheeler*, 777 N.E.2d at 963, 965, 968. Initially, the appellate court remanded the cause for a *Frye* hearing finding no reported cases in Illinois addressing the admissibility of LMG evidence. *Wheeler*, 777 N.E.2d at 968. On remand, the *Frye* hearing established a positive LMG reaction indicates a broad range of possible substances present on the material tested, but that it does not permit the tester to presume the presence of any particular substance. *Wheeler*, 777 N.E.2d at 970. Thus, the court found that LMG testing was generally accepted as a preliminary test for the presence of blood and not an accepted method for presuming the presence of blood. *Wheeler*, 777 N.E.2d at 970.

The admissibility of blood splatter evidence has also not been established in Illinois under *Frye*. In *People v. Owens*, 155 Ill.App.3d 990, 994, 508 N.E.2d 1088 (4th Dist. 1987), a crime scene technician testified that based on the location of blood splatters on a milk carton found at the scene, the victim was either standing or sitting behind the milk carton at the time he was shot, a key to the State's case against the defendant. The appellate court reversed the defendant's conviction and remanded the cause for a new trial finding no cases in which Illinois courts have taken judicial notice of the reliability of blood-splatter analysis evidence. *Owens*, 155 Ill.App.3d at 998. *Compare People v. Knox*, 121 Ill.App.3d 579, 459 N.E.2d 1077 (3rd Dist. 1984), *Justice Stouder dissenting* (court found that the blood splatter evidence presented in that case was not of

such a complex nature as to require a more detailed scientific foundation than what the State provided).

Thus, the admissibility of luminol testing and blood splatter evidence in Illinois has not been established under *Frye*. As such, defense counsel should have demanded a *Frye* hearing before Rea and Englert testified at Henry's trial, and appellate counsel should have raised the issue of trial counsel's ineffectiveness for not doing so on appeal. A *Frye* hearing could have resulted in a finding that one or both of the luminol testing or blood splatter evidence was inadmissible at Henry's trial because such testing had not gained general acceptance in the community. Or, as in *Wheeler*, the court may have found the evidence to be admissible but only in a limited capacity that would have been made clear to the jury. Counsels' failure to challenge this evidence under *Frye* was unreasonable.

Moreover, Henry was prejudiced as a result of his trial and appellate counsel's ineffectiveness. Rea's and Englert's testimonies were extremely damaging to Henry's case. Rea's testimony served as a basis for Englert's testimony. The foundation for Englert's testimony was that the areas on Henry's jacket and pants that glowed were blood, Nielsen's blood. Englert then opined that the "splatter" on the bottom of Henry's pants and the cuffs of his jacket was consistent with medium velocity splatter, and not picking up a bloody bag in a gangway, as Henry contended. Moreover, the State relied heavily on Rea's and Englert's testimonies in its closing argument:

> We had the jacket tested for luminol to see if other stains showed up, if there was any other indicia of blood on the jacket. And on that jacket you have splatter and blood which was pointed out by Mr. [Rea] and Mr. Englert [ ] who is an expert in crime scene reconstruction and blood splatter and was able to explain to you how the defendant got the blood on his clothes. And circumstantially we can

-40-

say well if the blood in that cut out on his right sleeve is consistent with all the enzymes of Millie Nielsen, blood that light up right now next to that cut out, couldn't you infer that's also the blood of Millie Nielsen? (Second Trial R. L84)

You heard Mr. Rod Englert he looked at the evidence and interpreted it for you. That interpretation was consistent with every piece of evidence. As Mr. Englert told you, he looks at all the pieces of the puzzle, this puzzle fit together. This puzzle when you put the pieces together portray the image of the defendant standing, beating up and choking Millie Nielsen in her room. (Second Trial R. L112)

Not only is that reasonable, but Rod Englert told you about that blood that she had during the attacks. Just because there may be a lot of blood at the scene, doesn't mean that at the moment of the attack, the individual gets blood soaked. It doesn't mean that at all. And he told you about the experiments he's conducted. (Second Trial R. L113)

Or is the more reasonable account for what happened as told to you by Rod Englert as borne out by the evidence when he talked about the transfer stains, the wipes, the swipes is the more reasonable account. That Millie as she's trying to fend off her attack and you look at the sleeves of this garment, you look a[t] the hand area of this garment. What do you see? Blood. You sweep this against the hands and the arms of the offender who is trying to take the life out of your body, there's your transfer stain. That explains it. (Second Trial R. L114)

The luminol testing and blood splatter evidence were critical to the State in refuting Henry's claim that he found the bag of Nielsen's things in the gangway and merely carried it to his car. Rea's testimony that the luminol testing showed blood splatters on Henry's pants and jacket was the basis for Englert's testimony that the blood stains found on Henry's jacket and pants could not have come from carrying a bloody bag, but rather were consistent with Henry's being Nielsen's killer.

Henry's *pro se* post-conviction petition, alleging that his trial and appellate counsels were ineffective for failing to challenge the trial court's acquiescence to the testimonies of Rea and Englert, stated the gist of a meritorious constitutional claim of ineffective assistance of counsel. Because luminol testing and blood splatter analysis have not achieved general acceptance in Illinois, trial counsel should have demanded a *Frye* hearing before this evidence was admitted at

-41-

Henry's trial, and having failed to do so, appellate counsel should have raised the issue of trial counsel's ineffectiveness on appeal. Rea's and Englert's testimonies regarding the luminol testing and blood splatter analysis were critical to the State's case against Henry, and Henry was thereby severely prejudiced by his counsels' ineffectiveness. Therefore, this Court must reverse the dismissal of Henry Kaczmarek's post-conviction petition and remand for further proceedings under the Post-Conviction Hearing Act.

## CONCLUSION

For the foregoing reasons, Henry Kaczmarek, Petitioner-Appellant, respectfully requests that this Court reverse the trial court's decision dismissing Henry's *pro se* petition for post-conviction relief, and remand this cause for the appointment of counsel and further proceedings pursuant to sections 122-4 through 122-6 of the Post-Conviction Hearing Act.

Respectfully submitted,

MICHAEL J. PELLETIER
Deputy Defender

SARAH CURRY
Assistant Appellate Defender
Office of the State Appellate Defender
203 North LaSalle Street - 24th Floor
Chicago, Illinois 60601
(312) 814-5472

COUNSEL FOR PETITIONER-APPELLANT

## <u>APPENDIX TO THE BRIEF</u>

Index to the Record . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-1

Certified Report of Disposition . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-11

Notice of Appeal . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-12

## INDEX TO THE RECORD

**Common Law Record ("C")**                                                                 **Page**

Memorandum of Orders ("Half Sheet") . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 26

Certified Statement of Conviction/Disposition . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Opinion Order (October 2, 2003, March 4, 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31, 45

Petition for Post Conviction Relief (March 24, 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 77

Chicago Police Department Laboratory Report . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 90

Certified Report of Disposition (June 21, 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 106

Order . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 107

Notice of Appeal (July 13, 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 114

**Supplemental Commonlaw Record ("SC")**

Correspondence from Forensic Science Associates . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

**Report of Proceedings ("R")**

| | **Direct** | **Cross** | **Redir.** | **Recr.** |
|---|---|---|---|---|
| May 19, 2004 | | | | |
| Continuance | | | | B2 |
| June 14, 2004 | | | | |
| Petition for Post-Conviction Relief - Denied | | | | B11 |

**Direct Appeal Record**
**Common Law Record ("SC")**                                                                 **Page**

Court No.  97-2557

Memorandum of Orders ("Half Sheet") . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Indictment (May 18, 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

Appellate Court's Opinion (March 31, 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

Motion to Reduce Bail (September 30, 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 79

A-1

Pro Se Motion for Appointment of Other Counsel (January 31, 1994) . . . . . . . . . . . . . . . . . . 82

Pro Se Motion to Secure Expert Witness (January 31, 1994) . . . . . . . . . . . . . . . . . . . . . . . . . 86

Motion for Bond Reduction (February 23, 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 90

Motion for Judgment Notwithstanding the Verdict (September 13, 1994) . . . . . . . . . . . . . . 91

Motion to Dismiss Based Upon Speedy Trial Violation (November 18, 1994) . . . . . . . . . . . 93

State's Motion to Compel Discovery (January 27, 1995) . . . . . . . . . . . . . . . . . . . . . . . . 104, 116

Order (April 6, 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 107

Documents Tendered by the State (June 27, 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 104, 116

Order (April 6, 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 107

Documents Tendered by the State (June 27, 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 109

State's Supplemental Answer to Discovery (January 27, 1995) . . . . . . . . . . . . . . . . . . . . . . 111

Certificate Adjudging Named Person to be Material Witness (August 8, 1995) . . . . . . . . . . 121

Report of Proceedings (October 11, 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 126

Bond . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 135

Renewed Motion to Revoke or Increase Defendant's Bond . . . . . . . . . . . . . . . . . . . . . . . . . 147

Jury Instructions and Verdicts (November 22, 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 152

Motion in Limine (November 18, 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 195

Motion to Dismiss with Exhibits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 199

Motion to Grand Bond Pending Appeal . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 201

Sentencing Order . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 201

Motion for New Trial (January 17, 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 294

Notice of Appeal (May 7, 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 296

**Direct Appeal**
**Report of Proceedings ("SR")**

|  | Direct | Cross | Redir. | Recr. |
|---|---|---|---|---|
| Jury Selection |  |  |  | H32 |

A-2

|  | **Direct** | **Cross** | **Redir.** | **Recr.** |
|---|---|---|---|---|
| Opening Statements |  |  |  |  |
|     State |  |  |  | I9 |
|     Defendant |  |  |  | I21 |
| States Witnesses |  |  |  |  |
|     Officer Marsala | I32 | I51 |  |  |
|     Ronald Larry | I60 | I85 | I101 |  |
|     Michael Chambliss | I103 | I147 | I155 | I156 |
|     Margaret Fisher | I176 | I194 | I203 |  |
|     John Fisher | I204 | I211 |  |  |
|     Mary Ann Furlong | I213 | I229 |  |  |
|     Robert Baike | J3 | J20 |  |  |
|     Jerome Bogucki | J27 | J61 |  |  |
|     Robert Davie | J70 | J86 |  |  |
|     Fern Briggs | J95 |  |  |  |
|     Barbara Briggs | J103 |  |  |  |
|     Theatrice Patterson | J110 | J121 | J123 |  |
|     Pam Fish | J127 | J164 | J170 |  |
|     Mitch Rea | K6, K26 | K21, K40 | K43 |  |
|     Rod Englert | K47, K66 | K64, K121 | K146 | K147 |
| Defense Witnesses |  |  |  |  |
|     Pam Hines | K151 | K157 |  |  |
|     Henry Kaczmarek | L172 | K213 | K258 |  |
|     Elizabeth Finuchi |  |  |  | K163 |
|     Dr. Kenneth Siegesmund | L3 | L9 | L35 |  |

| | **Direct** | **Cross** | **Redir.** | **Recr.** | |
|---|---|---|---|---|---|
| Defense Rests | | | | | L42 |
| State's Rebuttal | | | | | |
|     Detective Bogucki | L42 | L46 | L52 | L54 | |
|     Richard Stevens | L56 | L61 | L64 | | |
| Closing Arguments | | | | | |
|     State | | | | | L74 |
|     Defendant | | | | | L88 |
|     State | | | | | L106 |
| **Verdict** | | | | | L133 |
| Motion for New Trial | | | | | N3 |
| **Imposition of Sentence** | | | | | N13 |

**Direct Appeal Record**
**Common Law Record ("SC")**                                                    **Page**

**Court No. 89-3182**

Arrest Report (April 26, 1987 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Complaint (April 27, 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Order Committing Defendant to Cook County Department of Corrections to be Held Without
Bail (April 27, 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Indictment (May 18, 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

State's Motion for Discovery (May 20, 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

Placita (May 29, 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

**Direct Appeal Record**
**Common Law Record ("SC")**                                              **Page**

State's Answer to Discovery (June 25, 1987) ..................................... 35

State's Motion for Disclosure (July 9, 1987) ..................................... 40

Order (July 9, 1987) ............................................................. 41

Defendant's Answer to Discovery (July 9, 1987) ................................. 42

Motion to Advance and Reset (September 1, 1987) ................................ 47

Defendant's Motion for Discovery (November 12, 1987) .......................... 50

Motion to Quash Arrest and Suppress Evidence (November 12, 1987) .................. 55

Motion to Allow Inspection of Police Evidence Files (December 16, 1987) .............. 58

Subpoena (December 16, 1987) .................................................. 62

Order (December 17, 1987) ..................................................... 96

Defendant's Motion for Appointment of Certain Experts (February 23, 1987) ............ 98

State's Amended Answer to Discovery (October 26, 1988) .......................... 102

Motion to Suppress Statements (October 26, 1988) ............................... 104

Motion to Produce Testable Sample of Blood Stains and Blood (October 26, 1988) ...... 107

State's Response to the Defendant's Motion to Produce Testable Samples of Blood Stains
and Blood (November 2, 1988) ................................................. 109

State's Motion to Compel Discovery (March 22, 1989) ............................ 113

Order (April 6, 1989) .......................................................... 119

Motion to Advance and Reset Court Date (May 31, 1989) .......................... 122

Motion to Appoint the Public Defender as Counsel or Otherwise Provide for the Legal
Representation of Defendant (May 31, 1989) .................................... 126

Motion to Appoint Midwest Center to Institutions and Alternatives to Prepare
Sentencing Plan (May 31, 1989) ............................................... 129

Arrest Warrant for Thomas Szcszol and Danny Funkhauswer (June 5, 1989) ............ 132

Defendant's Answer to Discovery (June 5, 1989) ................................. 134

State's Second Amended Answer to Discovery (June 5, 1989) ...................... 134

**Direct Appeal Record**
**Common Law Record ("SC")** **Page**

Jury Waiver as to Death Penalty Hearing (June 5, 1989) .............................. 137

Order (June 6, 1989) ............................................................ 138

Defendant's Amended Answer to Discovery (June 6, 1989) ........................... 139

Defendant's Motion to Produce Evidence (June 6, 1989) ............................ 141

Defendant's Motion for Discovery and a Bill of Particulars as to Aggravation
(June 6, 1989) ................................................................. 144

Motion for Attorney Participation in Voir Dire (June 6, 1989) ...................... 145

Motion to Compel State to Disclose Any Non-Statutory Aggravating Factor (June 6, 1989) 147

Motion for Order Declaring Separate Sentencing Hearing Provision of the Death Penalty
Unconstitutional (June 6, 1989) ................................................. 148

Voir Dire Questions (June 6, 1989) .............................................. 182

Defendant's Amended Discovery Answer (June 12, 1989) ............................ 186

Jury Instructions (June 13, 1989) ............................................... 187

Notes from Jury (June 13, 1989) ................................................ 230

Verdicts (June 14, 1989) ....................................................... 232

Order (June 14, 1989) ......................................................... 236

Motion to Prohibit Consideration of Arrests Not Resulting in Conviction (July 13, 1989) .. 239

Motion to Allow Defendant Right of Allocution (July 13, 1989) ..................... 244

Motion for Discovery and Bill of Particulars as to Aggravation (July 13, 1989) ........ 245

Motion to Allow Defense to Present Opening Close and Rebuttal Argument at Phase
Two of Death Penalty Hearing (July 13, 1989) ................................... 247

Judge's Notes to Jury (July 13, 1989) ........................................... 249

Pre-Sentencing Investigation (July 13, 1989) ..................................... 251

State's Answer to Discovery for Death Penalty Hearing (July 18, 1989) .............. 258

Order (July 25, 1989) .......................................................... 259

**Direct Appeal Record**
**Common Law Record ("SC")**                                                              **Page**

Motion to Appoint Doctor to Conduct Neuropsychological Battery on Defendant
(September 20, 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 263

Sentencing Order (November 21, 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 267

Notice of Appeal (November 21, 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 268

Notice of Notice of Appeal (November 21, 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 269

Appointment of State Appellate Defender (November 21, 1989) . . . . . . . . . . . . . . . . . . 271

Impounding Order (July 13, 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 274

Exhibits (July 13, 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 285

Sentencing Report for Defendant (July 13, 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 292

**Direct Appeal**
**Report of Proceedings ("SR")**

|  | Direct | Cross | Redir. | Recr. |  |
|---|---|---|---|---|---|
| **Court No. 89-3182** |  |  |  |  | H32 |
| Motion to Quash Arrest and Suppress |  |  |  |  |  |
| Stipulation |  |  |  |  | 115 |
| State Rests |  |  |  |  | 133 |
| Arguments |  |  |  |  |  |
| Defense |  |  |  |  | 134 |
| State |  |  |  |  | 148 |
| **Ruling** |  |  |  |  | 162 |
| Motion to Suppress Statements |  |  |  |  |  |
| Witnesses |  |  |  |  |  |
| Jerome Bogucki | 174 | 183 | 212, 215 | 213, 215 |  |
| Raymond Schalk | 216 | 226 |  |  |  |
| Edmund R. Mook | 234 | 240 |  |  |  |
| Richard Stevens | 246 | 252 |  |  |  |

A-7

**Direct Appeal**
**Report of Proceedings ("SR")**

|  | Direct | Cross | Redir. | Recr. | |
|---|---|---|---|---|---|
| **Ruling** | | | | | 256 |
| **Trial** | | | | | |
| Voir Dire | | | | | 219 |
| Motion in Limine | | | | | 373 |
| Opening Statements | | | | | |
| State | | | | | 382 |
| Defendant | | | | | 390 |
| State's Witnesses | | | | | |
| Ronald Sadlowski | 408 | 416 | 425 | | |
| Officer Ross Marsala | 425 | 438 | | | |
| Officer Dennis Veneigh | 448 | 470 | 480 | 483 | |
| Margaret Fisher | 485 | 497 | 518 | | |
| John Fisher | 534 | 542 | 564 | 567 | |
| Detective Jerome Bogucki | 569 | 606, 623 | 660 | 665 | |
| Robert Davie | 675 | 691 | 703 | 733 | |
| Mary Ann Furlong | 705 | 725 | 758 | | |
| Fern Briggs | 759 | | | | |
| Joe Taylor | 770 | 774 | | | |
| Barbara Tucker | 778 | | | | |
| Michael Chamblis | 786 | 825 | 836 | 836 | |
| Pam Fish | 843 | 874 | 913, 938 | 919, 941 | |
| Defense Witnesses | | | | | |
| Roanld Larry | 976 | 1012 | | | |
| Daniel Larry | 1019 | 1033 | | | |

A-8

**Direct Appeal**
**Report of Proceedings ("SR")**

|  | Direct | Cross | Redir. | Recr. |
|---|---|---|---|---|
| Elizabeth Finuchi | 1038 | 1042 |  |  |
| Daniel Funkhauser | 1044 | 1047 | 1049 |  |
| Thomas Szeszol | 1050 | 1054 | 1060 |  |
| Julia Dillow | 1061 | 1066 |  |  |
| William Brown | 1069 | 1075 |  |  |
| William Kaupert | 1079 |  |  |  |
| Robert Davie | 1104 | 1110 |  |  |
| Pamela Hines | 1113 | 1121 |  |  |
| Henry Kaczmarek | 1129 | 1169 | 1208 | 1216 |
| Defense Rests |  |  |  |  |
| State's Rebuttal |  |  |  | 1233 |
| Thomas Szeszol | 1233 | 1234 |  |  |
| Richard Stevens | 1254 | 1261 | 1271 |  |
| Closing Arguments |  |  |  |  |
| State |  |  |  | 1277 |
| Defendant |  |  |  | 1294 |
| State |  |  |  | 1336 |
| **Verdict** |  |  |  | 1384 |
| Motion for New Trial |  |  |  | 1401 |
| **Ruling** |  |  |  | 1440 |
| **Sentencing Hearing** |  |  |  | 1443 |
| State's Witnesses |  |  |  |  |
| Pamela Hines | 1445 | 1454 |  |  |
| Max Stelle | 1462 | 1468 | 1478 |  |

A-9

**Direct Appeal**
**Report of Proceedings ("SR")**

|  | Direct | Cross | Redir. | Recr. |  |
|---|---|---|---|---|---|
| Edmond J. Reardon | 1479 | 1484 |  |  |  |
| Defense Witnesses |  |  |  |  |  |
| Mary Deslover | 1494 | 1516 |  |  |  |
| Marianne Grieco | 1530 | 1540 |  |  |  |
| Henry Kaczmarek | 1547 |  |  |  |  |
| Closing Arguments |  |  |  |  |  |
| State |  |  |  |  | 1548 |
| Defense |  |  |  |  | 1553 |
| State |  |  |  |  | 1559 |
| **Sentence** |  |  |  |  | 1561 |

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT – CRIMINAL DIVISION

PEOPLE OF THE STATE OF ILLINOIS          )
                                         )
                    VS.                  )          CASE NO. 87CR06131-01
                                         )
____ HENRY KACZMAREK _____ ___    )
                                         )

## CERTIFIED REPORT OF DISPOSITION

The following disposition was rendered before the Honorable Judge
LON SHULTZ ON JUNE 14, 2004 POST CONVICTION PETITION DENIED.

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

hereby certify that the foregoing has been entered of record on the above
ptioned case.

te:   JUNE 21, 2004
_____
          , Clerk of the Circuit Court

CLERK OF THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

POSTCONVICTION.WP

In the Circuit Court of the _____
___ Cook County ____ County, Illinois
(Or in the Circuit Court of Cook County).

RECEIVED

THE PEOPLE OF THE )
STATE )
OF ILLINOIS )
)
v. )
)
)
Henry Kaczmarek )
Defendant/Appellant

JUL 1 3 2004

CLERK OF THE CIRCUIT COURT
CRIMINAL DIVISION
No. 87 CR 06131-01

FILED

JUL 1 3 2004

DOROTHY BROWN
CLERK OF CIRCUIT COURT

Notice of Appeal

An appeal is taken from the order or judgment described below:

(1) Court to which appeal is taken:   First District Appellate Court
_____

(2) Name of appellant and address to which notices shall be sent:
Name: Henry Kaczmarek,  N-95790
Address:  P.O. Box 711 , Menard, IL 62259

(3) Name and address of appellant's attorney on appeal:
Name: Pro-Se
Address:_____
If appellant is indigent and has no attorney, does he want one appointed?
Request Appointment of Appellate Defender

(4) Date of judgment or order:  June 14, 2004

(5) Offense of which convicted:    Murder
_____

(6) Sentence: Natural Life

(7) If appeal is not from a conviction, nature of order appealed from: _____
Petition for Post-Convict Relief 725 ILCS 5/5-122-let. seq.

Signed _Henry Kaczmarek____
(May be signed by appellant, attorney for appellant, or clerk of circuit court)