**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| **HENRY KACZMAREK,** | ) |
| | ) |
| **Petitioner,** | ) |
| | ) |
| **v.** | ) No. 07 C 6126 |
| | ) |
| **DONALD HULICK,** | ) |
| | ) Wayne R. Andersen |
| **Respondent.** | ) District Judge |

**MEMORANDUM OPINION AND ORDER**

This case is before the court on the petition of Henry Kaczmarek for a writ of habeas

corpus pursuant to 28 U.S.C. § 2254. For the reasons set forth below, the petition for habeas

corpus is granted as to Count II and denied as to Counts I and III-VII.

**BACKGROUND**

Following a jury trial in 1989, Henry Kaczmarek was convicted of murder, residential

burglary, home invasion, and armed robbery. *People v. Kaczmarek*, 318 Ill. App. 3d 340, 341,

741 N.E.2d 1131, 1134 (1ˢᵗ Dist. 2000). On March 31, 1993, the Illinois Appellate Court

overturned these convictions, and the case was remanded for a retrial. *People v. Kaczmarek*, 243

Ill. App. 3d 1067, 1082, 613 N.E.2d 1253, 1264 (1993). In 1997, Kaczmarek was again

convicted of murder after a second jury trial. *Kaczmarek*, 318 Ill. App. 3d at 341, 741 N.E.2d at

1134. Factual findings by a state court "shall be presumed to be correct" in a federal habeas

corpus proceeding unless they are rebutted "by clear and convincing evidence." 28 U.S.C.

§ 2254(e)(1). Kaczmarek does not dispute the Illinois Supreme Court's factual findings, thus this

court adopts the following account from the decision of that court in *People v. Kaczmarek,* 207 Ill.2d 288, 798 N.E.2d 713 (2003).

> Defendant was tried for the murder of 86-year-old Millie Nielsen. The evidence indicated that defendant broke into Nielsen's apartment where he stabbed, beat, and strangled her in the course of an attack that apparently started in Nielsen's kitchen and concluded in her bedroom. Defendant took items of minimal value from Nielsen's residence and was later apprehended in possession of some of her bloodstained personal belongings. When he was arrested, officers observed bloodstains on the quilted shirt defendant was wearing, and bloodstained jeans were recovered from the trunk of his car. A witness testified that he had seen defendant in the backyard of Nielsen's apartment building on the night of the murder. The witness saw defendant carry a bag through the backyard, place it in the trunk of his car, and drive away.
> ...
>
> Pamela Fish, an expert in electrophoresis, serology, and DNA analysis, testified to the results of her 1987 examination of the physical evidence. At that time, she determined the blood found on defendant's jacket and jeans was consistent with Nielsen's blood type and could not have come from defendant. Fish determined that the substance on other evidentiary items was human blood, but due to the small quantity provided, she was unable to identify a particular blood type. Prior to defendant's second trial, Fish attempted to perform DNA testing on blood samples collected in this case; however, their small size and degraded condition made testing ineffective.
>
> Rod Englert, an expert in crime scene reconstruction and blood splatter, examined the physical evidence and photographs in the case. Englert stated that the blood on Nielsen's kitchen floor appeared smeared, indicative of a struggle in which someone bled. Englert noted that the blood on the kitchen wall immediately outside the bedroom represented classic medium velocity splatter, suggestive of blunt force being inflicted upon the victim. Given the low angle of projection, Englert believed that Nielsen had received numerous blows while on the kitchen floor. Englert concluded that the blood on the knees of defendant's jeans, and the back of his shirtsleeves, represented transfer stains-blood swiped against something or someone. The blood on the front of defendant's shirtsleeves represented medium velocity splatter. The blood at the bottom of defendant's jeans was also consistent with medium velocity splatter. Englert testified that these stains were not consistent with defendant having picked up a bag with blood on it or with such a bag having been placed on top of clothing. Englert further stated the stains were not consistent with defendant having kneed another person in the nose.
>
> Defendant testified, offering an explanation for the blood on his clothes and his possession of Nielsen's belongings. Defendant claimed he had been involved in three fights prior to the night of Nielsen's murder, and he intimated that the blood on his

clothing had been deposited there during one or more of those altercations. Defendant claimed two of the fights were with his friends, Tom Szeszol and Bill Henderson, while a third fight involved an unidentified man who was attempting to break into defendant's car. In the latter fight, defendant stated, he hit the man three or four times in the face and kneed him in the nose. According to defendant, everyone involved in the fights bled.

As for his possession of Nielsen's bloodstained property, defendant stated he had noticed a bag on the side of Nielsen's apartment building. He looked inside the bag and discovered therein a box of silverware. He picked up the bag, carried it to his car, and placed it in the trunk. Later that morning, defendant decided to look into the bag and removed the bag's contents, some or which were bloody. Defendant kept some items and disposed of others, including a bloody pillowcase, in a Dumpster. Defendant sold some of the items for $60. *Id*. at 291-93, 716-17.

Additional facts were not discussed by the Illinois Supreme Court but were summarized by the Appellate Court in *People v. Kaczmarek*, 318 Ill. App. 3d 340, 741 N.E.2d 1131 (1st Dist. 2000).

Mitch Rea was called by the State as an expert in luminol testing and interpretation. During *voir dire* examination of his qualifications, Rea stated he is an insurance fraud investigator who had previously worked over 26 years as a police officer with the Phoenix Police Department in Arizona. Of his time at the department, Rea spent ten years working as a detective in the homicide unit where he processed over an estimated 350 murder crime scenes. Rea has received training in crime scene investigation and specialized training in chemical blood detection involving luminol.
...

Rea detailed the application and use of the luminol chemical as a detecting agent, and described its glowing effect when it reacts with particular substances, including blood. Rea acknowledged that luminol is not specific to blood and that it reacts with other substances, such as metals and cleansers.

Upon questioning by defense counsel, Rea acknowledged never being educated or trained in the field of chemistry. Rea further admitted that he does not perform any additional testing, like DNA analysis, to ensure the accuracy of results indicating the presence of blood.

Over defendant's objection, Rea was accepted by the court as an expert and testified that he performed luminol tests on defendant's quilted jacket in early 1994. Rea explained that an application of luminol to the right front panel of the jacket produced a bright luminance of several small spots. According to Rea, these luminances indicated the presence of blood. Rea further observed luminances about sections of the jacket which

3

had been previously removed for Fish's examination, the right sleeve and cuff, and both the elbow region and back portion of the left sleeve. Rea stated that each of the foregoing luminances were consistent with the presence of blood. On cross-examination, Rea explained he did not perform any additional tests to confirm that the luminol reactions he observed were in fact reactions to blood.

...

To rebut the testimonies of Rea and Englert, the defense offered Dr. Kenneth Siegusmund as an expert in the fields of luminol processing and blood splatter analysis. During *voir dire,* Dr. Siegusmund testified he holds a Ph.D. and B.S. in biology and an undergraduate minor in chemistry. As his primary employ, Dr. Siegesmund works in the Department of Anatomy at the Medical College of Wisconsin developing a scientific instrument used in the field of immunology. The doctor admitted that this work is unrelated to the forensic science field. Previously, Dr. Siegesmund worked in the Department of Biology at Marquette University in Milwaukee. Dr. Siegesmund additionally teaches a general forensic sciences course at a local university, and has given lectures in the field to law enforcement personnel. Dr. Siegesmund holds memberships in the American Academy of Forensic Scientists, the Midwest American Association of Anatomy, the Neuroloectic Society of America, and the American Association for the Advancement of Science.

...

Responding to the defense's tender of Dr. Siegesmund as an expert, the court remarked that the doctor "appears to be a jack of all trades and [a] master of none." The court specifically commented on Dr. Siegesmund's credibility, stating that "his manner while testifying seemed disingenuous at times" undermining any attempt "to instill some confidence that someone is an expert in some kind of field." Finding the doctor's qualifications lacking, the court refused to accept Dr. Siegesmund as an expert in blood splatter analysis and luminol interpretation. The court, however, allowed Dr. Siegesmund to testify about the manner in which luminol testing is conducted.

Defense counsel did not proceed with Dr. Siegesmund as a witness, but instead made an offer of proof. Counsel explained Dr. Siegesmund would have testified that confirmatory testing is necessary when using luminol as a detecting agent for blood. In this regard, Dr. Siegesmund would have opined that Rea should have performed additional tests to confirm that the areas of luminance on defendant's jacket were in fact indicative of blood and, if so, a test to determine whether that blood was that of defendant. Dr. Siegesmund would have further refuted Englert's conclusions that the blood found on defendant's jacket represented splatter, and would have stated that the blood stains about the knee areas of defendant's jeans were indicative of lateral activity. The doctor would have also stated, contrary to Englert's opinion, that a majority of Ms. Nielsen's blood loss would have occurred prior to her death. On this basis, Dr. Siegesmund would have explained

that the offender would have been covered in blood and, thus, would have likely left bloody shoe prints in the victim's apartment.

Following the presentation of rebuttal evidence by the State and the jury's deliberations, defendant was found guilty of murder and sentenced to a term of natural life imprisonment. *Id.*

The statutory maximum for murder at the time of Kaczmarek's conviction was forty years, with the possibility of a sentence enhancement to natural life if the crime was determined to be "exceptionally brutal or heinous behavior indicative of wanton cruelty." 730 ILCS § 5/5-8-1(a)(1)(b). The trial court judge, who entered judgment prior to the United States Supreme Court's decision in *Apprendi v. New Jersey*, 530 U.S. 446 (2000), found that the crime was brutal and heinous, and therefore enhanced Kaczmarek's sentence for the murder of Millie Nielsen to a natural life term. Kaczmarek directly appealed based on claims that: 1) his constitutional right to a speedy trial had been violated; 2) he was denied a fair trial due to the court's rulings regarding the state's blood splatter evidence (specifically, he claimed that Mitch Rea should not have been accepted as an expert and that Dr. Siegesmund should not have been rejected as an expert); and 3) his sentence enhancement was a violation of *Apprendi*.

On December 27, 2000, the Illinois Appellate Court upheld the trial court's verdict, ruling against Kaczmarek's speedy trial and evidentiary claims, but vacated his natural life sentence stating that the enhancement implemented by the trial court was a violation of *Apprendi*. *Kaczmarek*, 318 Ill. App. 3d at 354, 741 N.E.2d at 1143. The state appealed the vacated sentence and Kaczmarek filed a cross-appeal on the speedy trial claim. On October 2, 2003, the Illinois Supreme Court affirmed the Appellate Court's decision regarding the speedy trial claim, but overturned the Appellate Court's decision regarding the sentence, thus reinstating the sentence of natural life. *Kaczmarek*, 207 Ill.2d at 303, 798 N.E.2d at 723. The Illinois

Supreme Court found that the sentence had been imposed in violation of *Apprendi*, but that Kaczmarek had not carried his burden of showing prejudice under the "plain error" test. *Id.* at 302, 798 N.E.2d at 722. Kaczmarek then filed a writ of certiorari to the Supreme Court of the United States. This writ of certiorari was denied on February 23, 2004. *Kaczmarek v. Illinois*, 540 U.S. 1199 (2004).

On March 24, 2004, Kaczmarek filed a post-conviction petition in the Circuit Court of Cook County claiming that: 1) his right to a fair trial was violated because Pamela Fish had supplied perjured testimony; and 2) he had received ineffective counsel because his attorney failed to challenge the State's luminol testing and blood spatter evidence under *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923). Postconviction petition, *People v. Kaczmarek*, No. 87 CR 6131 (Cir. Ct. of Cook County). The court summarily dismissed the petition on June 14, 2004, holding that the perjury claim did not follow the requirements of Section 122-2 of the Illinois Post-Conviction Hearing Act and that the petition did not present a valid constitutional claim for ineffective counsel. This ruling was affirmed by the Illinois Appellate Court on November 16, 2006. Rule 23 Order, *People v. Kaczmarek*, No. 1-04-2401 (1st Dist. 2006). Kaczmarek then filed a petition for leave to appeal ("PLA") to the Illinois Supreme Court solely regarding the Appellate Court's interpretation of Section 122-2 of the Illinois Post-Conviction Hearing Act. The Illinois Supreme Court denied the PLA on May 31, 2007. Order Denying PLA, *People v. Kaczamrek*, No. 104184. Kaczmarek did not seek review in the United States Supreme Court.

On October 16, 2007, Kaczmarek filed this instant petition for a writ of habeas corpus alleging that: 1) his constitutional right to a speedy trial was violated by the delay between his first and second trials; 2) his sentence enhancement that resulted in a sentence of natural life is

unconstitutional under *Apprendi*; 3) his claim that Pamela Fish committed perjury should not have been summarily dismissed under the Illinois Post Conviction Hearing Act; 4) his counsel was ineffective for failing to challenge the luminol testing and blood splatter evidence under *Frye*; 5) he was denied a fair trial when Dr. Siegesmund was not allowed to testify; 6) the trial court erred in qualifying Mitch Rea as an expert and allowing him to testify on the topic of luminol testing; and 7) he was denied a fair trial because his former girlfriend was not allowed to testify as to an alternative theory regarding the source of the blood on his jacket.

## DISCUSSION

Federal courts can issue a writ of habeas corpus when a petitioner demonstrates that he is in state custody "in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). In order for the federal courts to grant habeas relief, the state court's judgment must be deemed to have "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). The Supreme Court has held that a state court decision is contrary to federal law when "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 413 (2000). A state court decision involves an unreasonable application of a Supreme Court precedent "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.*

## I.    Petitioner's Procedurally Defaulted Claims

In order for a federal court to review the merits of a habeas petition, a petitioner must have "exhausted the remedies available in the courts of the State."  28 U.S.C. § 2254(b)(1)(A).  To avoid procedural default, "a habeas petitioner must have presented fully and fairly his federal claims to the state courts before he may obtain federal review of those same claims."  *Chambers v. McCaughtry*, 264 F.3d 732, 737 (7th Cir. 2001).  "State prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process."  *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999).  In Illinois, a state prisoner does not have a right "to review in the Illinois Supreme Court, but he does have a right … to raise his claims before that court."  *Id*; *see* 28 U.S.C. § 2254(c).  Thus, to complete one round of appellate review, all claims, both on direct appeal and on post-conviction appeal, must be appealed to the Illinois Supreme Court.  *See Lewis v. Sternes*, 390 F.3d 1019, 1025 (7th Cir. 2004)*; O'Sullivan,* 526 U.S. at 848.

### A.    Counts IV, V, VI, & VII are Procedurally Defaulted

#### 1.    Count IV

Kaczmarek's fourth claim alleges that his counsel was ineffective because he failed to present a *Frye* challenge to the blood splatter and luminol testimony at trial.  This claim was presented to the Circuit Court of Cook County court in Kaczmarek's post-conviction petition and was denied.  The Illinois Appellate Court upheld the denial.  *Kaczmarek*, 318 Ill. App. 3d 340, 741 N.E.2d 1131.  However, Kaczmarek did not raise this claim in his post-conviction PLA to the Illinois Supreme Court.  As stated above, in Illinois a complete round of appellate review

must include a PLA to the Illinois Supreme Court. *O'Sullivan,* 526 U.S. at 848. Therefore, this claim is procedurally defaulted.

### 2. Counts V & VI

Count V alleges that Kaczmarek was denied a fair trial because he was not allowed to present Dr. Siegesmund as an expert witness on the topics of blood splatter and luminol testing. In Count VI, Kaczmarek argues that the trial court abused its discretion when it allowed Mitch Rea to testify as an expert witness for the state regarding luminol testing. These two claims were raised on direct appeal and were denied by the Illinois Appellate Court. *Kaczmarek*, 318 Ill. App. 3d 340, 741 N.E.3d 1131. Kaczmarek did not appeal the appellate decision of these claims to the Illinois Supreme Court, nor did he raise them in his post-conviction petition. Accordingly, Counts V and VI are also procedurally defaulted.

### 3. Count VII

Kaczmarek's seventh claim alleges that he was denied a fair trial because his former girlfriend was barred from testifying concerning the source of the blood found on his jacket. This claim was not raised on direct appeal or in Kaczmarek's post-conviction petition, and therefore is procedurally defaulted.

## B.    Counts IV, V, VI, & VII do not Qualify for the Cause and Prejudice Exception

A federal court may address the merits of a procedurally defaulted claim only if the petitioner can establish cause and prejudice. *Dretke v. Haley*, 541 U.S. 386, 388 (2004); *Daniels v. Knight*, 476 F.3d 426, 430 (7th Cir. 2007). The Supreme Court defines "cause" under this test to mean some external factor to the petitioner which is both beyond his control and which cannot be attributed to him. *Murray v. Carrier,* 477 U.S. 478, 488 (1986). It should be

noted that "there is no right to effective counsel in post-conviction hearings" and therefore counsel's failures cannot be used to show cause for omissions made at this stage. *Pitsonbarger v. Gramley*, 141 F.3d 728, 737 (7th Cir. 1998); *see* 28 U.S.C. § 2254(I). To establish "prejudice" under this test, the petitioner must show errors that not merely created a possibility of prejudice, but that created "actual prejudice." *Murray*, 477 U.S. at 494. As set forth below, Kaczmarek fails to establish cause or prejudice for Counts IV, V, VI or VII.

*1.     Petitioner Fails to Establish Cause*

First, Kaczmarek fails to establish cause for any of his procedurally defaulted claims. In Count IV, Kaczmarek alleges that he received ineffective counsel because his attorney did not present a *Frye* challenge at trial. However, Kaczmarek does not establish cause for omitting this claim in his PLA to the Illinois Supreme Court. Additionally, Kaczmarek does not offer any cause for failing to raise the arguments set forth in Counts V and VI upon his first appeal to the Illinois Supreme Court. Kaczmarek could argue that this omission was due to ineffective counsel since he has a right to effective counsel upon direct appeal. However, for this cause to be valid, the claim of ineffective counsel must have passed a round of state appeal itself. Because Kaczmarek never claimed ineffective counsel as a cause for his omission of claims five and six from his initial appeal to the Illinois Supreme Court in any of his post-conviction petitions, he is barred from using these claims as cause in this habeas petition. Finally, Kaczmarek does not establish cause for not raising his claim in Count VII at any point in the appeal process.

## 2.    Petitioner Fails to Establish Prejudice

Kaczmarek also fails to establish prejudice for any of his procedurally defaulted claims. With respect to Count IV, the lack of a *Frye* hearing did not create actual prejudice. There is no reason to believe that the trial court would have barred the testimony regarding luminol testing or blood spatter had it held a *Frye* hearing since neither were novel scientific techniques. *People v. Cumbree*, 366 Ill. App. 3d 476, 491-98, 851 N.E.2d 934, 946-950 (2d Dist. 2006) (stating that scientific evidence is admissible "if the methodology or scientific principle upon which the expert's opinion is based is sufficiently established" and that only a novelty would require a *Frye* hearing to determine if a methodology is established). Furthermore, Illinois courts have since upheld the use of expert testimony regarding blood spatter and luminol testing. *See, e.g.*, *id*. (holding that luminol testing is generally accepted in the scientific community); *People v. Evans*, 369 Ill. App. 3d 366, 377, 859 N.E.2d 642, 651 (4th Dist. 2006) (holding that blood splatter is "generally accepted within the scientific and law-enforcement communities"). Additionally, luminol testing was not necessary to establish that blood was on Kaczmarek's clothes and on the items that were in his possession because large amounts were plainly visible to police at the time of his arrest.

Kaczmarek also fails to establish prejudice for Counts V, VI, or VII. An evidentiary decision is deemed to be prejudicial "only when that ruling violated the defendant's right to due process by denying him a fundamentally fair trial." *Milone v. Camp*, 22 F.3d 693, 702 (7th Cir. 1994). The trial court applied Illinois evidentiary law to determine that: 1) Dr. Siegesmund could not testify as an expert; 2) Mitch Rea could testify as an expert; and 3) Kaczmarek's former girlfriend could not testify as to the how blood got onto Kaczmarek's jacket. As

discussed, luminol testing was helpful but not essential to the state's proof that blood existed on

Kaczmarek's clothes and on items in his possession at the time of his arrest. Petitioner's former

girlfriend only could have testified to a small portion of the blood found (the blood on the jacket)

and thus could not have explained the other vast amounts of blood. Additionally, the Illinois

Appellate Court rejected the allegations in Counts V and VI when hearing them on appeal, thus

supporting the conclusion that the trial courts' decisions were correct and not prejudicial to

Kaczmarek. There is no evidence that any of these decisions led to a "fundamentally unfair

trial," and therefore prejudice is not established with respect to Counts V, VI or VII.

### C. Counts IV, V, VI, & VII do not Qualify for the Miscarriage of Justice Exception

The federal court may grant an exception to the cause and prejudice rule if "petitioner

can demonstrate a sufficient probability that our failure to review his federal claim will result in

a fundamental miscarriage of justice." *Edwards v. Carpenter*, 529 U.S. 446, 451 (2000). This

exception is limited to the extraordinary circumstances in which the petitioner is innocent of the

crime for which he is imprisoned. *Bell v. Pierson*, 267 F.3d 544, 551 (7th Cir. 2001). In order

for the miscarriage of justice exception to apply, the petitioner must "show that it is more likely

than not that no reasonable juror would have convicted him in the light of the new evidence."

*Schlup v. Delo*, 513 U.S. 298, 327 (1995). Counts IV, V, VI, and VII all allege evidentiary

ruling errors. However, even if Dr. Siegesmund and Kaczmarek's former girlfriend were

allowed to testify, the evidence against Kaczmarek is so overwhelming, so that it is nearly

certain that a reasonable juror still would have convicted him. Similarly, if the luminol evidence

and the testimony of Mitch Rea were excluded, it is likely that a reasonable juror would still find

Kaczmarek guilty of murder based on the other evidence presented at trial, such as a witness

placing him in the victim's backyard and his possession of the victim's bloody property. Therefore, petitioner has failed to demonstrate that the miscarriage of justice exception applies. Accordingly, Counts IV, V, VI, and VII are procedurally defaulted and this court is barred from reviewing them on the merits.

## II.     Count III does not Present a Cognizable Claim

Count III of Kaczmarek's habeas petition argues that his claim that Pamela Fish committed perjury should not have been summarily dismissed by the Illinois Appellate Court under the Illinois Post Conviction Hearing Act. This count asks this court to reconcile an alleged conflict between the rulings of two districts of the Illinois Appellate Court. Kaczmarek's state court post-conviction petition, which alleged that Pamela Fish had committed perjury, was supported by four newspaper articles. The Circuit Court and the First District of the Illinois Appellate Court held that newspaper articles are not "affidavits" under Section 122-2 of the Illinois Post-Conviction Hearing Act, and therefore Kaczmarek had not met the requirements to survive summary dismissal. Kaczmarek claims that the Fourth District of the Illinois Appellate Court allows newspaper articles to satisfy the requirements of Section 122-2 and he would like this alleged conflict to be resolved. The resolution of a conflict between two Illinois Appellate Court districts is a question of state law and therefore "does not present a cognizable claim for federal habeas relief." *Dellinger v. Bowen*, 301 F.3d 758, 764 (7th Cir. 2002); *see* 28 U.S.C. § 2254(d)(1).

Furthermore, there were no constitutional claims attached to the testimony of Pamela Fish raised in Kaczmarek's petition for leave to appeal to the Illinois Supreme Court. Therefore, any possible constitutional claim is procedurally defaulted and subject to the standards regarding

defaulted claims expressed above. This court does not find a constitutional claim that would warrant the cause and prejudice exemption or demonstrate a miscarriage of justice. Accordingly, this court is barred from reviewing the merits of any possible claim associated with the testimony of Pamela Fish.

III.    **Claims Subject to Review on the Merits**

Federal habeas relief can be granted if, after a full round of appellate review, a state court's adjudication of a claim "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

A.    **Count I: Speedy Trial Claim**

Count I alleges that Kaczmarek was denied his Sixth Amendment right to a speedy trial. This claim was successfully presented for a full round of appellate review because it was appealed to both the Illinois Appellate Court and the Illinois Supreme Court. We find that the state courts' rulings were not contrary to federal law or an unreasonable determination of the facts. Accordingly, the first claim of Kaczmarek's petition is denied.

In evaluating Kaczmarek's speedy trial claim, the Illinois Supreme Court identified and listed the four part test set forth in *Barker v. Wingo*, 407 U.S. 514 (1972). The four factors are: "[l]ength of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant." *Barker*, 407 U.S. at 530. Kaczmarek does not challenge that this is the proper

United States Supreme Court precedent, and thus the Illinois Supreme Court did not adjudicate this claim "contrary to" federal law.

Furthermore, the Illinois Supreme Court's application of *Barker* was not unreasonable. The first part of the *Barker* test requires the court to look at the length of the delay. *Id.* The court determined that the long delay in this case should be deemed presumptively prejudicial, thus triggering a full *Barker* inquiry. *Kaczmarek*, 207 Ill.2d at 295, 798 N.E.2d at 718. The second part of the *Barker* test requires the court to analyze the reasons for the delay. *Barker*, 407 U.S. at 530. The court found that the majority of the delay could be attributed to the actions of Kaczmarek and his counsel, who requested the delays in order to better prepare for trial. *Kaczmarek*, 207 Ill.2d at 297, 798 N.E.2d at 719. The third *Barker* factor addresses the defendants's assertion of his right to a speedy trial. *Barker*, 407 U.S. at 530. The court found that Kaczmarek's counsel prevented the assertion of his right to a speedy trial during a majority of the delay because they were not prepared for trial. Thus, the court held that Kaczmarek is bound to the decisions of his counsel, and is deemed not to have sufficiently asserted his rights throughout the delay. *Kaczmarek*, 207 Ill.2d at 297-299, 798 N.E.2d at 719-720. The final factor of the *Barker* test requires the court to determine if there is any prejudice against the defendant as a result of the delay. *Barker*, 407 U.S. at 432. The Illinois Supreme Court found that there was no prejudice to Kaczmarek resulting from the delay because the evidence presented at the first trial was nearly identical to the evidence presented at the second trial and the delay did not prevent Kaczmarek from presenting his defense. *Kaczmarek*, 207 Ill.2d at 300, 798 N.E.2d at 721. Thus, the Illinois Supreme Court reasonably applied the applicable United

States Supreme Court precedent.  Therefore, this court denies habeas relief based upon Kaczmarek's speedy trial claim.

### B.    Count II: *Apprendi* Claim

Kaczmarek's second claim alleges that his sentence of a natural life term was in violation of *Apprendi v. New Jersey*, 530 U.S. 466 (2000).  *Apprendi* requires any aggravating factor that can be used to enhance a sentence above the statutory maximum to be presented to the jury.  *See United States v. Knight*, 342 F.3d 697, 711 (7th Cir. 2003).  Illinois law allowed Kaczmarek's sentence to be enhanced from the statutory maximum of forty years to a term of natural life if the crime was determined to be "exceptionally brutal or heinous behavior indicative of wanton cruelty." 730 ILCS § 5/5-8-1(a)(1)(b).  At the time the trial judge sentenced Kaczmarek, the United States Supreme Court had not yet decided *Apprendi*, so the judge determined that the crime was brutal and heinous without presenting this question to the jury and enhanced Kaczmarek's sentence from forty years to natural life.  *People v. Kaczmarek*, 318 Ill.App.3d 340, 341, 741 N.E.2d 1131, 1134 (1st Dist. 2000).  The Illinois Appellate Court, deciding the case after the United States Supreme Court's decision in *Apprendi*, found that the trial judge's enhanced sentence was a violation of *Apprendi*, but the Illinois Supreme Court reversed the Illinois Appellate Court on that issue.  *Id.* at 354, 1143; *aff'd in part and rev'd in part*, 207 Ill.2d 288, 304, 798 N.E.2d 713, 723 (2003).  The Illinois Supreme Court correctly identified that *Apprendi* was the controlling United States Supreme Court precedent that should be followed because Kaczmarek's sentence was on direct appeal at the time that *Apprendi* was decided. *White v. Battaglia*, 454 F.3d 705, 706 (7th Cir. 2006).  Furthermore, all parties agree that *Apprendi* applies here.  However, as explained below, we disagree with the Illinois Supreme

Court's holding that Kaczmarek's sentence should be upheld and believe that Kaczmarek is entitled to be resentenced because the fact that the "brutal and heinous" element of his crime was not presented to the jury undermines the right of every criminal defendant to a jury trial. Accordingly, we are compelled to grant Kaczmarek's petition for habeas corpus with respect to Count II.

### 1.    *Illinois Appellate Court's decision*

The Illinois Appellate Court carefully considered the *Apprendi* opinion and the case law applying *Apprendi* and determined that *Apprendi* applied to the circumstances in this case. First, the Court stated that "the *Apprendi* Court explicitly recognized for the first time that an accused criminal had the constitutional right to have any statutory enhancement fact that, if found, increases the penalty for a crime beyond the prescribed maximum to be treated as an element of the underlying offense." *Kaczmarek*, 318 Ill. App. 3d at 344, 741 N.E.2d at 1137-38. Further, the Appellate Court held as follows,

> [T]he question of whether a particular murder was accompanied by 'exceptionally brutal or heinous behavior' necessarily involves an examination of, and is based upon, the factual circumstances presented by the evidentiary proofs. Further, a court's finding that a murder was accompanied by such behavior significantly increases the statutory maximum penalty from a term of 40 years' imprisonment to a term of natural life. Based on the foregoing, the 'exceptionally brutal or heinous' inquiry presented by section 6-8-1(a)(1)(b) is most accurately characterized for constitutional purposes as an element of a greater crime, rather than a mere factor to be considered at sentencing. Accordingly, if the State wishes to seek an enhanced sentence for murder on the grounds that the offense was 'exceptionally brutal or heinous.,' it must allege the factual circumstance in the relevant charging instrument and prove it to the jury beyond a reasonable doubt.
>
> ...
>
> Considering the merits of defendant's challenge, the crime of murder as defined in section 9-1 of the Criminal Code did not require a finding by the jury that defendant's conduct accompanying the victim's murder was 'exceptionally brutal or heinous.' It is of no surprise then that the State's charging instruments make no mention of such

circumstances. Further, the record is clear that defendant's jury made no finding concerning the nature of the victim's murder and specifically reveals that the jurors never considered and passed on the question of whether defendant acted brutally or heinously.

The highest punishment defendant could receive based solely on the facts reflected by the jury's verdict was the maximum of 40 years' imprisonment. The jury's verdict authorized no greater penalty. Only once the sentencing judge, proceeding under a relaxed evidentiary standard, found an additional factual circumstance related to the crime did defendant become subject to a prison term well in excess of the maximum. That procedure, as *Apprendi* dictates, offends constitutional principles and is invalid as applied to defendant in this case. *Id.* at 353, 741 N.E.2d at 1143.

Therefore, "[s]ince the State never alleged and proved to the jury beyond a reasonable doubt that the defendant acted in an 'exceptionally brutal or heinous' fashion when he murdered the victim," the Appellate Court vacated Kaczmarek's sentence and remanded it to the trial court. *Id.* In doing so, the Appellate Court did not undertake an analysis of whether the plain error or harmless error test should be applied to the *Apprendi* violation. The State then appealed the Appellate Court's decision to the Illinois Supreme Court, and the Supreme Court reversed the Appellate Court.

       *2.*       *Illinois Supreme Court's decision*

During the time between the Illinois Appellate Court's decision and the Illinois Supreme Court's decision in this case, several Illinois Supreme Court decisions considered the question of whether an *Apprendi* violation could be considered harmless or plain error, a question that had not been addressed by the Supreme Court in *Apprendi*. The Illinois Supreme Court specifically cited to three of its decisions in its opinion in Kaczmarek's case. *See People v. Thurow*, 203 Ill.2d 352, 786 N.E.2d 1019 (2003); *People v. Swift*, 202 Ill.2d 378, 781 N.E.2d 292 (2002); *People v. Crespo*, 203 Ill.2d 335, 788 N.E.2d 1117 (2001) (Supplemental Opinion Upon Denial of Rehearing issued in 2003).

In *Swift*, the defendant was convicted of first degree murder after a jury trial. The evidence at trial showed that the defendant stabbed the victim 21 times, resulting in his death. *Swift*, 202 Ill.2d at 379, 781 N.E.2d at 293. The trial judge, who sentenced the defendant prior to the *Apprendi* decision, determined that the crime was "exceptionally brutal and heinous" and enhanced defendant's sentence to 80 years (at that time the maximum term was 60 years absent that finding), without presenting the question to a jury. *Id.* The Illinois Appellate Court affirmed Swift's conviction, but vacated his enhanced sentence. *Id.* Kaczmarek then appealed and the Illinois Supreme Court affirmed the Appellate Court decision and remanded the case to the trial court for resentencing. *Id.* The Court did not engage in an analysis of whether the error was harmless or not, but simply stated that, because the defendant's enhanced 80-year sentence was based on the trial judge's factual finding that the behavior was exceptionally brutal or heinous, it violated *Apprendi* and could not stand. *Id.* at 392, 781 N.E.2d at 300.

> We conclude that for purposes of *Apprendi* analysis, the "sentencing range" for first degree murder in Illinois is 20 to 60 years' imprisonment. This is the only range of sentence permissible based on an ordinary jury verdict of guilt. Although there is statutory authorization for higher sentences to be imposed...any sentence longer...requires additional factual findings. According to *Apprendi*, any factual findings which take a sentence above the sentencing range must be proven to a jury beyond a reasonable doubt. In this case, the factual finding that defendant's crime was brutal and heinous was made by the circuit court, and the State was not held to the appropriate burden of proof. Accordingly, defendant's sentence cannot stand. *Id.*

In *Thurow*, a jury found the defendant guilty of involuntary manslaughter for suffocating her roommate's baby. *Thurow*, 203 Ill.2d at 354, 786 N.E.2d at 1020. The sentencing range for involuntary manslaughter in Illinois at that time was two to five years. *Id.* at 360, 786 N.E.2d at 1024. The judge concluded that the defendant was eligible for an enhanced sentence because the victim was a member of her household and because of the victim's young age. *Id.* at 354, 786

N.E.2d at 1020.  Accordingly, the judge sentenced the defendant to eight years in prison.  *Id.*

Defendant appealed, and the Illinois Appellate Court found that the enhanced sentence violated

*Apprendi* because there was no specific jury finding that the victim was a member of defendant's

household and the victim's age was not a question before the jury.  *Id.* at 359-60, 786 N.E.2d at

1023.

The Illinois Supreme Court affirmed the Appellate Court's decision that the enhanced

sentence was an error, and then launched into an analysis of whether an *Apprendi* violation could

be considered harmless error, as well as a discussion about the differences between the test for

harmless error and the test for plain error.  The Court explained that the two inquiries are similar;

however, there is an important difference between them.  *Thurow*, 293 Ill.2d at 363, 786 N.E.2d

at 1025 (citing *United States v. Olano*, 507 U.S. 725, 734 (1993)).  A harmless error inquiry is

undertaken when the defendant has made a timely objection, and the burden is on the state to

"prove beyond a reasonable doubt that the jury verdict would have been the same absent the

error."  *Thurow*, 293 Ill.2d at 363, 786 N.E.2d at 1025 (citing *Neder v. United States*, 527 U.S. 1,

19 (1999); *Chapman v. California*, 386 U.S. 18, 24 (1967)).  A plain error inquiry, however, is

undertaken when a defendant has failed to make a timely objection at trial, in which case the

burden is on the defendant to prove prejudice due to the error.  *Thurow*, 293 Ill.2d at 363, 786

N.E.2d at 1025 (citing *Olano*, 507 U.S. at 734).

The Court in *Thurow* determined that the harmless error analysis was the correct analysis

to be applied, and that the state had met its burden of demonstrating that the *Apprendi* violation

did, in fact, meet the standard for harmless error.  *Thurow*, 293 Ill.2d at 371, 789 N.E.2d at 1030.

Accordingly, the Illinois Supreme Court affirmed the eight year sentence.  *Id.*  In doing so, the

Court questioned the potential encroachment on the defendant's right to a jury trial, but stated that the United States Supreme Court's opinion in *Neder*, which states that a jury instruction that omitted an element of the offense could be subject to harmless-error review, is the most direct authority the Court had, and the Court felt compelled to follow that authority. *Id.* at 370-71, 786 N.E.2d at 1029.

In *Crespo*, the defendant was convicted of first degree murder following a jury trial. He also was convicted of one count of armed violence and two counts of aggravated battery. *Crespo* 203 Ill.2d at 337, 788 N.E.2d at 1118. The convictions were based upon Crespo's brutal and fatal stabbing of his wife, as well as the stabbing of his stepdaughter. *Id.* He was sentenced to 75 years imprisonment for the murder, 30 years for armed violence and five years for aggravated battery, all of which were to be served concurrently. *Id.* The Illinois Supreme Court originally issued an opinion regarding defendant's appeal in 2001, which is not relevant to the *Apprendi* analysis. However, the Illinois Supreme Court issued a Supplemental Opinion Upon Denial of Rehearing in 2003 that addressed *Apprendi* and modified its original opinion. *Id.* at 346, 788 N.E.2d at 1123. On rehearing, the defendant claimed that his enhanced 75 year sentence was a violation of *Apprendi* (the maximum sentence for first degree murder at that time was 60 years) because it was based on the trial judge's finding that the crime was brutal and heinous. *Id.* In its opinion, the Illinois Supreme Court determined that the plain error analysis was the correct analysis (as opposed to the harmless error analysis) because the defendant had failed to object at trial. *Id.* at 347, 788 N.E.2d at 1124 (citing *United States v. Cotton*, 535 U.S. 625 (2002), which applied the plain error test because defendant did not object at trial even

though *Apprendi* was not decided until after defendant was convicted). Accordingly, the Court

stated,

> The undisputed forensic evidence established that defendant attacked his victim with a
> kitchen knife with an eight-inch-long blade. He stabbed her repeatedly about the head,
> neck, and body, inflicting a total of 24 stab wounds. He used such force that after his
> assault the knife blade was bent at a 90-degree angle. While he was stabbing her,
> defendant held his victim by her hair, yanking it with sufficient severity to rip out a large
> clump of hair with the scalp still attached. On the basis of this overwhelming evidence
> that the crime was brutal and heinous, there is no basis for concluding that the *Apprendi*
> violation 'seriously affected the fairness, integrity or public reputation of judicial
> proceedings.' We have no doubt that a jury, presented with these facts, would have
> found the crime was committed in a brutal and heinous manner, indicative of wanton
> cruelty. Accordingly, defendant has failed to show that the error was prejudicial.
> ...
> Although the procedure followed by the circuit court in sentencing defendant did violate
> *Apprendi*, we conclude that the error did not rise to the level of plain error. *Id.* at 348-49,
> 1124-25.

The Illinois Supreme Court in Kaczmarek's case used the plain error analysis and the

*Crespo* decision to support its holding that the *Apprendi* violation in Kaczmarek's case did not

warrant resentencing. The Illinois Supreme Court stated that the *Crespo* decision "held that the

virtually identical *Apprendi* error, that had warranted reversal in *Swift*, was not plain error that

would warrant reversal" because the defendant did not show that the error was prejudicial.

*Kaczmarek*, 207 Ill.2d at 302, 798 N.E.2d at 722. Accordingly, the Illinois Supreme Court found

that while there was

> no doubt that the sentencing judge in Kaczmarek's case violated principles of
> *Apprendi* when he sentenced him to an enhanced term of natural life based upon *his*
> finding that the murder was committed in a brutal and heinous manner indicative of
> wanton cruelty...it is equally clear...that an *Apprendi* violation of this kind will not
> warrant resentencing where there is overwhelming evidence that the crime was
> committed in a brutal and heinous manner indicative of wanton cruelty. *Id.*

Furthermore, "[t]he conduct of the defendant in this instance qualifies as exceptionally brutal and heinous behavior indicative of wanton cruelty under *any* definition. Thus, defendant-who failed to object at trial-cannot demonstrate prejudice for purposes of plain error analysis." *Id.* The Court then discussed the physical evidence of the wounds that covered Ms. Nielsen's body, as well Dr. Chambliss' testimony that there had been a prolonged struggle throughout Ms. Neilsen's home at the time of the murder as further support for the argument that this murder was clearly brutal and heinous. *Id.* at 302-03, 798 N.E.2d at 722-23. Further, the Court, possibly attempting to fashion the standard as an objective one rather than a subjective one, then went on to quote cases defining "heinous" (behavior that is hatefully or shockingly evil; grossly bad; enormously and flagrantly criminal); brutal (behavior that is grossly ruthless, devoid of mercy or compassion; cruel and cold-blooded), and "wanton cruelty" (requires proof that the defendant consciously sought to inflict pain and suffering on the victim of the offense). *Id.* at 303, 798 N.E.2d at 723. Finally, the Court found,

> [t]he senseless, vicious murder of this elderly woman, effected by means of beating, stabbing and strangling, in order to perpetrate a robbery that could have been easily accomplished without killing her, undoubtedly qualifies as exceptionally brutal and heinous behavior. The manner of the murder clearly indicated that the defendant consciously inflicted unnecessary mental and physical suffering on his victim, indicative of wanton cruelty. Accordingly, we find that the failure to comply with the dictates of *Apprendi* does not require resentencing. *Id.* at 303-04, 798 N.E.2d at 723.

Accordingly, the Illinois Supreme Court reversed the portion of the Appellate Court's decision that directed that Kaczmarek be resentenced. *Id.*

### 3. Federal Court Precedent

Although several federal court cases, including cases within the Seventh Circuit, have declined to vacate sentences imposed in violation of *Apprendi* by reasoning that the *Apprendi*

violation constituted harmless error or that it did not rise to the level of plain error, the facts of those cases differ from the facts at issue here. In prior cases when the *Apprendi* violation was deemed to be harmless error or an error that did not meet the standard for plain error, the jury already had found the requisite facts needed for the enhancement, even though it had not made a specific finding as to those facts, or the reviewing court found an alternative basis to uphold the enhanced sentence. Furthermore, the determination with respect to whether the facts as submitted to the jury qualified the defendant for an enhanced sentence was not a ***subjective*** determination.

For example, in *Washington v. Recuenco*, 548 U.S. 212 (2006), the United States Supreme Court found that it was harmless error for the trial court to have applied a three year firearm enhancement to defendant's sentence even though the jury did not specifically find that the defendant had engaged in assault with a firearm because the jury had made a specific finding that the defendant committed assault with a deadly weapon, and a firearm qualified as a deadly weapon under the relevant law. *Recuenco*, 548 U.S. at 221-222. Further, in *Mitchell v. Esparza*, 504 U.S. 12 (2004), the Supreme Court found that the Ohio Court of Appeals' decision was not an "unreasonable application of clearly established Federal law" in finding harmless error when the jury did not specifically name the defendant as the principal offender, but the evidence indicated he was the only offender at the scene of the crime. *Mitchell*, 540 U.S. at 18. The Court stated, "we have often held that the trial court's failure to instruct a jury on all of the statutory elements of an offense is subject to harmless-error analysis." *Id.* at 16.

Additionally, several cases within the Seventh Circuit have held that the failure to charge drug quantity in the indictment or the charge to the jury are subject to a harmless error (or plain

error) analysis. For example, in *United States v. Adkins*, 274 F.3d 444 (7th Cir. 2001), the Court held the error was harmless when the jury found the defendant guilty of drug transactions involving pounds of methamphetamine, but did not specifically address the quantity in dispute, which needed to be over 100 grams, because it was clear from the overwhelming evidence that the amount exceeded that threshold. *Adkins*, 274 F.3d at 454. In *United States v. Martinez*, 258 F.3d 582 (7th Cir. 2001), the Court held that the defendant's failure to object to the fact that the indictment and the charge to the jury failed to state the drug quantity meant that the Court would review the defendant's sentence for plain error. *Martinez*, 258 F.3d at 586. Therefore, because the Presentence Report determined that the defendant was responsible for nearly 200 times the amount of cocaine base necessary to obtain a life sentence, the Court stated that "when there is overwhelming evidence presented as to the minimum quantity of drugs necessary to sustain the sentence imposed, we have found that the error is not so serious that it requires us to set aside the judgment." *Id.* Finally, in *United States v. Nance*, 236 F.3d 820 (7th Cir. 2000), the Court stated that whether it reviewed defendant's *Apprendi* challenge for plain or harmless error, the result was the same because the evidence was so overwhelming that the amount of drugs involved far exceeded the amount necessary to qualify for an enhanced sentence, and "if this jury was going to convict [the defendant] at all – which it plainly did – there is simply no way on this record that it could have failed to find that he was conspiring to distribute 5 grams or more of crack cocaine." *Nance*, 236 F.3d at 826.

In this case, although the jury found that Kaczmarek killed 86 year old Millie Nielsen by severely beating her, stabbing her multiple times, and eventually strangling her, the case is unlike the abovementioned drug cases because the determination of whether the murder qualifies

as "brutal and heinous" is necessarily a subjective one. This court is aware of one case in this district in which the court found that a sentence enhancement in similar circumstances constituted plain error under *Apprendi*, but upheld the sentence enhancement on the grounds that the defendant had not met his burden of proof with respect to the plain error analysis. In *United States ex rel. White v. Briley*, No. 03 C 1897, 2004 U.S. Dist. LEXIS 7396 (N.D. Ill. April 28, 2004), the court considered the defendant's petition for habeas corpus. *White*, 2004 U.S. Dist. LEXIS 7396, at *10. The trial court had enhanced the defendant's sentence to 80 years based on his "heinous and brutal conduct" after the defendant had pled guilty to first degree murder, which had statutory maximum sentence of 60 years, but could be enhanced if "the court found by a preponderance of the evidence that the offense was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty." *Id.* at *2. After first determining that the trial court had violated *Apprendi* in imposing the sentence enhancement because the "exceptionally brutal and heinous" finding was not charged prior to his guilty plea, the district court, relying primarily on *Crespo*, found that even though the *Apprendi* violation rose to the level of plain error, the defendant had not met his burden of demonstrating prejudice. *Id.* at *10-11. Therefore, in effect, the error was harmless. In support of its holding, the court listed the facts of the case, stating, "[t]he undisputed testimony shows that after plunging (and breaking) a knife deep into the back of [the victim], [the defendant] then stabbed and slashed [her] throat repeatedly, with significant brutality to sever the jugular vein and carotid artery." *Id.* at *10. The court then held,

> In light of this record, this Court is certain that had the trial court been asked to find that [the defendant's] crime was brutal and heinous using a reasonable doubt standard, it would not have hesitated to find so. Accordingly, [the defendant] cannot show that he was prejudiced in any fashion by the *Apprendi* error, nor can

there be any showing that any error seriously affected the fairness, integrity or public reputation of the judicial proceedings. *Id.*

However, when this decision was appealed, the Seventh Circuit declined to affirm the district court's decision based on its *Apprendi* analysis, but rather affirmed the court's decision on other grounds. *White v. Battaglia*, 454 F.3d 705, 707 (7th Cir. 2006) (upholding the sentence enhancement to natural life, but finding that *Apprendi* did not apply because the defendant was correctly found eligible for the death penalty and thus the defendant did not receive above the statutory maximum sentence).

### 4. *Application of* Apprendi *to Kaczmarek's case*

This court has great respect for the Illinois Supreme Court and understands the grounds on which its decision was made, especially given the extreme cruelty demonstrated by the facts of this case. However, we believe that we have an independent responsibility to apply federal law to the best of our ability. After a careful analysis of *Apprendi* and its progeny, we are compelled to grant Kaczmarek's habeas petition with respect to Count II.

In conducting our analysis, we find the opinions set forth by the Illinois Supreme Court in *Swift*, as well as the reasoning set forth by the Illinois Appellate Court in Kaczmarek's case, to be reasonable and persuasive. In both of these cases, the Court determined that the violation of *Apprendi* required the defendant's sentence to be vacated without a prolonged analysis of whether to apply the harmless error or plain error test. *Swift*, 202 Ill.2d 378, 781 N.E.2d 292; *Kaczmarek*, 318 Ill.App.3d 340, 741 N.E.2d 1131. We believe that these decisions were made correctly and concur with their reasoning. Regardless of whether the harmless or plain error test is applied, the fact that the trial judge proceeded under a relaxed evidentiary standard in finding that Kaczmarek's crime was "exceptionally brutal and heinous" violates constitutional principles

and a straightforward application of *Apprendi* mandates that Kaczmarek be resentenced. We simply are not comfortable with finding that, even though a necessarily subjective determination was not submitted to the jury, it did not prejudice the defendant. Accordingly, we hold that under *Apprendi* such subjective decisions cannot be made by the judge. Depriving Kaczmarek of his right to have a jury decide this issue undermined his fundamental right to a jury trial. Although we believe that the facts of this case are indicative of extreme cruelty, whether the crime was actually brutal and heinous is not the issue before this court. Rather, the issue is Kaczmarek's right to have a jury make that determination. Therefore, although we are reluctant to grant this petition and empathize with members of the victim's family who may be understandably distressed by this decision, we believe that there is an overriding judicial principle that necessarily leads us to this conclusion.

With respect to the determination that the *Apprendi* violation did not warrant resentencing, we find that the Illinois Supreme Court's decision was contrary to federal law as set forth in *Apprendi*, and Kaczmarek's habeas petition should be granted on this basis. Accordingly, we remand this case to the state court to resentence Kaczmarek within 180 days of the date of this order.


## **CONCLUSION**

For the foregoing reasons, we grant Henry Kaczmarek's § 2254 petition for a writ of habeas corpus [1] as to Count II, and deny the petition with respect to Counts I and III-VII. Furthermore, we certify this case to the Court of Appeals pursuant to 28 U.S.C. § 2253(c) on the grounds that the question of whether Kaczmarek's enhanced sentence violated *Apprendi*, set

forth in Count II of Kaczmarek's petition, is a substantial constitutional question. Finally, Kaczmarek filed a motion for appointment of counsel which we denied without prejudice on November 19, 2007. In light of the foregoing decision, we now grant Kaczmarek's motion for appointment of counsel [3] and appoint the office of the Federal Defender Program to represent Kaczmarek in further proceedings related to this case. This is a final and appealable order, and this case is hereby terminated.

It is so ordered.

_____
Wayne R. Andersen
United States District Judge

Dated: February 9, 2009